# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NOVAFUND ADVISORS, LLC,

    Plaintiff,

    v.

CAPITALA GROUP, LLC,

    Defendant.

No. 3:18-cv-1023 (MPS)

## RULING ON MOTION FOR PREJUDGMENT REMEDY AND MOTION FOR DISCLOSURE

In this contractual dispute between two financial services firms, the plaintiff, NovaFund Advisors, LLC ("NovaFund"), filed a motion seeking a prejudgment remedy against the defendant and counterclaim plaintiff, Capitala Group, LLC ("Capitala"), together with a motion for disclosure of assets. I held an evidentiary hearing on the motion for prejudgment remedy on March 28, 2019. This ruling sets forth my findings of fact and conclusions of law.

As set forth more fully below, I find that there is not probable cause to believe that a judgment in the amount sought by NovaFund – over $8.5 million – will be rendered in its favor, but that there is probable cause that a judgment in the amount of $250,000, taking into account defenses, counterclaims, and setoffs, will be rendered in its favor. Specifically, there is probable cause to believe that a $250,000 judgment will be rendered in favor of Novafund on its claim for breach of the covenant of good faith and fair dealing, and there is not probable cause to believe that any specific amount will be rendered in favor of Capitala on its counterclaims. NovaFund has demonstrated probable cause that, as the placement agent for Capitala's investment fund, it would have earned additional fees of $250,000 had Capitala not taken steps to frustrate and undermine the objectives of the agreement between the parties. These fees would have been generated by a large investment made into the fund by an investor courted by NovaFund, and from which Capitala

1

later unilaterally obtained a substantial investment outside the fund without NovaFund's knowledge. There is also probable cause to find that Capitala acted in bad faith. Accordingly, I GRANT IN PART and DENY IN PART the motion for prejudgment remedy (ECF No. 15) and GRANT the motion for disclosure of assets (ECF No. 19).

## I.    Legal Standard

### A.    Prejudgment Remedy

Fed. R. Civ. P. 64(a) provides in relevant part that "throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). I thus apply Connecticut's prejudgment remedy statute, Conn. Gen. Stat. §§ 52-278a, *et seq.* Under that statute, "[a] prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . ." *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 137 (2008) (citation and internal quotation marks omitted); *see also* Conn. Gen. Stat. § 52–278d(a)(1).

The probable cause standard is modest, and "not as demanding as proof by a fair preponderance of the evidence." *TES Franchising, LLC*, 286 Conn. at 137. "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Id.* (citation omitted). It is "a flexible common sense standard" that "does not demand that a belief be correct or more likely true than false." *Id.* (citation omitted). "[T]he trial court's function [under this standard] is to determine whether there is probable cause

to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." *Id.* (citation omitted). The trial court has "broad discretion" to make this determination, and "a prejudgment remedy hearing is not contemplated to be a full scale trial on the merits." *Id.* at 143.

In addition, the statute "requires that a trial court make a probable cause determination as to both the validity of the plaintiff's claim and the amount of the remedy sought." *Id.* at 145–46 (citation omitted). "[T]he party seeking the prejudgment remedy must present evidence that is sufficient to enable the court to determine the probable amount of the damages involved." *Id.* at 146 (citation and internal quotation marks omitted). "Although the likely amount of damages need not be determined with mathematical precision . . . the plaintiff bears the burden of presenting evidence that affords a reasonable basis for measuring her loss." *Id.* (internal quotations and alterations omitted). Nonetheless, the "court may grant a prejudgment remedy order that authorizes an attachment for an amount less than that sought in the application for prejudgment remedy as long as there is probable cause that a judgment in that lesser amount, taking into account any defenses, counterclaims or setoffs, will be rendered in the plaintiff's favor." *Connecticut Light & Power Co. v. Gilmore*, 89 Conn. App. 164, 176 (2005).

Finally, under Conn. Gen. Stat. § 52-278n, "the court may, on motion of a party, order an appearing defendant to disclose property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy." Conn. Gen. Stat. § 52-278n(a). "Generally, under Connecticut law, a disclosure of assets is ordered if a prejudgment remedy is ordered." *Wachovia Bank, N.A. v. Cummings*, No. 309CV957SRU, 2010 WL 466160, at *9 (D. Conn. Feb. 8, 2010); *see also* Conn. Gen. Stat. § 52–278n(c) (authorizing same).

