```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - x
 3                                  No. 3:18-CV-1023 (MPS)
     NOVAFUND ADVISORS, LLC
 4                                  JANUARY 21, 2020
     vs.
 5                                  10:01 a.m.
     CAPITALA GROUP, LLC
 6                                  TELEPHONIC STATUS CONFERENCE
     - - - - - - - - - - - - - - - x
 7

 8                        450 Main Street
                        Hartford, Connecticut
 9

10         BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:

14           SHIPMAN & GOODWIN LLP
                 One Constitution Plaza
15               Hartford, Connecticut 06103
             BY:  JILL M. O'TOOLE, ESQUIRE
16
     FOR THE DEFENDANT:
17
             ROBINSON, BRADSHAW AND HINSON
18               101 North Tryon Street, Suite 1900
                 Charlotte, North Carolina 28246
19           BY:  PEARLYNN G. HOUCK, ESQUIRE

20           ROBINSON & COLE, LLP
                 280 Trumbull Street
21               Hartford, Connecticut 06103
             BY:  BENJAMIN C. JENSON, ESQUIRE
22

23
     COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
24                      (860) 212-6937

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

```
 1            THE COURT:  Good morning.  This is Michael Shea.
 2   We're on the record in NovaFund versus Capitala, 18-CV-1023.
 3   Let's first just have counsel state appearances for the record,
 4   starting with plaintiff's counsel.
 5            MS. O'TOOLE:  Good morning, Your Honor.  This is Jill
 6   O'Toole from Shipman & Goodwin.
 7            THE COURT:  Good morning.
 8            MR. JENSEN:  And for the defendant/counterclaim
 9   plaintiff, this is Benjamin Jensen from Robinson & Cole.
10            THE COURT:  All right.  Good morning.
11            MS. HOUCK:  And this is Pearlynn Houck from Robinson
12   Bradshaw.
13            THE COURT:  Okay.  Good morning.  Is there anybody
14   else on the line?
15            MR. JENSEN:  That's all, Your Honor.
16            THE COURT:  Great.  So I have two sets of letters.
17   One concerns efforts by Capitala to obtain discovery from
18   Robertson Stephens, and then the other concerns NovaFund's
19   attempts to obtain discovery from certain banks where Capitala
20   entities do business.  So let's start with the dispute
21   concerning Robinson (sic) Stephens.
22            So, Attorney O'Toole, what is the privacy interest, if
23   any, that NovaFund has with respect to these records?
24            MS. O'TOOLE:  They are -- they are NovaFund's
25   documents for the most part.  So they're either documents that
```

1    NovaFund created.  In the case of the marketing and strategic

2    focus of the fund, there's like an investment tracker that

3    NovaFund created and it would share with the fund manager.

4    Then NovaFund also submitted invoices to Robertson Stephens for

5    the reimbursement of both expenses and retainer fees.  And then

6    it also has a privacy interest in the drafts of both the

7    settlement agreement that it's locked with Robertson Stephens

8    and drafts of the engagement letters.

9         So they're either documents that NovaFund created or

10   sent or that relate to its proprietary business and the

11   commercial focus, I would suppose you would say, of its

12   marketing strategy for the fund --

13        THE COURT:  Okay.

14        MS. O'TOOLE:  -- which was, in fact, yeah, quite

15   different from Fund V.

16        THE COURT:  Mr. Jensen, why isn't that enough for

17   standing?

18        MR. JENSEN:  And, Your Honor, I want to let you know

19   Attorney Houck is --

20        THE COURT:  Oh, okay, fine.

21        Attorney Houck, why isn't that enough for standing?

22        MS. HOUCK:  Well, Your Honor, first of all, this is --

23   the privacy interest that is protected is not automatic.  Just

24   because they're NovaFund's documents does not make their --

25   does not allow them to necessarily claim that there's a privacy

1    interest.

2         What they have to show the Court is that that privacy

3    interest relates to sensitive commercial information that

4    allows them to object to a third-party subpoena to an entity

5    that has possession of these documents at this time.

6         THE COURT:  Okay, but why isn't what Attorney O'Toole

7    describes sensitive commercial information?

8         MS. HOUCK:  Well, I would argue, Your Honor, that I

9    don't believe, you know, that engaged -- drafts of an

10   engagement letter and invoices sent to a party for payment I

11   believe is a stretch for sensitive information.  These are

12   routine back-and-forth documents.

13        The investment tracker that we're hearing about

14   today -- and to be clear, Your Honor, we've not seen these

15   documents.  It appears Attorney O'Toole does, has seen them,

16   but we've received different information from Robertson

17   Stephens and from NovaFund about what's in the documents.

18        The investment trackers may be.  There may be a

19   privacy interest in those the way they've been described to the

20   Court this morning.  To the extent they are contact lists that

21   are put together by NovaFund that have information related to

22   their introductions, I can see that argument.  Unfortunately,

23   we've not heard that articulated exactly this way -- that way

24   before.

25        Now, to be clear, the documents are Robertson

1   Stephens' investment strategy.  They're about their fund and

2   what the strategy of it is and how they intend to market it and

3   what the pros and cons -- these are the kinds of things we've

4   seen in other documents -- are of that strategy.  That's not

5   NovaFund's private information.  That's Robertson Stephens'.

6        And it's also notable, Your Honor, that neither

7   NovaFund or Robertson Stephens is currently doing business.

8   NovaFund is not offering placement agent services as an entity

9   anymore, and Robertson Stephens Partners, which was the agency

10  they were assisting, is out of business.  And so just because

11  this is confidential information doesn't mean that there's an

12  ongoing privacy right that needs to be protected here.

13        THE COURT:  Well, maybe NovaFund wants to get back

14  into the business.  I'm not seeing why the fact that NovaFund

15  isn't currently doing business makes it have less of a privacy

16  interest.  But let me move on to the settlement issue.

17        Suppose that I find that there is some privacy

18  interest that NovaFund has in the settlement documents.  What

19  is the relevance of the settlement documents to this case?

20        MS. HOUCK:  So, Your Honor, the settlement documents

21  in this case -- and we have been negotiating settlement-related

22  documents for Robertson Stephens and for NovaFund's engagement

23  for Deerpath, which were both going on, they were both entered

24  within days for Capitala and were both going on at the same

25  time as they were supposed to be using best efforts to raise

1    Capitala's funds.

2            The settlement documents, to the extent that Robertson

3    Stephens and NovaFund reached an agreement for payment related

4    to certain activities that NovaFund did for Robertson Stephens,

5    whether it be particular introductions to investors or whether

6    it be actual payments on investors for the fund, that's

7    relevant to our claim because our claim has been focused

8    around -- counterclaims are focused around the fact that while

9    NovaFund was supposed to be raising Capitala's fund, putting

10   its best efforts forth towards raising Capitala's funds

11   exclusive to Capitala, they were actually introducing investors

12   to competitive funds that should have been introduced to

13   Capitala.

14           THE COURT:  But how is the settlement -- how are the

15   settlement documents going to show that?

16           MS. HOUCK:  So, for example, we understand -- it's

17   hard for us to know because we've not seen them, but we

18   understand that the Deerpath settlement documents have a list

19   of investors that NovaFund got paid for introducing to Deerpath

20   and, we would claim, to Deerpath in lieu of Capitala.

21           THE COURT:  But are we dealing with the Deerpath

22   settlement documents now?  Is this part of this dispute?

23           MS. HOUCK:  No, but I'm using that as an example.  We

24   don't know what's in the settlement agreement, but to the

25   extent that NovaFund is getting paid for particular activities

1    on behalf of Robertson Stephens, particular investors or

2    introductions, that's relevant to what they were not doing for

3    Capitala.  And we have not seen the documents, and so we don't

4    know if they relate to that or not.

5            THE COURT:  Okay.  So, Attorney O'Toole, let me come

6    back to you.  With regard to the tracking spreadsheets and

7    other documents that show what NovaFund was doing with RSWM, or

8    Robertson Stephens, whatever its proper name is -- I know that

9    there was one entity and now it's defunct and the other, so

10   I'll just call it Robertson Stephens for short.

11           The documents that would show what NovaFund was doing

12   for or with that entity, those documents would be relevant to

13   the counterclaim concerning, A, best efforts and concerning

14   exclusivity; right?

15           MS. O'TOOLE:  No, they're not, Your Honor, because

16   Robertson Stephens was not a competitive fund.  They are

17   totally different funds.  Fund V for Capitala was the -- the

18   purpose of it was to make loans to middle-market companies, to

19   companies, and the loans were supposed to be senior secured or

20   senior subordinated loans.  Robertson Stephens was a liquidity

