## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NOVAFUND ADVISORS, LLC, | No. 3:18-cv-1023 (MPS) |
| Plaintiff, | |
| v. | |
| CAPITALA GROUP, LLC, | |
| Defendant. | August 26, 2020 |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT

**PLAINTIFF NOVAFUND ADVISORS, LLC**

Jill M. O'Toole (ct27116)
Alison P. Baker (ct28136)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.:   (860) 251-5000
Fax:   (860) 251-5218
jotoole@goodwin.com
abaker@goodwin.com

*Its Attorneys*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

FACTS AND PROCEDURAL HISTORY .................................................................................2

ARGUMENT .............................................................................................................................10

I. LEGAL STANDARD.......................................................................................................10

II. THERE IS GOOD CAUSE FOR MODIFYING THE
SCHEDULE TO ALLOW THE PROPOSED AMENDMENT...........................................11

  A. NovaFund Has Been Diligent .................................................................................12

  B. The Proposed Amended Claims Have Merit and Are Not Futile,
Because They Plausibly Allege Grounds for Piercing the Corporate Veil ...............16

  C. There Will Be No Prejudice to CGLLC, CPA, CIA, and CSLC ..............................26

CONCLUSION...........................................................................................................................28

Pursuant to Federal Rules of Civil Procedure 15, 16, 20, and 21, Local Rules 7(f) and 16, and this Court's scheduling orders, Plaintiff NovaFund Advisors, LLC ("NovaFund") respectfully submits this memorandum of law in support of its motion for leave to file an amended complaint against existing Defendant Capitala Group, LLC ("CGLLC") and to join defendants and add claims against Capitala Private Advisors, LLC ("CPA"), Capitala Investment Advisors, LLC ("CIA") (together, CPA and CIA do business as "Capitala Group," and collectively with CGLLC they are "Capitala"), and Capitala Specialty Lending Corporation ("CSLC").  In accordance with Local Rule 7(f), a redlined version of the proposed amended complaint ("PAC") showing the changes proposed against the current pleading is attached to the motion as Exhibit 1, and a clean version is attached to the motion as Exhibit 2.  As explained below, there is good cause to grant this motion and permit the filing of an amended complaint, because discovery has recently revealed that CPA, CIA, and CSLC operated CGLLC as their instrumentality and that they were alter egos of CGLLC.

## PRELIMINARY STATEMENT

NovaFund has been prosecuting its claims against CGLLC in this action for over two years.  Just as NovaFund was poised to take damning testimony from Capitala's investors and a former Capitala executive, CGLLC folded.  Folded not just in the context of this litigation – when its counsel moved for leave to withdraw to allow default to enter – but folded entirely, dissolving *sua sponte*.   In a recent text message, Capitala's founder and chief executive officer stated that as a result of the dissolution, "Nova receives what they deserve."  (A true and correct copy of excerpts of text messages from Capitala Group's former General Counsel, Richard Wheelahan, is attached hereto as Exhibit 1, at RW0203.)

Mr. Alala's statement hints that, while this lawsuit superficially appears to be a vanilla

breach of contract and tort action, lurking beneath the surface is a more complicated story.

Documents produced within the last month and deposition testimony provided very recently,

confirm that NovaFund's relationship with Capitala was marred by Capitala's fraud from the

very start.  And not just fraud relating to Capitala's retention of other placement agents in

violation of the contract.  And not just fraud relating to the carve out list (which listed investors

that Capitala did not know).  And not just fraud in denying there was any basis to pay NovaFund

its contractual fees.  But fraud in that Capitala executed an agreement in the name of a

purposefully insolvent entity – an entity that has been described as a mere ███████████████

███████████████████ – that served no purpose other than to be a signatory for

███████ contracts, so that Capitala could escape any ultimate obligation to pay.

That same fraudulent, inequitable conduct forms the basis for the instant motion.  As an

empty shell, propped up by the funds, executives, employees, and infrastructure of Capitala's

other entities, including CPA, CIA, and CSLC, CGLLC was the mere instrumentality and alter

ego of CPA, CIA, and CSLC, and those entities should be held liable for the debts of the

intentionally and perpetually penniless signatory to NovaFund's contract, CGLLC.  As explained

herein, there is good cause for granting leave to amend and the motion should be granted.

## FACTS AND PROCEDURAL HISTORY

The following facts are taken from the Proposed Amended Complaint ("PAC"), which

must be accepted as true for purposes of this motion and construed in a light most favorable to

NovaFund, as the moving party.  *Gallagher v. Town of Fairfield,* No. 3:10-cv-1270 (DJS), 2012

WL 370070, at *3 (D. Conn. Feb. 2, 2012).

In 2016, Capitala Group, doing business as CPA and CIA, sought to raise capital for a

private credit fund focused on making direct loans to lower middle market companies with

opportunistic equity co-investments.  (PAC ¶ 1.)  The credit fund was known as Capitala Private

Credit Fund V, L.P. ("Fund V").  (*Id.* ¶ 20.)  Capitala Group hired NovaFund as its exclusive

placement agent for Fund V, knowing that Capitala could work only with NovaFund and no

other placement agents.  (*Id.* ¶ 1.)

From the start, Capitala Group had no intention of dealing with NovaFund in good faith

or working exclusively with NovaFund.  (*Id.* ¶ 2.)  For example, Capitala Group used a shell

company, CGLLC, to sign the contract with NovaFund.  (*Id.*)  CGLLC is a sham entity, with no

assets, no income, no operations, no real structure, and no purpose other than to serve as the

counterparty to the agreement with NovaFund and other contracts considered to be preliminary

or lacking in substance.  (*Id.*)  CGLLC was intentionally undercapitalized so that it would not

any have assets in the event it were ever responsible for a liability or judgment.  (*Id.*)  Capitala

Group never disclosed any of this to NovaFund, and instead this information only came out after

CGLLC dissolved in June 2020.  (*Id.*)  As explained further below, NovaFund effectively

entered into a business relationship with Capitala Group and CGLLC.  (*Id.*)

Additionally, without telling NovaFund and in violation of its contractual obligation to

work only with NovaFund, Capitala conspired with another company, Sandler, O'Neill &

Partners L.P. ("Sandler O'Neill"), to solicit investors for Fund V.  (*Id.* ¶ 3.)  Capitala and Sandler

O'Neill also excluded NovaFund from critical decisions relating to the marketing of Fund V,

including which types of investors to solicit, which specific investors to solicit, and when such

investors should be solicited.  (*Id.*)  The immediate result of this pact was to prevent NovaFund

from working with dozens of investors and from receiving full fees in the event those investors

invested in Fund V.  (*Id.*)  But, because Capitala directly, and Sandler O'Neill indirectly, hid this

information from NovaFund at the outset of the process for raising capital for Fund V, it affected

Fund V's overall marketing strategy.  (*Id.*)  NovaFund has since learned that Sandler O'Neill was not the only other placement agent that Capitala worked with on Fund V.  (*Id.*)

Capitala's decision to use a shell company, CGLLC, to sign the contract with NovaFund, along with its deceitful engagement of Sandler O'Neill, demonstrate that NovaFund's entire engagement with Capitala was premised on lies and omission from the start.  (*Id.* ¶ 4.) NovaFund never would have entered into a contract with Capitala had it known that the party signing for Capitala – CGLLC – was a dummy entity with no assets or income, or that Capitala intended to work with (and did work with) Sandler O'Neill and other agents on Fund V.  (*Id.*)

Capitala's double-dealing persisted throughout its relationship with NovaFund and was detrimental to what is supposed to be a transparent collaboration among a fund, its manager, and the placement agent.  (*Id.* ¶ 5.)

