# EXHIBIT 2

Page 1

1

UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    NOVAFUND ADVISORS, LLC,

4              Plaintiff,              No. 3:18-cv-1023
                                       (MPS)

5        vs.

6    CAPITALA GROUP, LLC,

7              Defendant.

8

9

10

            VIRTUAL ZOOM DEPOSITION OF

11             RICHARD WHEELAHAN, ESQ.

12              (Taken by Plaintiff)

13           Charlotte, North Carolina

14            Tuesday, August 4, 2020

15

16

17

18

19    Reported by Andrea L. Kingsley, RPR

20

21

22

23

24

25

                                                        Page 7

1       am not authorized to administer an oath.  I am

2       not related to any party in this action nor am

3       I financially interested in the outcome.

4               Counsel and all present in the room

5       and everyone attending remotely will now state

6       their appearance and affiliation for the

7       record.  If there is any objections to the

8       proceeding, please state them at the time of

9       your appearance beginning with the noticing

10      attorney.

11              MS. O'TOOLE:  Good morning.  This

12      is Jill O'Toole from Shipman & Goodwin for the

13      plaintiff NovaFund Advisors, LLC.

14              MR. CORP:  Robert Corp is here on

15      behalf of plaintiffs.  I'm with Shipman &

16      Goodwin.

17              MS. BAKER:  This is Alison Baker

18      with Shipman & Goodwin.

19              MR. HOWE:  This is James Howe with

20      NovaFund Advisors.

21              THE VIDEOGRAPHER:  Please swear in

22      the witness.

23          RICHARD WHEELAHAN, being duly sworn,

24       was examined and testified as follows:

25   EXAMINATION BY

```
                                            Page 10
 1        Q.    Did you have the opportunity during that

 2   deposition to read and sign your transcript

 3   afterwards?

 4        A.    No.

 5        Q.    Do you understand that you are under

 6   oath today?

 7        A.    Yes.

 8        Q.    Do you understand that to mean you must

 9   tell the truth?

10        A.    Yes.

11        Q.    Could you briefly describe your

12   educational background?

13        A.    I have a BA in political science and a

14   BA in Russian from Appalachian State University and

15   then a JD from the University of North Carolina

16   School of Law.

17        Q.    How long did you work at Capitala?

18        A.    From April 2010 until October 7, 2018.

19        Q.    Did you leave Capitala effective October

20   8, 2019?

21                    THE REPORTER:  Hold on.  I'm

22        hearing a lot of interference.

23                    THE VIDEOGRAPHER:  There's some

24        feedback on the line.

25                    (Discussion off the record.)
```

```
                                      Page 11

 1       Q.    Mr. Wheelahan, did you leave Capitala
 2  effective October 8, 2019?
 3       A.    Yes.
 4       Q.    Is it your understanding Capitala is
 5  aware you're testifying today?
 6       A.    Yes.
 7       Q.    How do you know that?
 8       A.    The fact that I'm testifying in this
 9  deposition came up in open court in Mecklenburg
10  County a week and a half ago.
11       Q.    What matter were you involved in that
12  took place in court about a week and a half ago?
13       A.    It is a civil complaint that Capitala
14  filed against me personally regarding allegations
15  that I violated my non-disparagement agreement with
16  the firm when I left.
17       Q.    Do I understand correctly then there was
18  a proceeding in that other state court matter and
19  during the course of that court hearing the fact of
20  this deposition came up?
21       A.    Yes.
22       Q.    I would like to go through with you a
23  few positions you held at Capitala.  Just starting
24  with the basics.  What was the name of the Capitala
25  entity that was your employer?
```

```
 1              THE VIDEOGRAPHER:  We are now on
 2       the record.  The time is 10:25 a.m.  back from
 3       break.
 4       Q.    Mr. Wheelahan, we have shown you what
 5  has been marked as Plaintiff's Exhibit 1.  Do you
 6  see that?
 7       A.    Yes.
 8       Q.    Do you recognize that?
 9       A.    Yes.
10       Q.    What is it?
11       A.    The affidavit of Joe Alala in support of
12  his complaint filed against me in Mecklenburg
13  County.
14       Q.    In the state court action that you were
15  referencing?
16       A.    Correct.
17       Q.    Who is Mr. Joseph Alala?
18       A.    He is the founder and CEO of Capitala
19  Group.
20       Q.    May I have you please turn to paragraph
21  9 of the affidavit.  Sorry.  Let's start first with
22  looking at page 9 of the affidavit which should be
23  the signature page.
24              Do you recognize that signature?
25       A.    Yes.
```

```
                                                    Page 15
 1        Q.     Who's signature is it?

 2        A.     Joe Alala's.

 3        Q.     How is it that you recognize the

 4   signature?

 5        A.     I've seen his signature on documents

 6   over the course of the last 10 years.

 7        Q.     Is it fair to say that you have seen

 8   Mr. Alala's signature hundreds of times?

 9        A.     Yes.

10        Q.     And that you feel comfortable

11   recognizing his signature?

12        A.     Yes.

13        Q.     Was this affidavit served on you in

14   connection with the North Carolina state court

15   action?

16        A.     It was not served.  I received an e-mail

17   from Robinson Bradshaw & Hinson, counsel to

18   Capitala in the action.

19        Q.     Does that e-mail include the affidavit?

20        A.     Yes.

21        Q.     Let me have you look at paragraph 4

22   please.  It states, "That Capitala Advisors Corp.

23   employs the individual who provides services for the

24   various Capitala entities."  Do you see that?

25        A.     Yes.
```

1          Q.     Do you agree with that statement?

2          A.     Yes.

3          Q.     Was there any other Capitala entity that

4    was served as the employer for the individuals that

5    provided services to the Capitala entities?

6          A.     No.  Not as the employer.

7          Q.     In paragraph 5 it states that, "Capitala

8    Finance Corp., CPTA, is a publicly traded business

9    development company with its common stock and

10   certain bonds listed and traded publicly on the

11   NASDAQ."

12              Do you see that?

13         A.     Yes.

14         Q.     Do you agree with that statement?

15         A.     Yes.

16         Q.     What is a business development company?

17         A.     It is a regulated investment company

18   that doesn't incur federal income tax by statutory

19   creation.

20         Q.     What does it mean for a BDC to be

21   publicly traded?

22         A.     It means that the equity interest in the

23   BDC are freely transferrable in that they are

24   traded on a public stock exchange so any investor

25   can buy and sell shares.

Page 18

1     A.    Yes.

2     Q.    What is CIA?

3     A.    Capitala Investment Advisors, LLC, a

4  registered investment advisor.

5     Q.    In the affidavit, paragraph 8, it also

6  states that in 2015, you, "Became the general

7  counsel as well as chief compliance officer to

8  Capitala."  Do you see that?

9     A.    I do see that.

10    Q.    Do you agree with that statement?

11    A.    No.

12    Q.    Why not?

13    A.    I was appointed chief compliance officer

14  of Capitala Investment Advisors and Capitala

15  Finance Corp. in August of 2013, and in 2015 it was

16  when I became general counsel of Capitala

17  Investment Advisors.

18    Q.    In paragraph 9 it states that you served

19  as, "General counsel and chief compliance officer to

20  all of the Capitala entities including CTPA."

21           Do you see that?

22    A.    Yes.

23    Q.    Do you believe that's a typo, it should

24  be CPTA?

25    A.    I do.

1          Q.     Do you agree with that statement?

2          A.     No.  I was not the general counsel of

3     CPTA.

4          Q.     Was there any other entity for which you

5     were not a lawyer that was affiliated with Capitala?

6          A.     Yes.  Many.

7          Q.     So let's try this the other way around.

8     What were the entities for which you served as a

9     lawyer?

10         A.     Capitala Investment Advisors, LLC and

11    Capitala private Advisors, LLC.

12         Q.     Is it fair to say that it's your

13    testimony those are the only two Capitala entities

14    for which you served as a lawyer?

