UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NOVAFUND ADVISORS, LLC, | No. 3:18-cv-1023 (MPS) |
| Plaintiff, | |
| v. | |
| CAPITALA GROUP, LLC; CAPITALA PRIVATE ADVISORS, LLC; CAPITALA INVESTMENT ADVISORS, LLC; and CAPITALA SPECIALTY LENDING CORPORATION, | October 27, 2020 |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

Plaintiff NovaFund Advisors, LLC, by its attorneys, hereby alleges for its Second Amended Complaint against Defendants Capitala Group, LLC, Capitala Private Advisors, LLC, Capitala Investment Advisors, LLC, and Capitala Specialty Lending Corporation, as follows.

**Summary of Claims**

1.      In 2016, Capitala Group, doing business as Capitala Private Advisors, LLC ("CPA") and Capitala Investment Advisors, LLC ("CIA") (together, CPA and CIA are "Capitala Group"), sought to raise capital for a private credit fund focused on making direct loans to lower middle market companies with opportunistic equity co-investments.  Capitala Group decided to work with a placement agent, which typically assists with raising capital for private funds by introducing fund managers to qualified investors, identifying potential investors, advising on market strategy and marketing materials, and facilitating the closing of investor commitments to funds.  Capitala Group hired NovaFund Advisors, LLC ("NovaFund") as its exclusive placement agent for the fund, knowing that Capitala could work only with NovaFund and no other placement agents.  At the time, NovaFund was a division of its broker-dealer, Columbus Advisory Group, Ltd. ("Columbus").

2.      From the start, Capitala Group had no intention of dealing with NovaFund in good faith or working exclusively with NovaFund.  For example, Capitala Group used a shell company, Capitala Group, LLC ("CGLLC"), to sign the contract with NovaFund.  CGLLC is a sham entity, with no assets, no income, no operations, no real structure, and no purpose other than to serve as the counterparty to the agreement with NovaFund and other contracts considered to be preliminary or lacking in substance.  CGLLC was intentionally undercapitalized so that if it were ever responsible for a liability or judgment, it would not have sufficient assets to meet those obligations.  Capitala Group never disclosed any of this to NovaFund, and instead this information only came out after CGLLC dissolved in June 2020.  As described more fully herein, NovaFund effectively entered into a business relationship with Capitala Group and CGLLC (collectively, "Capitala").

3.      Additionally, without telling NovaFund and in violation of its contractual obligation to work only with NovaFund, Capitala conspired with another company, Sandler, O'Neill & Partners L.P. ("Sandler O'Neill"), to solicit investors for the fund.  Capitala and Sandler O'Neill also excluded NovaFund from critical decisions relating to the marketing of the fund, including which types of investors to solicit, which specific investors to solicit, and when such investors should be solicited.  The immediate result of this pact was to prevent NovaFund from working with dozens of investors and from receiving full fees in the event those investors invested in the fund.  But, because Capitala directly, and Sandler O'Neill indirectly, hid this information from NovaFund at the outset of the process for raising capital for the fund, it affected the fund's overall marketing strategy.  NovaFund has since learned that Sandler O'Neill was not the only other placement agent that Capitala worked with on the fund.

4.      Capitala's decision to use a shell company, CGLLC, to sign the contract with

NovaFund, along with its deceitful engagement of Sandler O'Neill, demonstrate that NovaFund's entire engagement with Capitala was premised on lies and omission from the start. NovaFund never would have entered into a contract with Capitala had it known that the party signing for Capitala – CGLLC – was a dummy entity with no assets or income, or that Capitala intended to work with (and did work with) Sandler O'Neill and other agents on the fund.

5.      Capitala's double-dealing persisted throughout its relationship with NovaFund and was detrimental to what is supposed to be a transparent collaboration among a fund, its manager, and the placement agent.

6.      Capitala also marred their relationship by interfering with NovaFund's efforts and throwing up one roadblock after another to prevent NovaFund from doing its job.  Aside from blocking NovaFund from working with over 100 high potential, very credible investors, Capitala also purposely delayed NovaFund from starting work on marketing activities and arranging investor meetings.  Then, almost immediately after NovaFund was permitted to begin contacting investors, Capitala soon looked for an excuse to re-trade its deal with NovaFund so that it could hire yet another placement agent and threatened to sue NovaFund if it did not agree to amend the parties' contract on worse economic terms.  Caving to the mounting pressure from Capitala, NovaFund agreed to amend their contract.

7.      Meanwhile, Capitala continued to act in bad faith towards NovaFund by excluding NovaFund from meetings with investors that NovaFund had been soliciting; developing and executing on the marketing strategy for the fund without NovaFund; failing to follow NovaFund's advice; and making false and disparaging statements about NovaFund to NovaFund's peer competitors, investor clientele, and investment professionals.  Capitala's conduct towards NovaFund throughout their relationship is quintessential bad faith and

demonstrates a pattern of frustrating, interfering with, and preventing NovaFund's performance.

8.     Despite all of the hurdles that Capitala put in NovaFund's path, NovaFund found a way to be successful by soliciting an investor with which it had a prior relationship, StepStone Group LP ("StepStone").  NovaFund introduced StepStone to Capitala and worked for over a year to keep StepStone interested in forming an investment relationship with Capitala. Ultimately, StepStone and Capitala set up two separately managed accounts as part of the process for raising capital for the fund to pursue significant investments with Capitala and its affiliates (the "StepStone-Capitala SMAs").

9.     Soon after the StepStone-Capitala SMAs were finalized in April 2018, Capitala issued a press release announcing that it had raised $1 billion in capital for a new investment vehicle.  After seeing the press release, NovaFund asked Capitala for information about the investors in that vehicle to evaluate whether NovaFund was due any fees.  Capitala refused, and did not disclose to NovaFund that the new entity was related to the StepStone-Capitala SMAs or that the new entity was set up to conceal StepStone's identity.

10.     Instead, Capitala immediately sued in North Carolina state court seeking a declaration that it owed NovaFund no money.  Capitala's lawsuit followed a string of disparaging comments that Capitala made about NovaFund to the fund's investors and StepStone falsely complaining about NovaFund's performance in an attempt to justify its decision to sue. But, as Capitala has admitted, there were numerous reasons why investors declined to invest in the fund having nothing to do with NovaFund and rather relating to Capitala, its decision to launch the marketing campaign for the fund in the fourth quarter of 2016 and to temporarily suspend fundraising efforts in early 2017, the performance of the fund and Capitala's other investment vehicles, and the market.  Nevertheless, Capitala pointed the blame at NovaFund.

11.     Capitala's derisive comments lacked any justification as is evident from Capitala's contradictory statements, such as criticizing NovaFund for reaching out to too many investors and then saying they had contacted too few; complaining that NovaFund did not set up a sufficient number of meetings but instructing NovaFund not to set up meetings or being unavailable for meetings; attacking NovaFund's marketing approach but praising and using NovaFund's advice regarding investor presentations; disparaging NovaFund generally for not going far and wide enough and then admitting that such an approach would be unnecessary if only one investor made a significant enough investment.  In fact, just one year's worth of the investments made by the StepStone-Capitala SMAs equated to half of the fund's targeted investment size.  Yet, despite NovaFund's successful contributions, Capitala has refused to pay NovaFund for the work that it did and for the benefits that Capitala has received and will continue to receive due to NovaFund's efforts.

## Parties

12.     Plaintiff NovaFund is a limited liability company organized under the laws of Delaware with two members, Bryan Kelley and James Howe.  They are both U.S. citizens, Mr. Howe has his residence and domicile in Connecticut, and Mr. Kelley recently changed his residence and domicile from Connecticut to Florida.  During the relevant time, NovaFund was an independent placement firm focused on delivering capital-raising and advisory services to private fund managers.  At all relevant times, it operated as a division of a licensed broker-dealer.  Before entering into the contract with Capitala, NovaFund made Capitala aware that NovaFund operated as a division of a broker-dealer, which at the time was Columbus, member of FINRA/SIPC.  NovaFund changed broker-dealers in November 2016 to MD Global Partners, LLC, member of FINRA/SIPC, and obtained Capitala's agreement to that change.

13.     Defendant Capitala Group, LLC was organized as a limited liability company under the laws of North Carolina.  At all relevant times, it had only one member, Joseph B. Alala, III, who is a U.S. citizen and has his domicile and residence in North Carolina.  CGLLC filed articles of dissolution with the Secretary of State of North Carolina with an effective date of dissolution of June 9, 2010.

14.     Defendant Capitala Private Advisors, LLC is a limited liability company organized under the laws of Delaware of which there is currently only one member, CIA.

