## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| NOVAFUND ADVISORS, LLC, |
| Plaintiff, |
| v. |
| CAPITALA GROUP, LLC, CAPITALA PRIVATE ADVISORS, LLC, CAPITALA INVESTMENT ADVISORS, LLC, AND CAPITALA SPECIALTY LENDING CORPORATION |
| Defendants. |

No. 3:18-cv-1023 (MPS)

## RULING ON DEFENDANTS' MOTION TO DISMISS

This action arises out of an agreement ("the Agreement") between NovaFund Advisors, LLC ("NovaFund") and Capitala Group, LLC ("CGLLC") whereby NovaFund agreed to assist CGLLC with capital-raising efforts.  NovaFund brought an action against CGLLC alleging that CGLLC breached the agreement and engaged in other unfair and fraudulent business practices. Two years into the litigation, CGLLC dissolved. ECF No. 152.  NovaFund amended its complaint, alleging that CGLLC existed merely as a shell company – "a dummy entity with no assets or income" – "intentionally undercapitalized" to escape liability. ECF No. 193 ¶¶ 2, 4.  In the Amended Complaint, NovaFund added as defendants the entities it asserts controlled CGLLC, namely, Capitala Private Advisors, LLC ("CPA"), Capitala Investment Advisors, LLC ("CIA"), and Capitala Specialty Lending Corporation ("CSLC") (collectively "Moving Defendants"). *Id.* ¶ 145.  Moving Defendants now move to dismiss NovaFund's Amended Complaint in its entirety under Fed. R. Civ. P. 12(b)(2) on the ground that this Court lacks personal jurisdiction over Moving Defendants. ECF No. 217 at 1.  In the alternative, Moving

1

Defendants seek dismissal under Fed. R. Civ. P. 12(b)(6), asserting that NovaFund has failed adequately to allege a claim for corporate veil piercing, failed to satisfy the particularity requirements for a fraud claim, failed to state a claim for unjust enrichment, and failed to satisfy the pleading requirements of Rule 8. ECF No. 217.  For the reasons set forth below, the motion to dismiss is DENIED.

## I.    BACKGROUND

The following facts are drawn from NovaFund's Amended Complaint, affidavits submitted by the parties, and other submissions on the motion to dismiss, which may be considered on a Rule 12(b)(2) motion in determining whether this Court has jurisdiction over the Capitala Entities. *See infra* Part IIA1.  The Court will consider only the allegations of the Amended Complaint, however, in deciding the Rule 12(b)(6) motion.

### A.  The Parties

CGLLC, the original defendant, was organized as a limited liability company under the laws of North Carolina with only one member, Joseph B. Alala, III, who is a United States citizen and has his domicile and residence in North Carolina. ECF No. 193 ¶ 13.  NovaFund's Amended Complaint seeks to hold liable the following three entities: (1) CPA—a limited liability company organized under the laws of Delaware with only one member, CIA; (2) CIA— a limited liability company organized under the laws of Delaware with two members, Atlas Capitala Investments, LLC ("Atlas") and Mitsui & Co. (U.S.A.), Inc. ("Mitsui"); and (3) CSLC—a corporation organized under the laws of Delaware, with its principal place of business in North Carolina, and wholly-owned by CPA. ECF No. 193 ¶¶ 14-15, 17; ECF No. 217-2 ¶ 5. NovaFund refers to CPA and CIA as "Capitala Group" because "CPA and CIA do business

under the marketing brand name of 'Capitala Group'[.]" ECF No. 193 ¶ 16.   NovaFund refers to

Capitala Group and CGLLC collectively as "Capitala." *Id.* ¶ 2.

### B.  The Formation of the Relationship

In 2015, Capitala, that is, Capitala Group and CGLLC, planned to launch and raise

capital for "a new credit fund to be known as Capitala Private Credit Fund V, L.P. ('Fund V.')"

*Id*. ¶¶ 2, 20.  Capitala "hired NovaFund, [organized under the laws of Delaware with two

members Bryan Kelley and James Howe,] to be its exclusive or only placement agent for Fund V

… meaning that Capitala could not work with any other placement agent on Fund V[.]" *Id.* ¶¶

12, 22.  Before entering into the agreement with NovaFund, and unbeknownst to NovaFund,

Capitala colluded with another company, Sandler, O'Neill & Partners L.P. ("Sandler"), to solicit

investors for Fund V. *Id.* ¶¶ 3, 23, 26.

> Capitala asked Sandler [] which investors Sandler [] wanted to solicit for Fund V….
> [and] Sandler provided … a list of 40 investors.  The understanding between Capitala and
> Sandler [] was that only Sandler [] could contact and solicit those 40 investors, not
> NovaFund, and if any of those 40 investors invested in Fund V, only Sandler [] would
> receive fees, not NovaFund.

*Id.* ¶ 23.  The forty investors were added to a "Carve Out" list in the contract between Capitala

and NovaFund, meaning that NovaFund would be precluded from receiving fees if any of the

forty investors were to invest in Fund V. *Id.* ¶ 24.  In total, the carve out list contained the names

of 105 investors, "including the 40 added by Sandler…." *Id.* ¶ 32.

"Capitala hid Sandler's identity, role, and involvement from NovaFund" over the

objection of some senior Capitala employees. *Id.* ¶ 26.

> For example, on April 27, 2016, Thomas Sullivan of Sandler [] sent an email to [] Alala,
> [] the founder and Chief Executive Officer of Capitala, and Capitala's General Counsel
> attaching the "initial target list" of investors that Sandler [] wanted to solicit for Fund V.
> In the email, [] Sullivan asked [] Alala for protection on the names on the list as they
> began to make calls.  On June 27, 2016, in an email to [] Alala, Capitala's Vice President
> - Business Development, Casey Swercheck, observed that NovaFund will "freak out" if

Capitala pays placement agent fees to Sandler [] should investors on the [C]arve [O]ut list invest.  On June 28, 2016, [] Alala emailed [] Sullivan to review the process for reaching out to the investors on Sandler['s] list and to inform him that Capitala had not had NovaFund contact anyone on the [C]arve [O]ut list.

*Id.* ¶ 25.

In addition,

in an April 25, 2016 email, [] Swercheck noted that it was "risky" to hide from NovaFund that Sandler [] may work on Fund V.  Also, in a September 28, 2016 email to [] Alala, [] Swercheck stated that he was "still nervous" about the arrangement with Sandler [] and acknowledged that Capitala was not being "transparent" with NovaFund.  Capitala's former General Counsel testified that he told [] Alala that hiding Sandler['s] involvement from NovaFund was a "bad idea" from a business perspective.

*Id.* ¶ 26.

### C.  The Agreement

In May 2016, NovaFund and Capitala entered into an agreement (the "Agreement") to retain NovaFund "as its exclusive placement agent in connection with raising capital for Fund V or separately managed accounts." *Id.* ¶ 27.  The Agreement "was signed by CGLLC on Capitala's behalf." *Id.*  Under the Agreement, NovaFund would "advise and assist in placing partnership interests in Fund V with North American, European, Australian, and Asian investors[,]" and Capital would "pay NovaFund a certain percentage of the amount of capital that any [investor] commits to Fund V or a separately managed account (the 'Success Fee')." *Id.* ¶¶ 28-29.

