## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NOVAFUND ADVISORS, LLC, | |
| Plaintiff, | No. 3:18-cv-1023 (MPS) |
| v. | |
| CAPITALA GROUP, LLC; CAPITALA PRIVATE ADVISORS, LLC; CAPITALA INVESTMENT ADVISORS, LLC; and CAPITALA SPECIALTY LENDING CORPORATION, | |
| Defendants. | September 30, 2021 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION

**PLAINTIFF NOVAFUND ADVISORS, LLC**

Jill M. O'Toole (ct27116)
Alison P. Baker (ct28136)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06109
Tel.: 860-251-5000
Fax: 860-251-5099
jotoole@goodwin.com
abaker@goodwin.com

*Its Attorneys*

**ORAL ARGUMENT NOT REQUESTED**

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ................................................................................................................3

I.     Legal Standard ................................................................................................. 3

II.    Defendants' Motion Should Be Denied on Veil Piercing.................................3

       A.    Defendants' Argument that Multiple Veils Must Be Pierced Is Specious....................3

             1.    Lateral Veil Piercing of Related Corporate Entities Is Permitted...........................5

             2.    NovaFund Does Not Seek to – and Is Not
                   Required to – Pierce Multiple Corporate Layers .................................................9

       B.    Defendants' Failure to Conduct a Veil Piercing
             Analysis Precludes the Entry of Summary Judgment..................................12

             1.    CG Was Intentionally Undercapitalized .................................................13

             2.    Capitala Ignored Corporate Formalities................................................14

             3.    Other Capitala Entities Completely Dominated and Controlled CG....................16

             4.    The Capitala Enterprise Is Excessively Fragmented .............................................17

             5.    Capitala Abused the Corporate Form .....................................................18

III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO
       NOVAFUND'S BREACH OF CONTRACT AND BAD FAITH CLAIMS......................19

       A.    There Are Disputed Issues of Material Fact as to the Contracting Parties .................19

       B.    The Term "Commits" in the Term Sheet Is Unambiguous and
             Success Fees Are Payable When an Investor Commits to an SMA ..........................23

IV.    THIS COURT ALREADY RULED THAT
       THE ADDENDUM'S RELEASE IS AMBIGUOUS........................................27

V.     SUMMARY JUDGMENT SHOULD BE DENIED
       ON NOVAFUND'S UNJUST ENRICHMENT CLAIM...................................29

i

VI.   DEFENDANTS' SUMMARY JUDGMENT MOTION ON NOVAFUND'S FRAUD
       CLAIMS SHOULD BE DENIED DUE TO NUMEROUS DISPUTED FACTS ...............30

VII.  SUMMARY JUDGMENT SHOULD NOT ENTER
       ON NOVAFUND'S TORTIOUS INTERFERENCE CLAIM.............................................34

VIII. PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED ON
       NOVAFUND'S CONNECTICUT UNFAIR TRADE PRACTICES ACT CLAIM............37

CONCLUSION..................................................................................................................38

## **TABLE OF AUTHORITIES**

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................................3

*Angell v. Santefort Family Holdings LLC*, App. No. 3-18-0724,
    2020 WL3127404 (Ill. App. Ct. June 12, 2020),
    *app. denied*, 159 N.E.3d 939 (Ill. 2020) ...............................................................8

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.),*
    473 B.R. 525 (Bankr. D. Del. 2012) ......................................................................7

*Baltas v. Rivera*, No. 3:19-cv-1043 (MPS), 2020 WL 6199821
    (D. Conn. Oct. 22, 2020)...........................................................................................3

*Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462 (D. Del. 2010)......................7, 10, 11

*Brown v. City of S. Burlington, Vt.,* 393 F.3d 337 (2d Cir. 2004) .................................29

*Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150 (N.C. 1990) ............................27

*Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*,
    791 A.2d 489 (Conn. 2002) ...................................................................................27

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
    491 B.R. 335 (S.D.N.Y. 2013)...............................................................................10

*Carr v. Fleet Bank*, 812 A.2d 14 (Conn. App. Ct. 2002).........................................30, 32

*Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472 (D. Conn. 2017) .........4, 5, 9

*Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 802 S.E.2d 888 (N.C. 2017) ...........26, 27

*Commonwealth Land Title Ins. Co. v. Miller (In re Project Homestead, Inc.),*
    374 B.R. 193 (Bankr. M.D.N.C. 2007)............................................................21, 22

*Conn Strux, Inc. v. Town of E. Granby*, No. CV99-0497551S,
    2002 WL 1007610 (Conn. Super. Ct. Apr. 15, 2002).........................................21

*DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73 (2d Cir. 1992).......................................27

*Dill v. Rembrandt Grp., Inc.*, 474 P.3d 176 (Colo. App. 2020),
    *cert. denied*, No. 20SC460, 2020 WL 6325871 (Colo. Oct. 26, 2020) ...............10

*DiNapoli v. Cooke*, 682 A.2d 603 (Conn. App. Ct. 1996),
    *cert. denied*, 686 A.2d 124 (Conn. 1996),
    *cert. denied*, 520 U.S. 1213 (1997) .................................................................................37

*Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337 (D. Conn. 2013) ...................................28

*Empower Health LLC v. Providence Health Sols. LLC*,
    No. 3:10-cv-1163 (JCH), 2012 WL 13027107 (D. Conn. Sept. 24, 2012)....................34, 36

*Feibus & Co. v. Godley Constr. Co.*, 271 S.E.2d 385 (N.C. 1980) ..............................................29

*Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*,
    689 S.E.2d 143 (N.C. Ct. App. 2009) ...................................................................................12

*Gen. Fid. Ins. Co. v. WFT, Inc.*, 837 S.E.2d 551 (N.C. Ct. App. 2020) ...................................7, 11

*Glenn v. Wagner*, 329 S.E.2d 326 (N.C. 1985) .................................................................. passim

*Greenspan v. LADT, LLC*, 121 Cal. Rptr. 3d 118 (Cal. Ct. App. 2010).....................................8, 9

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268 (Conn. 2000)......................................35

*Horse Tavern Builders, LLC v. Pizzino*, No. FBT-CV15-6049934,
    2016 WL 4708528 (Conn. Super. Ct. Aug. 8, 2016) ....................................................32, 33

*Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*,
    No. 14 CVS 1783, 2018 WL 2728782 (N.C. Super. Ct. June 5, 2018) .............11, 12, 13, 17

*Joseph Gen. Contracting, Inc. v. Cuoto*, 119 A.3d 570 (Conn. 2015)........................................22

*Kilduff v. Adams, Inc.*, 593 A.2d 478 (Conn. 1991) ...................................................................34

*Lawrence v. UMLIC-Five Corp.*, No. 06 CVS 20643,
    2007 WL 2917465 (N.C. Super. Ct. Sept. 14, 2007)....................................................12, 13

*Learning Care Grp., Inc. v. Armetta*, No. 3:13-cv-1540 (VAB),
    2016 WL 3248178 (D. Conn. June 12, 2016)........................................................................33

*Leisure Resort Tech., Inc. v. Trading Cover Assocs.*, 889 A.2d 785 (Conn. 2006).....................34

*Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*,
    84 A.3d 1167 (Conn. 2014) ...................................................................................................26

*May Ctrs., Inc. v. Paris Croissant of Enfield Square, Inc.*,
    599 A.2d 407 (Conn. Super. Ct. 1991) ...........................................................................21, 22

*McKay v. Longman*, 211 A.3d 20 (Conn. 2019) ........................................................9

*Mirlis v. Edgewood Elm Hous., Inc.*, No. 3:19-cv-700 (CSH),
    2020 WL 4369268 (D. Conn. July 30, 2020) ...............................................9

*N. Mill Equip. Fin., LLC v. Cinemacar Leasing, Inc.*, No. A-5027-17T1,
    2020 WL 563486 (N.J. Super. Ct. App. Div. Feb. 5, 2020) .................................8

*N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*,
    481 F. Supp. 3d 216 (S.D.N.Y. 2020).........................................................8

*Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*,
    685 A.2d 724 (Del. Super. Ct. 1996) ......................................................9, 10

*Pfizer Inc. v. Synthon Holding, B.V.*, 386 F. Supp. 2d 666 (M.D.N.C. 2005) ...................6, 7, 11

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F. Supp. 2d 633 (S.D.N.Y. 2006), *aff'd*, 582 F.3d 244 (2d Cir. 2009) ..........................10

*R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, 156 A.3d 539
    (Conn. App. Ct. 2017), *aff'd*, 216 A.3d 629 (Conn. 2019)...................................26

*Schering Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir. 1983) ......................................29

*Schnabel v. Trilegiant Corp.*, No. 3:10-cv-957 (JCH), 2011 WL 797505
    (D. Conn. Feb. 24, 2011) .............................................................30

*Son-Shine Grading, Inc. v. ADC Constr. Co.*, 315 S.E.2d 346 (N.C. Ct. App. 1984),
    *rev. denied*, 321 S.E.2d 900 (N.C. 1984)...............................................21, 22

*S. Shores Realty Servs., Inc. v. Miller*, 796 S.E.2d 340 (N.C. Ct. App. 2017),
    *rev. denied*, 798 S.E.2d 753 (N.C. 2017) ...............................................12

*State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*,
    666 S.E.2d 107 (N.C. 2008)..........................................................7, 11

*State ex rel. Neidig v. Superior Nat'l Ins. Co.*, 173 P.3d 123 (Or. 2007) .........................8

*TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749 (N.Y. 1998) ...........................13

*UCF I Tr. 1 v. Dimenna*, No. 16-cv-00156 (VAB),
    2016 WL 3620716 (D. Conn. June 29, 2016).............................................29

*U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097 (D. Del. 1988), *aff'd sub nom.*
    *Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989),
    *aff'd sub nom. U.S. v. Golden Acres, Inc.*, 879 F.2d 860 (3d Cir. 1989)...............7, 8, 10, 11

*Von Langendorff v. Riordan,* 163 A.2d 100 (Conn. 1960) ............................................................22

*Wagner v. Our Lady of Mount Caritas, O.S.B., Inc.*, 118 A.3d 103
     (Conn. App. Ct. 2015)........................................................................................................34

*Walker v. Doe*, No. 3:17-cv-425 (JCH), 2018 WL 4516672
     (D. Conn. Sept. 20, 2018) ..................................................................................................27

*W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*,
     153 A.3d 574 (Conn. 2016) ..........................................................................................34, 35

**Statutes and Rules**

Fed. R. Civ. P. 56..............................................................................................................................3

Fed. R. Civ. P. 59............................................................................................................................27

D. Conn. L. Civ. R. 56 ..................................................................................................................1, 3

**Miscellaneous**

Commit, Merriam-Webster, https://www.merriam-webster.com/dictionary/commit ..................25

Commitment, Merriam-Webster, https://www.merriam-webster.com/dictionary/commitment ...25

Commitment, Black's Law Dictionary (11th ed. 2019) .................................................................25

Restatement (Second) of Conflict of Laws § 148 (1971) .............................................................30

Plaintiff NovaFund Advisors, LLC ("NovaFund") respectfully submits this opposition to the partial summary judgment motion (ECF 327) filed by Defendants Capitala Investment Advisors, LLC ("CIA"), Capitala Private Advisors, LLC ("CPA"), and Capitala Specialty Lending Corp. ("CSLC") (together, CIA, CPA, and CSLC are "Defendants").[1]

## PRELIMINARY STATEMENT

Despite their representations to this Court in their pre-filing conference request and at the conference (ECF 306, 312, 313), Defendants have moved for summary judgment on a slew of new issues not raised previously and in contravention of the Local Rule's admonition that summary judgment motions are discouraged where responsible counsel should recognize that the motion cannot be granted. Local Rule 56(c). Defendants have failed to meet their "heavy burden" of showing the absence of material disputed facts. Each claim on which they have moved for partial summary judgment is replete with disputed factual issues, many of which have already been recognized by this Court.[2] As a result, their motion should be denied in full.

