**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NOVAFUND ADVISORS, LLC, | |
| Plaintiff, | No. 3:18-cv-1023 (MPS) |
| v. | |
| CAPITALA GROUP, LLC; CAPITALA PRIVATE ADVISORS, LLC; CAPITALA INVESTMENT ADVISORS, LLC; and CAPITALA SPECIALTY LENDING CORPORATION, | |
| Defendants. | September 30, 2021 |

**AFFIDAVIT OF BRYAN KELLEY IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION**

| | |
|---|---|
| STATE OF FLORIDA | ) |
| | ) ss.: |
| COUNTY OF ST. JOHNS | ) |

I, BRYAN D. KELLEY, being duly sworn, depose and say:

1.      I am over the age of eighteen and believe in the obligations of an oath.

2.      I am a member and Managing Director of Plaintiff NovaFund Advisors, LLC ("NovaFund"). I have made this affidavit based on personal knowledge and my personal review of the records of NovaFund. I am submitting this affidavit in support of NovaFund's Opposition to Defendants' Motion for Summary Judgment. If called upon, I could and would competently testify to the matters stated herein.

3.      In late 2015, Capitala Group began the process to raise capital for a private credit fund focused on making direct loans to lower middle market companies in the United States with opportunistic equity co-investments. Capitala Group formed a new credit fund known as Capitala Private Credit Fund V, L.P. ("Fund V").

4.     Capitala decided it wanted to work with a U.S. placement agent to raise capital for Fund V and separately managed accounts.  Capitala selected NovaFund, a Connecticut-based placement agent.

5.     I understood that NovaFund was to be the exclusive or only placement agent for Fund V.  In my experience, that type of exclusivity, where only one placement agent is used, is common in the industry because capital-raising projects can take up to two years and require considerable coordination between a fund, a fund's manager, and a placement agent to evaluate hundreds of potential investors, narrow the pool of potential investors to those most likely to consider an investment, and focus the parties' marketing efforts on meeting with and soliciting interest in the fund from these select investors.  NovaFund's exclusivity, meaning that Capitala could not work with any other placement agent on Fund V, was a material consideration for NovaFund and NovaFund would not have agreed to a contract without it.

6.     I also understood NovaFund's exclusivity to mean Capitala could not work with any other placement agent because I told Capitala that NovaFund typically worked with three to four funds at a time.  I also told Capitala that whenever NovaFund worked with three to four funds at a time, NovaFund tried to balance the type of funds it worked with, the timing, and the stages of the capital raising process that the funds were in. NovaFund had between six and seven employees during the relevant time period.

7.     NovaFund and Capitala entered into an agreement in May 2016 (the "Term Sheet").  I took the lead in negotiating the Term Sheet on NovaFund's behalf, but my colleagues Mr. Howe and Mark McAndrews, NovaFund's Chief Financial Officer, also had discussions about the Term Sheet's terms with representatives of Capitala.  From time to time, I would talk, email, or text message with Mr. Alala or Mr. Swercheck, but most of my conversations were

with Richard Wheelahan, who I understood to be a senior officer and General Counsel of some

of the Capitala entities.  When negotiating with Capitala, Messrs. Alala, Wheelahan, and

Swercheck did not distinguish which Capitala entity they were negotiating on behalf of.  When I

refer to NovaFund's understanding herein, I am doing so in my capacity as a member of

NovaFund based on my own understanding, but also based on what I know to be the

understanding of NovaFund's only other member, Mr. Howe, as a result of conversations and

communications between us.  In particular, as it relates to the Term Sheet's material terms, he

and I had the same understanding and we would not have executed the Term Sheet on

NovaFund's behalf had we had different understandings.

8. While I do not recall specifically who drafted the initial draft of the Term Sheet, I

believe I did.  I sent a draft of the Term Sheet to Messrs. Alala, Wheelahan, and Swercheck, with

a copy to their outside lawyer, John Herring from Robinson, Bradshaw & Hinson, P.A. on

February 5, 2016.  NovaFund understood that Capitala was represented by legal counsel during

both the negotiations and drafting of the Term Sheet.  NovaFund was not represented by any

lawyers in connection with the negotiations or drafting of the Term Sheet.

