# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NOVAFUND ADVISORS, LLC,

    Plaintiff,

    v.

CAPITALA GROUP, LLC; CAPITALA
PRIVATE ADVISORS, LLC; CAPITALA
INVESTMENT ADVISORS, LLC; and
CAPITALA SPECIALTY LENDING
CORPORATION,

    Defendants.

No. 3:18-cv-1023 (MPS)

September 30, 2021

**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT OF FACTS IN
OPPOSITION TO DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION**

**PLAINTIFF NOVAFUND ADVISORS, LLC**

Jill M. O'Toole (ct27116)
Alison P. Baker (ct28136)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06109
Tel.: 860-251-5000
Fax: 860-251-5099
jotoole@goodwin.com
abaker@goodwin.com

*Its Attorneys*

Plaintiff NovaFund Advisors, LLC ("NovaFund") respectfully submits this Local Rule 56(a)2 statement of facts in opposition to the partial summary judgment motion filed by Defendants Capitala Investment Advisors, LLC ("CIA"), Capitala Private Advisors, LLC ("CPA"), and Capitala Specialty Lending Corp. ("CSLC") and in response to Defendants' Local Rule 56(a)1 Statement (ECF 328).  As used herein, CIA and CPA are referred to as "Capitala Group," Capitala Group, LLC as "CG," and CIA, CPA, and CGLLC collectively are "Capitala." Other capitalized terms are defined herein; NovaFund does not adopt Defendants' definitions.

The transcript excerpts and documents submitted herewith as exhibits are cited as follows:  the August 4, 2020 deposition of Richard Wheelahan is "Wheelahan 1 Tr."; his February 12, 2021 deposition is "Wheelahan 2 Tr."; his March 30, 2021 deposition is "Wheelahan 3 Tr."; the February 5, 2020 deposition of Joseph Alala is "Alala 1 Tr."; the June 15, 2020 deposition of Joseph Alala is "Alala 2 Tr."; the February 11, 2021 deposition of Stephen Arnall is "Arnall 1 Tr."; the June 15, 2021 deposition of Stephen Arnall is "Arnall 2 Tr."; the depositions of Casey Swercheck is "Swercheck Tr."; the deposition of Hamilton Lane is "HL Tr."; the deposition of Kemper is "Kemper Tr."; and the deposition of StepStone is "StepStone Tr." The supporting affidavits submitted herewith are cited as follows:  Bryan's Kelley's affidavit is "Kelley Aff.," and James Howe's affidavit is "Howe Aff."

As an initial matter, NovaFund objects to Defendants' Local Rule 56(a)1 Statement because it is fourteen (14) pages and thus contravenes Local Rule 56(a)(1), which only allows the statement to be twelve (12) double-spaced pages.  Defendants did not request the Court's leave to exceed the pages.  Accordingly, NovaFund has provided responses to all of Defendants' statements, but submits that Pages 12 and 13 (paragraphs 86-95) should be disregarded.  Finally, NovaFund objects to Defendants' use of Mr. Alala's deposition transcript, because its use is not permitted under Federal Rule of Civil Procedure 32.

## LOCAL RULE 56(a)2 STATEMENT

1.      NovaFund Advisors, LLC is a Delaware limited liability company with its principal place of business in Darien, Connecticut.  *See* Second Amended Complaint ("SAC"), Doc. 193, at ¶ 12.  **RESPONSE:**  Admitted.

2.      Capitala Group, LLC ("CGLLC") was a North Carolina limited liability company.  At all times, Joseph Alala was the only member of CGLLC.  *See* Declaration of Joseph B. Alala, III ("Alala Dec.") at ¶ 2, attached as Exhibit A; SAC, Doc. 193 at ¶ 13. **RESPONSE:**  Admitted.

3.      CIA is a Delaware limited liability company.  *See* Exhibit A, Alala Dec. at ¶ 3.; SAC, Doc. 193 at 15.  **RESPONSE:**  Admitted.

4.      As of 2016 and until October 25, 2019, Atlas Capitala Investments, LLC was the owner of CIA.  As of October 25, 2019, Atlas Capitala Investments, LLC and Mitsui & Co. were the owners of CIA.  *See* Exhibit A, Alala Dec. at ¶ 4.  **RESPONSE:**  Objection. Fed. R. Civ. P. 56(c)(2, 4) (supporting declaration does not show declarant's competency to testify on matters stated).

5.      CPA is a Delaware limited liability company whose sole member at all relevant times was CIA.  *See* Exhibit A, Alala Dec. at ¶ 5.; SAC, Doc. 193 at 14. **RESPONSE:**  Admitted.

6.      CSLC is a Delaware corporation that is wholly-owned by CPA.  CSLC was incorporated on March 22, 2018.  *See* Exhibit A, Alala Dec. at ¶ 6. **RESPONSE:**  Admitted.

7.      CGLLC did not have common ownership with CIA, CPA and CSLC, and CIA, CPA and CSLC did not control CGLLC.  *See* Exhibit A, Alala Dec. at ¶ 18.

**RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(2, 4) (supporting declaration does not show declarant's competency to testify on matters stated), and denied.  An opposing party need not deny a legal conclusion masquerading as a factual assertion, and a court need not accept such a legal conclusion as true.  *Miron v. Town of Stratford*, 976 F. Supp. 2d 120, 127 (D. Conn. 2013) (disregarding legal conclusions in Local Rule 56 statements).  CG was under the dominion and control of other Capitala entities, including CPA and CIA.  Wheelahan 1 Tr. 233:6-234:8; *infra* ¶¶ 108, 109, 111.

8.      CIA, CPA and CSLC are separately and validly formed entities under Delaware law. They serve distinct, legitimate business purposes, observe corporate formalities, each respect and maintain their corporate separateness, and maintain separate bank accounts and debt obligations. *See* Exhibit A, Alala Dec. at ¶ 19.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(2, 4) (supporting declaration does not show declarant's competency to testify on matters stated), and denied.  CIA, CPA, CSLC, and CG operated as part of a single corporate enterprise with many other Capitala entities.  Wheelahan 1 Tr. 235:4-15; *infra* ¶¶ 108-110; *see also* Ex. 26, at CAP_0030429-31.

9.      CIA and CPA are both SEC registered investment advisors, and CSLC is a marketing vehicle that arranges senior debt and minor equity co-investments from third party investors. *See* Exhibit A, Alala Dec. at ¶¶ 7, 13.  **RESPONSE:**  Admitted that CIA and CPA are SEC-registered investment advisors.  As to the remainder, objection, Fed. R. Civ. P. 56(c)(2, 4) (supporting declaration does not show declarant's competency to testify on matters stated), and denied.  Ex. 72, at 5 (in SEC filing Mr. Alala signed, admitting that Capitala Private Credit Fund V, L.P. ("Fund V") and CSLC have "similar investment strategies"); Wheelahan 1 Tr. 120:12-122:24 (Fund V, separately managed accounts

established between affiliates of StepStone Group LP ("StepStone") and Capitala ("StepStone SMAs"), and CSLC have same investment strategy); Ex. 66, at CAP_0075585 (Fund V is "the co investment strategy of the StepStone SMA").

10.     Prior to its dissolution, CGLLC provided advisory services. *See* Excerpts from the Deposition Transcript of Joseph B. Alala, III ("Alala Depo. Tr.") at p. 37:11-18, attached as Exhibit B.  **RESPONSE:** Denied. Capitala witnesses testified CG had no legitimate business purpose and it did not have a role in any specific projects. Wheelahan 1 Tr. 221:15-222:24, 224:22-225:1; Arnall 1 Tr. 244:3-6; *infra* ¶¶ 99, 100-102. Mr. Alala could not identify a single client for which CG allegedly provided services. Alala 1 Tr. 37:11-38:4, 40:14-17. The private placement memorandum ("PPM") for Fund V does not even mention CG. Ex. 40. And, CG is not mentioned in organizational charts given to an anchor investor, Hamilton Lane, in response to a request for information asking for details on Fund V. Ex. 26, at CAP_0030430-31.

11.     At all relevant times until June 30, 2021, CIA served as the investment advisor to Capitala Finance Corporation ("CFC"). CFC is a publicly traded business development company ("BDC"). *See* Exhibit A, Alala Dec. at ¶ 8.  **RESPONSE:**  Admitted.

12.     At all relevant times, CPA served as the investment advisor to CapitalSouth Partners SBIC Fund IV, L.P. ("Fund IV").  *See* Exhibit A, Alala Dec. at ¶ 9.  **RESPONSE:**  Admitted only that CPA served as investment advisor to CapitalSouth Partners SBIC Fund IV, L.P. ("Fund IV"), and denied if the inference is that CPA advised only Fund IV.  In September 2016, CPA "became adviser" to Fund V.  Ex. 44, at CAP_0047583.  CPA is also the investment advisor to the StepStone SMAs.  Ex. X, at CAP_0084872, CAP_0085779; Wheelahan 1 Tr. 89:15-23; 225:9-15.

13.     In late December 2015, CGLLC sought to raise capital for a credit fund. *See*

3

Exhibit A, Alala Dec. at ¶ 10.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(2, 4)

(supporting declaration does not show declarant's competency to testify on matters stated),

and denied.  *See supra* ¶ 10.

14.     The fund was initially referred to as Capitala Private Credit Fund I, LP and

later became known Capitala Private Credit Fund V, LP ("Fund V" or the "Fund").  *See*

Exhibit A, Alala Dec. at ¶ 11.  **RESPONSE:**  Admitted that Capitala Group initially told

NovaFund the fund would be Capitala Private Credit Fund I, L.P. ("PCF I") and later called it

Fund V, Ex. 3, at NF009989; otherwise denied (and objection to defining Fund V as

including PCF I given the lack of foundation that one is the successor entity of the other).

15.     CGLLC sought to engage a placement agent to assist with the fundraising

efforts for the credit fund. *See* Exhibit A, Alala Dec. at ¶ 12.  **RESPONSE:**  Objection, Fed.

