# EXHIBIT 61

Message

| | |
|---|---|
| **From**: | Casey Swercheck [Casey@capitalagroup.com] |
| **Sent**: | 10/6/2017 1:12:40 PM |
| **To**: | Jovan Samardzic [jsamardzic@stepstoneglobal.com]; Stephen Penney [spenney@stepstoneglobal.com] |
| **CC**: | Joe Alala III [JAlala@capitalagroup.com]; Danny Speake [DSpeake@capitalagroup.com]; Urs von Bueren [uvonbueren@stepstoneglobal.com]; Max Ferri [mferri@stepstoneglobal.com]; Miriam Penney [mpenney@stepstoneglobal.com]; Richard Wheelahan [rwheelahan@capitalsouthpartners.com]; Danny Speake [DSpeake@capitalagroup.com]; Eric Althofer [EAlthofer@capitalagroup.com] |
| **Subject**: | RE: Due diligence on Capitala |
| **Attachments**: | image002.png; image003.png; image004.png; image005.jpg; Capitala Private Credit Fund V - Due Diligence Questionnaire - October 2017 vFinal.pdf; StepStone Swiss Capital Direct Lending Manager Phase I Qualitative DD_Capitala_10.05.17.xlsx |

Stepstone Team,

Attached are the two final submissions as part of Capitala's response to your data requests – the qualitative questionnaire and our latest internal DDQ. As always, please do not hesitate to reach out with any questions ahead of the site visit. We appreciate all of the time & effort put in by the Stepstone team thus far, and we very much look forward to the site visit on 10/23 in Charlotte!

Have a great weekend,

**Casey Swercheck** | Vice President
**Capitala Group**
500 E Broward Blvd | Ste 1710 | Fort Lauderdale, FL 33301
p 954 848 2860 |  m 215 796 8410



---

**From:** Jovan Samardzic [mailto:jsamardzic@stepstoneglobal.com]
**Sent:** Tuesday, July 18, 2017 1:22 PM
**To:** Casey Swercheck <Casey@capitalagroup.com>; Stephen Penney <spenney@stepstoneglobal.com>
**Cc:** Joe Alala III <JAlala@capitalagroup.com>; Danny Speake <DSpeake@capitalagroup.com>; Urs von Bueren <uvonbueren@stepstoneglobal.com>; Max Ferri <mferri@stepstoneglobal.com>
**Subject:** RE: Due diligence on Capitala

Hi Casey,

As mentioned in the previous emails, I am sending you the required data templates so please find attached the Default and Losses, Track Record and Qualitative Template.

We highly appreciate the time and effort needed from your side to provide all the needed information and are aware that due to the scope of the data required, your team might have certain questions after the templates have been reviewed. Hence, after you initial review, we would appreciate having a call so all the open points could be discussed.

Additionally, please find below a short description of each of the three templates.

### Defaults, Losses and IRR by Vintage Matrix Template:

▪        This template provides a basic summary with respect to how the team gauges the risk experienced in order to generate the returns achieved to date.
▪        The embedded instructions are detailed and specific and it is important that these are adhered to. Surely, you can understand the importance of StepStone's institutionalized definitions of Defaults and Losses and why these metrics are requested by year of origination.

EXHIBIT

0004

CAP_0086206

- However, please feel free to reach out to clarify any questions regarding the definitions.
- All Direct Lending transactions since inception are to be included (hereon defined as the "Track Record Transaction-Set").
- Please provide this on a composite/ aggregated basis for the full Track Record Transaction-Set, as well as repeating on separate tabs for:

I. all 1st lien loans since inception (also including Unitranche, delayed drawn loans and stretched senior loans, if applicable) across all funds, and

II. all other loans (potentially including 2nd lien and other subordinated loans).

Thus, please provide in total <u>3 separate tabs</u>.


## Track Record Transaction Data Template:

- The data required in this template will similarly be based on the above mentioned Track Record Transaction-Set, and will form the basis of verification of the Defaults and Losses composite numbers.
- The embedded instructions are detailed and specific and it is important that these are adhered to. However, please feel free to have the person in charge of completing the template contacting any of the StepStone team to clarify any input fields.
- For Realized transactions, the file denotes the data fields required ("R" in column D of the "Input Tab"), which are less than those for Unrealized positions. These can be filtered in Excel.
- You will see the file enables the template to expand/ collapse to different levels of data requirements for manager candidates at different stages in the selection process, with Level I being the lowest level of data that we maintain for peer managers (purely for segmentation).
- You may toggle between these levels on the tab "Input Fields Instructions Tab" by selecting the respective level at the top (in column J) and then hitting the button "Condense".
- As part of StepStone's full due diligence process, Level III is required for all transactions. However, the delivery requirement for the different levels is phased over the process.


## Qualitative Desktop Analysis:

- The various tabs together with the provided example data is relatively self-explanatory. However, please feel free to have the person in charge of completing the template contacting any of the StepStone team to clarify any input fields.


We will be looking forward to your initial feedback.

Best regards,

**Jovan Samardzic**
Senior Associate, Private Debt
Swiss Capital Alternative Investments AG
Klausstrasse 4
8008 Zurich
Direct +41.44.226.5267 | Main +41.44.226.5252 | Mobile +41.78.909.7506
jsamardzic@stepstoneglobal.com | www.stepstoneglobal.com



*Swiss Capital Alternative Investments AG is an affiliate of StepStone Group LP*

The information contained in this message (including all attachments, if any) is for the intended recipient's use only. It may contain confidential, proprietary or legally privileged information. Email transmission cannot be guaranteed to be secure or error-free as information could be corrupted, lost, destroyed, intercepted, arrive late or incomplete, or contain viruses. No confidentiality or privilege is waived or lost by any error in transmission. If you have received this email in error please notify the sender immediately and destroy this email. Any unauthorized copying, disclosure or distribution of the material in this email is strictly forbidden. We have

taken reasonable steps to reduce risks against viruses but cannot accept liability for any damage sustained as a result of transmission. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of an entity. If verification is required please request a hard-copy version.

Data privacy notice: The server hosting email data may be located outside of Switzerland, Ireland or the European Economic Area, and may be located in a country (including without limitation the United States), which may not have the same data protection laws as in Switzerland, Ireland or the European Economic Area. Further, Swiss Capital Alternative Investments AG (SCAI) is an affiliate of StepStone Group LP. SCAI reserves the right to disclose and transfer information provided by you within the StepStone Group of companies. SCAI may monitor outgoing and incoming emails and other telecommunications on its email and telecommunications systems. By replying to this email you give your consent to such data disclosure and monitoring.