**B.     Implied Covenant of Faith and Fair Dealing**

Under Connecticut law,[1] the covenant of good faith and fair dealing is implied in every contract and "requir[es] that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co*., 269 Conn. 424, 432 (2004) (citation omitted). "Essentially the implied covenant of good faith and fair dealing is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 n.11 (2016) (citation and alterations omitted). "The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." *Id.* "To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha of Hartford, Inc.*, 269 Conn. at 432 (alterations and citation omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . .

---

[1] The parties did not address the choice-of-law issue at the hearing. In the ruling on the motion to dismiss, I recognized that the law of North Carolina, where Capitala is based, might apply to the action, but declined to resolve the issue. (ECF No. 45 at 28–29.) There does not appear to be a material difference between Connecticut and North Carolina law on the implied covenant of good faith and fair dealing, and so I likewise need not resolve the issue for purposes of this motion. *See Bicycle Transit Authority v. Bell*, 314 N.C. 219, 228 (1985) ("In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.") (citation omitted); *Maglione v. Aegis Family Health Centers*, 168 N.C. App. 49, 56 (2005) ("All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose.") (citation omitted).

Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.* (citation omitted). "Bad faith may [also] include one party's performance or interpretation of the contract in a manner that evades its spirit and is unfaithful to its purpose, resulting in a denial of the justified expectations of the other party." *Landry v. Spitz*, 102 Conn. App. 34, 48 (2007).

## II.  Findings of Fact & Conclusions of Law[2]

I assume familiarity with the pleadings, NovaFund's motion for a prejudgment remedy and motion for disclosure, as well as the testimony and exhibits admitted at the March 28 hearing. I emphasize that I make the following findings based on the probable cause standard, not by a preponderance of the evidence. The parties have not yet taken any significant discovery, and it remains to be seen whether either party will be able to prove its claims and defenses by a preponderance of the evidence.

1.  NovaFund, was, at the relevant time, a business located in Darien, Connecticut, focused on providing investment advisory and investment placement services. Capitala, which is located in Charlotte, North Carolina, "organize[s] and manage[s] various types of investment funds and provide[s] investment management advice to institutional investors, portfolio companies, and clients." (ECF No. 56 at 7.)

2.  In May 2016, NovaFund and Capitala signed a "Term Sheet" by which Capitala hired NovaFund to find and "place" investors in a new investment fund created (or to be created) by Capitala known as "Fund V."[3]  Under the Term Sheet, which was signed by Bryan Kelley and

---

[2] Although I do not separately delineate my Findings of Fact and Conclusions of Law in this order, to the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

[3] Although the Term Sheet states that, "[a]t NovaFund's discretion," the parties may enter into a more formal, detailed agreement (PX 2), there is no evidence they did so. Neither party has suggested, however, that the Term Sheet does not amount to a binding contract, and there is probable cause that the parties intended it as a written expression of at least part of their agreement.

James Howe, NovaFund's principals, and Joseph Alala, Capitala's CEO, NovaFund agreed to "make best efforts to place partnership interests in" Fund V, including providing the following services: (1) "advising Capitala in producing a marketing presentation and private placement memorandum to be used with potential investors …", (2) "advising and assisting Capitala in making presentations to Target Investors …", (3) "advising and assisting Capitala with preparation of an on-line fund data site and preparations and delivery of due diligence materials …," and (4) "working with Capitala's legal counsel and other relevant parties to document and close the Fund." (PX 2).[4]  The term "Target Investors" was broadly defined to include "North American, European, Australian and Asian investors." (*Id.*)

3.     Under the Term Sheet, NovaFund would be entitled to up to three types of compensation in return for its services.  First, Capitala agreed to pay NovaFund a monthly retainer fee of $20,000 "until the sooner of: 1) the first close of Capitala Fund V (if such close constitutes commitments for which NovaFund is paid a success fee in excess of $200,000) or 2) $200,000 of retainer fees have been paid." (PX 2).  It is undisputed that Capitala paid NovaFund the $200,000 in retainer fees, as well as expense reimbursement.  Second, Capitala agreed to pay NovaFund a