21   fund making loans to entrepreneurs to individuals.

22           So on the first point, Robertson Stephens is making

23   loans to individuals.  Fund V was going to be making loans to

24   companies.  Robertson Stephens was operating in a tax space; so

25   they were making loans to companies that were in the growth

stage, venture-backed tech companies.  They would make a loan
to the entrepreneur him or himself or herself, and the
collateral would be the stock in the company.  The Robertson
Stephens fund was about 150 million.

They were totally different funds, entirely different
investment strategies.  So these couldn't be considered
competitor funds to begin with.  None of the Robertson Stephens
documents are relevant anyway.

THE COURT:  How would -- how would Capitala's counsel
know that?  In other words, is that already apparent from
documents you've produced, or is that --

MS. O'TOOLE:  You can Google it.

THE COURT:  -- or is that just your -- well, is that
your --

MS. O'TOOLE:  Publicly available information, and
we've provided information about the investment strategy.

THE COURT:  All right.  So let me hear from Capitala's
counsel about that.  So I'm told that this Robertson Stephens
is a totally different strategy, different target investors,
you know, lending to entrepreneurs, just apples and oranges.
What is your response to that?

MS. HOUCK:  Well, Your Honor, I think your question
kind of got at it.  First of all, we don't have any way to know
that.  We haven't received any documents related to the
Robertson Stephens strategy.

1          What we know is that NovaFund was engaged to do

2    exactly the same thing they were engaged to do with us, based

3    on the engagement letter that we have seen.  Attorney O'Toole's

4    description of what Fund V was doing and what its investment

5    strategy was is very different from what Capitala would -- how

6    Capitala would describe its own funds.

7          And we also disagree that there were -- there were

8    individuals, there were high network or family office

9    individuals certainly targeted as part of Fund V.  And the only

10   way for us to know and to test the assertions of counsel that

11   this was entirely different would be to see the list of folks

12   that they were going after.

13         That should benefit them.  If it was entirely

14   different and there was no overlap between the list of target

15   investors for Robertson Stephens and Fund V, that is

16   information that we need to know.  That is not the

17   understanding.

18         What I do know is that when Capitala learned that

19   Robertson Stephens was being represented by NovaFund at the

20   same time as their fund, they were incredibly angry and upset

21   about it.

22         THE COURT:  Is that the -- is that the revelation

23   that -- I remember during the prejudgment remedy hearing, there

24   was -- there were e-mails and Mr. Alala had learned at some

25   point that, from his standpoint, they were working with a

1  competing fund.  Was that the DeerPark (sic) fund or was that

2  the Robertson fund or some other?

3         MS. HOUCK:  At that point it was the Deerpath fund.

4  They learned about Robertson Stephens after.

5         THE COURT:  And then you obtained discovery from

6  Deerpath?

7         MS. HOUCK:  We have not obtained discovery from

8  Deerpath.  They have refused to produce discovery until we are

9  done negotiating with NovaFund related to discovery.  They

10  believe that NovaFund should be producing that discovery, not

11  them.

12         THE COURT:  I see.

13         MS. O'TOOLE:  And NovaFund is providing some of that

14  discovery, Your Honor.

15         THE COURT:  And then, Attorney O'Toole, let me just go

16  back on something that was said earlier.  What's your position

17  as to, A, standing and, B, relevance concerning the invoices

18  and the final versions of -- well, I guess let me back up for a

19  second.

20         First help me understand what you have produced.  My

21  understanding is you have produced the engagement letter.  Have

22  you, in fact, produced invoices or not?

23         MS. O'TOOLE:  We've produced the engagement letter.

24  We haven't produced the invoices.  And again, the dispute

25  between NovaFund and Robertson Stephens, which resulted in a

1  complaint by NovaFund against Robertson Stephens, which were

2  the nonpayments of a retainer fee and for certain expense

3  reimbursements.

4       THE COURT:  Oh.

5       MS. O'TOOLE:  Robertson Stephens was a failed fund,

6  meaning no investors invested.  So NovaFund -- and we've

7  explained this to counsel for Capitala.  Novafund's settlement

8  for Robertson Stephens has nothing to do with any type of

9  payments for investors in the Robertson Stephens fund because

10 there were none, which makes the settlement -- it's purely --

11 look, it's a fairly plain vanilla settlement agreement.  This

12 is entirely a fishing expedition by --

13      THE COURT:  Okay.  Let me stop you.  I hear you.  Let

14 me stop you.

15      Does the complaint -- you filed the complaint in

16 court; is that right?

17      MS. O'TOOLE:  Yeah, and the complaint's publicly

18 available.

19      THE COURT:  Right.  And does the complaint lay out the

20 fact that there were no investments?

21      MS. O'TOOLE:  Um, I would have to double-check.  I

22 know it says that the only dispute between NovaFund and

23 Robertson Stephens is for the 200K retainer -- nonpayment of

24 the retainer and about 9 grand in expense reimbursement.

25      THE COURT:  All right.  In light of that, let me ask

1   Capitala's counsel about that.  What reason to believe, then,

2   if that's true -- I assume you've read the complaint; is that

3   right?

4           MS. HOUCK:  We have.

5           THE COURT:  And so what reason do you have to believe,

6   then, that the settlement is going to refer to various entities

7   if the complaint lays out a dispute that's just, "Look, you owe

8   us $200,000 in the retainer fee plus expenses"?

9           MS. HOUCK:  We just don't know, Your Honor.

10          THE COURT:  Well, I understand we don't know, but you

11  have to have some reason to believe.  I mean that -- if that's

12  what the dispute was about, it's -- I don't know either.  But I

13  would venture to say it seems unlikely that the -- that the

14  settlement would, you know, suddenly be talking about, "And, by

15  the way, you know, you can use these investors in funds and

16  everything else."

17          I mean if you want, you can do an interrogatory to

18  NovaFund that says, you know, Is it true that the -- that there

19  was no -- were no investments in the Robertson fund?  And if

20  they say no, that's not true, well, then maybe there's

21  something there.

22          But if they confirm that that's true, then I'm not

23  seeing why there's any reason to believe that the settlement's

24  going to have discoverable information.

25          MS. HOUCK:  Well, I'm not sure, Your Honor, that it's

1  limited to investments in the fund.  If they were setting up

2  meetings or being reimbursed for various travel-related

3  meetings, that means they were using efforts to raise that

4  fund, potentially in lieu of Capitala's funds.

5          THE COURT:  But ordinarily a settlement agreement in

6  that is not going to detail, well, this is $500 because you

7  flew down to Philadelphia and here's another thousand because

8  you flew out to LA.  It's just going to say, here's the money

9  and, you know, we get a release.

10          MS. HOUCK:  Yeah, I know.  I appreciate that, Your

11  Honor, I do.

12          And just to back up to give a little bit more context

13  to this, when we issued the subpoena asking for the

14  communications with investors and asking for documents related

15  to their dispute, we understand that none of that exists at

16  Robertson Stephens with the exception of this settlement

17  agreement.  You know, part of what we were wondering is if

18  Robertson Stephens, as we understand was the case, was unhappy

19  they were representing a competitor at the same time or was

20  unhappy with the best efforts that were being put forth.

21          None of those -- what we received back was Robertson

22  Stephens Partners is no longer in business.

23          THE COURT:  Yeah.

24          MS. HOUCK:  None of that exists anymore.  "We have 21

25  documents that we are willing to give you."  This is what we

1   heard from Robertson Stephens, "21 documents we're willing to
2   give you."  We were not told what they were.
3        And then Capitala -- or NovaFund swept in right before
4   they were going to produce them and said, "We object.  They're
5   confidential."
6        We're having a hard time, if that is what the
7   settlement agreement looks like, plain vanilla, nothing in
8   there, why it's proprietary and why it's so sensitive.  If
9   there is sensitive-company information in the settlement
10  agreement, then that's what we're concerned about is that
11  there's some listing of clients that were introduced or
12  negotiation of payments that's set forth there.  I've not seen
13  that because I've not seen the settlement agreement.
14       THE COURT:  But let me ask you this:  Do you have
15  enough information that you're able to be satisfied that, in
16  fact, there were no investments in this Robertson Stephens
17  funds or not?
18       MS. HOUCK:  Yeah, I understand that there were no
19  investments.  I assume that counsel is not -- is representing
20  that.
21       THE COURT:  Okay.  If that's true, if that's true, let
22  me ask you a question.  How would you have been harmed, then,
23  your client have been harmed, by what NovaFund was doing with