Capitala also marred their relationship by interfering with NovaFund's efforts and throwing up one roadblock after another to prevent NovaFund from doing its job.  (*Id.* ¶ 6.) Aside from blocking NovaFund from working with over 100 high potential, very credible investors, Capitala also purposely delayed NovaFund from starting work on marketing activities and arranging investor meetings.  (*Id.*)  Then, almost immediately after NovaFund was permitted to begin contacting investors, Capitala soon looked for an excuse to re-trade its deal with NovaFund so that it could hire yet another placement agent and threatened to sue NovaFund if it did not agree to amend the parties' contract on worse economic terms.  (*Id.*)  Caving to the mounting pressure from Capitala, NovaFund agreed to amend their contract.  (*Id.*)

Meanwhile, Capitala continued to act in bad faith towards NovaFund by excluding NovaFund from meetings with investors that NovaFund had been soliciting; developing and executing on the marketing strategy for Fund V without NovaFund; failing to follow

NovaFund's advice; and making false and disparaging statements about NovaFund to NovaFund's peer competitors, investor clientele, and investment professionals.  (*Id.* ¶ 7.) Capitala's conduct towards NovaFund throughout their relationship is quintessential bad faith and demonstrates a pattern of frustrating, interfering with, and preventing NovaFund's performance.  (*Id.*)

Despite all of the hurdles that Capitala put in NovaFund's path, NovaFund found a way to be successful by soliciting an investor with which it had a prior relationship, StepStone Group LP ("StepStone").  (*Id.* ¶ 8.)  NovaFund introduced StepStone to Capitala and worked for over a year to keep StepStone interested in forming an investment relationship with Capitala.  (*Id.*) Ultimately, StepStone and Capitala set up two separately managed accounts as part of the process for raising capital for Fund V to pursue significant investments with Capitala and its affiliates (the "StepStone-Capitala SMAs").  (*Id.*)

Soon after the StepStone-Capitala SMAs were finalized in April 2018, Capitala issued a press release announcing that it had raised $1 billion in capital for a new investment vehicle.  (*Id.* ¶ 9.)  After seeing the press release, NovaFund asked Capitala for information about the investors in that vehicle to evaluate whether NovaFund was due any fees.  (*Id.*)  Capitala refused, and did not disclose to NovaFund that the new entity (CSLC) was related to the StepStone-Capitala SMAs or that the new entity was set up to conceal StepStone's identity.  (*Id.*)

Instead, Capitala immediately sued in North Carolina state court seeking to avoid paying fees to NovaFund.  (*Id.* ¶ 10.)  Capitala's lawsuit followed a string of disparaging comments that Capitala made about NovaFund to Fund V's investors and StepStone falsely complaining about NovaFund's performance in an attempt to justify its decision to sue.  (*Id.*)  But, as Capitala has admitted, there were numerous reasons why investors declined to invest in Fund V having

nothing to do with NovaFund and rather relating to Capitala, its decision to launch the marketing campaign for Fund V in the fourth quarter of 2016 and to temporarily suspend fundraising efforts in early 2017, the performance of Fund V and Capitala's other investment vehicles, and the market. (*Id.*)  Nevertheless, Capitala pointed the blame at NovaFund.  (*Id.*)

Capitala's derisive comments lacked any justification as is evident from Capitala's contradictory statements, such as criticizing NovaFund for reaching out to too many investors and then saying they had contacted too few; complaining that NovaFund did not set up a sufficient number of meetings but instructing NovaFund not to set up meetings or being unavailable for meetings; attacking NovaFund's marketing approach but praising and using NovaFund's advice regarding investor presentations; disparaging NovaFund generally for not going far and wide enough and then admitting that such an approach would be unnecessary if only one investor made a significant enough investment. (*Id.* ¶ 11.)  In fact, just one year's worth of the investments made by the StepStone-Capitala SMAs equated to half of Fund V's targeted investment size.  (*Id.*)  Yet, despite NovaFund's successful contributions, Capitala has refused to pay NovaFund for the work that it did and for the benefits that Capitala has received and will continue to receive due to NovaFund's efforts.  (*Id.*)

NovaFund filed the complaint in this action on June 15, 2018 (ECF 1, the "Complaint") against CGLLC seeking damages and other relief in connection with CGLLC's failure to compensate NovaFund even though NovaFund had served as the exclusive placement agent and assisted Capitala with raising capital for a private credit fund and separately managed accounts.[1]

In April 2019, CGLLC moved to join parties and amend its counterclaims to add as

---

[1]      The Complaint asserts claims against CGLLC for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*  (ECF 1.)

counterclaim-defendants Columbus Advisory Group, Ltd. ("Columbus") and MD Global Partners, LLC ("MD Global"), NovaFund's former and current broker-dealers, respectively. (ECF 67.)  In December 2019, NovaFund moved to amend its complaint to add allegations relating to CGLLC's breach of the Agreement's exclusivity provisions, fraud, and bad faith. (ECF 96.)  On January 14, 2020, the Court allowed both amendments.  (ECF 101.)  In that ruling, the Court stated that no further amendments to the pleadings would be allowed.  (*Id*. at 47.)  NovaFund filed its Amended Complaint on January 16, 2020.  (ECF 103.)  The Amended Complaint alleges claims against CGLLC for breach of contract, breach of the implied convent of good faith and fair dealing, unjust enrichment, fraud, tortious interference with business expectancies, and violation of state unfair and deceptive trade practices laws.  (*Id.*)

On April 9, 2020, the Court held a status conference (ECF 135) and issued an order granting the parties' motion to amend the scheduling order in light of the ongoing public health crisis involving COVID-19 and the status of the case.  (ECF 136.)  The Court's order revised the remaining deadlines in the litigation, setting September 15, 2020 as the close of discovery.  (*Id*.)

On June 9, 2020, CGLLC filed a notice of voluntary dismissal without prejudice of its counterclaims against Columbus and MD Global.  (ECF 150.)  Later that day, CGLLC's lead and local counsel of record moved to withdraw as counsel.  (ECF 151.)  The next day, June 10, 2020, the Court approved CGLLC's voluntary dismissal of claims against the broker-dealers and ordered they be terminated as defendants.  (ECF 152.)  The Court also granted CGLLC's counsel's motion to withdraw and ordered that the Court would enter a default judgment against CGLLC unless new counsel appeared on its behalf within seven days.  (*Id*.)