15         A.     That is my understanding, yes.

16         Q.     Were you ever a lawyer for Capitala

17    Group, LLC?

18         A.     No.

19         Q.     Is it fair to say that in the time

20    period between 2010 and 2015, you did not serve in a

21    legal capacity for Capitala?

22         A.     I think that's accurate.  I think -- I

23    agree with that statement.

24         Q.     Let me try it a different way which is:

25    Do you know the first time you became a lawyer for

Page 20

1   any of the Capitala entities?

2        A.    It was the morning in 2015 in which I

3   woke up to an e-mail telling me I was the general

4   counsel of the investment advisors or investment

5   advisor.

6        Q.    Today I want to keep in mind the fact

7   that at some point in time during your tenure with

8   Capitala, you served in a legal capacity.  So in

9   that respect, you were privy to certain

10  attorney/client privileged information during the

11  course of your employment.  It's not my intention

12  today to inquire about attorney/client privileged

13  information.  So if I ask a question and you think

14  that the answer would call for the disclosure of

15  privileged information, please let me know I will

16  ask you just to limit your answer to the

17  non-privileged information.  Okay?

18       A.    Okay.

19       Q.    So for purposes of today's deposition, I

20  would like to use Capitala as a shorthand when

21  referring to all of the entities and investment

22  vehicles that are affiliated with Capitala in the

23  broadest sense; is that okay?

24       A.    Yes.

25       Q.    And then if I want to ask you a question

```
                                          Page 21
 1   about one of the specific Capitala entities or

 2   investment vehicles, I will refer to those by their

 3   specific name; okay?

 4        A.    Okay.

 5        Q.    Super.

 6              Are you familiar with a Capitala entity

 7   that is Capitala Group, LLC?

 8        A.    Yes.

 9        Q.    Do you understand that that is the named

10   defendant in the action that's the subject of this

11   deposition?

12        A.    Yes.

13        Q.    What is Capitala Group, LLC?

14        A.    It is an entity that was the signatory

15   to term sheets, non-disclosure agreements, things

16   that were thought of as not substantive or

17   preliminary in a sense.

18        Q.    What do you mean by that?

19        A.    It was a relatively meaningless entity.

20        Q.    How so?

21        A.    No assets, no operations, no real

22   structure.

23        Q.    We'll come back to that in a little bit.

24   Let me have you look at what we will mark as

25   Plaintiff's Exhibit 2 which is the term sheet.
```

Page 36

1   fund or executive of Capitala or any of their
2   respective officers, directors and employees and any
3   such officers, directors or employees immediate
4   family members (and any investment vehicles
5   controlled by or established primarily for the
6   benefit of any such officer, director, employee
7   and/or his or her immediate family members) or if or
8   their own accounts?
9           Do you see that?
10   A.    Yes.
11   Q.    Did I read that correctly?
12   A.    Yes.
13   Q.    Is that known as an exception for family
14   and friends?
15   A.    Yes.
16   Q.    Can you give an example of that?
17   A.    A trust that was established and settled
18   for the benefit of Joe Alala would be carved out.
19   Q.    Meaning that NovaFund could not earn a
20   fee if that trust that was established for Mr. Alala
21   contributed capital to Fund V or an SMA?
22   A.    Correct.
23   Q.    The general partner, the term general
24   partner is capitalized in the term sheet but it's
25   not defined.  Who is the general partner of Fund V?

Page 37

```
 1        A.     Capitala PCF-V, LLC.
 2        Q.     And the term manager is a capitalized
 3   term in the term sheet but it's not defined.  What
 4   was your understanding of Fund V's manager at the
 5   time the term sheet was executed?
 6        A.     Either Capitala -- I'm sorry, either CIA
 7   or CPA.  Eventually it was CPA, but at the time it
 8   may have been CIA.
 9        Q.     Why do you say that?
10        A.     Because we'd formed a second investment
11   advisor that we registered with the SEC in order to
12   advise the private funds as opposed to the BDC.
13        Q.     Is it okay with you today that sometimes
14   we'll refer to Capitala Private Advisors, LLC as
15   CPA?
16        A.     Yes.
17        Q.     Is it also all right if we refer to
18   Capitala Investment Advisors as CIA?
19        A.     Yes.
20        Q.     Do you know approximately when CPA was
21   formed?
22        A.     Unfortunately, I don't recall, but it's
23   public, it's available from the SEC's website.
24        Q.     At the time that you were negotiating
25   the term sheet with NovaFund, did you ever tell them
```

```
                                            Page 55
 1       Q.    Mr. Wheelahan, did you attend a hearing
 2   in this lawsuit before Judge Shea on Novafund's
 3   application for a prejudgment remedy?
 4       A.    Yes.
 5       Q.    That was held on March 28, 2019?
 6       A.    Yes.
 7       Q.    Did you attend in person in Hartford,
 8   Connecticut?
 9       A.    Yes.
10       Q.    Were you present during the direct and
11   cross-examination of Mr. Alala?
12       A.    Yes.
13       Q.    I would like to show you what we will
14   mark as Plaintiff's Exhibit 3 which is the
15   prejudgment remedy hearing transcript.
16               (Plaintiff's Exhibit 3, PJR
17         transcript, marked for identification, as of
18         this date.)
19       Q.    Do you see that on your screen?
20       A.    Yes.
21       Q.    It is also -- we also sent it to you in
22   a paper format.  It's behind tab 43.
23       A.    Okay.
24       Q.    Did you ever have a chance to read the
25   transcript of the proceeding before Judge Shea on
```

```
                                                     Page 56
```

 1   the PJR application?

 2                    THE REPORTER:  Did you move your

 3        microphone, Ms. O'Toole?  You seem farther

 4        away.

 5                    MS. O'TOOLE:  I can't actually hear

 6        Madam Court Reporter or Mr. Wheelahan.

 7                    THE VIDEOGRAPHER:  Stand by.  We

 8        are now off the record.  The time is

 9        a.m. for break.

10               (Recess taken.)

11                    THE VIDEOGRAPHER:  Back on the

12        record.  The time is 11:41 a.m. from break.

13        Q.    Mr. Wheelahan, did you ever read the

14   transcript of the PJR hearing?

15        A.    No.

16        Q.    Let me have you turn to the transcript

17   at page 179.  Again, I believe you also have this in

18   paper form, tab 43.  Do you see line 6 to 8 it

19   states, "Question:  Focusing on Firm 1, did Firm 1

20   ever agree to invest in Fund V?  Answer:  They did

21   not."