15.     Defendant Capitala Investment Advisors, LLC is a limited liability company organized under the laws of Delaware of which there are currently two members, Atlas Capitala Investments, LLC ("Atlas") and Mitsui & Co. (U.S.A.), Inc. ("Mitsui").  Atlas is a limited liability company organized under the laws of North Carolina of which there is currently only one member, Capitala Trust.  The trustee of Capitala Trust is Markham Hunt Broyhill, who, upon information and belief, is a U.S. citizen and has his domicile and residence in North Carolina.  Mitsui is a corporation organized under the laws of New York, with its principal place of business in New York.

16.     Together, CPA and CIA do business under the marketing brand name of "Capitala Group."  Capitala Group and its affiliates organize and manage various types of investment funds and provide investment management advice to institutional investors, portfolio companies, and clients.

17.     Defendant Capitala Specialty Lending Corporation is a corporation organized under the laws of Delaware, with its principal place of business in North Carolina.

## Jurisdiction and Venue

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because

6

there is complete diversity of citizenship among the parties, and the matter in controversy

exceeds the sum of $75,000, exclusive of interest and costs.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events or omissions giving rise to the claims occurred in this District.

### Factual Allegations

20.     In 2015, Capitala planned to launch a new credit fund to be known as Capitala

Private Credit Fund V, L.P. ("Fund V").

21.     Capitala decided it wanted to work with a placement agent to raise capital for

Fund V.  Capitala conducted due diligence and interviewed several different potential agents.

Several agents declined, questioning among other things whether Fund V could be successfully

raised.  Capitala selected NovaFund, a Connecticut-based placement agent.

22.     Capitala knew that it had hired NovaFund to be its exclusive or only placement

agent for Fund V.  That type of exclusivity, where only one placement agent is used, is common

in the industry because capital-raising projects can take up to two years and require considerable

coordination between a fund, a fund's manager, and a placement agent to evaluate hundreds of

potential investors, narrow the pool of potential investors to those most likely to consider an

investment, and focus the parties' marketing efforts on meeting with and soliciting interest in the

fund from these select investors.  NovaFund's exclusivity, meaning that Capitala could not work

with any other placement agent on Fund V, was a material consideration for NovaFund and

NovaFund would not have agreed to a contract without it.

23.     Even though Capitala knew that NovaFund was its exclusive placement agent, it

had no intention of honoring its obligation.  Before even entering into a contract with NovaFund,

Capitala colluded with Sandler O'Neill to have Sandler O'Neill provide placement agent services

for Fund V.  Capitala asked Sandler O'Neill which investors Sandler O'Neill wanted to solicit

for Fund V.  In response, Sandler O'Neill provided Capitala with a list of 40 investors.  The

understanding between Capitala and Sandler O'Neill was that only Sandler O'Neill could contact

and solicit those 40 investors, not NovaFund, and if any of those 40 investors invested in Fund

V, only Sandler O'Neill would receive fees, not NovaFund.  At the time, Sandler O'Neill knew

that Capitala was negotiating a contract with NovaFund and later knew they signed a contract.

24.     Capitala and Sandler O'Neill further conspired together to add Sandler O'Neill's

list of 40 investors to the "carve out" list in the contract between Capitala and NovaFund.  A

"carve out" list generally means that a placement agent will be limited or precluded from

receiving fees if an investor on that list invests in a fund.  Carve out investors are nearly always

investors known only by the manager, not the placement agent.

25.     For example, on April 27, 2016, Thomas Sullivan of Sandler O'Neill sent an

email to Joseph Alala, III, the founder and Chief Executive Officer of Capitala, and Capitala's

General Counsel attaching the "initial target list" of investors that Sandler O'Neill wanted to

solicit for Fund V.  In the email, Mr. Sullivan asked Mr. Alala for protection on the names on the

list as they began to make calls.  On June 27, 2016, in an email to Mr. Alala, Capitala's Vice

President - Business Development, Casey Swercheck, observed that NovaFund will "freak out"

if Capitala pays placement agent fees to Sandler O'Neill should investors on the carve out list

invest.  On June 28, 2016, Mr. Alala emailed Mr. Sullivan to review the process for reaching out

to the investors on Sandler O'Neill's list and to inform him that Capitala had not had NovaFund

contact anyone on the carve out list.

26.     Capitala hid Sandler O'Neill's identity, role, and involvement from NovaFund,

even over the objection of at least two of Capitala's senior employees.  For example, in an April

8

25, 2016 email, Mr. Swercheck noted that it was "risky" to hide from NovaFund that Sandler

O'Neill may work on Fund V.  Also, in a September 28, 2016 email to Mr. Alala, Mr. Swercheck

stated that he was "still nervous" about the arrangement with Sandler O'Neill and acknowledged

that Capitala was not being "transparent" with NovaFund.  Capitala's former General Counsel

testified that he told Mr. Alala that hiding Sandler O'Neill's involvement from NovaFund was a

"bad idea" from a business perspective.  Capitala continued to hide Sandler O'Neill's role from

NovaFund, disclosing it only after this lawsuit had been pending for more than a year.

**The Agreement**

27.     NovaFund and Capitala entered into an agreement in May 2016 ("Agreement"),

which was signed by CGLLC on Capitala's behalf.  Capitala retained NovaFund as its exclusive

placement agent in connection with raising capital for Fund V or separately managed accounts.

At the time it entered into the Agreement, Capitala knew that it would have to pay fees to

NovaFund if an investor committed either to Fund V or to a separately managed account.

28.     Capitala hired NovaFund to advise and assist in placing partnership interests in

Fund V with North American, European, Australian, and Asian investors ("Target Investors").

The Agreement also describes the other advisory services NovaFund was to provide.

29.     In exchange, the Agreement obligated Capitala to pay NovaFund a certain

percentage of the amount of capital that any Target Investor commits to Fund V or a separately

managed account (the "Success Fee").

30.     There are a few exceptions to the Success Fee that are not relevant to this lawsuit,

in which NovaFund would not earn fees from investments made by "friends and family" of

Capitala and investments made in Capitala's traded credit vehicle.

31.     Another exception to the Success Fee was for "Carve Out" investors, which

limited the amount of fees that NovaFund could earn.  The parties agreed that no fee would be

payable on certain Carve Out investors, but only up to $125 million in aggregate commitments.

Once the $125 million cap was reached, Capitala was obligated to pay NovaFund the Success

Fee on any commitments over that amount even if the investors were on the Carve Out list.

32.    The Carve Out list of investors is set forth in Schedule 1 to the Agreement, and is

incorporated by reference into the Agreement.  All of the investors from Mr. Sullivan's April 27,

2016 list are on the Carve Out list attached to the agreement that Capitala and NovaFund signed

in early May 2016.  Capitala never told NovaFund that the Carve Out list contained the names of

40 investors added by Sandler O'Neill and that it intended only Sandler O'Neill to contact those

investors.  The Carve Out list contains the names of 105 investors, including the 40 added by

Sandler O'Neill and Sandler O'Neill itself.  Seven of the 40 investors added by Sandler O'Neill

are based in Connecticut.

33.    Before signing the Agreement, Mr. Alala and/or Mr. Swercheck represented to

Mr. Kelley and/or Mr. Howe that Capitala had a personal relationship with the investors listed on

the Carve Out list.  The Agreement expressly provides that the investors on the Carve Out list

were "previously known to Capitala."  NovaFund relied on the representations that Capitala had

meaningful personal contacts for each investor listed on the Carve Out list, which included some

of the largest potential investors for Fund V.  The strength of these relationships led NovaFund

to believe that Fund V could be raised successfully.  These representations were thus material to

NovaFund's decision to enter the Agreement.  The representations by Capitala were false when

made because Capitala did not have a personal relationship with the 40 investors added to the

Carve Out list from Sandler O'Neill's list and Capitala did not have meaningful contacts at many

of the other investors on the Carve Out list sufficient to solicit investments for Fund V.

10

34.     The Agreement also requires Capitala to pay NovaFund an additional fee based on a percentage of capital commitments from Target Investors that close into the next Capitala-sponsored successor vehicle with a substantially similar investment strategy (the "Tail Fee"). Capitala knew and understood that the Tail Fee was payable even if a Carve Out investor invested in Fund V and later invested in the next Capitala-sponsored successor vehicle.

35.     Capitala also agreed to pay NovaFund a minimum of $200,000 as compensation for the advisory and placement services, which was payable in a monthly retainer of $20,000, which was supposed to be offset dollar for dollar against the Success Fee.

36.     Beginning in May 2016, NovaFund sent monthly invoices to Capitala for the monthly retainer fee of $20,000.  These invoices instructed Capitala to remit the monthly retainer fee to NovaFund's broker-dealer, initially Columbus, then, beginning in late 2016, to MD Global.  While NovaFund issued these invoices to CGLLC, they were sent to Capitala, and Capitala, through CPA, paid the invoices on Capitala's behalf to NovaFund's broker-dealers. Similarly, NovaFund issued invoices to CGLLC for the reimbursement of expenses incurred by NovaFund, but was repaid by Capitala through CPA.