An exception to the Success Fee arrangement limits the amount of fees that Nova Fund can earn on investments made by investors on the Carve Out list. *Id.* ¶ 31.  "The parties agreed that no fee would be payable on certain Carve Out investors, but only up to $125 million in aggregate commitments. Once the $125 million cap was reached, Capitala was obligated to pay

NovaFund the Success Fee on any commitments over that amount even if the investors were on the Carve Out list." *Id.*

"Before signing the Agreement, [] Alala and/or [] Swercheck represented to [] Kelley and/or [] Howe that Capitala had a personal relationship with the investors listed on the Carve Out list…" *Id.* ¶ 33.  NovaFund relied on those representations, which "led NovaFund to believe that Fund V could be raised successfully." *Id.*  The representations were false because Capitala did not have "personal relationships" or "meaningful contacts" with the investors on the Carve Out list and, thus, could not rely on relationships or contacts to solicit investments for Fund V. *Id.*

The Agreement also compensates NovaFund for "capital commitments from [investors] that close into the next Capitala-sponsored successor vehicle with a substantially similar investment strategy (the 'Tail Fee')[,]" irrespective of whether the investor was on the Carve Out list. *Id.* ¶ 34.  Finally, the Agreement provides that Capitala will "pay NovaFund a minimum of $200,000 as compensation for the advisory and placement services, which was payable in a monthly retainer of $20,000, which was supposed to be offset dollar for dollar against the Success Fee." *Id.* ¶ 35.

### D.  Performance Under the Agreement

NovaFund began performing immediately after the agreement was executed.  Capitala asked, however, that some work be delayed.  "For example, Capitala instructed NovaFund not to do any work with Target Investors until after the first two investors, known as 'anchor investors,' finalized their commitment to Fund V." *Id.* ¶ 38.  NovaFund complied with that request, even though it believed it to be "detrimental to the parties' efforts to raise capital. NovaFund expressed these concerns to Capitala at the time, and explained that starting earlier in the year

5

allows a fund manager a better chance of success by having more time to solicit and close investors before the end of the year….” *Id.* ¶ 39. While NovaFund was holding off contacting investors at the request of Capitala, Capitala was “secretly working with Sandler [] to have Sandler [] solicit investors for Fund V, without telling NovaFund.” *Id.* ¶ 41.

NovaFund began to send monthly invoices to Capitala in May 2016 for the monthly retainer fee. *Id.* ¶ 36. Although “NovaFund issued these invoices to CGLLC, they were sent to Capitala, and Capitala, through CPA, paid the invoices on Capitala’s behalf to NovaFund’s broker-dealers. Similarly, NovaFund issued invoices to CGLLC for the reimbursement of expenses incurred by NovaFund, but was repaid by Capitala through CPA.” *Id.* In August 2016, “Capitala closed on the anchor investors’ commitments to Fund V[]” and “Capitala issued a press release about the first closing … announc[ing] that it included about $40 million in capital commitments by a globally renowned asset manager and an investment grade insurance company.” *Id.* ¶¶ 42, 43.

Thereafter, “NovaFund immediately began reaching out to investors to promote Fund V and sending offering documents and marketing materials to investors in an effort to generate interest in Fund V[]” in order to secure the target size of investments of “$300 million with a hard cap of $350 million.” *Id.* ¶¶ 44, 46. For example, in October 2016, NovaFund sent marketing materials for Fund V to StepStone—“the first time StepStone had been solicited in connection with Fund V and related separately managed accounts.” *Id.* ¶ 46.

During this period, “Capitala continued to work furtively with Sandler [], without disclosing this to NovaFund.” *Id.* ¶ 50.

> Not surprisingly, Capitala’s secret efforts with Sandler [] created conflicts. One member of the NovaFund team had asked for permission to arrange a meeting with a Connecticut-based investor that had been placed on the Carve Out list by Sandler []. Capitala initially agreed, but then reversed itself and instructed NovaFund not to pursue that investor. []

Swercheck of Capitala lied to NovaFund, and said that he simply had his "wires crossed," even though this was untrue, and [] Swercheck knew that both Sandler [] and NovaFund sought to pursue this same investor.  In fact, in a November 8, 2016 email, [] Swercheck noted that this was an "issue of having two agents, one of which is in the dark about the other one."  The opportunity to meet with the investor in the fall of 2016 was lost and eventually the investor declined to invest in Fund V.  This was an investor, however, that had been identified as a top prospect by NovaFund for investing in Fund V.

*Id.* ¶ 53.

Other events also impacted NovaFund's ability to raise capital for Fund V and earn fees under the Agreement.  For example, Alala was unavailable during the winter of 2016-2017 as a result of a divorce trial. *Id.* ¶¶ 55, 56.  In addition, between February and March of 2017, Capital requested that NovaFund "suspend its efforts … while Capitala focused its attention on raising capital overseas in Europe and the Middle East." *Id.* ¶ 57.  NovaFund informed Capitala that these events could result in declines, and given that "the market was not reacting favorably to Fund V's investment strategy," NovaFund "recommended that Capitala shift the strategy of Fund V to favor more senior debt investments and to focus less on subordinated debt investments." *Id.* ¶¶ 58, 59.

"February 2017 marked a turning point in the parties' relationship." *Id.* ¶ 60.

Alala was very frustrated with NovaFund and claimed that it had not produced meetings with investors.  These frustrations were unfounded in light of Capitala's inexperience with working with placement agents, Capitala's failure to follow advice provided by NovaFund, Capitala's decision to delay marketing efforts, [] Alala's unavailability and Capitala's resulting decision to take itself out of the market at inopportune moments, Capitala's efforts to block NovaFund from contacting the 105 investors on the Carve Out list (including 40 that were allocated exclusively to Sandler []), and NovaFund's performance despite the obstacles that Capitala had created.

*Id.* ¶ 62.

In March 2017, "Capitala proposed that the parties terminate their relationship by May 31, 2017, reduce the amount of the Success Fees, eliminate Tail Fees, and allow for a refund of the retainer payments made by Capitala.  NovaFund rejected Capitala's offer." *Id.* ¶ 67.  Days

later, "Capitala instructed NovaFund not to attend any future meetings with investors[]," and Capitala stopped paying NovaFund the monthly retainer fee. *Id.* ¶¶ 68, 69.  The parties met to discuss a potential amendment to the Agreement and thereafter entered into an Advisors Addendum (the "Addendum") in April 2017. *Id.* ¶¶ 70, 74.

The Addendum "refers to 'Capitala Group' in the document title, which at the time was the marketing moniker for CPA and CIA." *Id.* ¶ 74.  The Addendum "allows 'Capitala' to retain other placement agents 'focused on non-North American limited partners' and provides that capital commitments from investors obtained from the other placement agent(s) 'generally' would not entitle NovaFund to a Success Fee." *Id.* ¶ 75.   The Addendum also provides that Capitala will pay NovaFund "a Success Fee for capital commitments obtained from non-North American investors which were initially solicited by NovaFund or its agent before the date of the Addendum…." *Id.* ¶ 76.  One such investor, initially solicited by NovaFund before the Addendum, is StepStone. *Id.*  The Addendum permits either party to terminate the relationship "on or after September 1, 2017, and that, in the event of termination, Capitala would owe NovaFund a Success Fee 'on capital commitments from investors introduced to Capitala by Nova[Fund] either through conference calls or in-person meetings.'" *Id.* ¶ 77.