First, Defendants' summary judgment motion on NovaFund's veil piercing claim is based on the fundamental misconception that NovaFund is somehow seeking a novel form of veil piercing. NovaFund is not. Defendants argue that horizontal veil piercing of multiple entities requires multiple pierces – including the reverse pierce of Joseph B. Alala, III, Capitala's founder and head, to an entity he does not own. Defendants overcomplicate what is in fact a straightforward, single-level veil piercing of a corporate entity to its related affiliates, in a situation where one affiliate acts as a mere shell and instrumentality of the others. North

---

[1]       As used herein, CIA and CPA are "Capitala Group;" CIA, CPA, and CG collectively are "Capitala;" Defendants' brief (ECF 327-1) is "Mem.;" and NovaFund's Local Rule 56 Statement is "R. 56(a)2 Stmt."
[2]       Defendants have not moved for summary judgment on that portion of Count Six in the Second Amended Complaint ("SAC") asserting a violation of the North Carolina Unfair and Deceptive Trade Practices Act.

Carolina law has long permitted such piercing of the corporate veil.  And this Court has already found such allegations to state a viable claim for veil- piercing.  (ECF 339 at 19.)

Defendants also fail to apply the governing instrumentality test for veil piercing, and fail to address all of the requisite factors considered in a veil-piercing analysis.  Defendants' omission precludes the entry of summary judgment, given the myriad factual disputes implicated by a full veil-piercing analysis.  NovaFund has put forward substantial evidence demonstrating that Capitala intentionally misused the corporate form to defraud and injure Novafund.

Summary judgment should also be denied as to NovaFund's breach of contract and bad faith claims.  Defendants' contention that a non-signatory may not be held liable for breach of contract is wrong as a matter of law, particularly where, as here, the corporate veil should be pierced.  There are disputed issues of material fact as to the parties to the Term Sheet, and the parties' subsequent course of conduct and the Addendum both served to modify the Term Sheet to clarify that Capitala as a whole, not simply CG, was responsible for the payment obligations to NovaFund.  Further, Defendants' interpretation of the Success Fee provision is unavailing.  The Term "commits" in the Term Sheet is unambiguous and Success Fees are payable to NovaFund whenever an investor commits to a separately managed account ("SMA").

Further, Defendants cannot prevail in their assertion that NovaFund's claims are barred by the release language in the Addendum.  This Court already ruled that the release is ambiguous, and Defendants have offered nothing more than table pounding to the contrary.

Defendants' remaining assertions similarly fail.  Defendants pawn the superficial argument that a plaintiff may not seek unjust enrichment in the face of a valid contract, seemingly ignoring their own argument just a few pages earlier that they are not bound by any contract with NovaFund.  Defendants seek summary judgment on NovaFund's tortious

interference claims but can only support their argument by ignoring critical facts, documents, and testimony.  Defendants similarly misconstrue NovaFund's fraud claim, arguing that it is dependent on veil piercing, while wholly ignoring the demonstrated misrepresentations and omissions by Defendants themselves.  Finally, summary judgment should be denied as to NovaFund's claim under Connecticut's Unfair Trade Practices Act.  In support of their motion, Defendants offer little more than recycled arguments previously rejected by this Court – including that the claim is merely one for breach of contract, and there was no demonstrable deception on Defendants' part.

In sum, Defendants have wholly failed to clear the high hurdle of demonstrating the lack of genuine issues of material fact.  Accordingly, the Motion should be denied.

## ARGUMENT

## I.      LEGAL STANDARD

A summary judgment motion must be denied if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," show there are genuine issues of material fact. Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Baltas v. Rivera*, No. 3:19-cv-1043 (MPS), 2020 WL 6199821, at *1 (D. Conn. Oct. 22, 2020) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Defendants bear "a heavy burden." Local Rule 56(c).  When deciding a summary judgment motion, a court must assume that a "trier of fact would resolve all factual disputes in favor of the party opposing summary judgment." *Id.*

## II.     DEFENDANTS' MOTION SHOULD BE DENIED ON VEIL PIERCING

### A.      Defendants' Argument that Multiple Veils Must Be Pierced Is Specious

In its Ruling on Defendants' Motion to Dismiss, this Court held that Plaintiff alleged

facts sufficient to support the piercing CG's corporate veil, under the instrumentality test well-established under North Carolina law.  (*See* ECF 339 at 23, 25.)  As this Court recognized, Plaintiff's veil piercing claim is straightforward and compelling:  "NovaFund's allegations are sufficient to allege that CGLLC was completely dominated and that the control was used to deny NovaFund a remedy for its losses."  (*Id.* at 25; *see id.* at 20 ("NovaFund has alleged that CGLLC was used solely as an instrument by Moving Defendants to perpetrate their escape from liability and had no other purpose.").)

The underlying facts are clear-cut.  In 2016, CPA and CIA, which do business as "Capitala Group" (R. 56(a)2 Stmt. ¶¶ 15, 34, 55, 114) hired NovaFund as their exclusive placement agent to help Capitala raise capital for a private credit fund, Capitala Private Credit Fund V, L.P. ("Fund V") and separately managed accounts.  (*Id.* ¶¶ 130, 132.)  Operating in bad faith, Capitala Group used a shell company, CG, to sign the contract with NovaFund.  (*Id.* ¶¶ 59, 99, 127.)  CG is a sham entity, with no assets, no income, no operations, and no structure.  (*Id.* ¶¶ 55, 101.)  It was intentionally undercapitalized to have insufficient assets to meet a judgment.  (*Id.* ¶¶ 101- 107.)  Capitala ignored corporate formalities among its related entities.  (*Id.* ¶¶ 111-123.)  CG itself was a shell company that was disregarded within the organizational structure of Capitala, and that operated under the dominion and control of, and at the direction of, CIA, CPA, and CSLC.  (*Id.* ¶¶ 96-100, 108-110.)  In short, Defendants operated CG as their mere instrumentality, so dominated and controlled CG that it lacked a separate existence, and used that control to defraud and injure NovaFund.

The only veil NovaFund seeks to pierce is that of CG, which is a North Carolina LLC. (*Id.* ¶ 2.)  North Carolina law thus applies to this claim, as the law of the state of incorporation of the controlled corporation. *See Chapco, Inc. v. Woodway USA, Inc*., 282 F. Supp. 3d 472, 481

(D. Conn. 2017).  This Court has recognized the application of North Carolina law, and Defendants do not dispute that North Carolina law applies to pierce CG's veil.  (*See* ECF 339 at 22-23; Mem. at 14.)  And North Carolina law applies an instrumentality test that asks whether the corporate entity was so controlled or dominated by the defendant that it had "no separate mind, will, or existence of its own;" whether such control was used by the defendant to commit a fraud or wrong; and whether such control and breach of duty proximately caused the plaintiff's injury.  *See Glenn v. Wagner*, 329 S.E.2d 326, 330 (N.C. 1985).  As this Court has already determined, the facts Novafund has alleged (which, as set out below, are supported by the evidence in the record), satisfy each prong of the instrumentality test.  (ECF 339 at 25.)

It makes no difference that Defendants are horizontally affiliated with CG.  The instrumentality test applies regardless.  Contrary to Defendants' assertions, the law is clear that NovaFund may laterally pierce CG's corporate veil to reach CIA, CPA, and CSLC.  *See Glenn*, 329 S.E.2d at 330 (horizontally piercing the corporate veil to reach affiliated corporate entity, recognizing that veil-piercing "extend[s] liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity," and placing "the burden of loss upon the party who should be responsible").

### 1.     Lateral Veil Piercing of Related Corporate Entities Is Permitted

Defendants misstate the law in arguing that piercing the corporate veil is limited to cases involving a single parent company and its subsidiary or a single corporation and its controlling shareholder.  As the North Carolina Supreme Court held over 35 years ago in *Glenn*, "although the instrumentality rule has, until now, been tailored to deal with 'domination and control' as evidenced in a parent-subsidiary or sole dominant shareholder situation, the rule is not limited to factual situations or resulting legal analysis afforded by those cases."  329 S.E.2d at 332.

Instead, as the court in *Glenn* emphasized, "[i]t should be remembered that the theory of liability under the instrumentality rule is an equitable doctrine.  Its purpose is to place the burden of the loss upon the party who should be responsible.  Focus is upon reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation."  *Id*.  Thus, any "'corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled.  In such instances, the separate identities of parent and subsidiary **or affiliated corporations** may be disregarded.'"  *Id.* at 330 (citation omitted) (emphasis added); *see id*. at 331 ("It is sufficient where, as here, one affiliated corporation is dominated by another to the extent that the dominated corporation has no separate mind, will or **identity** of its own.") (emphasis in original).  In *Glenn*, the North Carolina Supreme Court engaged in precisely the form of lateral or horizontal veil piercing that Defendants here challenge.  *Id*. (holding that the defendant, D & S, was operated as a "mere shell" and instrumentality of its corporate affiliate, B-Bom, and B-Bom could be liable for its affiliate's wrongful actions).

Similarly, in *Pfizer Inc. v. Synthon Holding, B.V.*, 386 F. Supp. 2d 666 (M.D.N.C. 2005), the district court, applying North Carolina law, held that the "finances, policies and business practices of Synthon Labs were completely dominated and controlled" by its two affiliated, sibling corporations, Synthon Holding and Synthon Pharma.  *Id.* at 678.  The district court found that Synthon Labs operated as a mere shell, and "was created solely to file the ANDA [Abbreviated New Drug Application] for Synthon Pharma and Synthon Holding in an effort to manipulate jurisdiction regarding the ANDA."  Horizontally piercing the corporate veil, the court concluded that "Synthon Labs was the alter ego of Synthon Pharma and Synthon Holding."  *Id.*

at 679.  As in *Pfizer*, NovaFund is seeking to horizontally pierce CG's veil, as it is the alter ego of CG's affiliates, the Defendants herein.