9. Before sending the first draft of the Term Sheet, I recall having a conversation

with Mr. Wheelahan about which Capitala entity should be the counterparty and he told me

"Capitala Group, LLC" ("CG").  I would have never inserted a specific name for the

counterparty without calling Capitala first.

10. The language of the Term Sheet was heavily negotiated.  Capitala made

significant revisions to the language of the Term Sheet, including the Success Fee

language.  During the negotiations of the Term Sheet, I recall Mr. Swercheck telling me to

expect the Carve Out list to include the names of about sixty investors.  Mr. Swercheck conveyed

that Capitala had very good relationships with all the investors on the Carve Out list.

11.     Before the Term Sheet was signed, NovaFund was told to expect that Hamilton

Lane and Kemper would be the first two, or "anchor," investors and would be on the Carve Out

list.  NovaFund was also told that they had both invested with Capitala in the past.  NovaFund

first received a draft of the Term Sheet from Capitala listing Hamilton Lane and Kemper as

Carve Out investors on April 26, 2016.  No other investors were listed on the Carve Out list in

that draft of the Term Sheet.  NovaFund had a prior relationship with Hamilton Lane, a

Pennsylvania-based investor, because it had committed to a previous fund that Mr. Howe and I

were responsible for raising, Gridiron III.  NovaFund also was familiar with Kemper, an Illinois-

based investor.

12.     On April 28, 2016, NovaFund first received a draft of the Term Sheet containing

the names of 105 investors on the Carve Out list.  I recall having a conversation with Mr.

Swercheck after receiving this version and expressing surprise at the number of the investors on

the list.  He told me that Mr. Alala had added about forty additional investors at the last minute,

but he assured me that all of the investors on the Carve Out list were ones with whom Capitala

had a strong relationship and with which it had personal relationships.  At no point – either

before or after the Term Sheet was signed – did Capitala ever tell NovaFund that the Carve Out

list contained the names of 40 investors added by Sandler, O'Neill & Partners L.P. ("Sandler)

and that Capitala intended only Sandler to contact those investors.

13.     The executed version of the Term Sheet expressly provides that the investors on

the Carve Out list were "previously known to Capitala."  NovaFund relied on the representations

that Capitala had meaningful personal contacts for each investor listed on the Carve Out list,

4

which included some of the largest potential investors for Fund V.  The strength of these relationships led NovaFund to believe that Fund V could be raised successfully.  These representations were thus material to NovaFund's decision to enter the Term Sheet.  Based on what I know now, the representations by Capitala were false when made because Capitala did not have a personal relationship with the 40 investors added to the Carve Out list from Sandler's list and Capitala did not have meaningful contacts at many of the other investors on the Carve Out list sufficient to solicit investments for Fund V.

14.     On May 5, 2016 I sent a copy of the Term Sheet signed by both Mr. Howe and I on NovaFund's behalf to Capitala.  Mr. Alala had some additional changes, for which Mr. Wheelahan suggested language.   NovaFund and Capitala entered into the final version of the Term Sheet on or about May 9, 2016, which was signed by Mr. Alala on Capitala's behalf.  At the time, NovaFund understood that CPA was the manager for Fund V, and it is common for a placement agent to work with a fund as well as its fund manager, regardless of which entity signs the agreement.  As a result, NovaFund effectively entered into a business relationship with Capitala, working closely with CPA, manager for Fund V, even though Capitala did not distinguish among entities in its corporate family.  In my experience, Capitala's employees used the same email address regardless of the Capitala entity for which they were conducting business.

15.     When I executed the Term Sheet, I did not know that CG had been set up as a shell company used only to enter into contracts, which Capitala considered to be preliminary or lacking in substance; that CG had no assets, no income, no operations, no real structure, and no real purpose; that CG had been intentionally undercapitalized; and that CG was set up so that if it were ever found responsible for a liability or judgment, it would not have sufficient assets to

5

meet those obligations.  I would not have authorized NovaFund to execute the Term Sheet had I known any of this information.  NovaFund only learned this information later, during this lawsuit, after CG dissolved in June 2020.