R. Civ. P. 56(c)(1)(B) (materials cited do not establish absence of material dispute); Fed. R.

Civ. P. 56(c)(2, 4) (supporting declaration does not show declarant's competency to testify on

matters stated), and denied.  *See supra* ¶ 10.  No document shows that CG alone sought to

engage a placement agent; rather, the evidence shows it was "Capitala," "Capitala Group," or

other Capitala entities.  *See, e.g.*, Ex. 2, at CG00009829 (CapitalSouth, Capitala Finance

Group); Ex. 4, at CPA-CIA-CSLC0033017 (Capitala Group); Ex. 5, at CAP_0080390

(Capitala Group, Capitala Finance Corp. ("CFC"), CapitalSouth Growth Fund); Ex. 6, at

CAP_0080396 (same); Ex. 15 (same).  In response to Hamilton Lane's request for

information, the "Sponsor" of Fund V is listed as "Capitala Group," Ex. 25, at HL001130,

and the Sponsor, *i.e.* "Capitala Group," represents that it engaged NovaFund as placement

agent.  *Id.* at HL001129; *see* Wheelahan 1 Tr. 250:1-251:14.  When Mr. Swercheck first

contacted NovaFund about serving as placement agent, it was on behalf of "Capitala Group,"

not CG.  Ex. 1, at NF009886; *see* Ex. 3, at NF009991-98.

16.     In December 2015, Casey Swercheck began discussions with Bryan Kelley about serving as a placement agent. *See* Excerpts to the Deposition Transcript of Bryan Kelley ("Kelley Depo. Tr.") at 440:16-20, attached as Exhibit C.  **RESPONSE:**  Admitted only that Mr. Swercheck emailed Mr. Kelley on December 1, 2015 to introduce the "Capitala Group fundraise" and to set up a call to discuss; otherwise denied.  Ex. 1, at NF009886.

17.     On December 8, 2015, Casey Swercheck provided materials to Bryan Kelley concerning the Fund. *See* Exhibit C, Kelley Depo. Tr. at 477:2-5 and Defendants' Deposition Exhibit 519 attached as Exhibit D.  **RESPONSE:**  Admitted only that on that date, Mr. Swercheck provided a PDF of a presentation for PCF I dated as of November 2015; otherwise denied.  Ex. 3, at NF009989.

18.     The presentation included information about CFC and CapitalSouth SBIC Fund IV, LP. *See* Exhibit C, Kelley Depo. Tr. at 477:2-5; 483:24-484:5 and Exhibit D.  **RESPONSE:**  Admitted only that such presentation had limited information about CFC, Fund IV, and other Capitala entities; otherwise denied.  Ex. 3.

19.     Bryan Kelley provided Casey Swercheck a questionnaire seeking information. *See* Exhibit C, Kelley Depo. Tr. at 465:25-466:10 and Defendants' Deposition Exhibit 520 attached as Exhibit E.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied as Ex. E suggests only there was a list of questions.

20.     On January 6, 2016, Casey Swercheck provided the responses to the questionnaire to Bryan Kelley. *See* Exhibit C, Kelley Depo. Tr. at 465:25-466:10 and Exhibit E.  **RESPONSE:**  Admitted.

21.     The responses included information about CFC, Capitala Senior Liquid Loan

Fund, LLC and CapitalSouth Growth Fund IV ("Fund IV"). *See* Exhibit C, Kelley Depo. Tr. 465:25-466:10; 467:19-21 and Exhibit E. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied as Ex. E provides extremely limited information about those entities and instead states that information is being provided about "Capitala Group" and "Capitala." Ex. E.

22.     NovaFund and Joseph Alala, Richard Wheelahan and Casey Swercheck scheduled a due diligence meeting for February 1, 2016 *See* Exhibit C, Kelley Depo. Tr. at 488:10-21 and Defendants' Deposition Exhibit 523 attached as Exhibit F. **RESPONSE:** Admitted.

23.     On January 31, 2016, Casey Swercheck provided Bryan Kelley a draft term sheet for the Fund. The term sheet provided that the Fund was being organized by CIA. *See* Exhibit C, Kelley Depo. Tr. 479:15-22 and Defendants' Deposition Exhibit 521 attached as Exhibit G. **RESPONSE:** Admitted that Mr. Kelley, Mr. Howe, and Ms. Hapgood were sent the email and the term sheet states CIA organized PCF I, otherwise denied. Ex. G, at NF000008 (defining CIA, together with its "affiliates and related entities," as "Capitala Group").

24.     The draft term sheet provided to NovaFund indicated that most of the Fund's investments will be co-investments with CFC or Fund IV, both of which are under common management with the Fund. *See* Exhibit C, Kelley Depo. Tr. 483:24-484:11 and Exhibit G. **RESPONSE:** Admitted only as to PCF I; but denied that the term sheet establishes such information for Fund V. Ex. G.

25.     The draft term sheet provided that the Fund's general partner is Capitala PCF I, LLC, a North Carolina limited liability company (the "General Partner"). *See* Exhibit C, Kelley Depo. Tr. 485:9-17 and Exhibit G. **RESPONSE:** Admitted that the term sheet states

6

the general partner for PCF I is Capitala PCF I, LLC; but denied it does so for Fund V.  Ex. G.

26.     The draft term sheet further provided that the General Partner would be responsible for making investment and other decisions for the Fund and is controlled by CIA. *See* Exhibit G.  **RESPONSE:**  Admitted only as to PCF I; but denied the term sheet provides such information concerning Fund V.  Ex. G.

27.     On February 1, 2016, a due diligence meeting was held in Charlotte, North Carolina. *See* Exhibit C, Kelley Depo. Tr. 488:10-24.  **RESPONSE:**  Admitted.

28.     On February 4, 2016, Henry Riffe provided Bryan Kelly an updated term sheet for the Fund. *See* Exhibit C, Kelley Depo. Tr. 507:23-508:23 and Defendants' Deposition Exhibit 525 attached as Exhibit H.  **RESPONSE:**  Admitted for Fund V, but denied for PCF I.  Ex. H.

29.     The updated term sheet provided that the Fund was being organized by Capitala Private Advisors, LLC ("CPA") which, together with its affiliates and related entities were referred to as "Capitala Group." *See* Exhibit H.  **RESPONSE:**  Admitted that the term sheet states that CPA organized Fund V; but denied it so states for PCF I.  Ex. H.

30.     The updated term sheet provided to NovaFund indicated that most of the Fund's investments will be co-investments with CFC or Fund IV, both of which are under common management with the Fund. *See* Exhibit H.  **RESPONSE:**  Admitted only as to Fund V; but denied that the term sheet establishes such information for PCF I.  Ex. H.

31.     The updated term sheet provided that the Fund's general partner is Capitala PCF V, LLC, a North Carolina limited liability company. *See* Exhibit H.  **RESPONSE:**  Admitted for Fund V, but denied for Fund I.  Ex. H.

32.     The updated term sheet further provided that the General Partner would be

7

responsible for making investment and other decisions for the Fund and is controlled by CIA. *See* Exhibit H.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because the term sheet states the General Partner "is managed by Capitala Group" and nowhere mentions CIA.  Ex. H, at CAP_0000229.

33.     On February 5, 2016, Mr. Kelley provided Mr. Alala with a proposed term sheet and indicated "[w]e would like to execute this short form contract before proceeding to a full engagement letter that will incorporate the other key legal and regulatory matters for a private offering." *See* Exhibit C, Kelley Depo. Tr. 514:23-515:16 and Defendants' Deposition Exhibit 526 attached as Exhibit I.  **RESPONSE:**  Admitted that the email so states, and otherwise denied because Mr. Kelley sent the draft to Capitala and its outside legal counsel, whereas NovaFund was not represented by counsel.  Kelley Aff. ¶ 8.

34.     NovaFund drafted the proposed term sheet and utilized Capitala Group, LLC as the signatory. Exhibit C, Kelley Depo. Tr. 514:23-516:9.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied.  Kelley Aff. ¶¶ 8, 9; Ex. 13, at CAP_0029555; Ex. 18, at NF000097; Ex. 19, at NF000130; Ex. 20, at NF010459. Mr. Kelley listed CG as the counterparty only because he asked Mr. Wheelahan which Capitala entity to list and was told to use CG.  Kelley Aff. ¶ 9; *see* Wheelahan 2 Tr. 89:3-16. Though Mr. Wheelahan did not recall such a conversation, he did not deny it occurred, Wheelahan 3 Tr. at 174:8-175:2, and testified that he "withheld" information from NovaFund about the fact that CG would have no role in connection with Fund V.  *Id.* at 303:3-25.

35.     On February 18, 2016, Mr. Alala provided Mr. Kelley with a draft private placement memorandum ("PPM") for Fund V. Exhibit C, Kelley Depo. Tr. 531:1-22 and Defendants' Deposition Exhibit 527 attached as Exhibit J.  **RESPONSE:**  Admitted.

36.    The draft PPM provided that the Fund was being organized by CPA. *See* Exhibit J.  **RESPONSE:**  Admitted that in one place the PPM states Fund V was "organized" by CPA, Ex. J, at CAP_0000319, but denied as to Fund I, and denied because the PPM also states that CPA, "together with its affiliates and related entities," which are defined as "Capitala Group," "organizes and manages credit-focused investment vehicles," *id.,* at CAP_0000312 and, for additional information concerning Fund V, investors are directed to contact "Capitala Group" via CPA.  *Id.,* at CAP_0000363.

37.    The draft PPM provided that CPA was a Charlotte based investment advisor. *See* Exhibit J.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because the draft PPM states that CPA, "together with its affiliates and related entities," which are defined as "Capitala Group," "is a Charlotte-based investment advisor that, together with the other members of Capitala Group, organizes and manages credit-focused investment vehicles."  Ex. J, at CAP_0000312.

38.    The draft PPM identified Capitala PCF Fund V, LP as the general partner for the Fund. *See* Exhibit J.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied.  Ex. J, at CAP_0000313 (Capitala PCF V, LLC).