**From:** Casey Swercheck [mailto:Casey@capitalagroup.com]
**Sent:** Dienstag, 18. Juli 2017 13:22
**To:** Stephen Penney <spenney@stepstoneglobal.com>
**Cc:** Jovan Samardzic <jsamardzic@stepstoneglobal.com>; Joe Alala III <JAlala@capitalagroup.com>; Danny Speake <DSpeake@capitalagroup.com>; Urs von Bueren <uvonbueren@stepstoneglobal.com>; Max Ferri <mferri@stepstoneglobal.com>
**Subject:** Re: Due diligence on Capitala

All sounds good Steve, thanks in advance and safe travels

**Casey Swercheck** | Vice President
**Capitala Group**
500 E Broward Blvd | Ste 1710 | Fort Lauderdale, FL 33301
p 954 848 2860 | m 215 796 8410



On Jul 18, 2017, at 3:06 AM, Stephen Penney <spenney@stepstoneglobal.com> wrote:

Hi Casey
Max and I are travelling to NYC today.  We are still firming up some meetings but will try to call you over the next couple of days to agree an initial set of documents for review.
Kind regards.
Steve

**Steve Penney**
Partner, CEO Ireland
Swiss Capital Invest Holding (Dublin) Limited
Direct +353.1.536.1401 | Main +353.1.536.1400  Fax +353.1.536.1420
<image003.jpg>

**From:** Casey Swercheck [mailto:Casey@capitalagroup.com]
**Sent:** Tuesday, July 18, 2017 1:51 AM
**To:** Urs von Bueren
**Cc:** Stephen Penney; Jovan Samardzic; Joe Alala III; Danny Speake
**Subject:** Re: Due diligence on Capitala

Urs, Steve and Jovan, just circling back on my message below. Looking forward to scheduling the call and establishing next steps. Thanks in advance

Best

**Casey Swercheck** | Vice President
**Capitala Group**

ATTORNEYS' EYES ONLY

500 E Broward Blvd | Ste 1710 | Fort Lauderdale, FL 33301
p 954 848 2860 | m 215 796 8410

On Jul 14, 2017, at 1:09 PM, Casey Swercheck <Casey@capitalagroup.com> wrote:

Urs, great to hear from you, and Steve & Jovan, it is great to meet you by email. Thank you all for your continued communication and interest in working with Capitala. The firm is very excited to proceed with Stepstone as a highly valued relationship and partner, not just for Capitala Fund V but the long term growth of both of our platforms. We feel confident we can fulfill all requests detailed below, as well as the timeline you provided. As directed, I will wait to hear from you Steve as to next steps, and we look forward to the discussion

Have a great weekend

**Casey Swercheck** | Vice President
**Capitala Group**
500 E Broward Blvd | Ste 1710 | Fort Lauderdale, FL 33301
p 954 848 2860 | m 215 796 8410
<image002.png>  <image003.png>  <image004.png>

**From:** Urs von Bueren [mailto:uvonbueren@stepstoneglobal.com]
**Sent:** Friday, July 14, 2017 12:19 PM
**To:** Casey Swercheck <Casey@capitalagroup.com>
**Cc:** Stephen Penney <spenney@stepstoneglobal.com>; Jovan Samardzic <jsamardzic@stepstoneglobal.com>
**Subject:** Due diligence on Capitala

Dear Casey,

As we're obviously working on co-investments with the aim to also work together in a broader format we may as well kick-off the dd process.

Please let me introduce Steve Penney, head of operational due diligence, and Jovan Samardzic from my team.

Steve will reach out in the coming days to discuss next steps and formulate a document request.

Jovan is our quant analyst and is also involved in track record analysis. He will reach out and provide a detailed track analysis file, a matrix, a qualitative dd request and a basic questionnaire.

The aim to get the OpDD part done before September 30. For the rest we're aware that we're asking for a lot of details. Hence, Jovan usually starts off with a call to explain certain fields, etc. and then get an understanding of the GPs timing, etc.

Hope this helps.

Best Regards,
Urs

**Urs von Büren**
Partner, Head Private Debt
Swiss Capital Alternative Investments AG
Klausstrasse 4
8008 Zurich
Direct +41.44.226.52.03 | Cell +41.78.781.05.25

ATTORNEYS' EYES ONLY

uvonbueren@stepstoneglobal.com | www.stepstoneglobal.com

<image005.jpg>

*Swiss Capital Alternative Investments AG is an affiliate of StepStone Group LP*

The information contained in this message (including all attachments, if any) is for the intended recipient's use only. It may contain confidential, proprietary or legally privileged information. Email transmission cannot be guaranteed to be secure or error-free as information could be corrupted, lost, destroyed, intercepted, arrive late or incomplete, or contain viruses. No confidentiality or privilege is waived or lost by any error in transmission. If you have received this email in error please notify the sender immediately and destroy this email. Any unauthorized copying, disclosure or distribution of the material in this email is strictly forbidden. We have taken reasonable steps to reduce risks against viruses but cannot accept liability for any damage sustained as a result of transmission. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of an entity. If verification is required please request a hard-copy version.

Data privacy notice: The server hosting email data may be located outside of Switzerland, Ireland or the European Economic Area, and may be located in a country (including without limitation the United States), which may not have the same data protection laws as in Switzerland, Ireland or the European Economic Area. Further, Swiss Capital Alternative Investments AG (SCAI) is an affiliate of StepStone Group LP. SCAI reserves the right to disclose and transfer information provided by you within the StepStone Group of companies. SCAI may monitor outgoing and incoming emails and other telecommunications on its email and telecommunications systems. By replying to this email you give your consent to such data disclosure and monitoring.

CAP_0086210

## Contact Info

1. **Full legal name and address of the Fund.**

    Capitala Private Credit Fund V, L.P.

    4201 Congress Street, Suite 360

    Charlotte, North Carolina 28209

2. **Name, address, telephone and fax number of the General Partner and/or Investment Sponsor entity.**

    Capitala Private Advisors, LLC

    Capitala Group

    4201 Congress Street, Suite 360

    Charlotte, North Carolina 28209

    Office 704.376.5502

    Fax 704.376.5877

3. **Primary contact for obtaining additional information.**

    Casey Swercheck, Vice President

    casey@capitalagroup.com

    Office 954.848.2860; Mobile 215.796.8410

## General Partner

4. **Provide a historical overview of your firm.**

    Capitala Private Advisors, LLC ("CPA" and, together with its affiliates and related entities, "Capitala Group") is a Charlotte-based investment adviser that, together with the other members of Capitala Group, organizes and manages credit-focused investment vehicles. Capitala Group has, over the course of 19 years, made over $1.2 billion in debt and equity investments into 139 portfolio companies, across five principal (and two related) investment vehicles (the "Legacy Funds"). Over that time, the Capitala Group platform has grown and expanded geographically, deepening the team's capacity and also broadening the platform's capabilities.

    Capitala Group was founded by Joseph B. Alala, III, its Chief Executive Officer and President, Chief Investment Officer and Managing Partner and Hunt Broyhill, partner.  They are assisted by John F. McGlinn, the Chief Operating Officer and Director,  Christopher B. Norton, who serves as the Chief Risk Officer and the Director of Underwriting, Michael S. Marr, who serves as the Director of Portfolio Monitoring, Stephen Arnall, who serves as the Chief Financial Officer, Richard G. Wheelahan, III, who serves as General Counsel, Chief Compliance Officer and a Director, Randall Fontes, Director of Business Development, and Adam Richeson, Director of Capitala's growth investment strategy, as well as sixteen other investment professionals. Messrs. Alala, Broyhill, McGlinn, Norton, Fontes and Richeson serve as the investment committee for Capitala Private Credit Fund V,

CAP_0086211

L.P. (the "Fund" or "Fund V"). In addition to Fund V, CPA also manages CapitalSouth SBIC Fund IV, L.P. ("Fund IV").