---

[4] The parties dispute which version of the signed agreement is the correct one.  Capitala contends that the version it signed had signature blocks only for it and NovaFund (DX 510), while NovaFund contends that the correct version is its exhibit 2 (PX 2), which has, in addition, a signature block for Columbus Advisory Group and is signed on Columbus's behalf by Michael Murphy.  There are no other differences between the two documents.  The difference in signatures matters, Capitala contends, because it was led to believe that NovaFund was not a separate entity but a division of Columbus Advisory Group, a registered broker dealer.  NovaFund itself is not a registered broker dealer.  I need not definitively resolve this dispute here because I find that there is probable cause that NovaFund's version of the agreement (PX 2) is the correct one and that Capitala knew that the real party in interest on the other side of the agreement was NovaFund, an entity it knew was separate from Columbus.  I make this finding both for the reasons set forth in my ruling on Capitala's motion to dismiss (ECF No. 45) and because the evidence at the hearing suggested that Capitala knew it was dealing with NovaFund as a distinct entity and that NovaFund had merely partnered with a broker dealer (first Columbus and then MD Global) to enable it, for regulatory compliance purposes, to enter into a deal with Capitala.

"Success Fee" equal to 1.5% of the amount "of equity capital that any Target Investor commits to the Fund or a separately managed account." (*Id.*) The Success Fee would be lower – but with a floor of 1% – to the extent Capitala agreed with the investor to accept a management fee of less than 1.5%. It is undisputed that Capitala never paid NovaFund a success fee. It is also undisputed that – apart from an initial "closing" by two large "anchor investors" in late August 2016, for which Capitala owed NovaFund no success fee due to a carve-out provision in the Term Sheet – there were no further closings, i.e., no further investments, in Fund V. Third, Capitala agreed to pay NovaFund a "Tail Fee" under certain circumstances. Because the tail fee provision of the Term Sheet is not a model of clarity, I quote it in full: "NovaFund will be due a fee for capital commitments from Target Investors that close into the Fund to the next Capitala-sponsored successor vehicle with a substantially similar strategy at the rate of 50 basis points of such capital commitments ('Nova Tail Fee')." (PX 2). In its motion for prejudgment remedy, NovaFund asserted that "the Tail Fee applies only to the subset of Target Investors that actually invested in the Fund, and which later also invest in a successor fund sponsored by Capitala with a substantially similar investment strategy." (ECF No. 15 at 19.) It is undisputed that Capitala never paid NovaFund a Tail Fee. Other relevant terms of the Term Sheet are discussed below.

4. Although the parties signed the Term Sheet in May 2016, Capitala instructed NovaFund to hold off performing significant marketing activities until it had completed the anchor closing with two large investors. The anchor closing was completed on August 31, 2016; as noted, that transaction was not subject to the success fee arrangement. After the anchor closing, NovaFund began working to market Fund V to investors, including assisting with preparation of marketing materials, contacting prospective investors, and attending meetings and a "road show" with Capitala. NovaFund ultimately contacted almost 500 prospective investors and set up almost 70

meetings in its efforts to market Fund V and perform under the Term Sheet. One of the prospective investors it sought to attract was an entity the parties refer to only as "Firm 1," apparently due to confidentiality arrangements. I discuss Firm 1 more below.

5. During its initial marketing efforts, NovaFund learned that the asset mix in which Fund V was originally planning to invest – senior debt (typically first-lien, low-risk, and low-return debt), "mezzanine" or junior debt (higher risk and higher return), and "equity co-investments" (highest risk and highest return) – was not attracting the interest of investors, many of whom wanted a mix more focused on senior debt. NovaFund communicated this market intelligence to Capitala and urged it to shift the focus of the marketing efforts to convey to investors that Fund V would concentrate increasingly on senior debt. As discussed more below, Capitala heeded this message and the marketing pitches for Fund V increasingly focused on senior debt. Nonetheless, the parties were not successful in attracting any investor commitments through the end of 2016.