24  Robertson Stephens?  I suppose you could argue, well, the fact
25  they were spending time on this at all means it was taking away

1  from their best efforts for us, maybe.

2        But turning to the exclusivity argument, how would --

3  even if it is a breach of that provision, how would your client

4  be harmed by that?

5        MS. HOUCK:  Well, Your Honor, what we have seen so far

6  is examples of NovaFund -- a couple different things we have

7  seen and discovered.  We've seen examples of NovaFund e-mailing

8  potential investors with several different options for one.  We

9  have seen them then reach out to investors and say, "We've got

10  this fund and this fund.  Which one would you be interested

11  in?" which we understand from those in the business is not an

12  appropriate way to go out to investors.  You should be pushing

13  your singular fund --

14        THE COURT:  I see.

15        MS. HOUCK:  -- and explain to investors why that's

16  important.

17        We've also received evidence that in at least one

18  occasion, if not more, Capitala gave investor names to

19  NovaFund, and they then introduced other funds to those

20  investors prior or in lieu of introducing Capitala.

21        THE COURT:  Say that part again.  Capitala gave

22  investor names to NovaFund, and then NovaFund allegedly did

23  what with them?

24        MS. HOUCK:  Introduced a different fund, one of the

25  competitor funds to that investor first --

1          THE COURT:  I see.

2          MS. HOUCK:  -- prior to introducing Capitala.

3          So Capitala said, "You should reach out to so-and-so.

4     They would be interested in our fund.  We're a good fit for

5     what they're doing."

6          THE COURT:  I see.  I understand.

7          MS. HOUCK:  One competitor fund.  So that

8     back-and-forth matters.  We can't get that from Robertson

9     Stephens because they don't have it.  All they have is these 21

10    documents they're more than willing to give us.

11         THE COURT:  Okay.  I understand.  I understand.

12         Attorney O'Toole, do you want to respond?  You don't

13    have to.  You don't have to.  I just was saying I don't want to

14    cut you off if you did because I'm ready to move on to the next

15    issue.

16         MS. O'TOOLE:  No, Your Honor.

17         THE COURT:  Okay.

18         MS. O'TOOLE:  I think -- ultimately, I think the

19    compromise we offered will get them the information that they

20    were looking for without needing the settlement agreement or

21    invoices or the activity tracker.

22         THE COURT:  Okay.  Let's go on.

23         MS. HOUCK:  Your Honor.

24         THE COURT:  I'm sorry?

25         MS. HOUCK:  I'm sorry.  I was just going to say for

1    the biggest part of that that we disagree with is the activity

2    tracker.

3              THE COURT:  I get it.  That's what's the most

4    important to you.  I get it.

5              MS. HOUCK:  That's right.

6              THE COURT:  Yup.  So let's go on to the bank records

7    dispute.  Then we can come back and have some general comments

8    on this at the end.

9              So as I understand it, just looking at the subpoenas,

10   the breadth of the request really relates to how Capitala is

11   defined, although I guess I have a question.

12             So I'm looking at -- we have two different subpoenas

13   here, and there's a request for bank records concerning any

14   account maintained by Capitala, but then there are also

15   requests for bank records concerning three specific accounts.

16   And I guess I need to understand what those are.

17             So let's start with the subpoena to South State

18   Corporation.  And the first -- the first document request seeks

19   account statements, depositing, withdrawal records, etc.,

20   flowing into and out of Park Sterling Bank account number, and

21   then it has a long number.

22             What is that account or what is -- Attorney O'Toole,

23   it's your subpoena; so maybe you can start by telling me what

24   you think that account relates to.

25             MS. O'TOOLE:  Yes, Your Honor.  And so when we issued

1   the subpoena, we didn't have an understanding of Capitala's

2   corporate structure.  We had asked for an org chart and hadn't

3   received it, but based on the meet and confer, we have moved on

4   beyond the subpoena.  We have asked for multiple times to limit

5   the subpoena just to bank account statements for eight

6   entities, if those eight entities have bank accounts.

7           THE COURT:  Oh, okay.  So I don't need to worry about

8   the Park Sterling account or, for that matter, the first two

9   statements, first two requests for the other bank, U.S. Bank NA

10  account number and then the two account numbers.  I just need

11  to worry about bank statements relating to these eight

12  entities; right?

13          MS. O'TOOLE:  Correct.

14          THE COURT:  Thank you.  And the eight entities are

15  those that follow the definition of Capitala in the definition

16  section?

17          MS. O'TOOLE:  No, Your Honor.

18          THE COURT:  Oh.

19          MS. O'TOOLE:  What we had agreed to narrow the

20  subpoena to in the meet-and-confer process with Capitala.  And

21  so we had gone back to them and identified eight entities, one

22  of the named party defendants, Capitala Group.  The next one is

23  for Fund V and Fund V's manager, which is Capitala Private

24  Credit Fund V, LP, and the manager is Capitala Private

25  Advisors, LLC.

1      THE COURT:  Okay.

2      MS. O'TOOLE:  We didn't know if the two

3  StepStone-related entities would have bank accounts with U.S.

4  Bank and South State Corp., but we did identify those two

5  because we have confirmed the separately managed account was

6  managed for the StepStone affiliate.  It's called Swiss

7  Capital.  So the two accounts are Swiss Capital Capitala

8  Private Debt Fund, LP and Swiss Capital Capitala Private Debt

9  Offshore, SP.  So those are four and five.  The next one is for

10  Capitala Specialty Lending Corp.

11      THE COURT:  Yeah, I know what that is.

12      MS. O'TOOLE:  Yup.  And then the next two relate to

13  the Capitala's BDC.  It's the Capitala Finance Corp. and its

14  manager, which is Capitala Investment Advisors.

15      THE COURT:  Okay.  Okay.  So, now, let's go back to

16  brass tacks.  I know the case is changing and I've just, you

17  know, issued various rulings on it's going to be broadened and

18  all that stuff.

19      But I guess my best memory of the case comes from the

20  PJR hearing, and I know that may be a little misleading.  But

21  what I remember -- and I did review some of this yesterday --

22  was that the -- there was a Firm 1 that had, in fact, invested

23  in some way in Capitala SLC.  Is that StepStone?  Is that Firm

24  1?

25      MS. HOUCK:  It is, Your Honor.

1          THE COURT:  Okay.  All right.  I remember some concern

2     about identification.  We can talk about if you folks want to

3     file a motion to redact the transcript.  I'll try to not keep

4     using the word.

5          That part I think I understand.  And if StepStone

6     or -- sorry -- Firm 1 invested in Capitala SLC, I would think

7     that NovaFund would be allowed some discovery to determine the

8     amount of the investment, the nature of that investment, to try

9     to prove its claim that, in effect, that was some sort of a way

10    around the term sheet, breach of the covenant of good faith and

11    fair dealing, etc.  But -- and so that I think having some

12    evidence concerning StepStone's investment, that makes sense to

13    me.

14         But maybe I should start with you, Attorney O'Toole.

15    Why would we then say, well, okay, but then we need to look at

16    the bank accounts of eight different entities in order to get

17    evidence of Firm 1's investment?

18         Maybe you're going to tell me, "Well, we have evidence

19    that there are more firms invested."  I don't know.  I don't

20    know where discovery's been since then.  But why do we need the

21    bank accounts of eight different entities to get at this

22    information?

23         MS. O'TOOLE:  So just stepping back, the term sheet

24    between Capitala and NovaFund allows NovaFund to get, quote,

25    unquote, success fees --

1          THE COURT:  Right.

2          MS. O'TOOLE:  -- for capital commitments to Fund V and

3    to separately -- and to separately managed accounts.  It also

4    entitles NovaFund to tail fees for fees that a target investor

5    made into Fund V that also invest into the next

6    Capitala-sponsored vehicle.

7          THE COURT:  Okay.

8          MS. O'TOOLE:  So the breach of contract claim is

9    centered around those.

10          THE COURT:  Right.

11          MS. O'TOOLE:  I think that what we have learned

12    through discovery is that this case is really more about the

13    fraud and back scenes claims than it is in part about the

14    breach of contract claims.  So we do have claims that would

15    entitle NovaFund to disgorgement of process and the variety of

16    different fees that Capitala either has or ever will earn.

17    That's related to our claims.

18          You know, in term of the defenses, one of the things

19    that -- one of the things we need to be able to defend against

20    is the notion that some of these other entities that Capitala

21    set up has different investment strategies.  And what we have

22    seen through discovery is that if Capitala wanted to make a

23    loan to one of these companies, essentially deploying the

24    investor's capital that they committed or invested, then the

25    loan could be a $50 million loan to Company A.  And that loan