Two days later, on June 12, 2020, NovaFund moved for reconsideration of the order allowing counsel to withdraw on the ground that CGLLC had failed to comply with a previously

issued discovery order, because the documents subject to that order were necessary for NovaFund to provide its quantum of damages.  (ECF 154).  On June 15, 2020, this Court vacated its order permitting counsel to withdraw, reserved judgment on that motion, and directed CGLLC to respond to the motion for reconsideration and to show cause why its counterclaims against NovaFund should not be dismissed.  (ECF 156.)

Meanwhile, discovery has been continuing.  NovaFund has made eleven document productions; CGLLC has made ten document productions, the first in August 2019 and the most recent on June 26, 2020.  (Declaration of Jill O'Toole ¶ 3, attached hereto.)  Between them, the parties have served about 24 non-party subpoenas.  (*Id.* ¶ 4.)  In response to those subpoenas, Columbus, MD Global, various investors, and former clients of NovaFund have produced thousands of pages of documents.  (*Id.* ¶ 5.)

Additionally, NovaFund has been pursuing discovery from StepStone since serving a subpoena for documents dated July 10, 2019.  (*Id.* ¶ 6.)  Although CGLLC's President and Chief Executive Officer, Joseph Alala, III testified at the prejudgment remedy ("PJR") hearing in this action that CGLLC did not have a separately managed account ("SMA") with StepStone (PJR Tr. 179:6-14; 221:13-23, ECF 60), StepStone produced documents showing that StepStone does, in fact, have two SMAs with Capitala.  (O'Toole Decl. ¶ 7.)  StepStone's production also includes documents regarding the StepStone-Capitala SMAs that are responsive to NovaFund's production requests to CGLLC, but that CGLLC never produced.  (O'Toole Decl. ¶ 8.)

Discovery has also established that Capitala formed another entity – CSLC – to have a public way of referring to the investment activity between the StepStone-Capitala SMAs and Capitala without identifying StepStone by name.  (*See* Deposition Transcript of Richard Wheelahan dated Aug. 4, 2020, at 93:12-20, true and correct excerpts of which are attached

hereto as Exhibit 2; *see also id.* 55:13-15, 56:16-59:12 (████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████).)

On or about June 11, 2020, Capitala served a Notice of Dissolution of CGLLC, which states that CGLLC filed Articles of Dissolution with the North Carolina Secretary of State with an effective date of dissolution on June 9, 2020.  (ECF 157-8.)

On June 22, 2020, this Court held a status conference during which the Court indicated its intent to continue to reserve judgment on the motion to withdraw as counsel and NovaFund's motion for reconsideration.  NovaFund's counsel raised the issue of scheduling the deposition of Capitala Group's former general counsel, Richard Wheelahan.  The Court inquired as to whether Mr. Wheelahan's deposition could be postponed until after the Court's ruling on the pending motions.  (*See* ECF 160.)  Soon thereafter, NovaFund filed a notice that the deposition had been postponed.  (ECF 161.)  After the parties submitted status reports in mid-July (ECF 170, 171), this Court allowed CGLLC's counsel to withdraw.  (ECF 172.)  The Court directed that "unless new counsel for Capitala files an appearance within 7 days of this order, the Court will enter a default against Capitala and then instruct the plaintiff to move for default judgment."  (*Id.*)

Since then, CGLLC has failed to show cause why its counterclaims against NovaFund should not be dismissed, no new counsel for CGLLC has filed an appearance in this action, and no default has entered against CGLLC.

On Tuesday, August 4, 2020, NovaFund took Mr. Wheelahan's deposition without CGLLC's participation.  (O'Toole Decl. ¶ 9.)  Mr. Alala has received the transcript.  (*Id.*)

By this motion, NovaFund seeks leave to file a Second Amended Complaint to pierce CGLLC's corporate veil and to join additional defendants, CPA, CIA, and CSLC, as alter egos

of CGLLC, so that claims can be asserted against them identical to those asserted against

CGLLC in the Amended Complaint.  In accordance with Local Rule 7(f), NovaFund's counsel

contacted Mr. Alala to ascertain CGLLC's position on its motion for leave to amend its operative

complaint.  (*Id.* ¶ 10.)  In his response, Mr. Alala noted CGLLC's objection because CGLLC "is

dissolved and has no assets."  (*Id.*; *see* email from Mr. Alala dated Aug. 21, 2020, a true and

correct copy of which is attached hereto as Exhibit 3.)

## ARGUMENT

## I.    LEGAL STANDARD

Leave to amend pleadings shall be freely given when justice so requires.  Fed. R. Civ. P.

15; *see Select Portfolio Servicing, Inc. v. Burns & Kelly Ins., LLC*, No. 3:14-cv-00116 (CSH),

2014 WL 4388566, at *2 (D. Conn. Sept. 5, 2014) (holding that justice required a plaintiff be

given leave to amend its complaint to add additional claims for relief).  "Rule 15 has been

applied liberally, so that the Federal Rules 'facilitate a proper decision on the merits.'"  *Santiago*

*v. Rossi*, No. 3:12-cv-132 (JBA), 2013 WL 2446523, at *1 (D. Conn. June 5, 2013) (citing

*Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As the Second Circuit has explained, Rule 15's

"mandate" to provide leave to amend when justice requires must be "obeyed" absent reasons

such as undue delay or bad faith on the part of the moving party, undue prejudice to the opposing

party, or futility of the amendment.  *Monahan v. New York City Dep't of Corrections*, 214 F.3d

275, 283 (2d Cir. 2000); *see Anthony v. City of New York*, 339 F.3d 129, 138 n.5 (2d Cir. 2003)

("Rule 15(a) provides that leave to amend 'shall be freely given when justice so requires,' and

we have interpreted this instruction in favor of allowing the amendment absent a showing by the

non-moving party of bad faith or undue prejudice.") (quoting Fed. R. Civ. P. 15(a)).

The same factors – diligence, lack of prejudice, and lack of futility – are analyzed when a

court considers whether to permit amendment outside the timeframe of the pretrial schedule. Federal Rule of Civil Procedure 16 allows a pretrial schedule to be modified "for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, No. 3:17-CV-627 (VAB), 2019 WL 935959, at *3 (D. Conn. Feb. 26, 2019) (granting motion for leave to amend).  Good cause has been interpreted to mean that the schedule cannot reasonably be met, despite the movant's diligence, although the court may also consider whether the amendment would prejudice the adverse party.  *Gilead*, 2019 WL 935959, at *3.

Where a movant seeks to amend its pleading to add a new party, Rule 21 governs.  Rule 21 allows the court "at any time, on just terms" to add a party.  Fed. R. Civ. P. 21.  Rule 20 provides that defendants may be joined to an action if:  "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Adding an additional party to a litigation "creates no additional obstacle," beyond that required by Rule 15, as the showing necessary under Rule 21 is the same as that required by Rule 15.  *Soroof Trading Dev. Co. v. GE Microgen, Inc.,* 283 F.R.D. 142, 147 (S.D.N.Y. 2012).