22               Do you see that?

23        A.    Yes.

24        Q.    Did I read that correctly?

25        A.    Yes.

Page 57

```
 1        Q.    During the PJR hearing, did the parties
 2    refer to StepStone Group as firm 1?
 3        A.    Yes.
 4        Q.    The transcript at pages 9 to 11,
 5    "Question:  Did they ever agree to invest in an SMA
 6    associated with Fund V?  Answer:  They did not."
 7              Do you see that?
 8        A.    I do.
 9        Q.    Do you agree with that testimony?
10        A.    Not -- I don't really agree with it but
11    I understand technically why it may have been
12    answered that way.
13        Q.    Why is it that you don't really agree
14    with it?
15        A.    Because they did in fact invest in an
16    SMA that was formed after they declined to invest
17    in Fund V that had a substantially similar
18    investment strategy to that of Fund V.
19        Q.    When you say "they," you're referring to
20    StepStone?
21        A.    Yes.
22        Q.    Let me have you turn to the transcript
23    at page 221.  Are you there, Mr. Wheelahan?
24        A.    Yes.
25        Q.    At line 13 to 16, "Question:  Have you
```

```
1    ever done this type of -- have you ever done a
2    separately managed account with Firm 1 before?
3    Answer:  With Firm 1, no.  Well, we don't have a
4    separately managed account with Firm 1."
5              Do you see that?
6         A.   Yes.
7         Q.   Did I read that correctly?
8         A.   Yes.
9         Q.   Do you agree with that testimony?
10        A.   No.
11        Q.   Why not?
12        A.   Capitala absolutely has an SMA with Firm
13   1.
14        Q.   Meaning Capitala has a separately
15   managed account with StepStone?
16        A.   Two of them.
17        Q.   Continuing on page 21, starting at line
18   19, "Question:  Before this, before, you know, April
19   of 2018, it's your testimony that Capitala had never
20   done an SMA with Firm 1; correct?  Answer:
21   Continues to be my testimony, we have not done an
22   SMA with Firm 1."
23              Do you see that?
24        A.   Yes.
25        Q.   Do you agree that after April of -- do
```

```
                                            Page 59
 1   you agree with his testimony?

 2        A.    No.

 3        Q.    Why is that?

 4        A.    Because they have done an SMA with Firm

 5   1 being StepStone.

 6        Q.    And, in fact, StepStone formed two SMAs

 7   with Capitala after March of 2018; correct?

 8        A.    Correct.

 9        Q.    And do you agree that the two StepStone

10   SMAs were established in connection with the process

11   of raising capital for Fund V?

12        A.    Yes.

13        Q.    StepStone required Capitala to answer

14   certain due diligence questions and to complete a

15   due diligence questionnaire; correct?

16        A.    Yes.

17        Q.    Do you recall of those -- if Capitala

18   submitted the answers to those due diligence

19   questions on or about October 6, '17?

20        A.    Yes, that's right.

21        Q.    Do you recall if those due diligence

22   questions were submitted on a format that was in

23   reference to Fund V?

24        A.    I don't recall.

25        Q.    Let me show you what we will mark as
```

1  company at the same time on the same terms.

2      Q.    Did that actually happen?

3      A.    I believe so.  I'm a little stale but I

4  believe so.

5      Q.    We were talking a little bit before

6  break about the formation of Capitala Specialty

7  Lending Corp., CSLC.  What was its purpose?

8      A.    It's purpose was twofold.  It was to

9  receive the fee income that Capitala was entitled

10 to under the investment advisory agreements.  And

11 also as a marketing identifier or d/b/a for the

12 SMAs that had a nice ring to it, that could be used

13 to project the new capitalization of Capitala

14 without identifying the investor.

15     Q.    Aside from those two things, did it have

16 any business purpose?

17     A.    No.

18     Q.    Did it have any investors of its own?

19     A.    Every entity has an equity holder but

20 there were no strategic investors, if you will, in

21 the entity.

22     Q.    Who was the equity owner of CSLC?

23     A.    I don't know who that was ultimately.

24     Q.    But it's fair to say there were no

25 investors outside of Capitala that invested in CSLC?

Page 109

1        A.      That's my understanding.

2        Q.      Did CSLC have any funds coming into it

3    aside from the fee income that you described as

4    being coming through from the IAAs?

5        A.      No, I'm not aware of any.

6        Q.      In other words, did CSLC have any other

7    source of funds?

8        A.      Well, the sources of funds were the

9    portfolio companies that were procuring credit and

10   from the SMAs themselves pursuant to their

11   management fee agreement or management fee payment.

12   But both of those incoming cash flows were given to

13   CSLC by operation of the investment advisory

14   agreements.

15       Q.      What do you mean the portfolio companies

16   procuring credit?

17       A.      If you look at the advisory agreement,

18   it talks about instead of fee payment which is

19   carrying interest down the road, it talks about

20   management fee which is some number of basis points

21   on deployed capital.  And then it talks about the

22   closing fees.  So it says something along the lines

23   of Capitala's entitled to up to 100 -- it's

24   entitled to management -- closing fee income on new

25   loans to the extent that such closing fees exceed

Page 113

```
 1    just -- because they see a shiny object, then it's
 2    very difficult to have a successful mandate.
 3         Q.    Was it your personal opinion that that
 4    was happening while NovaFund was engaged as the
 5    placement agent?
 6         A.    Yes.
 7         Q.    By Capitala?
 8         A.    Yes.
 9         Q.    What information was conveyed by
10    Capitala to StepStone about the success fee that
11    might be due and payable to NovaFund after the press
12    release of April 2018?
13         A.    That there would be no success fee
14    payable.
15         Q.    Was any reason given for that?
16         A.    To StepStone by Capitala?
17         Q.    Yes.
18         A.    Generally speaking, it was -- surrounded
19    the fact that the term sheet was purportedly not a
20    valid contract, that Capitala would likely have
21    claims against Nova related to conflict of interest
22    in representing Deerpath and Capitala in the same
23    kind of strategy, and that they just didn't think
24    that -- and that NovaFund didn't have the
25    intestinal fortitude to prosecute a full civil
```

Page 114

1  action in order to attempt to recover a success

2  fee.

3       Q.    In your personal capacity, did you agree

4  with those statements?

5       A.    No.  I'm a lawyer so I'm aware of what

6  an enforceable contract is.  I didn't have any

7  insight into Nova's willingness to prosecute a

8  civil claim so I had no opinion on that at the

9  time.  And I disagreed with the balance of those

10  statements.

11       Q.    Why is that?

12       A.    Because of my personal knowledge at that

13  time.

14       Q.    Do you believe that the contract between

15  NovaFund and Capitala was enforceable from

16  Capitala's perspective?

17       A.    I believe the term sheet and addendum

18  are enforceable contracts.

19       Q.    Where did the idea that NovaFund lacked

20  fortitude come from?

21       A.    That it's not a capitalized type of

22  institution, it's not a -- doesn't have balance

23  sheet -- not seen to be backed by institutional

24  investors and that Capitala knows as well as any

25  other firm how expensive protracted litigation can

1      A.    Yes.

2      Q.    I believe there's a portion of it that

3   says, "In our calculations, the targeted amount over

4   3 years amounts to 600 million out of which 450

5   million and 150 million relates to the treaty and

6   offshore platform respectively."

7           What did you understand that to mean at

8   the time?

9      A.    That we would be investing $200 million

10  per year out of the SMAs.

11     Q.    I would like to talk for a minute about

12  what the -- let me round this out on that particular

13  e-mail.

14          Was that consistent with your

15  understanding then at the time?

16     A.    Yes.

17     Q.    Can you describe -- you did this to some

18  degree.  We started talking about the fees that were

19  earned in connection with the StepStone SMAs and I

20  believe you said that there were closing fees; is

21  that correct?

22     A.    Yes.

23     Q.    Management fees?

24     A.    Yes.

25     Q.    And incentive fees; is that correct?

1      A.    Yes.

2      Q.    Were there any other types of fees that

3  can be earned by any Capitala entity in connection

4  with that StepStone SMA?

5      A.    Not at the time I left, no.

6      Q.    Can you describe how the closing fees

7  worked?

8      A.    So if you're making a loan to a

9  portfolio company, the portfolio company, Capitala

10 in that case, would typically pay in the form of a

11 closing fee 2 percent of the amount of the loan in

12 a fee to Capitala.  That fee was ordinarily

13 allocated by fund.  So if CPTA made a $10 million

14 loan, it would get a 200,000 closing fee; if the

15 SMA made $10 million of the same loan, it would get

16 a $200,000 closing fee.  However, by the operation

17 of the investment advisory agreement, Capitala

18 Specialty Lending Corp. would keep half of that SMA

19 portion of the closing fee.  So if it was a 200

20 basis point closing fee, 100 basis points would go

21 to CSLC and 100 basis points would go to the SMA

22 upfront as income to the SMA.

23     Q.    Did Capitala track how much it was

24 earning in closing fees?

25     A.    I know that Joe did, yes.

1    Q.    Did you ever see any spreadsheets that

2    tracks the amount of closing fees that Capitala

3    earned?

4    A.    I don't recall seeing a spreadsheet

5    other than one that I would have done myself and

6    kept on my desktop just because it was the only way

7    we were going to make any money.

8    Q.    With respect to the management fees, how

9    did that work?

10    A.    It was either 55 or 60 basis points per

11    year in respect of deployed capital of the SMAs.