37.     After the parties executed the Agreement, NovaFund immediately began performing its duties under the Agreement by providing advice to Capitala on the private placement memorandum ("PPM"), marketing materials, and track record presentations. NovaFund was also ready to begin work on marketing efforts with investors, but Capitala asked NovaFund to delay that work.

38.     For example, Capitala instructed NovaFund not to do any work with Target Investors until after the first two investors, known as "anchor investors," finalized their commitment to Fund V.  Capitala explained to NovaFund that Capitala had been working with

two institutional investors interested in investing in Fund V and would not need NovaFund's assistance in finalizing their participation in Fund V.  Those two anchor investors did not close on their interests in Fund V until the first closing held in late August 2016.

39.     NovaFund complied with Capitala's request, even though NovaFund believed that delaying marketing efforts until after the first close would be detrimental to the parties' efforts to raise capital.  NovaFund expressed these concerns to Capitala at the time, and explained that starting earlier in the year allows a fund manager a better chance of success by having more time to solicit and close investors before the end of the year, and that investors often have investment allocation limits which are reached before the end of the third quarter.

40.     Capitala's decision to have NovaFund delay its efforts to solicit investors negatively impacted NovaFund's ability to earn fees under the Agreement.

41.     Capitala also asked NovaFund to hold off contacting investors while it was secretly working with Sandler O'Neill to have Sandler O'Neill solicit investors for Fund V, without telling NovaFund.

**The First Closing and Marketing Efforts for Fund V**

42.     On or about August 21, 2016, which was about four months after the Agreement's execution, Capitala closed on the anchor investors' commitments to Fund V.  Capitala considered Hamilton Lane, Inc. ("Hamilton Lane") and Kemper Insurance Company ("Kemper") to be the anchor investors, but their clients (in the case of Hamilton Lane) and subsidiary (in the case of Kemper) were the actual investors.  For example, Kemper's subsidiary, Trinity Universal Insurance Company, invested in Fund V.

43.     On September 7, 2016, Capitala issued a press release about the first closing and announced that it included about $40 million in capital commitments by a globally renowned

asset manager and an investment grade insurance company.

44.     Capitala set the target size of investments for Fund V (meaning the amount of capital it wanted to raise from investors) as $300 million with a hard cap of $350 million.

45.     Capitala intended to raise the balance of the target size for Fund V in a series of closings after the first close.

46.     After the first close, NovaFund immediately began reaching out to investors to promote Fund V and sending offering documents and marketing materials to investors in an effort to generate interest in Fund V.  For example, in or about October 11, 2016, NovaFund, not Capitala, sent the PPM and other marketing materials for Fund V to StepStone.  This was the first time StepStone had been solicited in connection with Fund V and related separately managed accounts.

47.     The PPM for Fund V, along with Capitala's public marketing materials, represent that Fund V is a limited partnership formed by CPA.  The PPM directs investors with questions to contact CPA.  Additionally, information filed by Capitala with the SEC identifies CPA as the investment adviser to Fund V.

48.     Within the first several months after Capitala authorized NovaFund to begin marketing Fund V, NovaFund contacted nearly 500 potential investors.  Eventually, NovaFund arranged and/or participated in approximately 70 meetings with potential investors.

49.     Capitala instructed NovaFund, however, not to contact any of the investors on the Carve Out list and at least one former top Capitala executive has referred to the Carve Out list as a "do not contact" list.

50.     In the period following the first closing, Capitala continued to work furtively with Sandler O'Neill, without disclosing this to NovaFund.

51.     NovaFund had personal relationships with several of the investors on Sandler O'Neill's list and would have solicited them for Fund V but for the fact that they were added to the Carve Out list.

52.     During one week in October 2016, Capitala's internal team had to split up so that some could cover meetings with investors arranged by Sandler O'Neill and others could attend investor meetings with NovaFund.  To prepare for those meetings, Capitala and Sandler O'Neill relied on marketing materials that NovaFund had helped prepare and used guidance that NovaFund had provided for pitch meetings, which Capitala had complimented.

53.     Not surprisingly, Capitala's secret efforts with Sandler O'Neill created conflicts. One member of the NovaFund team had asked for permission to arrange a meeting with a Connecticut-based investor that had been placed on the Carve Out list by Sandler O'Neill. Capitala initially agreed, but then reversed itself and instructed NovaFund not to pursue that investor.  Mr. Swercheck of Capitala lied to NovaFund, and said that he simply had his "wires crossed," even though this was untrue, and Mr. Swercheck knew that both Sandler O'Neill and NovaFund sought to pursue this same investor.  In fact, in a November 8, 2016 email, Mr. Swercheck noted that this was an "issue of having two agents, one of which is in the dark about the other one."  The opportunity to meet with the investor in the fall of 2016 was lost and eventually the investor declined to invest in Fund V.  This was an investor, however, that had been identified as a top prospect by NovaFund for investing in Fund V.

54.     Capitala's decision to allow Sandler O'Neill to work on Fund V and to add 40 investors to the Carve Out list that only Sandler O'Neill could contact and solicit negatively impacted NovaFund's ability to earn fees under the Agreement.  Unlike NovaFund, which was a bona fide placement agent, the employees of Sandler O'Neill working on Fund V were not.  The

outreach and communication by Sandler O'Neill to Fund V investors were very different and inferior to that of NovaFund. As a result, allowing Sandler O'Neill exclusively to pitch those investors for a Fund V investment also deprived NovaFund of the potential to earn fees on such commitments. Blocking NovaFund from marketing Fund V to some of the largest institutional investors was also a factor in preventing Fund V from being fully raised.

55.     In the winter of 2016-2017, NovaFund's capital-raising efforts were again stymied by a delay: a bitter divorce trial involving Mr. Alala. Mr. Alala was out of the office for a four-week period between mid-January to mid-February and was available only intermittently for calls. Individuals within Capitala advised Mr. Alala that he needed to be present for more meetings with potential investors. Mr. Alala pledged to turn his efforts back to raising capital for Fund V once the trial ended.

56.     Mr. Alala's lack of full availability during the key period of the marketing efforts had a negative impact on NovaFund's ability to earn fees under the Agreement.

57.     In addition, Capitala requested that NovaFund suspend its efforts for over a month in the mid-February to late-March 2017 time period while Capitala focused its attention on raising capital overseas in Europe and the Middle East.

58.     NovaFund informed Capitala that the delay in actively pursuing investors in the first quarter could result in declines, because investors would be considering other options, planning their 2017 budgets, and potentially committing to other funds before being able to seriously consider Fund V.

59.     By this time, NovaFund had already notified Capitala that the market was not reacting favorably to Fund V's investment strategy, which was focused on senior secured and senior subordinated debt investments with a lower middle market focus. As a result, NovaFund

recommended that Capitala shift the strategy of Fund V to favor more senior debt investments and to focus less on subordinated debt investments.

**Capitala's Threats to Fire NovaFund**

60.     February 2017 marked a turning point in the parties' relationship.  It had been about five months since Capitala had permitted NovaFund to begin marketing efforts.  At that time, the average length of a capital raise for a private fund was at least 18 months, and sometimes as long as 24 months.  When accounting for periods of Capitala's unavailability and stop-work instructions, NovaFund had only about 3 months to meet with investors at the end of 2016 when many investors were unavailable for the remainder of the year.

61.     The key to successfully driving investor interest to a quick close depended on an open collaboration between Capitala and NovaFund, which as NovaFund has since learned did not exist on Capitala's end.  Even if the conditions for a quick close had existed, the definition of what is "quick" can range from 6 to 18 months depending on the market conditions, the fund, the fund manager, fund performance, and the marketing plan, among other things.

62.     By February 1, 2017, Mr. Alala was very frustrated with NovaFund and claimed that it had not produced meetings with investors.  These frustrations were unfounded in light of Capitala's inexperience with working with placement agents, Capitala's failure to follow advice provided by NovaFund, Capitala's decision to delay marketing efforts, Mr. Alala's unavailability and Capitala's resulting decision to take itself out of the market at inopportune moments, Capitala's efforts to block NovaFund from contacting the 105 investors on the Carve Out list (including 40 that were allocated exclusively to Sandler O'Neill), and NovaFund's performance despite the obstacles that Capitala had created.  For example, as early as June 2016, NovaFund told Mr. Alala that if there were no "roadshow" presentations to investors (which are usually

meetings with the fund manager, the placement agent, and prospective investors) in July or August 2016, investors aside from the anchor investors would be unlikely to invest in 2016. The first roadshow was not until September 2016, which NovaFund arranged. Nevertheless, Capitala was considering other placement agents for Fund V and had discussions with some in the February-March 2017 time period.

63.     By February 2017, Mr. Alala had already begun disparaging and lying about NovaFund. For example, in February 2017, Mr. Alala had told an investment professional at Raymond James that Capitala had terminated NovaFund when it actually had not.