### E.  Investment by StepStone

NovaFund had several initial contacts with StepStone, "a leading global private markets firm providing investment and advisory solutions." *Id.* ¶ 81.  Based on those communications, "NovaFund suggested to Capitala that it shift its investment strategy for Fund V towards more senior debt investments and to consider a separately managed account [often called an SMA, a sidecar, or a parallel account,] especially for StepStone." *Id.* ¶¶ 81, 82.

> In the investment industry… an "SMA[]" … can be one of many different types of
> investment accounts, such as a separate account identified with a particular investor.

> Capital from an SMA can then be contributed alongside a fund's capital to jointly make an investment, such as making a $50 million loan to a retail store, where the SMA may lend $20 million and the fund lends the rest.

*Id.* ¶ 82.  Capitala and NovaFund understood that NovaFund would find investors interested in investing through SMAs and that NovaFund would earn fees on investments committed to SMAs. *Id.* ¶ 83.

NovaFund introduced StepStone to Capitala in December 2016 and arranged "a telephonic meeting for Capitala and StepStone in July 2017, but Capitala instructed NovaFund to participate only silently and not to announce itself on the call." *Id.* ¶ 85.  In August 2017, NovaFund helped Capitala prepare responses to StepStone's due diligence questions. *Id.* ¶ 86.  In September 2017, NovaFund arranged a meeting between Capitala and StepStone at a conference they would both be attending. *Id.* ¶¶ 87-88.  In October, 2017, StepStone made an onsite visit to Capitala's office but Capitala told NovaFund that NovaFund need not attend. *Id.* ¶ 89.  In October 2017, Capitala was excluding NovaFund from all communications with StepStone, and took other actions that excluded NovaFund from the relationship between Capitala and StepStone. *Id.* ¶ 91.  For example, Capitala submitted the responses to StepStone's due diligence without copying NovaFund. *Id.* ¶ 86.  In addition, NovaFund and Capitala stopped communicating about marketing Fund V, although Capitala continued to pursue investment from StepStone. *Id.* ¶¶ 94, 95.

In March 2018, two SMAs were in the final stages of being set up by Capitala and StepStone, but in order to keep StepStone's identity secret, Capitala formed a new investment vehicle, CSLC. *Id.* ¶¶ 97, 98.

> The StepStone-Capitala SMAs and CSLC are related and treated by Capitala and StepStone as one and the same. Capitala formed CSLC to be the confidential way of referring to the SMAs with StepStone and effectively uses CSLC as the anonymous front for StepStone's SMAs.  CSLC's formation enabled Capitala to publicly announce debt

investments by CSLC without having to disclose the participation and identity of StepStone or its SMAs.

*Id.* ¶ 99.  The StepStone-Capitala SMAs and Fund V also have the same investment strategy. *Id.* ¶ 100.

In April 2018, the SMAs became finalized and Capitala issued a press release announcing the $1.0 billion investment as "new capital." *Id.* ¶¶ 101, 104.  NovaFund learned about the Step-Stone Capitala SMAs in April 2018 through one of StepStone's employees; NovaFund's Chief Financial Officer contacted Capitala "to request information on the investors and capital commitments to CSLC so that NovaFund could determine if any placement agent fees were due under the Agreement, as amended." *Id.* ¶¶ 106, 107.  Capitala refused and informed NovaFund that it was not owed fees because "CSLC had a different investment strategy than Fund V…." *Id.* ¶ 108.  Capitala has failed to pay NovaFund for the services NovaFund rendered.

> There is no justification for Capitala refusing to pay NovaFund fees due on the commitments made by the StepStone-Capitala SMAs. Because the StepStone-Capitala SMAs are separately managed accounts within the meaning of the Agreement, and because NovaFund was the party that initially solicited StepStone, NovaFund is entitled to Success Fees on the investments that have been made by the StepStone-Capitala SMAs.

*Id.* ¶ 111.

### F.  Affidavits

Moving Defendants have submitted an affidavit by Alala that describes each of the entities that NovaFund has made claims against. ECF No. 217-2.  Alala states that "CGLLC did not have common ownership with CIA, CPA and CSLC, and CIA, CPA and CSLC did not control CGLLC." *Id.* ¶ 9.  In addition, "CIA, CPA and CSLC are separately and validly formed entities under Delaware law.  They serve distinct, legitimate purposes, observe corporate formalities and each respect and maintain their corporate separateness." *Id.* ¶ 10.  "CSLC is a

capital vehicle that provides senior debt and minor equity co-investments which is a substantially different strategy than Fund V." *Id.* ¶ 8.

### G. Relevant Procedural History

NovaFund brought this action in June 2018 against CGLLC. ECF No. 1.  In June 2020, counsel for CGLLC moved to withdraw stating that CGLLC was in the process of dissolving and winding up its business, ECF No. 151 ¶ 4; I granted the motion and issued an order stating that artificial entities, such as LLCs, cannot appear in federal court unless represented by counsel. ECF No. 152.  I ordered that unless new counsel for CGLLC appeared, I would enter a default against CGLLC. *Id.*  NovaFund filed a motion for reconsideration and I vacated the order that permitted counsel to withdraw, reserving judgment on the withdrawal issue until resolution of the motion for reconsideration. ECF No. 156.  I then ordered the parties to engage in discovery regarding "StepStone's investments in CSLC, any SMAs, or any other Capitala entities…." ECF No. 160.

In August 2020, NovaFund filed a motion to amend its complaint, seeking to assert corporate veil piercing claims and to add new parties; ECF No. 178; I granted the motion. ECF No. 191  NovaFund added Moving Defendants CPA, CIA, and CSLC and has asserted veil piercing claims that would hold Moving Defendants liable for the claims against the now dissolved CGLLC. ECF No. 193.  Specifically, NovaFund's Amended Complaint asserts six counts: (1) breach of contract against CGLLC, CPA, and CIA; (2) breach of the implied covenant of good faith and fair dealing against CGLLC, CPA, and CIA; (3) unjust enrichment against all defendants; (4) fraud against CGLLC, CPA, and CIA; (5) tortious interference with business expectancies against all defendants; and (6) unfair and deceptive trade practices against all defendants. *Id.*

### H.  Veil Piercing Allegations

The Amended Complaint asserts allegations that seek to hold Moving Defendants liable for unpaid fees, even though the Agreement was between NovaFund and CGLLC.  According to NovaFund, Moving Defendants are liable because Capitala abused the corporate form in that "CGLLC exists for no other purpose than for a vehicle for Capitala's fraud to avoid all liability and judgments." ECF No. 193 ¶ 153.  "CGLLC did not have a role in the operation of the Capitala enterprise, other than to serve as the signatory on the Agreement and certain other agreements entered into by Capitala, in an effort to protect Capitala from liability stemming from those agreements." *Id.* ¶ 128.  "CGLLC did not receive, and was not intended to receive, any of the fees that Capitala earned or will earn in connection with Fund V or the StepStone-Capitala SMAs." *Id.* ¶ 130.   The only funds CGLLC ever had were transferred to it by other Capitala entities during the course of this litigation for purposes related to this litigation. *Id.*