Contrary to Defendants' baseless assertions, horizontal veil piercing is well-established under North Carolina law, regardless of whether a label is applied.  *Glenn*, 329 S.E.2d at 331; *Pfizer*, 386 F. Supp. 2d at 679; *Gen. Fid. Ins. Co. v. WFT, Inc.*, 837 S.E.2d 551, 554-55 (N.C. Ct. App. 2020) (applying *Glenn*; affirming trial court order holding defendants jointly and severally liable based on piercing corporate veil); *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 113 (N.C. 2008) ("[W]hen a corporation operates as a 'mere shell, created to perform a function for an affiliated corporation,' liability can extend beyond the shell corporation.") (quoting *Glenn*, 329 S.E.2d at 331).

North Carolina is not alone in applying veil piercing to circumstances, as here, where one corporate entity serves as a mere shell and instrumentality for its controlling corporate affiliate. Delaware and numerous other jurisdictions have likewise pierced the corporate veil across corporate enterprises.  In Delaware, for example, a plaintiff may pierce the corporate veil where the plaintiff demonstrates "(1) that the companies operated as a single economic unit; and (2) the presence of an overall element of injustice or unfairness." *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 555 (Bankr. D. Del. 2012).  Applying the "single entity" test, Delaware courts have found that a plaintiff may pierce the corporate veil of a corporation to reach multiple interconnected corporate affiliates that exercised significant control over the corporation's operations, finances, and decision-making.  *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 465, 472-73 (D. Del. 2010) (denying summary judgment and permitting veil piercing claims against multiple defendant corporations formed by a series of "spin offs" or "carve outs" of Siemens AG to proceed to trial); *see also U.S. v. Golden Acres,*

*Inc.*, 702 F. Supp. 1097, 1112 n.7 (D. Del. 1988) ("Defendants argue that it is necessary for us to pierce the corporate veils of both J.L. Capano, Inc. and Golden Acres, Inc. to hold Mario and Joseph Capano personally liable for the debts of Golden Acres. This argument is incorrect as a matter of law. The alter ego doctrine may be applied even where defendants personally own no stock in the corporation, so long as the necessary action and total control have been established."), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989), *aff'd sub nom. U.S. v. Golden Acres, Inc.*, 879 F.2d 860 (3d Cir. 1989); *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 229-32 (S.D.N.Y. 2020) (holding that plaintiff sufficiently pleaded a claim for veil piercing under Delaware law where the related entities acted as a single economic unit).

Numerous other states have clarified that lateral veil piercing of related corporate entities is wholly consistent with the equitable foundation of the doctrine. *See, e.g.*, *N. Mill Equip. Fin., LLC v. Cinemacar Leasing, Inc.*, No. A-5027-17T1, 2020 WL 563486, at *4 (N.J. Super. Ct. App. Div. Feb. 5, 2020) (permitting lateral veil piercing of several closely held corporations where there was a "pervasive commingling of corporate assets and identities"); *Angell v. Santefort Family Holdings LLC*, App. No. 3-18-0724, 2020 WL3127404, at *3 (Ill. App. Ct. June 12, 2020) (permitting veil piercing between two affiliated LLCs), *app. denied*, 159 N.E.3d 939 (Ill. 2020); *State ex rel. Neidig v. Superior Nat'l Ins. Co.*, 173 P.3d 123, 137 (Or. 2007) (recognizing that veil piercing also may apply to claims against affiliated corporations, and holding that veil should be pierced where the defendant corporate affiliates were "operationally a single company for all practical purposes"); *Greenspan v. LADT, LLC*, 121 Cal. Rptr. 3d 118, 138-39 (Cal. Ct. App. 2010) ("[U]nder the single-enterprise rule, liability can be found between sister companies," so that "though there are two or more personalities, there is but one enterprise;

8

and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it.").

### 2. NovaFund Does Not Seek to – and Is Not Required to – Pierce Multiple Corporate Layers

Defendants ignore the controlling North Carolina precedent on horizontal veil piercing, and instead seek to tear down a strawman. Defendants argue that NovaFund cannot pierce multiple corporate veils, which they describe as involving an initial pierce of CG to Mr. Alala, and additional reverse veil piercings of Mr. Alala to Defendants. But NovaFund does not seek to, and is not required to, pierce those multiple corporate layers. Under *Glenn*, plaintiffs are entitled to horizontally pierce the single layer corporate veil where, as here, CG operated as a mere shell and instrumentality of each of the Defendant entities. 329 S.E.2d at 332.

The cases on which Defendants rely are neither controlling nor relevant to NovaFund's claims. *Mirlis v. Edgewood Elm Hous., Inc*., No. 3:19-cv-700 (CSH), 2020 WL 4369268, at *9 (D. Conn. July 30, 2020), does not, as Defendants contend, stand for the proposition that horizontal veil piercing is not allowed. (Mem. at 10.) It merely finds that the plaintiff in that case was not in fact seeking to laterally pierce related corporate entities, but instead was seeking a classic "reverse" pierce from the individual corporate insider (against whom he had obtained a judgment) to the corporation that individual controlled.[3] *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc*., 685 A.2d 724, 729 (Del. Super. Ct. 1996), is also not applicable. (Mem. at 14.) Apart from not addressing governing North Carolina law, the plaintiff in *Outokumpu*, unlike here, did not allege that the defendants were "involved in an elaborate shell game or are otherwise abusing the corporate form to effect a fraud." *Id.* at 729. The core factual

---

[3] And in any event, *Mirlis* is not controlling. *See Chapco*, 282 F. Supp. 3d at 481 (applying law of state of incorporation of controlled corporation in deciding a veil piercing claim). Numerous Connecticut cases, moreover, apply the instrumentality test without restriction. *See, e.g.*, *McKay v. Longman*, 211 A.3d 20, 52 (Conn. 2019).

foundation supporting piercing the corporate veil of corporations acting as a single economic unit was thus missing.  Other Delaware cases have made clear that a single, direct piercing of the corporate veil is permitted to reach corporate affiliates acting as a single economic entity.  *See, e.g., Blair*, 720 F. Supp. 2d at 472-73; *Golden Acres, Inc*., 702 F. Supp. at 1112 n.7; *see also supra* at 7-8.  Likewise, the Iowa, Colorado, and New York cases Defendants cite[4] have no bearing here, where the governing law plainly permits horizontal veil piercing.

Nor is there any requirement that Defendants share the same parent.  While shared ownership is certainly a common way in which companies may be affiliated, it is not a requirement to pierce the corporate veil.  Under North Carolina law, there is no requirement to first pierce through a layer of shared ownership in order to reach the corporate affiliates.  Instead, "courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity."  *Glenn*, 329 S.E.2d at 330.  It is the "reality, not form," that matters in determining whether "the operation of the corporation, and [] the defendant's relationship to that operation," merits piercing the corporate veil.  *Id.* at 332.  *Glenn* and its progeny did not engage in multiple levels of veil piercing in order to find the corporate affiliates

---

[4]    *See* Mem. at 11-12 (citing cases).  North Carolina has not adopted the approach of the Colorado court in *Dill v. Rembrandt Grp., Inc.*, 474 P.3d 176, 184-85 (Colo. App. 2020) (nor has Delaware or numerous other jurisdictions), and unlike *Dill*, the law of these states does not require that the veils separating each entity from the common owners be first pierced as part of a multi-step process.  *See supra* at 6-8.  Likewise, the Dutch and English law applied by the court in *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 453 F. Supp. 2d 633, 686-89 (S.D.N.Y. 2006), *aff'd*, 582 F.3d 244 (2d Cir. 2009), are far afield from the governing law of this case.  And in any event, *Presbyterian Church* did not require a multi-step veil piercing, it simply found that, under Dutch law, the plaintiffs had failed to present evidence that would support a single step veil piercing because they had failed to show any abuse of the corporate form.  *Id.* at 686-87.  *Capmark Financial Group Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013), also does not govern here.  Apart from the fact that *Capmark* did not purport to address North Carolina law, the plaintiffs in *Capmark* were seeking to avoid preferential transfers in bankruptcy, and did not allege veil piercing or alter ego theories in their complaint.  *Id.* at 346.

liable for the wrongdoing of their corporate relative.  These cases instead apply a single instrumentality test, looking past the form to the reality of the corporate operations.[5]

> Under the instrumentality rule, a plaintiff must show:
>
> "(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

*Id.* at 330.  To determine if these elements are met, courts consider: (1) inadequate, or "thin" capitalization; (2) non-compliance with corporate formalities; (3) complete domination and control of the corporation so that it has no independent identity; and (4) excessive fragmentation of a single enterprise into separate corporations.  *Id.* at 330-31.[6]  Defendants, in their motion, fail to grapple with **any** of these factors, which is grounds alone for denying their motion.

Finally, Defendants' assertion that "[l]iability must be assessed with regard to each entity individually when conducting veil piercing" (Mem. at 14), is both unremarkable and uncontested.  Defendants do not dispute that they must demonstrate that CG acted as a mere shell and instrumentality of each of CIA, CPA, and CSLC.  And as this Court found in its Ruling on Defendants' Motion to Dismiss, "grouping the entities together at times is reasonable, because those entities allegedly operated together as alter egos of CGLLC."  (ECF 339 at 33.)

---

[5]        *See, e.g., Pfizer*, 386 F. Supp. 2d at 677-79; *Gen. Fid. Ins.*, 837 S.E.2d at 554-55; *Ridgeway Brands*, 666 S.E.2d at 113; *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, No. 14 CVS 1783, 2018 WL 2728782, at *12-13 (N.C. Super. Ct. June 5, 2018).

[6]        Delaware's single entity test is similar, and like North Carolina, there is no requirement of shared ownership.  *See Blair*, 720 F. Supp. 2d at 472-73; *Golden Acres*, 702 F. Supp. at 1112 n.7.

**B.    Defendants' Failure to Conduct a Veil Piercing
Analysis Precludes the Entry of Summary Judgment**

Defendants' failure to apply the instrumentality test or address all of the required factors
in a veil piercing analysis precludes the entry of summary judgment.  Defendants focus solely on
the element of fraud and, as to that factor, ignore all of the evidence that Capitala intentionally
misused the corporate form to defraud and injure NovaFund.  Instead, Defendants contend, in
essence, that Novafund cannot claim fraud because it voluntarily contracted with CG.  (*See*
Mem. at 17.)  Defendants are wrong on the law and the facts.