16.     NovaFund did not know when it executed the Term Sheet that Capitala worked with at least one other company, Sandler to solicit investors for Fund V.  Even after I signed the Term Sheet, Capitala hid Sandler's identity, role, and involvement from NovaFund.  Capitala continued to hide Sandler's role from NovaFund, disclosing it only after this lawsuit had been pending for more than a year.

17.     When I signed the Term Sheet, NovaFund understood that Capitala had retained it as its exclusive placement agent in connection with raising capital for Fund V or separately managed accounts.

18.     NovaFund also understood that Capitala had hired NovaFund to advise and assist in raising capital for Fund V and separately managed accounts from North American, European, Australian, and Asian investors ("Target Investors").  The Term Sheet also describes the other advisory services that NovaFund understood it was to provide.

19.     NovaFund understood that Capitala would pay NovaFund a certain percentage of the amount of capital that any Target Investor commits to Fund V or a separately managed account (the "Success Fee").  Specifically, NovaFund understood that it would earn 1.5% of the amount of equity capital that any Target Investor committed to the Fund or a separately managed account, unless Capitala agreed to a management fee of less than 1.5% for a Target Investor, in which case NovaFund understood that it would earn a fee equal to one year of Capitala's management fee for that Target Investor, but in no case less than 1% of the Target Investor's capital commitment.

20.     NovaFund also understood that there were a few exceptions to the Success Fee, which are not relevant to this lawsuit. For example, NovaFund understood that it would not earn fees from investments made by "friends and family" of Capitala and investments made in Capitala's traded credit vehicle.

21.     Another exception to the Success Fee was for "Carve Out" investors. In my experience, a "carve out" list generally means that a placement agent will be limited or precluded from receiving fees if a carve out investor commits to a fund.  Also in my experience, carve out investors are nearly always investors well known to a manager before a placement agent's involvement with the manager.  In connection with the Term Sheet with Capitala, I understood that NovaFund would not be paid a fee on certain Carve Out investors, but only up to $125 million in aggregate commitments.  I also understood that once the $125 million cap was reached, Capitala was obligated to pay NovaFund the Success Fee on any commitments over that amount even if the investors were on the Carve Out list.  In other words, when I signed the Term Sheet, I understood that NovaFund's fees from Carve Out investors may be limited, but we would receive full fees once commitments from Carve Out investors totaled over $125 million. I also understood that NovaFund would solicit Carve Out investors, even if we received reduced fees from their commitments.  The Carve Out list of investors is set forth in Schedule 1 to the Term Sheet, and is incorporated by reference into the Term Sheet.

22.     In addition to Success Fees, NovaFund also understood that it would be compensated for its work on soliciting investors for Fund V and separately managed accounts by being paid what are known as "Tail Fees."  In particular, NovaFund understood that Capitala would pay NovaFund an additional fee based on a percentage of capital commitments from

Target Investors that close into the next Capitala-sponsored successor vehicle with a substantially similar investment strategy (which is defined as the "Tail Fee" in the Term Sheet).

23.     Further, NovaFund understood that it would be paid a minimum of $200,000 as compensation for the advisory and placement services in the Term Sheet.  NovaFund understood this amount would be paid as a $20,000 monthly retainer until at least $200,000 had been paid and that the amount of the retainer would be offset dollar for dollar against the Success Fee.

24.     After the parties executed the Agreement, NovaFund immediately began performing its duties under the Term Sheet by providing advice to Capitala on the private placement memorandum ("PPM"), marketing materials, track record presentations, and the investor presentation, also known as a pitch book or investor deck.  At about this time, NovaFund had approximately 6-7 employees.  NovaFund drafted and refined the presentation of the PPM and pitch book so Capitala could use them with the anchor investors.  NovaFund also provided advice to Capitala on the due diligence questionnaire for Hamilton Lane, and how to speak with and present materials to the anchor investors.  NovaFund was also ready to begin work on marketing efforts with investors, but Capitala asked NovaFund to delay that work by several months.