39.    The draft PPM indicated that the administrative and day-to-day operational services of the Fund will be provided under contract with a management company affiliated with the General Partner. *See* Exhibit C, Kelley Depo. Tr. 540:19-541:5 and Exhibit J. **RESPONSE:**  Admitted as to Fund V, and denied as to Fund I.  Ex. J.

40.    On April 26, 2016, Mr. Kelley provided a revised term sheet to Mr. Alala and Mr. Swercheck. The revised term sheet provided by Mr. Kelley still had CGLLC as the signatory. *See* Excerpts to the Deposition Transcript of Richard Wheelahan 3-30-2021

("Wheelahan Depo. Tr.") 288:12-24 attached as Exhibit K and Plaintiff's Deposition Exhibit 239 attached as Exhibit L.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited deposition transcript does not support statement), and denied, because the Term Sheet was heavily negotiated and CG was listed as a signatory at Capitala's request.  *See supra* ¶ 34.

41.    On April 28, 2016, Richard Wheelahan emailed a revised draft of the term sheet to Bryan Kelley which included the names on the carve out list which numbered approximately 105 names. *See* Excerpts to the June 17, 2021 Deposition Transcript of Bryan Kelley ("Kelley June Depo. Tr.") 36:12-21 attached as Exhibit N; and Plaintiffs' Deposition Exhibit 241 attached as Exhibit M.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited deposition transcript does not support statement because at Ex. N, 36:22-24, witness states document does not refresh his recollection as to the contents), and denied.  Ex. M (exactly 105).

42.    After Mr. Wheelahan provided the carve out list names, Mr. Kelley had an approximately five (5) to ten (10) minute conversation with Mr. Swercheck about the names on the list. *See* Kelley June Depo. Tr. 38:1-12.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. Kelley did not testify the conversation was five minutes.  Also, Ex. O, at NF000127, suggests there was another telephone call between the parties.

43.    Mr. Kelley and Mr. Swercheck did not discuss any particular names on the CO List. *Id.*  **RESPONSE:**  Denied.  Mr. Kelley recalls that Mr. Swercheck had previously told him to expect the carve out list to include about 60 investors, and during this particular conversation they talked about the inclusion of 40 additional investors.  Kelley Aff. ¶¶ 10, 12.

44.    Mr. Kelley did not recall expressing to Mr. Swercheck that NovaFund had a good relationship with any of the names on the CO List. *Id*. at 40.  **RESPONSE:**  Denied.

Ex. O, at NF000127-28 (referring to discussion "yesterday," referring to the "LP names we know well" on the carve out list, and identifying 6 additional "gatekeepers/consultants on the carve out list that [NovaFund] would like to discuss").

45.     The only names on the CO List Mr. Swercheck expressed confidence in were Hamilton Lane, Kemper, and the State of Florida–with Hamilton Lane and Kemper being the only two investors who committed to Fund V.  *Id.* at 43:17-44:5.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied.  *Supra* ¶ 43.  In the first and only closing of Fund V held on August 31, 2016, an affiliate of Kemper and four clients through Hamilton Lane committed capital to Fund V.  Wheelahan 1 Tr. 183:19-185:6; HL Tr. 26:5-28:9; Kemper Tr. 27:6-22; Swercheck 1 Tr. 190:25-191:2 (first closing held August 31, 2016); Alala 1 Tr. 112:17-19 (first closing was only closing).

46.     Mr. Swercheck also did not represent that any of the names on the CO List previously invested in a fund with any Capitala branded entity. *Id*.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. Kelley testified only that he did not remember and not that Mr. Swercheck had not so represented.  Ex. N, at 43:17-44:5.  Also, by the time of the conversation, Mr. Swercheck had already told Mr. Kelley that Hamilton Lane and Kemper had previously invested with Capitala.  *See* Ex. L (by April 26, 2016, Mr. Kelley knew Hamilton Lane and Kemper were likely to be carve out investors); Ex. 13, at CAP_0029556 (same); Ex. E (Kemper had previously invested); Kelley Aff. ¶ 11.

47.     Mr. Kelley, nor anyone associated with NovaFund, asked that any of the names be removed from the carve out list. *See* Exhibit C, Kelley Depo. Tr. 88:3-12.  **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied

because cited deposition testimony concerns only 1 investor.  *See* Ex. 19, at NF000128

(requesting that Cambridge Associates be removed and to discuss other gatekeepers/advisors).

48.    On April 29, 2016, Mr. Kelley offered a compromise concerning the carve out

list to provide a cap of $125,000,000 on carve out list investors. NovaFund would receive a fee

for any commitments made by carve out list investors over the $125,000,000 cap. *See* Exhibit

N, Kelley June Depo. Tr. 45:15-46:4; 50:6-23 and Defendants' Deposition Exhibit 658

attached as Exhibit O.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials

do not support statement), and denied because Mr. Kelley offered two different compromises

on the carve-out list: (1) a reduced fee on commitments from all Carve Out investors; and (2) a

$125 million cap on commitments from Carve Out investors after which NovaFund would

receive full fees on commitments, even if from Carve Out investors.  Ex. 19, at NF000127-28.

49.    In an email to Mr. Wheelahan, Mr. Kelley explained that NovaFund did not

know certain limited partners on the carve out list. *See* Defendants' Deposition Exhibit 659

attached as Exhibit P.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials

do not support statement), and denied because the email states that there are certain investors

either that NovaFund does "not know the LP at all **or** you have demonstrated a superior

relationship," and then Mr. Kelley identifies 3 specific investors.  Ex. P, at NF010462.

50.    On May 5, 2016, Mr. Kelley sent a copy of the term sheet signed by him

and James Howe to Mr. Alala, Mr. Wheelahan and Mr. Swercheck. CGLLC was listed as

the counterparty. *See* Plaintiff's Deposition Exhibit 2 attached as Exhibit Q and

Defendants' Deposition Exhibit 579 attached as Exhibit R. **RESPONSE:** Admitted only

that on May 5, 2016, Mr. Kelley sent a version of the Term Sheet partially signed;

otherwise denied.  Ex. Q is the final version of the Term Sheet executed on or about May

9, 2016.  Wheelahan 1 Tr. 22:18-23:12; Kelley Aff. ¶ 14.  By early February 2016, Mr. Wheelahan had told Mr. Kelley which Capitala entity to use as counterparty.  *Supra* ¶ 34.

51.     After Mr. Alala received the term sheet signed by Mr. Kelley and Mr. Howe, Mr. Alala asked whether it was clear that the fee attaches to limited partner commitments on equity but does not apply to third party debt. Mr. Kelley confirmed it did. *See* Exhibit N, Kelley June Depo. Tr. 51:8-52:21 and Exhibit P.  **RESPONSE:**  Admitted.

52.     Richard Wheelahan asked NovaFund to change the fee proposal language to provide that "Capitala will agree to compensate Nova for an amount equal to 1.5% of the amount of equity capital that any Target Investor commits to the Fund or a separately managed account ("Success Fee")." *See* Exhibit N, Kelley June Depo. Tr. 53:13-54:1 and Exhibit P.  **RESPONSE:**  Admitted.

53.     Mr. Kelley agreed to the language change proposed by Mr. Wheelahan, and revised the term sheet. *See* Exhibit N, Kelley June Depo. Tr. 53:13-54:1 and Exhibit P.  **RESPONSE:**  Admitted.

54.     On May 9, 2016, Mr. Kelley and Mr. Howe signed the revised term sheet. *See* Exhibit N, Kelley June Depo. Tr. 69:1-7.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because cited materials do not establish when Messrs. Kelley and Howe signed the Term Sheet.  Mr. Alala circulated a Term Sheet executed by Messrs. Kelley and Howe on May 9, 2016.  Ex. 21.

55.     Mr. Alala signed the term sheet on behalf of CGLLC. *See* Exhibit B, Alala Depo. Tr. 108:18-20 and Exhibit Q. **RESPONSE:** Admitted only that Mr. Alala signed the Term Sheet in a signature block for CG; otherwise denied because when the Term Sheet was signed Capitala considered CG to be a "relatively meaningless entity," with "[n]o assets, no

13

operations, no real structure," that was used to be a "signatory to term sheets . . not substantive or preliminary in a sense." Wheelahan 1 Tr. 21:6-22. Capitala hired NovaFund to "help Capitala raise capital commitments" primarily for Fund V, *id.* 23:13-16, for which the fund manager is CPA, *id.* 221:15-23, as well as for other investment vehicles. *Id.* 23:13-25. Mr. Wheelahan testified those other investment vehicles included sidecars to Fund V, single investor funds, "fund[s] of one," or SMAs. *Id.* 180:23-181:24. CG was considered "essentially a do nothing entity that is under common control with CPA by virtue of [Mr. Alala]'s control." *Id.* 221:24-222:9. In "order to accomplish the Fund V work," NovaFund was "working with legitimate operating entities," including CPA. *Id.* 222:10-24. Capitala also regularly used "Capitala Group" to refer to CIA and CPA, *see, e.g.*, Ex. 44, at CAP_0047583 (in SEC filing defining "Capitala Group" as CPA and CIA); or to CIA and its affiliates, Ex. G, at NF000008; or to CPA and its affiliates, Ex. H, at CAP0000228. The initial PPM sent to NovaFund was subject to further update, review, and modification by "The Capitala Group," Ex. I, at CAP_0000305, and defined CPA, together with its affiliates and related entities, as "Capitala Group." *Id.,* at CAP_0000307. Mr. Wheelahan told Mr. Kelley to use CG as the counterparty and withheld information about CG's true do-nothing purpose. *Supra* ¶ 34. NovaFund also understood it was being retained as placement agent by "Capitala," "Capitala Group," or other Capitala entities. *Supra* ¶ 15. Mr. Alala also told NovaFund that CPA would be sending the retainer payments due under the Term Sheet. Ex. 21. NovaFund thus understood Mr. Alala to be signing the Term Sheet on Capitala's behalf. Kelley Aff. ¶ 14.