5. **Describe any other investment, advisory or other business activities of the General Partner or its parent organization.**

Affiliated with CPA, Capitala Investment Advisors, LLC ("CIA") also manages Capitala Finance Corp., traded on the NASDAQ under symbol CPTA ("Capitala Finance"). Capitala Finance, which completed its initial public offering ("IPO") on September 30, 2013, is an externally managed non-diversified closed-end investment company that has elected to be regulated as a business development company under the Investment Company Act, with its common equity securities and its senior notes listed on NASDAQ and the New York Stock Exchange (under the symbols CPTA and CLA, respectively). Fund IV, managed by CPA, is a private investment limited partnership providing financing solutions to companies that generate between $5 million and $50 million in annual revenues and have between $1 million and $4.5 million in annual EBITDA. Fund IV had its first closing on outside investor commitments in March 2013 and obtained approval from the Small Business Administration (the "SBA") for its small business investment company ("SBIC") license in April 2013.

6. **Provide a chart showing the legal ownership structure of the General Partner, the Fund, and any parent organization (if applicable).**



ATTORNEYS' EYES ONLY

7. **Complete the following chart outlining any other investment vehicles or separate accounts previously managed by the General Partner. Please include both predecessors to the Fund and vehicles with different investment strategies than that of the Fund.**

| ($mm) Fund | Vintage | Commitments | SBA Leverage | Total Capital | % Drawn | Strategy | Status | Geographic Focus |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Prior Fund Details | | |
| CSP Fund I | 1999 | $10.9 | $21.8 | $32.7 | 80.6% | Private direct lending / equity | Wound down | US |
| CSP Fund II | 2002 | 26.2 | 52.4 | 78.6 | 100.0% | Private direct lending / equity | Assets transferred to BDC | US |
| CSP Fund III | 2007 | 105.7 | 150.0 | 255.7 | 100.0% | Private direct lending / equity | Assets transferred to BDC / Nearly fully allocated | US |
| CSP Florida Sidecar | 2011 | 1.3 | N/A | 1.3 | 100.0% | Private direct lending / equity | Assets transferred to BDC | US |
| CSGF IV | 2013 | 69.5 | 104.2 | 173.7 | 45.0% | Private direct lending / equity | Currently investing | US |
| CPCF V | 2016 | 44.0 | N/A | 44.0 | 20.0% | Private direct lending / equity | Currently investing | US |

8. **What is the current capital structure of the firm, and is any debt used?**

Capitala Group has a line of credit from a community bank in Charlotte that it utilizes for working capital purposes. Capitala Group arranged for a credit facility for the Fund which is provided by Wells Fargo, and secured by the uncalled capital commitments of Fund V's limited partners. Finally, limited partners can choose between parallel levered and unlevered sleeves of the Fund. Leverage levels in the leveraged sleeve will vary depending upon underlying asset mix (first lien, second lien and equity securities have different advance rates), although total gearing ratio is expected to be between 0.3x and 0.5x.

9. **Outline the ownership of the management company.**



ATTORNEYS' EYES ONLY

CAP_0086213

## Closing Schedule

1. **What is the targeted capitalization for the Fund, and what is the expected hard capitalization?**

    The targeted capitalization is $300MM of equity, with GP discretion to increase to $350MM. The targeted leverage profile is still TBD, as previously described.

2. **What is the closing schedule for the Fund?**

    Capitala Group held an anchor close in September 2016 with three commitments. The GP has a hard, unleveraged commitment of $4.0MM. Additionally, Hamilton Lane and Kemper Insurance, both existing LP relationships, made anchor investments of $25.0MM and $15.0MM, respectively. Capitala Group's final close is targeted by June 30, 2018, with final commitments collected by March 31, 2018. Capitala Group will have rolling closes from now until then.

## Investment Strategy

1. **Provide an overview of the types of investments that will be made by the Fund.**

| Anticipated Investment Type | | | | Prior Fund |
|---|---|---|---|---|
| ($mm) Investment Type | Projected # of Deals | Projected Total Inv. Capital | Projected % of Fund | Actual % of Prior Fund |
| First Lien Debt | 19 | $175 - 210 | 50 - 60% | 45.5% |
| Second Lien Debt | 19 | $87.5 - 105 | 25 - 30% | 32.7% |
| Equity & Warrants | 20 | $35 - $87.5 | 10 - 25% | 21.7% |
| Total | 58 | $350 | 100.0% | 100.0% |

Note: Actual fund reflect Capitala Group's Legacy Portfolio
Note: Projected deals reflect a specific investment; one deal may include multiple securitires

2. **Discuss how investments will be structured, including pricing and position in the capital structure, equity interests or warrants and other terms such as PIK interest, etc. Will the structure differ from the structure of Capitala's previous mezzanine investments?**

    The Fund will target debt investments that yield meaningful current income (inherently or through the use of leverage) and, in many cases, provide the opportunity for capital appreciation through participation or direct investment in equity securities. In each case, the following criteria and guidelines will be considered in the review of a potential investment for the Fund; however, not all criteria will necessarily be met in every single investment in the Fund's portfolio, nor does Capitala Group guarantee that all criteria will be met in the investments the Fund will make in the future.

    Historically, Capitala Group has allocated ~50% of its debt investments to first lien investments and 50% to subordinated debt investments. Capitala Group expects to allocate a higher portion of invested capital to first lien transactions in the Fund. Capitala Group generally looks to limit leverage to less than 4.0x through Capitala

4

ATTORNEYS' EYES ONLY

Group's debt, though it reviews each investment opportunity individually to structure an appropriate credit. This strategy is consistent with prior direct lending funds that the GP has managed. Capitala Group will continue to seek minority equity participations and/or warrant allocations to generate capital appreciation. Unlike prior funds, however, Capitala Group expects that the Fund will continue to invest in larger companies (as represented by trailing EBITDA at close). Additionally, thanks in part to Capitala Group's direct origination platform, Capitala Group has also increasingly shifted from a primary focus on mezzanine investments to a more diversified portfolio which now includes more stretch senior and unitranche loans. Stretch senior loans are typically lower yielding than mezzanine with partial collateral coverage and no senior (or split collateral revolving debt) in front of Capitala Group's investment. Unitranche loans are stretch senior loans where Capitala Group typically holds a last-out cash flow priority in an instrument with a true senior lender that is governed by an Agreement Among Lenders ("AAL") instead of an Intercreditor Agreement, and has more collateral rights and protections than a mezzanine loan. Capitala Group will continue to make second lien loans but is focused on increasing its placements higher in the capital structure.

**3. What is the target return for investments in the Fund? What percentage of overall return does the Fund expect to be generate through current income/coupon payments?**

Target return will vary by investment depending on type of transaction, position in the capital structure and overall leverage profile. Historically, if Capitala Group is able to secure a first lien position with strong creditor rights with a split collateral revolver (if applicable), then the targeted unlevered gross return target is in the 8-10% range (upon which leverage may be applied to enhance yields). For second lien and/or subordinated loans, Capitala Group generally targets a return between 11% and 14%. Capitala Group's loan returns are typically enhanced by the firm's strategy around equity participation (warrants and direct equity purchases) as well as any closing fees or OID generated at the time of investment. Overall, Capitala Group targets 14% to 16% gross unlevered returns at the Fund-level, and 16% to 20%+ at the gross levered Fund-level.