6. The parties' relationship began to deteriorate in February 2017. Joseph Alala, Capitala's CEO, became "very upset" with NovaFund. He believed – incorrectly, as shown below – that NovaFund had violated a provision of the Term Sheet (PX 2) purportedly requiring it to work exclusively for Capitala on any investments similar to those contemplated by Fund V and to refrain from working with asset managers that competed with Capitala. His reaction to this perceived injury would come to hamstring the parties' relationship. On February 16, 2017, he sent NovaFund an email stating in part as follows: "I am disappointed to hear of the misrepresentation to Capitala Group and your violation of the agreement[.] I believe … the lack of progress in the Fund V raise is now explained by your having a dual credit fund mandate and having two direct competitor funds in the market with Nova representing competing funds to the same investor base." (PX 7). He threatened to sue NovaFund. (*Id*.) As explained below, however, the premise of his email –

which was that NovaFund violated the Term Sheet by serving as placement agent for a competing asset manager – was both incorrect and unreasonable, based on the language of the Term Sheet and the Addendum as well as the credible testimony. It would lead to bad faith conduct on the part of Capitala.

7. After NovaFund signed the Term Sheet, it continued working as a placement agent for others, including an asset manager that Capitala saw as its competitor. But the Term Sheet does not expressly prohibit NovaFund from working as a placement agent for other fund managers – either with respect to similar or dissimilar investments. The only reference to exclusivity in the Term Sheet states that, "[a]s compensation for the advisory and exclusive placement services to be provided by NovaFund hereunder, Capitala agrees to pay NovaFund a monthly fee of $20,000 ('Retainer Fee')." (PX 2). That use of "exclusive" is, at best, ambiguous. Considered alone, it could mean that NovaFund was agreeing to provide advisory services exclusively for Capitala, or that Capitala was agreeing to hire exclusively NovaFund to provide advisory services for Fund V. Alala offered a third interpretation during his testimony at the hearing: his understanding was that it meant both, i.e., that it locked both parties in to dealing with each other exclusively, except that, he said, it did not bar NovaFund from serving as agent for investments dissimilar to those contemplated by Fund V. By contrast, Bryan Kelley of NovaFund testified that the "exclusive" language meant only that Capitala would not hire another placement agent for Fund V. I find that other language in the Term Sheet, the April 2017 Addendum, the parties' course of dealing, and the credible testimony from Mark McAndrews, NovaFund's CFO, all favor Kelley's interpretation. The parties never clearly agreed to bar NovaFund from working as a placement agent for others – for similar or dissimilar investments.

8.  There is no description in the Term Sheet of what investments Fund V would undertake; indeed, the Term Sheet does not describe Fund V at all beyond its title – Capitala Private Credit Fund V, L.P.  (PX 2).  On its face, then, the Term Sheet makes Alala's interpretation – that NovaFund could not serve as placement agent for competing asset managers with similar investment strategies – implausible, because it provides no basis to determine what a similar investment strategy or competing asset manager might look like.  While the ambiguity of the exclusivity provision allows me to consider extrinsic evidence, the extrinsic evidence suggests that the investment strategy of Fund V was protean; as I discuss below, the strategy as pitched to prospective investors changed as both NovaFund and Capitala realized that a more senior-debt-focused investment mix would be more likely to attract investors.  It is unclear why NovaFund would agree to be bound by an exclusivity provision the meaning of which could change as Capitala, the fund manager, decided to shift the investment focus of Fund V.  Thus, pinning the meaning of the exclusivity provision to the investment mix of Fund V – as Alala's interpretation would – is not a plausible interpretation of that provision.

9.  The Addendum confirms that Kelley's interpretation of the exclusivity provision is more plausible than Alala's.  The Addendum suggests that the provision actually means that *Capitala* would not use any placement agent other than NovaFund.  After Alala threatened to sue NovaFund for working for a competing asset manager, the parties negotiated the Addendum and signed it in April 2017.  The Addendum expressly allows Capitala to use other agents with respect to the non-North American investments but not with respect to North American investments – suggesting that the parties were amending the Term Sheet to limit the geographic scope of its exclusivity provision to permit Capitala to work with others outside North America.  The Addendum otherwise makes no mention of exclusivity and includes no provision barring NovaFund from working as placement

agent for others. The Addendum also includes a mutual release of all claims either Capitala or NovaFund might have against the other based on events arising before it was signed, i.e., April 24, 2017. But the issue of exclusivity still rankled for Alala, even after Capitala released any claim for breach of the exclusivity provision.