```
 1    will then be allocated across Capitala's investment platform.

 2    And we've seen numerous examples of that loan, and loans like

 3    it, being allocated across Fund I, Fund II, Fund III, Fund V,

 4    and CSLC and the BDC, meaning each one of those different

 5    entities may chip in 5 or 10 million dollars so that you get to

 6    the 50 million and then the investment is made to the -- to the

 7    Company A.

 8          THE COURT:  But here's -- you've lost me.  You've lost

 9    me.

10          I saw that in your letter, and the fact that Capitala

11    is extending a loan drawing on different of its own entities,

12    what's -- maybe I'm missing something basic here.  Probably.

13    But what's the connection between that, on the one hand, and

14    investments by Firm 1 or other entities that NovaFund claims it

15    would have some share of?  What's the connection between those

16    things?

17          MS. O'TOOLE:  Yup.

18          THE COURT:  Go ahead.

19          MS. O'TOOLE:  So, Your Honor, it's a two-step process.

20    First you have to get the investor's money, and then Capitala

21    will take that money and they go and invest it.  So they go and

22    they make the loans.  Those loans then presumably either pay

23    interest or they, you know, at the end of it, they'll recoup

24    the money.

25          THE COURT:  Right.
```

1      MS. O'TOOLE:  And that's how the investors make their

2  profit.

3      THE COURT:  Right.

4      MS. O'TOOLE:  So the deployment of the investors'

5  money shows the investment strategy.  So if this $50 million

6  loan is being made to Company A across Capitala's platform, it

7  shows that CSLC and StepStone and the BDC all are of the same

8  investment strategy because they're all investing in the same

9  companies.

10     THE COURT:  But why do you have to worry about

11  whether -- so if I'm following your logic then, so let's say

12  Firm 1 invests $50 million in this SLC syndicated loan project,

13  and, in fact, the way it's, as you put it, deployed, the way

14  the money flows is that it flows through eight different

15  Capitala entities.  I'm not sure why, but it does.  And then it

16  goes out from there to the borrower.  Why is that interim step

17  important to you?

18     MS. O'TOOLE:  We -- because for -- so on the one hand,

19  Capitala has said we're not -- NovaFund's not entitled to any

20  success fees relating to StepStone because it had an entirely

21  different investment strategy.  It said, You're not entitled to

22  anything related to CSLC because it has an entirely different

23  investment strategy.

24     THE COURT:  Yes.

25     MS. O'TOOLE:  Now, our argument is, when we get

1    success fees, the investment strategy doesn't matter.  The term

2    sheet says, You get investment into Fund V and separately

3    managed accounts.  There's no qualifier as to whether it is a

4    substantially similar investment strategy.

5              THE COURT:  Okay.

6              MS. O'TOOLE:  That said, we only get tail fees if

7    this -- the next Capitala-sponsored vehicle and Fund V have a

8    similar investment strategy.

9              THE COURT:  Oh.

10             MS. O'TOOLE:  So one way to determine an investment

11   strategy is to look -- these are credit funds.  These aren't

12   equity funds.  So the investments that Capitala is making on

13   behalf of Fund V to actually get the money back for its own

14   investors, it has to deploy that capital, and it makes

15   investments.  And so you look at what Capitala is investing in,

16   you know, through Fund V to determine what the investment

17   strategy is.

18             THE COURT:  So just so I'm clear, then, what you're

19   saying is that -- and I don't have the term sheet in front of

20   me, but to get to tail fee, you're going to have to prove that

21   the subsequent investment that gives rise to the tail fee was

22   made in a vehicle that had -- some other Capitala vehicle that

23   had a strategy that was similar to Fund V?

24             MS. O'TOOLE:  Yes.

25             THE COURT:  Okay.  Okay.  I think I understand that

1    now.

2            So but isn't, then, the place to start with Firm 1?

3    And I don't mean -- I know there may be reasons that it's hard

4    to get discovery from Firm 1.  I don't know.  Have you tried to

5    get discovery from Firm 1?

6            MS. O'TOOLE:  We've tried.  And we're probably going

7    to key that up for Your Honor fairly soon.

8            THE COURT:  All right.

9            MS. O'TOOLE:  And we don't even know, this may be --

10   we've given this list of eight entities to Capitala.  They

11   could come back and say to us, "Look, neither of this was

12   capped entities, has bank accounts at U.S. Bank and South State

13   Corp."  And then we'd say okay.  But they haven't come back and

14   said that.

15           THE COURT:  But I'm wondering whether even to go to

16   Capitala or Capitala entities to try to find out basically

17   where Firm 1 invested, not only an initial investment but any

18   subsequent investments, you need to start with the bank

19   statements to do that?  In other words, interrogatories or

20   documents sufficient to show investments during a certain time

21   frame by Firm 1 or -- I mean wouldn't that be more targeted

22   than asking for all of their bank statements?

23           MS. O'TOOLE:  We've tried.  And I think the answer,

24   Your Honor, is that we don't have to -- and this is -- you

25   know, we don't have to -- the bank account statements, even

1  though -- the touchstone under the federal rules isn't the best

2  evidence.  These are, nonetheless, the best evidence.  So the

3  money that was going -- what money was received by the account,

4  where did that money go, what was the purpose, what was the

5  money used for, what purposes was it used for, and who

6  benefited.

7         THE COURT:  Yeah, but it's a blunderbuss approach, and

8  it impinges on their privacy interest.  I mean they do have --

9  they do have privacy interest in their bank statements.  That's

10  well established.

11         And the bank statements are going to include records

12  of all kinds of transactions that have zero to do with this

13  case.  And that's why I'm wondering why there wouldn't be a

14  more targeted approach to find out, well, okay, we think Firm 1

15  and maybe we think some other investor also invested and that

16  was an investor that was, you know, we get a piece of because

17  of our efforts or it comes under the term sheet.

18         Why -- Capitala's going to have documents if those

19  entities invested.  And why isn't the place to start by asking

20  for those documents?

21         Now, if you were getting the runaround as to those

22  documents or if you know that Firm 1 has invested $120 million

23  and they're saying, "We don't have a shred of paper about

24  that," well, then maybe we'd need to come back and I would say,

25  "Well, maybe it's time to give up your bank statements."  But

1    it doesn't sound like you've done that.

2         MS. O'TOOLE:  Oh, Your Honor, we've been trying for

3    months.  I mean we subpoenaed -- we subpoenaed StepStone back

4    in July, and we've been getting the runaround ever since then.

5    They've given us -- StepStone's given us no documents.

6         And we've also been getting the runaround from

7    Capitala because what they've been offering to give us is

8    essentially like they get to cherry-pick the information.

9    They're only going to give us information on management fees

10   and closing fees.  And we know that that's gamesmanship to the

11   nth degree because there are so many other types of fees that

12   Capitala would be entitled to under these agreements.

13        And ultimately we do have -- they've asserted a $65

14   million counterclaim against us.  We have the right to show

15   that these entities do have the same investment strategy and

16   that --

17        THE COURT:  But that's -- so that part I didn't quite

18   follow because I understood what you said earlier about the

19   showing that these other entities have the same investment

20   strategy is relevant to our entitlement to a tail fee.  That I

21   understood.  I should know this, because I just dealt with