## II.     THERE IS GOOD CAUSE FOR MODIFYING THE SCHEDULE TO ALLOW THE PROPOSED AMENDMENT

While the deadline for amending pleadings and joining parties has passed, NovaFund has good cause for seeking to amend its pleading at this stage of the proceedings.  In determining whether there is good cause to modify a scheduling order under Rule 16(b), the "'primary consideration'" is whether the moving party can demonstrate diligence. *Gilead*, 2019 WL 935959, at *3 (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)); *Algonquin Gasoline, Inc. v. Petroleum & Franchise Capital, LLC*, No. 3:16-cv-00017-VAB,

11

2016 WL 6089674, at *1 (D. Conn. Oct. 17, 2016) (holding that good cause existed to amend scheduling order and to allow the plaintiffs to file an amended complaint, even though request was beyond the deadline set by scheduling order).  In addition to diligence, the district court also may consider "whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244.  For the reasons explained below, NovaFund's amendment should be permitted because NovaFund has been diligent, its claims are not futile and there will be no prejudice to CGLLC, CPA, CIA, or CSLC.

### A.    NovaFund Has Been Diligent

NovaFund has been actively prosecuting its claims against CGLLC.  The docket alone shows hundreds of filings since this action's inception. NovaFund has also diligently pursued discovery, serving at least 13 subpoenas on non-parties and reviewing nearly 18,000 documents totaling over 173,500 pages from parties and non-parties.  (O'Toole Decl. ¶¶ 4-5.)

CGLLC has aggressively defended this action and has employed heavy-handed litigation tactics.  CGLLC sought and received a stay discovery (ECF 32), effectively delaying the start of discovery until March 2019 (ECF 45), about nine months after this action commenced.

From the outset, CGLLC denied the existence of the StepStone-Capitala SMAs, which are at the core of NovaFund's allegations that it introduced Capitala to StepStone, an investor that formed two SMAs to invest with Capitala in connection with the process of raising capital for Fund V, which is compensable under the parties' agreement.  For example, Mr. Alala falsely testified at the PJR hearing that Capitala did not have an SMA with StepStone.  (PJR Tr. 179:6-14; 221:13-23, ECF 60.)  Mr. Wheelahan, who attended the PJR hearing, recently testified that ███████████████████████████████.  (Ex. 2, Tr. 55:13-15, 56:16-59:12.)  It took CGLLC months to produce documents confirming the existence of the StepStone-Capitala SMAs, and

StepStone's documents were not produced until April 2020. (O'Toole Decl. ¶¶ 4, 7.)

Additionally, CGLLC refused to produce other documents going to the core of this claim, namely documents relating to how much capital had been invested by the StepStone-Capitala SMAs, which led this Court to order CGLLC to produce responsive documents. (ECF 105.) CGLLC ignored that Court order, leading to another Court order requiring compliance. (ECF 160.) Those documents were produced only on June 26, 2020. (ECF 167.)

CGLLC also took until Fall 2019 to produce documents showing that Capitala had worked with another placement agent, Sandler O'Neill, on Fund V, even though the parties' agreement required that NovaFund be the only placement agent. That late document production prompted NovaFund's first proposed amendment to the Complaint. (*See* ECF 90, 96.)

Meanwhile, for the last two years, CGLLC has been defending against NovaFund's claims in a manner that has obfuscated the corporate structure of the Capitala enterprise, the intentional undercapitalization of CGLLC, and the true purpose of CGLLC. CGLLC's entire litigation strategy was premised on the notion that NovaFund lacks the " ███████████████ ██████████████████████████████████████████." (Ex. 2, Tr. 113:9-114:2; *see* PAC ¶ 112.) CGLLC has continued to act upon this strategy by filing articles of dissolution with the North Carolina Secretary of State effective as of June 9, 2020 (ECF 157-8) and having its lawyers move to withdraw their appearances in this action. CGLLC's ultimate goal was to ensure that it had no assets to which any creditor, including NovaFund, could look to for recovery in the event of a judgment or liability. (Ex. 2, Tr. 223:14-224:7; *see* PAC ¶¶ 128, 153.) This, again, was in furtherance of CGLLC's " ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

13

███████████████████████████████████" (Ex. 2, Tr. 237:1-238:10, 246:22-247:21; *see* PAC ¶ 112.)  In sum, CGLLC's own litigation tactics have both necessitated the present amendment (for, absent dissolution, NovaFund could simply have enforced the agreement against the contracting party) and prevented NovaFund from obtaining information previously that might have, at the very least, alerted NovaFund to a potential problem.

Delays in obtaining documents from Sandler O'Neill and StepStone pushed back the start of depositions.  (O'Toole Decl. ¶ 4.)   NovaFund served Rule 45 document subpoenas on Sandler O'Neill and StepStone on October 18, 2019 and July 10, 2019, respectively.  (*Id.*)  Sandler O'Neill took six months, or until April 8, 2020, to produce documents.  (*Id.*)  StepStone, which had been told by Capitala to keep documents relating to the StepStone-Capitala SMAs offshore (PAC ¶¶ 91, 210) took nine months, or until April 3, 2020.  (O'Toole Decl. ¶ 4.)

Once the parties and non-parties substantially completed document productions, NovaFund began noticing depositions, serving non-party subpoenas on Mr. Wheelahan; StepStone for a Rule 30(b)(6) deposition; one current and one former employee of StepStone; Kemper Insurance Corporation, one of Fund V's anchor investors, for a Rule 30(b)(6) deposition; and Sandler O'Neill for a Rule 30(b)(6) deposition.  (O'Toole Decl. ¶ 9.)

The subpoena to Mr. Wheelahan, noticed on May 29, 2020, set June 24, 2020 for his deposition.  (*Id.*)  It was postponed as a result of the June 22, 2020 status conference.  (*Id.*)  Mr. Wheelahan's deposition finally went forward on August 4, 2020 without CGLLC's participation (*id.*) after this Court had granted the motion by CGLLC's counsel to withdraw, which was in accord with the parties' discussion at the status conference.  His deposition established, for the first time, that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

14

████████████████████████████████████████

████████████████████████████████████████

██████████████████. (*See, e.g.*, Ex. 2, Tr. 223:23-225:1, 233:6-234:4.)

Before CGLLC's dissolution, the withdrawal of CGLLC's counsel, and Mr. Wheelahan's

deposition, NovaFund had no reason to believe that any Capitala entities other than CGLLC, the

signatory to the contract with NovaFund, needed to be party to this litigation. To the contrary, in

the past when payments were made to NovaFund's broker-dealer, they were paid on CGLLC's

behalf by CPA. (Ex. 2, Tr. 234:9-15.) Recent statements, however, underscore that CGLLC has

intended to leave itself with no assets. (*Compare* Ex. 3, an email from Mr. Alala dated Aug. 21,

2020 noting CGLLC's opposition to this motion because CGLLC "is dissolved and has no

assets" *with* Ex. 1 at RW0203, a text from Mr. Alala to Mr. Wheelahan dated June 23, 2020

stating that "We dissolved Capitala Group LLC. So your deposition I just learned is postponed.