12    So you earned your management fee which was 55 or

13    60 BPs as you invested money in the SMAs.

14    Q.    Which Capitala entity was receiving the

15    management fee?

16    A.    Either Capitala Private Advisors or

17    CSLC, I don't recall which one.

18    Q.    Can you describe the incentive fees and

19    how that worked?

20    A.    That's complicated.  Generally the

21    incentive fee, and it's true here, was an

22    additional fee that Capitala could earn based on

23    investment performance.  If the total return of the

24    portfolio was better than 15 percent per year,

25    Capitala captured I think 20 percent of that excess

Page 160

1   it's been displaced since then.

2          Q.    Is it your understanding if there were

3   an invoice for the payment of a management fee, that

4   the Capitala entity issuing the invoice would be the

5   entity that received the management fee?

6          A.    I wouldn't bank on that.  I mean, we

7   could have issued an invoice from any entity on

8   behalf of the recipient.  There wasn't a whole lot

9   of attention paid to formality of entities as you

10  have learned in this entire litigation.

11         Q.    So it's possible that if an invoice were

12  issued by Capitala Private Advisors the money for

13  the management fees could have gone to CSLC, you

14  just don't know one way or the other?

15         A.    Exactly.

16         Q.    To the best your recollection, the

17  closing fees were actually paid to CSLC?

18         A.    Yes.

19         Q.    My apologies if I asked you this.  Do

20  you know how much in total Capitala received in

21  closing fees in connection with the StepStone SMAs

22  by the time you left in October of 2019?

23         A.    Unfortunately, I don't remember.

24         Q.    If StepStone had -- if the StepStone

25  SMAs had made at least 145.7 million in loans by May

Page 161

1  of 2019, does that also mean that by that date

2  Capitala would have been entitled to about 1.45

3  million in closing fees?

4      A.   Assuming that they were all basis point

5  upfront fees which they typically were, that's

6  correct.

7      Q.   Do you know if CSLC -- switching gears

8  from the StepStone SMAs over to Fund V.  Did any of

9  the Capitala entities earn fees in connection with

10  Fund V?

11      A.   Yes.  Capitala Private Advisors earned a

12  one and a half percent management fee on deployed

13  capital and it is entitled to incentive fee payment

14  if they exceed their hurdle.

15      Q.   What does that mean, entitled to an

16  incentive fee if they exceed their hurdle?

17      A.   If the return is over 20 percent at the

18  end of the fund -- I'm sorry, if the fund returns

19  over 8 percent to the investors, Capitala -- the GP

20  gets 20 percent of the profits.

21      Q.   If we can -- I believe Plaintiff's

22  Exhibit 7 is still up on the screen.  With respect

23  to the incentive fee for StepStone SMAs, this says,

24  "8 hurdle with 25 percent carry."

25          Do you see that?

Page 163

```
 1   so that the carry doesn't knock the investor back
 2   down.
 3        Q.   Just switching gears back to Fund V
 4   then, you talked about a fee that would go to CPA.
 5   Did any other Capitala entity earn fees in
 6   connection with Fund V?
 7        A.   Yes.  The general partner is entitled to
 8   carry interest or incentive fee of 20 percent over
 9   8.
10        Q.   I am getting an emergency alert that
11   there is a tornado warning in this area until 3:45.
12   I was wondering if we should take a break for a bit
13   or if we can just --
14                 THE VIDEOGRAPHER:  Would you like
15        to go off the record?
16                 MS. O'TOOLE:  Let's go off the
17        record a bit.
18                 THE VIDEOGRAPHER:  We're now off
19        the record the time is 3:02 p.m. for break.
20             (Recess taken.)
21                 THE VIDEOGRAPHER:  We are now on
22        the record, the time is 4:32 p.m.
23        Q.   Bear with me for one minute.
24             (Pause in proceedings.)
25        Q.   We are having some electrical issues
```

                                        Page 164

1    apparently because of the storm that came through so

2    please bear with me.  We do not have, apparently,

3    internet access.

4              I think before we took a break, we were

5    talking about some of the fees that may have been

6    due to some of the Capitala entities.  I would like

7    to switch gears and just ask a couple questions

8    about fees that would be due to the placement agent.

9              Mr. Wheelahan, do you agree that based

10   on the amounts that were invested by StepStone into

11   the two SMAs, that NovaFund is entitled to fees

12   under the term sheet?

13        A.    Yes.

14        Q.    And if we look back at the CSLC

15   spreadsheet which was Plaintiff's Exhibit 14, that

16   was the spreadsheet that showed there was about

17   145.7 million in loans made by the StepStone SMAs as

18   of about May 15, 2019.  Do you recall that

19   spreadsheet?

20        A.    Yes, I do.

21        Q.    Based on that amount, do you agree that

22   NovaFund is due a success fee between 1 to 1 and a

23   half percent of that 145.7 million as of mid May

24   2019?

25        A.    Yes.

```
                                            Page 169
 1   tab 8 of your material and it should have a cover
 2   e-mail from Jennifer Gentry with a G dated September
 3   22, 2016 bearing Bates stamp CAP 007088.  Do you see
 4   that?
 5        A.    I do.
 6        Q.    Do you recognize the document that is
 7   attached to that cover e-mail?
 8        A.    Yes.
 9        Q.    What is that?
10        A.    That's the PPM for Fund V.
11        Q.    Is that also known as the private
12   placement memorandum?
13        A.    Yes.
14        Q.    Did you help prepare this?
15        A.    I did.
16        Q.    On page 1 of the PPM which should be on
17   the page bearing Bates stamp 7095.  At the very
18   bottom it says, "Attractive track record."
19             Do you see that?
20        A.    I do.
21        Q.    And it says, "Since 1998, Capitala
22   Private Advisors, LLC, and its affiliates and
23   related entities collectively Capitala," and then it
24   continues.
25             Do you see that?
```

1       A.      Yes.

2       Q.      Do you agree that they are defined

3   collectively as Capitala?

4       A.      Yes.

5       Q.      In your experience, was it common to

6   collectively refer to various Capitala entities as

7   just Capitala or Capitala Group?

8       A.      Yes.

9       Q.      Were they often referred to collectively

10  as Capitala group?

11      A.      They were sometimes.  When I formed the

12  Capitala Group label with the SEC in 2016, I think

13  it was, the intent was to have a brand name for the

14  asset management platform or the advisors as

15  opposed to funds, but often times people conflated

16  the concept with a broad label.

17      Q.      What do you mean that you formed the

18  Capitala Group label with the SEC in 2016?

19      A.      In the form ADD for Capitala Investment

20  Advisors and the form ADD for the Capitala Private

21  Advisors, I collectively refer to two advisors as

22  Capitala Group period.  Like a d/b/a.

23      Q.      Why did you do that?

24      A.      Because it was a mouthful.  Because

25  people would refer to the investment investor or

Page 171

```
 1    investment investors, and sometimes they referred
 2    to Capitala Investment Advisors and they would use
 3    the wrong label for the right advisor and it just
 4    came up with a d/b/a that kept people from making
 5    that mistake.
 6         Q.   Did you have to do something to
 7    officially register Capitala Group with the SEC?
 8         A.   No.  It's by designating that other
 9    business name, it effected that.
10         Q.   Was it the case that you helped prepare
11    the form ADDs during your tenure at Capitala?
12         A.   Yes.
13         Q.   Let me have you take a look at one other
14    thing as a housekeeping matter.  If we could mark as
15    Plaintiff's Exhibit 19 the LP agreement.  And this
16    bears Bates stamp number starting with Kemper 00008.
17                   (Plaintiff's Exhibit 19, LP
18         Agreement, Kemper 00008, marked for
19         identification, as of this date.)
20         Q.   Mr. Wheelahan, this is behind tab 8 of
21    your materials.  Just let me know when you have that
22    in front of you.
23         A.   I already pulled it out at some point.
24    What is it again?  Describe it.
25         Q.   It is Amended and Restated Agreement of
```

1  the Limited Partnership of Fund V.