64.     In late February 2017, Capitala attended a conference in Berlin, Germany as part of the effort to raise capital overseas. Before that trip, Mr. Alala sent an email to NovaFund threatening to fire and sue NovaFund, because he claimed that Capitala had learned that NovaFund was in the market helping to raise capital for another credit fund with a different investment strategy from Fund V. The source of this information appears to be from another placement agent that was interested in replacing NovaFund as a placement agent for Fund V. As a result, Capitala made a decision that it would move in a new direction, one without NovaFund.

65.     Capitala knew, however, that these threats lacked any justification because the Agreement does not have a non-compete clause or a non-solicitation clause, and it does not otherwise limit NovaFund to working only with Capitala. The threats were also baseless because it would be highly unusual for a placement agent to work with only one client at a time, particularly a client that has instructed a placement agent to work on marketing efforts in fits and starts. And, in any event, Capitala knew as early as May 2016 that NovaFund was working with another credit fund.

66.     To support its threats, Capitala boasted about its litigation experience, its skill in

handling complex trials, and the financial resources of the entire Capitala platform that could be deployed.  As part of its threats, Capitala presented NovaFund with an ultimatum:  amend the Agreement on worse economic conditions or be fired.

67.     On March 7, 2017, Capitala proposed that the parties terminate their relationship by May 31, 2017, reduce the amount of the Success Fees, eliminate Tail Fees, and allow for a refund of the retainer payments made by Capitala.  NovaFund rejected Capitala's offer.

68.     On March 10, 2017, Capitala instructed NovaFund not to attend any future meetings with investors.

69.     In or about this time, Capitala also stopped paying the required monthly retainer to NovaFund.  Upon information and belief, this was done in bad faith and to further increase the pressure on NovaFund to amend the Agreement.

70.     In mid-March 2017, NovaFund's Chief Financial Officer met with Capitala's General Counsel to discuss a potential amendment to the Agreement.  During this meeting, Capitala's General Counsel stated in substance that he was lucky to still have a job since the "exclusive" in the Agreement did not imply a non-compete requirement for NovaFund and instead meant that NovaFund had the exclusive right to market Fund V without any other agents being involved.

71.     Capitala's conduct and threats in the first quarter of 2017 were particularly counter-productive to the parties' fund-raising efforts, and had the effect of further frustrating and preventing NovaFund from being able to effectively generate investor interest in Fund V.  During this time period, Capitala also became non-communicative, making it very difficult for NovaFund to arrange meetings with potential investors.  The first quarter of any calendar year is typically the most productive in terms of investor focus and flexibility and can have a significant

impact on fund-raising activities for the balance of the year.

72.     By late March 2017, Capitala requested that the parties amend the Agreement to allow Capitala to retain one or more additional placement agents focused on investors in specific non-North American jurisdictions, including Europe, Asia, and Israel, such that NovaFund would no longer be the exclusive placement agent for Capitala in those territories, but it would continue to be the exclusive placement agent in North America.

73.     For its part, NovaFund was willing to entertain an amendment because it was convinced that capital could be raised for Fund V and separately managed accounts, it had already expended considerable time and effort working under the Agreement, and it had already received interest from StepStone, which had the potential to make a substantial investment.  Yet, had NovaFund known about Sandler O'Neill's role and involvement with Capitala less than a year earlier, which significantly restricted NovaFund's ability to contact some of the investors most likely to be interested in Fund V, NovaFund never would have entered into the Agreement, let alone an amendment to it.

74.     Capitala and NovaFund entered into an Advisors Addendum (the "Addendum") on or about April 24, 2017.  The Addendum does not identify a specific Capitala entity that is the counterparty to the Addendum.  It refers to "Capitala Group" in the document title, which at the time was the marketing moniker for CPA and CIA.

75.     The first paragraph of the Addendum allows "Capitala" to retain other placement agents "focused on non-North American limited partners" and provides that capital commitments from investors obtained from the other placement agent(s) "generally" would not entitle NovaFund to a Success Fee.  Capitala was purposefully not specific in its reference to "Capitala," in this paragraph, and left the language broad enough so that it could include other

Capitala entities, including CPA and CIA.

76.     In the Addendum, Capitala affirmed its obligation to pay NovaFund a Success Fee for capital commitments obtained from non-North American investors which were initially solicited by NovaFund or its agent before the date of the Addendum, and from certain enumerated Target Investors or their affiliates.  StepStone is one such investor that was initially solicited by NovaFund before the Addendum.

77.     In addition, the parties agreed that either party may terminate the parties' relationship on or after September 1, 2017, and that, in the event of termination, Capitala would owe NovaFund a Success Fee "on capital commitments from investors introduced to Capitala by Nova either through conference calls or in-person meetings."

**After Executing the Addendum, Capitala Continues its Bad Faith Conduct**

78.     In the period following the Addendum's execution, multiple factors had an impact on NovaFund's ability to effectively generate investor interest, including the delayed start to marketing Fund V until September 2016, the interrupted nature of marketing activities in the first quarter of 2017, above-market management fees for Fund V, Capitala's decision to make investments that were unattractive to the market at the time, and unfavorable market news regarding Capitala.  For example, Capitala was reporting losses in 2017, it had experienced unfavorable returns on its investments, certain loans that it held were non-performing because of non-payments by borrowers, Capitala's share price declined, and several investment professionals left Capitala.  Investors gave NovaFund feedback expressing significant concern that Capitala was more focused on its share price, compliance and regulatory matters, financial issues, and interest in its publicly-traded investment fund than on Fund V.

79.     After the Addendum was signed, NovaFund continued performing services by

contacting investors and arranging introductions to Capitala (and, in fact, NovaFund had never stopped its efforts of contacting investors even during the period that Capitala was threatening to terminate the Agreement and sue).  NovaFund also provided advice on Fund V and its marketing strategy; revised Fund V's marketing materials to be more focused on senior debt investments; advised and assisted Capitala in making presentations to Target Investors, including StepStone; tracked investor interest in Fund V; and worked to arrange meetings for Capitala to attend with potential investors.

80.     For its part, Capitala continued to act in bad faith towards NovaFund even after the Addendum was signed by continuing its campaign of disparaging NovaFund to Fund V investors, StepStone, and other professionals in the investment community; lying and being deceitful to NovaFund; excluding NovaFund from meetings with Target Investors; and working with other placement agents in violation of the Agreement, as amended by the Addendum.

81.     One example of Capitala's bad faith relates to StepStone, which eventually formed two separately managed accounts to pursue investments with Capitala.  NovaFund had been regularly communicating with StepStone during the relevant period.  StepStone is a leading global private markets firm providing investment and advisory solutions.  As a result of several initial contacts with StepStone, NovaFund suggested to Capitala that it shift its investment strategy for Fund V towards more senior debt investments and to consider a separately managed account especially for StepStone.

82.     In the investment industry, a separately managed account (often called an "SMA," a sidecar, or a parallel account) can be one of many different types of investment accounts, such as a separate account identified with a particular investor.  Capital from an SMA can then be contributed alongside a fund's capital to jointly make an investment, such as making a $50

million loan to a retail store, where the SMA may lend $20 million and the fund lends the rest.

83.     At the time Capitala entered into the Agreement, it understood that an SMA could either be what's known as a fund of one, meaning a limited partnership that has one limited partner in which a Capitala affiliate is the general partner, or an account held on the balance sheet of an institutional investor in which a Capitala entity serves as the investment advisor. Internally, Capitala referred to this latter type of SMA as a "true SMA."  Capitala also understood when it entered into the Agreement that NovaFund would earn fees whether an investor committed to either type of SMA.  For its part, NovaFund had understood that it was retained not only to find investors potentially interested in Fund V, but also investors interested in investing with Capitala through SMAs.

84.     When NovaFund raised the idea of an SMA for StepStone, Capitala responded favorably.  In fact, after a call in December 2016 during which NovaFund introduced StepStone to Capitala, one Capitala employee described StepStone as a sophisticated group capable of consummating a deal in a timely manner and securing other investors for Fund V.

85.     After the Addendum was executed, NovaFund continued in its efforts to pursue StepStone's interest in Capitala through an SMA.  NovaFund was successful in arranging a telephonic meeting for Capitala and StepStone in July 2017, but Capitala instructed NovaFund to participate only silently and not to announce itself on the call.

86.     In August 2017, NovaFund worked with Capitala to respond to due diligence questions from StepStone.  Capitala understood that StepStone wanted Capitala to complete the information in connection with the prospective investment in an SMA.  Capitala submitted the answers to the due diligence questions on or about October 6, 2017, but did not copy NovaFund. The due diligence responses were submitted on a form that was in reference to Fund V and

Capitala answered the questions in connection with Fund V.  For example, one question asks for the full legal name and address of the fund and Capitala provided Fund V's information. Another question asks for the general partner and investment sponsor for Fund V.