NovaFund alleges the following as further support for its claim that CGLLC is a sham entity:

- CGLLC did not have a source of money;
- CGLLC never generated or received any income or revenue;
- CGLLC had no capital to pay for its obligations;
- CGLLC did not have its own bank account;
- CGLLC was set up specifically to be undercapitalized;
- CGLLC's business purpose was to be the signatory for nuisance agreements so that the entity on the hook for a judgment or liability against it would not be capitalized;
- Capitala provided NovaFund a flow chart reflecting the "Capitala corporate entities and their respective places in Capitala's corporate structure."  CGLLC was not included in those materials.
- CGLLC and Moving Defendants shared the same office space, the space was leased, and there was only one Capitala entity on the lease for the entire enterprise;
- CGLLC and Moving Defendants all shared the same employees. CGLLC had no employees of its own;

- CGLLC and Moving Defendants used the same website and employees used the same email address no matter which entity they worked for;
- CGLLC and Moving Defendants all shared the same executives. For example, Alala is the Chairman and CEO of Capitala Group and CGLLC, he is the President and CEO of CPA and CIA, and he is the head of all the Capitala affiliates operating under the "Capitala" moniker;
- CGLLC was under common control with other Capitala affiliates, including Moving Defendants;
- CGLLC did not have its own corporate records or a compliance manual;
- CGLLC operated at the direction of other Capitala affiliates, including Moving Defendants;
- CGLLC's "operations were all accomplished by other members of the Capitala enterprise, which at first included CPA and CIA, and then later included CSLC after the StepStone-Capitala SMAs were finalized;"
- Moving Defendants exercised complete dominion and control of CGLLC
- CGLLC and Moving Defendants functioned as a single entity and operated as part of a single enterprise; and
- The purpose of undercapitalizing and CGLLC was to insulate Moving Defendants from any obligations to NovaFund.

*Id.* ¶¶ 130-53.

The moniker "Capitala Group" is used generically, rather than referring to one specific entity that observes corporate formalities. *Id.* ¶ 123. CPA and CIA both do business under the moniker Capitala Group on Capitala's website, for marketing purposes, and in Securities and Exchange Commission ("SEC") filings. *Id.* ¶¶ 124-25. "Capitala dissolved CGLLC effective June 9, 2020[]" and on June 23, 2020, Alala sent a text message to his former general counsel stating, "We dissolved [CGLLC] … We are allowing a default judgment [sic] against that LLC as that LLC has no assets…. Nova[Fund] receives what they deserve." *Id.* ¶¶ 151, 152.

## II. DISCUSSION

Moving Defendants seek dismissal on the following grounds: (1) this Court lacks personal jurisdiction over Moving Defendants and the action should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure; (2) under Rule 12(b)(6), NovaFund has failed to plead adequately a veil piercing claim; and (3) has failed to state a claim for unjust

13

enrichment; (4) NovaFund has failed to state a claim for fraud under Rule 9(b); and (5) the entire Amended Complaint should be dismissed for failure to plead sufficient facts against any defendant under Rule 8. ECF No. 217-1.

### A. Rule 12(b)(2) Motion

*1. Legal Standard*

In diversity cases within the Second Circuit, "personal jurisdiction is determined by the law of the state in which the district court sits," which in this case is Connecticut. *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  The party asserting jurisdiction, NovaFund in this case, bears the burden of showing that the court has jurisdiction over the defendant when a motion to dismiss is brought under Rule 12(b)(2). *Whitaker v. American Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001).  "[T]he nature of the plaintiff's obligation varies depending on the procedural posture of the litigation.  Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith … legally sufficient allegations of jurisdiction[,]" *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied,*  498 U.S. 854 (1990), "i.e., by making a prima facie showing of jurisdiction….  [W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor [.]" *Whitaker,* 261 F.3d at 208 (citations and quotation marks omitted).  Because no party has requested an evidentiary hearing on this issue, NovaFund need only allege facts constituting a prima facie showing of personal jurisdiction. *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012).

*2. Discussion*

In response to the attack on the Court's personal jurisdiction, NovaFund argues that this Court should disregard the corporate form and pierce the corporate veil of CGLLC to find that there is personal jurisdiction over Moving Defendants on the basis that they are a unified entity and "alter egos" of CGLLC, an entity the parties do not dispute is subject to this Court's jurisdiction for purposes of this motion.[1] ECF No. 193 at 28; ECF No. 213 at 8. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) ("It is [] well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process.").

There is a threshold question about the choice of law for the determination of whether to pierce the corporate veil for jurisdictional purposes. Moving Defendants state that Connecticut law should apply because this Court sits in diversity in Connecticut. ECF No. 217-1 at 13. NovaFund does not appear to disagree. *See* ECF No. ECF No 231 at 8-9 (citing Connecticut Superior Court cases and federal district court cases from the District of Connecticut). Although it is true that a federal court sitting in diversity applies forum law to determine personal jurisdiction, the question is whether Connecticut courts apply Connecticut law to determine whether there is jurisdiction over a foreign alter ego for the purposes of asserting personal jurisdiction over a foreign entity. At least one of my colleagues has stated that, when faced with the issue of what law to apply when evaluating personal jurisdiction under an alter ego theory, Connecticut courts apply the law of the controlled entity's state of incorporation—North Carolina in this case, rather than Connecticut. *See, e.g., Graduation Sols., LLC v. Acadima, LLC*, No. 3:17-CV-01342 (VLB), 2018 WL 3637479, at *5 (D. Conn. July 31, 2018)

---

[1] In an earlier ruling, I concluded that this Court has jurisdiction over CGLLC. ECF No. 45 at 13. Therefore, the only question that remains is whether Moving Defendants can be considered alter egos of CGLLC for the purposes of asserting personal jurisdiction over them.

("Connecticut choice of law principles generally apply the law of the state of incorporation in determining whether two entities are alter egos of each other.") citing *Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472, 481 (D. Conn. 2017) ("In determining whether to pierce corporate formalities because two entities are alter egos of each other, the court must apply the law of the state of incorporation, in this case Connecticut.") (citation omitted).

In any event, both Connecticut and North Carolina apply an instrumentality test to determine whether the corporate veil should be pierced for the purposes of asserting personal jurisdiction.[2] I see no meaningful difference or conflict between the two instrumentality tests and, given that the parties have relied on Connecticut law, I will too. *See Network Enter., Inc. v. APBA Offshore Prod., Inc.*, 264 Fed. App'x 36, 40 (2d Cir. 2008) ("As we conclude that veil piercing is warranted in this case under either standard, we do not reach the questions of whether a conflict of law exists and if so, which law should apply.").