North Carolina courts have repeatedly rejected similar arguments as a matter of law.  In
*Fischer Investment Capital, Inc. v. Catawba Development Corp*., 689 S.E.2d 143, 150 (N.C. Ct.
App. 2009), the North Carolina Court of Appeals made clear that a claimant is not precluded
from piercing the corporate veil to recover from a party with which the claimant has not
contracted.  In fact, piercing the corporate veil is routinely allowed in breach of contract cases
where the controlled entity is the contractual party.  *See S. Shores Realty Servs., Inc. v. Miller*,
796 S.E.2d 340, 354 (N.C. Ct. App. 2017) (affirming denial of motions for directed verdict and
JNOV where evidence supported that the defendant "exercised complete control" over the
contracting parties); *Insight Health*, 2018 WL 2728782, at \*13 (rejecting the defendants'
argument that the plaintiff should be denied veil-piercing relief because it chose to contract only
with MDI–NC, the controlled entity).  Indeed, in *Insight Health*, the court emphasized that "[t]he
conduct of the party seeking to pierce the corporate veil is typically not relevant to the analysis.
Instead, courts focus on the actions of the corporate entity and the extent to which others
exercised control over it." *Id.* at \*16 (quoting *Lawrence v. UMLIC-Five Corp*., No. 06 CVS

20643, 2007 WL 2917465, at *7 (N.C. Super. Ct. Sept. 14, 2007)).[7]

That Defendants focus on this one argument, ignoring the other veil piercing factors, is not surprising.  As set forth below, the factors that must be considered when undertaking the veil piercing analysis mandate denial of summary judgment.

### 1.    CG Was Intentionally Undercapitalized

CG was intentionally undercapitalized.  (R. 56(a)2 Stmt. ¶¶ 101-107.)  Its commercial intent was to be a signatory for "nuisance" agreements.  (*Id.* ¶¶ 59, 99, 127.)  If the proverbial "sugar hit the fan," then CG, as the entity "on the hook for that judgment or liability would not be capitalized."  (*Id.* ¶¶ 106, 128.)  Mr. Alala is open in disclosing that CG has no assets.  (*Id.* ¶ 107.)  For example, he texted Richard Wheelahan, Capitala's former Chief Compliance Officer, and general counsel of CIA and CPA, that "We are allowing a default judgement against that LLC [meaning CG] as that LLC has no assets."  (*Id.*)  Mr. Wheelahan, who left in 2019, has described CG as a "NINJA" meaning "no income, no job, no assets" (*id.* ¶ 101), and as a "relatively meaningless entity" because it has "[n]o assets, no operations, no real structure."  (*Id.*)

CG also had no income (*id.* ¶¶ 101, 102) and no independent source of revenue.  (*Id.* ¶¶ 103-105.)  CG did not receive any of the fees that Capitala has earned or will earn in connection with Fund V or the separately managed accounts established between affiliates of StepStone Group LP ("StepStone") and Capitala ("StepStone SMAs").  For example, CPA earns a management fee on deployed capital in Fund V, not CG.  (*Id.* ¶¶ 103, 104.)  CIA also received fees in connection with Fund V.  (*Id.* ¶ 103.)  Fund V's general partner, Capitala PCF-V, LLC, earns an incentive fee (or carried interest), not CG.  (*Id.*)  For the StepStone SMAs, either CPA

---

[7]     Defendants' reliance on *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751-52 (N.Y. 1998), is misguided.  The veil piercing claims there failed because the plaintiff did not offer sufficient evidentiary support for them, not because they were not cognizable under New York law (which in any event has no bearing on this case).

or CSLC receives management fees and closing fees, not CG.  (*Id.* ¶ 104.)  CG did not have an independent revenue source, other than transfers from other Capitala entities, and had no capital to pay for its obligations, including the monthly retainer payments due to NovaFund.  (*Id.* ¶ 105.)

### 2.    Capitala Ignored Corporate Formalities

Capitala ignored corporate formalities.  For example, Capitala entities are referred to as "Capitala Group" or "Capitala."  (*Id.* ¶ 114.)  For marketing purposes, CIA and CPA do business as "Capitala Group."  (*Id.*)  In press releases, "Capitala Group" is defined as including CIA "together with its affiliates."  (*Id.*)  In SEC filings, "Capitala Group" means both CIA and CPA: "CPA is a wholly-owned subsidiary of CIA, an SEC registered investment adviser (collectively with CPA, 'Capitala Group')."  (*Id.* ¶ 116.)  The SEC website lists "Capitala Group" as one of CPA's "alternate names."  (*Id.*)  CPA's latest Form ADV states the "Other Business Name" for CPA is "Capitala Group."  (*Id.*)  Elsewhere, Capitala defined "Capitala Group" as CPA, together with its affiliates and related entities.  (*Id.* ¶ 55.)  And, the PPM defines "Capitala" as including CPA and all of "its affiliates and related entities."  (*Id.* ¶¶ 36, 37; *see id.* ¶ 10 (citing Ex. 40.) Even one of the anchor investors, Hamilton Lane, could not identify the general partner for Fund V and testified that the distinction between the various Capitala entities "would not have mattered" for purposes of the investment committee process.  (*Id.* ¶ 117.)  Hamilton Lane also generally considered Capitala to be one entity.  (*Id.*)

Overall, the term "Capitala Group" refers to various Capitala-related entities, but does not always include CG.  (*Id.* ¶ 98.)  Notably, Capitala did not mention CG at all when responding to StepStone's question about the ownership structure of Fund V, its general partner, and the relevant parent organization.  (*Id.* ¶ 97.)  CG is also omitted from the historical overview of the firm and the organizational structure of the management company's ownership.  (*Id.*)  The fact

14

that CG is missing from flow charts showing the various Capitala entities and their respective places in Capitala's corporate structure reflects that it was a disregarded entity (*id*. ¶¶ 96-100), which is consistent with CG not being considered the parent company of any other Capitala entity. (*Id*. ¶ 96.) Also, when marketing all of its entities under the "Capitala Group" moniker, Capitala blends the assets and performance of each related affiliate to provide an aggregate overview. (*Id*. ¶ 118.) For example, Capitala's press releases frequently state that "Capitala Group manages $2.7 billion of capital among permanent capital vehicles, closed-end funds, and discretionary managed accounts," where the amount of capital being managed is computed by adding capital across Capitala's platform. (*Id*.)

Capitala's failure to observe corporate formalities is also evident in how it handles its employees and executives. (*Id*. ¶¶ 119-121.) Defendants all share the same employees, and none of them have employees of their own. (*Id*. ¶ 119.) Capitala used one entity – Capitala Advisors Corp. – to employ all of the individuals who provide services for the various Capitala entities. (*Id*.) Capitala's entities also share the same executives. (*Id*. ¶¶ 119-120.) For example, Mr. Alala is Chairman and CEO of "Capitala Group," CG, CPA, CIA, and CSLC. (*Id*. ¶ 119.) Mr. Alala has admitted that he is the President, CEO, Chairman and/or manager of Capitala Advisors Corp., Capitala Finance Corp., and their affiliated entities, which he collectively defined as "Capitala." (*Id*.) Defendants – and all other Capitala entities – use the same website (https://www.capitalagroup.com/) and employees used the same email address regardless of the Capitala entity for which they were conducting business. (*Id*. ¶ 121.)

Capitala's approach to record keeping also evidences its failure to observe the corporate form. CG did not have its own corporate records or compliance manual, whereas CPA and CIA share a compliance manual and investment allocation policy. (*Id*. ¶ 113.) Capitala's handling of

15

the monthly retainer payments and expense reimbursements under the Term Sheet with NovaFund also demonstrates its disregard of the corporate form.  Although CG signed the Term Sheet, and NovaFund sent invoices to CG for retainer payments, payments were made by CPA.  (*Id.* ¶¶ 55, 61.)  Similarly, NovaFund issued invoices to CG for reimbursement of expenses, but they were repaid to NovaFund's broker-dealer by CPA.  (*Id.* ¶ 61.)

Further, various Capitala entities also transferred funds to one another.  (*Id.* ¶ 123.)  Stephen Arnall, Capitala's Chief Financial Officer, testified that the various Capitala entities transfer money, for example, to fund payroll.  (*Id.*)  He also testified that funds are transferred between and among the various entities within the firm in connection with the payment of management fees charged by one Capitala entity to another.  (*Id.*)

Capitala also disregarded the corporate form in its drafting and execution of the Addendum.  (*Id.* ¶ 122.)  Capitala did not specify which Capitala entity was party to the Addendum, instead generically referring to "Capitala Group" in the document title, which at the time was the marketing moniker for CPA and CIA.  (*Id.*)  Capitala was "purposefully not specific" in its use of the term "Capitala" throughout the Addendum, and left the language broad enough so that it could include other Capitala entities, including CPA and CIA.  (*Id.*)

### 3.    Other Capitala Entities Completely Dominated and Controlled CG

CG was completely dominated and controlled by other Capitala entities.  (*Id.* ¶¶ 108-110.)  Mr. Wheelahan testified that CG was under the dominion and control of CIA and CPA (among other Capitala entities), and operated as part of a single corporate enterprise with many other Capitala entities including CIA, CPA, and CSLC.  (*Id.* ¶ 108.)  All Capitala entities shared the same office space with one entity on the lease and had the same employees and executives.  (*Id.* ¶¶ 109, 112, 119.)  CG did not have its own corporate records, and was controlled by the

same officers as other Capitala entities.  (*Id.* ¶¶ 109, 113.)  As the top of the Capitala enterprise, Mr. Alala controls it all.  (*Id.* ¶ 111 ("The feeling is that the firm exists as Joe's alter ego. It's all his."); *id.* ("There are no institutions, there were no real – institutions or entities at issue, Joe was the state.").)  CG had no source of revenue aside from a single transfer from another Capitala entity, and other Capitala entities paid its expenses.  (*Id.* ¶¶ 61, 102.)  CG was a shell company that was run by other Capitala affiliates, including but not limited to CPA, CIA, and CSLC.  It was solely supported by those entities and operated at their direction.  (*Id.* ¶¶ 59, 99, 110, 127.)

### 4.      The Capitala Enterprise Is Excessively Fragmented

The Capitala enterprise is excessively – and intentionally – fragmented.  (*Id.* ¶¶ 124-126.) The term "excessive fragmentation," refers to division which does not serve a substantial legitimate business purpose.  *Insight Health*, 2018 WL 2728782, at *5.  Here, Mr. Wheelahan was unable to articulate any distinct purpose for CG, except to be the signatory for nuisance contracts.  (R. 56(a)2 Stmt. ¶¶ 55, 101 (explaining that CG is a "relatively meaningless entity" with "[n]o assets, no operations, no real structure"); *id.* ¶¶ 55, 59, 99, 127 (describing CG as a "do nothing entity").)  Yet it was CPA who paid the fees to NovaFund that were supposed to be paid by CG.  (*Id.* ¶ 61.)  CG simply had no legitimate business purpose.  (*Id.* ¶¶ 96-100.)