25.     Soon thereafter, Mr. Alala instructed NovaFund to wait to market Fund V to investors until after the first close with the anchor investors.  I advised Mr. Alala that delaying such efforts could result in not closing additional capital before the end of 2016.  While NovaFund was able to begin some communications with investors in the summer of 2016, we did not begin a broad marketing of Fund V to investors in earnest until September 2016.

26.     On September 7, 2016, NovaFund received a press release that Capitala issued about the first closing and announced that it included about $40 million in capital commitments

by a globally renowned asset manager and an investment grade insurance company.  In

discussions between Capitala and NovaFund, Capitala told NovaFund that it had set the target

size of investments for Fund V (meaning the amount of capital it wanted to raise from investors)

as $300 million with a hard cap of $350 million.  Capitala also told NovaFund that it intended to

raise the balance of the target size for Fund V in a series of closings after the first close.  Without

knowing about Capitala's bad faith and wrongful conduct, NovaFund reasonably expected it

could help raise $300 million in capital commitments for Fund V and separately managed

accounts, when taking into account investments from anchor investors and the strength of

Capitala's relationships with Carve Out investors.

27.     NovaFund did not know that after the first closing, Capitala continued to work

furtively with Sandler.  NovaFund had personal relationships with several of the investors on

Sandler's list and would have solicited them for Fund V but for the fact that they were added to

the Carve Out list.  Blocking NovaFund from marketing Fund V to some of the largest

institutional investors was also a factor in preventing Fund V from being fully raised.  It also

negatively impacted NovaFund's ability to earn fees under the Term Sheet.

28.     For example, in or about October 2016, one member of the NovaFund team had

asked for permission to arrange a meeting with a Connecticut-based investor, Knights of

Columbus, with which it had a relationship, that had been placed on the Carve Out list by

Sandler.  Capitala initially agreed, but then reversed itself and instructed NovaFund not to pursue

that investor.  Mr. Swercheck of Capitala said that he simply had his "wires crossed."  I later

learned that in an internal November 8, 2016 email, Mr. Swercheck noted that this was an "issue

of having two agents, one of which is in the dark about the other one."  NovaFund lost the

opportunity to meet with Knights of Columbus in the fall of 2016, when there would have been

momentum in the fund-raise.  Ms. Hapgood was eventually given permission to contact Knights

of Columbus in early 2017, but by then that investor had no further allocation for credit funds

remaining in 2017, and it declined to invest in Fund V.  This was an investor, however, that had

been identified as a top prospect by NovaFund for investing in Fund V.

29.     In the winter of 2016-2017, NovaFund's capital-raising efforts were again

stymied by a delay: a bitter divorce trial involving Mr. Alala. I had learned about this from Mr.

Alala and Mr. Swercheck, as well as others at Capitala. Mr. Alala was out of the office for a

four-week period between mid-January to mid-February and was available only intermittently

for calls. During this period, I received an email from Mr. Alala in which he pledged to turn his

efforts back to raising capital for Fund V once the trial ended. Mr. Alala's lack of full availability

during the key period of the marketing efforts had a negative impact on NovaFund's ability to

earn fees under the Term Sheet.

30.     In addition, Capitala requested that NovaFund suspend its efforts for over a month

in the mid-February to mid-March 2017 time period while Capitala focused its attention on

raising capital overseas in Europe and the Middle East.

31.     I and others at NovaFund informed Capitala that the delay in actively pursuing

investors in the first quarter could result in declines, because investors would be considering

other options, planning their 2017 budgets, and potentially committing to other funds before

being able to seriously consider Fund V.

32.     By this time, NovaFund had already notified Capitala that the market was not

reacting favorably to Fund V's investment strategy, which was focused on senior secured and

senior subordinated debt investments with a lower middle market focus. As a result, NovaFund

recommended that Capitala shift the strategy of Fund V to favor more senior debt investments and to focus less on subordinated debt investments.