      56.    At the time Mr. Kelley signed the term sheet on May 9, 2016, he knew that the fund manager for Fund V was CPA. *See* 12-7-2020 Affidavit of Bryan Kelley in Support of

Prejudgment Remedy ("Kelley PJR Aff.") at ¶ 13 Doc. 222-1 attached as Exhibit S; Exhibit N at 70:14-21. **RESPONSE:** Admitted.

57.     In Mr. Kelley's view, the first step in the fundraising process is signing an agreement with the fund manager. *See* Excerpts of Prejudgment Remedy Hearing Transcript ("PJR Tr.") at p. 8 attached as Exhibit T. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. Kelley testified only about the usual steps for a fundraise.  For Fund V's fundraise, Mr. Wheelahan told Mr. Kelley to use CG as the counterparty and withheld information about CG's true do-nothing purpose.  *Supra* ¶ 34.  Capitala also intentionally obfuscated the information concerning the Capitala counterparty under the Term Sheet.  *Supra* ¶ 55.

58.     NovaFund was aware there were multiple Capitala branded entities. With full knowledge that CPA was the fund manager for Fund V, NovaFund elected to only obligate CGLLC on the Term Sheet—not CPA (or any other Defendants or any other Capitala branded entity). *See* Exhibit C, Kelley Depo. Tr. 186:24-187:16; Exhibit N, Kelley June Depo. Tr. 90:4-22.  **RESPONSE:**  Denied.  For Fund V's fundraise, Mr. Wheelahan told Mr. Kelley to use CG as the counterparty and withheld information about CG's true do-nothing purpose.  *Supra* ¶ 34.  Capitala also intentionally obfuscated the information concerning the Capitala counterparty under the Term Sheet.  *Supra* ¶ 55.

59.     Pursuant to the Term Sheet, NovaFund further had the discretion to require execution of a more definitive agreement, but NovaFund elected not to do so. *See* Exhibit C, Kelley Depo. Tr. 186:24-187:16. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. Kelley testified only that NovaFund started with a Term Sheet instead of a longer engagement letter.  Capitala knew

15

that the Term Sheet was "intended to precede an engagement letter." Ex. 14.  Mr. Howe

recalls regularly asking Mr. Alala about preparing an engagement letter and being brushed

aside.  Howe Aff. ¶ 3; *see* Ex. I, at NF000500 (suggesting parties start with Term Sheet

which "allows us to start working together sooner and to make sure we are on the same

page on the business points").  Internally, Capitala discussed keeping the documentation of

the engagement with NovaFund "simple" and "less 'formal'" because "[t]he more we enter

amendments to terms sheet then becomes more like a contract."  Ex. 61.  Mr. Wheelahan

███████████████████████████████████████████████████████████████

███████████████████████████████████████████  Ex. 56, at CPA-

CIA-CSLC0029709.  By March 23, 2017, Mr. Alala thought ████████████████████

████████████  *id.,* at CPA-CIA-CSLC0029708, and by April 11, 2017, he clearly did

not want to enter into a lengthier agreement.  *See* Ex. 59.  Moreover, NovaFund had no way

of knowing that the only "business purpose" of CG "was to be the signatory for certain

nuisance agreements . . . like a stooge, a useful idiot."  Wheelahan 1 Tr. 224:22-225:4.

NovaFund did not know that CG was designed to be a "do nothing entity" and a "shell."  *Id*.

233:13-16, 221:24-222:9.

      60.    Pursuant to the Term Sheet, the services provided required NovaFund to "make

best efforts to place partnership interest in [Fund V] with North American, European, Australian

and Asian Investors ("Target Investors").  Nova Fund will begin advisory work immediately

with Capitala Group LLC ("Capitala" to assist with the preparation of marketing materials and,

in coordination with Capitala, contacting potential Fund investors." *See* Exhibit Q.

**RESPONSE:**  Admitted, except for typographical errors.

      61.    Pursuant to the Term Sheet, CGLLC agreed to pay NovaFund a monthly retainer

fee of $20,000.00 until the sooner of (1) the first close of Fund V if such close constitutes commitments for which NovaFund is paid a success fee in excess of $20,000.00; or (2) $200,000.00 in retainer fees have been paid to NovaFund with the first retainer fee due on May 11, 2016. *See* Exhibit Q.  **RESPONSE:**  Denied, because misquotes the Term Sheet which provides part (1) is "in excess of **$200,000**," not "**$20,000**."  Also, in practice, CPA, not CG, paid the retainer and expenses to NovaFund.  *See* Ex. 45 (expense reimbursement request for $4838.97) and Ex. 46, at NF037541 (CPA transferred $4838.97 two days later); Ex. 27 (CPA paid NovaFund's then broker-dealer, Columbus, first $20,000 retainer under Term Sheet); Wheelahan 1 Tr. 234:9-15.

62.    "[CGLLC] also agreed to compensate NovaFund for an amount equal to of the amount of equity capital that any Target Investor commits to the Fund or a separately managed account ("Success Fee"). Should [CGLLC] agree to a lower management fee than 1.5% for any Target Investor, NovaFund will earn a fee equal to one year of the Company's management fee from the Target investor, but in no case less than 1.0% of committed capital for the Target investor(s) . . . . Retainer Fees will offset Success Fees at the rate of 50% until all Retainer Fees have been rebated. The Success Fee will be paid quarterly based on invested capital with NovaFund's total Success Fee being paid in full in 30 months. NovaFund will be due a fee for capital commitments from Target Investors that close into the Fund to the next [CGLLC] sponsored successor vehicle with a substantially similar strategy at the rate of 50 basis points of such capital commitments ("Nova Tail Fee")." *See* Exhibit Q.  **RESPONSE:**  Denied, because misquotes the Term Sheet.  Defendants' alteration of the Tail Fee provision renders it meaningless given that CG did not sponsor Fund V, *supra* ¶ 15, and was a "do nothing" entity.  *Supra* ¶ 55.

17

63.     At no point from the time Mr. Kelley sent the initial draft of the term sheet on
February 5, 2016 until his execution of the term sheet on May 9, 2016 did he ever ask that
any other Capitala entity execute the term sheet. *See* Exhibit C, Kelley Depo. Tr. 515:11–
516:20.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not
support statement), and denied because Mr. Wheelahan told Mr. Kelley which Capitala
entity to list on the Term Sheet, Capitala intentionally obfuscated the counterparty through
its interchangeable use of the terms "Capitala" and "Capitala Group," and Capitala resisted
efforts to enter into a more fulsome agreement.  *Supra* ¶¶ 34, 55, 57, 58, 59.

64.     After the Term Sheet was executed, NovaFund did not immediately
begin marketing to investors. *See* Exhibit S, Kelley PJR Aff. at ¶ 28.
**RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support
statement), and denied because the cited material describes only Capitala's request, not
NovaFund's work.  NovaFund immediately began marketing work for investors by
advising on and making revisions to the PPM and the investor presentation, and by
advising Capitala on its efforts with the anchor investors.  Ex. S ¶ 28; Kelley Aff. ¶ 24.

65.     NovaFund did not begin marketing to investors until September 2016 after the
first close of two investors known as "anchor investors"—Hamilton Lane and Kemper
Insurance. *Id.* at ¶ 29.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do
not support statement), and denied because cited material describes only Capitala's instructions,
not NovaFund's work.  Ex. 31; Kelley Aff. ¶ 25.  NovaFund also needed a final PPM before it
could begin marketing in earnest.  Ex. 33.

66.     NovaFund was aware that CGLCC sought to have the first close prior to
NovaFund beginning its marketing investors for Fund V. *Id.*  **RESPONSE:**  Objection, Fed. R.

Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied. CG did no work on Fund V. *Supra* ¶ 10; *infra* ¶ 100. Soon after the Term Sheet was signed, Capitala instructed NovaFund to delay marketing Fund V to investors until after the first closing with the anchor investors. Wheelahan 1 Tr. 186:14-23. NovaFund advised that delaying such efforts could result in not closing additional capital before year end. Ex. 28, at CAP_0003629; Ex. 34 (as of August 29, 2016, another closing in 2016 unlikely).

67. When NovaFund began marketing the Fund to investors in September 2016, it identified to potential investors that Fund V was a limited partnership organized by CPA. *See* Excerpts to the Deposition Transcript of Kallie Hapgood ("Hapgood Depo. Tr.") 185:7-18 attached as Exhibit U and Defendants' Deposition Exhibit 543 attached as Exhibit V.

**RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement). To the extent this is a reference to statements in the PPM, *see supra* ¶ 36.

68. Mr. Alala was not available for certain meeting with potential investors for Fund V during the month of October 2016, and in January and February 2017. *See* Exhibit S, Kelley PJR Aff. at ¶ 39. **RESPONSE:** Admitted.

69. In February 2017, Mr. Alala sent an email to NovaFund threatening NovaFund because he learned that NovaFund was also raising capital for another credit fund—Deerpath Capital Management. *See* Exhibit C, Kelley Depo. Tr. 302:18-21.

**RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not mention Deerpath and thus do not support statement), and denied. Capitala fabricated a reason to send an email to NovaFund on February 16, 2017 threatening termination, Kelley Aff. ¶ 35, so that Capitala could renegotiate the terms of the Term Sheet to allow Capitala to hire another placement agent. Ex. 47; Ex. 49 (two weeks before said email, Mr. Alala planned to

meet with another placement agent); Ex. 50, at CAP_0051083 (Capitala discussed switching placement agents with Hamilton Lane); Ex. 51, at CG00098647; CG00106889 (discussing other placement agents a week before said email); Ex. 57.  Both before and after signing the Term Sheet, NovaFund told Capitala that it would be working with other fund managers, and Capitala already knew soon thereafter that NovaFund was working with Deerpath.  Ex. 9 (Capitala referring NovaFund to another fund manager); Ex. 22, at CAP_0029974 ("These guys will represent three other funds this year. . . ."); Kelley Aff ¶ 36.