**4. Please detail anticipated average investment and transaction sizes.**

Capitala Group anticipates deploying approximately $10MM to $20MM (inclusive of both debt and minority equity investments) per investment. Capitala Group does not anticipate investments of greater than 10% of the Fund in any one investment, expects a maximum hold size to be ~$30MM and will generally not make investments of less than $5MM. Given that the Fund expects a portion of the investments to be dividend recapitalizations or growth investments for acquisitions, it is difficult to define an average Enterprise Value. However, the Fund will typically invest in companies with at least than $4.5MM of LTM EBITDA and generally will not consider companies that trade in less than a 4x EBITDA valuation range. Accordingly, minimum Enterprise Value can be thought of in the $20-$25MM range, but can greatly exceed that range.

5

CAP_0086215

5.  **What transaction types will the Fund's investments be made in conjunction with?**

    Generally speaking, Capitala Group's historical transactions have been fairly evenly divided among recapitalizations, leveraged buyout financing and growth capital. In Capitala Group's experience, while leveraged buyouts may be active during one part of a cycle, recapitalizations will be active during the other end of the same cycle. Accordingly, sponsor-backed and auctioned transactions tend to oscillate between LBO and recapitalizations, but even-out in the long run. Due to the strength of its direct origination platform, Capitala Group believes it sees a greater number of non-sponsored opportunities, relative to peers. These opportunities tend to be a mix of growth financings, acquisition financings and recapitalizations / refinancing's. Capitala's team has reviewed, on average, over 1,000 investment opportunities per year since 2010 from its five origination offices. Historically speaking, 50% of Capitala Group's deals have been sponsored transactions, and the other 50% have been non-sponsored deals. See below for an illustrative summary of anticipated transactions by type:

    | Anticipated Transaction Type | | | |
    |---|---|---|---|
    | ($mm)<br>Transaction Type | Projected #<br>of Deals | Projected Total<br>Inv. Capital | Projected % of<br>Fund |
    | Recapitalizations | 8 | $112 | 32.0% |
    | Bridge Financing | 1 | $14 | 4.0% |
    | Expansion/Growth Capital | 8 | $112 | 32.0% |
    | Leveraged Buyouts | 8 | $112 | 32.0% |
    | Total | 25 | $350 | 100.0% |

6.  **What is the proposed portfolio construction, investment pace, and holding periods?**

    | Anticipated Fund Parameters | |
    |---|---|
    | Target number of deals in Fund * | 25 to 35 |
    | Max % of Fund to be invested in single investment | 10% |
    | Target number of deals completed per year | 8 to 12 |
    | Expected holding period per investment | 3 to 5 years |
    | Expected number of years until Fund is fully invested | 3 to 4 years |

    * Assumes a ~$15MM average investment size

7.  **Detail the Fund's strategy within each industry in regards to types of businesses targeted (size, financial performance, stage of life cycle, capital structure, management, etc.)**

    Historically, Capitala Group has been diversified across industries, as detailed in the chart below.

6

CAP_0086216



Capitala Group typically does not alter its investment strategy based on industry. Each investment, regardless of industry, is assessed for prior financial performance, industry dynamics, type of transaction, whether new equity is being invested as part of the transaction and proposed leverage and capital structure. On every transaction, Capitala Group looks to make quality credit investments that have appropriate fixed charge coverage, can support a company/industry downturn, provide flexibility to execute operational plans and generate attractive returns. As part of the underwriting process, Capitala Group typically attends an in-person management meeting or presentation to meet management, assess the culture of the organization and Capitala Group's ability to work well with the sponsor (if applicable) and management, as well as to examine the physical infrastructure of the target company. For certain industries, there are specific metrics which are also evaluated, such as rent adjusted leverage for retail concepts, but Capitala Group's core strategy does not change across industries.

8. **Complete the chart that details the Fund's anticipated geographic focus.**

Capitala leverages its nationwide presence of five offices to generate deal flow throughout the U.S. Capitala maintains offices in target-rich, yet underserved markets throughout the U.S., which management believes generates more attractive deal flow than peers who may focus on larger, more competitive markets.

| | Anticipated Geographic Focus | | | Prior Fund |
|---|---|---|---|---|
| ($mm) Location | Projected # of Deals | Projected Total Inv. Capital | Projected % of Fund | Actual % of Prior Fund |
| US | 24 | $336 | 96.0% | 99.0% |
| Non US | 1 | 14 | 4.0% | 1.0% |
| Total | 25 | $350 | 100.0% | 100.0% |

9. **Discuss international investment guidelines and restrictions.**

Given Capitala Group's historical focus on the United States, the Fund expects the vast majority of its investments to be domestic. While there are no specific prohibitions on international investments, this has not been Capitala Group's historical focus and the Fund does not expect many, if any, international investments.

7

CAP_0086217

**10. Discuss the impact of recycling on returns.**

The Fund's return profile is not predicated on recycling investments and Capitala Group has not factored prepayment penalties or incremental issuance fees into its returns model. Historically speaking, Capitala Group's hold period across realized transactions have averaged approximately 3.5 years.  Inasmuch as the investment period for the Fund is three years (with the option for extension), the Fund's ability to recycle is expected to be limited.

**11. Describe the Fund's due diligence process. How is your due diligence process staffed and conducted?**

Please reference Section V of the PPM for a detailed overview of the Capitala Group Investment Process. The due diligence process and deliverables will be led by at least two investment professionals; however, all investment and portfolio team members will be regularly updated throughout the Investment Committee process as the deal team completes both its due diligence plan and corresponding full due diligence memo. The investment professionals leading the due diligence efforts are typically expected to be assigned from the original deal team that worked on the screening and initial IC memorandum; however, post-term sheet deal teams will sometimes contain one or more additional investment professionals and may include other professionals from business development, portfolio management or other areas if a particular skill or experience set would be especially valuable in the due diligence process. The members of the underwriting team will complete due diligence and analyze the relationships among the prospective portfolio company's business plan, operations and expected financial performance. In all direct debt and equity investments in lower and traditional middle market companies, due diligence will include some or all of the following:

- On-site visits with senior management and other relevant key employees, including an assessment of depth of management experience beyond c-suite;
- In-depth review and analysis of historical and projected financial statements, including covenant calculation work sheets;
- Interviews with customers and/or suppliers;
- Review of reports by third-party accountants, outside counsel and other industry, operational or financial experts, whether retained by us, or the financial sponsor (if applicable);
- Management background checks;
- Review of material contracts;
- Assessment of financial sponsor's historical track-record and reputation with existing lenders; and
- Review of financial sponsor's due diligence package and internal executive summary

8

12. **Describe the Fund's objectives with board seats. What is the average number of board seats any individual will hold? Describe how boards are typically structured, and the Fund's participation in those boards. Will the Fund appoint any outside directors?**

Capitala Group has primarily made debt investments with minority equity positions and has deliberately sought to minimize potential lender liability and conflicts of interest by not serving on portfolio company boards. Capitala Group will appoint a board member in certain instances where Capitala funds own a significant (or majority) portion of the equity. In most circumstances, however, Capitala Group will have board observation rights, allowing us to participate (often materially) in all board meetings and receive all board level reporting materials without having a voting influence on the board. Finally, in some instances where Capitala Group invests a significant portion of minority equity, Capitala Group will obtain springing board rights that become effective only upon certain covenant defaults. Board observation rights are usually jointly held between the underwriting team and the portfolio management team.  The portfolio management team takes the lead, but a member of the underwriting team who worked with the company during diligence and who has an intricate understanding of the company and industry dynamics through diligence, plays a supporting role.