10. Given how upset Alala was in February 2017 about NovaFund's work for a competitor – and his specific reference to litigation – I find that if Capitala genuinely believed that there was a solid legal basis to conclude that NovaFund's other work violated a provision of the Term Sheet, it would have done one of two things: either it would have ceased doing business with NovaFund altogether – and refused to release it from what it regarded as a breach of the Term Sheet; or, if it thought the benefits of continuing to work with NovaFund outweighed the costs associated with NovaFund's past violations of the Term Sheet, it would have insisted on including explicit terms barring such competing work in the Addendum to make clear that, going forward, NovaFund had to dedicate all of its placement efforts to Capitala for Fund-V-type investments. It took neither of these steps, however, suggesting that, despite Alala's pique, Capitala recognized that the Term Sheet did not foreclose NovaFund's work as a placement agent for similar investments. Finally, I find credible the testimony of NovaFund's CFO, Mark McAndrews, about his conversation with Capitala's general counsel, Richard Wheelahan, at a meeting in New York shortly after the February 2017 email from Alala. According to McAndrews, Wheelahan said that he recognized that there was no basis in the Term Sheet to claim a prohibition on competing work, and that Alala was displeased that Wheelahan had failed to include such a provision in the Term Sheet in the first instance. Capitala did not seek to rebut or cross-examine that testimony.

11. The Addendum proved not to be a reconciliation between the parties, in spite of the mutual release and apparent recommitment to the Term Sheet. After the Addendum was signed,

Capitala focused its efforts on raising money for Fund V by itself, i.e., largely without input from NovaFund. There was credible testimony by Kelley about Capitala's excluding him from meetings that the placement agent should have attended, and there appears to have been dwindling communication between the parties after the Addendum was signed. While Capitala did not entirely "freeze out" NovaFund – as Alala testified, Capitala would still have accepted investments for Fund V actually delivered to it by NovaFund –, it ceased making good faith efforts to work with NovaFund to carry out the goals of the agreement. It also increasingly kept NovaFund at a distance during its dealings with Firm 1, at one point allowing Kelley only to "listen in" to a call with Firm 1 (but not identify himself or speak) and at another excluding Kelley from a due diligence meeting with Firm 1. As Kelley testified, Capitala effectively prevented NovaFund from "advising and assisting" with marketing and selling Fund V, as the Term Sheet contemplated.

12. Although there was conflicting testimony at the hearing about which party had a more established relationship with Firm 1, NovaFund offered more specific, credible evidence that its own contacts at Firm 1 – especially Kelley's – were closer and more substantial than Capitala's. Kelley testified that he knew, professionally and socially, several executives at Firm 1, and had done deals with them in the past. He also testified that, in connection with NovaFund's efforts to identify and attract investors for Fund V, he made numerous contacts with Firm 1 – on the phone, in person, and through electronic communication – attempting to persuade it to invest in Fund V. (*See, e.g.*, PX 19 (arranging meeting between Swercheck and representative of Firm 1 in Sept. 2017)). At the same time, he was reporting back to Capitala that Firm 1 and others in the market were more interested in an investment focused more exclusively on senior debt – and less interested in the "hybrid" of senior debt, junior debt, and equity co-investments that Fund V was initially offering. There was credible evidence at the hearing that Capitala began to heed these

suggestions, pitching prospective Fund V investors, including Firm 1, on the notion that the investment would be mostly focused on senior debt, or at least that accommodations would be made to permit such investors to make an overall investment through Capitala more focused on senior debt.

13.     The evidence at the hearing showed that there were multiple failed attempts at persuading Firm 1 to invest in Fund V and that a term sheet prepared and sent to Firm 1 for a $25 million investment in Fund V, plus a purchase of $25 million in assets from another Capitala entity, ultimately did not result in a deal.  Nonetheless, the evidence also suggested that, over time, each approach to Firm 1 became more focused on moving the proposed investment, as a whole, into primarily or exclusively senior debt, an approach that NovaFund had been encouraging Capitala to adopt with Firm 1 and more generally.