22   their counterclaims, but what does that have to do with their

23   counterclaims?

24        MS. O'TOOLE:  Part of their counterclaims is we didn't

25   perform, and one of the reasons why we were having trouble

1    raising money, especially when it hit 2017, is because of the

2    extent of the losses that were in the Business Development

3    Corp., the BDC, which is the Capitala Finance Corp.

4           THE COURT:  I see.

5           MS. O'TOOLE:  And the feedback that -- and so part of

6    what we need to do to show our defenses is to show that all --

7    there was a 25-percent market capitalization loss in the BDC in

8    the summer of 2017, and investors were totally spooked.

9           And when we tried to bring that to Capitala's

10   attention, their answer was, "NovaFund doesn't understand us.

11   They don't understand what we're doing.  They're not going to

12   work for us anymore," even though we had a commitment to work

13   with them through 2017.

14          But it was a combination of the losses in the BDC and

15   the nonperforming assets in the BDC that caused investors not

16   to want to invest in Fund V.  They were expressing concern that

17   Capitala was more concerned about the BDC than Fund V, and even

18   Capitala understood this is -- there's discovery showing that

19   Capitala understood, in its communications with potential

20   investors for Fund V, that one of the investor's concern was

21   the allocation of time, deals, and resources as between Fund V

22   and the BDC and that there were going to be certain investors

23   that just generally had a distaste for BDC, which would make

24   them unlikely to want to invest in Fund V.  So what was

25   happening in the BDC is relevant.

1          THE COURT:  Yeah, I'm going to ask counsel about that,

2     but I see the theory.  But just because what was happening in

3     the BDC is relevant doesn't mean you're entitled to all of

4     BDC's bank statements; right?  I don't know.  I'm going to ask.

5     They probably produce financial statements, they probably do

6     tax returns, probably do other things that, frankly, would be

7     far more transparent in terms of understanding actually what

8     their profitability was, how they were doing, whether they were

9     losing money, than combing through their bank records; right?

10          I mean the BDC's financial condition, based on your

11    theory, is relevant, I agree.  But that doesn't make every

12    scrap of paper that has a number on it at the BDC relevant or

13    proportional.  I mean, again, why isn't the best -- have you

14    requested audited financials from the BDC?

15          MS. O'TOOLE:  It should be included in our discovery

16    requests.

17          THE COURT:  All right.  Well, let me ask Capitala's

18    counsel -- and I keep calling her Capitala's counsel because I

19    can't remember her last name.  She could remind me.

20          MS. HOUCK:  Houck.

21          THE COURT:  Houck, sorry.  Thank you.

22          Attorney Houck, can you respond -- let's start with

23    the BDC since that's pretty fresh in my mind.  You know, based

24    on what Attorney O'Toole talked about -- and I do remember some

25    evidence like this at the hearing -- that NovaFund's version of

1    events was, "Hey, look, part of what our struggle was was that

2    Capitala was having its own financial difficulties, and that's

3    why we weren't able to sell Fund V."

4           And so if you're counterclaiming for failure to use

5    best efforts, why shouldn't NovaFund be entitled to some

6    discovery about the financial condition of the BDC?

7           MS. HOUCK:  Well, Your Honor, I guess, as a baseline

8    conversation about the BDC, is that during our meet and

9    confers -- and there have been many -- I'm not even sure

10   they've asked for financial information related to BDC.  If

11   they did, it was in a very broad request.  That has not been

12   articulated or discussed --

13          THE COURT:  Okay.

14          MS. HOUCK:  -- or negotiated, quite frankly.  This is

15   the first time we heard that as a rationale for wanting these

16   bank account statements.

17          THE COURT:  Okay.

18          MS. HOUCK:  What I would say is, based on what I just

19   heard, it sounds like the concern is what investors believed

20   the problem was.  The actual financial condition of the BDC is

21   irrelevant.

22          If the question is, Did investors believe or did that

23   cause a problem with investors' willingness to invest with

24   Capitala? that evidence is in NovaFund's possession.  To the

25   extent it got feedback from investors that it was reaching out

1  to that there was a problem with the financial condition of the

2  BDC, they have that document.  Whether it was true or not that

3  there was a financial condition with the BDC, that is not

4  relevant.

5  THE COURT:  Well, let's talk about that.  The same

6  thing occurred to me.  I was going to ask Attorney O'Toole

7  about that, but then it occurred to me that you might -- you

8  might argue at a trial that, "We don't know what they're

9  talking about.  The BDC was in great shape.  And, you know, so

10  they're listening to rumors out there, you know.  We can tell

11  you, the BDC was in great shape."

12  And so that would be a defense that would tend to

13  undermine that assertion.  So why shouldn't they -- so I

14  wouldn't go so far as to say it's irrelevant.

15  Now, if you were going to stipulate that, hey, we're

16  going to acknowledge that the BDC was losing such and such

17  money or we're not going to defend the notion that the BDC was

18  not doing well, well, then there might be something else to

19  talk about in that regard.

20  But they are vulnerable to an argument that, well,

21  whatever they were hearing out in the market, it was

22  ill-informed and untrue.

23  MS. HOUCK:  No, that's fair, and it's really not

24  something that we have -- we have negotiated --

25  THE COURT:  Okay.

1          MS. HOUCK:  -- or even met and conferred on.

2          THE COURT:  All right.

3          MS. HOUCK:  There are -- certainly Your Honor's right,

4   there is better evidence, less intrusive evidence of the

5   performance of the BDC than what is being requested in these.

6          And on that front that, Your Honor, there's been a lot

7   discussed, I'm going to try to run through it unless there's

8   something specific that you want me to address.

9          THE COURT:  Well, let me see if I can put a fine point

10  on it, which is Attorney O'Toole makes the point that they're

11  going to have to show, in order to show that they're entitled

12  to tail funds, that subsequent investments by an investor were

13  put into funds with similar strategies.  I don't have the

14  language in front of me, but similar investments.

15         So that does, it seems to me, does allow them to go

16  beyond Capitala SLC to see if, okay, well, if Firm 1 made

17  investments in -- I don't know -- one of these other groups,

18  then, you know, they need to determine whether the strategy of

19  that group was similar.  So that's what I'm interested in

20  hearing from you.

21         MS. HOUCK:  So for Firm 1 -- and we can call it

22  StepStone.

23         THE COURT:  Okay.

24         MS. HOUCK:  I think that's out in the pleadings at

25  this point.

1          But for that firm, we have agreed and have already

2     produced documents that show all fees that have been received

3     from that firm, both management fees under the investment

4     advisory agreement, which NovaFund has the investment advisory

5     agreement as well, so they can see what fees they were entitled

6     to.  But we have produced the fees.

7          We have agreed to produce the invoices related to

8     those fees.  We have produced closing fees, which are a

9     different kind of fee that Capitala received related to

10    deployment of money put in the investment advisory agreement

11    arrangement.  And we have also disclosed which loans those

12    closing fees were coming from.

13          THE COURT:  Okay.

14          MS. HOUCK:  We have represented to NovaFund that there

15    are no additional fees coming in to any Capitala-related entity