We are allowing a default judgement against that LLC as that LLC has no assets. Court denied

adding other parties to the lawsuit. So Nova receives what they deserve.")

NovaFund acted promptly and diligently in light of the recent developments and

information, and has brought this motion about three weeks after Mr. Wheelahan's deposition.[2]

In similar circumstances, courts have granted leave to amend, even where the deadline to amend

has expired. *See Gilead Cmty. Servs.*, 2019 WL 935959, at *3 (granting motion for leave to

amend made just over a year after the Court's deadline for amending pleadings); *Echevarria v.

Utitec, Inc.*, No. 3:15-CV-1840 (VLB), 2017 WL 1042060, at *2 (D. Conn. Mar. 17, 2017)

(granting leave to amend four months after pretrial deadline and noting "the very purpose of

---

[2]     A tornado warning for the Hartford area caused a long delay during Mr. Wheelahan's
deposition. (Ex. 2, Tr. 163:10-164:3.) Widespread power outages due to the storm impacted the
ability to work remotely, including undersigned counsel who lost power for six days.

15

discovery" is to learn facts relevant to one's claims, making discovery of such facts a proper

basis to amend); *Soroof Trading*, 283 F.R.D. at 149 (where discovery revealed basis for

amendment, granting motion to amend filed one year and seven months after deadline to amend

pleadings and allowing plaintiff to pierce corporate veil and add claims against new defendants).

      **B.**      **The Proposed Amended Claims Have Merit and Are Not Futile,**
                        **Because They Plausibly Allege Grounds for Piercing the Corporate Veil**

      NovaFund has meritorious claims, which will easily survive a motion to dismiss, against

CPA, CIA, and CSLC because they are the alter egos of CGLLC and they operated CGLLC as a

mere instrumentality.  *See Select Portfolio*, 2014 WL 4388566, at *2 (holding that proposed

amendments are futile if they could not withstand a Rule 12(b)(6) motion to dismiss).

      In determining whether to pierce the corporate veil and disregard the corporate form,

courts apply the law of the state of incorporation of the controlled corporation.  *Chapco, Inc. v.*

*Woodway USA, Inc.*, 282 F. Supp. 3d 472, 481 (D. Conn. 2017) (applying Connecticut law

because entities alleged to be controlled were organized under Connecticut law); *Phillips v. Reed*

*Grp., Ltd.*, 955 F. Supp. 2d 201, 228 (S.D.N.Y. 2013) (applying Colorado law because limited

liability company and corporation allegedly controlled by two individuals, were formed under

Colorado law).  Here, NovaFund seeks to pierce the corporate veil of CGLLC, a North Carolina

limited liability company.  North Carolina law thus governs the veil piercing inquiry.[3]

      Under North Carolina law, "courts will disregard the corporate form or 'pierce the

---

[3]     The result would be the same under Delaware law, should CGLLC seek to apply
Delaware law as the place of organization of CPA, CIA, and CSLC.  As explained below, the
PAC's allegations readily overcome the standard for disregarding the corporate form under
Delaware law.  *New York Wheel Owner LLC v. Mammoet Holding B.V.*, No. 17-cv-4026 (JMF),
2020 WL 4926379, at *6 (S.D.N.Y. Aug. 21, 2020) (denying motion to dismiss because plaintiff
plausibly alleged grounds to pierce corporate veil).  Thus, NovaFund may pierce the corporate
veil and assert claims against CPA, CIA, and CSLC under Delaware law.

corporate veil,' and extend liability for corporate obligations beyond the confines of a

corporation's separate entity, **whenever necessary to prevent fraud or to achieve equity**."

*Glenn v. Wagner*, 329 S.E.2d 326, 330 (N.C. 1985) (emphasis added).  Under what is referred to

under North Carolina law as the "instrumentality" rule, a plaintiff must show:

> "(1)  Control, not mere majority or complete stock control, but complete
> domination, not only of finances, but of policy and business practice in respect to
> the transaction attacked so that the corporate entity as to this transaction had at the
> time no separate mind, will or existence of its own; and
>
> (2)  Such control must have been used by the defendant to commit fraud or
> wrong, to perpetrate the violation of a statutory or other positive legal duty, or a
> dishonest or unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or
> unjust loss complained of."

*Id.*  To determine if these elements have been met, the following factors are considered:

(1) inadequate, or "thin" capitalization; (2) non-compliance with corporate formalities;

(3) complete domination and control of the corporation so that it has no independent

identity; and (4) excessive fragmentation of a single enterprise into separate corporations.

*Id.* at 330-331 (collecting cases).[4]

    Applying the foregoing factors, it is clear the PAC sufficiently alleges that CPA, CIA,

and CSLC are alter egos of CGLLC that operated CGLLC as their mere instrumentality, and they

---

[4]     Under Delaware law, courts consider similar factors under the "single entity test":
"(1) whether the company was adequately capitalized for the undertaking; (2)
whether the company was solvent; (3) whether corporate formalities were
observed; (4) whether the controlling shareholder siphoned company funds; and
(5) whether, in general, the company simply functioned as a facade for the
controlling shareholder."
*New York Wheel*, 2020 WL 4926379, at *6; *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d
462, 470-71 (D. Del. 2010).  While the list of factors is not exhaustive and no single
factor is dispositive, some element of fraudulent intent is required, either through proof of
actual fraud or an overall element of injustice or unfairness.  *New York Wheel*, 2020 WL
4926379, at *6; *Blair*, 720 F. Supp. 2d at 471.

are all essentially a single entity.

     *First*, CGLLC was intentionally undercapitalized.  (Ex. 2, Tr. 223:14-225:4; PAC ¶¶ 2, 132-134, 153, 183, 205.)  It was purposefully set up to be undercapitalized and its commercial intent during the relevant period was to be a signatory for what has been described as ████████ agreements.  (Ex. 2, Tr. 224:8-225:4; PAC ¶¶ 2, 132, 133.)  The idea was that if the proverbial "████████████████████████████████████████ ████████████████." (Ex. 2, Tr. 223:23-224:7; PAC ¶¶ 128, 133, 153.)  Mr. Alala has stated numerous times that CGLLC has no assets.  (Ex. 2, Tr. 237:1-238:10; 246:22-248:2; Ex. 1 at RW203; Ex. 3.)  For example, he recently texted Mr. Wheelahan, who had been terminated in October 2019, that "We are allowing a default judgement against that LLC [meaning CGLLC] as that LLC has no assets."  (Ex. 1 at RW203; Ex. 2, Tr. 10:17-11:3, 237:1-238:10, Tr. 246:22-248:2.)  Mr. Wheelahan has described CGLLC as a "██████" meaning "████████████████████ ████" (Ex. 2, Tr. 247:18-20; *see* PAC ¶ 2) and as a "████████████████████" because it has "████████████████████████████████" (Ex. 2, Tr. 21:6-22; *see* PAC ¶ 2.)