2        A.    Got it.

3        Q.    Do you have that in front of you?

4        A.    I do.

5        Q.    Do you recognize this?

6        A.    I do.

7        Q.    What is this?

8        A.    This is the Amended and Restated

9  Agreement of Limited Partnership for the Private

10 Credit Fund V as of that date prior to a subsequent

11 amendment of the LPA.

12        Q.    Did this happen to be the LP agreement

13 with the Kemper entity?

14        A.    Yes.  And with Hamilton Lane advisory

15 clients.

16        Q.    I would like to ask you a question if

17 you may turn to Exhibit A.

18        A.    Okay.

19        Q.    Which should be on page Kemper 89.

20        A.    Got it.

21        Q.    Do you recognize this document?

22        A.    I do.

23        Q.    What is this?

24        A.    It's the investment allocation policy

25 for Capitala Group.

```
                                          Page 173
```

1      Q.    So is this -- is it the same investment
2   allocation policy for CIA and CPA?
3      A.    Yes.
4      Q.    I would like to direct your attention to
5   footnote 1.  It says, "From time to time, the
6   advisors may sponsor and manage one or more
7   separately managed accounts ("SMAs") in addition to
8   the BDC, CTCF and Fund IV."  Do you see that?
9      A.    Yes.
10      Q.    Was this an accurate statement at the
11   time that this policy was in effect?
12      A.    Yes.
13      Q.    Do you think that -- was it your
14   understanding that the Fund V investors knew that
15   separately managed accounts could be set up in
16   connection with Fund V?
17      A.    Yes.
18      Q.    There is a section in this policy,
19   number 3, on allocations involving SMAs.  Do you see
20   that?  It's on page Kemper 94.
21      A.    I do.
22      Q.    Did you draft that section?
23      A.    I drafted the whole thing.
24      Q.    Did you intend for it to be truthful and
25   accurate in statements you were making in this

Page 195

1      Q.    At the time Capitala signed the term

2    sheet, what was your understanding of how the

3    exclusivity provisions worked?

4      A.    That they were our exclusive placement

5    agent in respect of the target investors which is

6    basically credible investors.

7      Q.    Meaning -- how did you understand

8    exclusivity to run?

9      A.    That they were our only placement agent.

10     Q.    After the meeting that you had with

11   Mr. McAndrews in March 2017, the parties amended the

12   term sheet; correct?

13     A.    Yes.

14     Q.    I would like to show you what we will

15   mark as Plaintiff's Exhibit 25.  This is in your

16   materials as tab 14.  This is an e-mail from you to

17   Mr. McAndrews dated April 24, 2017.  It starts with

18   Bates number NS 008730.

19              (Plaintiff's Exhibit 25, e-mail

20         dated April 24, 2017, NS 008730, marked for

21         identification, as of this date.)

22     A.    Got it.

23     Q.    Do you recognize Plaintiff's Exhibit 25?

24     A.    I do.

25     Q.    What is this?

1      A.     It's the addendum meant to modify the

2   term sheet based on the language of the addendum.

3      Q.     Who drafted this addendum on Capitala's

4   part?

5      A.     Me.

6      Q.     Who negotiated it?

7      A.     I negotiated it with Mark and at the

8   instruction and guidance of Alala.

9      Q.     Which Capitala entity was the

10  counterparty to this addendum?

11     A.     There's no entity specified, but if you

12  notice the top, it purports to be between Capitala

13  Group and NovaFund Advisors.  We never knew what

14  entity NovaFund Advisors was, but Capitala Group,

15  LLC is an entity, that's not specifying it,

16  Capitala Group in the form -- if you look at the

17  SEC filings, in the form ADD, is meant to describe

18  Capitala Investment Advisor, LLC, and Private

19  Advisors, LLC, but it purports to amend the term

20  sheet which was entered into by I think Capitala

21  Group, LLC and NovaFund Advisors.

22     Q.     In the first paragraph it refers to --

23  it says, "Nova agrees that Capitala is free to

24  retain placement agents focused on non-North

25  American limited partners."  Do you see that?

```
                                            Page 197
 1        A.     Yes.
 2        Q.     Who was the Capitala in that paragraph?
 3        A.     It was purposefully not specific.
 4        Q.     What do you mean?
 5        A.     It was purposefully not specific.  Like,
 6   you know --
 7        Q.     It could have referred to other Capitala
 8   entities?
 9        A.     Yes.
10        Q.     Including CPA?
11        A.     That's a very reasonable interpretation.
12        Q.     Could it also have included CIA?
13        A.     Yes.
14        Q.     Do you agree that in the addendum
15   NovaFund gave up some of its exclusivity rights and
16   that Capitala was allowed to retain another
17   placement agent?
18        A.     Yes.
19        Q.     Is it also the case that the other
20   placement agent could only be retained for a
21   specific geographic area?
22        A.     Yes.
23        Q.     At some point in time did you have the
24   understanding that NovaFund was -- had the right to
25   be retained by other investment managers even while
```

Page 222

1        A.      Capitala Group, LLC?  Or Capitala

2   Group --

3        Q.      Either.

4        A.      Capitala Group described the investment

5   advisors, one of which is the PA, which is the

6   investment advisor to Fund V.  Capitala Group, LLC,

7   is a -- essentially a do nothing entity that is

8   under common control with CPA by virtue of Joe's

9   control.

10       Q.      I will have you turn back to the term

11  sheet which is PX 2 which is under tab 6 of your

12  materials.  It says that NovaFund is supposed to

13  begin advisory group immediately with Capitala

14  Group, LLC, which has been defined as Capitala.  So

15  was it supposed to work with essentially a do

16  nothing entity or was it supposed to work with other

17  Capitala entities to raise capital to raise capital

18  for Fund V?

19       A.      It was certainly working with legitimate

20  operating entities in order to accomplish the Fund

21  V work.

22       Q.      Among those entities, NovaFund had to

23  work with CPA; correct?

24       A.      Absolutely.

25       Q.      Do you know what the standard industry

Page 223

1   practice is for engaging a placement agent in terms

2   of which entity the fund or fund manager or other

3   corporate affiliates typically engage a placement

4   agent?

5              (Discussion off the record.)

6        A.    Typically, the fund itself is the

7   counterparty to the placement agent, however, the

8   investment investor is also a party that is on the

9   hook for the obligations and the expense

10  reimbursement and things like that.

11       Q.    And in this situation, the investment

12  advisor would be CPA; correct?

13       A.    Yes.

14       Q.    Do you agree or disagree with this

15  statement:  That Capitala as an enterprise used

16  Capitala Group, LLC, to make contractual promises

17  that a fund manager would usually make knowing that

18  Capitala Group with not keep those promises?

19       A.    I don't think it was made with the idea,

20  the intention that Capitala Group wouldn't keep any

21  of the promises, but if you rephrase it, I bet we

22  can get to a different answer.

23       Q.    How would you put it?

24       A.    I would put it that Capitala generally

25  intended to live up to the bargain whether it was

Page 224

1  an NDA, term sheet with a for flowed company or a
2  term sheet with a placement agent except that the
3  understanding was in the entire firm that if the --
4  as Joe would put it, if the sugar hit the fan and
5  there was ultimately a judgement or a liability,
6  the entity on the hook for that judgement or
7  liability would not be capitalized.
8       Q.    At the time Capitala entered into the
9  term sheet with NovaFund, was the entity Capitala
10 Group, LLC sufficiently capitalized in your opinion?
11      A.    No.
12      Q.    During any point in time during your
13 tenure do you believe that Capitala Group, LLC was
14 sufficiently capitalized?
15      A.    I don't.
16      Q.    Why do you say that?
17      A.    That was the commercial intent behind
18 Capitala Group, LLC.
19      Q.    Meaning it was set up specifically to be
20 under capitalized?
21      A.    Yes.
22      Q.    What was its business purpose while you
23 were there?
24      A.    To be the signatory for certain nuisance
25 agreements, if you will, in which the risk -- like

Page 225

1   a stooge, a useful idiot.