87.      On or about September 6, 2017, NovaFund had lunch with StepStone alone, without Capitala, to urge it to meet Mr. Swercheck of Capitala at an upcoming conference they would both be attending.

88.      On or about September 19, 2017, NovaFund arranged a meeting between StepStone and Capitala at the conference.

89.      In October 2017, StepStone made an onsite visit to Capitala's office in North Carolina.  Capitala told NovaFund that it did not need to attend because the purpose of the meeting was only for operational diligence, which turned out to be untrue.  In hindsight, it was done solely for the purpose of excluding NovaFund from further substantive discussions with StepStone so that Capitala could attempt to avoid paying NovaFund fees.

90.      In mid-October 2017, however, Capitala admitted that NovaFund had facilitated substantive dialogue with StepStone.

91.      From October 2017 forward, Capitala excluded NovaFund from all communications with StepStone, disparaged NovaFund to StepStone, made derogatory remarks about NovaFund's performance to StepStone, and urged StepStone to keep documents relating to the StepStone-Capitala SMAs "offshore" so that they could be kept from being discovered in this action.  Based on the statements made by Capitala to StepStone, it is unlikely that StepStone would have wanted to do business again with NovaFund in the future.

92.      By the fall of 2017, NovaFund tried to coordinate with Capitala to prioritize marketing efforts to those investors most likely to invest, which is typical in the industry after a

fund has been in the market for a period of time.  By then, investor interest in Fund V was limited and the parties were approaching the deadline Capitala had set for the final closing.

93.     Capitala, however, wanted to use the opportunity to further amend the parties' contract by reducing the fees that it would have to pay NovaFund.  NovaFund did not capitulate to Capitala's demands and instead understood that Capitala would likely continue to prevent NovaFund from participating in the fund-raising activities from that point forward.

94.     By about October 2017, the parties stopped communicating with one another to coordinate marketing efforts for Fund V.

95.     Capitala continued to pursue a potential investment from StepStone without involving NovaFund.

96.     But, unlike before when Capitala was hoping that the recognition of StepStone's name would be an incentive for other investors to invest in Fund V, Capitala instead took steps to keep StepStone's name secret and to make it nearly impossible for anyone to learn of Capitala's investor base.

97.     In or about March 2018, StepStone and Capitala were in the final stages of setting up two SMAs for the purpose of having the SMAs invest alongside other Capitala investment vehicles, including Fund V, by making loans to the same companies.

98.     As part of the efforts to keep StepStone's identity secret, Capitala decided to set up a new investment vehicle and, in March 2018, formed Capitala Specialty Lending Corp. ("CSLC").  CSLC was formed only a few months before the targeted final closing of Fund V.

99.     The StepStone-Capitala SMAs and CSLC are related and treated by Capitala and StepStone as one and the same.  Capitala formed CSLC to be the confidential way of referring to the SMAs with StepStone and effectively uses CSLC as the anonymous front for StepStone's

SMAs.  CSLC's formation enabled Capitala to publicly announce debt investments by CSLC without having to disclose the participation and identity of StepStone or its SMAs.

100.     The StepStone-Capitala SMAs and Fund V have the same investment strategy. For example, in public filings with the U.S. Securities and Exchange Commission ("SEC"), Capitala has described CSLC as having the same investment strategy as Fund V.

101.     In April 2018, Capitala and StepStone finalized the legal documentation associated with the SMAs, called investment advisory agreements.

102.     Capitala and StepStone each used affiliates as the counterparties to the investment advisory agreements.  For Capitala, the counterparty was CPA, which is also Fund V's investment adviser.  CPA's role was to provide the same investment management decisions and services for the StepStone-Capitala SMAs it provides to Fund V.  CPA is entitled to lucrative fees under the investment advisory agreements.  Capitala also expected that CSLC would receive fee income that it was entitled to receive under the investment advisory agreements.

103.     Capitala had kept the Fund V investors updated on the negotiations with StepStone and one of them even assisted with the investment process by warehousing assets, which involved making certain loans and then later selling them to StepStone.

104.     On April 25, 2018, Capitala issued a press release announcing that it had raised $1.0 billion in a "new, permanent capital vehicle," which it described as a new venture known as CSLC.  Capitala also announced that the funding for CSLC was "raised from global institutional investors" and described the $1.0 billion as being "new capital."

105.     In the press release, Capitala stated that the investment strategy for CSLC is different than the prior Capitala-sponsored funds.  But, as explained above, Capitala has stated in SEC filings that the investment strategies for Fund V and CSLC are the same.

106.     In April 2018, NovaFund learned about the StepStone-Capitala SMAs through one of StepStone's employees.

107.     After Capitala issued the press release about CSLC, NovaFund's Chief Financial Officer reached out to Capitala to request information on the investors and capital commitments to CSLC so that NovaFund could determine if any placement agent fees were due under the Agreement, as amended.

108.     Capitala refused, falsely claiming in an email sent to NovaFund that CSLC had a different investment strategy than Fund V and that investor information was confidential. Capitala also falsely stated that the vehicle was "beyond the scope of services ever discussed with" NovaFund and that Capitala was focused only on funds with substantially different strategies than Fund V.

109.     Within about twenty-four hours, Capitala commenced a lawsuit in North Carolina state court seeking a declaration that it did not owe NovaFund any fees and instead seeking damages for itself.

110.     NovaFund reasonably expected to be paid for its services under the Agreement and Addendum.  Despite demand, Capitala has failed and refused to pay NovaFund in accordance with the Agreement and Addendum, even though Capitala accepted NovaFund's services, praised NovaFund for them, and benefitted from them.

111.     There is no justification for Capitala refusing to pay NovaFund fees due on the commitments made by the StepStone-Capitala SMAs.  Because the StepStone-Capitala SMAs are separately managed accounts within the meaning of the Agreement, and because NovaFund was the party that initially solicited StepStone, NovaFund is entitled to Success Fees on the investments that have been made by the StepStone-Capitala SMAs.

26

112.    In or around April 2018, Capitala communicated to StepStone that it would not be paying NovaFund any Success Fee.  One of the reasons provided by Capitala to StepStone for its claim that it would not have to pay NovaFund any Success Fees was that Capitala believed NovaFund lacked the conviction and resources to fully litigate a civil action in order to recover any fees.  Capitala conveyed to StepStone that NovaFund lacked the institutional backing to endure an expensive protracted litigation.

113.    Capitala's former General Counsel has admitted that NovaFund is due Success Fees on the amounts that have been invested and committed to date by the StepStone-Capitala SMAs.

114.    Capitala has also failed to pay NovaFund for Tail Fees due and payable under the Agreement.

115.    On February 27, 2019, Capitala announced the formation of Capitala Senior Loan Fund II ("CSLF II"), which is a joint venture between a Capitala affiliate and a Kemper subsidiary, Trinity Universal Insurance Company, which is an anchor investor in Fund V.

116.    The purpose of CSLF II is to invest in senior secured loans to lower middle market companies.  CSLF II has invested in the same companies as Fund V.  CSLF II and Fund V have substantially similar investment strategies.

117.    CSLF II, which is sponsored by Capitala, is a successor vehicle to Fund V and the commitments by one of the Fund V investors in it triggered the Agreement's Tail Fee provision.

118.    Capitala has announced that CSLF II began investing during the fourth quarter of 2018 and that it is designed to grow to $150 million in size.  To date, Kemper has committed $50 million to CSLF II through debt and equity commitments.

119.    Capitala intentionally engaged in conduct for the purpose of depriving NovaFund

of its reasonably anticipated benefits under the Agreement, as amended.  Capitala's conduct was willful, deliberate, threatening, and malicious, was committed in reckless and wanton disregard of NovaFund's rights, and was done to deprive NovaFund of NovaFund's benefits of the Agreement and Addendum.

120.    Capitala never formally terminated the parties' relationship, and in fact neither has NovaFund.

121.    NovaFund only learned in discovery through this action that Capitala had hired other placement agents to work on Fund V, including Sandler O'Neill, a Nordic agent, and a group from Utah.

122.    As a direct result of Capitala's bad faith conduct described herein, NovaFund has not been hired as a placement agent for new fund managers since no later than 2018.

**Capitala Disregards the Corporate Form**

123.    Capitala did not observe corporate formalities for the entities affiliated with the "Capitala Group" moniker during the relevant time.

124.    For example, the Capitala-related entities are referred to as "Capitala Group" or "Capitala" in Capitala's website, marketing, and SEC filings.