Under Connecticut law, a corporate alter ego theory can serve as the basis to pierce the corporate veil and assert personal jurisdiction over a foreign corporation. *See Shanshan Shao v. Beta Pharma, Inc.*, No. 3:14-cv-1177 (CSH), 2019 WL 7882485, at *10 (D. Conn. Sept. 23, 2019) ("Connecticut recognizes that its long-arm statute may extend personal jurisdiction based

---

[2] North Carolina's instrumentality test requires the following three elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn v. Wagner*, 329 S.E.2d 326, 330 (N.C. 1985); *see also State ex rel. Cooper v. Western Sky Financial*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *6-7 (N.C. Sup. Ct. Aug. 27, 2017) (applying the instrumentality test to determine whether the court had personal jurisdiction over the alter ego).

on a corporate alter ego theory.") (citation and quotation marks omitted).  This is because "[c]ourts will disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor...." *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010) (citation, quotation marks, and alterations omitted).  The corporate veil is only pierced, however, "under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *SFA Folio Collections, Inc. v. Bannon*, 585 A.2d 666, 672 (Conn. 1991) (citation and quotation marks omitted) (concluding that trial court's finding that plaintiff corporation was a separate entity for tax purposes was not clearly erroneous because assets had not been intermingled, formalities of separate corporate procedure had not been ignored, corporation had not been inadequately financed, and corporations had not been held out to the public as one entity).

Connecticut uses an instrumentality test to determine whether to pierce the corporate veil to assert personal jurisdiction.

> The instrumentality rule requires … proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of....

*Naples*, 990 A.2d at 339. (citations and quotation marks omitted).[3]

---

[3] In addition to the instrumentality test, Connecticut courts also apply an identity test to determine whether corporate veil piercing is proper. *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339–40 (Conn. 2010).  North Carolina does not apply an identity test.  In light of the similarity between the instrumentality tests applied by the two states, as well as the parties' reliance on Connecticut law, I confine my analysis to that test for the purposes of this ruling.

Factors to consider in assessing the first prong of the instrumentality test, control, include:

> (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*McKay v. Longman*, 211 A.3d 20, 52 (Conn. 2019) (citation and quotation marks omitted).

When I consider those factors and evaluate the first prong, control, I find that NovaFund has alleged facts that suggest that CGLLC was not merely controlled, but completely dominated. Specifically, NovaFund alleges that CGLLC did not have its own corporate records or a compliance manual and was not included in the organizational chart of the Capitala entities. ECF No. 193 ¶¶ 135, 143. NovaFund further alleges that CGLLC had no source of money, never generated or received income, had no capital to pay for its obligations, had no bank account, never received any of the fees in connection with Fund V or the Step-Stone Capitala SMAs, and was set up specifically to be undercapitalized. *Id.* ¶¶ 130-131. According to NovaFund, CGLLC never had any assets other than what was transferred to it by the Moving Defendants for purposes of this litigation. *Id.* ¶ 130. NovaFund alleges that CGLLC and Moving Defendants shared the same employees, shared the same office space, shared the same website, and shared the same executives. *Id.* ¶¶ 137-140. Other Capitala affiliates accomplished all of CGLLC's business operations; CGLLC had no operations of its own. *Id.* ¶ 147.

As for the second and third prongs, NovaFund has alleged that Moving Defendants used their control over CGLLC to commit a fraud or wrong that caused NovaFund's losses. *See McKay*, 211 A.3d at 52-53 ("With regard to the second and third prongs of the instrumentality

18

test, that is, (2) whether such control was used to commit a fraud or wrong, and (3) whether that fraud or wrong proximately caused the plaintiff's loss, this court has stated that it is not enough simply to show that a judgment remains unsatisfied.  There must be some wrong beyond the creditor's inability to collect, which is contrary to the creditor's rights, and that wrong must have *proximately caused* the inability to collect.") (internal quotation marks, alterations and citations omitted; emphasis in original).  Specifically, NovaFund alleges that CGLLC's only purpose, was to be the signatory for "nuisance agreements so that if there was [] ultimately a judgment or a liability, the entity on the hook for that judgment or liability would not be capitalized." *Id.* ¶¶ 133, 153.  CGLLC was dissolved in June 2020 in order to "insulate [Moving Defendants] from any obligations to NovaFund[,]" leaving NovaFund unable to recover the Success Fees and Tail Fees due under the Agreement. *Id.* ¶¶ 151, 153, 156.  "Capitala's intent in keeping CGLLC undercapitalized and in dissolving CGLLC was to try to insulate [Moving Defendants] from any obligations to NovaFund.  As a sham entity, CGLLC exists for no other purpose than for a vehicle for Capitala's fraud to avoid all liability and judgments." *Id.* ¶ 153. As evidence of this intent, NovaFund alleges that Alala sent a text message to his former general counsel stating that by dissolving CGLLC, the Moving Defendants ensured that NovaFund "receive[d] what it deserve[d]." *Id.* ¶ 152.  NovaFund's allegations, construed in the light most favorable to NovaFund, provide a specific averment that Moving Defendants used their control over CGLLC to commit a fraud or wrong that prevented NovaFund from gaining relief for its injuries.  Therefore, NovaFund has alleged facts sufficient to support piercing the corporate veil of CGLLC to assert personal jurisdiction over Moving Defendants.

Moving Defendants argue that the controlling test in Connecticut for jurisdictional veil piercing is set forth in *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925).  In

*Cannon*, a North Carolina corporation brought an action in North Carolina state court against a Maine corporation.  The Maine corporation removed the case to federal court and then moved to dismiss for lack of jurisdiction, asserting that it was not doing business within the state and had not been served with process. *Id.*  The plaintiff had served a subsidiary of the Maine corporation that had an office in North Carolina. *Id.* at 334-35.  The question before the Court was "whether, at the time of the service of process, [the Maine corporation] was doing business within the state in such a manner and to such an extent as to warrant the inference that it was present there." *Id.* The Court concluded that the parent and subsidiary were separate corporate entities with separate books and that the corporate separation was not pure fiction. *Id.* at 335.  Therefore, the parent/subsidiary relationship did not suffice to subject the parent corporation to jurisdiction in North Carolina. *Id.* at 336-37.

The principle that Connecticut courts have drawn from *Cannon* is "that the use of a subsidiary to transact business is not sufficient to subject a nonresident parent corporation to the jurisdiction of the forum in which that business is transacted." *Hersey v. Lonrho*, Inc., 807 A.2d 1009, 1013 (Conn. App. 2002).  That principle has no application to the facts that NovaFund has alleged.  NovaFund has not alleged that Moving Defendants' relationship to CGLLC is one of parent/subsidiary in which Moving Defendants own interests in CGLLC so as to give rise to jurisdiction over CGLLC.  Instead, as I have discussed, NovaFund has alleged that CGLLC was used solely as an instrument by Moving Defendants to perpetrate their escape from liability and had no other purpose.  *Cannon*, therefore, is inapposite.

Moving Defendants also draw a distinction between veil piercing for jurisdictional purposes and veil piercing for liability, asserting that the bar is higher for establishing personal jurisdiction. ECF No. 217-1 at 16.  That argument finds no support in Connecticut case law,

however, which applies the instrumentality and identity tests to determine whether the corporate veil should be pierced for jurisdictional purposes. *See, e.g.*, *Hersey*, 807 A.2d at 1015-16 (applying the instrumentality and identity tests to determine whether the trial court properly had declined to pierce the corporate veil to assert personal jurisdiction over the defendant); *Zhaoyin Wang v. Beta Pharma, Inc.*, No. X06CV146044253, 2019 WL 3546473, at *4 (Conn. Sup. Ct. July 5, 2019) (finding that the plaintiff's allegations of complete control and domination "support[ed] piercing the corporate veil" so as to confer personal jurisdiction over the alter ego defendants).