This fragmentation pervaded Capitala's entire organizational structure.  Even Mr. Alala testified that he had no idea how many different Capitala entities were within the Capitala enterprise, but it was somewhere between 15 and 150.  (*Id.* ¶ 124.)  When asked what entities he was referring to when using the term "Capitala," he responded "Oh, my God, there's so many of them."  (*Id.*)  But each entity did not have a defined role.  CapitalSouth Corp. was the signatory to the lease for the Capitala offices.  (*Id.* ¶ 112.)  All employees were employed by Capitala Advisors Corp, regardless of their role.  (*Id.* ¶ 119.)  CSLC had no discernable purpose other

than to be the marketing front for the StepStone SMAs; and it was paid fees even though other Capitala entities performed services for the SMAs.  (*Id.* ¶¶ 12, 125.)  CG was a "relatively meaningless entity."  (*Id*. ¶¶ 101, 134.)  Even Mr. Arnall, the corporate representative for CPA and CIA on the topic concerning Capitala's corporate structure and observation or lack of observation of corporate formalities, among other things, testified that he was not aware of the business purpose for CG, Atlas Capitala Investment, LLC, and Capitala Trust.  (*Id*. ¶ 126.)  He was neither aware of nor knew the role within the firm of Capitala Investment Group, LLC, Capitala Global Holdings, LLC, Capitala Private Investments, LLC.  (*Id*.)

Capitala's multitude of various entities, each without a discernable role with the greater corporate structure, is exactly the type of excessive fragmentation that supports the conclusion that veil piercing is proper.

### 5.    Capitala Abused the Corporate Form

Capitala capitalized on the ambiguity in corporate identity, and intentionally misused the corporate form to defraud and injure NovaFund.  CG was designed to be a "shell," a "do nothing entity," for which its only business purpose was be the signatory for "nuisance" contracts.  (*Id.* ¶ 127.)  CG was purposefully penniless so that "if the sugar hit the fan," and there was ultimately a liability, CG would not be capitalized and the Capitala enterprise would not have to pay.  (*Id.* ¶¶ 106, 127, 128.)  Capitala has ensured that CG is an entity with no assets, and is allowing a default judgment to enter against it, so that "Nova receives what they deserve."  (*Id.* ¶ 129.)

It is beyond dispute that NovaFund has been damaged as a result of Capitala's corporate ruse.  In sum, Capitala's manipulative and controlling orchestration of various corporate entities defrauded NovaFund into entering into a vague contract, under which NovaFund directed the performance of its obligations to various Capitala entities and was paid by entities other than the

contractual signatory.  When NovaFund sought to enforce through litigation its entitlement to payment for its services, CG vanished – exactly as it was created to do.  (*Id.* ¶¶ 107, 129.)

NovaFund, after successfully raising hundreds of millions of dollars for Capitala, has been sent home empty-handed – not by bad luck, but by the nefarious, intentional, manipulative scheme of Capitala.  Under such circumstances, it would defeat justice to allow CIA, CPA, and CSLC to escape unscathed while CG simply folds its hands and walks away.  Defendants' failure to address any of these facts precludes the entry of summary judgment.

## III.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO NOVAFUND'S BREACH OF CONTRACT AND BAD FAITH CLAIMS

In the Motion, Defendants seek summary judgment because two of the many terms in only one of the parties' agreements are unambiguous.  Defendants' arguments are unavailing.[8]

### A.    There Are Disputed Issues of Material Fact as to the Contracting Parties

In the Motion, Defendants argue that the Term Sheet unambiguously identifies CG as the counterparty, and contend that a non-signatory may not be held liable for breach of contract. (Mem. at 21.)  Defendants are incorrect as a matter of law and fact.  As an initial matter, as set out above, veil piercing is routinely permitted to find liability in contract cases, when the controlled party is the signatory to the contract.  *See supra* at 3-11.  But separate and apart from veil piercing, Defendants should be held liable under the contract.  There are disputed issues of material fact about the parties' intent.  And even if it were clear that CG was intended to be the counterparty at the time of the Term Sheet's execution, the parties' subsequent course of conduct and the Addendum both served to modify the Term Sheet.

---

[8]    Over two years ago, this Court held that it was premature to determine which state's law applied to NovaFund's claims.  (ECF 45 at 29.)  NovaFund submits that its breach of contract and bad faith claims are governed by Connecticut law, but submits that, even under North Carolina law, Defendants have failed to establish entitlement to judgment as a matter of law.

Significantly, Capitala cannot claim there are undisputed material facts by ignoring that the only facts establish it was Capitala, not NovaFund, that selected CG as the counterparty. Bryan Kelley, who negotiated the Term Sheet on NovaFund's behalf, called Mr. Wheelahan to ask which Capitala entity should sign the Term Sheet.  (R. 56(2) Stmt. ¶¶ 34, 55, 57.)  Mr. Wheelahan, **on Capitala's behalf** instructed Mr. Kelly to list CG as the counterparty (*id.*), and withheld information from NovaFund about CG's true, do nothing purpose.  (*Id.* ¶ 34.)  Capitala, therefore, has no basis for its assertion that "Mr. Kelley captured the intent of NovaFund to specifically identify [CG] as the party to the Term Sheet."[9]  (Mem. at 23.)  Moreover, given that Capitala selected and identified the counterparty, not NovaFund, the doctrine of *contra preferentum* does not apply.[10]

That Novafund did not know which Capitala entity to use in the Term Sheet is not surprising.  (R. 56(a)2 Stmt. ¶ 34.)  CIA and CPA, for example, do business as "Capitala Group." (*Id*. ¶ 114.)  They are known as Capitala Group for marketing purposes, define themselves as "Capital Group" for SEC filings, and use the names CPA and Capitala Group interchangeably. (*Id.* ¶¶ 36, 55, 114-116.)  When NovaFund was first provided information regarding the fundraise, Defendants had identified CIA as the fund's organizer, then labeled Fund I.  (*Id.* ¶ 23.) Capitala PCF I, LLC was identified as the general partner.  (*Id*. ¶ 25.)  Thereafter, NovaFund was provided updated information regarding the fund – this time, labeled Fund V, for which CPA was identified as the organizer (*id*. ¶¶ 28-32), and Capitala PCF V, LLC was identified as the

---

[9]       NovaFund disputes that it was NovaFund's intent to identify CG as the counterparty.  (R. 56(a)2 Stmt. ¶ 58.)  NovaFund would not have entered into the Term Sheet or Addendum had it known about CG's true nature – a shell entity with no assets or separate identity of its own, controlled by Defendants to be used as a shield against any lawsuit by NovaFund.  (*Id.* ¶ 72.)
[10]      Capitala also has no factual citations for its argument that NovaFund and Capitala were of relatively equal bargaining power.  At the time, Capitala touted itself as a multi-billion dollar asset management firm.  (R. 56(a)2 Stmt. ¶ 118.)  In contrast, NovaFund had seven employees.  (*Id.* ¶ 133.)  Moreover, during the negotiations of the Term Sheet, Capitala was represented by legal counsel but NovaFund was not.  (*Id.* ¶ 33.)

general partner.  (*Id.* ¶ 31.)  Capitala also regularly used "Capitala Group" to refer to CIA and

CPA (*id.* ¶ 55 (in SEC filing defining "Capitala Group" as CPA and CIA)); or to CIA and its

affiliates; or to CPA and its affiliates.  (*Id.*)  NovaFund understood it was being retained as

placement agent by "Capitala," "Capitala Group," or other Capitala entities.  (*Id.*)[11]

Regardless of the parties' intent at the time the Term Sheet was executed, the parties'

subsequent course of conduct modified the Term Sheet to clarify that Capitala as a whole, not

simply CG, was in fact the proper counterparty, responsible for its payment obligations to

NovaFund.  Under both Connecticut and North Carolina law, "[a] course of conduct may not

only indicate the intent of the parties for the purpose of interpreting ambiguous language in a

contract; but also evince a subsequent modification of a contract or an abrogation of specific

contract terms."  *May Ctrs., Inc. v. Paris Croissant of Enfield Square, Inc*., 599 A.2d 407, 409

(Conn. Super. Ct. 1991) (internal citation omitted); *see Conn Strux, Inc. v. Town of E. Granby*,

No. CV99-0497551S, 2002 WL 1007610, at *1 (Conn. Super. Ct. Apr. 15, 2002) (same); *Son-

Shine Grading, Inc. v. ADC Constr. Co*., 315 S.E.2d 346, 349 (N.C. Ct. App. 1984) ("It is well

established under our law that: The provisions of a written contract may be modified or waived

by a subsequent parol agreement, or by conduct which naturally and justly leads the other party

to believe the provisions of the contract have been modified or waived, even though the

instrument involved provides that only written modifications shall be binding."); *Commonwealth

Land Title Ins. Co. v. Miller (In re Project Homestead, Inc.)*, 374 B.R. 193, 200-01 (Bankr.

M.D.N.C. 2007) ("It is well established that parties to a contract may, by their

---

[11]     Further, NovaFund anticipated entering into a longer engagement letter thereafter.  (R. 56(a)2 Stmt. ¶ 59.)
Likewise, Capitala knew that the Term Sheet was "intended to precede an engagement letter."  (*Id.*)  Mr. Howe
recalls regularly asking Mr. Alala about preparing an engagement letter and being brushed aside.  (*Id.*)  Internally,
Capitala discussed not following with a more formal engagement letter to keep it from becoming "more like a
contract," but Mr. Wheelahan advised this argument was unlikely to succeed.  (*Id.*)

conduct, modify their agreement or waive conditions contained in the contract."); *Von Langendorff v. Riordan,* 163 A.2d 100, 102 (Conn. 1960) (holding that provisions in written contract may be waived by parties' conduct). Thus, in *May Centers*, for example, the court held that the parties' course of conduct indicated their mutual consent to change the due date for the payment of rent in their agreement. 599 A.2d at 409. And in *Son-Shine*, contract terms were found to be modified by a mutual oral agreement, as evidenced by the parties' course of conduct, notwithstanding provisions in the contract calling for written authority from a company officer. 315 S.E.2d at 349.[12]

Here, the parties' course of conduct evidences an intent to modify the Term Sheet to clarify that other Capitala entities, not just CG, would be contractual parties. The Term Sheet provides that "NovaFund will begin advisory work immediately with the Capitala Group LLC ('Capitala') to assist with the preparation of offering materials and, in coordination with Capitala, contacting potential Fund investors." (Defs.' Ex. Q.) It further provides that "Capitala shall reimburse NovaFund on a timely basis for documented out-of-pocket expenses . . .;" that "Capitala agrees to pay NovaFund a monthly fee of $20,000 ('Retainer Fee'); and that "Capitala will agree to compensate NovaFund for an amount equal to 1.5% of the amount of equity capital that any Target Investor commits to the Fund or a separately managed account ('Success Fee')." (*Id.*) From the outset, however, it was not CG that performed the payment obligations under the Term Sheet, but rather CPA. CPA paid the retainer payments owed to Novafund under the Term Sheet, and reimbursed NovaFund's expenses under the Term Sheet. (R. 56(a)2 Stmt. ¶¶ 55, 61, 105.) At no point did CG make payments under the Term Sheet to NovaFund, nor could it, since

---

[12]     Defendants' reliance on *Joseph Gen. Contracting, Inc. v. Cuoto*, 119 A.3d 570 (Conn. 2015) (Mem. at 22-23), is unavailing. There, the trial court had "refused to use the doctrine of piercing the corporate veil," and instead held the principal accountable on an unrecognized "joint action" theory. *Id.* at 576-77. It was this novel theory that the Supreme Court of Connecticut rejected.

it had no revenue source.  (*Id.* ¶ 105.)  Similarly, NovaFund's contractual obligations were performed on behalf of, and for the benefit of, CPA and the other Capitala entities, not CG.  For example, NovaFund was required to work with CPA and other Capitala entities to assist in the fund raising process.  (*Id.* ¶¶ 15, 55, 66, 122.)  And CG did not receive any of the fees that Capitala has earned or will earn in connection with Fund V or the StepStone SMAs.  (*Id.* ¶¶ 103-104.)  Thus, in the course of performance of the contractual obligations, Capitala clarified that CPA and the other Capitala entities, not CG, were the proper counterparties.