33.     From NovaFund's perspective, February 2017 marked a turning point in the parties' relationship.  It had been about five months since Capitala had permitted NovaFund to begin marketing efforts.  At that time, the average length of a capital raise for a private fund was at least 18 months, and sometimes as long as 24 months.  When accounting for periods of Capitala's unavailability and stop-work instructions, NovaFund had only about 3 months to meet with investors at the end of 2016 when many investors were unavailable for the remainder of the year.

34.     By February 1, 2017, Mr. Alala was very frustrated with NovaFund and claimed that it had not produced meetings with investors.  These frustrations were unfounded in light of Capitala's inexperience with working with placement agents, Capitala's failure to follow advice provided by NovaFund, Capitala's decision to delay marketing efforts, Mr. Alala's unavailability and Capitala's resulting decision to take itself out of the market at inopportune moments, Capitala's efforts to block NovaFund from contacting the 105 investors on the Carve Out list (including 40 that were allocated exclusively to Sandler), and NovaFund's performance despite the obstacles that Capitala had created.

35.     On February 16, 2017, Mr. Alala sent an email to NovaFund threatening to fire and sue NovaFund, because he claimed that Capitala had learned that NovaFund was in the market helping to raise capital for another credit fund with a different investment strategy from Fund V.

36.     At the time, NovaFund did not believe these threats had any justification because the Term Sheet does not have a non-compete clause or a non-solicitation clause, and it does not

otherwise limit NovaFund to working only with Capitala.  NovaFund also believed the threats

were baseless because it would be highly unusual for a placement agent to work with only one

client at a time, particularly a client that has instructed a placement agent to work on marketing

efforts in fits and starts.  While we were negotiating the Term Sheet, I had told Mr. Alala that

NovaFund typically represented 3-4 funds at any given time.  And, in any event, NovaFund had

mistakenly alerted Capitala as early as May 2016 that NovaFund was working with another

credit fund managed by Deerpath.  In May 2016, NovaFund had provided Capitala with

responses to certain due diligence questions, some of which were meant for Deerpath.

      37.     During this time period – especially those periods when Capitala was unavailable

– NovaFund had been working on raising capital as a placement agent for other private fund

managers, as part of the normal course of its business.  In my experience, it is customary in the

industry for a placement agent to work for several asset managers, funds, or general partners at

the same time, unless a placement agent expressly agrees with a client not to solicit investors for

any other funds.  Even in the instances where there is such a non-competition clause, it is

typically limited to not competing in a specific investment strategy.  It bears repeating, however,

that NovaFund did not agree to any such limitations with Capitala and the Term Sheet does not

have a non-competition clause.  In any event, at the time Mr. Alala sent the February 16, 2017

email, the funds for Capitala and Deerpath clearly had different investment strategies.

      38.     To support the threats made in its February 16, 2017 email, Capitala boasted

about its litigation experience, its skill in handling complex trials, and the financial resources of

the entire Capitala platform that could be deployed. Mr. Alala stated that he was "in very great

litigation shape and multi week and immensely complex trials are fortunately one of my best

skill sets." He also strongly suggested that Capitala had the money to devote to a lawsuit against

NovaFund, Mr. Alala wrote that "the resources of the Capitala platform are substantial to execute on all mandates the firm pursues." As part of its threats, Capitala presented NovaFund with an ultimatum:  amend the Term Sheet on worse economic conditions or be fired.  Also, at or about this time in February 2017, Capitala stopped making monthly retainer payments.

39.     Even though NovaFund knew there was no merit to Mr. Alala's email, NovaFund took Mr. Alala's threat seriously and hired attorneys. NovaFund responded to Mr. Alala's email by taking a conciliatory tone, acknowledging that it had been a stressful time for Mr. Alala personally, and assuring him that "NovaFund has fully complied with the terms of our agreement with Capitala to date, and it is our intention to fully comply with the agreement moving forward."