70.     At or about that time, Mr. Alala instructed NovaFund to stop attending meetings for Fund V. *See* Exhibit S, Kelley PJR Aff. at ¶ 36 and 40.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied.  In the period between mid-February to mid-March, Capitala had requested that NovaFund suspend its efforts while Capitala conducted fundraising in Europe and the Middle East.  Ex. S ¶ 40. In the time period after Mr. Alala had sent his email threatening termination, Capitala did not have the expectation that NovaFund would be reaching out to investors on Capitala's behalf. Swercheck 1 Tr. 271:12-20.  On March 10, 2017, Capitala formally instructed NovaFund not to attend further investor meetings.  Kelley Aff. ¶ 41.  Capitala also deactivated NovaFund's ability to access the data room for the fundraise.  Ex. 53.

71.     Around March 2017, CGLLC stopped making the monthly retainer payments.  SAC, Doc. 193, at ¶ 69.  **RESPONSE:**  Denied, because CG never made any retainer payments, and therefore could not have stopped doing so.  CPA stopped making monthly retainer payments in about February 2017.   Kelley Aff. ¶ 38.

72.     On April 24, 2017, NovaFund and CGLLC entered into an Addendum to the Term Sheet. NovaFund voluntarily and with full knowledge entered into the Addendum *See*

Exhibit N, Kelley June Depo. Tr. 112:2-25 and Plaintiff's Deposition Exhibit 360B attached as Exhibit W. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied. The Addendum was entered into between NovaFund and "Capitala Group," and nowhere mentions CG. Ex. 60. Capitala was "purposefully not specific" about the Capitala entity referenced in the Addendum, and it could have referred to other Capitala entities including CPA and CIA. Wheelahan 1 Tr. 195:19-197:13; Kelley Aff. ¶ 44. NovaFund would not have entered into either the Term Sheet or Addendum had it known of the various frauds that Capitala had perpetrated (using a dummy counter signatory, including many investors on the carve out list with which it had no relationship, working with other placement agents, including Sandler, O'Neill & Partners, L.P. ("Sandler")), Kelley Aff. ¶¶ 5, 7, 15, and Capitala's bad faith. *See, e.g.*, Ex. 52 (while negotiating Addendum, Capitala's internal view was ██████████████████ ██████████████); *See infra* ¶¶ 103-111.

73.    The Addendum provided that CGLLC was free to retain placement agents focused on non-North American limited partners (e.g. Europe, Asia and Israel) and that capital commitments obtained from such jurisdictions will generally not entitle NovaFund to a Success Fee. *Id.* **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied. *Supra* ¶ 72; Ex. 60 ¶ I(a).

74.    Hamilton Lane and Kemper were the only investors that committed to Fund V. *See* Exhibit A, Alala Dec. at ¶ 20. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied. *Supra* ¶ 45.

75.    Swiss Capital did not make a commitment to Fund V. *See* Exhibit A, Alala Dec. at ¶ 14. **RESPONSE:** Admitted.

76.     CPA entered into two investment sub-advisory agreements with Swiss Capital.  *See* Exhibit A, Alala Dec. at ¶ 15 and Plaintiff's Deposition Exhibits 9 and 10 attached as Exhibit X.  **RESPONSE:**  Denied.  Affiliates of Capitala and StepStone entered into two investment advisory agreements in connection with the StepStone SMAs.  Ex. X.  StepStone called them the separately managed accounts that were established with Capitala, one onshore and one offshore.  StepStone Tr. 46:16-50:16.

77.     The investment sub-advisory agreements between CPA and Swiss Capital did not contain any commitment of capital from Swiss Capital. *See* Alala Dec. at ¶ 16 and Exhibit X.  **RESPONSE:**  Denied.  To StepStone, Capitala is a "sponsor" of the SMAs, StepStone Tr. 37:15-19, which means Capitala is an investment management firm organizing private capital.  *Id.* 14:2-10.  As a sponsor, Capitala had "investment authority over the account."  *Id.* 134:6-19.  Once the SMAs were set up, Capitala could begin deploying capital and arranging loans. *Id.* 182:25-183:19. StepStone's corporate representative confirmed that under the StepStone SMAs, StepStone was obligated to invest funds when Capitala identified appropriate investments.  *Id.* 160:10-161:13. He testified that if a "loan is funded, capital would be deployed to fund the loan," *id.* 213:8-19, unless the loan at issue was a delayed draw facility (*i.e.* a loan that has been made but the borrower may take the loan proceeds over time, *id.* 203:18-22), in which case the "loan could be committed but not have cash move."  StepStone's database generates a report that "reflects the cash flows related to the StepStone Capitala SMAs."  *Id.* 190:6-191:25.  The report tracked, *inter alia*, "how much was **committed** to the onshore SMA at that date."  *Id.* 193:5-13 (emphasis added). Thus, under the SMAs, a "commitment" occurs later in the process, once a loan has been made and the SMAs are obligated to fund them.  This is consistent with internal Capitala communications referring to "commitments" being made in connection with

the StepStone SMAs. *See, e.g.*, Ex. 62 (after meeting with StepStone in Nov. 2017, Capitala's

CFO, Stephen Arnall, asked ███████████████████████████████████████

███████████████████████████); Ex. 63, at CPA-CIA-CSLC0002296 (in Nov. 2017,

Mr. Alala states that Capitala received "two verbal commitments," one from Swiss Capital,

which he described as "a $750MM to $1Billion commitment to private funds in the form of a

SMA offshore vehicle"); Ex. 65 (in providing a ████████████ in Jan. 2018, Mr. Alala

explains that StepStone wants to ████████████████████████████████

████████ and expects to grow the ████████████ thereafter); Ex. 67 (in Feb. 2018, Mr.

Alala describes the StepStone SMA as a ████████████).  When Capitala signed the

Term Sheet, it understood it was obligated to pay fees on investments by an investor to Fund V

or separately managed accounts, Wheelahan 1 Tr. 54:16-25; 59:6-12, because Capitala would

have been "happy to have capital raised in any format that paid us for it."  *Id.* 23:13-25.

78.     Pursuant to the executed Term Sheet, CGLLC agreed "to compensate Nova

for an amount equal to 1.5% of the amount of equity capital that any Target Investor

commits to the Fund or a separately managed account ("Success Fee")."  *See* Exhibit Q.

**RESPONSE:**  Admitted.

79.     Success Fees are calculated based on committed capital. Exhibit T, PJR Tr. at

104:18-21; 127:18-22.  **RESPONSE:**  Admitted. Wheelahan 1 Tr. 27:7-16 (defining

invested and committed capital); *id.* 28:24-29:18 (Mr. Wheelahan understood under Term

Sheet that if investor committed to an SMA, NovaFund could receive fees).

80.     A fund manager can call capital based on the commitments to make

investments in other companies pursuant to the strategy of the Fund. *See* Exhibit T, PJR Tr. at

p. 11:15-23.  **RESPONSE:** Admitted as to funds; otherwise denied because cited testimony

does not concern SMAs, which effectively call capital by demanding funds when the SMAs commit to making loans. Mr. Alala stated ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Alala 1 Tr. 269:22-270:25.  Mr. Wheelahan also explained that CPA's role with the StepStone SMAs was to identify investment opportunities, which are loans by the SMAs to U.S. companies. Wheelahan 1 Tr. 89:24-90:20.  The onshore SMA makes "loans at the time they are made," and the offshore SMA "purchases loans after the time that they were initially made" for tax reasons. *Id.* 87:14-88:13. When the SMAs commit to a loan, "StepStone had discretionary authority to demand funds just like any GP does of his LPs and it was calling that capital from its clients and depositing that money into the bank account." *Id.* 92:3-10.

81.     Under the Term Sheet, a commitment of capital requires an agreement between an investor and manager binding the investor to an investment program, including an investment amount. *See* Exhibit N, Kelley June Depo. 201:2-18; *see also* Deposition Excerpts of Mark McAndrews ("McAndrews Depo. Tr."), June 2021 at 316:19- 317:19 attached as Exhibit Y.  **RESPONSE:**  Admitted as to funds; otherwise denied because cited testimony does not concern SMAs and does not support statement.  *Supra* ¶¶ 77, 80.

82.     The commitments are made during a closing "when an investor commits, through executing legal documentation that binds them, to provide capital to the manager for their investment strategy." The funding may actually come at a later date. *See* Exhibit T, PJR Tr. at 9:3-13.  **RESPONSE:**  Admitted as to funds; otherwise denied because cited testimony does not concern SMAs and does not support statement, and statement mischaracterizes Mr. Kelley's testimony, which pertained only to funds, Ex. T 8:3-9:13, not SMAs. *Supra* ¶¶ 77, 80.

24

83.     If an investor breaches an agreement and does not fulfil its

commitment, NovaFund would still get paid based on the commitment. *Id*. at 129:2-

15.  **RESPONSE:**  Admitted.  Wheelahan 1 Tr. 28:3-23.

84.     If an investor commits capital, but the capital is never invested, NovaFund is

still due a fee based on the commitment of capital within thirty (30) months. *Id.* at p. 126:8-15.

**RESPONSE:**  Admitted.  Wheelahan 1 Tr. 28:3-23.

85.     If NovaFund failed to close any capital commitments in Fund V, the retainer

fee and reimbursements would be the only compensation to NovaFund under the Term

Sheet. *Id.* at p. 91:12-16.  **RESPONSE:**  Admitted as to funds; otherwise denied because

cited testimony concerns only funds, not SMAs.  Mr. Kelley later testified that NovaFund

would be paid if target investors invested in SMAs. Ex. 77, at 92:12-20.  Wheelahan 1 Tr.

32:1-5, 54:11-25 (NovaFund owed fees on StepStone SMAs); Wheelahan 3 Tr. 258:6-259:4

(same, notwithstanding the lack of a Fund V commitment).