13. **Will leverage be used at the Fund level? If so, what financial institution supplies the leverage?**

The Fund is expected to obtain leverage to finance its investment activities. The Fund's "Leveraged Strategy" may include, among other forms of leverage, asset-level financing for certain suitable portfolio investments or Fund level financing through a credit facility secured by investors' capital commitments. Investors who choose not to invest in the Leveraged Strategy may opt into a parallel fund (the "Non-Leveraged Fund"), which will not use asset-level financing for portfolio investments but may obtain a subscription credit facility secured solely by uncalled capital commitments to the Non-Leveraged Fund (subject to any restrictions in the definitive documents of the Non-Leveraged Fund). If the Non-Leveraged Fund is created, Capitala Group generally intends to make investments using capital from both the Fund and the Non-Leveraged Fund pro-rata based on their relative capital available for investment.

14. **Are there maximum or target portfolio company leverage guidelines?**

Capitala Group has not set forth an explicit maximum leverage guideline for the Fund's investments; however, the current weighted average net leverage for Capitala Finance's loan portfolio (a useful proxy) was 4.2x and has remained in the 3.5-4.2x range since Capitala Finance's IPO. Capitala Group's investment committee has historically been reluctant to deploy beyond 4.0x of leverage in the majority of Capitala Group's investments.  Since inception, the average net leverage of all Capitala Group investments is 3.4x. Capitala Group expects this trend to continue in Fund V.

ATTORNEYS' EYES ONLY

15. **What are your competitive advantages relative to competitors?**

Capitala Group has two primary advantages over its competitors. First, Capitala Group has an experienced and cohesive management team. A core group of the Fund's investment team members that are involved in screening and underwriting all transactions have worked together since 2002, and have an average of over 20 years of experience in the industry. These investment professionals have worked together at Capitala Group, screening opportunities and underwriting new investments, as well as managing a portfolio of investments in lower and traditional middle-market companies through two recessions, a credit crunch, the dot-com boom and bust and a historic, leverage-fueled asset valuation bubble, and have continued to invest significant portions of their own capital into Capitala Group over the years. Second, Capitala Group has a unique, proven direct origination platform which allows the firm to more selectively participate in broadly shopped processes while favoring directly originated transactions that provide higher yield at lower leverage points. With five regional offices across the country, Capitala Group has extensive deal flow with an attractive mix of proprietary deals that aren't sourced in competitive processes where, typically, leverage remains above 4.0x and yields remain compressed.

16. **Discuss your deal sourcing capabilities. How many deals do you see on average per year?**

Capitala Group reviews over 1,000 transactions per year as a result of its unique direct origination platform of five regional offices spread throughout the United States. Importantly, while some of these transactions are sourced via intermediated processes by funded sponsors, much of Capitala Group's deal flow is more proprietary in nature, as regional business development officers have extensive local contacts and can generate meaningful relationships with local companies, intermediaries and family offices that would not be so easily serviced from a singular office.

Capitala Group leverages its direct origination network and sources from a diverse set of constituencies, including but not limited to: directly from sponsors, directly from management and also from investment banks/intermediaries or other advisers to the portfolio companies (*i.e.*, lawyers, accountants and financial advisers). Historically, ~50% of Capitala's investments have been funded sponsor-led transactions, 38% have been non-sponsored deals, and 13% have been fundless sponsor-led transactions. Furthermore, Capitala Group tends to focus on funded sponsors that are smaller groups, typically earlier in their firm's formation, which are more focused from an industry and geographic perspective. These funds tend to generate more proprietary deal flow given their level of specialization and focus, which Capitala Group believes results in more reasonable valuations with attractive structuring opportunities for Capitala Group. Capitala Group's ability to leverage the firm's large base of resources, flexibility of investment mandate across security type (including equity participation) and its long track record in the lower middle market

10

allows it to compete effectively in sponsored transactions, and has led to many sponsor relationships which drive first and last look on transactions.

**17. Discuss the Fund's anticipated exit strategies.**

Capitala Group underwrites its investments through maturity; however, investments are typically repaid through a combination of deleveraging during the life of the loan through both amortization (when applicable) and through use of excess cash flow sweeps. For any remaining bullet payments at maturity, Capitala Group expects to be refinanced through either cash on the balance sheet or most likely through a new lender. A meaningful number of investments in Capitala Group's Legacy portfolio have been repaid early, often inside the prepayment penalty, and usually related to a change of control transaction at the borrower, though refinancing transactions have also occurred when portfolio companies make add-on acquisitions and decide to re-leverage to levels or with terms at which Capitala Group does not want to participate, or when portfolio companies outperform expectations and find themselves able to refinance into all-bank structures with a lower blended cost of capital.

**18. Provide two examples of failing companies (focus on assets in Capitala Finance) and how they were dealt with. Describe any lessons learned from underperforming deals in Prior Funds.**

*Deal # 1: Impresa Aerospace (originally Venture Aircraft "VAC" or "Impresa")*

Capitala Group originally invested in VAC as part of a buyout led by a well-known Sponsor that had a previous, successful exit in the aerospace industry. The CEO from that investment was involved in the VAC deal and served as the Chairman of the Board post-close. VAC was a tier one supplier of precision crafted sheet metal and other machined components to both the commercial and military aerospace markets.

A predecessor to Capitala Finance made a $10MM subordinated debt investment behind 1.5x of senior debt (VAC was asset-intensive), resulting in total debt at close to 2.7x EBITDA. Total equity was $15MM ($11MM from sponsor, $3MM of rollover and $1MM from Capitala Group).

Diligence focused on customer concentration, specifically with Boeing. Mitigants included VAC's diversification through multiple aircraft platforms and that the relationship was divided among eight different divisions of Boeing. Additional diligence focused on VAC's mix of business that was heavily weighted towards "Bluestreak" work (expedited parts needed that weren't on long term contracts) versus contracted work or LTA's – long term agreements with contracted pricing and target volumes. At the time of the acquisition, Boeing was doing a significant amount of Bluestreak work as it worked to release the first ten units of the 787 jetliner, as well as remodels of other platforms. An independent firm with aerospace expertise was hired to conduct an industry diligence report. The summary of their report found that while VAC was trying to migrate towards more LTA work that there would be more than enough Bluestreak work for the

11

CAP_0086221

foreseeable future. (This consulting firm also made a co-investment in the equity following its review of VAC).

After performing very well initially post-close, VAC began to lose work from Boeing. While complicated, the main cause was that VAC was charging very high prices for Bluestreak parts ordered by the new Boeing Charleston, SC plant (that was very behind on producing the 787). With all the Bluestreak work that VAC was doing for Charleston, VAC fell behind on LTA work for Boeing-Seattle (headquarters). Eventually, Seattle took over the purchasing function for Charleston, which alerted Boeing-Seattle to the Boeing-Charleston pricing difference. Boeing soon ceased most of the Bluestreak work and also did not award other business to VAC.