14.     As noted, apart from the initial anchor close in late August 2016, there were no investments in Fund V.  Indeed, it appears that by the end of 2017, efforts to attract new investors to Fund V were largely abandoned and Capitala and NovaFund were no longer working together at all, even though the fund's closing deadline had been extended until June 2018.

15.     In April 2018, Capitala announced that it had raised $1 billion "in a new, permanent capital vehicle."  (PX 17).  The press release stated that "[f]unding for the new venture, Capitala Specialty Lending Corp., was raised from global institutional investors, and is expected to provide senior debt and equity co-investments across Capitala's family of funds."  It also stated that, "Capitala Specialty Lending Corp's exclusive focus on senior debt investments is a substantially different strategy than prior Capitala-sponsored funds, which have historically been raised to invest in subordinated and mezzanine debt."  (*Id.*)

16.  Upon learning of this announcement, McAndrews of NovaFund contacted Capitala by email, noting that "[w]e have heard from our contacts at Firm 1 that they and their related entities/clients were part of this closing" and requesting "a complete list of the entities investing in [Capitala Specialty Lending Corp.] and their respective commitments so that we can calculate the fees due to NovaFund." (PX 18).  Alala responded to this email as follows:

> "Mark  Hope you are well.  We are not allowed to disclose the investors in this vehicle due to the confidentiality of the agreements.  This vehicle is a substantially different strategy from our mezzanine strategy of prior funds, including Fund V, and this is beyond the scope of services ever discussed with Nova.  We continue to have Fund V Mezzanine strategy but have not closed any new investors since our original closing in Fund V and due to the mismanaged process of launch of Fund V by Nova representing too many similar strategies and competing Funds, I think Fund V is a stub Fund.  At current time, this firm is no longer raising any mezzanine, or Fund V, type strategies and we are focused on substantially different strategies now with our Growth Funds and Senior Debt Funds.  Happy to discuss when convenient to you."

The tone of this email makes clear that NovaFund's alleged work for a competing asset manager still rankled in Alala's mind, even though, as noted, the parties' agreement did not prohibit that work and Capitala had agreed to release any claim that it did (at least for conduct before April 24, 2017).

17.  Alala's testimony ultimately revealed that Capitala's April 2018 press release did not mean what its first sentence suggested.  Specifically, he testified that, although the press release announced that Capitala had "successfully raised $1.0 billion … from global institutional investors," (PX 17) this did not mean that the investors had given it $1 billion to invest or even that they had committed to doing so.  Instead, as he described it, it meant that Capitala anticipated that these investors would ultimately invest that amount and that, as the press release indicates, such funding was "expected to provide senior debt and equity co-investments across Capital's family of funds."  (*Id.*)  As he explained at the hearing, what the "new venture" described in the press release really amounted to was a loan syndication program, whereby Capitala would

originate loans (i.e., lend to commercial borrowers) and then "syndicate" or sell some portion of its rights and obligations as the lender to the "global institutional investors." The syndication he described would be accomplished through note purchase agreements or, as discussed below, an investment advisory agreement in the case of Firm 1.

18. Alala testified that, to date, several large investors have committed a total of about $200 million to this new loan syndication arrangement. $120 million of that amount came from Firm 1. The arrangement with Firm 1 was reflected in an investment advisory agreement. Under that agreement, if particular loan arrangements met criteria specified by Firm 1, then Capitala had the option to "put them in the box," i.e., to include them in the investment advisory arrangement reflected in the agreement. (The parties did not offer, and I have not seen, a copy of this agreement.) Although Alala's testimony on this point was not crystal clear, Firm 1's investment strategy under this arrangement originally also included an 8% "equity co-investment" component, meaning it was not limited to senior debt, although Alala also testified that this feature was in the process of being removed.

19. The investment advisory arrangement with Firm 1 was attractive to Capitala – more attractive than the ordinary note sales by which it offloaded some of its exposure as a lender under the syndication program – because Capitala earned more fees under this arrangement. Specifically, Alala testified that, for each loan it originated and syndicated, it earned an "origination fee" of one percent, which was ultimately paid by the borrower. For loans put into the investment advisory arrangement with Firm 1, however, it also earned "monitoring fees" and, after a few years, "incentive fees," also referred to as "carried interest." Alala testified that, to date, Capitala had earned approximately $1.2 million in origination fees and $187,000 in monitoring fees – but no incentive fees – under the investment advisory arrangement with Firm 1.