16    from StepStone or Swiss Capital, which are two affiliated

17    companies that are relevant here to Firm 1.

18          THE COURT:  Okay, and so -- so you -- but have you

19    disclosed which Capitala entities StepStone has invested in

20    other than Capitala SLC?

21          MS. HOUCK:  They have not invested in any other

22    Capitala entities.

23          THE COURT:  But what about these SMAs that Ms. O'Toole

24    mentioned, Swiss Capitala or whatever it's called?

25          MS. HOUCK:  Those are the Swiss Capital related

1   manager and advisor for their fund.

2            THE COURT:  When you say --

3            MS. HOUCK:  Capitala entity.

4            THE COURT:  I don't follow.  I thought those had

5   something to do with StepStone.

6            MS. HOUCK:  Those two entities I believe are being

7   pulled from the investment advisory agreement.  What this

8   arrangement is is that Capitala -- or Swiss Capital, which is a

9   StepStone affiliate or related company, so we use them

10  interchangeably just for this purposes, not for discovery, but

11  for this purposes, Swiss Capital has its own fund.

12            THE COURT:  Okay.

13            MS. HOUCK:  And it has a manager of that fund, and it

14  has its own bank accounts.  Everything is done itself.  It has

15  its own agreements.

16            It then turned around and entered into an advisory

17  agreement where on a quarterly or monthly basis -- I'm not sure

18  which one; I have to look -- Capitala is given a certain amount

19  of money to invest according to -- this is the conversation Mr.

20  Alala had with you about investing in loans that fit within the

21  box.

22            THE COURT:  Yes.

23            MS. HOUCK:  Disagreements.

24            THE COURT:  Yes.

25            MS. HOUCK:  They are paid a fee based on allocations

1    money out of this fund to invest it.  That is what we call the

2    investment advisory agreement.  That's what Ms. O'Toole calls

3    the SMA.  We disagree on --

4              THE COURT:  Oh, okay.  But let me ask you this:  Isn't

5    NovaFund entitled to documents sufficient to show whether or

6    not the, as you call it, investment advisory agreement, as she

7    calls it, SMA, is -- has a similar strategy so that it comes

8    under the tail fee language?  Aren't they entitled to that?

9              MS. HOUCK:  I would argue -- well, I can see them

10   wanting the documents.  I would argue legally they're not

11   entitled to anything because StepStone -- tail fees only give

12   rise if somebody invested in Fund V and none of these

13   entities --

14             THE COURT:  Right, I know that.  I know that's your

15   position, yeah.

16             MS. HOUCK:  So on a very technical level, no.  But I

17   understand the question.  That is the reason we have identified

18   for them exactly which entities that the StepStone related

19   money have been deployed into.  That's what the closing fees,

20   there's an actual loan type.  There's a name of where that's

21   been deployed, what the investment was, because that is

22   potentially relevant to their theory, although we disagree with

23   it, their theory of this case.

24             THE COURT:  Yeah.

25             MS. HOUCK:  Yes, that's not what they're asking for

1  here.  They're asking for a complete -- they want to know

2  everything that's out there.

3      THE COURT:  Yeah, I get it.  They want the bank

4  statements, I know.

5      So, Attorney O'Toole, let me ask you to respond to

6  that.  It sounds like perhaps you might need some more

7  documents concerning what you call the SMA, but it sounds like

8  they've given you disclosure of all the fees generated by

9  investments by StepStone.  So how does that translate into

10  getting a basis to getting bank records for all these different

11  Capitala entities?

12      MS. O'TOOLE:  So first of all, Your Honor, we're --

13  our argument is that the term sheet entitled NovaFund to

14  success fees on capital commitments to either Fund V or an SMA.

15  We are not arguing that StepStone's entity qualifies for tail

16  fees.  We're saying it qualifies for success fees.

17      THE COURT:  Okay.

18      MS. O'TOOLE:  That we are specifically -- and then

19  it's going to be up to us to show this investment advisory

20  agreement structure actually equals separately managed account

21  that would entitle NovaFund to success fees.  Just to clarify

22  our arguments.

23      THE COURT:  Yes.

24      MS. O'TOOLE:  The problem is that, first of all, we

25  only recently got these documents from Capitala within the last

1    what I think -- and Pearlynn correct me if I'm wrong -- I think

2    they were in like the January 6th production or something this

3    year.  So we only recently got them.

4          It's a tiny spreadsheet that shows two types of fees:

5    management fees and closing fees.  And that's -- the problem is

6    that's not the only -- and it only shows what has already been

7    received.  And our breach of contract claim and our other

8    claims would say we get fees not only for what's been invested,

9    but what will be invested in the future because we understand

10   the deal with StepStone was that they were going to ultimately

11   put in $450 million.

12          THE COURT:  Right.

13          MS. O'TOOLE:  150 a year for three years.

14          THE COURT:  Right.

15          MS. O'TOOLE:  So we would be asking for -- we're not

16   asking the Court to speculate.  We're just asking for the

17   Court -- you know, the jury to award fees for what had been

18   already invested and then sort of a declaration as to what the

19   percentage would look like going forward.

20          THE COURT:  Of course, the bank statements aren't

21   going to tell you that though.  The bank statements are just

22   going to tell you --

23          MS. O'TOOLE:  Show what they've gotten so far.

24          THE COURT:  Right.

25          MS. O'TOOLE:  And they're supposed to get 1 percent

1   closing fees.  They're supposed to get management fees of 0.55

2   percent on most of the assets, and they also get performance

3   fees.  And this is the real kicker, it's the performance fee of

4   25 percent if they get beyond an 8-percent rate of return on

5   the investment.  So if -- and this goes -- this does go to what

6   Mr. Alala was testifying to in the PJR hearing, that if -- he

7   ultimately said that there were more types of fees than just

8   management fees and closing fees.

9           THE COURT:  And presumably that's written down in an

10  agreement somewhere.

11          MS. O'TOOLE:  Correct, in the IAA.

12          THE COURT:  And you have the IAA.

13          MS. O'TOOLE:  Correct.

14          THE COURT:  So help me out here.  Why is it -- if you

15  know all this, why do you need the bank statements?

16          MS. O'TOOLE:  Because then you'd need to apply it to

17  what's actually come in to see what they've earned.  I mean the

18  bank statements will show two things.  They will show not only

19  what money has come in, and they will show then presumably for

20  how the moneys have been paid for fees.  So it would be

21  investor commitments plus fees.

22          You know, the StepStone lawyer that I spoke to from

23  Steptoe & Johnson said that his understanding was that

24  StepStone was not -- or Swiss -- the StepStone affiliate, Swiss

25  Capital, was not the only investor in this StepStone entity.

1    There was an onshore entity and an offshore entity that was

2    affiliated with this -- that's actually two entities affiliated

3    with the investment advisory agreement.

4            THE COURT:  Okay.

5            MS. O'TOOLE:  And he told me that some other investor

6    came in through StepStone.  So it would be relevant -- the

7    problem is we've been trying for like six months to get

8    discovery about StepStone, and we have gotten so little

9    information that part of what we are asking for are bank

10   account statements.

11           THE COURT:  I'll tell you what.  Okay, I think I

12   understand this.  I think getting all the bank statements from

13   all these entities is just too broad at this time.  Okay?  I

14   think it goes beyond what you need.  I understand you've made