     CGLLC also had no income (Ex. 2, Tr. 247:1-19; PAC ¶¶ 2, 4, 130), no independent source of revenue (Ex. 2, Tr. 234:6-8; PAC ¶¶ 130, 134), and no bank account of its own (Ex. 2, Tr. 231:14-17; PAC ¶ 131).  CGLLC also did not receive any of the fees that Capitala has earned and stands to earn in connection with Fund V or the StepStone-Capitala SMAs.  For example, CPA earns a management fee on deployed capital in Fund V, not CGLLC.  (Ex. 2, Tr. 161:7-14; *see* PAC ¶ 130.)  Fund V's general partner, Capitala PCF-V, LLC, also earns an incentive fee (or carried interest), not CGLLC.  (Ex. 2, Tr. 36:23-37:1, 163:3-9; *see* PAC ¶ 130.)  In connection with the StepStone-Capitala SMAs, either CPA or CSLC receives management fees and closing fees (Ex. 2, Tr. 153:17-154:1, 155:14-17, 160:11-18), not CGLLC.  (*See* PAC ¶ 130.)  Overall,

CGLLC did not have a source of money, other than transfers from other Capitala entities, and CGLLC had no capital to pay for its obligations, including its regular monthly retainer payments that were due to NovaFund under the Agreement.  (PAC ¶ 130.)

*Second*, Capitala ignored corporate formalities.  (PAC ¶ 123.)  For example, the Capitala entities are referred to as "Capitala Group" or "Capitala" in Capitala's website, marketing, and SEC filings.  (*Id.* ¶ 124.)  CPA and CIA do business under the moniker "Capitala Group" for marketing purposes.  (*Id.* ¶ 125.)  On its website under the "About Us" section, Capitala defines CIA as "Capitala Group" and states that "Capitala Group is a $2.7 billion asset management firm."  (*Id.*)  In its press releases, Capitala has defined "Capitala Group" as including CIA, "together with its affiliates."  (*Id.*)  In SEC filings, Capitala has defined "Capitala Group" as being CPA and CIA:  "CPA is a wholly-owned subsidiary of CIA, an SEC registered investment adviser (collectively with CPA, 'Capitala Group')."  (*Id.*)  On the SEC's website, one of CPA's "alternate names" is "Capitala Group."  (*Id.*)  Additionally, in Capitala's most recent Form ADV filed for CPA, it states that the "Other Business Name" for CPA is "Capitala Group."  (*Id.*)  In other documents, Capitala has defined "Capitala Group" as CPA, together with its affiliates and related entities.  (*Id.*)  The PPM for Fund V defines "Capitala" as including CPA and all of "its affiliates and related entities."  (*Id.* ¶ 126.)

Overall, the term "Capitala Group" is used to mean a host of various Capitala-related entities, sometimes, but not always, including CGLLC.  (Ex. 2, Tr. 169:16-171:5, 195:14-197:13; *see* PAC ¶¶ 123-124.)  When marketing all of its entities under the "Capitala Group" moniker, Capitala blends the assets and performance of each related affiliate to provide an aggregate overview.  (PAC ¶ 127.)  For example, Capitala's press releases frequently state that "Capitala Group manages $2.7 billion of capital among permanent capital vehicles, closed-end funds, and

discretionary managed accounts," where the size of the capital is computed by combining capital across Capitala's platform.  (*Id.*)  But, CGLLC is notably missing from flow charts reflecting the various Capitala corporate entities and their respective places in Capitala's corporate structure, reflecting that it was a disregarded entity.  (*Id.* ¶ 135.)  CGLLC was not considered to be the parent company to any of the other Capitala entities.  (Ex. 2, Tr. 225:5-8; PAC ¶ 136.)  And, Capitala routinely transferred money between various Capitala entities and affiliates, including to CGLLC.  (PAC ¶ 129.)

Capitala's failure to observe corporate formalities is also evident in the handling of its employees and executives.  CGLLC, CPA, CIA, and CSLC all shared the same employees.  (Ex. 2, Tr. 14:4-16:6, 229:18-230:5; PAC ¶ 139.)  CGLLC has no employees of its own; nor does CPA, CIA, or CSLC.  (Ex. 2, Tr. 14:4-16:6, 229:18-230:5; PAC ¶ 139.)  CGLLC, CPA, CIA, and CSLC all shared the same executives.  (Ex. 2, Tr. 14:4-16:6, 229:18-230:17, 233:6-233:23; PAC ¶ 140.)  For example, Mr. Alala is Chairman and Chief Executive Officer ("CEO") of "Capitala Group"; he is Chairman and CEO of CGLLC; he is the President and CEO of CPA; he is the President and CEO of CIA; he is the Chairman and CEO Capitala Finance Corp. and Capitala Transaction Corp.; and he is the head of all the Capitala affiliates operating under the "Capitala" moniker.  (*Id.*)  He is also the manager of CGLLC, CIA, Capitala Holdings, LLC, and Capitala Restricted Shares I, LLC, among others.  (*Id.*)  CGLLC, CPA, CIA, and CSLC, along with all of the other Capitala entities, used the same website (https://www.capitalagroup.com/) and employees utilized the same email address regardless of the Capitala entity for which they were conducting business.  (PAC ¶ 138.)

The discrepancy regarding Mr. Wheelahan's role between Mr. Alala's description and Mr. Wheelahan's own view only serves to highlight the fact that many people wore many

different hats across the dozens of different Capitala-related entities.  (*Id.* Tr. 14:4-15:18, 18:5-20:5.)  For his part, Mr. Wheelahan testified ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████.  (*Id.* Tr. 18:13-19:18.)  He expressly testified that ███████████

███████████████.  (*Id.* Tr. 19:7-18.)  *See, e.g., Microspace Commc'ns Corp. v. Guest-Tek Interactive Entm't, LTD*, No. 5:14-CV-535-F, 2015 WL 4910134, at *3 (E.D.N.C. Aug. 17, 2015) (denying motion to dismiss alter ego allegations where "companies have elected to advertise in a way that makes them appear to be the same company; they have identical corporate leadership; they intermingle their bills").

Further evidence of Capitala's failure to observe the corporate form is CGLLC's failure to have its own corporate records or any compliance manual.  (Ex. 2, Tr. 230:21-231:5; PAC ¶ 143.)  CPA and CIA also share the same compliance manual and the same investment allocation policy.  (Ex. 2, Tr. 230:24-231:5, 172:8-173:3; PAC ¶ 144.)  Fund V and the StepStone-Capitala SMAs also share the same investment committee.  (PAC ¶ 142.)

Capitala's handling of the monthly retainer payments and expense reimbursements under the Agreement with NovaFund also demonstrate its disregard of the corporate form.  NovaFund issued invoices to CGLLC for the reimbursement of expenses it had incurred, but CPA would repay NovaFund.  (PAC ¶ 36.)  Similarly, even though CGLLC signed the contract with NovaFund, and even though NovaFund sent invoices to CGLLC for retainer payments, the payments were made by CPA not CGLLC.  (Ex. 2 Tr. 234:9-15; PAC ¶ 36.)