2       Q.   Did you call those nuisance agreements?

3       A.   I just did.  They weren't called that

4   there though.

5       Q.   Was Capitala Group, LLC considered to be

6   a parent company to any of the other Capitala

7   entities?

8       A.   No.

9       Q.   And the counterparty under the

10  investment advisory agreement with StepStone is CPA;

11  correct?

12      A.   Correct.

13      Q.   And CPA is also the fund manager to Fund

14  V; correct?

15      A.   Correct.

16      Q.   Did CPA have a board?

17      A.   No.  Oh, CPA?  No.  Until the time I

18  left at least, there was no board for CPA.

19      Q.   Did it have any committees?

20      A.   I don't think so, no.

21      Q.   CPA is owned 100 percent by CIA;

22  correct?

23      A.   Yes -- at least at --

24      Q.   Pardon?

25      A.   I said at least at the time of my

Page 229

1    would roll our eyes.

2         Q.    Did CTA have its own office?

3         A.    It wasn't distinct from CIA or anything

4    else.

5         Q.    So would you agree that CTA, Capitala

6    Group, LLC, and CIA all shared the same office

7    space?

8         A.    Yes.

9         Q.    Was that office space owned or leased?

10        A.    Leased.

11        Q.    Do you know what Capitala entity was on

12   the lease?

13        A.    I think it was Capitala Advisors Corp.

14   but I'm not sure.

15        Q.    Did other Capitala entities all share

16   the same office space?

17        A.    Yes.

18        Q.    Did Capitala Group have any employees of

19   its own?

20        A.    You mean LLC?

21        Q.    Correct.

22        A.    Not to my knowledge.

23        Q.    Did CPA have any employees of its own?

24        A.    Not to my knowledge.

25        Q.    CIA?

1          A.    Not to my knowledge.

2          Q.    Do you agree that Capitala Group, LLC,

3     CIA and CPA all shared the same employees?

4          A.    Yes.  They shared the same professionals

5     to dispense the work of those firms.

6          Q.    Fund V had an investment committee;

7     correct?

8          A.    Yes.

9          Q.    The investment committee for Fund V

10    included Messrs. Alala, Broyhill, McGlinn, Norton,

11    Fontes, and then Richeson?

12         A.    That's right.

13         Q.    Did those individuals serve as the

14    investment committee for any other Capitala

15    investment vehicles?

16         A.    Yes.  They were the investment committee

17    for the StepStone SMA.

18         Q.    Did Capitala Group, LLC, CIA or CPA have

19    any of their own corporate records?

20         A.    Yes.  CIA and CPA had corporate records.

21         Q.    Did Capitala Group, LLC have its own

22    corporate records?

23         A.    Not to my knowledge.

24         Q.    Do you agree that Capitala Group, LLC,

25    CIA and CPA all shared the same compliance manual?

```
                                              Page 231
 1        A.     I don't think Capitala Group, LLC had a
 2   compliance manual, but CIA and CPA did have a
 3   compliance manual.
 4        Q.     Did you draft that compliance manual?
 5        A.     With help from outside counsel, yes.
 6        Q.     Did Capitala Group, LLC ever provide any
 7   financing to CPA?
 8        A.     Not to my knowledge.
 9        Q.     Did CPA ever provide financing to
10   Capitala Group, LLC?
11        A.     I'm not sure actually.  And I'm not sure
12   if it did that it would be privileged at this
13   point.  I'm a little confused.
14        Q.     How about -- let me ask you some
15   questions about bank accounts.  Did Capitala Group,
16   LLC have its own bank account?
17        A.     I'm not aware of one.
18        Q.     Did CPA have its own bank account?
19        A.     I believe so.
20        Q.     Do you know if CIA had its own bank
21   account?
22        A.     Yes.
23        Q.     Were you aware of any transfers of funds
24   between Capitala Group, LLC on the one hand and CPA
25   or CIA on the other?
```

1    litigation expense.

2         Q.    Involving this litigation?

3         A.    Yes.  Or its predecessor.

4         Q.    Was CPA run by Capitala Group, LLC?

5         A.    No.

6         Q.    Would you say that Capitala Group, LLC

7    was run by CPA?

8         A.    It was run by CPA's agents who were all

9    employed by Capitala Advisors Corp.  But you know,

10   it's -- individuals entered into agreements on

11   behalf of Capitala Group, LLC in furtherance of

12   business of Capitala Advisors.

13        Q.    Do you think it is fair to say that

14   Capitala Group, LLC was a shell company that was run

15   by other Capitala affiliates?

16        A.    Yes.

17        Q.    And those affiliates would include CPA

18   and CIA?

19        A.    Including but not limited to.

20        Q.    What other ones do you think that

21   Capitala Group, LLC was run by?

22        A.    Capitala Advisors Corp. and section 16

23   officers of Capitala Finance Corp.

24        Q.    Would you say that Capitala Group, LLC

25   was under the dominion and control of another

```
 1   Capitala entity?
 2        A.    Yes.
 3        Q.    Which one or ones?
 4        A.    Capitala Advisors Corp., CIA and CPA.
 5        Q.    I may have asked you this but let me
 6   just ask it a different way.  Did Capitala Group,
 7   LLC have an independent source of revenues?
 8        A.    No.
 9        Q.    Are you aware that the retainer --
10   you're aware that retainer payments were made to
11   NovaFund under the term sheet; correct?
12        A.    Yes.
13        Q.    Do you agree that those retainer
14   payments were made by CPA, not Capitala Group, LLC?
15        A.    Yes.
16        Q.    Do you think it's fair to say that
17   Capitala Group, LLC was supported by CPA, CIA and
18   other Capitala affiliates?
19        A.    Yes.
20        Q.    In your experience, did Capitala observe
21   corporate formalities for each of those affiliates?
22        A.    No.
23        Q.    Based on your experience, did one or
24   more Capitala entities function as a single
25   enterprise?
```

Page 235

1        A.     Yes.

2        Q.     Which ones?

3        A.     The more the better.

4        Q.     Would you say that Capitala Group, LLC

5    operated as part of an enterprise with other

6    Capitala entities?

7        A.     Yes.

8        Q.     Which ones?

9        A.     CIA, CPA, Capitala Advisors Corp.,

10   Capitala Finance Corp., Capital South SBIC Fund IV,

11   Capital South SBIC Fund III, and Capital South

12   Partners Fund II.

13       Q.     What about CSLC?

14       A.     Yes, and CSLC.  Sorry.  I told you it

15   was a bunch of them.

16       Q.     I think I am nearly done.  I may have a

17   couple of documents I want you to identify.

18                   MS. O'TOOLE:  Could we go off the

19          record for like five minutes and then come

20          back on?

21                   THE VIDEOGRAPHER:  Stand by.  We

22          are now off the record.  The time is 6:19 p.m.

23          for break.

24              (Recess taken.)

25                   THE VIDEOGRAPHER:  We are now on

1      Q.    Mr. Wheelahan, we're going to mark your

2   text messages as Plaintiff's Exhibit 29.

3                  (Plaintiff's Exhibit 29, text

4         messages, marked for identification, as of

5         this date.)

6      Q.    Let me know when that comes up.

7      A.    They're up.

8      Q.    This is in your paper materials behind

9   tab 41.

10              Did you receive a subpoena in this

11   matter requesting copies of text messages that you

12   sent or received relating to this matter?

13      A.    Yes.

14      Q.    And responsive to the subpoena, did you

15   provide your cell phone to a vendor?

16      A.    I provided my cell phone number -- my

17   credentials to a vendor who accurately pulled my

18   text messages off of it.

19      Q.    Was it your understanding that the

20   vendor then extracted the text messages from your

21   phone?