125.    CPA and CIA do business under the moniker "Capitala Group" for marketing purposes.  For example, on its website under the "About Us" section, Capitala defines CIA as "Capitala Group" and states that "Capitala Group is a $2.7 billion asset management firm."  In its press releases, Capitala has defined "Capitala Group" as including CIA, "together with its affiliates."  In SEC filings, Capitala has defined "Capitala Group" as being CPA and CIA:  "CPA is a wholly-owned subsidiary of CIA, an SEC registered investment adviser (collectively with CPA, 'Capitala Group')."  And, on the SEC's website, one of CPA's "alternate names" is

"Capitala Group."  Additionally, in Capitala's most recent Form ADV filed for CPA, it states

that the "Other Business Name" for CPA is "Capitala Group."   In other documents, Capitala has

defined "Capitala Group" as CPA, together with its affiliates and related entities.

126.    The PPM for Fund V defines "Capitala" as including CPA and all of "its affiliates

and related entities."

127.    When marketing all of its entities under the "Capitala Group" moniker, Capitala

blends the assets and performance of the other companies to provide an aggregate overview.  For

example, Capitala's press releases frequently state that "Capitala Group manages $2.7 billion of

capital among permanent capital vehicles, closed-end funds, and discretionary managed

accounts," where the size of the capital is computed only by combining capital across Capitala's

platform.

128.    CGLLC did not have a role in the operation of the Capitala enterprise, other than

to serve as the signatory on the Agreement and certain other agreements entered into by Capitala,

in an effort to protect Capitala from liability stemming from those agreements.

129.    The entities affiliated with the Capitala enterprise routinely transferred money and

assets among themselves, including making at least one transfer to CGLLC.

130.    CGLLC did not have a source of money, other than transfers from other Capitala

entities.  CGLLC never generated or received any income or revenue.  CGLLC did not receive,

and was not intended to receive, any of the fees that Capitala earned or will earn in connection

with Fund V or the StepStone-Capitala SMAs.  The only funds that were ever in CGLLC's

possession were transferred to it by other Capitala entities during the course of litigation with

NovaFund, for purposes related to the litigation.  CGLLC had no capital to pay for its

obligations, including its regular monthly retainer payments that were due to NovaFund under

the Agreement.

131.    CGLLC did not have its own bank account.

132.    When Capitala entered into the Agreement with NovaFund, CGLLC was not sufficiently capitalized nor was it sufficiently capitalized at any point thereafter.  It was set up specifically to be undercapitalized.

133.    CGLLC's business purpose was to be the signatory for certain nuisance agreements so that if there was an ultimately judgment or a liability, the entity on the hook for that judgment or liability would not be capitalized.

134.    Although CGLLC was the entity that signed the Agreement with NovaFund, CGLLC was not the entity that paid NovaFund's broker-dealer the retainer required under the Agreement; instead, CPA did so.  This is because CGLLC had no source of revenue separate and apart from CPA and other Capitala affiliates.

135.    In Capitala's responses to certain due diligence questionnaires and requests for information, it provided a flow chart reflecting the various Capitala corporate entities and their respective places in Capitala's corporate structure.  CGLLC was not included in these overview materials, reflecting that it was a disregarded entity.

136.    CGLLC was not considered to be the parent company to any of the other Capitala entities.

137.    CGLLC, CPA, CIA, and CSLC, along with all of the other Capitala entities, all shared the same office space.  The office space was leased, and there was only one Capitala entity on the lease for the entire Capitala enterprise.

138.    CGLLC, CPA, CIA, and CSLC, along with all of the other Capitala entities, used the same website (https://www.capitalagroup.com/) and employees utilized the same email

address regardless of the Capitala entity for which they were conducting business.

139.   CGLLC, CPA, CIA, and CSLC all shared the same employees.  CGLLC has no employees of its own; nor does CPA, CIA, or CSLC.

140.   CGLLC, CPA, CIA, and CSLC all shared the same executives.  For example, Mr. Alala is Chairman and Chief Executive Officer ("CEO") of "Capitala Group"; he is Chairman and CEO of CGLLC; he is the President and CEO of CPA; he is the President and CEO of CIA; he is the Chairman and CEO Capitala Finance Corp. and Capitala Transaction Corp.; and he is the head of all the Capitala affiliates operating under the "Capitala" moniker.  He is also the manager of CGLLC, CIA, Capitala Holdings, LLC, and Capitala Restricted Shares I, LLC, among others.

141.   CGLLC was under common control with other Capitala affiliates, including but not limited to CPA, CIA, and CSLC.

142.   Fund V and the StepStone-Capitala SMAs shared the same investment committee.

143.   CGLLC did not have its own corporate records and did not have a compliance manual.

144.   CPA and CIA share the same compliance manual and they also share the same investment allocation policy.

145.   CGLLC was a shell company that was run by other Capitala affiliates, including but not limited to CPA, CIA, CSLC, Capitala Advisors Corp. and officers of Capitala Finance Corp.

146.   CGLLC was supported solely by other Capitala affiliates, including but not limited to CPA, CIA, CSLC, Capitala Advisors Corp. and officers of Capitala Finance Corp.

147.   CGLLC operated at the direction of other Capitala affiliates, including but not

31

limited to CPA, CIA, CSLC, Capitala Advisors Corp. and officers of Capitala Finance Corp. CGLLC had no operations of its own; its operations were all accomplished by other members of the Capitala enterprise, which at first included CPA and CIA, and then later included CSLC after the StepStone-Capitala SMAs were finalized.

148.    Capitala affiliates, including but not limited to CPA, CIA, CSLC, Capitala Advisors Corp. and officers of Capitala Finance Corp., exercised complete dominion and control of CGLLC.

149.    CGLLC and other Capitala affiliates, including but not limited to CPA, CIA, CSLC, and Capitala Advisors Corp., functioned as a single entity and operated as part of a single enterprise.

150.    Within Capitala, the view is that the firm exists as Mr. Alala's alter ego.

151.    Capitala dissolved CGLLC effective June 9, 2020.

152.    Following CGLLC's dissolution, Mr. Alala sent a text message on June 23, 2020 to his former general counsel in which he stated, "We dissolved Capitala Group, LLC . . . We are allowing a default judgement against that LLC as that LLC has no assets. . . .  Nova receives what they deserve."

153.    Capitala's intent in keeping CGLLC undercapitalized and in dissolving CGLLC was to try to insulate CPA, CIA, and CSLC from any obligations to NovaFund.  As a sham entity, CGLLC exists for no other purpose than for a vehicle for Capitala's fraud to avoid all liability and judgments.  Injustice and unfairness has resulted from Capitala's abuse of the corporate form.

## COUNT ONE
## BREACH OF CONTRACT
### (Against CGLLC, CPA, and CIA)

154.     NovaFund repeats and realleges paragraphs 1 through 153 above, as if fully set forth herein.

155.     As described herein, NovaFund performed the obligations it was supposed to perform under the Agreement and Addendum and any additional performance was excused because Capitala interfered with, prevented, frustrated, and/or made impossible such performance.

156.     As described herein, Capitala breached the Agreement and Addendum.  Among other things, Capitala:

         a.     breached the exclusivity provisions in the Agreement obligating Capitala not to work with any placement agents aside from NovaFund by working with Sandler O'Neill, and other placement agents.  Such claims are not barred by the Addendum's release because such release is invalid due to Capitala's fraud described herein;

         b.     failed to pay NovaFund any Success Fees in connection with the StepStone-Capitala SMAs;

         c.     failed to pay NovaFund any Tail Fees.

157.     As a result of Capitala's conduct described herein, NovaFund has suffered injury and damages for which Capitala is liable.  Among other things, NovaFund is entitled to past due and future Success Fees relating to investments in the StepStone-Capitala SMAs, which after one year was approximately $150 million and which is expected to grow to at least $450 million; and past due and future Tail Fees in connection with CSLF II.

158.     CGLLC, CPA, and CIA are jointly and severally liable because they operated as a

single enterprise; CPA and CIA are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA and CIA.

159.    Additionally, NovaFund seeks declaratory relief pursuant to the Court's authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 regarding the parties' rights and legal relations.

160.    As described herein, there is an actual, ripe, justiciable controversy as to the parties' respective rights and legal relations.

161.    By virtue of the foregoing, NovaFund is entitled to a declaration of this Court:

   a.    that Capitala is obligated to pay NovaFund Success Fees that NovaFund will earn in the future in respect of investments in the StepStone-Capitala SMAs; and

   b.    that Capitala is obligated to pay NovaFund Tail Fees that NovaFund will earn in the future in respect of capital commitments by Trinity Universal Insurance Company to CSLF II.

## COUNT TWO
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against CGLLC, CPA, and CIA)

162.    NovaFund repeats and realleges paragraphs 1 through 161 above, as if fully set forth herein.

163.    As a matter of law, the Agreement and Addendum included a covenant of good faith and fair dealing.

164.    As described herein, Capitala acted in bad faith and breached the covenant of good faith and fair dealing included in the Agreement and Addendum.

165.    As described herein, NovaFund has suffered injury and damages for which Capitala is liable.

166.     CGLLC, CPA, and CIA are jointly and severally liable because they operated as a single enterprise; CPA and CIA are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA and CIA.