Moving Defendants also argue that NovaFund's allegations are "merely conclusory" and are "generalized" rather than specific to any defendant individually, warranting dismissal. ECF No. 217-1 at 17.  Moving Defendants rely on *Matthews v. SBA, Inc.*, 89 A.3d 938, 958 (Conn. App. 2014).  *Matthews*, however, evaluated personal jurisdiction under Connecticut's long arm statute, not under a veil piercing theory. *See id.*, 89 A.3d at 958 ("The plaintiffs' claim is twofold: first, the court has jurisdiction over these defendants under the applicable long arm statutes…").  The court held that the long arm statute applicable to foreign LLCs required factual allegations as to each defendant's tortious conduct to establish jurisdiction. Conn. Gen. Stat. § 52–59b (a); *Matthews*, 89 A.3d at 550.  According to Moving Defendants, even though the "*Matthews* Court was not addressing jurisdictional veil-piercing, the Court's rationale is equally applicable here and warrants dismissal of the claims against [Moving] Defendants." ECF No. 217-1 at 17.  But the rationale is not equally applicable here, because no one disputes (for the purposes of this motion) that the court has long-arm jurisdiction over CGLLC, and it is thus not necessary for NovaFund to allege specific contacts to Connecticut by any Moving

Defendant; it need only allege that each Moving Defendant is an alter ego of CGLLC, and that it has done.[4]

Therefore, the motion to dismiss under Rule 12(b)(2) is denied.

### B. Rule 12(b)(6) Motion

*1. Legal Standard*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)). The Court must accept the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014). The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

*2. Discussion*

a. Veil Piercing

The parties agree that the law of North Carolina, the state of incorporation of the allegedly controlled corporation, CGLLC, should apply to the substance of the veil piercing allegations. ECF No. 231 at 14 n. 5; ECF 217-1 at 22. Moving Defendants argue that NovaFund

---

[4] Because I conclude that NovaFund has made a prima facie showing that Moving Defendants are alter egos of CGLLC and subject to personal jurisdiction on that basis, I need not reach the alternative grounds that Moving Defendants are independently subject to personal jurisdiction for their allegedly tortious conduct in Connecticut. ECF No. 231 at 11.

has failed to allege facts that support veil piercing under North Carolina's instrumentality rule. When I accept as true the well-pleaded factual allegations in the Amended Complaint and draw all reasonable inferences in NovaFund's favor, I conclude that the allegations satisfy that rule.

"In North Carolina, the corporate veil may be pierced to prevent fraud or to achieve equity." *Strategic Outsourcing, Inc. v. Stacks*, 625 S.E.2d 800, 804 (N.C. App. 2006) (citation and internal quotation marks omitted). "[A] corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded." *Glenn v. Wagner*, 329 S.E.2d 326, 330 (N.C. 1985) (citations, internal quotation marks, and alterations omitted).

To pierce the corporate veil, North Carolina courts follow the instrumentality rule, which requires the following three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn,* 329 S.E.2d at 330; *see also General Fidelity Ins. Co. v. WFT, Inc.*, 837 S.E.2d 551, 558 (N.C. App. 2020). As noted above, Connecticut's instrumentality test is substantively identical.

North Carolina courts also consider a non-exclusive list of factors similar to those used in Connecticut when evaluating a veil piercing claim: inadequate capitalization, non-compliance with corporate formalities, "complete domination and control of the corporation so that it has no

independent identity[,]" "[e]xcessive fragmentation of a single enterprise into separate corporations[,]" "non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-functioning of other officers or directors, [and] absence of corporate records." *Glenn,* 329 S.E.2d at 330-31, 332.

NovaFund has alleged facts demonstrating that CGLLC was completely dominated and that the control over CGLLC was used to commit a fraud or wrong that caused NovaFund's losses. As I have described, NovaFund alleges that CGLLC was set up to be undercapitalized, never generated or received any income, did not have a bank account, did not have corporate records or a compliance manual, and its only purpose was to be the signatory for nuisance agreements so that there would be no assets should a judgment be rendered against it. *See* Part I.H. Two years into the litigation, Capitala dissolved CGLLC, thereby enabling Moving Defendants to perpetrate alleged wrongs on NovaFund with impunity. ECF No. 193 ¶ 151.

Those allegations are more than threadbare conclusions that CGLLC "was controlled." *See, e.g., Krebs v. Charlotte School of Law*, No. 3:17-CV-00190 (GCM), 2017 WL 3202831, at *4 (W.D.N.C. July 27, 2017) (dismissing complaint where "[p]laintiffs' claims against [the defendant entities] lack any factual basis, and instead rely upon entirely conclusory assertions. For example, Plaintiffs allege that the [defendant entities] 'controlled the other corporate defendants' and that [another defendant entity] is 'owned and *operated*' by the [defendant entities].… The allegations are merely a 'threadbare recital[ ] of the elements of a cause of action' and are not enough to survive a motion to dismiss.…") (citations omitted; emphasis in original). Instead, NovaFund has pointed to specific acts of control and domination that allowed Moving Defendants to take advantage of the arrangement. For example, NovaFund alleges that the Addendum was crafted with "language broad enough so that it could include other Capitala

entities" and "does not identify a specific Capitala entity that is the counterparty to the Addendum." ECF No. 193 ¶¶ 74, 75.  The generic terminology prevents NovaFund from holding any one Capitala entity liable.  Further, NovaFund alleges that Alala sent an email suggesting that his intent, and that of the Moving Defendants, was all along to use CGLLC as a shield against any lawsuit by NovaFund, to be cut loose when the litigation intensified. *Id.* ¶ 152.

In addition, and contrary to Moving Defendants' assertions, the allegations also set forth facts, when taken as true, that establish wrongdoing, rather than mere breach of the contract.  The factual allegations suggest that CGLLC was created as a shell for the sole purpose of entering into the Agreement with NovaFund so that Moving Defendants could escape liability. *See Best Cartage, Inc. v. Stonewall Packaging, LLC*, 727 S.E.2d 291, 300–01 (N.C. App. 2012) ("[I]t does not appear, and plaintiff has not alleged, that defendant Jackson created defendant Stonewall for the sole purpose of entering the Agreement; and it does not appear that the creation of defendant Stonewall somehow unjustly insulates defendant Jackson from any liability. Consequently, we must hold that plaintiff failed to sufficiently allege a wrongdoing to meet the second prong of the instrumentality test for piercing the corporate veil, and as a result, the trial court did not err in dismissing plaintiff's claim for piercing the corporate veil pursuant to defendant Jackson's Rule 12(b)(6) motion.").  NovaFund's allegations are sufficient to allege that CGLLC was completely dominated and that the control was used to deny NovaFund a remedy for its losses.[5]

---

[5] The parties do not address the specific mechanism by which Moving Defendants exercised control over CGLLC. For example, there are no allegations that Moving Defendants had any ownership interest in CGLLC or other legal means of exercising control over it.  But, as discussed, NovaFund has alleged facts showing that the Moving Defendants used CGLLC as an instrument to perpetrate a wrong against NovaFund, and those allegations are specific enough to satisfy the instrumentality test under North Carolina law.