In drafting and executing the Addendum, moreover, Capitala further modified the agreement to include "other Capitala entities."  (*Id.* ¶¶ 72, 122.)  Capitala did not specify which Capitala entity was party to the Addendum, instead generically referring to "Capitala Group" in the document title, which at the time was the marketing moniker for CPA and CIA.  (*Id.* ¶ 72.)  Capitala purposefully left the language broad enough to include other Capitala entities, including CPA and CIA.  (*Id.* ¶¶ 72, 122.)

For these reasons, there remain genuine disputes of material fact as to the counterparties to the contract at issue.

> **B.      The Term "Commits" in the Term Sheet Is Unambiguous and Success Fees Are Payable When an Investor Commits to an SMA**

In the Motion, Defendants urge an interpretation of the Success Fee provision that would never entitle NovaFund to fees for SMAs.  (Mem. at 25-28.)  They argue that "commits" only has one meaning, which they claim is when an investor is bound to an investment program and a specific investment amount.  (*Id.* at 26.)  Defendants then contend that because the investment advisory agreements with Swiss Capital did not bind Swiss Capital to invest a particular amount, the SMAs with Swiss Capital can never entitle NovaFund to fees.  (*Id.* at 27.)  Defendants are wrong because investors commit to invest in SMAs and because Defendants' interpretation

would run afoul of well-established contract interpretation principles.

First, Defendants' interpretation how SMAs work ignores that investors are bound to provide capital when they commit to the investment that is the subject of the SMA. If Defendants were to be believed, SMAs are set up as empty investment vehicles because investors are never obligated to fund them so that investments can be made. Defendants' argument is too cute by half and is based nearly entirely on arguing how commitments are made to a fund. Fund investments depend on the corporate form that is used for the fund, but a private capital fund is typically set up as a limited partnership and the investors become limited partners in the fund. (R. 56(a)2 Stmt. ¶ 132.) The limited partnership usually obligates a limited partner to make an investment of a specific dollar amount, which then enables a fund manager to call capital as the manager is ready to invest the investors' pooled capital. (*Id.*) For example, a fund may have five limited partners each of which commits to making a $20 million investment, which will provide the fund with $100 million in pooled capital. (*Id.*) Subsequently, the fund manager may identify an investment it wants to make on behalf of the fund; for a private debt fund, it could be a $15 million loan to a company. (*Id.*) The fund manager would then call $3 million in capital from each investor and under the terms of the limited partnership agreement each limited partner is obligated to transfer that amount to the fund. (*Id.*)

The undisputed facts establish that SMAs are different than private funds, but still involve "committed" capital, albeit with different timing. (*Id.*) The StepStone SMAs committed the SMAs to fund investments no later than when the loans closed. (*Id.*) StepStone considered Capitala to be the "sponsor" of the StepStone SMAs, which means that Capitala is an investment management firm that organizes private capital. (*Id.* ¶ 77.) As a sponsor, Capitala had "investment authority over the account." (*Id.*) Thus, once the SMAs were set up, Capitala could

begin deploying capital and arranging loans.  (*Id.*)  StepStone's corporate representative confirmed that under the SMAs between StepStone and Capitala, StepStone was obligated to invest funds when Capitala identified appropriate investments.  (*Id.*)  As he explained, if a "loan is funded, capital would be deployed to fund the loan," unless the loan at issue was a delayed draw facility (which is a loan that has been made but the borrower has the option to take the loan proceeds over time), in which case the "loan could be committed but not have cash move."  (*Id.*) StepStone's database generates a report that "reflects the cash flows related to the StepStone Capitala SMAs."  (*Id.*)  Among other things, the report tracked "how much was committed to the onshore SMA at that date."  (*Id.*)  Accordingly, under the SMAs, a "commitment" occurs later in the process, once a loan has been made and the SMAs are obligated to fund them.  (*Id.* ¶ 132.)

Capitala would have this Court believe – in fact, hold as a matter of law – that if Capitala closed on a loan with a borrower, Capitala could be on the hook for funding the entirety of the loan even if it were a loan in which the SMAs committed to participate.  Again, Capitala's position boils down to one of timing.  With a limited partner, the commitment occurs up front, at the time the limited partner closes on its interest in the limited partnership.  With an SMA that will make debt investments, the commitment comes later, once the SMA and the fund manager agree on making a loan to borrower.  This is consistent with the dictionary definition of commit. *See* Merriam-Webster (defining "commit" as "to carry into action deliberately: perpetrate").[13]

It would be incongruous to deny payment to NovaFund for the StepStone SMAs when both NovaFund and Defendants intended to hire Nova to raise capital for investment vehicles

---

[13]     https://www.merriam-webster.com/dictionary/commit.  Defendants suggest using the definition of a term – commitment – not used in the Term Sheet.  Yet the definition of "commitment" is also consistent with NovaFund's position.  *See* Merriam-Webster (defining "commitment" as "an agreement or pledge to do something **in the future**") (emphasis added), https://www.merriam-webster.com/dictionary/commitment.  Even using the dictionary definition cited by Defendants, the SMAs have "assume[d] a financial obligation."  (Mem. at 25 (citing Commitment, Black's Law Dictionary (11th ed. 2019)).)

other than Fund V.  (R. 56(a)2 Stmt. ¶ 55.)  As Mr. Wheelahan testified, NovaFund was hired to raise capital for investment vehicles other than Fund V itself, whether they were a sidecar to Fund V, single investor fund, "fund of one," or an SMA.  (*Id.*)  Because Capitala knew it was hiring NovaFund to raise capital for these other types of investment vehicles, allowing Capitala to escape its payment obligation to NovaFund simply because they are non-fund vehicles would abrogate the contracting parties' intent.

Capitala's argument is even more specious here, where Capitala itself referred to "commitments" being made in connection with the StepStone SMAs.  (*See, e.g.*, *id.* ¶ 77 (after meeting with StepStone in November 2017, Capitala's CFO, Mr. Arnall, asked if StepStone would make a "commitment to fund v" to which Mr. Alala responded, "500million in a SMA"); *id*. (in November 2017, Mr. Alala states that Capitala received "two verbal commitments," one from Swiss Capital, which he described as "a $750MM to $1Billion commitment to private funds in the form of a SMA offshore vehicle"); *id*. (in providing a "StepStone update" in January 2018, Mr. Alala explains that StepStone wants to "allocate no less than 100mm per annum to the SMA for the next 3 years" and expects to grow the "base commitment" thereafter); *id*. (in February 2018, Mr. Alala describes the StepStone SMAs as a "1 billion commitment").)

Second, it is black letter law that a contract must be interpreted as a whole, giving effect to all of its terms.  *See, e.g.*, *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1173 (Conn. 2014) (holding that in interpreting a contract, a court "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result"); *R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co*., 156 A.3d 539, 554-55 (Conn. App. Ct. 2017) (same), *aff'd*, 216 A.3d 629 (Conn. 2019); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 802 S.E.2d 888, 892 (N.C.

2017).  A related contract interpretation principle is that contracts must be read in such a manner as to avoid rendering terms meaningless.  *Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*, 791 A.2d 489, 497-98 (Conn. 2002); *Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 153 (N.C. 1990).  By Defendants' argument, here, even though StepStone invested approximately $250 million, StepStone could be deemed to have never made a commitment.  Such an argument would read the phrase "separately managed accounts" out of the Term Sheet entirely and it would render meaningless the fee provision obligating Capitala to pay NovaFund fees on separately managed accounts.

## IV.    THIS COURT ALREADY RULED THAT
##        THE ADDENDUM'S RELEASE IS AMBIGUOUS

The law of the case doctrine is inapplicable.  *See* Fed. R. Civ. P. 59(b) ("Any order or other decision . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Walker v. Doe*, No. 3:17-cv-425 (JCH), 2018 WL 4516672, at *4 (D. Conn. Sept. 20, 2018) (explaining the law of the case doctrine is not binding, but providing that a court should adhere to its earlier decisions in later stages of litigation absent compelling reasons otherwise).  The "doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992).

Even if the doctrine did apply, which it does not, Capitala does not even attempt to satisfy the requisite elements.  Capitala cites to NovaFund's ***arguments***, rather than identifying a matter that has been previously ruled upon.  (*See* Mem. at 28-29 (citing NovaFund's brief in support of its motion to dismiss CG's counterclaims and the deposition transcript of Mr. Kelley).) Presumably, Capitala seeks to extrapolate the Court's Order on NovaFund's Motion to Dismiss (ECF 101), but Capitala's argument is a swing and miss.  In that Order, the Court held that

claims asserted ***against NovaFund*** related to NovaFund's performance before April 24, 2017 were barred by the release in the Addendum (ECF 101 at 13).[14]  The Court did ***not*** rule on the viability of NovaFund's claims against Capitala.[15]

There is a material issue of fact regarding the parties' intent in entering into the Addendum.  Capitala attempts to mislead the Court by claiming Mr. Kelley testified that "he understood the intention of the release was for both parties to have a 'clean' slate moving forward."  (Mem. at 30.)  Mr. Kelley, however, testified that his understanding of the release was based on "what we knew at that point."  (R. 56(a)2 Stmt. ¶ 95.)  Moreover, by Defendants' own argument, the release does not apply to NovaFund's claims against Defendants because (according to Defendants) they did not contract with NovaFund.  Defendants cannot have it both ways.  Even so, there is ample evidence that Defendants continued to hide the shell nature of CG at the time NovaFund entered into the Addendum, rendering the release voidable.  *See generally Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 366-67 (D. Conn. 2013) (denying defendant's motion to dismiss claim that release was void for fraud).[16]  Moreover, by its terms, the release applies only to claims concerning "Capitala's obligations to Nova," which would not apply to the SAC's allegations about Capitala's fraud, bad faith conduct with Sandler, O'Neill & Partners, L.P. ("Sandler"), tortious interference with NovaFund's business expectancies, unfair trade practice violations, and its campaign of disparaging NovaFund.