40.     Days later, on March 7, 2017, Capitala proposed that the parties terminate their relationship by May 31, 2017, reduce the amount of the Success Fees, eliminate Tail Fees, and allow for a refund of the retainer payments made by Capitala.  In the email, which was sent by Mr. Wheelahan, Capitala stated that it was considering several other placement agent proposals. NovaFund rejected Capitala's offer.

41.     On March 10, 2017, Capitala instructed NovaFund not to attend any future meetings with investors. The email sent by Capitala states, "we will not permit Nova's attendance at any meetings, whether scheduled or not scheduled, from here forward."

42.     Capitala's conduct and threats in the first quarter of 2017 were particularly counter-productive to the parties' fund-raising efforts, and had the effect of further frustrating and preventing NovaFund from being able to effectively generate investor interest in Fund V. During this time period, Capitala also became non-communicative, making it very difficult for NovaFund to arrange meetings with potential investors. The first quarter of any calendar year is

typically the most productive in terms of investor focus and flexibility and can have a significant impact on fund-raising activities for the balance of the year.

43.     By late March 2017, Capitala requested that the parties amend the Term Sheet to allow Capitala to retain one or more additional placement agents focused on investors in specific non-North American jurisdictions, including Europe, Asia, and Israel, such that NovaFund would no longer be the exclusive placement agent for Capitala in those territories, but it would continue to be the exclusive placement agent in North America.

44.     The amendment to the Term Sheet ("Addendum") was negotiated on NovaFund's behalf by Mark McAndrews, Mr. Howe, and me, and Messrs. Alala and Wheelahan on Capitala's behalf. Messrs. Alala and Wheelahan did not identify any particular Capitala entity on which behalf they were negotiating. As was customary during our relationship, it was just "Capitala."

45.     For its part, NovaFund was willing to entertain an addendum because it was convinced that capital could be raised for Fund V and separately managed accounts, it had already expended considerable time and effort working under the Term Sheet, and it had already received interest from StepStone/Swiss Capital, which had the potential to make a substantial investment. Yet, had NovaFund known about Sandler's role and involvement with Capitala less than a year earlier, which significantly restricted NovaFund's ability to contact some of the investors most likely to be interested in Fund V, NovaFund never would have entered into the Term Sheet, let alone an addendum to it.

46.     By this time, I had a relationship with Mark Maruszewski, who was a Partner at StepStone. My professional relationship with Mr. Maruszewski began in the early 2000s when he was a Partner at Pomona Capital. On a personal level, Mr. Maruszewski was a neighbor of

mine in Darien, CT, we socialized together, and would regularly see one another on the train to New York.  Through this litigation, NovaFund has learned about the disparaging statements that Capitala made to StepStone about NovaFund.  Since Capitala began making disparaging remarks about NovaFund, my relationship with Mr. Maruszewski has become distant, and NovaFund has not done any business with StepStone or Swiss Capital since 2018, despite having worked with StepStone/Swiss Capital in connection with other funds for which NovaFund served as placement agent.  In fact, NovaFund had never had a hard time winning business until after engaging with Capitala.  Hamilton Lane did not do any business with NovaFund after 2018.  And, NovaFund has not been hired as a placement agent for new fund managers since no later than 2018, which it attributes to Capitala's bad faith conduct.

47.     Ultimately, NovaFund contacted about 500 investors in connection with either Fund V or separately managed accounts for Capitala.  Novafund also set up at least 70 meetings with potential investors in Fund V or separately managed accounts.  NovaFund, however, has been negatively impacted by the disparaging comments made by Capitala, and has experienced a loss in new business from fund managers and a detrimental impact in the relationships with investors it once enjoyed.  The impact from the harm to NovaFund's relationships with other fund managers and investors is longer term, because it impacts future fund-raising engagements.

[*remainder of page intentionally left blank*]

Bryan D. Kelley

Subscribed and sworn before me
this 28 day of Sept, 2021

Notary Public

My commission expires: 3-11-23

10351651

2