86.     NovaFund was paid all of the retainer payments of $200,000.00 and

its reimbursements under the Term Sheet. *Id.* at p. 167:16-25.  **RESPONSE:**

Admitted as to reimbursements, but denied as to retainer payments, which Capitala

withheld until NovaFund renegotiated the Term Sheet.  *Supra* ¶ 71; Ex. 58.

87.     NovaFund knew there was no guarantee it would receive Success Fees and

was aware of that risk in a fund raise. *See* Exhibit Y, McAndrews Depo. Tr. June 2021

311:19- 312:17.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do

not support statement), and denied because Mr. McAndrews testified only about typical

fundraises, not the fundraise for Capitala.

88.     Investors do not invest in a fund due to the work of a placement agent. An

investor invests due to its interest in the fund. *See* Exhibit Y, McAndrews Depo. Tr. March

2021, 208:11-209:15.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do

not support statement), and denied as mischaracterizing Mr. McAndrews' testimony.  Mr.

McAndrews noted that it is "absolutely" the placement agent's job to "get general partners in

front of investors" and organize the general partner's data for investors.  Ex. Y 208:11-209:15.

Mr. Wheelahan testified that there are meaningful differences in quality between placement

agents and that those differences can affect a fundraise.  Wheelahan 1 Tr. 209:13-211:12.

89.     Even though Knights of Columbus was on the Carve Out List, NovaFund was

instructed it could pursue a meeting, but Knights of Columbus declined interest. *See* Exhibit

U, Hapgood Depo. Tr. 340:7-341:18.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A)

(cited materials do not support statement), and denied.  The Term Sheet does not preclude

communications with Carve Out investors, Ex. Q, but after the Term Sheet was signed,

Capitala instructed NovaFund not to communicate with Carve Out investors.  Swercheck 1

Tr. 128:5-19.  In early November 2016, Ms. Hapgood asked Mr. Swercheck if she could

reach out to Knights of Columbus, was initially told yes, but then told no because Capitala

gave the opportunity to Sandler, Ex. 42; Ex. 41; Swercheck 1 Tr. 149:23-155:14, and

"blocked" NovaFund from contacting them.  Ex. 43.  NovaFund did not have the opportunity

to reach out to this investor soon after the first closing, when there would have been

momentum in the fundraising.  Kelley Aff. ¶ 28.  By the time Ms. Hapgood was finally

permitted to contact this investor in early 2017, the investor had no further allocations for

credit funds in 2017 and the opportunity was lost.  *Id*.

90.     NovaFund ceased engaging in any active business in July 2018. *See* Exhibit

C, Kelley Depo. Tr. 378:23-25; Exhibit N, June Kelley Depo. Tr. 193:23-194:9.

**RESPONSE:**  Admitted only that at his first deposition, Mr. Kelley testified that the last time NovaFund engaged in active business was July 2018; otherwise denied because second deposition testimony does not support statement.

91.     It was a voluntary decision because NovaFund believed its North Carolina litigation with CGLLC would be a distraction and because it was having a hard time winning new business. *See* Exhibit C, Kelley Depo. Tr. 379:1-22. **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied. Mr. Kelley testified that Capitala's disparaging statements to the marketplace contributed to NovaFund not obtaining new engagements as it "never had a hard time winning business in the past." Ex. N 195:21-196:3. Hamilton Lane did not do any business with NovaFund after 2018, Kelley Aff. ¶ 46, and Capitala urged Hamilton Lane and Kemper not to do business with NovaFund as late as April 2020.  Ex. 74.  Kemper's corporate representative agreed that disparagement like Capitala's of NovaFund was likely to have an impact on NovaFund's ability to land business.  Kemper Tr. 157:24-158:18.  Mr. McAndrews testified that in 2018 "Nova at that point had a damaged name, and was difficult to - to garner new mandates for fundraising."  McAndrews 2 Tr. 436:21-437:11.  He also testified, "Capitala was badmouthing us everywhere in the business."  Since Mr. Kelley's original deposition, Capitala has produced more documents showing that Capitala interfered with NovaFund's relationship with Deerpath by having another placement agent make inquiries on Capitala's behalf, Ex. 55, which is the same placement agent crafting arguments for Capitala to make that the Term Sheet is not enforceable.  Ex. 56.

92.     There is no evidence that any disparaging remarks preventing NovaFund from obtaining business. *See* Exhibit N, Kelley Depo. Tr. 195:21-196:3.  **RESPONSE:**

Denied.  *Supra* ¶ 91.  Also, for example, Mr. Alala sent an email to Greg Mason, a Managing Director focusing on investor relations, at Ares Management referring to NovaFund as ███████████████████████ Ex. 69.  Mr. Howe had a prior relationship with Ares and would not expect Ares Management to want to do any business and they have not done any business with NovaFund since 2018.  Howe Aff. ¶ 5.

93.     There is no evidence that any investor would not do business with NovaFund because of any alleged disparaging remarks. *See* Exhibit Y, McAndrews Depo. Tr. 438:23-440:7.  **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. McAndrews said it "absolutely" would have had an impact.  Ex. Y at 439:12-15; *see also supra* ¶¶ 91-92.

94.     If CGLLC and NovaFund entered into a more definitive agreement, which was solely in NovaFund's discretion, the fund manager would have been named as an obligor or signatory. *See* Exhibit K, Wheelahan Depo. Tr., 253:23-254:11.  **RESPONSE:** Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied.  *Supra* ¶ 59.

95.     NovaFund understood the release in the Addendum was for both parties to have a clean slate moving forward. *See* Exhibit N, Kelley June Depo. Tr., 118:23-119:19. **RESPONSE:**  Objection, Fed. R. Civ. P. 56(c)(1)(A) (cited materials do not support statement), and denied because Mr. Kelley's understanding was based on "what we knew at that point."  Ex. N 118:23-119:19; *supra* ¶ 72.  Mr. Wheelahan testified the purpose of the Addendum's release was to have a "clean slate." Wheelahan 3 Tr. 373:11-16.

## ADDITIONAL MATERIAL FACTS

### CG Had No Role Within the Capitala Enterprise

96.     CG was disregarded within the organizational structure of Capitala.  Wheelahan 1 Tr. 233:6-234:8; 234:16-19; Ex. 61, at CAP_0086213 (CG missing); Ex. 44A, at CAP_0047603-60 (in Form ADVs for CIA and CPA, no mention of CG); Ex. 72 (same in SEC filing for CFC); *supra* ¶ 10.  CG is not considered the parent company of any other Capitala entity.  Wheelahan 1 Tr. 225:5-8; Arnall 2 Tr. 27:22-28:3 (CG not considered a parent and he did not know CG's purpose).

97.     Capitala did not mention CG at all when responding to StepStone's question about the ownership structure of Fund V, its general partner, and the relevant parent organization.  Ex. 61, at CAP_0086212.  CG is also omitted from the historical overview of the firm, *id.,* at CAP_0086211-12, and the organizational structure of the management company's ownership.  *Id.,* at CAP_0086212.

98.     Overall, the term "Capitala Group" refers to various Capitala-related entities, but does not always include CG.  Wheelahan 1 Tr. 169:16-171:5, 195:14-197:13.

99.     Capitala's then-Chief Compliance Officer, Richard Wheelahan, testified that CG's only "business purpose" "was to be the signatory for certain nuisance agreements . . . like a stooge, a useful idiot."  *Id.* 224:12-225:4.  He further testified that CG was designed to be a "do nothing entity" and a "shell."  *Id.* 221:24-222:9, 233:13-16.

100.    Mr. Arnall, Capitala's CFO (Arnall 1 Tr. 9:9-14), testified that CG had no employees and no individuals had any role or responsibilities on CG's behalf.  *Id.* 30:7-15.  For example, he testified that he never served as CFO or Chief Operating Officer for CG, and had no responsibilities whatsoever for CG.  *Id.* 16:15-20, 20:14-17.  In fact he testified that he was "not

familiar with any specifics related to [CG]," *id.* 243:10-18, and he was not aware of whether CG

ever had any specific projects within the Capitala enterprise.  *Id.* 244:3-6.

**CG Was Undercapitalized**

101.    Mr. Wheelahan has described CG as a "NINJA" meaning "no income, no job, no

assets," and as a "relatively meaningless entity" because it has "[n]o assets, no operations, no

real structure."  Wheelahan 1 Tr. 247:10-21; *id.* 21:6-2; 237:1-238:10; 246:22-248:2.

102.    Mr. Arnall testified that he was not aware if CG ever had any income, expenses,

or a bank account.  Arnall 1 Tr. 243:10-244:2; Arnall 2 Tr. 28:20-29:15.  Mr. Wheelahan

testified that CG had no income, no independent source of revenue, and no bank account of its

own, except for one transfer around 2018, which he believed was for a litigation expense.

Wheelahan 1 Tr. 231:14-233:3; 234:5-8; 247:1-21.  This is consistent with Defendants'

production of CG's bank account statements, ordered to be produced from 2015 to date.  ECF

331.  Only statements from December 2018 to April 2019 were produced, which show that the

account was only funded in November 2018 and January 2019 from transfers in the total amount

of about ████.  Ex. 70, at CIA-CPA-CSLC0039073 (carryover funding from November

2018), -39441 (funding from January transfer).  In January 2019, a one-time transfer of ████

was made to a Richard "Rick" Dunham, a supposed consultant to Capitala.  *Id.*, at CPA-CIA-

CSLC0039076; Alala 1 Tr. 37:11-39:14.  The inference is that CG had no bank account before

November 2018.

103.    CG did not receive any of the fees that Capitala has earned or will earn in

connection with Fund V or the StepStone SMAs.  For example, CPA earns a management fee on

deployed capital in Fund V, not CG.  Wheelahan 1 Tr. 161:7-14.  CIA also received fees in

connection with Fund V.  Ex. 64, at KEMPER002372-74; Kemper Tr. 143:8-17; 145:22-146:9;

147:15-149:19.  In addition, Fund V's general partner, Capitala PCF-V, LLC, earns an incentive fee (or carried interest), not CG.  Wheelahan 1 Tr. 36:23-37:1; 163:3-9.