As VAC profitability began to suffer, the CEO and most of the management team was replaced. Coincidentally, around the same time, a local, larger competitor had serious operational and financial issues. Boeing approached the new VAC management team and asked them to purchase the failing competitor. After a hasty diligence review and under pressure from several customers, VAC acquired the competitor along with promises that new, higher pricing would be granted in the future. While the cash purchase price was low, the Company assumed over $6MM of trade payables as well as a very challenging integration. The new combined entity was renamed Impresa Aerospace. In brief, Impresa never received the promised price increases, integration did not go well (mostly IT-related) and the new entity was saddled with unprofitable business, a liability-heavy balance sheet and liquidity issues.

Capitala Group worked very closely with the sponsor, management (the new CEO was fired within the year), the senior lender and even directly with Boeing representatives to alleviate the problems. Over a year and a half, and after millions of dollars of additional equity investment, Capitala Group reducing some of the senior debt (allowing for an amicable senior lender forbearance) and numerous multi-party negotiations, the Company continued to struggle. From the strong relationships Capitala Group had formed with the various parties, we had insight into a potential distressed buying group and by buying out the senior debt, Capitala Group was able to negotiate a buyout of the newly acquired senior debt at par and a buyout of the subordinated debt at 50% of par. Through interest, fees and repayments, Capitala Group was ultimately able to recover nearly 80% of its investment.

Lessons learned:

- While customer concentration has always been a diligence concern, inherent concentration due to industry dynamics is not a mitigant in and of itself. Additionally, when doing business with multiple divisions, if the decision is (or can be) centralized, this does not mitigate the concentration (nor does multiple platforms).
- Industry specialized diligence should not be taken at face value.
- Further diligence is needed if a Company is achieving above market gross margins.
- Direct, early, high-level communications, especially with the senior lender are critical to a successful outcome.

12

CAP_0086222

- Working and communicating with the sponsor is important, but emphasis needs to remain with Capitala Group's creditor rights. In conjunction, holding a perfected lien on assets continues to be critical.

*Deal #2: Sun and Skin Care Research ("SSCR" or the "Company")*

SSCR was a global manufacturer of sun care branded products. A predecessor to Capitala Finance originally invested to support the sponsor's control acquisition of the Company in 2012. Capitala Group's internal underwriting process identified the sun care category's seasonality and its associated working capital swings. However, multiple factors challenged the investment, including unseasonably mild and wet summer weather.  In the face of mounting inventory, management doubled down on its commissioned sales efforts, and discounted heavily, along with all the other sun care competitors. In a business in which retailers are free to return unsold inventory, retailers generally don't say "no"; instead, they charge the manufacturer for shipping to return the unsold product. Post-closing, during site visits, Capitala Group visitors found that the Company had warehouses full of returned product.  The Company's cash position was poor, vendors were not happy, the CEO was terminated, and the senior lender was concerned. Capitala Group communicated frequently with the senior lender and always followed through in negotiations, which earned Capitala Group credibility as the process unfolded.

Capitala Group mandated that the Company engage a Chief Restructuring Officer ("CRO") and an investment bank with success in analyzing and executing on challenged engagements. The deal team worked closely with the Company's CRO, CFO and new CEO in a complex situation involving a host of internal constituents, including a senior secured lender, unsecured creditors, a sponsor unwilling to commit substantive new capital to the Company, the Company's board of directors, the investment banker, Company restructuring counsel, board counsel, and the former owner of the Company, who was also a member of the board.

Ultimately, by investing considerable internal resources, Capitala Group successfully worked with the new CEO and CRO to rationalize the Company's peak inventory build-up season. A more rational inventory build-up approach allowed the Company to continue to support its largest, and most strategically important retail customer, which then positioned the Company for a timely sale to a strategic acquirer – at the Company's lowest working capital point and just prior to the return season.  In a UCC Article 9 transaction, Capitala Group did not recoup its entire investment (0.85x MOIC); however, by implanting its internal process and working as a team through a complex business situation, the outcome was more favorable for Capitala Group investors than it would have been otherwise.

A core strength of Capitala Group is the ability to leverage its collective team experience. As the portfolio monitoring team dealt daily with a number of complex legal and situational issues, the team met frequently during an over year-long period to gather input from all of its team members. Early and consistent portfolio intervention is important, but every situation is and will be different. And obviously, one of the first questions our deal teams ask when reviewing any potential investment in a consumer

13

CAP_0086223

products business is – "can this product be returned?" Fortunately, the sun care business seems to be an anomaly.

## Management Team

1. **How many employees does the firm have? In which offices are they located and, if applicable, on which industries or strategies do they focus?**

   Capitala Group's 25 investment professionals are primarily located in the Charlotte, NC headquarters. In addition to the executive team, underwriting team, portfolio monitoring team, and compliance / back office in Charlotte, Capitala Group opened the Raleigh, NC office in 2002, where its COO and investment committee member Jack McGlinn resides. In 2010, Capitala Group opened its Atlanta, GA office where Director of Business Development and investment committee member Randall Fontes resides. In 2013, Capitala Group opened its Fort Lauderdale, FL office where Casey Swercheck resides, as well as its Washington, D.C. office, where Mario Shaffer resides. Finally, in 2014 Capitala Group opened its Los Angeles, CA office where Christian MacCarron resides. While Capitala Group's regional offices are all business development-focused, there is no strategic or industry focus by office, all Capitala Group employees are generalists and focus on all industries.

2. **Provide a current organizational chart depicting the investment professionals involved in managing the Fund. If applicable, please provide a list of operating partners who are dedicated or contracted by the General Partner, their area of expertise and prior experience**.

   Please reference the PPM and investor presentation for a complete listing of Capitala Group's investment related employees, as well as detailed biographical information. See below for additional information related to individual roles and responsibilities:

3. **Provide the names, titles, industry group, location, dates of birth, length of time with the firm and total years of relevant experience for each of the investment professionals.**