20.    NovaFund's motion for prejudgment remedy seeks a prejudgment remedy in excess of $8.5 million, which it calculated as a Success Fee under the Term Sheet using the $1 billion figure in the April 2018 press release.  The evidence at the hearing, however, does not support a finding that there is probable cause that a judgment will be rendered in favor of NovaFund in that amount. First, as noted, Capitala has not actually received anything close to $1 billion in funding for its loan syndication program – the total so far is about $200 million.  As noted, most of this amount – $120 million – came from Firm 1.  While Alala tentatively identified a few of the other "global institutional investors" that had committed to investing the remainder of the $200 million in the new loan syndication program, he did not specify how much each had committed.  Further, there was no evidence that NovaFund had ever made efforts to attract any of these other investors to Fund V.  Nor was there any evidence that any of these other investors, to the extent they were contacted at all, ever had the slightest interest in Fund V.  Finally, even if any of these other investors could be considered "Target Investors" under the Term Sheet (because of how broadly that term is defined), there is no evidence that Capitala did not make its own independent efforts with those investors – or have its own independent relationships with those investors – well in advance of hiring NovaFund.  Reading the term "Target Investors" in the Term Sheet to mean that NovaFund is entitled to a percentage of any investment in any Capitala entity until the Term Sheet is formally terminated – as NovaFund has at times suggested – would lead to an absurd result the parties could not have intended; indeed, it would give Capitala an incentive to terminate the parties' agreement prematurely lest it be forced to share its profits with NovaFund with respect to any other fundraising activities outside the context of Fund V.   At this time, then, there is no basis to make a finding – even using the probable cause standard – that had Capitala behaved differently, any of these other investors would have committed to Fund V.

21.  But there is a basis to make such a finding with respect to Firm 1.  Specifically, there was credible evidence that (1) Kelley had a strong relationship with Firm 1 and had worked with its personnel previously, (2) Capitala, though it was aware of Firm 1, had no established track record with it, (3) Kelley made substantial efforts to persuade Firm 1 to invest in Fund V or a separately managed account, and set up meetings between Capitala and Firm 1, (4) Capitala sought to limit Kelley's involvement in communications – and excluded Kelley from some meetings – with Firm 1 in 2017, (5) Kelley was urging Capitala to move generally, and with respect to Firm 1 in particular, to a pitch more focused on senior debt and less on junior debt, (6) Capitala (and Alala in particular) viewed NovaFund's work for a competing asset manager as a betrayal, and while Capitala ultimately recognized that the Term Sheet did not foreclose such work, Alala no longer trusted NovaFund after mid-February 2017, and (7) Capitala's view of NovaFund in 2017 led it to cease working with NovaFund in good faith under the Term Sheet and Addendum, excluding NovaFund from key meetings and failing to cooperate with it.  The upshot was that NovaFund was not fully able to perform the advisory and marketing services it had been hired to provide and, as a result, the purpose of the parties' agreement was frustrated.  I also find that there is probable cause to believe that, had Capitala continued to work cooperatively with NovaFund, the two could have managed to attract a substantial investment by Firm 1 into Fund V, even if that meant allowing Firm 1 to invest through a separately managed account and/or to participate in other Capitala opportunities focused more exclusively on senior debt.

22.  Firm 1 has invested a total of $120 million in the advisory agreement/loan syndication arrangement with Capitala.  Although this point was not crystal clear, apparently even that arrangement was not, until very recently, purely debt; it included an equity component of eight percent.  Firm 1's overall investment is thus not radically different from the pitches NovaFund and