15   some efforts.  It sounds like StepStone has been -- well, shall

16   we say that you haven't worked anything out with StepStone yet.

17           That, to me, is the logical place to start.  We're

18   sort of -- it seems to me we're sort of doing this in reverse

19   because they're the ones who are going to have -- well,

20   Capitala, too, would have documents, I think, showing actual

21   investments and commitments that StepStone has made.  And those

22   documents I think you're entitled to.

23           Now, it sounds like you've gotten some of them.  Maybe

24   you haven't gotten all of them.  You laid out a theory earlier

25   as to why you should be allowed to show that any vehicles -- if

1    you were pursuing a tail fee theory, you clarified that that's

2    not the basis for the documents concerning StepStone.  But if

3    you were pursuing a tail fee theory with regard to StepStone,

4    you've laid out a basis to get some evidence of what the

5    different strategies of the different entities are.  But that,

6    again, doesn't entail getting the bank statements I don't

7    think.  In fact, I'm not sure the bank statements would be very

8    good evidence of what the strategy was.  It might be some

9    evidence.

10         So I guess what I'm likely to do is to have you narrow

11    these requests somewhat.  That's not to say you'll never get

12    the bank statements, because, as I said before, if it turns out

13    that -- I don't know -- you're not getting cooperation with

14    regard to more focused requests, then it may be necessary to

15    say, well, you know, they've tried everything else and you're

16    not giving it to them.

17         That's, obviously, meant for both listeners on -- sets

18    of listeners on this call.  I would expect that Capitala would

19    produce documents related essentially to, honestly, to any

20    StepStone investment in a Capitala entity during the relevant

21    period.

22         Now, I don't know.  Maybe there was some preexisting

23    arrangement between StepStone and Capitala, some, you know,

24    remote Capitala entity that has nothing to with this case that

25    preexisted this litigation, and, you know, that wouldn't be

1    really what I'm contemplating.

2         What I'm contemplating is the documents that would

3    show what StepStone did as sort of the sequelae and the sort of

4    contemplated future actions beginning with the what I

5    understood to be the $120 million investment in Capitala SLC.

6    Again, I might have the details wrong, but I think counsel sees

7    where I'm going.

8         There are ways to request documents concerning

9    StepStone's activities with Capitala that don't entail getting

10   all Capitala's bank statements.  And it doesn't sound like

11   you've exhausted those.  It sounds like you've done some of

12   those things.  It doesn't sound like you've exhausted them.

13        I don't have StepStone and its lawyer in front of me,

14   and I don't know what you've requested from them.  It sounds to

15   me like, you know, your going to StepStone and asking for

16   documents from StepStone is a very appropriate thing to do.

17   Again, I haven't seen the request.  I don't know and I'm not

18   opining that they're proper requests because I haven't seen

19   them.

20        But that's certainly, given what you want to prove

21   here, is definitely a proper course of action.  And if you need

22   to elevate that to me, you should do so sooner rather than

23   later.  So I'm perfectly willing to get on the phone with you

24   and StepStone's lawyer about that.  So I'll craft an order on

25   this that sort of lays out those thoughts.

1        With regard to Robertson Stephens, these are my

2   thoughts:  I don't think, Attorney Houck, that there's really a

3   basis to produce the settlement documents at this point.  Given

4   what little perhaps we know, given what it says in the

5   complaint, given that it appears to be agreed that there were

6   no investments there, it strikes me it's exquisitely unlikely

7   that the settlement agreement's going to have discoverable

8   information.  And I'm not inclined to have people paw through

9   documents where there's just no reason to believe it's going to

10  produce discoverable information.

11       On the other hand, Attorney O'Toole, with regard to

12  what your client was doing with regard to Robertson Stephens, I

13  get that your view is not a competing fund, but they don't have

14  to take your word for that.  So I am going to be, I think,

15  ordering that -- or overruling the objection to producing

16  documents concerning what NovaFund was doing with Robertson

17  Stephens.

18       Obviously, in terms of privacy and confidentiality,

19  obviously the protective order should apply.  And, in fact, I

20  don't see any reason why -- and this would go both ways to the

21  extent that -- I mean I think counsel should talk about this,

22  whether this is necessary, and they should work with the

23  third-party's counsel.  But I don't see why everything here in

24  these categories -- I'm talking about bank records; I'm talking

25  about documents coming from StepStone; I'm talking about

1    documents coming from Robertson Stephens -- those should all be

2    marked at least confidential.  And that's just a matter of they

3    relate to the parties' internal business activities.

4          So anyway, so those are my thoughts on this.  Is there

5    anybody who wants to say anything else?

6          MS. O'TOOLE:  Your Honor, one clarification with

7    respect to bank statements.  Would NovaFund be at least

8    entitled to the bank statements for Fund V and the Fund V

9    manager and CSLC fee?

10          THE COURT:  Well, that's a good question.

11          So, Attorney Houck, what about that?  Let's start with

12    Fund V.  My understanding is, other than the anchor

13    investments, there weren't any investments in Fund V.  And if

14    they want to verify that, why shouldn't they be allowed to look

15    at the bank statements to do that?

16          MS. HOUCK:  Your Honor, to allow them to verify that

17    for Fund V, we have already produced the audited financials for

18    Fund V.  We certainly think -- you are right, that there were

19    anchor investors and there were no other investors closed in

20    there.

21          We don't think the bank account statements for Fund V

22    are necessary in order to do that.  We've also, I believe,

23    answered that in interrogatories that there were no other

24    closings into Fund V.

25          THE COURT:  All right.

1          MS. HOUCK:  As far as the manager, we definitely

2     object to that.  What they are asking for is bank accounts

3     related to a separate entity, Capitala Private Advisors,

4     without any evidence that any money went into Capitala Private

5     Advisors from investors or anything like that.

6          THE COURT:  Can I ask a question?  Capitala Private

7     Advisors, did it have any role other than being the manager for

8     Fund V?  Did it do anything else, or was it created only for

9     that purpose?

10          MS. HOUCK:  No, it does other things --

11          THE COURT:  Okay.

12          MS. HOUCK:  -- is my understanding, Your Honor.  I

13     have to clarify that, but that is my understanding.  That is

14     one of the major -- the platforms of Capitala.  And my

15     understanding is it does do other things.

16          Fund V was created separately.  We have produced an

17     audit for Fund V, financial audit for Fund V.  We've also

18     produced the tax returns for Capitala SLC, and so that they can

19     see that StepStone is the -- the management fees from StepStone

20     and management fees are the only moneys going into Capitala

21     SLC.

22          THE COURT:  Have you produced other information

23     concerning Capitala SLC, who the investors were, that kind of

24     thing?  I don't know if that's been requested, but has that

25     come up?

1    MS. HOUCK:  We have answered that StepStone was the

2    only investor in Capitala -- it wasn't a fund.  It's just, if

3    you recall, it's --

4    THE COURT:  Yes.

5    MS. HOUCK:  -- it's just a marketing entity.

6    THE COURT:  Yes.

7    MS. HOUCK:  But the only investor that they received