Capitala also showed it disregard for the corporate form when it entered into the Addendum.  (Ex. 2, Tr. 195:14-197:13; PAC ¶ 74.)  Capitala did not specify which Capitala entity was the counterparty to the Addendum, instead generically referring to "Capitala Group"

in the document title, which at the time was the marketing moniker for CPA and CIA.  (Ex. 2, Tr. 170:5-171:9, 196:9-21; PAC ¶ 74.)  Capitala was "███████████████" in its use of the term "Capitala" throughout the Addendum, and left the language broad enough so that it could include other Capitala entities, including CPA and CIA.  (Ex. 2, Tr. 196:22-197:13; PAC ¶ 75.)

*Third*, CGLLC was completely dominated and controlled by other Capitala entities. (PAC ¶¶ 141, 145-148.)  Mr. Wheelahan unequivocally testified that █████████████████ ████████████████████████████████████████████ (Ex. 2, Tr. 233:6-234:8), ██████████████████████████████████████████████████████ ████████████████ (*id.* 235:4-15; *see* PAC ¶ 149).  All Capitala entities shared the same office space with one entity on the lease for the entire enterprise (Ex. 2, Tr. 229:2-17; PAC ¶ 137) and had the same employees and executives (Ex. 2, Tr. 14:4-16-6, 229:18-230:5; PAC ¶¶ 139-140). CGLLC did not have its own corporate records (Ex. 2, Tr. 230:21-23; PAC ¶ 143), and controlled by the same officers as other Capitala entities (Ex. 2, Tr. 233:6-234:4; PAC ¶¶ 139-141, 147).  As the top of the Capitala enterprise, Mr. Alala controls it all.  (Ex. 1 at RW009, text from Mr. Wheelahan dated Apr. 7, 2017 ("The feeling is that the firm exists as Joe's alter ego. It's all his."); Ex. 2, Tr. 238:11-239:16 ("████████████████████████████ ███████████████████████████████.").)  CGLLC had no source of revenue aside from transfers from other Capitala entities and, without an income, it is no surprise that it had no bank account of its own, especially when other Capitala entities paid its expenses.  (PAC ¶¶ 130-132.)  CGLLC was a shell company that was run by other Capitala affiliates, including but not limited to CPA, CIA, CSLC, Capitala Advisors Corp. and officers of Capitala Finance Corp.  It was solely supported by those entities and operated at their direction.  (*Id.* ¶¶ 2, 4, 141, 145-148, 205.)

**Fourth**, the Capitala enterprise is excessively – and intentionally – fragmented.  Mr. Wheelahan was unable to articulate ███████████████████████████████████ ████████████████████████.  (Ex. 2, Tr. 224:12-225:1; *see id.* Tr. 21:13-22 (explaining that CGLLC is a "████████████████████████████████████████████"); Tr. 222:6-9 (describing CGLLC as a "█████████████"); *see also* PAC ¶¶ 2, 4, 133, 135.)  And it was for this very purpose that CGLLC was used here.  Typically, when a placement agent is retained, the counterparties to the placement agent contract are the fund (here, Fund V) and the fund's investment advisor (here, CPA).  (Ex. 2, Tr. 222:25-223:13).  However, here, the signatory to the placement agent agreement was CGLLC, a "███████████████."  (*Id.* Tr. 224:12-225:1.)  Even though CPA was not party to the placement agent agreement, NovaFund was required to work with CPA and other Capitala entities to assist in the fund raising process. (*Id.* Tr. 222:10-24.)  In sum, Capitala had a "shell" company sign the contract with NovaFund, but had CPA perform the obligations.

But this fragmentation was not isolated to the NovaFund contract and instead pervaded Capitala's entire organizational structure.  Capitala, as an enterprise, used CGLLC to act as the counterparty for contracts deemed to be preliminary or not substantive, such as non-disclosure agreements, or for other contracts with the potential to subject Capitala to judgment or liability in which case Capitala's intent was to have CGLLC, as an undercapitalized entity, serve as signatory.  (Ex. 2, Tr. Tr. 21:13-22, 222:6-225:1; PAC ¶¶ 2, 4, 128, 133, 153, 205.)

And, by way of another example, CSLC similarly had no purpose other than to serve as the marketing front for the StepStone-Capitala SMAs and to receive some of the fees Capitala was set to receive in connection with those SMAs.  (Ex. 2, Tr. 108:5-109:5; PAC ¶ 99, 207.)

**Fifth,** Capitala capitalized on the ambiguity in corporate identity, and intentionally

misused the corporate form to perpetrate a fraud on NovaFund, thereby causing injury to NovaFund under the third element of the "instrumentality" test under North Carolina law. CGLLC was designed to be a "██████," a "████████████," for which its only business purpose was to serve as the signatory for "████████" contracts. (Ex. 2, Tr. 233:13-16, 222:4-9; 224:8-225:1; PAC ¶¶ 2, 4, 133, 135, 141, 145-148, 205.) CGLLC was purposefully penniless so that "██████████████," and there was ultimately a liability, CGLLC would not be capitalized and therefore the Capitala enterprise would not have to pay. (Ex. 2, Tr. 223:23-224:7; PAC ¶¶ 2, 4, 133, 153, 205.) The PAC more than plausibly alleges how the use of CGLLC as a "dummy" entity has caused and will cause NovaFund harm. (PAC ¶¶ 4, 176.) Capitala has ensured that CGLLC is an entity with no assets (Ex. 3.), and is allowing a default judgment to enter against it, so that "Nova receives what they deserve." (Ex. 1 at RW203; PAC ¶ 152.)[5] It is thus beyond dispute that NovaFund has been damaged as a result of Capitala's corporate ruse.

In sum, as a result of Capitala's manipulative and controlling orchestration of various corporate entities, NovaFund entered into a vague contract signed by CGLLC, under which NovaFund was to direct the performance of its obligations to various Capitala entities and to be paid by entities other than the contractual signatory. Then, when NovaFund sought to enforce through litigation its entitlement to payment for its services, CGLLC vanished – exactly as it was created to do. (Ex. 2, Tr. 222:6-9; 224:24-225:1; 233:13-16; PAC ¶¶ 112, 152, 153.) NovaFund, after successfully raising hundreds of millions of dollars for Capitala, has been sent home empty-handed – not by bad luck, but by the nefarious, intentional, manipulative scheme of Capitala.

---

[5]     Such factors also amply satisfy Delaware's requisite element of actual fraud or an overall element of injustice or unfairness. *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Capital Grp. Glob. I LLC*, No. CV-18-654-RGA, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019) ("Acts intended to leave a debtor judgment proof are sufficient to show fraud and injustice.").

Under such circumstances, it would defeat justice to allow CPA, CIA, and CSLC to escape

unscathed while CGLLC simply folds its hands and walks away.  *See McLeskey v. Davis Boat*

*Works, Inc.*, 225 F.3d 654, No. 99-1113, 2000 WL 1008793, at *3 (4th Cir. July 21, 2000)

(applying North Carolina law, and allowing alter ego claims to survive summary judgment where

defendants "failed to observe corporate formalities in operating a dissolved corporation,"

operated several businesses out of a single facility and under a single trade name, shared banks

accounts, and diverted commissions from one contract to another corporate entity).  Such a result

would be unfair to NovaFund, which after fully performing its contractual obligations, and

obtaining hundreds of millions of dollars for Capitala, would be left empty-handed.  It would

reward Capitala's duplicitous conduct, a result that contravenes foundational principles of

justice.  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary

conceptions of justice and public policy require that the wrongdoer shall bear the risk of the

uncertainty which his own wrong has created.").