22      A.    Yes.

23      Q.    Did you review your text messages after

24   they were extracted and before -- before they got

25   produced in this matter?

```
                                          Page 238
1        A.    Yes.
2        Q.    Is it your understanding that
3   Plaintiff's Exhibit 29 is the complete set of text
4   messages that were extracted from your phone?
5        A.    Yes.
6        Q.    Did you keep those text messages in the
7   ordinary course of your work for Capitala as the
8   messages related to Fund V or the issues in this
9   lawsuit?
10        A.    Yes.
11        Q.    Let me just have you flip a couple of
12   pages and ask you some questions about some of
13   these.  If I could have you turn to page RW 0009.
14   There's a text from you that is -- has the timestamp
15   of April 7, 2017 at 8:27.  Do you see that?
16        A.    Yes.
17        Q.    It says, "The feeling is that the firm
18   exists as Joe's alter ego, it's all his."
19              Do you see that?
20        A.    I do.
21        Q.    Is that a text that you sent?
22        A.    Yes.
23        Q.    You sent that to Mr. Swercheck?
24        A.    Yes.
25        Q.    What did you mean by that?
```

1       A.    I think it was Louis XIII, his quote was

2    "I am the state."   There are no institutions, there

3    were no real -- institutions or entities at issue,

4    Joe was the state.

5       Q.    Was Mr. Alala the head of all the

6    entities that we were discussing before?

7       A.    Yes.   With the exception of Capitala

8    Finance Corp., he was the chairman and CEO but he

9    had a board.

10       Q.    During your tenure was he the head of

11    CIA?

12       A.    Yes.

13       Q.    CPA?

14       A.    Yes.

15       Q.    And Capitala Group, LLC?

16       A.    Yes.

17       Q.    On page RW 11 there's a text from you

18    with a timestamp of April 7, 2017, at 8:33.  And you

19    said, "I know!  The way it is at a real business."

20    What did you mean by that?

21       A.    That the way Capitala operates is not

22    the way that a real credible institutional business

23    operates.

24       Q.    How so?

25       A.    Joe making unilateral, autonomous

Page 246

1    Beach.

2         Q.    In the text below he says, "He has

3    helped me bury a few bodies in the day."  Do you see

4    that?

5         A.    Yep.

6         Q.    What did you understand that to mean?

7         A.    All the nefarious shit that his trusts

8    do, he has enablers, his mother was one, Derek was

9    another one.

10        Q.    On page -- if you turn the page to RW

11   76.  The e-mail from Mr. Alala dated January 31,

12   2019 at 6:39 p.m.  In that text he says, "I have the

13   Japs wet."  Do you see that?

14        A.    Yep.

15        Q.    Was that a text from him to you?

16        A.    Yes.

17        Q.    What did you understand that text to

18   mean?

19        A.    He's analogizing Mitsui's interest in

20   getting a deal done to sexual arousal in a female.

21        Q.    I will leave that one alone.

22              Let me have you turn to RW 203.  There's

23   only one text on this page dated June 23, 20/20 at

24   7:02.  Is this a text from him to you?

25        A.    Yes.

1      Q.    He says, "We dissolved Capitala Group,

2    LLC so your deposition I just learned is postponed.

3    We are allowing a default judgement against that LLC

4    as that LLC has no assets.  Court denied adding

5    other party to the lawsuit so Nova receives what

6    they deserve.  I have hired Rob Wilder and replaced

7    RBH.  You know Rob.  Great litigator."

8              Did I read that correctly?

9      A.    Yes.

10     Q.    What did you understand that text to

11   mean?

12     A.    I understood that text to mean that

13   notwithstanding the fact that his communications

14   were no longer privileged with me, he was

15   communicating his strategy, overall strategy of the

16   litigation which was to prosecute, prosecute,

17   prosecute until Nova ran out of energy and

18   fortitude and then have a dummy entity with no

19   assets -- have a NINJA, no income, no job, no

20   assets behind it holding the bag and then Nova goes

21   home sad.

22              He was also, I think, trying to inform

23   me in such a way that I would lose whatever

24   motivation I had to cooperate with this deposition

25   notwithstanding the fact I had a judicially issued

```
                                              Page 248
 1   subpoena and I had an obligation to cooperate with
 2   them.
 3        Q.   Do you in fact know an attorney named
 4   Rob Wilder?
 5        A.   I know of him and I have been in
 6   communication with him over e-mail for various
 7   things before.
 8        Q.   Are you familiar with Mr. Alala's view
 9   of Mr. Wilder?
10        A.   Yes.
11        Q.   What was that?
12        A.   Bull in a china shop.  Low EQ, high IQ,
13   a provocateur.  Just break glass, cause friction,
14   grind your opponent into submission type of
15   litigator.
16        Q.   Is he a litigator in North Carolina?
17        A.   He is.
18        Q.   Did you understand the reference to RBH
19   in that text message to be Robinson Bradshaw &
20   Hinson?
21        A.   Yes.
22        Q.   Let me see if we can --
23             MS. O'TOOLE:  Robert, do you by any
24        chance have HL 1129 ready to go?
25        Q.   Mr. Wheelahan, did Capitala do anything
```

Page 254

1        okay?
2                    THE REPORTER:   Absolutely.
3                    MS. O'TOOLE:   That would be
4        terrific.
5                    THE REPORTER:   And somebody
6        mentioned a rough.   Do you still want that or
7        do you just want the final on Thursday?
8                    MS. O'TOOLE:   I think the final on
9        Thursday is fine.
10           (Deposition concluded at 6:49 p.m.)
11                  (Signature reserved)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 255

1    STATE OF NORTH CAROLINA
2    WAKE COUNTY
3                    REPORTER'S CERTIFICATE
4            I, Andrea L. Kingsley, a Notary Public
5    in and for the State of North Carolina, do hereby
6    certify that there came before me on Tuesday, the
7    August 4, 2020, the person hereinbefore named, who
8    was by me duly sworn via Virtual Zoom to testify to
9    the truth and nothing but the truth of his
10   knowledge concerning the matters in controversy in
11   this cause; that the witness was thereupon examined
12   under oath, the examination reduced to typewriting
13   under my direction, and the deposition is a true
14   record of the testimony given by the witness.
15           I further certify that I am neither
16   attorney or counsel for, nor related to or employed
17   by, any attorney or counsel employed by the parties
18   hereto or financially interested in the action.
19           IN WITNESS WHEREOF, I have hereto set
20   my hand this the 6th day of August, 2020.
21
22
23
24   _____
25           Andrea L. Kingsley, Notary Public
             Notary Public #201903800023

<u>ERRATA SHEET</u>

NOVAFUND ADVISORS, LLC V. CAPITALA GROUP, LLC

DEPOSITION OF:  <u>RICHARD G. WHEELAHAN, III</u>        DATE:<u>   AUGUST 4, 2020</u>

| Page # | Line # | CHANGE | REASON |
|--------|--------|--------|--------|
| 2 | | Delete Esquire after Lisa B. Waller's name | Incorrect title |
| 15 | 22 | Start quote at "Capitala" | Punctuation |
| 15 | 23 | Change "individual" to "individuals" | Transcription Error |
| 15 | 23 | Change "provide" to "provides" | Transcription Error |
| 16 | 8 | Change ", CPTA," to ("CPTA") | Punctuation |
| 16 | 9 | Comma after "company" | Punctuation |
| 16 | 22 | Change "interest" to "interests" | Transcription Error |
| 17 | 8 | Change "middle market" to "middle-market" | Transcription Error |
| 17 | 19 | Delete quotation marks "which is defined as CIA" | Punctuation |
| 18 | 6 | Change "became general counsel, as well as chief compliance officer, to Capitala" to "became the general counsel as well as chief compliance officer to Capitala" | Punctuation |
| 18 | 20 | Comma after "entities" | Punctuation |
| 19 | 11 | Capitalize "P" in private" | Capitalization |
| 24 | 4 | Change "LP." to "L.P." | Punctuation |
| 24 | 17 | Change "investor" to "investors" | Transcription Error |
| 24 | 20 | Change "is" to "that is" | Transcription Error |