**COUNT THREE**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

167.     NovaFund repeats and realleges paragraphs 1 through 166 above, as if fully set forth herein.

168.     As described herein, all Defendants benefitted from NovaFund's work, including NovaFund's work on advising on marketing presentations and the PPM for Fund V; advising and assisting Capitala with making presentations to investors at meetings with or without NovaFund; advising Capitala on market strategy; advising Capitala on investment strategies for Fund V and SMAs; introducing Capitala to investors, including StepStone; suggesting the use of an SMA for StepStone; and maintaining StepStone's interest, which eventually resulted in the formation of the StepStone-Capitala SMAs.

169.     CPA and CSLC have also benefitted from NovaFund's work, because they have been paid and they will continue to be paid in connection with the StepStone-Capitala SMAs, through various fees such as management fees, closing fees, and success, incentive, or performance fees.  CIA has also benefitted from NovaFund's work in connection with the StepStone-Capitala SMAs, because it is the sole owner of CPA.  Capitala has also benefited from NovaFund's work because it has been paid and will continue to be paid in connection with CSLF II, through various fees.

170.     As described herein, Defendants unjustly did not pay or otherwise compensate NovaFund for the benefit they received, which was to NovaFund's detriment.

171.     NovaFund has been damaged by virtue of the foregoing, because it expended time and resources laboring for the benefit of Defendants, and Defendants unjustly refused to pay.

172.     By virtue of the foregoing, Defendants have been unjustly enriched.

173.     Defendants are jointly and severally liable because they operated as a single enterprise; CPA, CIA, and CSLC are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA, CIA, and CSLC.

174.     NovaFund asserts this Count Three in the alternative as to CGLLC, CPA, and CIA in the event the parties' contracts are deemed not to apply to the StepStone-Capitala SMAs. On Capitala's behalf, Mr. Alala has taken the position that Capitala did not hire NovaFund to pursue any advisory agreements, such as the one that governs the StepStone-Capitala SMAs.

**COUNT FOUR**
**FRAUD**
**(Against CGLLC, CPA, and CIA)**

175.     NovaFund repeats and realleges paragraphs 1 through 174 above, as if fully set forth herein.

176.     As described herein, Capitala fraudulently induced NovaFund to enter into the Agreement by, among other things, using a dummy entity as the signatory to the Agreement; concealing that certain investors on the Carve Out list in Schedule 1 of the Agreement were included at Sandler O'Neill's behest; promising that NovaFund would be the exclusive placement agent working on the engagement; and promising that all investors listed on the Carve Out list in Schedule 1 of the Agreement were previously known to, and had personal relationships with, Capitala.

177.     Capitala perpetuated its fraudulent conduct when it induced NovaFund to enter into the Addendum.

36

178.     When Capitala entered into the Agreement, Capitala knew that the exclusivity language in the contract meant that Capitala could not hire any other placement agent unless NovaFund consented.

179.     Capitala misrepresented to NovaFund that NovaFund would be the exclusive placement agent for Fund V, and this misrepresentation was made to induce NovaFund to execute the Agreement.  Capitala's misrepresentation was untrue and known to be untrue by Capitala when it was made.  When Capitala entered into the Agreement, it had already been colluding with Sandler O'Neill in connection with Fund V, and it continued working with Sandler O'Neill on efforts to raise capital for Fund V after the Agreement was signed.  As explained herein, Capitala concealed Sandler O'Neill's role and identity from NovaFund.

180.     Despite promising that NovaFund would be the exclusive placement agent for Fund V and telling NovaFund that it would not hire other placement agents, Capitala worked with other placement agents, besides Sandler O'Neill, on Fund V, without telling NovaFund or obtaining NovaFund's consent to work with them.  This included working on Fund V with a placement agent located in Salt Lake City, Utah in violation of the exclusivity agreed to in the Agreement and the Addendum.

181.     Capitala also knew that the representations it made to NovaFund about having previously known all of the investors on the Carve Out list were untrue and known to be untrue by Capitala when they were made.  While Capitala and NovaFund were negotiating the Agreement, Capitala asked Sandler O'Neill to provide a list of names to be included on the Carve Out list, which it received on April 27, 2016.  Sandler O'Neill specifically asked Capitala for protection on the listed names, meaning Sandler O'Neill, not NovaFund, would be paid a fee for any investments made by the investors added by Sandler O'Neill to the Carve Out list.

182.    Capitala made the misrepresentations described herein to NovaFund to induce NovaFund to act upon them by entering into the Agreement and, later, the Addendum.

183.    Capitala then further defrauded NovaFund by using CGLLC as the counterparty to the Agreement, knowing that CGLLC was a sham entity that was intentionally undercapitalized.

184.    NovaFund would not have entered into the Agreement or the Addendum had it known about CGLLC's true nature, the development of the Carve Out list, Capitala's lack of personal and meaningful relationships with many Carve Out investors, or Capitala's engagement of other placement agents, including but not limited to Sandler O'Neill, for Fund V.

185.    As described herein, NovaFund relied upon Capitala's misrepresentations to its detriment.

186.    As a result of Capitala's conduct described herein, NovaFund has suffered injury and damages for which Capitala is liable.

187.    CGLLC, CPA, and CIA are jointly and severally liable because they operated as a single enterprise; CPA and CIA are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA and CIA.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES
### (Against All Defendants)

188.    NovaFund repeats and realleges paragraphs 1 through 187 above, as if fully set forth herein.

189.    Before entering into the Agreement with NovaFund, Capitala knew that NovaFund had business relationships with prospective investors.  During the course of the fund-raising process for Fund V, NovaFund shared information with Capitala about the prospective

investors with which it had business relationships.

190.    Based on the conduct described herein, Capitala tortiously and intentionally interfered with NovaFund's business relationships with prospective investors.  Among other things, Capitala barred NovaFund from communicating with all investors on the Carve Out list, including the 40 investors added by Sandler O'Neill.

191.    Additionally, as described herein, Capitala interfered with NovaFund's existing and prospective relationships with investors through Capitala's disparaging comments, which were made in bad faith and with full knowledge of the lack of any legitimate basis for them.  For example, Capitala criticized NovaFund for the lack of investor interest in Fund V to other investment professionals, even though Capitala knew that other factors having nothing to do with NovaFund were the cause.  Capitala also falsely told individuals in the investing community, which consisted of NovaFund's prospective business partners, that NovaFund's behavior was unprofessional, that NovaFund violated the terms of its agreement with Capitala, and that NovaFund was lousy.  Capitala also told certain investment professionals that it had fired NovaFund, when it had not.

192.    Capitala's disparaging comments about NovaFund to prospective investors and fund managers negatively impacted NovaFund's ability to partner with those individuals and companies.  By disparaging NovaFund to these individuals and companies, Capitala made it unlikely that they would want to do business with NovaFund in the future.

193.    Capitala has no justification for working secretly with Sandler O'Neill, failing to explain Sandler O'Neill's role in the fund-raising efforts for Fund V, and blocking NovaFund from soliciting certain investors that were placed on the Carve Out list for Sandler O'Neill.  In fact, Sandler O'Neill's inferior work on Fund V was to the detriment of the overall marketing

strategy and process for Fund V.

194.    Capitala also has no justification for excluding NovaFund's participation from investor meetings that had been arranged by NovaFund or otherwise preventing NovaFund from raising capital for Fund V or SMAs.

195.    As described herein, Capitala acted fraudulently and maliciously towards NovaFund and is guilty of misrepresentation and intimidation in its relations with NovaFund.

196.    By virtue of the foregoing, Capitala's conduct was wrongful, improper, and unjustified, and undertaken with malice, intimidation, for improper motives or means, and without claim or right or lawful entitlement.

197.    As a direct and proximate result of Capitala's tortious interference described herein, NovaFund has suffered and will suffer actual losses for which Capitala is liable.

198.    Defendants are jointly and severally liable because they operated as a single enterprise; CPA, CIA, and CSLC are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA, CIA, and CSLC.

199.    As described herein, Capitala had actual awareness of the facts necessary to establish NovaFund's tortious interference claim and concealed Sandler O'Neill's work on Fund V from NovaFund.  For example, Capitala did not disclose information about Sandler O'Neill's involvement until well after this lawsuit was filed.  Capitala also made false statements to NovaFund in its April 2018 email refusing to provide information about the investors in CSLC. Among other things, Mr. Alala falsely told NovaFund's Chief Financial Officer in this email that:  (i) that the StepStone-Capitala SMAs were beyond the scope of services discussed with NovaFund; (ii) that the investment strategy for the StepStone-Capitala SMAs was substantially different from the investment strategy for Fund V; and (iii) that Capitala was not raising any

Fund V-type strategies and was instead focused on substantially different strategies.  Mr. Alala also falsely testified in March 2019 in this action that Capitala had no SMAs with StepStone, knowing full well it had not one but two.  Additionally, Capitala instructed StepStone to keep documents relating to CSLC and the StepStone-Capitala SMAs offshore, so that they would be out of reach from discovery in this litigation.