Therefore the motion to dismiss for failure to state a claim for veil piercing under Rule 12(b)(6) is denied.

b. Unjust Enrichment

Moving Defendants seek to dismiss NovaFund's claim for unjust enrichment on the ground that the cause of action is not available where there is an enforceable contract between the parties. ECF No. 217-1 at 31.  Unjust enrichment can be pled, however, in the alternative under Rule 8.[6]  NovaFund's claim for unjust enrichment in the Amended Complaint is not an alternative theory of liability in terms of whether an Agreement ever existed, but rather seeks to recover in the alternative for a subject matter that Moving Defendants argue is not governed by the Agreement.

Unjust enrichment is a "broad and flexible remedy" by which a plaintiff can seek to recover a benefit that the defendant received unjustly and for which "no remedy is available by an action on the contract." *Town of New Hartford v. Conn. Res. Rec. Auth.*, 970 A.2d 592, 609 (Conn. 2009).  The elements of an unjust enrichment claim are: "(1) that the defendant[] w[as] benefited, (2) that the defendant[] unjustly did not pay the plaintiff[] for the benefit[] and (3) that the failure of payment was to the plaintiff[']s detriment." *Id.* (citation omitted).  An express contract between the parties, however, precludes a claim for unjust enrichment covering the same subject matter as the contract. *Meaney v. Connecticut Hosp. Ass'n, Inc.*, 735 A.2d 813, 823 (Conn. 1999) ("It is often said that an express contract between the parties precludes recognition

---

[6] Rule 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). "Where the parties dispute whether there is an enforceable written contract at all . . .Rule 8(d)(2) of the Federal Rule of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for quantum meruit and unjust enrichment." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 243 (S.D.N.Y. 2013) (collecting cases); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 379 (D. Conn. 2018) (concluding same).

of an implied-in-law contract governing the same subject matter.") (citation and internal quotation marks omitted).

NovaFund's claim for unjust enrichment concerns the StepStone-Capitala SMAs that Capitala announced in April 2018 valuing $1.0 billion. ECF No. 193 ¶¶ 104, 169. NovaFund alleges that it introduced Capitala to StepStone, suggested the use of an SMA for StepStone, and maintained StepStone's interest, ultimately resulting in the formation of the StepStone-Capitala SMAs. *Id.* ¶ 168. Moving Defendants benefited from NovaFund's work in that "they will continue to be paid in connection with the StepStone-Capitala SMAs, through various fees such as management fees, closing fees, and success, incentive, or performance fees." *Id.* ¶ 169. Moving Defendants did not pay NovaFund for the benefits they received, which was to NovaFund's detriment. *Id.* ¶ 170.

Earlier in the case, CGLLC asserted in an answer and counterclaim that NovaFund was not entitled to fees for the SMAs because the "new" capital vehicle holding those investments was "unrelated and dissimilar to Fund V" and "represented a substantially different investment strategy and line of business than any existing or prior Capitala-sponsored funds, including Fund V, so that no fees were owed under the Term Sheet[.]" ECF No. 106 ¶ 5. NovaFund also alleges that Alala "has taken the position that Capitala did not hire NovaFund to pursue any advisory agreements, such as the one that governs the StepStone-Capitala SMAs." ECF No. 193 ¶ 174. It is in response to those arguments, should they prevail, that NovaFund would seek to recover under the theory of unjust enrichment for the work done in connection with raising capital for the SMAs. *See Maalouf v. Salomon Smith Barney, Inc.*, No. 02-CV-4770, 2003 WL 1858153, at *7 (S.D.N.Y. Apr. 10, 2003) (explaining that if dispute falls outside the scope of the existing contract, contract claim would fail but plaintiff might still have unjust enrichment claim as an

alternative remedy).   NovaFund has thus properly pled unjust enrichment in the alternative "in the event the parties' contracts are deemed not to apply to the StepStone-Capitala SMAs." *Id.* ¶ 174.

The cases cited by Moving Defendants address a different point, namely, that when an unjust enrichment claim is asserted in the alternative on the ground that no express contract existed, the unjust enrichment claim cannot survive if the plaintiff incorporates the breach of contract allegations, allegations that affirm the existence of a contract, into the unjust enrichment claim. *See N. Am. Tech. Servs., Inc. v. V.J. Techs., Inc.*, No. 10 CV 1384 (AWT), 2011 WL 4538069, at *6 (D. Conn. Sept. 29, 2011) ("In the Third Count, which alleges unjust enrichment, the plaintiff incorporates paragraphs 1 through 56 of the Complaint.… Because lack of an express contract is a precondition to recovery based on unjust enrichment, allegations to the contrary incorporated into the count require dismissal.").

As discussed, NovaFund has not pled its unjust enrichment claim in the alternative by way of arguing that no Agreement existed.  Instead, the unjust enrichment claim is pled in the alternative to address Moving Defendants' argument that the SMAs fall outside the scope of the Agreement. *See NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-CV-1023 (MPS), 2019 WL 1173019, at *15-16 (D. Conn. Mar. 13, 2019) (motion to dismiss unjust enrichment claim denied because defendant vehemently disputed the enforceability of the contract and unjust enrichment claim was pled in the alternative).  Further, NovaFund explicitly alleges within the unjust enrichment claim that the claim is asserted "in the alternative … in the event the parties' contracts are deemed not to apply to the Step-Stone Capitala SMAs." ECF No. 193 ¶ 174.

Therefore, the motion to dismiss the unjust enrichment claim is denied.

### C.  Fraud Claim: Rule 9(b)

Both parties refer to Connecticut law in addressing the fraud claim and Moving Defendants do not identify any distinction between the elements for fraud under Connecticut law and North Carolina law. *See* ECF No. 217-1 at 40.  I thus apply Connecticut law as well.

*1. Legal Standard*

A fraud claim must allege the following elements: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. *Billington v. Billington*, 595 A.2d 1377, 1379 (Conn. 1991).

A fraud claim must also satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).[7]  "Rule 9(b) is designed [to] 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'" *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 663 (2d Cir. 1997) (quoting *O'Brien v. Nat'l Prop. Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)).  Courts have interpreted Rule 9(b) to require plaintiffs to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).  The Second Circuit has noted that Rule 9(b) requires fraud plaintiffs to plead not only the particular "circumstances of the fraud"—the who, what, where, when, and why of the false statements—but also "the

---

[7] Because this Court's jurisdiction is based on the diversity of citizenship of the parties, state law defines the elements of a fraud claim, but federal law governs the pleading requirements. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Perkett v. Applied Printing Techs., L.P.*, No. 3:03CV1840, 2004 WL 322895, at *2 (D. Conn. Feb. 17, 2004).

defendant's mental state." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

160, 171 (2d Cir. 2015).  "[T]hough mental states may be pleaded generally, Plaintiffs must

nonetheless allege facts that give rise to a strong inference of fraudulent intent." *Id.* (internal

quotation marks omitted).

     *2. Discussion*

     NovaFund has alleged three different theories of fraud within the single fraud count of

the Amended Complaint: (1) fraudulent representations regarding the personal relationships with

the investors on the Carve Out list; (2) fraudulently using a dummy entity as the signatory to the

Agreement; and (3) fraudulently promising that NovaFund would be the exclusive placement

agent. ECF No. 193 ¶ 176.