Capitala's ratification argument is likewise flawed.  Capitala contends that NovaFund had

---

[14]     The Addendum, executed April 24, 2017, contains a provision in which NovaFund and Capitala "agree to release and discharge each other and all affiliates, offices and agent, of any and all claims, disputes, demands or causes of action of any nature, which the parties had, now have, or may have, related to Nova's services rendered to Capitala, or Capitala's obligations to Nova, to date."  (Ex. 60.)

[15]     Further, the Court declined to hold that claims of fraud and fraudulent inducement were barred, because the terms "services rendered" and "obligations" might not include "issues regarding the execution and validity of the agreement. . . ."  (ECF 101 at 20.)

[16]     Moreover, the SAC enumerates a host of post-Addendum misconduct on the part of Capitala (ECF 193 ¶¶ 78-122), which allegations are included in each one of NovaFund's claims.

"full knowledge" at the time it entered into the Addendum.  (Mem. at 33.)  Not true.  *None* of the parties to this lawsuit have contended that NovaFund knew of Capitala's work with Sandler on Fund V until damning documents were produced in discovery.  (R. 56(a)2 Stmt. ¶¶ 134-138.) Nor has Capitala shown that, once NovaFund learned of Capitala's duplicitous conduct, NovaFund retained any consideration; instead, NovaFund has had to defend itself against the very claims NovaFund negotiated to release in the Addendum.  (ECF 106, Am. Counterclaims, ¶¶ 14-55, 67-105; ECF 344 ¶¶ 48-56.)  By the very authority Capitala cites (Mem. at 32), Capitala's argument fails.  *Brown v. City of S. Burlington, Vt.,* 393 F.3d 337, 343-44 (2d Cir. 2004) (remanding case after appeal of summary judgment decision, and noting a party claiming ratification of a voidable contract must demonstrate that the releasor intended to ratify the agreement, which is a question of fact).  Moreover, because ratification requires proof of intent, *UCF I Tr. 1 v. Dimenna*, No. 16-cv-00156 (VAB), 2016 WL 3620716, at *4 (D. Conn. June 29, 2016) ("Intention is an essential element in the doctrine of ratification."), it is generally not appropriate for determination on summary judgment.  *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir. 1983) ("As we have previously cautioned, summary judgment is likely to be inappropriate when the issues concern intent.") (internal quotation omitted); *Feibus & Co. v. Godley Constr. Co.*, 271 S.E.2d 385, 393 (N.C. 1980) (affirming denial of summary judgment and noting "[g]enerally, summary judgment is inappropriate when intent or other subjective feelings are material").

In sum, there is no merit to Defendants' argument that the release in the Addendum entitles Defendants to summary judgment on any of NovaFund's claims.

## V.     SUMMARY JUDGMENT SHOULD BE DENIED ON NOVAFUND'S UNJUST ENRICHMENT CLAIM

This Court has already held that NovaFund's unjust enrichment claim was properly pled.

(ECF 45, Order on CG's Mot. to Dismiss, at 33-35.)  In its motion to dismiss, CG made the same

argument that Defendants are now making, namely that unjust enrichment is not available where

an enforceable contract exists on the same subject matter.  (*Compare* ECF 25, CG's Mem. in

Support of Mot. to Dismiss, at 32-33 *with* Mem. at 31-32.)  In rejecting this argument, this Court

stated that "Rule 8 (of the Federal Rules of Civil Procedure) permits pleading unjust enrichment

claims in the alternative where, as here, the existence of an enforceable contract is in dispute."

(ECF 45 at 33.)  As the Court explained in its Order on CG's Motion to Dismiss, the cases cited

by CG related to unjust enrichment involved cases where the existence of a valid contract did not

appear to be in dispute.  (*Id*. at 34.)  The same is true for the cases that Defendants now argue as

precluding the unjust enrichment claims, pled in the alternative, in the SAC.  CG and Defendants

continue to dispute that the Term Sheet is an enforceable contract.  As a result, Defendants'

motion for summary judgment on NovaFund's unjust enrichment claim should be denied.

## VI.   DEFENDANTS' SUMMARY JUDGMENT MOTION ON NOVAFUND'S FRAUD CLAIMS SHOULD BE DENIED DUE TO NUMEROUS DISPUTED FACTS

A fraud claim requires proof:  (1) of a false representation of fact; (2) that the party

making the representation knew it to be false; (3) that the representation was made to induce the

other party to act; and (4) of the other party's action to its detriment.  *Carr v. Fleet Bank*, 812

A.2d 14, 17 (Conn. App. Ct. 2002).[17]  Defendants contend that NovaFund's fraud claim is

dependent on its veil piercing theory and there is "nothing in the record" to substantiate the

---

[17]       Connecticut law governs NovaFund's fraud claims.  Connecticut courts follow the Restatement (Second) or Conflicts of Law.  *Schnabel v. Trilegiant Corp.,* No. 3:10-cv-957 (JCH), 2011 WL 797505, at *3 n.2 (D. Conn. Feb. 24, 2011).  Under that test, courts consider: (1) where plaintiff acted in reliance on defendant's false representations; (2) where plaintiff received the representations; (3) where defendant made the representations; (4) the place of incorporation and place of business of the parties; and (5) where plaintiff is to render performance of a contract to which it was falsely induced.  Restatement (Second) of Conflict of Laws § 148 (1971).  Those factors clearly point to Connecticut, where NovaFund relied to its detriment on Defendants' false statements, where NovaFund received those false statements, where NovaFund is incorporated and does business, and where NovaFund performed under the Term Sheet and Addendum.  Defendants do not contend otherwise.  (*See* Mem. at 32-39.)

assertion that any Defendant made any misrepresentation or concealment to NovaFund concerning CG.  (Mem. at 33.)  Not so.

Defendants made several misrepresentations to NovaFund.  First, Mr. Wheelahan represented to NovaFund that CG – a dummy entity with no corporate purpose – was the appropriate signatory to the Term Sheet.  (R. 56(a)2 Stmt. ¶¶ 34, 57, 99).  Defendants' argument that NovaFund knew there were several entities within the Capitala umbrella (Mem. at 34) misses the mark.  Capitala could have 100 entities or two – the point is that Defendants' authorized agent told NovaFund to contract with the wrong entity, because he "withheld" information about CG being a shell entity purposefully undercapitalized to ensure no liability.

Second, Defendants promised that NovaFund would be the exclusive placement agent working on the engagement – but then worked behind NovaFund's back with another placement agent, Sandler.  (*Id.* ¶¶ 130, 131, 134-138.)  Before entering into the Term Sheet with NovaFund, Capitala colluded with Sandler to have Sandler insert terms into the Term Sheet concerning the investors that Sandler alone would be able to reach out to for Fund V.  (*Id.* ¶ 134.)  Capitala also worked with Sandler as a placement agent on Fund V after the Term Sheet was signed.  (*Id.*)  Capitala's collusion with Sandler was simple:  Sandler provided Capitala with a list of 40 investors it wanted to pitch for Fund V; Capitala added Sandler's list of 40 investors to the Carve Out list in the Term Sheet; Capitala would block NovaFund from contacting those investors, even though the agreement lacked such a bar; if an investor on that list committed capital to Fund V, Capitala would only pay Sandler, not NovaFund; and they would do all of this without telling NovaFund.  (*Id.* ¶ 135.)  Both Messrs. Swercheck and Wheelahan thought this plan was a "bad idea" (*id.* ¶¶ 136, 137), and Mr. Swercheck, Capitala's Director of Investor Relations, wrote several emails expressing that he was "nervous," and thought NovaFund would "freak out" if it

learned Capitala paid fees to Sandler on Carve Out investors.  (*Id.* ¶ 136.)  While Sandler knew

about NovaFund and its contract with Capitala, NovaFund was kept in the dark about Sandler.

(*Id.* ¶ 137.)  Capitala hid Sandler's role from NovaFund, disclosing it only after this lawsuit had

been pending for more than a year.  (*Id.* ¶ 138.)

      Third, Defendants told NovaFund that Defendants had relationships with all investors on

the Carve Out list when they did not.  (*Id.* ¶¶ 72, 138.)[18] Again, Defendants' contention that the

parties exchanged drafts of the contract without the Carve Out list attached is of no moment –

NovaFund ***signed*** based on the representation that Capitala had meaningful business

relationships with all Carve Out investors.[19]  (*Id.* ¶¶ 72, 138.)  Similarly, who NovaFund knew or

did not know on the Carve Out list does not alter the nature of Defendants' mistruth.  NovaFund

relied to its detriment on all of the foregoing misrepresentations, and would not have entered into

the Term Sheet or Addendum had it known the truth.  (*Id.* ¶¶ 72, 138.)

      Even if it could credibly be argued that Defendants were not the ones who made the

aforementioned misrepresentations, it is clear that Defendants had an obligation to advise

NovaFund of the true state and failed to do so.  Fraud by nondisclosure occurs when a party fails

to make a full and fair disclosure of known facts about a matter on which that party has assumed

to speak, where there is a duty to speak.  *Carr*, 812 A.2d at 17.  A duty to speak arises "'where

the circumstances are such that the effect of the silence is actually to produce a false impression

in the minds of the other parties and the making of the agreement or doing of some other act may

in itself lead the other parties to the transaction to believe that a certain fact exists and so amount

---

[18]     Defendants' assertion that Mr. Swercheck did not recall telling Mr. Kelley that Defendants had relationships with all investors on the Carve Out list (Mem. at 34) only underscores the existence of material factual disputes.  Even so, Defendants fail to include this so-called fact in their 95-paragraph Local Rule 56 Statement.

[19]     In fact, Mr. Kelley recalls Mr. Swercheck previously telling him to expect the Carve Out list to include about 60 investors.  They then had a conversation in which they talked about the inclusion of 40 additional investors. (R. 56(a)2 Stmt. ¶ 138.)

to an affirmation of it.'" *Horse Tavern Builders, LLC v. Pizzino*, No. FBT-CV15-6049934, 2016 WL 4708528, at *8 (Conn. Super. Ct. Aug. 8, 2016) (citation omitted) (noting fraud in inducement is another name for fraudulent misrepresentation). Defendants do not even try to argue they failed to disclose the truth to NovaFund, their business partner, about the aforementioned misrepresentations. Nor could they. Mr. Wheelahan testified that he "withheld" information from NovaFund about the fact that CG would have no role in connection with Fund V. (R. 56(a)2 Stmt. ¶ 34.) The record is replete with evidence showing Defendants knew hiding Sandler's involvement from NovaFund was wrong. Mr. Swercheck thought doing so was "risky" and was "nervous" about doing so. (*Id.* ¶ 136.) He thought that NovaFund would "freak out" if Capitala paid fees to Sandler on Carve Out investors. (*Id.*) Mr. Wheelahan told Mr. Alala that hiding Sandler's involvement from NovaFund was a "bad idea." (*Id.*) Accordingly, at the very least, there is a question of fact whether Defendants' intentional withholding of information relating to Sandler's involvement with Fund V constitutes a fraudulent non-disclosure.