104.    For the StepStone SMAs, either CPA or CSLC receives management fees and closing fees, not CG.  Wheelahan 1 Tr. 153:17-154:1; 155:14-17; 160:2-18.

105.    CG did not have an independent revenue source, and had no capital to pay for its obligations, including the monthly retainer payments due to NovaFund.  Wheelahan 1 Tr. 231:23-234:19; 247:1-21.  Even Mr. Alala was not sure if CG had any income in the 2016 to 2020 time period.  Alala 1 Tr. 119:21-120:2.

106.    CG was intentionally undercapitalized, to have insufficient assets to meet a judgment.  Wheelahan 1 Tr. 223:14-225:4.  If the proverbial "sugar hit the fan," then CG, as the entity "on the hook for that judgment or liability would not be capitalized."  *Id.* 223:23-224:7.

107.    Mr. Alala has acknowledged that CG has no assets.  Ex. 76; Wheelahan 1 Tr. 237:1-238:10; 246:22-248:2.  For example, he texted Mr. Wheelahan, who was terminated in October 2019, that "We are allowing a default judgement against that LLC [meaning CG] as that LLC has no assets."  Ex. 78 (excerpts of text messages), at RW203; Wheelahan 1 Tr. 10:17-11:3; 237:1-238:10; 246:22-248:2.  According to Mr. Alala, CG had to dissolve because "it couldn't support itself anymore" as it had "burned through all its resources."  Alala 1 Tr. 119:4-14.

**CG Was Dominated and Controlled by the Other Capitala Entities**

108.    Mr. Wheelahan testified that CG was under the dominion and control of CIA and CPA (among other Capitala entities), Wheelahan 1 Tr. 233:6-234:4, and operated as part of a single corporate enterprise with many other Capitala entities including CIA, CPA, and CSLC. *Id.* 234:23-235:15.

109.    CG was controlled by the same officers as other Capitala entities.  Wheelahan 1

Tr. 233:6-234:4.

110.    CG was solely supported by CIA, CPA, and CSLC, and operated at their

direction.  Wheelahan 1 Tr. 233:6-234:8; 234:16-19.

**Capitala Ignored Corporate Formalities**

111.    As the top of the Capitala enterprise, Joe Alala controlled each of the Capitala

entities.  Wheelahan 1 Tr. 238:11-239:16 ("There are no institutions, there were no real –

institutions or entities at issue, Joe was the state."); Ex. 78 (excerpts of text messages), at RW009

("The feeling is that the firm exists as Joe's alter ego.  It's all his.").

112.    At the company headquarters in Charlotte, North Carolina, all Capitala entities

shared the same office space with one entity on the lease (CapitalSouth Corp.) and the same

employees and executives.  Wheelahan 1 Tr. 14:4-16:6; 229:2-230:5; *see* Alala 2 Tr. 453:5-25;

458:3-11.  Mr. Alala testified that between 50 to 100 Capitala entities occupy one single suite in

that same building.  Alala 2 Tr. 458:12-459:6.

113.    While CG did not have its own corporate records or compliance manual, CPA and

CIA shared a compliance manual and investment allocation policy.  Wheelahan 1 Tr. 171:13-

173:3; 230:18-231:5.

114.    Capitala entities are referred to as "Capitala Group" or "Capitala."  *Supra* ¶ 15;

Wheelahan 1 Tr. 169:6-171:9; Swercheck 1 Tr. 25:15-17 ("Capitala Group" means the

organization as a whole), 27:4-11 (business card said "Capitala Group," but he did not know

which entities that referenced), 27:23-28:5 ("Capitala Group" meant the firm).  Mr. Wheelahan

explained that when he "formed the Capitala Group label with the SEC in 2016," the intent was

to have that label refer to both CIA and CPA.  Wheelahan 1 Tr. 170:5-171:12.  For marketing

purposes, CIA and CPA do business as "Capitala Group."  *Id*. 195:14-197:13.  In press releases,

"Capitala Group" is defined as including CIA "together with its affiliates."  Ex. 71; Ex. 73.

115.    Though Mr. Alala was the corporate representative testifying at a deposition on behalf of CIA and CPA, he could not remember the name of the general partner for Fund V.  He said "there's a lot of Capitala entities, yes.  The name is Capitala."  Alala 1 Tr. 108:6-15.

116.    In SEC filings, "Capitala Group" means both CIA and CPA.  Ex. 44, at CAP_0047555 & CAP_0047558 (in CIA's Form ADV for 2016, defining CIA as "Capitala" and defining "Capitala Group" as both CIA and CPA); *id.*, at CAP_0047853 (in CPA's Form ADV for 2016, defining CPA and CIA together as "Capitala Group").  The Form ADVs for both CIA and CPA list "Capitala Group" as their "Other Business Name."  *Id.*, at CAP_0047604 & CAP_0047631.  Even today, the SEC website lists "Capitala Group" as an alternative name for CPA and CIA.  Ex. 7.

117.     One of the anchor investors, Hamilton Lane, a Pennsylvania-based investor could not identify the general partner for Fund V and testified that the distinction between the various Capitala entities "would not have mattered" for purposes of the investment committee process. HL Tr. 28:14-29:10; *see* Kelley Aff. ¶ 11.  Hamilton Lane also generally considered Capitala to be one entity.  *Id.* 73:6-74:3.

118.    When marketing all of its entities under the "Capitala Group" moniker, Capitala blends the assets and performance of each related affiliate to provide an aggregate overview.  For example, Capitala's press releases frequently state that "Capitala Group manages $2.7 billion of capital among permanent capital vehicles, closed-end funds, and discretionary managed accounts," where the amount of capital being managed is computed by adding capital across Capitala's platform.  Ex. 68; *see* Ex. 71; Ex. 73; Wheelahan 1 Tr. 95:15-18.

119.    Defendants all share the same employees, and none of them have employees of

33

their own.  Wheelahan 1 Tr. 14:4-16:6; 229:18-230:5.  Capitala used one entity – Capitala Advisors Corp. ("CAC") – to employ all of the individuals who provide services for the various Capitala entities.  *Id.* 15:21-16:6.  Capitala's entities also share the same executives.  For example, Mr. Alala is Chairman and CEO of "Capitala Group," CG, CPA, CIA, and CSLC.  *Id.* 14:4-16:6, 239:5-16.  Mr. Alala has admitted that he is the President, CEO, Chairman and/or manager of Capitala Advisors Corp., Capitala Finance Corp., and their affiliated entities, which he collectively defined as "Capitala."  Ex. 75 ¶ 2.  Mr. Alala is also the President and CEO of CapitalSouth.  Alala 2 Tr. 456:8-14.

120.    Many people wore many different hats across the many different Capitala-related entities.  Wheelahan 1 Tr. 14:4-15:18; 18:5-20:5.  For example, Mr. Wheelahan testified that he was a former employee of Capitala Advisors Corp., former Chief Compliance Officer to CIA and Capitala Finance Corp., and former General Counsel to CIA and CPA.  *Id.* 18:13-19:15.  Mr. Swercheck began at Capitala as a vice president, but when asked to identify his employer he testified that he "always viewed my role as reporting directly to Joe [Alala]."  Swercheck 1 Tr. 16:11-20.  When asked to identify the entity he worked for, he testified that there are "a lot of entities within Capitala.  I can't recall which one actually signed my paychecks, put it that way." *Id.* 17:5-12.  Randall Fontes, a managing director with Capitala who ran the Atlanta, Georgia office, Swercheck 1 Tr. 169:19-25, worked for the "broker-dealer, the funds, the GPs of the funds," and the two registered investment advisors, CIA and CPA.  Alala 2 Tr. 470:4-471:3.  Another employee, Christian MacCarron, was employed by CAC but performed services to "Fund V, Fund IV, the BDC" and "other groups."  *Id.* 471:9-25.

121.    Defendants – and all other Capitala entities – use the same website (https://www.capitalagroup.com/).  Alala 1 Tr. 14:10-19.  In NovaFund's experience, Capitala's

employees used the same email address regardless of the Capitala entity for which they were conducting business. Kelley Aff. ¶ 14; *see supra* ¶ 15 (citing examples of signature blocks and email addresses for Capitala employees).

122.    Capitala did not specify which Capitala entity was party to the Addendum, instead generically referring to "Capitala Group" in the document title, which at the time was the marketing moniker for CPA and CIA.  Wheelahan 1 Tr. 170:5-171:9; 195:14-197:13.  Capitala was "purposefully not specific" in its use of the term "Capitala" throughout the Addendum, and left the language broad enough so that it could include other Capitala entities, including CPA and CIA. *Id.* 196:22-197:13; *see also* Kelley Aff. ¶ 44.

123.    Various Capitala entities also transferred funds to one another.  Ex. 39; Arnall Tr. 2 50:24-51:6; 54:9-17 (as General Partner of Fund V, Capitala PCF-V, LLC was required to contribute capital to Fund V), 54:23-55:16 (three Capitala entities transferred funds to the General Partner, which then contributed capital to Fund V); Ex. 48, at CIA-CPA-CSLC0039440-41 (CFC transfer to CPA), -39441 (CPA transfer to CIA). Mr. Arnall testified █████████████ ██████████████████████████████████████████████. Arnall 2 Tr. 62:15-63:6.  He also testified that ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. *Id.* 63:7-64:8.

**The Capitala Enterprise is Excessively Fragmented**

124.    Mr. Alala testified that he had no idea how many different Capitala entities were within the Capitala enterprise, but it was somewhere between 15 and 150.  Alala 1 Tr. 22:13-21. When asked what entities he refers to when using the term "Capitala," he responded, "Oh, my God, there's so many of them." *Id.* 45:15-17.