14

CAP_0086224

**Experience of Investment Professionals**

| Name | Title | Industry Group | Location | Birthday | Age | PE Exp. (yrs.) | Tenure (yrs.) | Prior Experience | Educational Background |
|---|---|---|---|---|---|---|---|---|---|
| Joe R. Alala, III* | Chairman & CEO | Executive Team | Charlotte | 3/21/70 | 47 | 19 | 19 | • Harrison, Associate | • JD/MBA – Wake Forest University<br>• AB – Princeton University |
| M. Hunt Broyhill* | Partner & Member of Board of Directors | Executive Team | Charlotte | 4/1/64 | 53 | 25 | 19 | • Broyhill Asset Management, Founder | • BA – Wake Forest University |
| Jack McGlinn* | COO & Director | Executive Team | Raleigh | 12/6/68 | 48 | 28 | 19 | • PriceWaterhouse Coopers<br>• Medical Equipment Company, President | • MBA – UNC Chapel Hill<br>• BA Accounting – Notre Dame |
| Chris Norton* | CFO & Director – Underwriting | Executive Team, Underwriting | Charlotte | 3/7/71 | 45 | 21 | 14 | • Bowles Hollowell Connor, Investment Banking Associate<br>• First Union Capital Partners, Private Equity Analyst | • MBA & BS Commerce – University of Virginia |
| Steve Arnall | CFO | Executive Team, Accounting / Operations | Charlotte | 1/2/61 | 55 | 30 | 4 | • Park Sterling Bank, CFO | • BA Accounting – James Madison University / CPA |
| Richard Wheelahan | COO, Director & General Counsel | Executive Team, Compliance / Operations | Charlotte | 11/1/80 | 36 | 12 | 7 | • Mayer Brown LP, Associate (Leveraged Finance Group)<br>• Moore & Van Allen PLLC, Associate | • JD – UNC Chapel Hill<br>• BA Political Science – Appalachian State University |
| Lynne Girts | CAO | Accounting / Administration | Charlotte | 11/19/80 | 51 | 21 | 10 | • Bank Lindsay & Partner, Staff/Tax Accountant<br>• Alexander VanLiew, Staff/Tax Accountant | • BS Accounting – University of Southern Mississippi |
| Michael Marr | Director – Portfolio | Portfolio Management | Charlotte | 7/19/60 | 57 | 31 | 9 | • McGuireWoods, Partner (M&A Practice)<br>• Seabeard & Co, Merchant Bank, Director | • ML Taxation – Emory / JD – Campbell<br>• BSBA – University of North Carolina |
| Randall Fontes* | Director | Business Development | Atlanta | 8/12/75 | 42 | 20 | 6 | • Capital Finance, Consumer<br>• Hubbus Capital Management, Principal | • MBA – Duke University<br>• BA Economics – Tulane University |
| Adam Richeson* | Director | Operations, Portfolio Management, Business Development | Charlotte | 7/19/80 | 36 | 7 | 7 | • Stabilus GmbH, Regional Sales Representative<br>• Stillwaters, LLC, Editor and Customer Service Manager | • MBA – Wake Forest University<br>• BA – The Ohio State University |
| Davis Hutchens | Director | Portfolio Management | Charlotte | 9/24/80 | 36 | 9 | 9 | • Nobel, Glass & Harwell, Trustee | • MBA – UNCC<br>• BA Sociology & Computer Science – Duke |
| Eric Althofer | Vice President | Underwriting | Charlotte | 7/9/81 | 35 | 11 | 3 | • Jefferies, Investment Banking Associate<br>• Deloitte Consulting, Associate & Analyst | • MBA – University of Michigan<br>• BA Economics – Washington University |
| Casey Swercheck | Vice President | Business Development, Investor Relations | Fort Lauderdale | 10/23/81 | 35 | 13 | 4 | • Hamilton Lane, Associate<br>• Winston Associates, Senior Analyst | • BS Finance – University of Pittsburgh |
| Christian MacCarron | Vice President | Business Development | Los Angeles | 9/4/85 | 32 | 10 | 3 | • Platinum Equity, Associate<br>• Winstpartner Capital, Associate | • BA Economics – UCLA |
| Kevin Koonts | Vice President | Accounting / Administration | Charlotte | 9/27/80 | 32 | 10 | 4 | • Dixon Hughes Goodman, Manager | • BSBA & Master of Accounting – University of North Carolina / CPA |
| Jack Vander Leeuw | Vice President | Underwriting | Charlotte | 12/21/94 | 39 | 10 | 1 | • Nauxbar Inc, Principal<br>• Oakstone Investment Corp, Associate<br>• BB&T Capital Markets, Analyst | • BSBA Business Management – Georgetown University |
| Danny Speake | Senior Associate | Underwriting | Charlotte | 9/29/90 | 28 | 5 | 3 | • SunTrust Robinson Humphrey, Analyst (M&A) | • BA Economics – Sewanee |
| Peter McArthur | Associate | Underwriting | Charlotte | 3/2/91 | 26 | 4 | 1 | • Regions Bank Securities, Analyst | • BS Business Administration – University of North Carolina |
| Joe Chavins | Associate | Business Development | Charlotte | 9/26/91 | 37 | 4 | 1 | • DH3 Corporate Finance<br>• 3 Mile Advisors<br>• Peel Ventures | • BS Commerce – University of Virginia |
| Kevin Roberts | Associate | Portfolio Management | Charlotte | 9/28/89 | 27 | 3 | 1 | • Wedge Capital Management, Asst Vice President<br>• Ernst & Young, Audit Senior | • BS Business Administration – Boston College |
| Alex Pruitt | Analyst | Underwriting | Charlotte | | | 1 | 1 | | • BA Accounting & Finance – Wofford College |
| Jack Limer | Analyst | Portfolio Management | Charlotte | 5/30/94 | 23 | 1 | 1 | • Totem & Company, Analyst | • BSBA Business Management – High Point University |
| Katrina Cole Jakubowski | Administrator | Marketing / Administration | Charlotte | 11/9/72 | 44 | 17 | 4 | • M+E Fusion, Partner<br>• Frontier Capital | • BA Business Administration – Campbell University |
| Peter Sherman | Consultant | Portfolio Management | Charlotte | 6/10/61 | 56 | 29 | 1 | • Brevet Capital Management, Partner<br>• Ernst & Young, Head of Capital & Debt Advisory<br>• Bank of America, Senior Advisor<br>• Prudential, Senior Advisor | • MBA – The Wharton School<br>• BA – The University of New Orleans |

4. **Describe how each of the Key Principals (those individuals who hold titles of Vice President or above) will divide their time.**

| Key Principals' Time Allocation | | | | | | |
|---|---|---|---|---|---|---|
| Name | Managing Firm | Deal Sourcing | Due Diligence | Monitoring / Value-Add | Non-Fund Initiatives | Total |
| Joe Alala | 75% | 15% | 0% | 0% | 10% | 100% |
| Hunt Broyhill | 30% | 10% | 0% | 0% | 60% | 100% |
| Jack McGlinn | 30% | 20% | 20% | 10% | 20% | 100% |
| Chris Norton | 20% | 10% | 60% | 10% | 0% | 100% |
| Steve Arnall | 50% | 0% | 0% | 25% | 25% | 100% |
| Randall Fontes | 0% | 80% | 10% | 10% | 0% | 100% |
| Richard Wheelahan | 50% | 10% | 10% | 10% | 20% | 100% |
| Lynne Girts | 10% | 0% | 0% | 60% | 30% | 100% |
| Michael Marr | 20% | 0% | 10% | 60% | 10% | 100% |
| Adam Richeson | 0% | 20% | 50% | 20% | 10% | 100% |
| Davis Hutchens | 0% | 0% | 10% | 70% | 20% | 100% |
| Eric Althofer | 0% | 10% | 50% | 20% | 20% | 100% |
| Jack Vander Leeuw | 0% | 30% | 50% | 10% | 10% | 100% |
| Casey Swercheck | 0% | 50% | 10% | 20% | 20% | 100% |
| Christian MacCarron | 0% | 80% | 10% | 10% | 0% | 100% |
| Kevin Koonts | 0% | 0% | 0% | 80% | 20% | 100% |

*Note: Non-Fund Initiatives represent time spent on Capitala Group initiatives not directly related to the Fund.*

5. **Are there any plans to hire additional staff? Have candidates been identified? Detail the candidates' backgrounds.**

Capitala Group maintains one of the largest teams in the lower middle market direct private lending space relative to assets under management. While the firm is always interested in meeting talented professionals across all functional areas including new office locations, there are no immediate hiring plans.

ATTORNEYS' EYES ONLY

6. **What is the Fund's key man clause? If different from the Prior Funds, explain.**

   There is little change to the Fund's key person provisions from Fund IV. If Joe Alala ceases, on a permanent or long-term basis, to be actively involved in the affairs of the Fund (the "Key Person Event"), the investment period will be suspended automatically unless two thirds of investors reinstate it. If the investment period is not reinstated within 90 days of the Key Person Event, the investment period will terminate.