Capitala were making to it in 2017, which sought to tailor the opportunity with a greater offering of senior debt.  Nonetheless, I recognize that there are still significant differences between the loan syndication program and Fund V, and I do not think there is probable cause to believe that, but for Capitala's conduct, Firm 1 would have invested $120 million in Fund V.  Because of the different asset mixes, it is more likely that Firm 1 would have – but for Capitala's conduct – invested some substantial amount in Fund V and another substantial amount in another Capitala vehicle that was focused more exclusively on senior debt; and the second part of such an investment would not have entitled NovaFund to any fees.  Specifically, I find that there is probable cause to believe that, but for Capitala's conduct, Firm 1 would have invested approximately $25 million in Fund V.  This estimate is based on the fact that (1) NovaFund was anticipating, based on its communications with Firm 1, that any investment by Firm 1 in Fund V would be in the range of $20 to $30 million (PX 13), and (2) Capitala and Firm 1 discussed – and Capitala sent a term sheet to Firm 1 and NovaFund reflecting – a $25 million investment by Firm 1 in Fund V, together with a $25 million purchase of assets from a distinct Capitala vehicle (PX 6), an arrangement similar to one Kelley had suggested to Capitala.  While Alala testified that the deal reflected in this term sheet "died" because it still included too much junior debt and equity for Firm 1's tastes, the dollar figure reflected in the term sheet for Firm 1's hoped-for investment in Fund V is consistent with NovaFund's projection of $20 to $30 million.  In addition, the two anchor investors each had invested only $20 million, and so it seems unlikely that Firm 1 would have made an investment substantially greater than the anchor investors.  Therefore, I find that there is probable cause to believe that, but for Capitala's conduct, Firm 1 would have invested approximately $25 million in Fund V.

23.     Had Firm 1 made a $25 million commitment to Fund V, it is likely, based on the evidence at the hearing, that it would have received favorable terms for such a large investment. In particular, I find that it is unlikely Firm 1 would have agreed to pay Capitala a management fee of any more than 1%. Therefore, applying the terms of the Term Sheet, I find that there is probable cause that, had Capitala fully cooperated with NovaFund in the marketing and selling of Fund V (as well as separately managed accounts associated with Fund V, as contemplated by the Term Sheet), NovaFund would have received a Success Fee of $250,000, i.e., the one percent floor for its success fee on a $25 million investment. I do not find probable cause to believe that NovaFund is owed a Tail Fee.

24.     While Capitala presented some evidence to support its counterclaims – principally its claim that NovaFund did not comply with the "best efforts" obligation under the Term Sheet, for example, in connection with an investors conference in Berlin, Germany –, it made no real effort at the hearing to quantify any damages from this alleged breach. At one point, Alala offered the view that Capitala had sustained between $30 million to $50 million in damages, but there was no evidence as to how this broad range was calculated or what it was based on, and Capitala offered no supporting projections of expected management fees from Fund V or any related documents. Further, given that Capitala realized a gain from the subsequent investment of Firm 1 (and perhaps others who might have otherwise invested in Fund V) in the loan syndication program, it is unclear at this point that Capitala has suffered any damages. Because there was insufficient evidence to find (even using the probable cause standard) that Capitala sustained any damages as a result of any breach by NovaFund, I make no finding and express no opinion on whether NovaFund breached its best efforts obligation or any other provision of the parties' agreement.

25.      For the foregoing reasons, I find that NovaFund is entitled to a prejudgment remedy in the amount of $250,000.  Because I have determined that probable cause exists to support the prejudgment remedy, disclosure of assets is also appropriate.  *See Wachovia Bank, N.A.*, 2010 WL 466160, at *9 (same).  However, this portion of the order is stayed until the parties decide how to resolve the bond issue described below; the Court will issue further instructions at that time.

## III.    Conclusion

For the foregoing reasons, NovaFund's motion for prejudgment remedy is GRANTED in part and DENIED in part.  (ECF No. 15.)  NovaFund is entitled to a prejudgment remedy in the amount of $250,000.  In light of this resolution, NovaFund's motion for disclosure of assets is also GRANTED, but stayed for the time being.  (ECF No. 19.)  The prejudgment remedy statute further contemplates that, "if the court finds that the application for the prejudgment remedy should be granted," as it has here, the Court should consider "whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy."  Conn. Gen. Stat. § 52-278d(a)(4).  Because neither party was prepared to address these issues at the hearing, the Court hereby orders that the parties shall confer, either in person or by telephone, to resolve the issue of whether NovaFund, Capitala, or neither will post a bond.  If they are unable to agree, the parties shall simultaneously file briefs of **no more than 8 pages** addressing only the bond issues within **14 days** of this order.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:         Hartford, Connecticut
               March 31, 2019