8    fees from Capitala SLC was StepStone, and we have confirmed

9    that.

10    THE COURT:  Sorry.  Say that again.  The only

11    investor -- say that part again.

12    MS. HOUCK:  The only fees -- the only investor that

13    has fees coming in to Capitala SLC is StepStone, and we have

14    gone back and forth --

15    THE COURT:  Oh.

16    MS. HOUCK:  -- and are negotiating that with counsel

17    and I believe have confirmed that is not something we are

18    working on yet.

19    THE COURT:  Attorney O'Toole, Attorney O'Toole, wait.

20    Wait.  Wait.

21    MS. O'TOOLE:  That's one of our concerns.

22    THE COURT:  Wait, please.

23    MS. O'TOOLE:  Sorry.

24    THE COURT:  Wouldn't whether that statement was

25    true -- and I'm not doubting this truth of it, but whether it

1    was true, wouldn't that be something you could confirm by

2    looking at the tax returns?

3         MS. O'TOOLE:  Well, Your Honor, again, some of these

4    documents literally just came in.  And so, you know, have I, in

5    the last two -- these were included in the most recent

6    production, I believe, that was made in January of 2020.  So I

7    have not been able to analyze some of these documents to know

8    if they provide all of the information we requested.

9         But I think the statement that counsel just made

10   exactly underscores our concern, that Capitala's being, with

11   all due respect to counsel, too cute by half because it's not

12   just relevant what fees came into Capitala from investors

13   because if multiple investors came in that Capitala waived fees

14   or there's some contractual provision waiving fees, which we've

15   seen evidence of having happened, that's relevant because what

16   happens is an investor that we were pitching like Knights of

17   Columbus, what happens if Knights of Columbus comes in and

18   Capitala says, "You know what?  We're going to do you a favor

19   on this one.  We're going to cut your fees on this one because

20   we know you're going to come in some other time."  That then is

21   directly relevant.

22        THE COURT:  Let me ask you this, Attorney O'Toole:

23   Have you asked for confirmation of whether or not Knights of

24   Columbus and other entities that you were pitching for Fund V,

25   have you asked Capitala whether those entities invested in

1    Capitala SLC?

2            MS. O'TOOLE:  Well, remember, so we are entitled to

3    tail fees for the next sponsored vehicle.  So we were trying to

4    figure out -- and this is part of our meet-and-confer

5    discussions -- if any of the investor we were pitching invested

6    in any of the other --

7            THE COURT:  But let's start with Capitala SLC.  Have

8    you asked whether any of the folks you were pitching have

9    invested in Capitala SLC other than StepStone?

10           MS. O'TOOLE:  That would have been part of our

11   meet-and-confer discussions.  Did we say it that specifically?

12   Probably not.

13           THE COURT:  Again, this is a matter of -- I mean there

14   is a privacy interest in bank statements.  I agree with you

15   that Capitala SLC is kind of closer to the core issues in the

16   case, but I think it would be appropriate to start with other

17   questions, if you will.

18           And so Fund V, I am going to order the bank statements

19   for Fund V.  There's no reason they shouldn't get that.  The

20   manager, because the manager's involved in other things, I'm

21   not inclined to order that yet.  Same goes for Capitala SLC.

22   But I agree that you are entitled to know whether any entities

23   that you were pitching committed to Capitala SLC.  I agree with

24   that; so you can get that.

25           MS. O'TOOLE:  Your Honor, and what we have discussed

1    doing on that front is we have discussed receiving a list of

2    the investors that they believe they have introduced to

3    Capitala SLC -- or to Capitala in providing information about

4    whether any fees were either received or waived on the theory

5    that we somehow would refuse to take fees for any of those.  We

6    are in the process of negotiating that compromise.

7              THE COURT:  Okay.  All right.

8              MS. O'TOOLE:  That is something we have discussed and

9    are just hammering out exactly what information will be

10   provided on that.

11             And, Your Honor, just to be clear, to the extent that

12   any of these documents were just recently produced, that is

13   because we were hammering out the terms of the amended

14   protective order, not --

15             THE COURT:  Okay, fair enough.  Let me move on to

16   something else, and we won't take a long time with this because

17   I have to go.

18             So, folks, you've been going at it hammer and tongs

19   for quite some time.  Your clients are spending a lot of money

20   on this.  Both sides have good lawyers.  They know what they're

21   doing.  This is expensive, etc.

22             I think, especially because we now have expanded the

23   case and we're going to have new people at the table, MD Global

24   and Columbia and the like, I think it would make sense for

25   there to be some kind of a settlement discussion here.  I don't

1    think we should do that now.  I think we should wait until the

2    new folks are at the table.  But this is -- you know, you folks

3    are really going at it, and -- not inappropriately, but it's

4    just expensive.

5         And so what I think would make sense is after

6    everyone's been served and we've got appearances from new

7    counsel and all, I'll let a couple weeks go by, but I'm going

8    to -- I'll put an order on soon to say, you know, there should

9    be a meet and confer with all counsel about whether mediation

10   would make sense, about, you know -- my guess is the folks, the

11   lawyers, let's be realistic, the lawyers from Columbia and MD

12   Global are going to come in and say, "Judge, we need more time.

13   We just got here."  I'm going to have to accede to that.

14        So we need to sort of get this under control and see

15   if there's an opportunity to potentially -- see if there's an

16   opportunity to resolve it.  I can get a magistrate judge

17   involved on a fairly short order, if everybody's interested and

18   everybody's willing to play ball, to sit down with you folks.

19        I take it -- am I correct in assuming there really

20   haven't been meaningful settlement discussions at this point?

21   Is that accurate?

22        No, it's not.

23        MS. HOUCK:  Not any kind of mediations.

24        THE COURT:  All right.  I mean I'm not one for forcing

25   people into mediation.  And at the end of the day, I won't do

it.  But I do want folks seriously to discuss it.  I don't
think now, right now, is the time, but I think when the new
lawyers come into the case, everybody's been served and the
like, it would probably make sense for me to have everybody
actually in the courtroom.

We can talk -- I'll have you folks submit -- you know,
if the new lawyers want to talk about a new schedule, I'll have
them submit a proposal after conferring and then to talk about,
you know, the case a little and whether it makes sense to sit
down.  And I will have already contacted a magistrate judge at
that point.  I might even be able to give you a date.  I don't
know about that for sure.  I would need to make the referral
before that.

But I just think it makes sense because this case is
going to be -- continue to be expensive.  It's going to get
more expensive, and we need to talk about whether that might
make sense.  So there it is.

Okay, we will get orders out.  If there are additional
discovery disputes with StepStone, you should tee that up
sooner rather than later okay.

MS. O'TOOLE:  Thank you, Your Honor.

(Proceedings concluded at 11:11 a.m.)

1

2

3                    C E R T I F I C A T E

4

5

6

7              I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                    /S/ JULIE L. MONETTE
                  _____
16                Julie L. Monette, RMR, CRR, CRC
                       Official Court Reporter
17                       450 Main Street
                    Hartford, Connecticut 06103
18                       (860) 212-6937

19

20

21

22

23

24

25