        The recent decision in *New York Wheel*, 2020 WL 4926379, at *6-8, is instructive.  The

case arose from a project to design and build an observation wheel, similar to the London Eye,

on Staten Island.  The plaintiff-project developer sued the members and associated companies of

the limited liability company (known as "DBT") hired to design and build the wheel.  *Id.* at *1.

The court held that the plaintiff plausibly alleged grounds for piercing the corporate veil under

Delaware law.  *Id.* at *6.  The plaintiff plausibly pled that DBT was undercapitalized and "had

insufficient capital to cover reasonably anticipated costs," *id.* *7, which is similar to the PAC's

allegation about CGLLC.  (PAC ¶¶ 2, 36, 130-132.)  There, DBT also became insolvent, as did

CGLLC.  (PAC ¶¶ 13, 152-153.)  There, expenses were paid from the bank account of another

member of the corporate enterprise, just as CGLLC's expenses were paid by CPA.  (PAC ¶¶ 36,

25

134.)  There, the allegations included that DBT did not have its own office, executives, and email addresses, which are the same as allegations against CGLLC.  (PAC ¶¶ 137-140.)  The court therefore concluded that under Delaware law the allegations, taken together, "are sufficient to state a claim that" DBT and another corporate entity were "a 'single entity.'"  2020 WL 4926379, at *7.  The court also concluded that the plaintiff had sufficiently alleged an overall element of unfairness or injustice based on the above factors and the commingling of assets, insufficient capital to cover expenses, and bloated payments to other corporate entities.  *Id.* Here, as in *New York Wheel*, the allegations in the PAC plausibly allege grounds to pierce CGLLC's corporate veil to reach CPA, CIA, and CSLC.

In sum, NovaFund's new claims against CPA, CIA, and CSLC are not futile.  NovaFund should be afforded the opportunity to litigate its meritorious claims, and to recover from a solvent, liable party.  *Soroof Trading*, 283 F.R.D. at 149 (granting motion to amend to add claims against additional defendant under alter ego theory).

## C.     There Will Be No Prejudice to CGLLC, CPA, CIA, and CSLC

CGLLC, CPA, CIA, and CSLC will not be prejudiced if NovaFund is allowed to amend. In determining what constitutes "prejudice," courts consider whether the new claims would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).  The non-moving party bears the burden of establishing prejudice.  *See id.*

CGLLC cannot credibly argue that it will be prejudiced.  CGLLC allowed its counsel to move to withdraw, positioned itself so that a default judgment will enter against it in this action, and has stated that it does not intend to litigate this matter.  (ECF 151.)  CGLLC also delayed the

start of discovery in this matter, delayed the production of documents going to the core of the claims at issue, and has brought meritless motions that it has withdrawn, which only further bogged down the swift prosecution of NovaFund's claims.  CGLLC has yet to substantively respond to the Court's order to show cause why its baseless counterclaims against NovaFund should not be dismissed.

Any claim of prejudice by CPA, CIA, and CSLC would also lack merit because the new claims against them will not unduly increase the scope of discovery or require additional resources to prepare for trial.  Rather, the amendments only seek to hold these additional Capitala entities liable for the existing claims that CGLLC has already been defending for nearly two years.[6]  Notably, Capitala is well aware, and has been aware, of the facts that form the basis for the amendment since the inception of this litigation.  The only additional factual allegations included in the proposed amended pleading are based on documents that CGLLC already produced in discovery, documents produced by non-parties of which Capitala was aware (and in most instances received before the litigation), and a single deposition by a former Capitala employee regarding company operations during his tenure at Capitala.  Given the relationship between and among CGLLC, CPA, CIA, and CSLC, it cannot be argued that CPA, CIA, and CSLC lack access to, and knowledge of, all discovery produced to date.[7]  Accordingly, NovaFund submits that the existing scope of discovery will not be expanded by the proposed amendment.  *Coale v. Metro-N. R. R. Co.*, No. 3:08-CV-01307 (CSH), 2009 WL 4881077, at *3 (D.

---

[6]     For this reason, the addition of CPA, CIA, and CSLC easily clears the low bar of Fed. R. Civ. P. 20: NovaFund's right to relief is asserted against CGLLC, CPA, CIA, and CSLC jointly, all claims arise out of the same transaction or occurrence, and questions of fact or law are common to all defendants.  Fed. R. Civ. P. 20(a)(2).

[7]     Indeed, NovaFund served a document subpoena on CSLC and was told that any production would be covered by CGLLC's production.

Conn. Dec. 11, 2009) (granting motion to amend after deadline in the scheduling order where no prejudice to defendant was identifiable as discovery was ongoing and the proposed counterclaim did not expand the scope of discovery).

Even if modest additional discovery were justified to ferret out the extent of Capitala's fraud, the amendment would still be warranted.  Where proposed amendments have expanded the scope of operative facts and required additional discovery, courts have still granted leave to amend.  *Miller v. Selsky*, 234 F.3d 1262, No. 00-0157, 2000 WL 1727880, at *2 (2d Cir. Nov. 21, 2000) (holding plaintiff should have been permitted to amend complaint to add "new set of operative facts" that were variations on original complaint's themes); *Bayonne v. Pitney Bowes, Inc.*, No. 3:03-CV-712 (WWE), 2004 WL 169285, at *2 (D. Conn. Jan. 12, 2004) (granting motion to amend where amendments would expand the scope of discovery but defendant was not unduly prejudiced by expanded scope of discovery).

The addition of new parties also will not unreasonably delay the resolution of this matter. To the contrary, the inclusion of all relevant actors – CGLLC, CPA, CIA, and CSLC – will promote an expedient and harmonious resolution of NovaFund's claims.  Absent leave to amend, NovaFund will be required to commence separate litigation to hold CPA, CIA, and CSLC liable for the same claims that CGLLC has been defending against for the last two years.  Starting anew on a matter of this scope would be a waste of all parties' resources, drain judicial resources, and unnecessarily delay justice for NovaFund.

## **CONCLUSION**

For the foregoing reasons, NovaFund respectfully requests that this Court grant this motion and allow NovaFund to file the proposed amended complaint attached hereto as Exhibit 2, together with such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**PLAINTIFF NOVAFUND ADVISORS, LLC**

By:  _/s/ Jill M. O'Toole_
        Jill M. O'Toole (ct27116)
        Alison P. Baker (ct28136)
        Shipman & Goodwin LLP
        One Constitution Plaza
        Hartford, CT 06109
        Tel.: 860-251-5000
        Fax: 860-251-5099
        jotoole@goodwin.com
        abaker@goodwin.com

        _Its Attorneys_