| Page # | Line # | CHANGE | REASON |
|---|---|---|---|
| 25 | 3 | Change "as" to "if" | Transcription Error |
| 25 | 23 | Begin quote at "Capitala" | Punctuation |
| 25 | 25 | Change "%" to "percent" | Punctuation |
| 26 | 1 | Capitalize "T" in target; "I" in investor; "F" in fund | Capitalization |
| 26 | 20 | Quote is: "Should Capitala agree to a lower management fee than 1.5% for any Target Investor, NovaFund will earn a fee equal to one year of the Company's management fee from the Target Investor but in no case less than 1.0% of committed capital for the Target Investor(s)" | Punctuation; Capitalization |
| 32 | 10 | Change "Provided" to "provided" | Capitalization |
| 32 | 11 | Change "success fee" to "Success Fee" | Capitalization |
| 32 | 13 | Capitalize "F" in "fund" | Capitalization |
| 35 | 23 | Quote is: "It is understood that no Fee shall be payable with respect to commitments by the Manager or General Partner of the Fund or executives of Capitala or any of their respective officers, directors and employees and any such officer's, director's or employee's immediate family members (and any investment vehicles controlled by or established primarily for the benefit of any such officer, director, employee and/or his or her immediate family members), for its or their own accounts," | Capitalization, Punctuation |
| 38 | 18 | Capitalize "F" in "fee" | Capitalization |
| 38 | 19 | Change "commitment" to "commitments" | Transcription Error |

| Page # | Line # | CHANGE | REASON |
|---|---|---|---|
| 38 | 22 | Capitalize "S" in "schedule"; Capitalize "C" in carve; "O" in "out"; "I" in "investors" | Capitalization |
| 38 | 23 | Change "125,000,000 to "125 million"; Change "commitment" to "commitments" | Transcription Error |
| 40 | 23 | Change "no" to "know" | Transcription Error |
| 44 | 23 | Capitalize "T" in "tail" and "F" in "fee" | Capitalization |
| 45 | 18 | Capitalize "T" in "target"; "I" in "investors" and "F" in "fund" | Capitalization |
| 45 | 19 | Change "Capitala sponsored" to "Capitala-sponsored" | Transcription Error |
| 45 | 21 | Change "commitment" to "commitments" | Transcription Error |
| 46 | 12 | Change "Next" to "next"; Change "Capitala sponsored" to "Capitala-sponsored" | Capitalization and Transcription Error |
| 47 | 2 | Change "With to "with" | Capitalization |
| 49 | 13 | Change "would" to "were" | Transcription Error |
| 51 | 9 | Change "Australian church (phonetic)" to "Israeli insurance company" | Transcription Error |
| 52 | 4 | Change "investment" to "investments" | Transcription Error |
| 60 | 6 | Change "CAP 00086206" to "CAP_0086206" | Transcription Error |
| 64 | 22 | Change "intent of support letter" to 'intent of support letter'" | Punctuation |
| 64 | 23 | Delete "take" after the word "are" | Transcription Error |

| Page # | Line # | CHANGE | REASON |
|--------|--------|--------|--------|
| 65 | 24 | Capitalize "C" in "capital" | Capitalization |
| 69 | 3 | Capitalize "P" in "private"; "D" in "debt"; "F" in "fund" | Capitalization |
| 70 | 14; 19 | Change "Board" to "board" | Capitalization |
| 71 | 14 | Change "150 MM" to "150mm" | Transcription Error |
| 74 | 10 | Change "Board" to "board" | Capitalization |
| 76 | 12 | Change "300 million" to "300MM"; "350 million" to "350MM" | Capitalization |
| 77 | 2 | Change "300 million" to "$300 million"; "350 million" to "$350 million" | Transcription Error |
| 77 | 6 | Change "2 hundred million" to $200 million" | Transcription Error |
| 77 | 19 | Change "LLC" to "LP" | Transcription Error |
| 77 | 20 | Change "With" to "with" | Capitalization |
| 95 | 2 | Change "1 Billion" to "$1.0 Billion" | Transcription Error |
| 95 | 21 | Change "$1 billion dollars" to "$1.0 billion" | Transcription Error |
| 98 | 15 | Change "1 billion" to "$1bn" | Transcription Error |
| 98 | 17 | Comma before, "with" | Punctuation |
| 99 | 10; 14 | Change "1 billion" to "$1bn" | Transcription Error |
| 121 | 11 | Capitalize "I" in "investment; Capitalize "A" in "advisor" | Capitalization |
| 121 | 12 | Change "LP" to "L.P." | Transcription Error |

4

| Page # | Line # | CHANGE | REASON |
|--------|--------|--------|--------|
| 121 | 17 | Parentheses before "referred" and after "CSLC"; <br><br> Quotes around "Capitala Specialty Lending Corp. or CSLC" | Transcription Error |
| 121 | 19; 20 | Change "middle market" to "middle-market" | Transcription Error |
| 142 | 15 | Change "Principal" to "Principle" | Transcription Error |
| 151 | 14 | Capitalize "F" in "fund" | Capitalization |
| 151 | 15 | Change "150 million a year" to "$150MM per year" | Transcription Error |
| 151 | 16 | Change "600 million" to "$600MM" | Transcription Error |
| 153 | 3 | Quote: "In our calculations the targeted amount over three years amounts to $600m (out which $450m and $150m relates to the Treaty and Offshore Platform, respectively)" | Transcription Error |
| 162 | 3 | Change "NC" to "entities" | Transcription Error |
| 170 | 19 | Change "ADD" to "ADV" | Transcription Error |
| 170 | 20 | Change "ADD" to "ADV" | Transcription Error |
| 171 | 11 | Change "ADDs" to "ADVs" | Transcription Error |
| 171 | 16 | Change "Kemper 00008" to "Kemper000008" | Transcription Error |
| 172 | 19 | Change "Kemper 00008" to Kemper000008" | Transcription Error |
| 173 | 6 | Capitalize "A" in "advisors" | Capitalization |
| 173 | 8 | Change "CTCF" to "CPCF" | Transcription Error |

| Page # | Line # | CHANGE | REASON |
|--------|--------|--------|--------|
| 186 | 25 | Change "in" to "and" | Transcription Error |
| 187 | 2 | Change "funding" to "launching" | Transcription Error |
| 188 | 24 | Change "so some" to "some" | Transcription Error |
| 189 | 5 | Change "effort" to "efforts" | Transcription Error |
| 198 | 17 | Change "ADD" to "ADV" | Transcription Error |
| 209 | 20 | Change "Brian" to "Bryan" | Transcription Error |
| 210 | 8 | Change "Brian" to "Bryan" | Transcription Error |
| 210 | 13 | Change "Brian" to "Bryan" | Transcription Error |
| 213 | 4 | Change "agreed" to "agree" | Transcription Error |
| 217 | 3 | Change "again" and "against" | Transcription Error |
| 223 | 18 | Change "with" to "would" | Transcription Error |
| 224 | 1 | Change "for flowed" to "portfolio" | Transcription Error |
| 227 | 17 | Change "trust" to "Trust" | Capitalization |
| 229 | 2 | Change "CTA" to "CPA" | Transcription Error |
| 229 | 5 | Change "CTA" to "CPA" | Transcription Error |
| 246 | 23 | Change "20/20" to "2020" | Transcription Error |

8927356

### ACKNOWLEDGMENT OF DEPONENT

I, RICHARD G. WHEELAHAN, III, do hereby certify that I have read the pages of the transcript of my testimony, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance noted in the attached Errata Sheet.


Richard G. Wheelahan, III

STATE OF North Carolina

COUNTY OF Mecklenburg

Subscribed and sworn to before me, the undersigned authority, on this the

26th day of August, 2020

Notary Public

My Commission expires: 12|10|2024

DEVIN E. SCHUETTE
NOTARY
PUBLIC
MECKLENBURG COUNTY, N.C.