200.   Capitala concealed its tortious conduct from NovaFund for the purpose of delaying, temporarily or indefinitely, NovaFund from learning of, and seeking redress for, Capitala's wrongful conduct.

201.   NovaFund did not discover the facts relating to Capitala's tortious conduct until Capitala produced documents late in this action.  Capitala sought and received a stay of discovery in this action, which further delayed NovaFund's discovery of this information.  Capitala did not produce the documents relating to its relationship with Sandler O'Neill discussed herein until September 26, 2019 and NovaFund did not complete its review of those documents until November 8, 2019.

202.   Promptly upon completing this review, NovaFund sought leave to amend its complaint.  As a result, the statute of limitations for NovaFund's causes of action should be tolled.

## COUNT SIX
## UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

203.   NovaFund repeats and realleges paragraphs 1 through 202 above, as if fully set forth herein.

204.   Capitala is a person engaged in trade or commerce in the State of Connecticut within the meaning of Conn. Gen. Stat. § 42-110a.

205.    Capitala, in bad faith and without justification, used a shell entity to sign the Agreement with NovaFund in an attempt to have an undercapitalized entity with no assets be the counterparty in the event that Capitala became responsible for a liability or judgment.  Mr. Alala has stated numerous times in communications that CGLLC is an entity "with no assets." NovaFund would not have entered into the Agreement had it known about CGLLC's true nature.

206.    Capitala, in bad faith and without justification, secretly engaged at least one other agent, Sandler O'Neill to work on Fund V.  As a result of the collusion and conspiracy between Capitala and Sandler O'Neill, 40 investors were added to the Carve Out list and NovaFund was instructed not to contact any of them.  NovaFund would not have entered into the Agreement had it known this, and NovaFund was thus fraudulently induced into entering into the Agreement. Capitala fraudulently misrepresented to NovaFund that it had personal relationships with the Carve Out investors that would assist Capitala and NovaFund successfully raise Fund V. Capitala and Sandler O'Neill then worked to identify and arrange investor meetings without telling NovaFund, during the same period of time that Capitala was supposed to be working with NovaFund exclusively.  Capitala's secretive and collusive conduct with Sandler O'Neill on Fund V, and its lack of existing personal relationships with the Carve Out investors, deprived NovaFund of the benefits it expected to receive under the Agreement.

207.    Capitala, in bad faith and without justification, also excluded NovaFund from participating in communications with StepStone.  Capitala later tried to prevent NovaFund from learning that the StepStone-Capitala SMAs had even been formed.  For example, Capitala took steps to shield StepStone's identity from the public by forming CSLC and using CSLC as the anonymous front for the StepStone-Capitala SMAs.

208.    Unbeknownst to NovaFund, Capitala formed CSLC while the fundraising for

42

Fund V was still underway and Capitala was supposed to still be working exclusively with

NovaFund on Fund V and related SMAs.  Capitala later falsely told NovaFund that CSLC did

not have the same or similar investment strategy as Fund V.  Capitala has admitted in SEC

filings, however, that the investment strategies for Fund V and CSLC are the same.

209.    Capitala's affirmative misrepresentation about the investment strategies of Fund

V and CSLC was made in a purposeful effort to deprive NovaFund of the fees to which it is

entitled to under the Agreement.

210.    After filing its lawsuit in North Carolina state court, which preceded this action,

Capitala also instructed StepStone to keep documents related to CSLC and the StepStone-

Capitala SMAs offshore in a jurisdiction with favorable treatment of confidential information in

an attempt to shield them from discovery in this action.

211.    Defendants, through Mr. Alala, have regularly disparaged, made derogatory

comments about, and made false statements about NovaFund to Fund V investors, StepStone,

and other investment professionals all in an attempt to cast blame for not raising more capital for

Fund V.  Mr. Alala has been widespread in the disparaging statements made about NovaFund,

effectively telling anybody who would listen, all to hide behind his own failures relating to Fund

V.  For example, Mr. Alala told investment professionals that NovaFund had been fired when it

had not been; that NovaFund's behavior was unprofessional, when NovaFund conducted itself

with the utmost in professionalism; that NovaFund had violated the Agreement's exclusivity

terms when the Agreement lacked a non-compete provision and Capitala later released all claims

relating to its complaints about NovaFund working for other fund managers; and that it would

engage in a campaign of heavy handed litigation against NovaFund to ultimately wear NovaFund

down so that it would walk away.  Mr. Alala engaged in sophomoric name calling about

NovaFund and in the conduct described above in an effort to impugn NovaFund's credibility.

212.    Based on the conduct described herein, it is unlikely that the Fund V investors, StepStone, or other investment professionals will work with NovaFund in the future.

213.    The conduct of Capitala described herein is immoral, unethical, oppressive, or unscrupulous; offensive to public policy; and/or causes substantial injury to consumers, competitors, or other business persons.  Based on the foregoing, Capitala's conduct constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Conn. Gen. Stat. § 42-110b.

214.    As described herein, Capitala engaged in its actions willfully, intentionally, knowingly and it demonstrates calculated, deceitful, and unfair conduct, and reckless indifference to NovaFund's rights.  Accordingly, NovaFund is entitled to punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

215.    As a result of the foregoing unfair and/or deceptive acts and practices, NovaFund has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. § 42-110g(a), and has suffered, and will continue to suffer, damages in an amount to be determined at trial.

216.    Pursuant to Conn. Gen. Stat. § 42-110g(c), upon commencement of this action, NovaFund gave due notice of its claims to the Attorney General and the Commissioner of Consumer Protection for the State of Connecticut.

217.    In the event that North Carolina law is deemed to apply to this action, as described herein, Capitala has engaged in acts and practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ("NC UDTPA").

218.    As described herein, Capitala engaged in fraudulent, deceptive, and misleading conduct, and misleadingly concealed (under circumstances requiring a duty to disclose) or

44

falsely represented (i) the true nature of CGLLC's corporate form, its lack of corporate substance, and its operation as a mere instrumentality and alter ego of CPA, CIA, and CSLC; (ii) that NovaFund would be the exclusive placement agent for Fund V; (iii) that the Carve Out investors listed on Schedule 1 to the Agreement were previously known to and had personal relationships with Capitala; (iv) that the StepStone-Capitala SMAs were beyond the scope of services discussed with NovaFund; (v) that the StepStone-Capitala SMAs and Fund V have substantially different investment strategies; and (vi) that Capitala was not raising any Fund V-type strategies and was instead focused on substantially different strategies.  Under all of the facts and circumstances alleged herein, Capitala's actions violated the NC UDTPA because the actions were unfair and deceptive.

219.    As described herein, Capitala acted in bad faith, inequitably, and in a manner that undermines the ethical standards and good faith dealings between parties engaged in business transactions.

220.    Capitala's actions were in and affecting commerce.

221.    NovaFund suffered injury as a result of Capitala's violations of the NC UDTPA, which are compensable under the NC UDTPA, in an amount to be determined at trial.

222.    Defendants are jointly and severally liable under CUTPA and the NC UDTPA because they operated as a single enterprise; CPA, CIA, and CSLC are the alter egos of CGLLC; and CGLLC was operated as a mere instrumentality of CPA, CIA, and CSLC.

## **PRAYER FOR RELIEF**

WHEREFORE, NovaFund respectfully seeks judgment in its favor and seeks:

(a)    compensatory and money damages, including but not limited to all its direct, consequential, and incidental damages resulting from Defendants' wrongful conduct described

herein; restitution; and disgorgement of revenue, all as prayed for above;

      (b)      interest and late fees allowable by law, equity, or contract;

      (c)      lost profits;

      (d)      punitive damages;

      (e)      compensatory damages, punitive damages, and attorneys' fees and costs pursuant

to CUTPA, Conn. Gen. Stat. § 42-110g;

      (f)      damages in an amount to be proved at trial, trebled per N.C. Gen. Stat. § 75-16.1;

      (g)      attorneys' fees and costs, as permitted by N.C. Gen. Stat. § 75-16.1;

      (h)      statutory pre-judgment and post-judgment interest, including Conn. Gen. Stat.

§ 37-3a or as otherwise allowed by law or rule;

      (i)      declaratory relief, as prayed for herein;

      (j)      an accounting; and

      (k)      such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Trial by jury is hereby demanded as to all issues so triable.

Respectfully submitted,

**PLAINTIFF NOVAFUND ADVISORS, LLC**

By: */s/ Jill M. O'Toole*
    Jill M. O'Toole (ct27116)
    Alison P. Baker (ct28136)
    Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT 06109
    Tel.: 860-251-5000
    Fax: 860-251-5099
    jotoole@goodwin.com
    abaker@goodwin.com

*Its Attorneys*

8935983