     NovaFund has set forth factual allegations that meet the requirements to state a claim for

at least one of these theories.  Specifically, NovaFund alleges that Capitala promised that it

knew, and had personal relationships with, the investors on the Carve Out list, all while

concealing Sandler's involvement. ECF No. 193 ¶ 176.  "While Capitala and NovaFund were

negotiating the Agreement, Capitala asked Sandler [] to provide a list of names to be included on

the Carve Out list[.]" *Id.* ¶ 181.  Sullivan emailed Alala the "initial target list" on April 27, 2016

and the Agreement was signed in "early May 2016." *Id.* ¶¶ 25, 32.  "Before signing the

Agreement, [] Alala and/or [] Swercheck represented to [] Kelley and/or [] Howe that Capitala

had a personal relationship with the investors listed on the Carve Out list." *Id.* ¶ 33.

     "NovaFund relied on the representations that Capitala had meaningful personal contacts

for each investor listed on the Carve Out list, which included some of the largest potential

investors for Fund V.  The strength of these relationships led NovaFund to believe that Fund V

could be raised successfully…. and were thus material to NovaFund's decision to enter the

Agreement." *Id.*  NovaFund suffered injury and damages by relying on Capitala's representations because "Capitala did not have a personal relationship with the 40 investors added to the Carve Out list and … Capitala did not have meaningful contacts [with] many of the other investors on the Carve Out list sufficient to solicit investments for Fund V." *Id.* ¶¶ 33, 185, 186.  In addition, Capitala concealed Sandler's "role and identity from NovaFund[,]" had been colluding with Sandler when it entered into the Agreement with NovaFund, and continued to work with Sandler to raise capital for Fund V. *Id.* ¶ 179.

Those allegations assert with enough specificity that Alala and/or Swercheck (who), falsely stated that they had personal relationships with investors on the Carve Out list (what), in an email and in another representation (where), between April and May of 2016 (when), in order to conceal Sandler's involvement and to induce NovaFund to enter into the Agreement (why), even though they did not have meaningful contacts with the investors (falsity).

Moving Defendants argue that NovaFund's fraud claim fails because it does not identify an individual speaker. ECF No. 217-1 at 38.  I disagree.  NovaFund has alleged that Alala and/or Swercheck represented to Kelley and/or Howe that they had personal relationships with investors.  Both Alala and Swercheck played leadership roles within the Capitala organization, according to the Amended Complaint.  Alala was the "founder and Chief Executive Officer of Capitala"; ECF No. 193 ¶ 25; and Swercheck was "Capitala's Vice President - Business Development[.]" *Id.* ¶ 25.  Whether either, or both, made the false representation, NovaFund has identified an individual speaker as opposed to just a corporation. *See Santana v. Fed. Nat.'l Mortg. Ass'n,* No. 1:15-CV-1424, 2016 WL 5955889, at *3 (N.D.N.Y. Oct. 13, 2016) (dismissing fraud claim for failing to "identify any particular speaker, but instead attribut[ing] the allegedly fraudulent speech to a corporation and a corporation's website[]").

Because I have concluded that NovaFund has alleged a plausible theory of fraud with adequate particularity, I need not address the two alternative theories of fraud. *See In re American Express Anti-Steering Rules Antitrust Litigation*, 343 F. Supp. 3d 94, 102 (E.D.N.Y. 2018) ("[A]t the pleading stage, parties are not entitled to a determination that certain of the alternative legal theories under which the plaintiff might be entitled to relief will not fly.") (citation, internal quotation marks, and alterations omitted).

### D.  Rule 8: "Grouping"

Finally, Moving Defendants assert that the Amended Complaint should be dismissed in its entirety because NovaFund has failed to plead facts against any particular defendant but has, instead, made only general references against "Capitala" and "Defendants," in violation of Fed. R. Civ. P. 8. ECF No. 217-1 at 41-42.  I disagree.  It can hardly be debated that the Amended Complaint meets the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.

*1. Legal Standard*

Rule 8 is "extremely permissive" and its purpose is to give the defendant or defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) (citation and internal quotation marks omitted); *Ricciutti v. New York Trans. Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (The purpose of Rule 8 is "to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.") (citation omitted). The Rule requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

*2. Discussion*

The Amended Complaint includes 222 paragraphs of allegations, and defines the parties as I have described.  "Capitala Group" consists of CPA and CIA. ECF No. 193 ¶ 1.  "Capitala" consists of CPA, CIA, and CGLLC. *Id.* ¶ 2.  Although the allegations do frequently group the defendants together, that grouping makes sense in context because NovaFund's theory is that the entities acted as one entity, with the same officers, at the direction of Alala, as alter egos for the sham entity CGLLC.  It also makes sense because NovaFund alleges that the entities sometimes grouped themselves together for obfuscation.  For example, the entity listed on the Addendum was "Capitala Group" rather than a specific entity such as CGLLC. *Id.* ¶ 74.  "Capitala was purposefully not specific in its reference to 'Capitala,' … and left the language broad enough so that it could include other Capitala entities, including CPA and CIA." *Id.* ¶ 75.  When I accept NovaFund's allegations as true, which I must, I find that grouping the entities together at times is reasonable, because those entities allegedly operated together as alter egos of CGLLC.

There are also instances in the Amended Complaint in which the entities are not grouped together.  In fact, each count identifies the specific entities from which NovaFund seeks relief. *See Hudak v. Berkley Group, Inc.*, No. 3:13-cv-00098 (WWE), 2014 WL 354676, at * 4 (D. Conn. Jan. 23, 2014) ("Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.").  For example, the breach of contract claim (Count One) is asserted against CGLLC, CPA, and CIA, whereas the unjust enrichment claim (Count Three) is asserted against all defendants. ECF No. 193 at 33, 35.

In addition, the Amended Complaint contains numerous allegations specific to each defendant. *See Ritchie v. Northern Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 236 (S.D.N.Y. 2014) (denying motion to dismiss under Rule 8 on the ground that the plaintiff lumped together three

defendants because the complaint contained "numerous allegations specific to each" defendant). Regarding CSLC, NovaFund alleges that CSLC was formed "to be the confidential way of referring to the SMAs with StepStone" and was used "as the anonymous front for StepStone's SMAs. CSLC's formation enabled Capitala to publicly announce debt investments by CSLC without having to disclose the participation and identity of StepStone or its SMAs." ECF No. 193 ¶ 99. Those allegations give Capitala (consisting of CGLLC, CPA, and CIA) a fair understanding of what NovaFund alleges to be CSLC's role in the dispute. Regarding CPA and CIA, NovaFund alleges that both entities "do business under the moniker 'Capitala Group' for marketing purposes[,]" define themselves as "Capitala Group" for SEC filings, and use the names CPA and Capitala Group interchangeably. *Id.* ¶ 125. Because they do business under the same moniker, allegedly obfuscating the distinction between them, NovaFund has alleged adequately facts against both entities. Moving Defendants are on notice as to what NovaFund's claims are and the grounds upon which they rest.

I therefore decline to dismiss NovaFund's Amended Complaint on the ground that it fails to satisfy Rule 8.

**III.    CONCLUSION**

As explained above, the motion to dismiss, ECF No. 217, is DENIED.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              August 11, 2021