Defendants then weakly suggest that NovaFund has not been damaged as a result of Defendants' lies and deceit. (Mem. at 37.) Defendants contend that NovaFund has been appropriately compensated to the tune of $200,000 in retainer fees. But, under Connecticut law, NovaFund is entitled to recover damages in the amount of its anticipated benefit of the bargain. *Learning Care Grp., Inc. v. Armetta*, No. 3:13-cv-1540 (VAB), 2016 WL 3248178, at *4 (D. Conn. June 12, 2016). At a minimum, on just NovaFund's fraud claim, NovaFund stood to earn no less than $2,625,000, because when NovaFund signed the Term Sheet it reasonably expected that it would be able to help raise $300 million in capital commitments for Fund V and separately managed accounts based on Capitala's representations about the Carve Out investors and the anticipated first closing of commitments from anchor investors. (R. 56(a)2 Stmt. ¶ 139.)

Even if $125 million in capital had been raised from Carve Out investors, NovaFund could have been paid 1.5% on the remaining $175 million.  (*Id.*)

In addition, NovaFund is entitled to recover consequential damages caused by Defendants' fraud, as well as punitive damages.  *See Kilduff v. Adams, Inc*., 593 A.2d 478, 484 (Conn. 1991) ("A plaintiff in a fraud action is entitled to recover 'any consequential damages resulting directly from the fraud.'") (citations omitted); *Leisure Resort Tech., Inc. v. Trading Cover Assocs.*, 889 A.2d 785, 793 (Conn. 2006) (in a fraud action, the measure of damages is either the "benefit of the bargain" or "out-of-pocket measure"); *Wagner v. Our Lady of Mount Caritas, O.S.B., Inc.*, 118 A.3d 103, 111-12 (Conn. App. Ct. 2015) (affirming award of punitive damages for defendant's fraud).  In sum, there is ample evidence that NovaFund has been damaged by Defendants' fraud.  Defendants' assertion that NovaFund benefitted from Defendants' lies (Mem. at 37) disregards the very real harm effectuated on NovaFund.

## VII.   SUMMARY JUDGMENT SHOULD NOT ENTER ON NOVAFUND'S TORTIOUS INTERFERENCE CLAIM

In an attempt to eliminate NovaFund's tortious interference claim, Defendants apply incorrect law,[20] and omit significant facts. These missteps are fatal to Defendants' summary judgment argument and support finding the existence of significant disputed material facts.

Connecticut law, not North Carolina law, applies to NovaFund's tortious interference claim.  "When evaluating a choice of law questions sounding in tort, this court applies the 'most significant relationship'" test under the Restatement (Second) of Conflicts of Law.  *W. Dermatology Consultants, P.C. v. VitalWorks, Inc*., 153 A.3d 574, 584 (Conn. 2016).  This test

---

[20]     Defendants direct the Court to apply North Carolina law, yet the case on which they rely applies the substantive law of Connecticut to the tort claims.  (*See* Mem. at 38 (citing *Empower Health LLC v. Providence Health Sols. LLC*, No. 3:10-cv-1163 (JCH), 2012 WL 13027107, at *13 (D. Conn. Sept. 24, 2012)).)

calls for evaluating "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Id*.  NovaFund's relationships with investors and potential investors were injured by Capitala's disparaging remarks.  Capitala made these remarks to potential investors located in Illinois and Pennsylvania.  (R. 56(a)2 Stmt. ¶¶ 117, 141.)  NovaFund's relationships with investors and potential investors, including Capitala, are not geographically restricted, but all are centered, developed, and maintained by NovaFund, whose primary place of business is in Connecticut.  (*Id.* ¶ 1.)  Although Capitala is located in North Carolina, neither NovaFund nor Capitala have alleged or identified any investor relationship damaged by Capitala's disparaging comments in North Carolina.  (*Id.* ¶ 112.)  Given that the most significant relationship test evaluates contacts "according to their relative importance with respect to the particular issue," Connecticut is the only state with a significant relationship to NovaFund's tort claim, and should be the choice of law applied.  *W. Dermatology*, 153 A.3d at 584.

Under Connecticut law, the "elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000).  Regardless of the choice of law, however, Defendants cannot meet their burden for summary judgment.

Defendants first claim NovaFund cannot demonstrate any loss, either as a result of their disparaging comments or from precluding NovaFund from communicating with investors. However, Defendants are only able to support this argument by cherry-picking favorable

testimony, discarding context, and blatantly ignoring witnesses' testimony.  (Mem. at 38.)

Contrary to Defendants' assertion, NovaFund has provided evidence of loss resulting from Defendants' disparaging comments.  As Mr. Kelley explained, NovaFund "was having a hard time winning new business" and "ceased engaging in any active business" because Capitala's tainted the NovaFund name.  (R. 56(a)2 Stmt. ¶ 91.)  Mr. Kelley testified that NovaFund "never had a hard time winning business in the past," before working with Capitala. (*Id.*)  Mr. McAndrews also testified that NovaFund ceased pursing new business because "Capitala was badmouthing us everywhere in the business," which led individuals to believe that "Nova at that point had a damaged name, and it was difficult to – to garner new mandates for fundraising."  (*Id.*)  When asked if Capitala's disparagement impacted how one of the investors in Fund V (Kemper) sees NovaFund, Kemper responded "Yes . . . I can't not unhear (sic) what I've heard."  (*Id.* ¶ 141.)  There are, in short, ample disputed issues of material fact about the impact that Defendants' campaign of making disparaging remarks had on NovaFund.  (*Id.* ¶¶ 91-93, 140-141.)

Similarly, NovaFund has provided evidence that it suffered loss due to Capitala's prohibition against contacting certain investors.  NovaFund's actual loss stems from interference with the relationships of many[21] investors, potential investors, and other fund managers.  (*Id.* ¶¶ 91-93, 140-141.)  Capitala barred NovaFund from communicating with the investors on the Carve Out list, forty of which were names Capitala wrongfully reserved for Sandler.  (*Id.* ¶¶ 89, 135.)  Yet the viability of NovaFund's entire business relied on contacting and building

---

[21]    Defendants attempt to lead the Court astray by relying on *Empower Health*, where the plaintiffs claimed loss from the interference of two relationships, "with whom the plaintiffs claim a relationship under the Agreement." 2012 WL 13027107, at *13.  Unlike NovaFund's relationships, which can be engaged in multiple or repetitive fundraisings (R. 56(a)2 Stmt. ¶ 140), the relationship in *Empower* was limited to the specific agreement.  *Id.*

relationships with hundreds of investors.  (*Id.* ¶ 140.)[22]  It is obvious that by improperly

precluding NovaFund from contacting these investors, the very foundation of NovaFund's

business, Capitala caused NovaFund to suffer loss.

Knights of Columbus is a prime example of the impact that Capitala's prohibition had on

NovaFund.  In early November 2016, Kallie Hapgood of NovaFund asked Mr. Swercheck if she

could reach out to Knights of Columbus, was initially told yes, but then told no because Capitala

gave the opportunity to Sandler, and "blocked" NovaFund from contacting them.  (*Id.* ¶ 89).

NovaFund did not have the opportunity to reach out to this investor soon after the first closing,

when there would have been momentum in the fundraising.  (*Id.*)  By the time Ms. Hapgood was

finally permitted to contact this investor in early 2017, the investor had no further allocations for

credit funds in 2017 and the opportunity was lost.  (*Id.*)

Ultimately, while Defendants contend that no reasonable juror would find any loss

associated with their conduct (Mem. at 38), this "determination is a question for the trier of fact."

*DiNapoli v. Cooke*, 682 A.2d 603, 608 (Conn. App. Ct. 1996).  At a minimum, regardless of

Defendants' effort to supplant facts with extracted snippets of favorable and out of context

testimony, it is evident that there are material disputes of fact as it pertains to NovaFund's claim

of tortious interference.

## VIII.   PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED ON NOVAFUND'S CONNECTICUT UNFAIR TRADE PRACTICES ACT CLAIM

In the Motion (Mem. at 39-40), Defendants argue that NovaFund's claim under the

Connecticut Unfair Trade Practices Act fails as matter of law.[23]  But in making this argument,

---

[22]     Defendants argue that NovaFund did not have a "prospective" contract with any Carve Out or target investors (Mem. at 39) but that is a red herring:  the existence of a prospective contract is not an element of NovaFund's claim for tortious interference with business relationships.
[23]     Defendants do not, however, move for summary judgment on NovaFund's claim for violation of North Carolina Unfair and Deceptive Trade Practices Act.

Defendants advance the same arguments this Court has already rejected.  CG previously moved to dismiss NovaFund's CUTPA claim – for the same reasons Defendants raise here – arguing that NovaFund's claim is nothing but a simple breach of contract claim.  (*Compare* ECF 25 at 33-35 (arguing that an intentional breach of contract, without more, is insufficient to constitute a CUTPA violation) *with* Mem. at 40 ("A simple breach of contract, even if intentional, cannot support a CUPTA [sic] claim".).)  This Court, however, held that NovaFund's allegation of fraudulent misrepresentation to deny NovaFund fees to which it is entitled "constitutes sufficiently aggravating circumstances to give rise to a CUTPA claim."  (ECF 45 at 36-37.) Those same allegations are asserted against Defendants, precluding entry of summary judgment.

Defendants also argue that NovaFund cannot demonstrate any deception by Defendants or any ascertainable loss.  (Mem. at 40.)  Defendants do not even try to identify undisputed issues of material fact that would enable the Court to rule as a matter of law.  Instead, Defendants merely incorporate arguments they made elsewhere in the Motion.  (Mem. at 40.)  But, those arguments only show that there are numerous disputed issues of material fact that preclude the entry of summary judgment.  Accordingly, Defendants' partial summary judgment motion on Count Six should be denied for these reasons as well.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' partial summary judgment motion should be denied in its entirety, together with such other and further relief in favor of NovaFund as the Court deems proper.

Respectfully submitted,

**PLAINTIFF NOVAFUND ADVISORS, LLC**

By:  _/s/ Jill M. O'Toole_____
     Jill M. O'Toole (ct27116)
     Alison P. Baker (ct28136)
     Shipman & Goodwin LLP
     One Constitution Plaza
     Hartford, CT 06109
     Tel.: 860-251-5000
     Fax: 860-251-5099
     jotoole@goodwin.com
     abaker@goodwin.com

*Its Attorneys*