125.    Similarly, CSLC had no purpose other than to be the marketing front for the

StepStone SMAs and to receive fees Capitala was set to receive in connection with those SMAs. Wheelahan 1 Tr. 108:5-109:5; *see* Alala Tr. 1 26:1-27:2; Arnall 1 Tr. 178:21-179:2.

126.    Mr. Arnall, the corporate representative for CPA and CIA concerning, *inter alia*, Capitala's corporate structure and observation or lack thereof of corporate formalities, Arnall 1 Tr. 22:9-21; 24:3-11; 24:12-25:16, ████████████████████████████████ ████████████████████████████. Arnall 2 Tr. 27:22-24; 45:14-25.  He was neither aware of nor knew the role within the firm of Capitala Investment Group, LLC, Capitala Global Holdings, LLC, Capitala Private Investments, LLC. Arnall 2 Tr. 51:13-53:21.

**Capitala Misused the Corporate Form to Defraud and Injure NovaFund**

127.    Capitala intentionally misused the corporate form to defraud and injure NovaFund.  CG was designed to be a "shell," a "do nothing entity," for which its only business purpose was be the signatory for "nuisance" contracts.  Wheelahan 1 Tr. 221:24-222:9; 224:8-225:4, 233:13-23.  According to Mr. Wheelahan, Capitala, as an enterprise, used CG to act as the counterparty for contracts deemed to be preliminary or not substantive, such as non-disclosure agreements, or for other contracts with the potential to subject Capitala to judgment or liability in which case Capitala's intent was to have CG, as an undercapitalized entity, serve as signatory. *Id.* 21:13-22; 221:24-225:1.  Mr. Arnall, however, was not aware of any contract that CG had entered into.  Arnall 2 Tr. 28:22-24.

128.    CG was purposefully penniless so that "if the sugar hit the fan," and there was ultimately a liability, CG would not be capitalized and the Capitala enterprise would not have to pay.  Wheelahan 1 Tr. 223:14-224:7.

129.    Capitala has ensured that CG is an entity with no assets (Ex. 76), and is allowing a default judgment to enter against it, so that "Nova receives what they deserve."  Ex. 78 (excerpts

of text messages), at RW203.  When NovaFund sought to enforce through litigation its

entitlement to payment for its services, CG vanished.  Wheelahan 1 Tr. 21:13-22; 221:24-222:9;

224:12-225:4; 247:1-248:2.

**Capitala's Additional Wrongful, Bad Insert, and Fraudulent Conduct**

130.    The Term Sheet between Capitala and NovaFund provided that NovaFund would

be the exclusive placement agent to raise capital for Fund V and separately managed accounts.

Ex. Q; Wheelahan 1 Tr. 195:1-9.

131.    In February 2016, Mr. Swercheck anticipated that the ███████████████████ in

the negotiations would be around ███████ and how Capitala decided to ███████████

███████████████████ Ex. 8.  Capitala handled that issue by not telling NovaFund

anything about Sandler and its role in raising capital for Fund V.  *Infra* ¶¶ 134-138.  By April

2016, Mr. Swercheck internally proposed avoiding giving "some sort of global exclusivity to

nova, which is what they are asking for" because he did not think a "four person shop in

Connecticut" needed it.  Ex. 16, at CG00023570.  He was willing, however, for Capitala to give

NovaFund exclusivity on NovaFund's "best 1000 names."  *Id.* The executed Term Sheet gives

NovaFund exclusivity on investors in North America, Europe, Australia, and Asia.  Ex. Q, at

NF025770-71; Wheelahan 1 Tr. 25:13-26:8.

132.    NovaFund and Capitala also understood at the time of the Term Sheet's execution

that NovaFund was retained to raise capital for Fund V and separately managed accounts.  *Supra*

¶ 34.  Fund investments depend on the corporate form that is used for the fund, but a private

capital fund is typically set up as a limited partnership and the investors become limited partners

in the fund.  Howe Aff. ¶ 4.  The limited partnership usually obligates a limited partner to make

an investment of a specific dollar amount, which then enables a fund manager to call capital as

the manager is ready to invest the investors' pooled capital. *Id.* For example, a fund may have five limited partners each of which commits to making a $20 million investment, which will provide the fund with $100 million in pooled capital. *Id.* Subsequently, the fund manager may identify an investment it wants to make on behalf of the fund; for a private debt fund, it could be a $15 million loan to a company. *Id.* The fund manager would then call $3 million in capital from each investor and under the terms of the limited partnership agreement each limited partner is obligated to transfer that amount to the fund. *Id.* Unlike a fund, investors to an SMA are bound to provide capital when they commit to the investment that is the subject of the SMA. *Id.* SMAs, though different than private funds, still involve "committed" capital, albeit with different timing. *Id.* By design, an SMA is a customized approach to investing. *Id.* A "commitment" occurs later in the process, once a loan has been made and the SMAs are obligated to fund them. *Id.*

133.     When NovaFund entered into the Term Sheet, it typically handled 3-4 engagements for fund managers at any given time. *Supra* ¶ 69. It had between 6-7 employees during the relevant time period. Kelley Aff. ¶ 6, 24.

134.     Before entering into the Term Sheet with NovaFund, Capitala colluded with Sandler to have Sandler insert terms into the Term Sheet concerning the investors that Sandler alone would be able to reach out to for Fund V. Wheelahan 1 Tr. 201:6-203:21; Ex. 10



); Ex. 11

);

Capitala also worked with Sandler as a placement agent on Fund V after the Term Sheet was signed. Wheelahan 1 Tr. 192:5-19; *infra* ¶¶ 137-138.

135.    Capitala's collusion with Sandler was simple:  Sandler provided Capitala with a list of 40 investors it wanted to pitch for Fund V; Capitala added Sandler's list of 40 investors to the Carve Out list in the Term Sheet; Capitala would block NovaFund from contacting those investors, even though the agreement lacked such a bar; if an investor on that list committed capital to Fund V, Capitala would only pay Sandler, not NovaFund; and they would do all of this without telling NovaFund.  Ex. 12; Ex. 17; Ex. 29; Ex. 30; Ex. 37; Ex. 38.

136.    Capitala's Vice President of Business Development, Mr. Swercheck, thought the plan was "risky."  Ex. 12; Wheelahan 1 Tr. 203:22-25, 204:18-208:24.  He was "nervous" about the plan.  Ex. 38.  He thought that NovaFund would "freak out" if Capitala paid fees to Sandler on Carve Out investors.  Ex. 29; Ex. 32.  Mr. Wheelahan told Mr. Alala that hiding Sandler's involvement from NovaFund was a "bad idea," Wheelahan 1 Tr. 203:22-25; 204:18-23; 205:10-206:20; 207:23-208:14, but was told to "eat shit."  *Id.* 207:1-208:14.

137.    While Sandler knew about NovaFund and its contract with Capitala, NovaFund was kept in the dark about Sandler.  Wheelahan 1 Tr. 203:22-25; 204:18-23; 205:10-207:19; Ex. 12; Ex. 23; Ex. 35; Ex. 38 (Capitala was not "transparent").  Capitala provided Sandler with the terms of its agreement with NovaFund.  Ex. 24 ("Joe's going to share the terms"); Ex. 35; Ex. 36.  The internal Capitala documents reflect that it was aware that providing the term sheet to Sandler may be problematic, but that it decided to go ahead with the decision.  Ex. 24.

138.    Capitala hid Sandler's role from NovaFund, disclosing it only after this lawsuit had been pending for more than a year.  Kelley Aff. ¶ 16.  It was only then that Capitala's misrepresentation made in the Term Sheet and before the Term Sheet's execution was revealed.  In the Term Sheet, Capitala represents that **all** Carve Out investors were previously known to it.  Ex. Q, at NF025771.  Before the Term Sheet was signed, Mr. Kelley had a conversation with Mr.

Swercheck during which Mr. Swercheck told Mr. Kelley to expect about sixty investors on the Carve Out list.  Kelley Aff. ¶ 10.  NovaFund only signed the Term Sheet based on these representations, and would not have otherwise signed the Term Sheet.  *Id.*¶ 7.

139.    When NovaFund signed the Term Sheet, it reasonably assumed that it could help raise $300 million in capital commitments for Fund V and separately managed accounts, when taking into account investments from anchor investors and the strength of Capitala's relationships with Carve Out investors.  Kelley Aff. ¶ 26.  Even if $125 million in investments came from Carve Out investors, NovaFund would have earned a minimum of $2,625,000 in fees had investors committed $175 million to Fund V, using a 1.5% fee percentage.

140.    Ultimately, NovaFund contacted about 500 investors in connection with either Fund V or separately managed accounts for Capitala.  Kelley Aff. ¶ 47. Novafund also set up at least 70 meetings with potential investors in Fund V or separately managed accounts. NovaFund, however, has been negatively impacted by the disparaging comments made by Capitala, and has experienced a loss in new business from fund managers and a detrimental impact in the relationships with investors it once enjoyed.  Howe Aff. ¶ 5.  The impact from the harm to NovaFund's relationships with other fund managers and investors is longer term, because it impacts future fundraising engagements.  Kelley Aff. ¶ 47.

141.    Capitala interfered with NovaFund's business expectancies with Carve Out investor, Kemper Corporation, which is located in Illinois.  Ex. 74; Kelley Aff. ¶ 11.  When asked if Capitala's disparagement impacted how Kemper sees NovaFund, Kemper responded "Yes, I think it's -- it's not -- Again, we had no relationship prior to. So I don't have good interactions to counterbalance there… I can't not unhear (sic) what I've heard." Kemper Tr. 158:3-5; 158:17-18.

Respectfully submitted,

**PLAINTIFF NOVAFUND ADVISORS, LLC**

By:  */s/ Jill M. O'Toole*
     Jill M. O'Toole (ct27116)
     Alison P. Baker (ct28136)
     Shipman & Goodwin LLP
     One Constitution Plaza
     Hartford, CT 06109
     Tel.: 860-251-5000
     Fax: 860-251-5099
     jotoole@goodwin.com
     abaker@goodwin.com

*Its Attorneys*