7. **Describe any succession programs for the firm and any safeguards in place in the event there is turnover of key individuals.**

   There is a formal management succession plan in place at Capitala Finance, which has been approved by Capitala Finance's board of directors, but there is currently no formalized management succession plan in place at Capitala Group or the Fund.

8. **Please detail the senior investment professionals (Vice President level & above) who have left the General Partner over the course of the past ten years.**

| Turnover | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | Title | Start Date | Leave Date | Tenure | Reason for Leaving | New Employer | Email |
| Jay Turner | Director | 2007 | 2012 | 5.0 | Moved to another firm | Dos Rios Partners | jay.turner@dorriospartners.com |
| David Reed | Director | 2003 | 2009 | 6.0 | Re-allocation of resources | Shepard Capital | dreed@shepardcap.com |
| Keith Carlson | Vice President | 2007 | 2013 | 6.0 | Moved to another firm | Silverstone Advisors | keith@silverstoneadv.com |
| Ken Berryman | Director | 2007 | 2012 | 5.0 | Re-allocation of resources | Weller Equity | kberryman@wellerequity.com |
| Timothy Cox | Director | 2013 | 2015 | 2.0 | Re-allocation of resources | Beacon Heights Advisory | tccox00@gmail.com |
| Steven Riddell | Director | 2015 | 2016 | 1.0 | Moved to another firm | Redding Ridge Asset Mgmt | snriddell@gmail.com |
| Michael Graham | Vice President | 2014 | 2016 | 2.0 | Moved to another firm | Peak Rock Capital | h.michael.graham@gmail.com |
| Mario Shafer | Director | 2013 | 2017 | 4.0 | Moved to another firm | HIG Whitehorse | TBD |

## Compensation/Principals' Commitment

1. **Describe compensation structure (salary, bonus and carried interest) for the Key Principals. How do you provide incentives to the staff?**

   Team compensation is intended to be generally derived 1/3 from base salary, 1/3 from a semi-annual, discretionary "bonus pool" and 1/3 from carried interest (including but not limited to incentive fees earned by Capitala Group from Capitala Finance or from the legacy funds or the Fund). Since the investment team members can potentially triple their base salaries in the form of incentive compensation, there is substantial incentive for each of Capitala Group's team members to perform.

2. **List the percentage split of Key Principal's income per year (tab "U").**

| Principals' Income Split | | | | |
|---|---|---|---|---|
| Name | Management Fee | Transaction Fee / Other | Carry | Total |
| Joe Alala | 50.0% | 0.0% | 50.0% | 100.0% |
| Jack McGlinn | 50.0% | 0.0% | 50.0% | 100.0% |
| Chris Norton | 50.0% | 0.0% | 50.0% | 100.0% |
| Richard Wheelahan | 50.0% | 0.0% | 50.0% | 100.0% |
| Michael Marr | 50.0% | 0.0% | 50.0% | 100.0% |
| Steve Arnall | 50.0% | 0.0% | 50.0% | 100.0% |

16

CAP_0086226

3. **How will the carry be split among the management team in the Fund?**

   See table provided in Question 5 of this section for additional detail.

4. **How is carried interest vested for those parties that participate?**

   Vesting for employees, while subject to final determination, is expected to occur over 3.0 years on a straight-line basis.

5. **What amount of capital will each Principal commit to the Fund? Are the commitments leveraged or loaned? Do the commitments represent deferred management fees?**

   Commitments of the Principals are not leveraged or loaned; they are paid in cash. Please reference section 5.04 of the LPA for further detail.

| Principals' Financial Commitment | | | |
|---|---|---|---|
| **Name** | **$ Commitment** | **% of New Fund** | **Profit-Sharing Interests** |
| Capitala Employee Non-Voting F-V, LLC | $1,600,000 | 0.5% | 40.0% |
| Capitala Private Investments, LLC | $400,000 | 0.1% | 0.0% |
| Capitala Investment Group, LLC | $1,000,000 | 0.3% | 15.0% |
| Capitala Group Holdings, LLC | $1,000,000 | 0.3% | 40.0% |
| JBA Chapter II, LLC | 0 | 0.0% | 5.0% |
| Total | $4,000,000 | 1.1% | 100.0% |

Note: Assumes Fund is $350MM.

6. **If the General Partner is affiliated with another organization, what are the parent company's economics and capital commitment to the Fund? What, if any involvement, will the parent company have with the management or decision-making process of the Fund?**

   The GP will assign its management function for the Fund to CPA, a registered investment advisor, and an affiliate under common control with CIA. In exchange, the GP will assign its management fee to CPA. Carried interest will be allocated in accordance with item 3, above.

### Investment Approval Process and Other Governance

1. **Outline the investment approval process and the investment committee members.**

   Capitala Group's investment team is led by its investment committee ("IC"), which is responsible for all aspects of the Fund's investment process.  Since the Fund's first closing, there is a new, multi-step investment committee process. The Fund's IC consists of Joe Alala, Hunt Broyhill, Jack McGlinn, Chris Norton, Randall Fontes and Adam Richeson. In order for a term sheet to be issued, a majority of the investment committee must approve.

17

CAP_0086227

The Fund's investment process requires potential transactions to be screened by various members of the investment team. In order for a potential investment to be considered by the investment committee, the investment (a) must be endorsed by a majority of the underwriting team that has been assigned to it and (b) Mr. Norton must approve its submission, as Chief Risk Officer and Director of Underwriting for Capitala Group. Once endorsed, the deal team will submit an initial screening memo to IC in order to obtain approval to issue a proposed full term sheet. Each investment will require the approval of a majority of the members of the investment committee, which majority must include Mr. Alala. Messrs. Alala, McGlinn, Norton, Fontes and Richeson meet at least weekly and, together with Mr. Broyhill, on an as needed basis, depending on the nature and volume of investment opportunities. The majority of Capitala Group's current investment committee has worked together in the same capacity since 2003. Once a proposed term sheet is accepted by a borrower or sponsor, the deal team will then begin a multi-step diligence and execution process whereby it produces a risk identification/diligence plan that is vetted by IC. Throughout the course of the transaction, the deal team will execute the diligence plan while summarizing findings in a full diligence memo, which can be presented to IC on an ongoing basis, but which must be approved by a majority of IC, once completed, before an investment may be closed and funded.

2. **Will any other affiliates co-invest with the Fund or participate in the management of the Fund?**

Other than investment advisory services rendered by CPA, no other affiliates are expected to participate in management of the Fund. Capitala Finance is expected to primarily co-invest with the Fund. Any co-investment with the Fund would be pari passu, on the same terms, and in accordance with both (a) Capitala Finance's Exemptive Relief Order from the SEC permitting such co-investments and (b) Capitala Group's Investment Allocation Procedure. The SEC Exemptive Relief Order was obtained by Capitala Group in late 2016, contemporaneous with the Fund's first close.

3. **Provide a list of advisory board members in the Prior Fund. Are they compensated for their activities? If so, please describe.**

The Advisory Board is not expected to be compensated, and its members are yet to be determine

18

**NATIVE DOCUMENT PLACEHOLDER**

**Please review the native document CAP_0086229.XLSX**