# EXHIBIT 72

10-K 1 tv514470-10k.htm FORM 10-K

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒    **Annual Report Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**For the Fiscal Year Ended December 31, 2018**

☐    **Transition Report Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

| Commission File Number | Exact name of registrant as specified in its charter, address of principal executive office, telephone number and state or other jurisdiction of incorporation or organization | I.R.S. Employer Identification Number |
|---|---|---|
| **814-01022** | **Capitala Finance Corp.** | **90-0945675** |

**4201 Congress St., Suite 360**
**Charlotte, North Carolina 28209**
**Telephone: (704) 376-5502**
**State of Incorporation: Maryland**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, par value $0.01 per share** | **NASDAQ Global Select Market** |
| **5.75% Convertible Notes due 2022** | **NASDAQ Capital Market** |
| **6.00% Notes due 2022** | **NASDAQ Global Select Market** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act of 1933.    Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Exchange Act 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (check one):

Large accelerated filer ☐              Accelerated filer ☒

Non-accelerated filer ☐              Smaller reporting company ☐

                              Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $121.3 million based on the number of shares held by non-affiliates of the registrant as of June 29, 2018, which was the last business day of the registrant's most recently completed second fiscal quarter. For the purposes of calculating this amount only, all directors and executive officers of the registrant have been treated as affiliates.

The number of shares of Capitala Finance Corp.'s common stock, $0.01 par value, outstanding as of March 1, 2019 was 16,072,386.

**Documents Incorporated by Reference**

Portions of the registrant's definitive proxy statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A relating to the registrant's 2019 Annual Meeting of Stockholders, to be filed with the Securities and Exchange Commission within 120 days following the end of the Company's fiscal year, are incorporated by reference in Part III of this Annual Report on Form 10-K as indicated herein.

**EXHIBIT**
**0013**

# TABLE OF CONTENTS

|  |  | **PAGE** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 30 |
| Item 1B. | Unresolved Staff Comments | 63 |
| Item 2. | Properties | 63 |
| Item 3. | Legal Proceedings | 63 |
| Item 4. | Mine Safety Disclosures | 63 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 64 |
| Item 6. | Selected Consolidated Financial Data | 66 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 67 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 94 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 95 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 96 |
| Item 9A. | Controls and Procedures | 96 |
| Item 9B. | Other Information | 96 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 97 |
| Item 11. | Executive Compensation | 97 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 97 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 97 |
| Item 14. | Principal Accountant Fees and Services | 97 |
| **PART IV** | | |
| Item 15. | Exhibits and Consolidated Financial Statement Schedules | 98 |
| Item 16. | Form 10-K Summary | 101 |
| Signatures | | 102 |

i

**PART I**

*In this Annual Report on Form 10-K, except as otherwise indicated, the terms:*

- *"we," "us," "our," "Capitala Finance" and the "Company" refer to Capitala Finance Corp., together with its consolidated subsidiaries;*

- *The "Investment Advisor" and "Capitala Investment Advisors" refer to Capitala Investment Advisors, LLC, our investment adviser; and*

- *The "Administrator" refers to Capitala Advisors Corp., our administrator.*

## ITEM 1. BUSINESS

## FORMATION OF OUR COMPANY

We are an externally managed non-diversified closed-end management investment company incorporated in Maryland that has elected to be regulated as a business development company ("BDC") under the Investment Company Act of 1940, as amended (the "1940 Act"). We commenced operations on May 24, 2013 and completed our initial public offering ("IPO") on September 30, 2013. We are managed by Capitala Investment Advisors, LLC (the "Investment Advisor"), an investment adviser that is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and Capitala Advisors Corp. (the "Administrator") provides the administrative services necessary for us to operate. For United States ("U.S."). federal income tax purposes, we have elected to be treated, and intend to comply with the requirements to continue to qualify annually, as a regulated investment company ("RIC") under subchapter M of the Internal Revenue Code of 1986, as amended (the "Code").

Our investment objective is to generate both current income and capital appreciation through debt and equity investments. Both directly and through our subsidiaries that are licensed by the U.S. Small Business Administration ("SBA") under the Small Business Investment Company ("SBIC") Act, we offer customized financing to business owners, management teams and financial sponsors for change of ownership transactions, recapitalizations, strategic acquisitions, business expansion and other growth initiatives. We invest in first lien loans, second lien loans and subordinated loans, and, to a lesser extent, equity securities issued by lower middle-market companies and traditional middle-market companies.

We were formed for the purpose of: (i) acquiring, through a series of transactions, an investment portfolio from the following entities: CapitalSouth Partners Fund I Limited Partnership ("Fund I"); CapitalSouth Partners Fund II Limited Partnership ("Fund II"); CapitalSouth Partners Fund III, L.P. ("Fund III Parent"); CapitalSouth Partners SBIC Fund III, L.P. ("Fund III") and CapitalSouth Partners Florida Sidecar Fund I, L.P. ("Florida Sidecar" and, collectively with Fund I, Fund II, Fund III and Fund III Parent, the "Legacy Funds"); (ii) raising capital in the IPO and (iii) continuing and expanding the business of the Legacy Funds by making additional debt and equity investments in lower middle-market and traditional middle-market companies.

On September 24, 2013, we acquired 100% of the limited partnership interests in Fund II, Fund III and Florida Sidecar and each of their respective general partners, as well as certain assets from Fund I and Fund III Parent, in exchange for an aggregate of 8,974,420 shares of our common stock (the "Formation Transactions"). Fund II, Fund III and Florida Sidecar became our wholly owned subsidiaries. Fund II and Fund III retained their SBIC licenses, continued to hold their existing investments at the time of the IPO and have continued to make new investments. The IPO consisted of the sale of 4,000,000 shares of our common stock at a price of $20.00 per share resulting in net proceeds to us of $74.25 million, after deducting underwriting fees and commissions totaling $4.0 million and offering expenses totaling $1.75 million. The other costs of the IPO were borne by the limited partners of the Legacy Funds. During the fourth quarter of 2017, Florida Sidecar transferred all of its assets to Capitala Finance Corp. and was legally dissolved as a standalone partnership.

The Company has formed and expects to continue to form certain consolidated taxable subsidiaries (the "Taxable Subsidiaries"), which are taxed as corporations for income tax purposes. These Taxable Subsidiaries allow the Company to make equity investments in companies organized as pass-through entities while continuing to satisfy the requirements of a RIC under the Code.

1

TABLE OF CONTENTS

## OUR INVESTMENT STRATEGY

Our investment objective is to generate both current income and capital appreciation through debt and equity investments. We expect the companies in which we invest will generally have between $4.5 million and $30.0 million in trailing twelve month earnings before interest, tax, depreciation and amortization ("EBITDA"). We believe our focus on direct lending to private companies enables us to receive higher interest rates and more substantial equity participation. As part of that strategy, we may invest in first lien loans, which have a first priority security interest in all or some of the borrower's assets. In addition, our first lien loans may include positions in "stretch" senior secured loans, also referred to as "unitranche" loans, which combine characteristics of traditional first lien senior secured loans and second lien loans, providing us with greater influence and security in the primary collateral of a borrower and potentially mitigating loss of principal should a borrower default. We also may invest in second lien loans, which have a second priority security interest in all or substantially all of the borrower's assets. In addition to first and second lien loans, we invest in subordinated loans, which may include mezzanine and other types of junior debt investments. Like second lien loans, our subordinated loans typically have a second lien on all or substantially all of the borrower's assets; however, the principal difference between subordinated loans and second lien loans is that in a subordinated loan, we may be subject to the interruption of cash interest payments, at the discretion of the first lien lender, upon certain events of default. In addition to debt securities, we may acquire equity or detachable equity-related interests (including warrants) from a borrower. Typically, the debt in which we invest is not initially rated by any rating agency; however, we believe that if such investments were rated, they would be rated below investment grade. Below investment grade securities, which are often referred to as "high yield" or "junk," have predominantly speculative characteristics with respect to the issuer's capacity to pay interest and repay principal. We intend to target investments that mature in four to six years from our investment.

We typically will not limit the size of our loan commitments to a specific percentage of a borrower's assets that serve as collateral for our loan, although we attempt to protect against risk of loss on our debt investments by structuring, underwriting and pricing loans based on anticipated cash flows of our borrowers. As of December 31, 2018, our Investment Advisor underwrote investments in 134 lower middle-market and traditional middle-market companies totaling more than $1.4 billion of invested capital since 2000, and we believe that a continuation of this strategy allows us to make structured investments with more attractive pricing and greater opportunities for meaningful equity participation than traditional asset-based, senior secured loans. Further, we believe that we benefit from our Investment Advisor's long-standing relationships with many private equity fund sponsors, whose participation in portfolio companies, we believe, makes repayment from refinancing, asset sales and/or sales of the borrowers themselves more likely than a strategy whereby we consider investments only in founder-owned or non-sponsored borrowers.

## OUR INVESTMENT ADVISOR

We are managed by the Investment Advisor, whose investment team members have significant and diverse experience financing, advising, operating and investing in lower middle-market and middle-market companies. Moreover, our Investment Advisor's investment team has refined its investment strategy by sourcing, reviewing, acquiring and monitoring 134 portfolio companies totaling more than $1.4 billion of invested capital from 2000 through December 31, 2018. The Investment Advisor's investment team also manages CapitalSouth Partners SBIC Fund IV, L.P. ("Fund IV"), a private investment limited partnership providing financing solutions to smaller and lower middle-market companies. Fund IV had its first closing in March 2013 and obtained SBA approval for its SBIC license in April 2013. In addition to Fund IV, affiliates of the Investment Advisor may manage several affiliated funds whereby institutional limited partners in Fund IV have the opportunity to co-invest with Fund IV in portfolio investments. An affiliate of the Investment Advisor also manages Capitala Private Credit Fund V, L.P. ("Fund V"), a private investment limited partnership, and a private investment vehicle (referred to herein as "Capitala Specialty Lending Corp." or "CSLC"), both of which provide financing solutions to lower middle-market and traditional middle-market companies. The Investment Advisor and its affiliates may also manage other funds in the future that may have investment mandates that are similar, in whole and in part, with ours. To the extent permitted by the 1940 Act and interpretation of the staff of the U.S. Securities and Exchange Commission (the "SEC"), the Investment Advisor and its affiliates may determine that an investment is appropriate for

us and for one or more of those other funds. In such event, depending on the availability of such investment and other appropriate factors, the Investment Advisor or its affiliates may determine that we should invest side-by-side with one or more other funds. Any such investments will be made only to the extent permitted by applicable law and interpretive positions of the SEC and its staff, and consistent with the Investment Advisor's allocation procedures. We expect to make, and have made, co-investments with Fund V and/or CSLC given their similar investment strategies.

On June 1, 2016, the SEC issued an exemptive order (the "Order"), which permits the Company to co-invest in portfolio companies with certain funds or entities managed by the Investment Advisor or its affiliates in certain negotiated transactions where co-investing would otherwise be prohibited under the 1940 Act, subject to the conditions of the Order. Pursuant to the Order, the Company is permitted to co-invest with its affiliates if a "required majority" (as defined in Section 57(o) of the 1940 Act) of the Company's independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to the Company and its stockholders and do not involve overreaching in respect of the Company or its stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of the Company's stockholders and is consistent with its then-current objectives and strategies.

Our Investment Advisor is led by Joseph B. Alala, III, our chief executive officer, chairman of our Board of Directors (the "Board"), and the managing partner and chief investment officer of our Investment Advisor, M. Hunt Broyhill, a member of the Board and a partner of our Investment Advisor, Stephen A. Arnall, our chief financial officer and chief operating officer, and John F. McGlinn, a managing director of our Investment Advisor. Messrs. Alala, Broyhill and McGlinn serve as our Investment Advisor's investment committee. They are assisted by nineteen investment professionals.

Our Investment Advisor's investment committee, as well as certain key investment team members that are involved in screening and underwriting portfolio transactions, have worked together for more than 15 years. These investment professionals have an average of over 20 years of experience in various finance-related fields, including operations, corporate finance, investment banking, business law and merchant banking, and have collectively developed a broad network of contacts that can offer us investment opportunities. Much of our Investment Advisor's investment team has worked together screening opportunities, underwriting new investments and managing a portfolio of investments in lower middle-market and traditional middle-market companies through two recessions, a credit crunch, the dot-com boom and bust and a historic, leverage-fueled asset valuation bubble.

## INVESTMENTS

We will engage in various investment strategies from time to time in order to achieve our overall lending and investment objectives. Our strategies will generally require current cash yields and sensible leverage and fixed charge coverage ratios and either a first or second lien position (subject to limited instances in which we will not obtain security) in the collateral of the portfolio company. The strategy we select will depend upon, among other things, market opportunities, the skills and experience of our Investment Advisor's investment team, the result of our financial, operational and strategic evaluation of the opportunity, and our overall portfolio composition. Most of our existing debt investments offer, and we expect most of our future debt investments will offer, the opportunity to participate in a borrower's equity performance through warrant participation, direct equity ownership or otherwise, and many notes that we purchase will require the borrower to pay an early termination fee. Collectively, these attributes have been, and are expected to be, important contributors to the returns generated by our Investment Advisor's investment team.

The Investment Advisor's investment team uses a disciplined investment portfolio monitoring and risk management process that emphasizes strict underwriting standards and guidelines, strong due diligence investigation, regular portfolio review, analysis and performance-guided responses, and proper investment diversification. We allocate capital among different industries, geographies and private equity sponsors on the basis of relative risk/reward profiles as a function of their associated downside risk, volatility, perceived fundamental risk and our ability to obtain favorable investment protection terms.

3

### Types of Investments

We will target debt investments that yield meaningful current income and, in many cases, provide the opportunity for capital appreciation through equity securities. In each case, the following criteria and guidelines are applied to the review of a potential investment; however, not all criteria are met in every single investment in our portfolio, nor do we guarantee that all criteria will be met in the investments we will make in the future.

- *Established Companies With Positive Cash Flow.* We seek to invest in established companies with a history of generating revenues and positive cash flows. We intend to focus on companies with a history of profitability and minimum trailing twelve month EBITDA of between $4.5 million and $30.0 million. We do not intend to invest in start-up companies, distressed or "turn-around" situations or companies with business plans that we do not understand.

- *Experienced Management Teams with Meaningful Investment.* We seek to invest in companies in which senior or key managers have significant company or industry-level experience and have significant equity ownership. It has been our experience that these management teams are more committed to the company's success and more likely to manage the company in a manner that protects our debt and equity investments.

- *Significant Invested Capital.* We believe that the existence of an appropriate amount of equity beneath our debt capital provides valuable support for our investment. In addition, the degree to which the particular investment is a meaningful one for the portfolio company's financial sponsor, and the financial sponsor's ability and willingness to invest additional equity capital as and to the extent necessary, are also important considerations.

- *Appropriate Capital Structures.* We seek to invest in companies that are appropriately capitalized. First, we examine the amount of equity that is being invested by the company's private equity sponsor to determine whether there is a sufficient capital cushion beneath our invested capital. We also analyze the amount of leverage and the characteristics of senior debt with lien priority over our investment.

- *Strong Competitive Position.* We intend to invest in companies that have developed strong, defensible product or service offerings within their respective market segments. These companies should be well positioned to capitalize on organic and strategic growth opportunities, and should compete in industries with strong fundamentals and meaningful barriers to entry. We further analyze prospective portfolio investments in order to identify competitive advantages within their respective industries, which may result in superior operating margins or industry-leading growth.

- *Customer and Supplier Diversification.* We expect to invest in companies with sufficiently diverse customer and supplier bases. We believe these companies will be better able to endure industry consolidation, economic contraction and increased competition than those that are not sufficiently diversified. However, we also recognize that from time to time, an attractive investment opportunity with some concentration among its customer base or supply chain will present itself. We believe that concentration issues can be evaluated and, in some instances (whether due to supplier or customer product or platform diversification, the existence and quality of long-term agreements with such customers or suppliers or other select factors), mitigated, thus presenting a superior risk-adjusted pricing scenario.

### Debt Investments

The Investment Advisor's investment team tailors the terms of each debt investment to the facts and circumstances of the transaction, the needs of the prospective portfolio company and, as applicable, its financial sponsor, negotiating a structure that seeks to protect our rights and manage our risk while creating incentives for the portfolio company to achieve its business plan. As of December 31, 2018, 69.2% of our debt investments were secured by a first lien on the assets of the portfolio company, and 30.8% of our debt investments were secured by a second lien on the assets of the portfolio company. We expect our primary source of return to be the monthly cash interest we will collect on our debt investments. We also typically seek board observation rights with each portfolio company and we offer (and have historically provided)

4

managerial and strategic assistance to these companies. We seek to further protect invested principal by negotiating appropriate affirmative, negative and financial covenants in our debt documents that are conservative enough to represent a prudent cushion at closing or to budgeted projections, but that are flexible enough to afford our portfolio companies and their financial sponsors sufficient latitude to allow them to grow their businesses. Typical covenants include default triggers and remedies (including penalties), lien protection, leverage and fixed charge coverage ratios, change of control provisions and put rights. Most of our loans feature call protection to enhance our total return on debt investments that are repaid prior to maturity.

Most of our debt investments are structured as first lien loans, and as of December 31, 2018, 69.2% of the fair value of our debt investments consisted of such investments. First lien loans may contain some minimum amount of principal amortization, excess cash flow sweep feature, prepayment penalties, or any combination of the foregoing. First lien loans are secured by a first priority lien in existing and future assets of the borrower and may take the form of term loans or delayed draw facilities. In some cases, first lien loans may be subordinated, solely with respect to the payment of cash interest, to an asset based revolving credit facility. Unitranche debt, a form of first lien loan, typically involves issuing one debt security that blends the risk and return profiles of both senior secured and subordinated debt in one debt security, bifurcating the loan into a first-out tranche and last-out tranche. As of December 31, 2018, 13.7% of the fair value of our first lien loans consisted of last-out loans. We believe that unitranche debt can be attractive for many lower middle-market and traditional middle-market businesses, given the reduced structural complexity, single lender interface and elimination of intercreditor or potential agency conflicts among lenders.

We may also invest in debt instruments structured as second lien loans. On a fair market value basis, 9.5% of our debt investments consisted of second lien loans as of December 31, 2018. Second lien loans are loans which have a second priority security interest in all or substantially all of the borrower's assets, and which are not subject to the blockage of cash interest payments to us at the first lien lender's discretion.

In addition to first and second lien loans, we may also invest in subordinated loans. On a fair market value basis, 21.3% of our debt investments consisted of subordinated loans as of December 31, 2018. Subordinated loans typically have a second lien on all or substantially all of the borrower's assets, but unlike second lien loans, may be subject to the interruption of cash interest payments upon certain events of default, at the discretion of the first lien lender.

Some of our debt investments have payment-in-kind ("PIK") interest, which is a form of interest that is not paid currently in cash, but is accrued and added to the loan balance until paid at the end of the term. While we generally seek to minimize the percentage of our fixed return that is in the form of PIK interest, we sometimes receive PIK interest due to prevailing market conditions that do not support the overall blended interest yield on our debt investments being paid in all-cash interest. As of December 31, 2018, our weighted average PIK yield was 0.5%. As of December 31, 2018, the weighted average annualized cash yield on our debt portfolio was 11.4%. In addition to yield in the form of current cash and PIK interest, some of our debt investments include an equity component, such as a warrant to purchase a common equity interest in the borrower for a nominal price.

The weighted annualized yield is calculated based on the effective interest rate as of period end, divided by the fair value of our debt investments. The weighted average annualized yield of our debt investments is not the same as a return on investment for our stockholders but, rather, relates to a portion of our investment portfolio and is calculated before the payment of all of our fees and expenses. There can be no assurance that the weighted average yield will remain at its current level.

### Equity Investments

When we make a debt investment, we may be granted equity participation in the form of detachable warrants to purchase common equity in the company in the same class of security that the owners or equity sponsors receive upon funding. In addition, we may make non-control equity co-investments in conjunction with a loan transaction with a borrower. The Investment Advisor's investment team generally seeks to structure our equity investments, such as direct equity co-investments, to provide us with minority rights

5

provisions and, to the extent available, event-driven put rights. They also seek to obtain limited registration rights in connection with these investments, which may include "piggyback" registration rights. In addition to warrants and equity co-investments, our debt investments in the future may contain a synthetic equity position.

## INVESTMENT PROCESS

Our Investment Advisor's investment team is led by its investment committee and is responsible for all aspects of our investment process. The current members of the investment committee are Joseph B. Alala, III, our chief executive officer, chairman of our Board and the managing partner and chief investment officer of our Investment Advisor, M. Hunt Broyhill, a partner of our Investment Advisor, and John F. McGlinn, a managing director of our Investment Advisor. They are assisted by a team of nineteen investment professionals. While the investment strategy involves a team approach, whereby potential transactions are screened by various members of the investment team, Mr. Alala and one other member of the investment committee of the Investment Advisor must approve investments in order for them to proceed. Messrs. Alala and McGlinn meet weekly and, together with Mr. Broyhill, on an as needed basis, depending on the nature and volume of investment opportunities. The Investment Advisor's investment committee has worked together for over fifteen years. The stages of our investment selection process are as follows:

### Deal Generation/Origination

Deal generation and origination is maximized through long-standing and extensive relationships with industry contacts, brokers, commercial and investment bankers, entrepreneurs, service providers (such as lawyers and accountants), as well as current and former clients, portfolio companies and investors. Our Investment Advisor's investment team supplements these lead generators by also utilizing broader marketing efforts, such as attendance at prospective borrower industry conventions, an active calling effort to investment banking boutiques, private equity firms and independent sponsors that are also investing in high quality lower middle-market and traditional middle-market companies, and, most importantly, based on our Investment Advisor's track record as a responsive, flexible, value-add lender and co-investor, as demonstrated by 134 investments in lower middle-market and traditional middle-market businesses and equity co-investments with reputed private equity firms since 2000. We believe we have developed a reputation as a knowledgeable and reliable source of capital, providing value-added industry advice and financing assistance to borrowers' businesses and in executing financial sponsors' growth strategies. Furthermore, with offices throughout the United States, we have the ability to cover a large geographical area and to market to unique groups from each office. Specifically, our Charlotte, Raleigh, Fort Lauderdale, Atlanta, Los Angeles, and Dallas offices cover significant territory that is traditionally underserved, allowing us to source a high volume of direct deal flow.

### Screening

All potential investments that are received are screened for suitability and consistency with our investment criteria (see "— Due Diligence and Underwriting," below). In screening potential investments, our Investment Advisor's investment team utilizes the same value-oriented investment philosophy they employed in their work with the Legacy Funds and commits resources to managing downside exposure. If a potential investment meets our basic investment criteria, a deal team is assigned to perform preliminary due diligence. In doing so, we consider some or all of the following factors:

- A comprehensive financial model that we prepare based on quantitative analysis of historical financial performance, financial projections made by management or the financial sponsor, and pro forma financial ratios assuming an investment consistent with possible structures. In analyzing our model, we test various investment structures, pricing options, downside scenarios and other sensitivities in order to better understand potential risks and possible financial covenant ratios;

- The competitive landscape and industry dynamics impacting the potential portfolio company;

- Strengths and weaknesses of the potential investment's business strategy and industry outlook; and

- Results of a broad qualitative analysis of the company's products or services, market position and outlook, customers, suppliers and quality of management.

If the results of this preliminary due diligence are satisfactory, the deal team prepares an executive summary that is presented to our Investment Advisor's investment committee in a meeting that includes all members of the portfolio and investment teams. This executive summary includes the following areas:

- Company history and summary of product(s) and/or service(s);

- An overview of investors, anticipated capital sources and transaction timing;

- Investment structure and expected returns, including initial projected financial ratios;

- Analysis of historical financial results and key assumptions;

- Analysis of the company's business strategy;

- Analysis of the financial sponsor's relevant experience or expected strategy;

- Investment strengths, weaknesses and priority issues to be addressed in due diligence; and

- Pro forma capitalization and ownership.

If our investment committee recommends moving forward, we will issue a non-binding term sheet or indication of interest to the potential portfolio company and, when applicable, its financial sponsor. If a term sheet is successfully negotiated, we will begin more formal due diligence and underwriting as we progress towards the ultimate investment approval and closing.

***Due Diligence and Underwriting***

The completion of due diligence deliverables is led by at least two investment professionals. However, all investment and portfolio team members are regularly updated with due diligence progress, especially any issues that emerge. The investment professionals leading the due diligence efforts are typically assigned to the original deal team that worked on the executive summary. However, post-term sheet deal teams sometimes contain one or more additional investment professionals and may include other professionals from business development, portfolio or other areas if a particular skill or experience set would be especially valuable in the due diligence process. The members of the underwriting team complete due diligence and analyze the relationships among the prospective portfolio company's business plan, operations and expected financial performance. Due diligence consists of some or all of the following:

- On-site visits with management and relevant key employees;

- In-depth review of historical and projected financial statements, including covenant calculation work sheets;

- Interviews with customers and suppliers;

- Management background checks;

- Review of reports by third-party accountants, outside counsel and other industry, operational or financial experts, whether retained by us or the financial sponsor;

- Review of material contracts; and

- Review of financial sponsor's due diligence package and internal executive summaries.

Typically, we utilize outside experts to analyze the legal affairs, accounting systems and financial results and, where appropriate, we engage specialists to investigate certain issues. During the underwriting process, significant, ongoing attention is devoted to sensitivity analyses regarding whether a company might bear a significant "downside" case and remain profitable and in compliance with assumed financial covenants. These "downside" scenarios typically involve assumptions regarding the loss of key customers and/or suppliers, an economic downturn, adverse regulatory changes and other relevant stressors that we attempt to simulate in our quantitative and qualitative analyses. Further, we continually examine the effect of these scenarios on financial ratios and other metrics.

7

During the underwriting process, the executive summary that was completed for the initial investment committee presentation is updated and changes are presented at subsequent, weekly meetings of the investment committee for continued discussion and, to the extent applicable, the investment committee issues new instructions to the underwriting team from the investment committee.

### *Approval, Documentation and Closing*

The underwriting team for the proposed investment presents the updated executive summary and key findings from due diligence to the investment committee on an ongoing, weekly basis. Prior to the commencement of documentation, approval from the investment committee is sought and, if approved, the underwriting professionals heretofore involved proceed to documentation.

At all times during the documentation process, the underwriting professionals who conducted the due diligence remain involved; likewise, all extensively negotiated documentation decisions are made by the lead underwriting team member, in accordance with input from at least one investment committee member and guidance from outside counsel. As and to the extent necessary, key documentation challenges are brought before the investment committee for prompt discussion and resolution. Upon the completion of satisfactory documentation and the satisfaction of closing conditions, final approval is sought from the investment committee before closing and funding.

### ONGOING RELATIONSHIPS WITH PORTFOLIO COMPANIES

### *Monitoring*

Our Investment Advisor monitors our portfolio companies on an ongoing basis. It monitors the financial trends of each portfolio company to determine if it is meeting its business plan and to assess the appropriate course of action for each company. We generally require our portfolio companies to provide annual audited financial statements and quarterly unaudited financial statements, in each case, with management discussion and analysis and covenant compliance certificates, and monthly unaudited financial statements. Using the monthly financial statements, we calculate and evaluate all financial covenants and additional financial coverage ratios that might not be part of our covenant package in the loan documents. For purposes of analyzing a portfolio company's financial performance, we may adjust their financial statements to reflect pro forma results in the event of a recent change of control, sale, acquisition or anticipated cost savings.

Our Investment Advisor has several methods of evaluating and monitoring the performance and fair value of our investments, including the following:

- Assessment of success in adhering to each portfolio company's business plan and compliance with covenants;

- Periodic and regular contact with portfolio company management and, if appropriate, the financial or strategic sponsor, to discuss financial position, requirements and accomplishments;

- Comparisons to our other portfolio companies in the industry, if any;

- Attendance at and participation in the board meetings; and

- Review of monthly and quarterly financial statements and financial projections for portfolio companies.

In addition to various risk management and monitoring tools, our Investment Advisor also uses an investment rating system to characterize and monitor our expected level of return on each investment in our portfolio.

As part of our valuation procedures, we risk rate all of our investments. In general, our investment rating system uses a scale of 1 to 5, with 1 being the lowest probability of default and principal loss. Our internal rating is not an exact system but is used internally to estimate the probability of: (i) default on our

8

debt securities and (ii) loss of our debt principal, in the event of a default. In general, our internal rating system may also assist our valuation team in its determination of the estimated fair value of equity securities or equity-like securities. Our internal risk rating system generally encompasses both qualitative and quantitative aspects of our portfolio companies.

Our internal investment rating system incorporates the following five categories:

| Investment Rating | Summary Description |
|---|---|
| 1 | In general, the investment may be performing above our internal expectations. Full return of principal and interest is expected. Capital gain is expected. |
| 2 | In general, the investment may be performing within our internal expectations, and potential risks to the applicable investment are considered to be neutral or favorable compared to any potential risks at the time of the original investment. All new investments are initially given this rating. |
| 3 | In general, the investment may be performing below our internal expectations and therefore, investments in this category may require closer internal monitoring; however, the valuation team believes that no loss of investment return (interest and/or dividends) or principal is expected. The investment also may be out of compliance with certain financial covenants. |
| 4 | In general, the investment may be performing below internal expectations and quantitative or qualitative risks may have increased substantially since the original investment. Loss of some or all principal is expected. |
| 5 | In general, the investment may be performing substantially below our internal expectations and a number of quantitative or qualitative risks may have increased substantially since the original investment. Loss of some or all principal is expected. |

Our Investment Advisor will monitor and, when appropriate, change the investment ratings assigned to each investment in our portfolio. In connection with our valuation process, our Investment Advisor will review these investment ratings on a quarterly basis. The investment rating of a particular investment should not, however, be deemed to be a guarantee of the investment's future performance.

The following table shows the distribution of our investments on the 1 to 5 investment rating scale at fair value as of December 31, 2018 and December 31, 2017 (dollars in thousands):

| Investment Rating | As of December 31, 2018 | | As of December 31, 2017 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Investments | Investments at Fair Value | Percentage of Total Investments |
| 1 | $ 171,829 | 38.3% | $ 191,204 | 38.2% |
| 2 | 194,411 | 43.3 | 186,445 | 37.3 |
| 3 | 73,325 | 16.3 | 97,309 | 19.5 |
| 4 | 9,362 | 2.1 | 24,981 | 5.0 |
| 5 | — | — | — | — |
| Total | $ 448,927 | 100.0% | $ 499,939 | 100.0% |

9

## AGREEMENTS

### Investment Advisory Agreement

Our Investment Advisor is registered as an investment adviser under the Advisers Act. Subject to the overall supervision of our Board, our Investment Advisor manages our day-to-day operations and provides investment advisory and management services to us. Under the terms of our Investment Advisory Agreement, the Investment Advisor:

- determines the composition of our portfolio, the nature and timing of the changes to our portfolio and the manner of implementing such changes;

- identifies, evaluates and negotiates the structure of the investments we make (including performing due diligence on our prospective portfolio companies);

- closes and monitors the investments we make; and

- provides us with other investment advisory, research and related services as we may from time to time require.

The Investment Advisor's services under the Investment Advisory Agreement are not exclusive, and it is free to furnish similar services to other entities so long as its services to us are not impaired.

### *Management Fee*

Pursuant to the Investment Advisory Agreement, we have agreed to pay the Investment Advisor a fee for investment advisory and management services consisting of two components — a base management fee and an incentive fee.

The base management fee is calculated at an annual rate of 1.75% of our gross assets, which is our total assets as reflected on our consolidated statements of assets and liabilities and includes any borrowings for investment purposes. Although we do not anticipate making significant investments in derivative financial instruments, the fair value of any such investments, which will not necessarily equal their notional value, will be included in our calculation of gross assets. For services rendered under the Investment Advisory Agreement, the base management fee is payable quarterly in arrears. The base management fee is calculated based on the average value of our gross assets at the end of the two most recently completed calendar quarters, and appropriately adjusted for any share issuances or repurchases during the current calendar quarter.

The incentive fee consists of the following two parts:

The first part of the incentive fee is calculated and payable quarterly in arrears based on our pre-incentive fee net investment income for the immediately preceding calendar quarter. For this purpose, pre-incentive fee net investment income means interest income, dividend income and any other income (including any other fees (other than fees for providing managerial assistance), such as commitment, origination, structuring, diligence and consulting fees or other fees that we receive from portfolio companies) accrued during the calendar quarter, minus our operating expenses for the quarter (including the base management fee, expenses payable under an administration agreement between us and the administrator (the "Administration Agreement"), and any interest expense and dividends paid on any issued and outstanding preferred stock, but excluding the incentive fee). Pre-incentive fee net investment income includes, in the case of investments with a deferred interest feature (such as original issue discount, debt instruments with PIK interest and zero coupon securities), accrued income that we have not yet received in cash. Pre-incentive fee net investment income does not include any realized capital gains, computed net of all realized capital losses or unrealized capital appreciation or depreciation. Pre-incentive fee net investment income, expressed as a rate of return on the value of our net assets at the end of the immediately preceding calendar quarter, is compared to a hurdle of 2.0% per quarter (8.0% annualized). Our net investment income used to calculate this part of the incentive fee is also included in the amount of our gross assets used to calculate the 1.75% base management fee. We pay the Investment Advisor an incentive fee with respect to our pre-incentive fee net investment income in each calendar quarter as follows:

10

- no incentive fee in any calendar quarter in which our pre-incentive fee net investment income does not exceed the hurdle of 2.0%;

- 100% of our pre-incentive fee net investment income with respect to that portion of such pre-incentive fee net investment income, if any, that exceeds the hurdle but is less than 2.5% in any calendar quarter (10.0% annualized). We refer to this portion of our pre-incentive fee net investment income (which exceeds the hurdle but is less than 2.5%) as the "catch-up." The "catch-up" is meant to provide our Investment Advisor with 20% of our pre-incentive fee net investment income as if a hurdle did not apply if this net investment income exceeds 2.5% in any calendar quarter; and

- 20% of the amount of our pre-incentive fee net investment income, if any, that exceeds 2.5% in any calendar quarter (10.0% annualized) is payable to the Investment Advisor (once the hurdle is reached and the catch-up is achieved, 20% of all pre-incentive fee investment income thereafter is allocated to the Investment Advisor).

The Investment Advisor has voluntarily agreed to waive all or such portion of the quarterly incentive fees earned by the Investment Advisor that would otherwise cause our quarterly net investment income to be less than the distribution payments declared by our Board. Quarterly incentive fees are earned by the Investment Advisor pursuant to the Investment Advisory Agreement. Incentive fees subject to the waiver cannot exceed the amount of incentive fees earned during the period, as calculated on a quarterly basis. The Investment Advisor will not be entitled to recoup any amount of incentive fees that it waives. The waiver was effective in the fourth quarter of 2015 and will continue unless otherwise publicly disclosed by the Company.

The following is a graphical representation of the calculation of the income-related portion of the incentive fee:

**Quarterly Incentive Fee Based on Net Investment Income**
**Pre-incentive fee net investment income**
**(expressed as a percentage of the value of net assets)**



**Percentage of pre-incentive fee net investment income allocated to the Capitala Investment Advisors**

These calculations are appropriately pro-rated for any period of less than three months and adjusted for any share issuances or repurchases during the relevant quarter. You should be aware that a rise in the general level of interest rates can be expected to lead to higher interest rates applicable to our debt investments. Accordingly, an increase in interest rates would make it easier for us to meet or exceed the incentive fee hurdle rate and may result in a substantial increase of the amount of incentive fees payable to our Investment Advisor with respect to pre-incentive fee net investment income.

The second part of the incentive fee is determined and payable in arrears as of the end of each calendar year (or upon termination of the Investment Advisory Agreement, as of the termination date), and will equal 20% of our realized capital gains, if any, on a cumulative basis from inception through the end of each calendar year, computed net of all realized capital losses and unrealized capital depreciation on a cumulative basis, less the aggregate amount of any previously paid capital gain incentive fees with respect to each of the investments in our portfolio.

We will defer cash payment of the portion of any incentive fee otherwise earned by our Investment Advisor that would, when taken together with all other incentive fees paid to our Investment Advisor during the most recent 12 full calendar month period ending on or prior to the date such payment is to be made, exceed 20% of the sum of (a) our pre-incentive fee net investment income during such period, (b) our net unrealized appreciation or depreciation during such period and (c) our net realized capital gains or losses during such period. Any deferred incentive fees will be carried over for payment in subsequent calculation periods to the extent such payment is payable under the Investment Advisory Agreement.

11

**Examples of Quarterly Incentive Fee Calculation**

**Example 1: Income Related Portion of Incentive Fee\***

**Alternative 1:**

*Assumptions*

Investment income (including interest, dividends, fees, etc.) = 1.25% Hurdle rate[1] = 2.0%
Management fee[2] = 0.50%
Other expenses (legal, accounting, custodian, transfer agent, etc.)[3] = 0.20%
Pre-incentive fee net investment income

    (investment income − (management fee + other expenses)) = 0.55%

    Pre-incentive net investment income does not exceed hurdle rate, therefore there is no incentive fee.

**Alternative 2:**

*Assumptions*

Investment income (including interest, dividends, fees, etc.) = 2.9%
Hurdle rate[1] = 2.0%
Management fee[2] = 0.50%
Other expenses (legal, accounting, custodian, transfer agent, etc.)[3] = 0.20%
Pre-incentive fee net investment income

    (investment income − (management fee + other expenses)) = 2.2%

Incentive fee = 100% × pre-incentive fee net investment income, subject to the "catch-up"[4]
             = 100% × (2.2% − 2.0%)
             = 0.20%

    Pre-incentive fee net investment income exceeds the hurdle rate, but does not fully satisfy the "catch-up" provision, therefore the income related portion of the incentive fee is 0.20%.

**Alternative 3:**

*Assumptions*

Investment income (including interest, dividends, fees, etc.) = 3.50%
Hurdle rate[1] = 2.0%
Management fee[2] = 0.50%
Other expenses (legal, accounting, custodian, transfer agent, etc.)[3] = 0.20%
Pre-incentive fee net investment income

    (investment income − (management fee + other expenses)) = 2.80%

Incentive fee = 20% × pre-incentive fee net investment income, subject to "catch-up"[4]
Incentive fee = 100% × "catch-up" + (20% × (pre-incentive fee net investment income − 2.5%))

Catch-up    = 2.5% − 2.0%
          = 0.5%

---

\*    The hypothetical amount of pre-incentive fee net investment income shown is based on a percentage of total net assets.

TABLE OF CONTENTS

Incentive fee = (100% × 0.5%) + (20% × (2.80% − 2.5%))
            = 0.5% + (20%× 0.3%)
            = 0.5% + 0.06%
            = 0.56%

Pre-incentive fee net investment income exceeds the hurdle rate, and fully satisfies the "catch-up" provision, therefore the income related portion of the incentive fee is 0.56%.

(1)  Represents 8.0% annualized hurdle rate.

(2)  Represents 2.00% annualized management fee.

(3)  Excludes organizational and offering expenses.

(4)  The "catch-up" provision is intended to provide the Investment Advisor with an incentive fee of 20% on all of Capitala Finance's pre-incentive fee net investment income as if a hurdle rate did not apply when its net investment income exceeds 2.5% in any calendar quarter.

**Example 2: Capital Gains Portion of Incentive Fee**

**Alternative 1:**

*Assumptions*

- Year 1:   $20 million investment made in Company A ("Investment A"), and $30 million investment made in Company B ("Investment B")

- Year 2:   Investment A sold for $50 million and fair market value ("FMV") of Investment B determined to be $32 million

- Year 3:   FMV of Investment B determined to be $25 million

- Year 4:   Investment B sold for $31 million

The capital gains portion of the incentive fee would be:

- Year 1:  None

- Year 2:   Capital gains incentive fee of $6 million ($30 million realized capital gains on sale of Investment A multiplied by 20%)

- Year 3:  None

$5 million (20% multiplied by ($30 million cumulative capital gains less $5 million cumulative capital depreciation)) less $6 million (previous capital gains fee paid in Year 2).

- Year 4:   Capital gains incentive fee of $200,000

$6.2 million ($31 million cumulative realized capital gains multiplied by 20%) less $6 million (capital gains fee taken in Year 2).

**Alternative 2:**

*Assumptions*

- Year 1:   $20 million investment made in Company A ("Investment A"), $30 million investment made in Company B ("Investment B") and $25 million investment made in Company C ("Investment C")

- Year 2:   Investment A sold for $50 million, FMV of Investment B determined to be $25 million and FMV of Investment C determined to be $25 million

- Year 3:   FMV of Investment B determined to be $27 million and Investment C sold for $30 million

13

- Year 4:   FMV of Investment B determined to be $24 million

- Year 5:   Investment B sold for $20 million

The capital gains incentive fee, if any, would be:

- Year 1:   None

- Year 2:   $5 million capital gains incentive fee

20% multiplied by $25 million ($30 million realized capital gains on Investment A less unrealized capital depreciation on Investment B).

- Year 3:   $1.4 million capital gains incentive fee(1)

$6.4 million (20% multiplied by $32 million ($35 million cumulative realized capital gains less $3 million unrealized capital depreciation)) less $5 million capital gains fee received in Year 2.

- Year 4:   None

- Year 5:   None

$5 million (20% multiplied by $25 million (cumulative realized capital gains of $35 million less realized capital losses of $10 million)) less $6.4 million cumulative capital gains fee paid in Year 2 and Year 3.

———————————————

(1)   As illustrated in Year 3 of Alternative 2 above, if the Company were to be wound up on a date other than December 31 of any year, the Company may have paid aggregate capital gain incentive fees that are more than the amount of such fees that would be payable if the Company had been wound up on December 31 of such year.

**Example 3: Application of the Incentive Fee Deferral Mechanism**

*Assumptions*

- In each of Years 1 through 4 in this example pre-incentive fee net investment income equals $40.0 million per year, which we recognized evenly in each quarter of each year and paid quarterly. This amount exceeds the hurdle rate and the requirement of the "catch-up" provision in each quarter of such year. As a result, the annual income related portion of the incentive fee before the application of the deferral mechanism in any year is $8.0 million ($40.0 million multiplied by 20%). All income-related incentive fees were paid quarterly in arrears.

- In each year preceding Year 1, we did not generate realized or unrealized capital gains or losses, no capital gain-related incentive fee was paid and there was no deferral of incentive fees.

- Year 1: We did not generate realized or unrealized capital gains or losses.

- Year 2: We realized a $30.0 million capital gain and did not otherwise generate realized or unrealized capital gains or losses.

- Year 3: We recognized $5.0 million of unrealized capital depreciation and did not otherwise generate realized or unrealized capital gains or losses.

- Year 4: We realized a $6.0 million capital gain and did not otherwise generate realized or unrealized capital gains or losses.

14

| | Income Related Incentive Fee Accrued Before Application of Deferral Mechanism | Capital Gains Related Incentive Fee Accrued Before Application of Deferral Mechanism | Incentive Fee Calculations | Incentive Fees Paid and Deferred |
|---|---|---|---|---|
| Year 1 | $8.0 million ($40.0 million multiplied by 20%) | None | $8.0 million | Incentive fees of $8.0 million paid; no incentive fees deferred |
| Year 2 | $8.0 million ($40.0 million multiplied by 20%) | $6.0 million (20% of $30.0 million) | $14.0 million | Incentive fees of $14.0 million paid; no incentive fees deferred |
| Year 3 | $8.0 million ($40.0 million multiplied by 20%) | None (20% of cumulative net capital gains of $25.0 million ($30.0 million in cumulative realized gains less $5.0 million in cumulative unrealized capital depreciation) less $6.0 million of capital gains fee paid in Year 2) | $7.0 million (20% of the sum of (a) our pre-incentive fee net investment income, (b) our net unrealized appreciation or depreciation during such period and (c) our net realized capital gains or losses during Year 3) | Incentive fees of $7.0 million paid; $8.0 million of incentive fees accrued but payment restricted to $7.0 million; $1.0 million of incentive fees deferred |
| Year 4 | $8.0 million ($40.0 million multiplied by 20%) | $0.2 million (20% of cumulative net capital gains of $31.0 million ($36.0 million cumulative realized capital gains less $5.0 million cumulative unrealized capital depreciation) less $6.0 million of capital gains fee paid in Year 2) | $8.2 million | Incentive fees of $9.2 million paid ($8.2 million of incentive fees accrued in Year 4 plus $1.0 million of deferred incentive fees); no incentive fees deferred |

### Payment of Our Expenses

The investment team of our Investment Advisor and their respective staffs, when and to the extent engaged in providing investment advisory and management services, and the compensation and routine overhead expenses of such personnel allocable to such services, are provided and paid for by the Investment Advisor. We bear all other costs and expenses of our operations and transactions, including (without limitation):

- the cost of our organization;
- the cost of calculating our net asset value, including the cost of any third-party valuation services;
- the cost of effecting sales and repurchases of our shares and other securities;
- interest payable on debt, if any, to finance our investments;
- fees payable to third parties relating to, or associated with, making investments (such as legal, accounting, and travel expenses incurred in connection with making investments), including fees and expenses associated with performing due diligence reviews of prospective investments and advisory fees;

15

TABLE OF CONTENTS

- transfer agent and custodial fees;

- fees and expenses associated with marketing efforts;

- costs associated with our reporting and compliance obligations under the 1940 Act, the Securities Exchange Act of 1934, as amended (the "1934 Act"), and other applicable federal and state securities laws, and ongoing stock exchange listing fees;

- federal, state and local taxes;

- independent directors' fees and expenses;

- brokerage commissions;

- costs of proxy statements, stockholders' reports and other communications with stockholders;

- fidelity bond, directors' and officers' liability insurance, errors and omissions liability insurance and other insurance premiums;

- direct costs and expenses of administration, including printing, mailing, telephone and staff;

- fees and expenses associated with independent audits and outside legal costs; and

- all other expenses incurred by either our Administrator or us in connection with administering our business, including payments under the Administration Agreement that will be based upon our allocable portion of overhead and other expenses incurred by our Administrator in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions, and our allocable portion of any costs of compensation and related expenses of our chief compliance officer and our chief financial officer and their respective administrative support staff.

### *Duration and Termination*

The Investment Advisory Agreement was initially approved by the Board on June 10, 2013 and signed on September 24, 2013. The Investment Advisory Agreement was most recently re-approved by the Board, including by a majority of our non-interested directors, at an in-person meeting on July 26, 2018. Unless earlier terminated as described below, the Investment Advisory Agreement will remain in effect from year to year if approved annually by our Board or by the affirmative vote of the holders of a majority of our outstanding voting securities, including, in either case, approval by a majority of our directors who are not parties to such agreement or who are not "interested persons" of any such party, as such term is defined in Section 2(a)(19) of the 1940 Act. The Investment Advisory Agreement will automatically terminate in the event of its assignment. The Investment Advisory Agreement may also be terminated by either party without penalty upon not less than 60 days' written notice to the other party. See "Risk Factors — Risks Relating to Our Business and Structure — Capitala Investment Advisors has the right to resign on 60 days' notice, and we may not be able to find a suitable replacement within such time, resulting in a disruption in our operations that could adversely affect our financial condition, business and results of operations."

### *Indemnification*

The Investment Advisory Agreement provides that, absent willful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of the reckless disregard of its duties and obligations, the Investment Advisor and its officers, managers, partners, agents, employees, controlling persons, members and any other person or entity affiliated with it are entitled to indemnification from Capitala Finance for any damages, liabilities, costs and expenses (including reasonable attorneys' fees and amounts reasonably paid in settlement) arising from the rendering of the Investment Advisor's services under the Investment Advisory Agreement or otherwise as an investment adviser of Capitala Finance.

### *Organization of the Investment Advisor*

The Investment Advisor is a Delaware limited liability company. The principal executive offices of the Investment Advisor are located at 4201 Congress Street, Suite 360, Charlotte, North Carolina 28209.

16

**Administration Agreement**

Capitala Advisors Corp., a North Carolina corporation, serves as our administrator. The principal executive offices of our Administrator are located at 4201 Congress Street, Suite 360, Charlotte, North Carolina 28209. The Administrator, pursuant to a sub-administration agreement, has engaged U.S. Bank Global Fund Services to act on behalf of the Administrator in its performance of certain administrative services for us. The principal office of U.S. Bank Global Fund Services is 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202. Pursuant to the Administration Agreement, our administrator furnishes us with office facilities, equipment and clerical, bookkeeping and record keeping services at such facilities. Under the Administration Agreement, our Administrator also performs, or oversees the performance of, our required administrative services, which include, among other things, being responsible for the financial records that we are required to maintain and preparing reports to our stockholders. In addition, our Administrator assists us in determining and publishing our net asset value, oversees the preparation and filing of our tax returns and the printing and dissemination of reports to our stockholders, and generally oversees the payment of our expenses and the performance of administrative and professional services rendered to us by others. Payments under the Administration Agreement are equal to an amount based upon our allocable portion of our Administrator's overhead in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions, and our allocable portion of the compensation of our chief financial officer, chief compliance officer and our allocable portion of the compensation of their respective administrative support staff. Under the Administration Agreement, our Administrator will also provide on our behalf managerial assistance to those portfolio companies that request such assistance. Unless terminated earlier in accordance with its terms, the Administration Agreement will remain in effect if approved annually by our Board. On July 26, 2018, the Board approved the renewal of the Administration Agreement. The Administration Agreement may be terminated by either party without penalty upon 60 days' written notice to the other party. To the extent that our Administrator outsources any of its functions, we will pay the fees associated with such functions on a direct basis without any incremental profit to our Administrator. Stockholder approval is not required to amend the Administration Agreement.

Our Administrator also provides administrative services to our Investment Advisor. As a result, the Investment Advisor will also reimburse our Administrator for its allocable portion of our Administrator's overhead, including rent, the fees and expenses associated with performing compliance functions for the Investment Advisor, and its allocable portion of the compensation of any administrative support staff.

The Administration Agreement provides that, absent willful misfeasance, bad faith or negligence in the performance of its duties or by reason of the reckless disregard of its duties and obligations, our Administrator and its officers, managers, partners, agents, employees, controlling persons, members and any other person or entity affiliated with it are entitled to indemnification from Capitala Finance for any damages, liabilities, costs and expenses (including reasonable attorneys' fees and amounts reasonably paid in settlement) arising from the rendering of our Administrator's services under the Administration Agreement or otherwise as administrator for Capitala Finance.

**License Agreement**

We have entered into a license agreement with the Investment Advisor pursuant to which the Investment Advisor has agreed to grant us a non-exclusive, royalty-free license to use the name "Capitala." Under this agreement, we have a right to use the Capitala name for so long as the Investment Advisory Agreement with the Investment Advisor is in effect. Other than with respect to this limited license, we will have no legal right to the "Capitala" name.

**Staffing**

Capitala Finance has no employees. Mr. Alala, through his financial interests in the Investment Advisor, will be entitled to a portion of any investment advisory fees paid by Capitala Finance to the Investment Advisor. Our other executive officers are employees of our Administrator and perform their functions under the terms of our Administration Agreement.

Our day-to-day investment operations are managed by the Investment Advisor. The Investment Advisor's investment team currently consists of the members of its investment committee, Messrs. Alala,

17

McGlinn and Broyhill, and a team of nineteen additional investment professionals. The Investment Advisor may hire additional investment professionals, based upon its needs, in the future. See "— Investment Advisory Agreement."

In addition, we reimburse our Administrator for our allocable portion of overhead and other expenses incurred by it in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions, and the compensation of our chief financial officer, chief compliance officer, and their respective administrative support staff. See "— Administration Agreement."

### VALUATION PROCESS AND DETERMINATION OF NET ASSET VALUE

We determine the net asset value of our investment portfolio each quarter by subtracting our total liabilities from the fair value of our gross assets.

We conduct the valuation of our assets, pursuant to which our net asset value shall be determined, at all times consistent with U.S. generally accepted accounting principles ("U.S. GAAP") and the 1940 Act. Our valuation procedures are set forth in more detail below:

Securities for which market quotations are readily available on an exchange shall be valued at such price as of the closing price on the day of valuation. We may also obtain quotes with respect to certain of our investments from pricing services or brokers or dealers in order to value assets. When doing so, we determine whether the quote obtained is sufficient according to U.S. GAAP to determine the fair value of the security. If determined adequate, we use the quote obtained.

Securities for which reliable market quotations are not readily available or for which the pricing source does not provide a valuation or methodology or provides a valuation or methodology that, in the judgment of our Investment Advisor or the Board, does not represent fair value, which we expect will represent a substantial majority of the investments in our portfolio, shall be valued as follows: (i) each portfolio company or investment is initially valued by the investment professionals responsible for the portfolio investment; (ii) preliminary valuation conclusions are documented and discussed with our senior management; (iii) independent third-party valuation firms engaged by, or on behalf of, the Board will conduct independent appraisals, review management's preliminary valuations and prepare separate preliminary valuation conclusions on a selected basis such that each portfolio investment shall be independently reviewed at least annually (investments will not be selected for such review, however, if they (a) have a value as of the previous quarter of less than 1.0% of our gross assets as of the previous quarter, or (b) have a value as of the current quarter of less than 1.0% of our gross assets as of the previous quarter, after taking into account any repayment of principal during the current quarter); and (iv) the Board will discuss valuations and determine the fair value of each investment in our portfolio in good faith based on the input of the Investment Advisor and, where appropriate, the respective third-party valuation firms.

The recommendation of fair value will generally be based on the following factors, as relevant:

- the nature and realizable value of any collateral;
- the portfolio company's ability to make payments;
- the portfolio company's earnings and discounted cash flow;
- the markets in which the issuer does business; and
- comparisons to publicly traded securities.

Securities for which market quotations are not readily available or for which a pricing source is not sufficient may include, but are not limited to, the following:

- private placements and restricted securities that do not have an active trading market;
- securities whose trading has been suspended or for which market quotes are no longer available;
- debt securities that have recently gone into default and for which there is no current market;
- securities whose prices are stale;

18

- securities affected by significant events; and
- securities that the Investment Advisor believes were priced incorrectly.

Determination of fair value involves subjective judgments and estimates not susceptible to substantiation by auditing procedures. Accordingly, under current auditing standards, the notes to our financial statements will refer to the uncertainty with respect to the possible effect of such valuations, and any change in such valuations, on our financial statements. In addition, the SBA has established certain valuation guidelines for SBICs to follow when valuing portfolio investments.

In making the good faith determination of the value of these securities, we start with the cost basis of the security, which includes the amortized original issue discount and PIK interest or dividends, if any. We prepare the valuations of our investments in portfolio companies using the most recent portfolio company financial statements and forecasts. We also consult updates that we receive from senior management members at portfolio companies, whether solicited for valuation purposes, or received in the ordinary course of our portfolio monitoring or due diligence process. These updates include information such as industry trends, new product development or service offerings and other operational or strategic issues.

For debt securities that are not publicly traded or for which there is no market, we begin with our investment rating of the security as described above. Using this investment rating, we seek to determine the value of the security as if we intended to sell the security in a current sale. The factors that may be taken into account in arriving at fair value include the following, as applicable: the portfolio company's ability to service its interest and principal payment obligations, its estimated earnings and projected discounted cash flows, the nature and realizable value of any collateral, the financial environment in which the portfolio company operates, comparisons to securities of similar publicly traded companies, statistical ratios compared to lending standards and to other similarly situated securities, and other relevant factors.

As part of the valuation process, the audit committee reviews the preliminary evaluations prepared by the independent valuation firm engaged by the Board, as well as management's valuation recommendations. Management and the independent valuation firm respond to the preliminary evaluation to reflect comments provided by the audit committee. The audit committee reviews the final valuation report and management's valuation recommendations and makes a recommendation to the Board based on its analysis of the methodologies employed and the various weights that should be accorded to each portion of the valuation as well as factors that the independent valuation firm and management may not have considered in their evaluation process. The Board then evaluates the audit committee recommendations and undertakes a similar analysis to determine the fair value of each investment in the portfolio in good faith.

Due to the inherent uncertainty of determining the fair value of investments that do not have a readily available market value, the fair value of our investments may differ significantly from the values that would have been used had a ready market existed for such investments, and the differences could be material. Additionally, changes in the market environment and other events that may occur over the life of the investments may cause the gains or losses ultimately realized on these investments to differ from the valuations assigned at any time. For a discussion of the risks inherent in determining the fair value of securities for which readily available market values do not exist, see "Risk Factors."

**Determinations in Connection with Offerings**

In connection with certain future offerings of shares of our common stock, our Board, or an authorized committee thereof, will be required to make the determination that we are not selling shares of our common stock at a price below the then current net asset value of our common stock at the time at which the sale is made. Our Board, or an authorized committee thereof, will consider the following factors, among others, in making such a determination:

- the net asset value of our common stock disclosed in the most recent periodic report that we filed with the SEC;
- our management's assessment of whether any material change in the net asset value of our common stock has occurred (including through the realization of gains on the sale of our portfolio securities) during the period beginning on the date of the most recently disclosed net asset value of our common stock and ending as of a time within 48 hours (excluding Sundays and holidays) of the sale of our common stock; and

19

- the magnitude of the difference between (i) a value that our Board, or an authorized committee thereof, has determined reflects the current (as of a time within 48 hours, excluding Sundays and holidays) net asset value of our common stock, which is based upon the net asset value of our common stock disclosed in the most recent periodic report that we filed with the SEC, as adjusted to reflect our management's assessment of any material change in the net asset value of our common stock since the date of the most recently disclosed net asset value of our common stock, and (ii) the offering price of the shares of our common stock in the proposed offering.

Moreover, to the extent that there is even a remote possibility that we may (i) issue shares of our common stock at a price per share below the then current net asset value per share of our common stock at the time at which the sale is made or (ii) trigger the undertaking (which we provide in certain registration statements we file with the SEC) to suspend the offering of shares of our common stock if the net asset value per share of our common stock fluctuates by certain amounts in certain circumstances until the prospectus is amended, our Board will elect, in the case of clause (i) above, either to postpone the offering until such time that there is no longer the possibility of the occurrence of such event or to undertake to determine the net asset value per share of our common stock within two days prior to any such sale to ensure that such sale will not be below our then current net asset value per share and, in the case of clause (ii) above, to comply with such undertaking or to undertake to determine the net asset value per share of our common stock to ensure that such undertaking has not been triggered.

These processes and procedures are part of our compliance policies and procedures. Records will be made contemporaneously with all determinations described in this section and these records will be maintained with other records that we are required to maintain under the 1940 Act.

## COMPETITION

We compete for investments with other BDCs and investment funds (including private equity funds, private credit funds, mezzanine funds and other SBICs), as well as traditional financial services companies such as commercial banks and other sources of funding. Additionally, competition for investment opportunities has emerged among alternative investment vehicles, such as collateralized loan obligations ("CLOs") and other BDCs, some of which are sponsored by other alternative asset investors, as these entities have begun to focus on making investments in lower middle-market and traditional middle-market companies. As a result of these new entrants, competition for our investment opportunities may intensify. Many of these entities have greater financial and managerial resources than we do. We believe we will be able to compete with these entities primarily on the basis of our experience and reputation, our willingness to make smaller investments than other specialty finance companies, the contacts and relationships of our Investment Advisor, our responsive and efficient investment analysis and decision-making processes, and the investment terms we offer.

We believe that certain of our competitors may make first lien and second lien loans with interest rates and returns that will be comparable to or lower than the rates and returns that we will target. Therefore, we will not seek to compete solely on the interest rates and returns that we offer to potential portfolio companies. For additional information concerning the competitive risks we face, see "Risk Factors — Risks Relating to Our Business and Structure — We operate in a highly competitive market for investment opportunities, which could reduce returns and result in losses."

## ELECTION TO BE TAXED AS A RIC

As a BDC, the Company has elected to be treated, and intends to comply with the requirements to continue to qualify annually, as a RIC under subchapter M of the Code. As a RIC, we generally will not have to pay corporate-level U.S. federal income taxes on any income that we distribute to our stockholders as dividends. To qualify as a RIC, we must, among other things, meet certain source-of-income and asset diversification requirements (as described below). In addition, to qualify for RIC tax treatment we must distribute to our stockholders, for each taxable year, at least 90% of our "investment company taxable income," which generally is our ordinary income plus the excess of our realized net short-term capital gains over our realized net long-term capital losses (the "Annual Distribution Requirement").

20

**TAXATION AS A RIC**

For any taxable year in which we:

- qualify as a RIC; and

- satisfy the Annual Distribution Requirement,

we generally will not be subject to U.S. federal income tax on the portion of our income we distribute to stockholders. We will be subject to U.S. federal income tax at the regular corporate rates on any income or capital gains not distributed to our stockholders.

We will be subject to a 4% nondeductible U.S. federal excise tax on certain undistributed income unless we distribute in a timely manner an amount at least equal to the sum of (1) 98% of our net ordinary income for each calendar year, (2) 98.2% of our capital gain net income for the one-year period ending October 31 in that calendar year and (3) any income recognized, but not distributed, in preceding years and on which we paid no corporate-level U.S. federal income tax (the "Excise Tax Distribution Requirement").

In order to qualify as a RIC for U.S. federal income tax purposes, we must, among other things:

- continue to qualify as a BDC under the 1940 Act at all times during each taxable year;

- derive in each taxable year at least 90% of our gross income from dividends, interest, payments with respect to loans of certain securities, gains from the sale or other disposition of stock, securities or foreign currencies, net income from certain "qualified publicly traded partnerships," or other income derived with respect to our business of investing in such stock or securities (the "90% Income Test"); and

- diversify our holdings so that at the end of each quarter of the taxable year:

  - at least 50% of the value of our assets consists of cash, cash equivalents, U.S. Government securities, securities of other RICs, and other securities if such other securities of any one issuer do not represent more than 5% of the value of our assets or more than 10% of the outstanding voting securities of the issuer; and

  - no more than 25% of the value of our assets is invested in the securities, other than U.S. government securities or securities of other RICs, of one issuer, of two or more issuers that are controlled, as determined under applicable Code rules, by us and that are engaged in the same or similar or related trades or businesses or of certain "qualified publicly traded partnerships" (the "Diversification Tests").

Qualified earnings may exclude such income as management fees received in connection with our SBIC subsidiaries or other potential outside managed funds and certain other fees.

In accordance with certain applicable Treasury regulations and other guidance issued by the Internal Revenue Service ("IRS"), a RIC may treat a distribution of its own stock as fulfilling its RIC distribution requirements if each stockholder may elect to receive his or her entire distribution in either cash or stock of the RIC, subject to a limitation that the aggregate amount of cash to be distributed to all stockholders must be at least 20% of the aggregate declared distribution. If too many stockholders elect to receive cash, each stockholder electing to receive cash must receive a pro rata amount of cash (with the balance of the distribution paid in stock). In no event will any stockholder, electing to receive cash, receive less than 20% of his or her entire distribution in cash. If these and certain other requirements are met, for U.S. federal income tax purposes, the amount of the dividend paid in stock will be equal to the amount of cash that could have been received instead of stock. We have no current intention of paying dividends in shares of our stock in accordance with these Treasury regulations or other applicable IRS guidance.

We may be required to recognize taxable income in circumstances in which we do not receive cash. For example, if we hold debt obligations that are treated under applicable tax rules as having original issue discount (such as debt instruments with PIK interest or, in certain cases, increasing interest rates or issued with warrants), we must include in income each year a portion of the original issue discount that accrues over the life of the obligation, regardless of whether cash representing such income is received by us in the same taxable year. We may also have to include in income other amounts that we have not yet received in

21

cash, such as PIK interest, deferred loan origination fees that are paid after origination of the loan or are paid in non-cash compensation such as warrants or stock, or certain income with respect to equity investments in foreign corporations. Because any original issue discount or other amounts accrued will be included in our investment company taxable income for the year of accrual, we may be required to make a distribution to our stockholders in order to satisfy the Annual Distribution Requirement, even though we will not have received any corresponding cash amount.

Gain or loss realized by us from the sale or exchange of warrants acquired by us as well as any loss attributable to the lapse of such warrants generally will be treated as capital gain or loss. Such gain or loss generally will be long-term or short-term, depending on how long we held a particular warrant.

Although we do not presently expect to do so, we are authorized to borrow funds and to sell assets in order to satisfy distribution requirements. However, under the 1940 Act, we are not permitted to make distributions to our stockholders while our debt obligations and other senior securities are outstanding unless certain "asset coverage" tests are met. Moreover, our ability to dispose of assets to meet our distribution requirements may be limited by (1) the illiquid nature of our portfolio and/or (2) other requirements relating to our status as a RIC, including the Diversification Tests. If we dispose of assets in order to meet the Annual Distribution Requirement or the Excise Tax Distribution Requirement, we may make such dispositions at times that, from an investment standpoint, are not advantageous. If we are prohibited from making distributions or are unable to obtain cash from other sources to make the distributions, we may fail to qualify as a RIC, which would result in us becoming subject to corporate-level U.S. federal income tax.

In addition, we will be partially dependent on our SBIC subsidiaries for cash distributions to enable us to meet the RIC distribution requirements. Our SBIC subsidiaries may be limited by the Small Business Investment Act of 1958, and SBA regulations governing SBICs, from making certain distributions to us that may be necessary to maintain our tax treatment as a RIC. We may have to request a waiver of the SBA's restrictions for our SBIC subsidiaries to make certain distributions to maintain our RIC tax treatment. We cannot assure you that the SBA will grant such waiver. If our SBIC subsidiaries are unable to obtain a waiver, compliance with the SBA regulations may cause us to fail to qualify for tax treatment as a RIC, which would result in us becoming subject to corporate-level U.S. federal income tax.

The remainder of this discussion assumes that we will qualify as a RIC and have satisfied the Annual Distribution Requirement.

Any transactions in options, futures contracts, constructive sales, hedging, straddle, conversion or similar transactions, and forward contracts will be subject to special tax rules, the effect of which may be to accelerate income to us, defer losses, cause adjustments to the holding periods of our investments, convert long-term capital gains into short-term capital gains, convert short-term capital losses into long-term capital losses or have other tax consequences. These rules could affect the amount, timing and character of distributions to stockholders. We do not currently intend to engage in these types of transactions.

A RIC is limited in its ability to deduct expenses in excess of its "investment company taxable income" (which is, generally, ordinary income plus net realized short-term capital gains in excess of net realized long-term capital losses). If our expenses in a given year exceed gross taxable income (e.g., as the result of large amounts of equity-based compensation), we would experience a net operating loss for that year. However, a RIC is not permitted to carry forward net operating losses to subsequent years. In addition, expenses can be used only to offset investment company taxable income, not net capital gain. Due to these limits on the deductibility of expenses, we may for tax purposes have aggregate taxable income for several years that we are required to distribute and that is taxable to our stockholders even if such income is greater than the aggregate net income we actually earned during those years. Such required distributions may be made from our cash assets or by liquidation of investments, if necessary. We may realize gains or losses from such liquidations. In the event we realize net capital gains from such liquidations, you may receive a larger capital gain distribution than you would have received in the absence of such transactions.

Investment income received from sources within foreign countries, or capital gains earned by investing in securities of foreign issuers, may be subject to foreign income taxes withheld at the source. In this regard, withholding tax rates in countries with which the United States does not have a tax treaty are often as high

22

as 30%. The United States has entered into tax treaties with many foreign countries that may entitle us to a reduced rate of tax or exemption from tax on this related income and gains. The effective rate of foreign tax cannot be determined at this time since the amount of our assets to be invested within various countries is not now known. We do not anticipate being eligible for the special election that allows a RIC to treat foreign income taxes paid by such RIC as paid by its stockholders.

If we acquire stock in certain foreign corporations that receive at least 75% of their annual gross income from passive sources (such as interest, dividends, rents, royalties or capital gain) or hold at least 50% of their total assets in investments producing such passive income ("passive foreign investment companies"), we could be subject to U.S. federal income tax and additional interest charges on "excess distributions" received from such companies or gain from the sale of stock in such companies, even if all income or gain actually received by us is timely distributed to our stockholders. We would not be able to pass through to our stockholders any credit or deduction for such a tax. Certain elections may, if available, ameliorate these adverse tax consequences, but any such election requires us to recognize taxable income or gain without the concurrent receipt of cash. We intend to limit and/or manage our holdings in passive foreign investment companies to minimize our tax liability. In addition, under recently proposed regulations, income required to be included as a result of such an election would not be qualifying income for purposes of the 90% Income Test unless we receive a distribution of such income from the passive foreign investment company in the same taxable year to which the inclusion relates.

Foreign exchange gains and losses realized by us in connection with certain transactions involving non-dollar debt securities, certain foreign currency futures contracts, foreign currency option contracts, foreign currency forward contracts, foreign currencies, or payables or receivables denominated in a foreign currency are subject to Code provisions that generally treat such gains and losses as ordinary income and losses and may affect the amount, timing and character of distributions to our stockholders. Any such transactions that are not directly related to our investment in securities (possibly including speculative currency positions or currency derivatives not used for hedging purposes) could, under future Treasury regulations, produce income not among the types of "qualifying income" from which a RIC must derive at least 90% of its annual gross income.

## FAILURE TO QUALIFY AS A RIC

If we fail to satisfy the 90% Income Test or the Diversification Tests for any taxable year, we may nevertheless continue to qualify as a RIC for such year if certain relief provisions are applicable (which may, among other things, require us to pay certain corporate-level U.S. federal income taxes or to dispose of certain assets).

If we were unable to qualify for treatment as a RIC and the foregoing relief provisions are not applicable, we would be subject to tax on all of our taxable income at regular corporate rates, regardless of whether we make any distributions to our stockholders. Distributions would not be required, and any distributions would be taxable to our stockholders as ordinary dividend income to the extent of our current and accumulated earnings and profits and, subject to certain limitations, may be eligible for the 20% maximum rate for noncorporate taxpayers provided certain holding period and other requirements were met. Subject to certain limitations under the Code, corporate distributees would be eligible for the dividends-received deduction. Distributions in excess of our current and accumulated earnings and profits would be treated first as a return of capital to the extent of the stockholder's tax basis, and any remaining distributions would be treated as a capital gain. To requalify as a RIC in a subsequent taxable year, we would be required to satisfy the RIC qualification requirements for that year and dispose of any earnings and profits from any year in which we failed to qualify as a RIC. Subject to a limited exception applicable to RICs that qualified as such under the Code for at least one year prior to disqualification and that requalify as a RIC no later than the second year following the nonqualifying year, we could be subject to tax on any unrealized net built-in gains in the assets held by us during the period in which we failed to qualify as a RIC that are recognized within the subsequent five years, unless we made a special election to pay corporate-level U.S. federal income tax on such built-in gain at the time of our requalification as a RIC.

23

## REGULATION

A BDC is regulated under the 1940 Act. A BDC must be organized in the U.S. for the purpose of investing in or lending to primarily private companies and making significant managerial assistance available to them. A BDC may use capital provided by public stockholders and from other sources to make long-term, private investments in businesses. A BDC provides stockholders the ability to retain the liquidity of a publicly traded stock while sharing in the possible benefits, if any, of investing in primarily privately owned companies.

We may not change the nature of our business so as to cease to be, or withdraw our election as, a BDC unless authorized by vote of a majority of the outstanding voting securities, as required by the 1940 Act. A majority of the outstanding voting securities of a company is defined under the 1940 Act as the lesser of: (a) 67% or more of such company's voting securities present at a meeting if more than 50% of the outstanding voting securities of such company are present or represented by proxy, or (b) more than 50% of the outstanding voting securities of such company. We do not anticipate any substantial change in the nature of our business.

As with other companies regulated by the 1940 Act, a BDC must adhere to certain substantive regulatory requirements. A majority of our directors must be persons who are not interested persons, as that term is defined in the 1940 Act. Additionally, we are required to provide and maintain a bond issued by a reputable fidelity insurance company to protect the BDC. Furthermore, as a BDC, we are prohibited from protecting any director or officer against any liability to us or our stockholders arising from willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of such person's office.

As a BDC, we are generally required to meet an asset coverage ratio, defined under the 1940 Act as the ratio of our gross assets (less all liabilities and indebtedness not represented by senior securities) to our outstanding senior securities, of at least 200% (or, after November 1, 2019, 150%, if certain conditions are met) after each issuance of senior securities. On March 23, 2018, the Small Business Credit Availability Act (the "SBCA") was signed into law, which included various changes to regulations under the federal securities laws that impact BDCs. The SBCA included changes to the 1940 Act to allow BDCs to decrease their asset coverage requirement from 200% to 150% (i.e. the amount of debt may not exceed 66.7% of the value of our total assets), if certain requirements are met. On November 1, 2018, the Board, including a "required majority" (as such term is defined in Section 57(o) of the 1940 Act) approved the application of the modified asset coverage. As a result, our asset coverage requirements for senior securities will be changed from 200% to 150%, effective November 1, 2019.

We may also be prohibited under the 1940 Act from knowingly participating in certain transactions with our affiliates without the prior approval of our directors who are not interested persons and, in some cases, prior approval by the SEC. On June 1, 2016, the SEC issued the Order, which permits us and certain of our affiliates to co-invest with one or more other affiliated investment funds, including future affiliated investment funds, where co-investing would otherwise be prohibited under the 1940 Act. Pursuant to the Order, the Company is permitted to co-invest with its affiliates if a "required majority" (as defined in Section 57(o) of the 1940 Act) of the Company's independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to the Company and its stockholders and do not involve overreaching in respect of the Company or its stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of the Company's stockholders and is consistent with its then-current investment objectives and strategies.

We are generally not permitted to issue and sell our common stock at a price below net asset value per share. See "Risk Factors — Risks Relating to Our Business and Structure — Regulations governing our operation as a BDC affect our ability to raise additional capital and the way in which we do so. As a BDC, the necessity of raising additional capital may expose us to risks, including the typical risks associated with leverage." We may, however, sell our common stock, or warrants, options or rights to acquire our common stock, at a price below the then-current net asset value of our common stock if our Board determines that such sale is in our best interests and the best interests of our stockholders, and our stockholders approve

24

our policy and practice of making such sales. In any such case, under such circumstances, the price at which our common stock is to be issued and sold may not be less than a price which, in the determination of our Board, closely approximates the market value of such common stock. In addition, we may generally issue new shares of our common stock at a price below net asset value in rights offerings to existing stockholders, in payment of dividends and in certain other limited circumstances.

We will be periodically examined by the SEC for compliance with the 1940 Act.

As a BDC, we are subject to certain risks and uncertainties. See "Risk Factors — Risks Relating to Our Business and Structure."

## QUALIFYING ASSETS

Under the 1940 Act, a BDC may not acquire any asset other than assets of the type listed in Section 55(a) of the 1940 Act, which are referred to as qualifying assets, unless, immediately after such acquisition is made, qualifying assets represent at least 70% of the BDC's gross assets. The principal categories of qualifying assets relevant to our proposed business are the following:

- Securities purchased in transactions not involving any public offering, the issuer of which is an eligible portfolio company;

- Securities received in exchange for or distributed with respect to securities described in the bullet above or pursuant to the exercise of options, warrants or rights relating to such securities; and

- Cash, cash items, government securities or high quality debt securities (within the meaning of the 1940 Act), maturing in one year or less from the time of investment.

An eligible portfolio company is generally a domestic company that is not an investment company (other than a SBIC wholly owned by a BDC) and that:

- does not have a class of securities with respect to which a broker may extend margin credit at the time the acquisition is made;

- is controlled by the BDC and has an affiliate of the BDC on its board;

- does not have any class of securities listed on a national securities exchange;

- is a public company that lists its securities on a national securities exchange with a market capitalization of less than $250 million; or

- meets such other criteria as may be established by the SEC.

Control, as defined by the 1940 Act, is presumed to exist where a BDC beneficially owns more than 25% of the outstanding voting securities of the portfolio company.

In addition, a BDC must have been organized and have its principal place of business in the U.S. and must be operated for the purpose of making investments in eligible portfolio companies, or in other securities that are consistent with its purpose as a BDC.

## SIGNIFICANT MANAGERIAL ASSISTANCE TO PORTFOLIO COMPANIES

BDCs generally must offer to make available to the issuer of the securities significant managerial assistance, except in circumstances where either (i) the BDC controls such issuer of securities or (ii) the BDC purchases such securities in conjunction with one or more other persons acting together and one of the other persons in the group makes available such managerial assistance. Making available significant managerial assistance means, among other things, any arrangement whereby the BDC, through its directors, officers or employees, offers to provide, and, if accepted, does so provide, significant guidance and counsel concerning the management, operations or business objectives and policies of a portfolio company.

## TEMPORARY INVESTMENTS

Pending investment in other types of "qualifying assets," as described above, our investments may consist of cash, cash equivalents, U.S. government securities or high-quality debt securities maturing in one year or less from the time of investment, which we refer to, collectively, as temporary investments, so that

70% of our assets are qualifying assets. Typically, we will invest in U.S. Treasury bills or in repurchase agreements, provided that such agreements are fully collateralized by cash or securities issued by the U.S. government or its agencies. A repurchase agreement involves the purchase by an investor, such as us, of a specified security and the simultaneous agreement by the seller to repurchase it at an agreed-upon future date and at a price which is greater than the purchase price by an amount that reflects an agreed-upon interest rate. There is no percentage restriction on the proportion of our assets that may be invested in such repurchase agreements. However, if more than 25% of our gross assets constitute repurchase agreements from a single counterparty, we would not meet the diversification tests in order to qualify as a RIC under the Code. Thus, we do not intend to enter into repurchase agreements with a single counterparty in excess of this limit. Our Investment Advisor will monitor the creditworthiness of the counterparties with which we enter into repurchase agreement transactions.

### SENIOR SECURITIES

We are permitted, under specified conditions, to issue multiple classes of indebtedness and one class of stock senior to our common stock if our asset coverage, as defined in the 1940 Act, is at least equal to 200% (or 150%, if certain requirements are met, after November 1, 2019) immediately after each such issuance. On June 10, 2014, we received an exemptive order from the SEC granting relief from the asset coverage requirements for certain indebtedness issued by Fund II and Fund III as SBICs. In addition, while any senior securities remain outstanding, we must make provisions to prohibit any distribution to our stockholders or the repurchase of such securities or shares unless we meet the applicable asset coverage ratios at the time of the distribution or repurchase. We may also borrow amounts up to 5% of the value of our gross assets for temporary or emergency purposes without regard to asset coverage. For a discussion of the risks associated with leverage, see "Risk Factors — Risks Relating to Our Business and Structure."

### CODE OF ETHICS

We and our Investment Advisor have adopted a code of ethics pursuant to Rule 17j-1 under the 1940 Act and Rule 204A-1 under the Advisers Act that establishes procedures for personal investments and restricts certain transactions by our personnel. Our code of ethics generally does not permit investments by our employees in securities that may be purchased or held by us. Our code of ethics is also available on our website at *www.Capitalagroup.com*.

### COMPLIANCE POLICIES AND PROCEDURES

We and our Investment Advisor have adopted and implemented written policies and procedures reasonably designed to detect and prevent violation of the federal securities laws and are required to review these compliance policies and procedures annually for their adequacy and the effectiveness of their implementation and designate a chief compliance officer to be responsible for administering the policies and procedures. Richard G. Wheelahan, III currently serves as our chief compliance officer.

### SARBANES-OXLEY ACT OF 2002

The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") imposes a wide variety of regulatory requirements on publicly-held companies and their insiders. Many of these requirements affect us. For example:

- pursuant to Rule 13a-14 of the 1934 Act, our chief executive officer and chief financial officer must certify the accuracy of the financial statements contained in our periodic reports;

- pursuant to Item 307 of Regulation S-K, our periodic reports must disclose our conclusions about the effectiveness of our disclosure controls and procedures;

- pursuant to Rule 13a-15 of the 1934 Act, our management is required to prepare an annual report regarding its assessment of our internal control over financial reporting, and is required to obtain an audit of the effectiveness of internal control over financial reporting performed by our independent registered public accounting firm; and

26

- pursuant to Item 308 of Regulation S-K and Rule 13a-15 of the 1934 Act, our periodic reports must disclose whether there were significant changes in our internal controls over financial reporting or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

The Sarbanes-Oxley Act requires us to review our current policies and procedures to determine whether we comply with the Sarbanes-Oxley Act and the regulations promulgated thereunder. We will continue to monitor our compliance with all regulations that are adopted under the Sarbanes-Oxley Act and will take actions necessary to ensure that we are in compliance therewith.

## PROXY VOTING POLICIES AND PROCEDURES

We have delegated our proxy voting responsibility to the Investment Advisor. The proxy voting policies and procedures of the Investment Advisor are set forth below. The guidelines will be reviewed periodically by the Investment Advisor and our non-interested directors, and, accordingly, are subject to change. For purposes of the proxy voting policies and procedures described below, "we," "our" and "us" refers to the Investment Advisor.

### *Introduction*

An investment adviser registered under the Advisers Act has a fiduciary duty to act solely in the best interests of its clients. As part of this duty, we recognize that we must vote client securities in a timely manner free of conflicts of interest and in the best interests of our clients.

These policies and procedures for voting proxies for our investment advisory clients are intended to comply with Section 206 of, and Rule 206(4)-6 under, the Advisers Act.

### *Proxy Policies*

We will vote proxies relating to our portfolio securities in what we perceive to be the best interest of our clients' stockholders. We will review on a case-by-case basis each proposal submitted to a stockholder vote to determine its impact on the portfolio securities held by our clients. Although we will generally vote against proposals that may have a negative impact on our clients' portfolio securities, we may vote for such a proposal if there exist compelling long-term reasons to do so.

Our proxy voting decisions will be made by the senior officers who are responsible for monitoring each of our clients' investments. To ensure that our vote is not the product of a conflict of interest, we will require that: (1) anyone involved in the decision making process disclose to our managing member any potential conflict that he or she is aware of and any contact that he or she has had with any interested party regarding a proxy vote; and (2) employees involved in the decision making process or vote administration are prohibited from revealing how we intend to vote on a proposal in order to reduce any attempted influence from interested parties.

### *Proxy Voting Records*

You may obtain information about how we voted proxies by making a written request for proxy voting information to: Capitala Investment Advisors, LLC, 4201 Congress Street, Suite 360, Charlotte, North Carolina 28209.

## PRIVACY PRINCIPLES

We are committed to maintaining the privacy of our stockholders and to safeguarding their non-public personal information. The following information is provided to help you understand what personal information we collect, how we protect that information and why, in certain cases, we may share information with select other parties.

Generally, we do not receive any non-public personal information relating to our stockholders, although certain non-public personal information of our stockholders may become available to us. We do not disclose any non-public personal information about our stockholders or former stockholders to anyone, except as permitted by law or as is necessary in order to service stockholder accounts (for example, to a transfer agent or third-party administrator).

27

We restrict access to non-public personal information about our stockholders to employees of our Investment Advisor and its affiliates with a legitimate business need for the information. We maintain physical, electronic and procedural safeguards designed to protect the non-public personal information of our stockholders.

**SMALL BUSINESS INVESTMENT COMPANY REGULATIONS**

Fund II and Fund III, which are our wholly owned subsidiaries, are licensed to act as SBICs and are regulated by the SBA. As of December 31, 2018, investments in Fund II and Fund III accounted for approximately 11.7% and 53.6%, respectively, of the fair value of our portfolio. As of December 31, 2018, Fund II and Fund III had $15.7 million and $150.0 million, respectively, of SBA-guaranteed debentures outstanding under the SBIC program. Fund II and Fund III are fully drawn and may not make borrowings in excess of their aggregate $165.7 million of SBA-guaranteed debentures outstanding as of December 31, 2018.

The SBIC licenses allow our SBIC subsidiaries to borrow funds by issuing SBA-guaranteed debentures, subject to the issuance of a capital commitment by the SBA and other customary procedures. The SBA regulations require, among other things, that a licensed SBIC be examined periodically and audited by an independent auditor to determine the SBIC's compliance with the relevant SBA regulations. SBA-guaranteed debentures are non-recourse, interest-only debentures with interest payable semi-annually and have a ten year maturity. The principal amount of SBA-guaranteed debentures is not required to be paid prior to maturity but may be prepaid at any time without penalty. The interest rate of SBA-guaranteed debentures is fixed at the time of issuance at a market-driven spread over U.S. Treasury Notes with 10-year maturities.

SBICs are designed to stimulate the flow of private equity capital to eligible small businesses. Under current SBA regulations, a licensed SBIC may provide capital to those entities that have a tangible net worth not exceeding $19.5 million and an average annual net income after U.S. federal income taxes not exceeding $6.5 million for the two most recent fiscal years. In addition, a licensed SBIC must devote 25.0% of its investment activity to those entities that have a tangible net worth not exceeding $6.0 million and an average annual net income after U.S. federal income taxes not exceeding $2.0 million for the two most recent fiscal years. The SBA regulations also provide alternative size standard criteria to determine eligibility, which depend on the industry in which the business is engaged and are based on factors such as the number of employees and gross sales. The SBA regulations permit licensed SBICs to make long-term loans to small businesses, invest in the equity securities of such businesses and provide them with consulting and advisory services. The SBA also places certain limitations on the financing terms of investments by SBICs in portfolio companies and prohibits SBICs from providing funds for certain purposes or to businesses in a few prohibited industries. Compliance with SBA requirements may cause Fund II and Fund III to forego attractive investment opportunities that are not permitted under SBA regulations.

Further, the SBA regulations require that a licensed SBIC be periodically examined and audited by the SBA to determine its compliance with the relevant SBA regulations. The SBA prohibits, without prior SBA approval, a "change of control" of an SBIC or transfers that would result in any person (or a group of persons acting in concert) owning 10.0% or more of a class of capital stock of a licensed SBIC. If either Fund II or Fund III fails to comply with applicable SBA regulations, the SBA could, depending on the severity of the violation, limit or prohibit Fund II's and Fund III's use of debentures, declare outstanding debentures immediately due and payable, and/or limit Fund II and Fund III from making new investments. Such actions by the SBA would, in turn, negatively affect us because Fund II and Fund III are our wholly owned subsidiaries. Fund II and Fund III were in compliance with the terms of the SBA's leverage as of December 31, 2018 as a result of having sufficient capital as defined under the SBA regulations.

The maximum leverage available to a "family" of affiliated SBIC funds is $350.0 million, subject to SBA approval. SBA regulations currently limit the amount that an SBIC subsidiary may borrow to a maximum of $150 million when it has at least $75 million in regulatory capital. Affiliated SBICs are permitted to issue up to a combined maximum amount of $350 million when they have at least $175 million in regulatory capital. As of December 31, 2018, Fund II had $26.2 million in regulatory capital and $15.7 million in SBA-guaranteed debentures outstanding and Fund III had $75.0 million in regulatory capital and $150.0 million in SBA-guaranteed debentures outstanding.

28

On June 10, 2014, we received exemptive relief from the SEC to permit us to exclude the debt of our SBIC subsidiaries guaranteed by the SBA from the definition of senior securities in the 200% (or 150%, if certain conditions are met, after November 1, 2019) asset coverage test under the 1940 Act. This provides us with increased flexibility under the 200% (or 150%, if certain conditions are met, after November 1, 2019) asset coverage test by permitting us to borrow up to $165.7 million more than we would otherwise be able to absent the receipt of this exemptive relief.

Our SBIC subsidiaries are subject to regulation and oversight by the SBA, including requirements with respect to maintaining certain minimum financial ratios and other covenants. Receipt of SBIC licenses does not assure that our SBIC subsidiaries will receive SBA-guaranteed debenture funding, which is dependent upon our SBIC subsidiaries continuing to be in compliance with SBA regulations and policies. The SBA, as a creditor, will have a superior claim to our SBIC subsidiaries' assets over our stockholders in the event we liquidate our SBIC subsidiaries or the SBA exercises its remedies under the SBA-guaranteed debentures issued by our SBIC subsidiaries upon an event of default.

## NASDAQ GLOBAL SELECT MARKET REQUIREMENTS

We have adopted certain policies and procedures intended to comply with the NASDAQ Global Select Market's corporate governance rules. We will continue to monitor our compliance with all future listing standards that are approved by the SEC and will take actions necessary to ensure that we are in compliance therewith.

## AVAILABLE INFORMATION

Our executive offices are located at 4201 Congress Street, Suite 360, Charlotte, NC 28209. We maintain a website located at *www.Capitalagroup.com* and our phone number is (704) 376-5502. We make available free of charge on our website our proxy statement, annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports as soon as reasonably practical after we file such material with, or furnish to, the SEC. Information contained on our website is not incorporated by reference into this Annual Report on Form 10-K and you should not consider information contained on our website to be part of this Annual Report on Form 10-K or any other report we file with the SEC.

The SEC also maintains a website that contains reports, proxy and information statements and other information we file with the SEC at *www.sec.gov*.

## ITEM 1A. RISK FACTORS

*Investing in our securities involves a number of significant risks. Before you invest in our securities, you should be aware of various risks, including those described below and elsewhere in this Annual Report on Form 10-K. You should carefully consider these risk factors, together with all of the other information included in this Annual Report on Form 10-K, before you decide whether to make an investment in our securities. The risks set out below are not the only risks we face. Additional risks and uncertainties not presently known to us or not presently deemed material by us may also impair our operations and performance. If any of the following events occur, our business, financial condition, results of operations and cash flows could be materially and adversely affected. In such case, our net asset value and the trading price of our securities could decline, and you may lose all or part of your investment. The risk factors described below are the principal risk factors associated with an investment in us as well as those factors generally associated with an investment company with investment objectives, investment policies, capital structure, or trading markets similar to ours.*

### Risks Relating to Our Business and Structure

#### *We have a limited operating history as a BDC.*

Capitala Finance was formed in February 2013 and has only operated as a BDC since September 2013. As a result, we are subject to many of the business risks and uncertainties associated with recently formed businesses, including the risk that we will not achieve our investment objective and that the value of your investment could decline substantially. As a BDC, we are subject to the regulatory requirements of the SEC, in addition to the specific regulatory requirements applicable to BDCs under the 1940 Act and RICs under the Code. Our management and that of the Investment Advisor did not have any prior experience operating under this regulatory framework, and we incur substantial costs, and expend significant time or other resources, to operate under this regulatory framework. From time to time, the Investment Advisor may pursue investment opportunities in which it has more limited experience. We may also be unable to replicate the historical performance of prior investment funds managed by our management team. In addition, we may be unable to generate sufficient revenue from our operations to make or sustain distributions to our stockholders.

#### *Our investment portfolio is recorded at fair value, with our Board having final responsibility for overseeing, reviewing and approving, in good faith, its estimate of fair value and, as a result, there may be uncertainty as to the value of our portfolio investments.*

Under the 1940 Act, we are required to carry our portfolio investments at market value or, if there is no readily available market value, at fair value as determined by us, with our Board having final responsibility for overseeing, reviewing and approving, in good faith, our estimate of fair value. Typically, there will not be a public market for the securities of the privately held companies in which we invest. As a result, we value these securities quarterly at fair value based on input from management, a third-party independent valuation firm and our audit committee, and with the oversight, review and approval of our Board.

The determination of fair value and, consequently, the amount of unrealized gains and losses in our portfolio, are to a certain degree, subjective and dependent on a valuation process approved by our Board. Certain factors that may be considered in determining the fair value of our investments include external events, such as private mergers, sales and acquisitions involving comparable companies. Because such valuations, and particularly valuations of private securities and private companies, are inherently uncertain, they may fluctuate over short periods of time and may be based on estimates. Our fair value determinations may differ materially from the values that would have been used if a ready market for these securities existed. Due to this uncertainty, our fair value determinations may cause our net asset value on a given date to materially understate or overstate the value that we may ultimately realize on one or more of our investments. As a result, investors purchasing our common stock based on an overstated net asset value would pay a higher price than the value of our investments might warrant. Conversely, investors selling shares during a period in which the net asset value understates the value of our investments would receive a lower price for their shares than the value of our investments might warrant. In addition, we may not be able to realize the values on our investments needed to pay interest on our borrowings.

30

***Our financial condition and results of operations depend on our ability to effectively manage and deploy capital.***

Our ability to achieve our investment objective depends on our ability to effectively manage and deploy capital, which depends, in turn, on our Investment Advisor's ability to identify, evaluate and monitor, and our ability to finance and invest in, companies that meet our investment criteria.

Accomplishing our investment objective on a cost-effective basis is largely a function of our Investment Advisor's handling of the investment process, its ability to provide competent, attentive and efficient services and our access to investments offering acceptable terms. In addition to monitoring the performance of our existing investments, our Investment Advisor's investment team may also be called upon, from time to time, to provide managerial assistance to some of our portfolio companies as well as other funds that they manage. These demands on their time may distract them or slow our rate of investment. See also "— There are significant potential conflicts of interest that could negatively affect our investment returns."

Even if we are able to grow and build upon our investment operations, any failure to manage our growth effectively could have a material adverse effect on our business, financial condition, results of operations and prospects. The results of our operations depend on many factors, including the availability of opportunities for investment, readily accessible short and long-term funding alternatives in the financial markets, and economic conditions. Furthermore, if we cannot successfully operate our business or implement our investment policies and strategies, it could negatively impact our ability to make distributions.

***We depend upon Capitala Investment Advisors' key personnel for our future success.***

We depend on the diligence, skill and network of business contacts of Joseph B. Alala, III, M. Hunt Broyhill and John F. McGlinn, who serve as the members of the investment committee of the Investment Advisor and lead the Investment Advisor's investment team. Our success depends on the continued service of these individuals and the other senior investment professionals available to the Investment Advisor. We cannot assure you that unforeseen business, medical, personal or other circumstances would not lead Messrs. Alala, Broyhill or McGlinn or any other such individual to terminate his relationship with us. Additionally, we cannot assure you that a reduction in revenue to the Investment Advisor, including as a result of fee waivers or a decrease in our assets, would not lead to a loss of investment professionals in the future. Such loss of members of the Investment Advisor's investment committee and other investment professionals could have a material adverse effect on our ability to achieve our investment objective as well as on our financial condition and results of operations. In addition, we can offer no assurance that the Investment Advisor will continue indefinitely as our investment adviser.

The members of the Investment Advisor's investment team are and may in the future become affiliated with entities engaged in business activities similar to those intended to be conducted by us and may have conflicts of interest in allocating their time. For example, an affiliate of the Investment Advisor also manages Fund IV, Fund V, and CSLC, private investment limited partnerships providing financing solutions to the lower middle-market and traditional middle-market. Mr. Alala dedicates a significant portion of his time to the activities of Capitala Finance; however, he may become engaged in other business activities that could divert his time and attention in the future.

***We operate in a highly competitive market for investment opportunities, which could reduce returns and result in losses.***

We compete for investments with other BDCs with similar investment strategies, private equity funds with similar investment strategies, venture lending funds, finance companies with venture lending units and banks focused on venture lending. Many of our potential competitors are substantially larger and have considerably greater financial, technical and marketing resources than we have. For example, some competitors may have a lower cost of capital and access to funding sources that are not available to us. In addition, some of our competitors have higher risk tolerances or different risk assessments than we have. These characteristics might allow our competitors to consider a wider variety of investments, establish more relationships or offer better pricing and more flexible structuring than we are able to offer. We may lose investment opportunities if we do not match our competitors' pricing, terms or structure. If we are forced

31

TABLE OF CONTENTS

to match our competitors' pricing, terms or structure, we may not be able to achieve acceptable returns on our investments or may bear substantial risk of capital loss. We believe a significant part of our competitive advantage stems from the fact that the market for investments in lower and traditional middle-market companies is underserved by traditional commercial banks and other financing sources. A significant increase in the number and/or the size of our competitors in this target market could force us to accept less attractive investment terms. Furthermore, many of our potential competitors have greater experience operating under, or will not be subject to, the regulatory restrictions that the 1940 Act impose on us as a BDC.

***Any inability of our Capitala Investment Advisors to maintain or develop strong referral relationships, or the failure of these relationships to generate investment opportunities, could adversely affect our business.***

We depend upon our Investment Advisor to maintain its relationships with venture capital and private equity firms, placement agents, investment banks, management groups and other financial institutions, and we expect to rely to a significant extent upon these relationships to provide us with potential investment opportunities. If our Investment Advisor fails to maintain such relationships, or to develop new relationships with other sources of investment opportunities, we will not be able to grow our investment portfolio. In addition, individuals with whom our Investment Advisor has relationships are not obligated to provide us with investment opportunities, and we can offer no assurance that these relationships will generate investment opportunities for us in the future.

***Our success depends on the ability of Capitala Investment Advisors to attract and retain qualified personnel in a competitive environment.***

Our growth requires that the Investment Advisor retain and attract new investment and administrative personnel in a competitive market. Its ability to attract and retain personnel with the requisite credentials, experience and skills depends on several factors including, but not limited to, its ability to offer competitive wages, benefits and professional growth opportunities. Many of the entities with which the Investment Advisor competes for experienced personnel, including investment funds (such as private equity funds, credit funds and mezzanine funds) and traditional financial services companies, have greater resources than the Investment Advisor has. We cannot assure you that a reduction in revenue to the Investment Advisor, including as a result of fee waivers or a decrease in our assets, would not lead to a loss of investment professionals in the future.

***There are significant potential conflicts of interest that could negatively affect our investment returns.***

The members of the Investment Advisor's investment team also monitor and service other affiliated investment funds. In addition, our executive officers and directors, as well as the current and future members of our Investment Advisor's investment team may serve as officers, directors or principals of other entities that operate in the same or a related line of business as we do. Accordingly, they may have obligations to investors in those entities, the fulfillment of which obligations may not be in the best interests of us or our stockholders.

In the course of our investing activities, we pay management and incentive fees to the Investment Advisor and reimburse the Investment Advisor for certain expenses it incurs. As a result, investors in our common stock invest on a "gross" basis and receive distributions on a "net" basis after expenses, resulting in a lower rate of return than an investor might achieve through direct investments. Accordingly, there may be times when the management team of the Investment Advisor will have interests that differ from those of our stockholders, giving rise to a conflict. The Investment Advisor will not be reimbursed for any performance-related compensation for its employees. We have entered into a royalty-free license agreement with our Investment Advisor, pursuant to which the Investment Advisor grants us a non-exclusive royalty-free license to use the name "Capitala." Under the license agreement, we have the right to use the "Capitala" name for so long as the Investment Advisor or one of its affiliates remains our Investment Advisor. In addition, we pay our Administrator our allocable portion of overhead and other expenses incurred by our Administrator in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions, and our allocable portion of the compensation of our chief financial officer, chief compliance officer and their respective administrative support staff. These arrangements create conflicts of interest that our Board must monitor.

In addition, an affiliate of the Investment Advisor also manages Fund IV, a private investment limited partnership providing financing solutions to smaller and lower middle-market companies that had its first closing in March 2013 and obtained SBA approval for its SBIC license in April 2013. In addition to Fund IV, affiliates of the Investment Advisor may manage several affiliated funds whereby institutional limited partners in Fund IV have the opportunity to co-invest with Fund IV in portfolio investments. An affiliate of the Investment Advisor also manages Fund V, a private investment limited partnership, and CSLC, both of which provide financing solutions to the lower middle-market and traditional middle-market. The Investment Advisor and its affiliates may also manage other funds in the future that may have investment mandates that are similar, in whole or in part to ours. To the extent permitted by the 1940 Act and interpretation of the SEC staff, the Investment Advisor and its affiliates may determine that an investment is appropriate for us and for one or more of those other funds. In such event, depending on the availability of such investment and other appropriate factors, the Investment Advisor or its affiliates may determine that we should invest side-by-side with one or more other funds. Any such investments will be made only to the extent permitted by applicable law and interpretive positions of the SEC and its staff, and consistent with the Investment Advisor's allocation procedures. We do not expect to make co-investments, or otherwise compete for investment opportunities, with Fund IV because its focus and investment strategy differ from our own. However, we do expect to make, and have made, co-investments with Fund V and/or CSLC given their similar investment strategies.

As a BDC, we are substantially limited in our ability to co-invest in privately negotiated transactions with affiliated funds unless we obtain an exemptive order from the SEC. On June 1, 2016, the SEC issued an order (the "Order") permitting this relief. Subject to satisfaction of certain conditions to the Order, we and certain of our affiliates are now permitted, together with any future BDCs, registered closed-end funds and certain private funds, each of whose investment adviser is our investment adviser or an investment adviser controlling, controlled by, or under common control with our investment adviser, to co-invest in negotiated investment opportunities where doing so would otherwise be prohibited under the 1940 Act, providing our stockholders with access to a broader array of investment opportunities. Pursuant to the Order, we are permitted to co-invest in such investment opportunities with our affiliates if a "required majority" (as defined in Section 57(o) of the 1940 Act) of our independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to us and our stockholders and do not involve overreaching in respect of us or our stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of our stockholders and is consistent with our then-current investment objective and strategies.

In the ordinary course of business, we may enter into transactions with portfolio companies that may be considered related party transactions. In order to ensure that we do not engage in any prohibited transactions with any persons affiliated with us, we have implemented certain written policies and procedures whereby our executive officers screen each of our transactions for any possible affiliations between the proposed portfolio investment and us, companies controlled by us or our executive officers and directors. We will not enter into any agreements unless and until we are satisfied that doing so will not raise concerns under the 1940 Act or, if such concerns exist, we have taken appropriate actions to seek review and approval by our Board or exemptive relief for such transaction. Our Board will review these procedures on an annual basis.

***The investment committee and other investment professionals of Capitala Investment Advisors may, from time to time, possess material non-public information about or related to our portfolio companies, limiting our investment discretion.***

Members of our Investment Advisor's investment committee and other investment professionals of the Investment Advisor may serve as directors of, or in a similar capacity to, portfolio companies in which we invest. In the event that material nonpublic information is obtained with respect to such companies, or we become subject to trading restrictions under the internal trading policies of those companies or as a result of applicable law or regulations, we could be prohibited for a period of time from purchasing or selling the securities of such companies, and this prohibition may have an adverse effect on us.

33

***The involvement of our interested directors in the valuation process may create conflicts of interest.***

We make many of our portfolio investments in the form of loans and securities that are not publicly traded and for which no market-based price quotation is available. As a result, our Board determines the fair value of these loans and securities in good faith as described in the section titled "Valuation of Investments" in Note 2 to our consolidated financial statements. In connection with that determination, investment professionals from the Investment Advisor may provide our Board with valuations based upon the most recent portfolio company financial statements available and projected financial results of each portfolio company. While the valuation for certain portfolio investments is reviewed by an independent valuation firm quarterly, the ultimate determination of fair value is made by our Board, including our interested directors, and not by such third-party valuation firm. The participation of the Investment Advisor's investment professionals in our valuation process could result in conflicts of interest as the Investment Advisor's management fee is based, in part, on the value of our gross assets, and its incentive fees will be based, in part, on realized and unrealized gains and depreciation.

***The terms of the Investment Advisory Agreement with Capitala Investment Advisors and the Administration Agreement with our Administrator were not negotiated on an arm's length basis and may not be as favorable to us as if they had been negotiated with an unaffiliated third-party, including an incentive fee structure that may induce Capitala Investment Advisors to pursue speculative investments, and to use leverage when it may be unwise to do so.***

The Investment Advisory Agreement and the Administration Agreement were negotiated between related parties. Consequently, their terms, including fees payable to the Investment Advisor and the Administrator, may not be as favorable to us as if they had been negotiated with an unaffiliated third-party.

The incentive fee payable by us to the Investment Advisor may create an incentive for the Investment Advisor to pursue investments on our behalf that are riskier or more speculative than would be the case in the absence of such compensation arrangement. The incentive fee payable to our Investment Advisor is calculated based on a percentage of our return on invested capital. This may encourage our Investment Advisor to use leverage to increase the return on our investments. Under certain circumstances, the use of leverage may increase the likelihood of default, which would impair the value of our common stock. In addition, our Investment Advisor receives the incentive fee based, in part, upon net capital gains realized on our investments. Unlike that portion of the incentive fee based on income, there is no hurdle rate applicable to the portion of the incentive fee based on net capital gains. As a result, the Investment Advisor may have a tendency to invest more capital in investments that are likely to result in capital gains as compared to income-producing securities. Such a practice could result in our investing in more speculative securities than would otherwise be the case, which could result in higher investment losses, particularly during economic downturns.

Although we currently do not anticipate doing so, we may invest, to the extent permitted by law, in the securities and instruments of other investment companies, including private funds, and, to the extent we so invest, will bear our ratable share of any such investment company's expenses, including management and performance fees. We also remain obligated to pay management and incentive fees to our Investment Advisor with respect to the assets invested in the securities and instruments of other investment companies. With respect to each of these investments, each of our stockholders will bear his or her share of the management and our Investment Advisor's incentive fee as well as indirectly bearing the management and performance fees and other expenses of any investment companies in which we invest.

***Capitala Investment Advisors' liability is limited under the Investment Advisory Agreement, and we have agreed to indemnify Capitala Investment Advisors against certain liabilities, which may lead Capitala Investment Advisors to act in a riskier manner on our behalf than it would when acting for its own account.***

Under the Investment Advisory Agreement, the Investment Advisor has not assumed any responsibility to us other than to render the services called for under that agreement. It is not responsible for any action of our Board in following or declining to follow the Investment Advisor's advice or recommendations. Under the Investment Advisory Agreement, the Investment Advisor, its officers, members and personnel, and any person controlling or controlled by the Investment Advisor are not liable to us, any subsidiary of ours, our directors, our stockholders or any subsidiary's stockholders or partners

34

for acts or omissions performed in accordance with and pursuant to the Investment Advisory Agreement, except those resulting from acts constituting gross negligence, willful misfeasance, bad faith or reckless disregard of the duties that the Investment Advisor owes to us under the Investment Advisory Agreement. In addition, as part of the Investment Advisory Agreement, we have agreed to indemnify the Investment Advisor and each of its officers, directors, members, managers and employees from and against any claims or liabilities, including reasonable legal fees and other expenses reasonably incurred, arising out of or in connection with our business and operations or any action taken or omitted on our behalf pursuant to authority granted by the Investment Advisory Agreement, except where attributable to gross negligence, willful misfeasance, bad faith or reckless disregard of such person's duties under the Investment Advisory Agreement. These protections may lead the Investment Advisor to act in a riskier manner when acting on our behalf than it would when acting for its own account.

***A general increase in interest rates will likely have the effect of making it easier for our Investment Advisor to receive incentive fees, without necessarily resulting in an increase in our net earnings.***

Under the structure of our Investment Advisory Agreement with our Investment Advisor, any general increase in interest rates will likely have the effect of making it easier for our Investment Advisor to meet the quarterly hurdle rate for payment of income incentive fees under the Investment Advisory Agreement without any additional increase in relative performance on the part of our Investment Advisor. In addition, in view of the catch-up provision applicable to income incentive fees under the Investment Advisory Agreement, our Investment Advisor could potentially receive a significant portion of the increase in our investment income attributable to such a general increase in interest rates. If that were to occur, our increase in net earnings, if any, would likely be significantly smaller than the relative increase in our Investment Advisor's income incentive fee resulting from such a general increase in interest rates.

***PIK interest payments we receive will increase our assets under management and, as a result, will increase the amount of base management fees and incentive fees payable by us to Capitala Investment Advisors.***

Certain of our debt investments contain provisions providing for the payment of contractual PIK interest. Because PIK interest results in an increase in the size of the loan balance of the underlying loan, the receipt by us of PIK interest will have the effect of increasing our assets under management. As a result, because the base management fee that we pay to the Investment Advisor is based on the value of our gross assets, the receipt by us of PIK interest will result in an increase in the amount of the base management fee payable by us. In addition, any such increase in a loan balance due to the receipt of PIK interest will cause such loan to accrue interest on the higher loan balance, which will result in an increase in our pre-incentive fee net investment income and, as a result, an increase in incentive fees that are payable by us to the Investment Advisor.

***Capitala Investment Advisors has the right to resign on 60 days' notice, and we may not be able to find a suitable replacement within such time, resulting in a disruption in our operations that could adversely affect our financial condition, business and results of operations.***

Our Investment Advisor has the right, under the Investment Advisory Agreement, to resign at any time on 60 days' written notice, whether we have found a replacement or not. If our Investment Advisor resigns, we may not be able to find a new investment adviser or hire internal management with similar expertise and ability to provide the same or equivalent services on acceptable terms within 60 days, or at all. If we are unable to do so quickly, our operations are likely to experience a disruption, our financial condition, business and results of operations as well as our ability to pay distributions are likely to be adversely affected and the market price of our shares may decline. In addition, the coordination of our internal management and investment activities is likely to suffer if we are unable to identify and reach an agreement with a single institution or group of executives having the expertise possessed by our Investment Advisor and its affiliates. Even if we are able to retain comparable management, whether internal or external, the integration of such management and their lack of familiarity with our investment objective may result in additional costs and time delays that may adversely affect our financial condition, business and results of operations.

TABLE OF CONTENTS

***Capitala Investment Advisors may not be able to achieve the same or similar returns as those achieved for other funds it currently manages or by its investment team while they were employed at prior positions.***

The Investment Advisor manages other funds and may manage other entities in the future. The track record and achievements of these other entities are not necessarily indicative of future results that will be achieved by the Investment Advisor because these other entities may have investment objectives and strategies that differ from ours. Additionally, although in the past Mr. Alala and other members of our Investment Advisor's investment team have held senior positions at a number of investment firms, including the Legacy Funds, their track record and achievements are not necessarily indicative of future results that will be achieved by our Investment Advisor. We cannot assure you that we will be able to achieve the results realized by prior vehicles managed by our Investment Advisor's investment team, including the Legacy Funds.

***Any failure on our part to maintain our status as a BDC would reduce our operating flexibility.***

We have elected to be regulated as a BDC under the 1940 Act. The 1940 Act imposes numerous constraints on the operations of BDCs. For example, BDCs are required to invest at least 70% of their gross assets in specified types of securities, primarily in private companies or thinly traded U.S. public companies, cash, cash equivalents, U.S. government securities and other high quality debt investments that mature in one year or less. Furthermore, any failure to comply with the requirements imposed on BDCs by the 1940 Act could cause the SEC to bring an enforcement action against us and/or expose us to claims of private litigants. In addition, upon approval of a majority of our stockholders, we may elect to withdraw our status as a BDC. If we decide to withdraw our election, or if we otherwise fail to qualify, or maintain our qualification, as a BDC, we may be subject to the substantially greater regulation under the 1940 Act as a closed-end investment company. Compliance with such regulations would significantly decrease our operating flexibility and could significantly increase our costs of doing business.

***Regulations governing our operation as a BDC affect our ability to raise additional capital and the way in which we do so. As a BDC, the necessity of raising additional capital may expose us to risks, including the typical risks associated with leverage.***

We may issue debt securities or preferred stock and/or borrow money from banks or other financial institutions, which we refer to collectively as "senior securities," up to the maximum amount permitted by the 1940 Act. Under the provisions of the 1940 Act, we are permitted, as a BDC, to issue senior securities in amounts such that our asset coverage ratio, as defined in the 1940 Act, equals at least 200% (or 150%, if certain conditions are met, after November 1, 2019), of gross assets less all liabilities and indebtedness not represented by senior securities, after each issuance of senior securities. If the value of our assets declines, we may be unable to satisfy this test. If that happens, we may be required to sell a portion of our investments and, depending on the nature of our leverage, repay a portion of our indebtedness at a time when such sales may be disadvantageous. Also, any amounts that we use to service our indebtedness would not be available for distributions to our common stockholders. Furthermore, as a result of issuing senior securities, we would also be exposed to typical risks associated with leverage, including an increased risk of loss.

As of December 31, 2018, we had $165.7 million of outstanding SBA-guaranteed debentures, $75.0 million of 6.0% fixed rate notes due May 31, 2022 (the "2022 Notes") outstanding, $52.1 million of 5.75% fixed rate convertible notes due May 31, 2022 (the "2022 Convertible Notes") outstanding, and $10.0 million outstanding under the Credit Facility that provides for borrowings of up to $114.5 million on a revolving basis and may be increased up to $200.0 million pursuant to its "accordion" feature. We have received an exemptive order from the SEC granting relief from the asset coverage requirements for certain indebtedness issued by Fund II and Fund III as SBICs. If we issue preferred stock, the preferred stock would rank "senior" to common stock in our capital structure, preferred stockholders would have separate voting rights on certain matters and might have other rights, preferences, or privileges more favorable than those of our common stockholders, and the issuance of preferred stock could have the effect of delaying, deferring or preventing a transaction or a change of control that might involve a premium price for holders of our common stock or otherwise be in your best interest.

36

We generally may not issue and sell our common stock at a price below net asset value per share. We may, however, sell our common stock, or warrants, options or rights to acquire our common stock, at a price below the then-current net asset value per share of our common stock if our Board determines that such sale is in our best interests and in the best interests of our stockholders, and our stockholders approve such sale. In any such case, the price at which our securities are to be issued and sold may not be less than a price that, in the determination of our Board, closely approximates the market value of such securities (less any commission or discount). If we raise additional funds by issuing more common stock or senior securities convertible into, or exchangeable for, our common stock, then the percentage ownership of our stockholders at that time will decrease, and you may experience dilution.

At our 2019 Annual Stockholders Meeting, subject to certain determinations required to be made by our Board, we will ask our stockholders to approve our ability to sell or otherwise issue shares of our common stock, not exceeding 25% of our then outstanding common stock immediately prior to each such offering, at a price below the then current net asset value per share during a period beginning on May 2, 2019 and expiring on the earlier of the one year anniversary of the date of the 2019 Annual Stockholders Meeting and the date of our 2020 Annual Stockholders Meeting, which is expected to be held in April 2020.

In certain limited circumstances, pursuant to an SEC staff interpretation, we may also issue shares at a price below net asset value in connection with a transferable rights offering so long as: (1) the offer does not discriminate among stockholders; (2) we use our best efforts to ensure an adequate trading market exists for the rights; and (3) the ratio of the offering does not exceed one new share for each three rights held. If we raise additional funds by issuing more common stock or senior securities convertible into, or exchangeable for, our common stock, the percentage ownership of our stockholders at that time would decrease and they may experience dilution. Moreover, we can offer no assurance that we will be able to issue and sell additional equity securities in the future, on favorable terms or at all.

***We borrow money, which magnifies the potential for gain or loss on amounts invested and may increase the risk of investing in us, and the calculation of our base management fee, which is based upon our gross assets, may have the effect of encouraging our Investment Advisor to utilize leverage when it may not be advisable to do so.***

The use of leverage magnifies the potential for gain or loss on amounts invested and, therefore, increases the risks associated with investing in our securities. In addition to the existing SBA-guaranteed debentures, the 2022 Notes, the 2022 Convertible Notes and the Credit Facility, we may borrow from and issue senior debt securities to banks, insurance companies and other lenders in the future. Holders of these senior securities will have fixed dollar claims on our assets that are superior to the claims of our common stockholders, and we would expect such lenders to seek recovery against our assets in the event of a default. If the value of our assets decreases, leverage would cause net asset value to decline more sharply than it otherwise would have had we not been leveraged. Similarly, any decrease in our income would cause net income to decline more sharply than it would have had we not borrowed. Such a decline could also negatively affect our ability to make distributions on our common stock. Leverage is generally considered a speculative investment technique. Our ability to service any debt that we incur will depend largely on our financial performance and will be subject to prevailing economic conditions and competitive pressures. Moreover, as the management fee payable to our Investment Advisor will be payable based on our gross assets, including those assets acquired through the use of leverage, our Investment Advisor will have a financial incentive to incur leverage that may not be consistent with our stockholders' interests. In addition, our common stockholders will bear the burden of any increase in our expenses as a result of leverage, including any increase in the management fee payable to our Investment Advisor.

The Credit Facility, and any other credit facility into which we may enter, imposes financial and operating covenants that restrict our business activities, including limitations that could hinder our ability to finance additional loans and investments or to make the distributions required to maintain our tax treatment as a RIC under the Code. Even though our Board has approved a resolution permitting the Company to be subject to a 150% asset coverage ratio to be effective on November 1, 2019, contractual leverage limitations under our existing Credit Facility or future borrowings may limit our ability to incur additional indebtedness.

37

***To the extent we borrow money to finance our investments, changes in interest rates will affect our cost of capital and net investment income.***

To the extent we borrow money to finance our investments, our net investment income will depend, in part, upon the difference between the rate at which we borrow funds and the rate at which we invest those funds. As a result, we can offer no assurance that a significant change in market interest rates will not have a material adverse effect on our net investment income in the event we borrow money to finance our investments. In periods of rising interest rates, our cost of funds would increase, which could reduce our net investment income. We expect that our long-term fixed-rate investments will be financed primarily with equity and long-term debt. We may use interest rate risk management techniques in an effort to limit our exposure to interest rate fluctuations. Such techniques may include various interest rate hedging activities to the extent permitted by the 1940 Act. Our Investment Advisor does not have significant experience with utilizing these techniques and did not implement these techniques to any significant extent with our portfolio. If we do not implement these techniques properly, we could experience losses on our hedging positions, which could be material.

***A disruption in the capital markets and the credit markets could impair our ability to raise capital and negatively affect our business.***

As a BDC, we have to maintain our ability to raise additional capital for investment purposes. Without sufficient access to the capital markets or credit markets, we may be forced to curtail our business operations, or we may not be able to pursue new business opportunities.

In the past, the capital markets and the credit markets have experienced periods of extreme volatility and disruption and, accordingly, there has been and may continue to be uncertainty in the financial markets in general. Continuing U.S. debt ceiling and budget deficit concerns, including automatic spending cuts stemming from sequestration, together with signs of deteriorating sovereign debt conditions in Europe, have increased the possibility of additional credit-rating downgrades and economic slowdowns, or a recession in the U.S. The impact of this or any further downgrades to the U.S. government's sovereign credit rating or its perceived creditworthiness could adversely affect the U.S. and global financial markets and economic conditions. These developments, along with the European sovereign debt crisis, could cause interest rates and borrowing costs to rise, which may negatively impact our ability to access the debt markets on favorable terms. Continued adverse economic conditions could have a material adverse effect on our business, financial condition and results of operations. Any further disruptive conditions in the financial industry and the impact of new legislation in response to those conditions could restrict our business operations and could adversely impact our results of operations and financial condition.

If the fair value of our assets declines substantially, we may fail to maintain the asset coverage ratios imposed upon us by the 1940 Act. Any such failure would affect our ability to issue senior securities, including borrowings, and pay dividends, which could materially impair our business operations. Our liquidity could be impaired further by an inability to access the capital markets or to consummate new borrowing facilities to provide capital for normal operations, including new originations. In recent years, reflecting concern about the stability of the financial markets, many lenders and institutional investors have reduced or ceased providing funding to borrowers.

We have fully drawn on our SBA-guaranteed debentures and, absent changes to legislation or regulation, may not make borrowings in excess of their aggregate $165.7 million of SBA-guaranteed debentures outstanding as of December 31, 2018. We also had approximately $75.0 million and $52.1 million, respectively, of the 2022 Notes and 2022 Convertible Notes outstanding as of December 31, 2018. In addition, as of December 31, 2018, we had approximately $10.0 million outstanding under the Credit Facility that provides for borrowings of up to $114.5 million on a revolving basis and may be increased up to $200.0 million pursuant to its "accordion" feature. If we are unable to secure additional debt financing on commercially reasonable terms, our liquidity could be reduced significantly. If we are unable to repay amounts outstanding under any debt facilities we may obtain and are declared in default or are unable to renew or refinance these facilities, we may not be able to operate our business in the normal course. These situations may arise due to circumstances that we may be unable to control, such as lack of access to the credit markets, a severe decline in the value of the U.S. dollar, another economic downturn or an operational problem that affects third parties or us and could materially damage our business.

38

You should also be aware that a rise in the general level of interest rates can be expected to lead to higher interest rates applicable to our debt investments. Accordingly, an increase in interest rates would make it easier for us to meet or exceed the incentive fee hurdle rate and may result in a substantial increase of the amount of incentive fees payable to our Investment Advisor with respect to our pre-incentive fee net investment income.

***Global economic, political and market conditions may adversely affect our business, results of operations and financial condition, including our revenue growth and profitability.***

The current worldwide financial market situation, as well as various social and political tensions in the United States and around the world, may contribute to increased market volatility, may have long-term effects on the United States and worldwide financial markets, and may cause economic uncertainties or deterioration in the United States and worldwide. The U.S. and global capital markets experienced extreme volatility and disruption during the economic downturn that began in mid-2007, and the U.S. economy was in a recession for several consecutive calendar quarters during the same period. In 2010, a financial crisis emerged in Europe, triggered by high budget deficits and rising direct and contingent sovereign debt, which created concerns about the ability of certain nations to continue to service their sovereign debt obligations. Risks resulting from such debt crisis and any future debt crisis in Europe or any similar crisis elsewhere could have a detrimental impact on the global economic recovery, sovereign and non-sovereign debt in certain countries and the financial condition of financial institutions generally. In June 2016, the United Kingdom held a referendum in which voters approved an exit from the European Union ("Brexit") and, accordingly, on February 1, 2017, the U.K. Parliament voted in favor of allowing the U.K. government to begin the formal process of Brexit. The initial negotiations on Brexit commenced in June 2017. Brexit created political and economic uncertainty and instability in the global markets (including currency and credit markets), and especially in the United Kingdom and the European Union, and this uncertainty and instability may last indefinitely. Because the U.K. Parliament rejected Prime Minister Theresa May's proposed Brexit deal with the European Union in January 2019, there is increased uncertainty on the outcome of Brexit. There is continued concern about national-level support for the Euro and the accompanying coordination of fiscal and wage policy among European Economic and Monetary Union member countries. In addition, the fiscal policy of foreign nations, such as Russia and China, may have a severe impact on the worldwide and U.S. financial markets.

The Republican Party currently controls the executive branch and the Senate portion of the legislative branch of government, which increases the likelihood that legislation may be adopted that could significantly affect the regulation of U.S. financial markets. Areas subject to potential change, amendment or repeal include the Dodd-Frank Act and the authority of the Federal Reserve and the Financial Stability Oversight Council. For example, in March 2018, the U.S. Senate passed a bill that eased financial regulations and reduced oversight for certain entities. The United States may also potentially withdraw from or renegotiate various trade agreements and take other actions that would change current trade policies of the United States We cannot predict which, if any, of these actions will be taken or, if taken, their effect on the financial stability of the United States. Such actions could have a significant adverse effect on our business, financial condition and results of operations. We cannot predict the effects of these or similar events in the future on the U.S. economy and securities markets or on our investments. We monitor developments and seek to manage our investments in a manner consistent with achieving our investment objective, but there can be no assurance that we will be successful in doing so.

***Further downgrades of the U.S. credit rating, impending automatic spending cuts, another government shutdown or a failure to raise the statutory debt limit of the United States could negatively impact our liquidity, financial condition and earnings.***

Recent U.S. debt ceiling and budget deficit concerns have increased the possibility of additional credit-rating downgrades and economic slowdowns, or a recession in the U.S. In the future, the U.S. government may not be able to meet its debt payments unless the federal debt ceiling is raised. If legislation increasing the debt ceiling is not enacted, as needed, and the debt ceiling is reached, the U.S. federal government may stop or delay making payments on its obligations, which could negatively impact the U.S. economy and our portfolio companies. Any default by the U.S. government on its obligations or any prolonged U.S. government shutdown could negatively impact the U.S. economy and our

39

TABLE OF CONTENTS

portfolio companies. In addition, disagreement over the federal budget has caused the U.S. federal government to shut down for periods of time. Continued adverse political and economic conditions could have a material adverse effect on our business, financial condition and results of operations.

### *We may experience fluctuations in our quarterly and annual results.*

We may experience fluctuations in our quarterly and annual operating results due to a number of factors, including our ability or inability to make investments in companies that meet our investment criteria, any sales, dispositions or liquidity events of our portfolio companies, the interest rate payable on the debt securities we acquire, the level of portfolio dividend and fee income, the level of our expenses, variations in and the timing of the recognition of realized and unrealized gains or losses, the degree to which we encounter competition in our markets and general economic conditions. Given that the portfolio is concentrated, distributions, dispositions or liquidity events affecting a portfolio company in which we own a significant position may adversely affect our net asset value and results of operations. As a result of these factors, results for any period should not be relied upon as being indicative of performance in future periods.

### *Our Board may change our investment objective, operating policies and strategies without prior notice or stockholder approval, the effects of which may be adverse.*

Our Board has the authority to modify or waive our investment objective, operating policies, investment criteria and strategies without prior notice and without stockholder approval. We cannot predict the effect any changes to our current operating policies, investment criteria and strategies would have on our business, net asset value, operating results and value of our stock. However, the effects might be adverse, which could negatively impact our ability to make distributions and cause you to lose all or part of your investment.

### *We will be subject to corporate-level U.S. federal income tax if we are unable to qualify or maintain our RIC tax treatment under the Code.*

Although we have elected to be treated as a RIC beginning with our taxable year ended August 31, 2014, no assurance can be given that we will be able to continue to qualify for and maintain our RIC tax treatment under the Code. To continue to maintain our RIC tax treatment under the Code, we must meet the following source-of-asset diversification, and distribution requirements.

The income source requirement will be satisfied if we obtain at least 90% of our income for each year from dividends, interest, gains from the sale or other disposition of stock or securities or similar sources. The asset diversification requirement will be satisfied if we meet certain asset diversification requirements at the end of each quarter of our taxable year. Failure to meet those requirements may result in our having to dispose of certain investments quickly in order to prevent the loss of our RIC tax treatment under the Code. Because most of our investments will be in private companies, and therefore will be relatively illiquid, any such dispositions could be made at disadvantageous prices and could result in substantial losses.

The annual distribution requirement for a RIC will be satisfied if we distribute to our stockholders on an annual basis at least 90% of our net ordinary income and net short-term capital gains in excess of our net long-term capital losses, if any. Because we may use debt financing, we are subject to certain asset coverage ratio requirements under the 1940 Act, as well as future financial covenants under loan and credit agreements that could, under certain circumstances, restrict us from making distributions necessary to satisfy the distribution requirement. If we are unable to obtain cash from other sources, we could fail to qualify for tax treatment as a RIC under the Code.

If we fail to qualify for tax treatment as a RIC under the Code for any reason and remain or become subject to corporate-level U.S. federal income tax on all of our income, the resulting corporate taxes could substantially reduce our net assets, the amount of income available for distribution or reinvestment and the amount of our distributions.

40

*We cannot predict how tax reform legislation will affect us, our investments, or our stockholders, and any such legislation could adversely affect our business.*

Legislative or other actions relating to taxes could have a negative effect on us. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the U.S. Treasury Department. We cannot predict with certainty how any changes in the tax laws might affect us, our stockholders, or our portfolio investments. New legislation and any U.S. Treasury regulations, administrative interpretations or court decisions interpreting such legislation could significantly and negatively affect our ability to qualify for tax treatment as a RIC or the U.S. federal income tax consequences to us and our stockholders of such qualification or could have other adverse consequences. Stockholders are urged to consult with their tax advisor regarding tax legislative, regulatory, or administrative developments and proposals and their potential effect on an investment in our securities.

*We may not be able to pay our stockholders distributions, our distributions may not grow over time and a portion of our distributions may be a return of capital.*

We intend to pay distributions to our stockholders out of assets legally available for distribution. We cannot assure you that we will achieve investment results that will allow us to make a specified level of cash distributions or year-to-year increases in cash distributions. Our ability to pay distributions might be adversely affected by, among other things, the impact of one or more of the risk factors described herein. In addition, the inability to satisfy the asset coverage test applicable to us as a BDC can limit our ability to pay distributions. All distributions will be paid at the discretion of our Board and will depend on our earnings, our financial condition, maintenance of our RIC status, compliance with applicable BDC regulations and such other factors as our Board may deem relevant from time to time. We cannot assure you that we will pay distributions to our stockholders in the future. In the event we liquidate or dispose of a significant equity position in our portfolio, we may distribute a special dividend relating to the realized capital gains from such investment in order to minimize to the greatest extent possible our U.S. federal income or excise tax liability.

When we make distributions, we will be required to determine the extent to which such distributions are paid out of current or accumulated earnings and profits. Distributions in excess of current and accumulated earnings and profits will be treated as a non-taxable return of capital, which is a return of a portion of a stockholder's original investment in our common stock, to the extent of an investor's basis in our stock and, assuming that an investor holds our stock as a capital asset, thereafter as a capital gain. Generally, a non-taxable return of capital will reduce an investor's basis in our stock for U.S. federal income tax purposes, which will result in higher tax liability when the stock is sold.

*We may have difficulty paying our required distributions if we recognize income before or without receiving cash representing such income.*

For U.S. federal income tax purposes, we include in our taxable income certain amounts that we have not yet received in cash, such as PIK interest or original issue discount, which may arise if we receive warrants in connection with the origination of a loan or possibly in other circumstances. Such original issue discount or increases in loan balances as a result of contractual PIK arrangements are included in our taxable income before we receive any corresponding cash payments. We also may be required to include in our taxable income certain other amounts that we will not receive in cash.

Since, in certain cases, we may recognize taxable income before or without receiving corresponding cash payments, we may have difficulty meeting the annual distribution requirement necessary to maintain our RIC tax treatment under the Code. Accordingly, to satisfy our RIC distribution requirements, we may have to sell some of our investments at times and/or at prices we would not consider advantageous, raise additional debt or equity capital or forgo new investment opportunities. If we are not able to obtain cash from other sources, we may fail to qualify as a RIC for tax treatment under the Code and thus become subject to corporate-level U.S. federal income tax.

41

***Capitala Investment Advisors is not obligated to reimburse us for any part of the incentive fee it receives that is based on accrued income that we never receive.***

Part of the incentive fee payable by us to our Investment Advisor that relates to our net investment income is computed and paid on income that may include interest that has been accrued but not yet received in cash, such as market discount, debt instruments with PIK interest, preferred stock with PIK dividends and zero coupon securities. If a portfolio company defaults on a loan that is structured to provide accrued interest, it is possible that accrued interest previously used in the calculation of the incentive fee will become uncollectible. Our Investment Advisor will not be under any obligation to reimburse us for any part of the incentive fees it received that was based on accrued income that we never receive as a result of a default by an entity on the obligation that resulted in the accrual of such income.

***We may in the future choose to pay dividends in our own stock, in which case you may be required to pay tax in excess of the cash you receive.***

We may distribute taxable dividends that are payable in part in our stock. In accordance with certain applicable Treasury regulations and guidance issued by the IRS, a RIC may treat a distribution of its own stock as fulfilling the RIC distribution requirements if each stockholder may elect to receive his or her entire distribution in either cash or stock of the RIC, subject to a limitation that the aggregate amount of cash to be distributed to all stockholders must be at least 20% of the aggregate declared distribution. If too many stockholders elect to receive cash, the cash available for distribution must be allocated among the stockholders electing to receive cash (with the balance of the distribution paid in stock). In no event will any stockholder, electing to receive cash, receive the lesser of (a) the portion of the distribution such stockholder has elected to receive in cash or (b) an amount equal to his or her entire distribution times the percentage limitation on cash available for distribution. If these and certain other requirements are met, for U.S. federal income tax purposes, the amount of the dividend paid in stock will be equal to the amount of cash that could have been received instead of stock. Taxable stockholders receiving such dividends (whether received in cash, our stock, or a combination thereof) will be required to include the full amount of the dividend as ordinary income (or as long-term capital gain to the extent such distribution is properly reported as a capital gain dividend) to the extent of our current and accumulated earnings and profits for U.S. federal income tax purposes. As a result, a U.S. stockholder may be required to pay tax with respect to such dividends in excess of any cash received. If a U.S. stockholder sells the stock it receives as a dividend in order to pay this tax, the sales proceeds may be less than the amount included in income with respect to the dividend, depending on the market price of our stock at the time of the sale. Furthermore, with respect to non-U.S. stockholders, we may be required to withhold U.S. tax with respect to such dividends, including in respect of all or a portion of such dividend that is payable in stock. In addition, if a significant number of our stockholders determine to sell shares of our stock in order to pay taxes owed on dividends, it may put downward pressure on the trading price of our stock.

***If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results or prevent fraud. As a result, stockholders and noteholders could lose confidence in our financial and other public reporting, which would harm our business.***

Effective internal controls over financial reporting are necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud. Any failure to implement required new or improved controls, or difficulties encountered in their implementation could cause us to fail to meet our reporting obligations. In addition, any testing by us conducted in connection with Section 404 of the Sarbanes-Oxley Act, or the subsequent testing by our independent registered public accounting firm (when undertaken, as noted below), may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses or that may require prospective or retroactive changes to our consolidated financial statements or identify other areas for further attention or improvement. Inferior internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on our business.

We are required to disclose changes made in our internal controls and procedures over financial reporting on a quarterly basis and our management is required to assess the effectiveness of these controls annually. Our independent registered public accounting firm is required to attest to the effectiveness of our internal controls over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act.

An independent assessment of the effectiveness of our internal controls could detect problems that our management's assessment might not. Undetected material weaknesses in our internal controls could lead to financial statement restatements and require us to incur the expense of remediation. As a public company, may incur significant additional expenses in the near term, which may negatively impact our financial performance and our ability to make distributions to our stockholders. This process also will result in a diversion of management's time and attention. We cannot be certain as to the timing of completion of any evaluation, testing and remediation actions or the impact of the same on our operations, and we may not be able to ensure that the process is effective or that our internal controls over financial reporting are or will be effective in a timely manner. In the event that we are unable to maintain or achieve compliance with Section 404 of the Sarbanes-Oxley Act and related rules, the market price of our common stock may be adversely affected.

*Recent legislation may allow us to incur additional leverage.*

The 1940 Act generally prohibits us from incurring indebtedness unless immediately after such borrowing we have an asset coverage for total borrowings of at least 200% (i.e., the amount of debt may not exceed 50% of the value of our total assets). However, on March 23, 2018, the Small Business Credit Availability Act (the "SBCA") was signed into law, which included various changes to regulations under the federal securities laws that impact BDCs. The SBCA included changes to the 1940 Act to allow BDCs to decrease their asset coverage requirement from 200% to 150% (i.e. the amount of debt may not exceed 66.7% of the value of our total assets), if certain requirements are met. On November 1, 2018, the Board, including a "required majority" (as such term is defined in Section 57(o) of the 1940 Act) approved the application of the modified asset coverage requirements set forth in Section 61(a)(2) of the 1940 Act, as amended by the SBCA. As a result, our asset coverage requirements for senior securities will be changed from 200% to 150%, effective November 1, 2019. The Board may also recommend the submission of a proposal for stockholders to approve the application of the 150% minimum asset coverage ratio to the Company at an annual or special meeting of stockholders. The Board has not recommended the submission of any such proposal. If any such stockholder proposal is approved by the required votes of the Company's stockholders at such meeting of stockholders, the Company would become subject to the 150% minimum asset coverage ratio the day after such stockholder approval. Changing the asset coverage ratio would permit the Company to double its leverage, which would result in increased leverage risk and increased expenses.

*Changes in laws or regulations governing our operations may adversely affect our business or cause us to alter our business strategy.*

We and our portfolio companies will be subject to applicable local, state and federal laws and regulations. New legislation may be enacted, or new interpretations, rulings or regulations could be adopted, including those governing the types of investments we are permitted to make, any of which could harm us and our stockholders, potentially with retroactive effect. Additionally, any changes to the laws and regulations governing our operations relating to permitted investments may cause us to alter our investment strategy in order to avail ourselves of new or different opportunities. Such changes could result in material differences to the strategies and plans set forth herein and may result in our investment focus shifting from the areas of expertise of our Investment Advisor's investment team to other types of investments in which the investment team may have less expertise or little or no experience. Thus, any such changes, if they occur, could have a material adverse effect on our results of operations and the value of your investment. In addition, any change to the SBA's current debenture SBIC program could have a significant impact on our ability to obtain lower-cost financing and, therefore, our competitive advantage over other finance companies.

Over the last several years, there has been an increase in regulatory attention to the extension of credit outside of the traditional banking sector, raising the possibility that some portion of the non-bank financial sector will be subject to new regulation. While it cannot be known at this time whether these regulations will be implemented or what form they will take, increased regulation of non-bank credit extension could negatively impact our operations, cash flows or financial condition, impose additional costs on us, intensify the regulatory supervision of us or otherwise adversely affect our business.

TABLE OF CONTENTS

***Two of our wholly owned subsidiaries are licensed by the U.S. Small Business Administration, and as a result, we are subject to SBA regulations.***

Fund II and Fund III, became our wholly owned subsidiaries after the completion of the Formation Transactions. Fund II was licensed to act as an SBIC and was regulated by the SBA until March 1, 2019, when we prepaid all remaining SBIC debts related to Fund II and relinquished Fund II's license to act as an SBIC. Fund III is currently licensed to act as an SBIC and is regulated by the SBA. As of December 31, 2018, Fund II and Fund III portfolio companies accounted for 65.3% of the fair value of our aggregate portfolio. An SBIC license allows an SBIC to borrow funds by issuing SBA-guaranteed debentures, subject to the issuance of a capital commitment by the SBA and other customary procedures. The SBA regulations require, among other things, that a licensed SBIC be examined periodically and audited by an independent auditor to determine the SBIC's compliance with the relevant SBA regulations.

Under current SBA regulations, a licensed SBIC may provide capital to those entities that have a tangible net worth not exceeding $19.5 million and an average annual net income after U.S. federal income taxes not exceeding $6.5 million for the two most recent fiscal years. In addition, a licensed SBIC must devote 25.0% of its investment activity to those entities that have a tangible net worth not exceeding $6.0 million and an average annual net income after U.S. federal income taxes not exceeding $2.0 million for the two most recent fiscal years. The SBA regulations also provide alternative size standard criteria to determine eligibility, which depend on the industry in which the business is engaged and are based on factors such as the number of employees and gross sales. The SBA regulations permit licensed SBICs to make long term loans to small businesses, invest in the equity securities of such businesses and provide them with consulting and advisory services. The SBA also places certain limitations on the financing terms of investments by SBICs in portfolio companies and prohibits SBICs from providing funds for certain purposes or to businesses in a few prohibited industries. Compliance with SBA requirements may cause a Legacy Fund to forego attractive investment opportunities that are not permitted under SBA regulations.

The SBA also prohibits, without prior SBA approval, a "change of control" of an SBIC or transfers that would result in any person (or a group of persons acting in concert) owning 10.0% or more of a class of capital stock of a licensed SBIC. Each of Fund II and Fund III was in compliance with the terms of the SBA's leverage requirements as of December 31, 2018 as a result of having sufficient capital as defined under the SBA regulations. If, in the future, Fund III fails to comply with applicable SBA regulations, Fund III could, depending on the severity of the violation, limit or prohibit Fund III's use of debentures, declare outstanding debentures immediately due and payable, and/or limit Fund III from making new investments. Such actions by Fund III would, in turn, negatively affect us because Fund III is our wholly owned subsidiary.

On June 10, 2014, we received an exemptive order from the SEC exempting us, Fund II and Fund III from certain provisions of the 1940 Act (including an exemptive order granting relief from the asset coverage requirements for certain indebtedness issued by Fund II and Fund III as SBICs) and from certain reporting requirements mandated by the 1934 Act with respect to Fund II and Fund III. We intend to comply with the conditions of the order. As a result, we will generally be permitted to incur a greater amount of leverage relative to our total assets and net asset value, which may expose us to a greater degree of risk.

***Our wholly owned SBIC subsidiaries may be unable to make distributions to us that will enable us to meet or maintain RIC tax treatment, which could result in the imposition of a corporate-level U.S. federal income tax.***

In order for us to continue to qualify for RIC tax treatment under the Code and to minimize corporate-level U.S. federal income taxes, we will be required to distribute substantially all of our net ordinary income and net capital gain income, including income from certain of our subsidiaries, which includes the income from our SBIC subsidiaries. We will be partially dependent on our SBIC subsidiaries for cash distributions to enable us to meet the RIC distribution requirements. Our SBIC subsidiaries may be limited by the Small Business Investment Act of 1958, and SBA regulations governing SBICs, from making certain distributions to us that may be necessary to maintain our status as a RIC. We may have to request a waiver of the SBA's restrictions for our SBIC subsidiaries to make certain distributions to maintain our RIC status. We cannot assure you that the SBA will grant such waiver and if our SBIC subsidiaries are unable to obtain a waiver, compliance with the SBA regulations may result in loss of RIC tax treatment and a consequent imposition of a corporate-level U.S. federal income tax on all of our income.

44

***Our business is subject to increasingly complex corporate governance, public disclosure and accounting requirements that are costly and could adversely affect our business and financial results.***

As a publicly traded company, we incur legal, accounting and other expenses, including costs associated with the periodic reporting requirements applicable to a company whose securities are registered under the 1934 Act, or the Exchange Act, as well as additional corporate governance requirements, including requirements under the Sarbanes Oxley Act, and other rules implemented by the SEC. Also, we are subject to changing rules and regulations of federal and state government as well as the stock exchange on which our common stock is listed. These entities, including the Public Company Accounting Oversight Board, the SEC and the NASDAQ Stock Market, have issued a significant number of new and increasingly complex requirements and regulations over the course of the last several years and continue to develop additional regulations and requirements in response to laws enacted by Congress. Our efforts to comply with these existing requirements, or any revised or amended requirements, have resulted in, and are likely to continue to result in, an increase in expenses and a diversion of management's time from other business activities.

***We are highly dependent on information systems and systems failures could significantly disrupt our business, which may, in turn, negatively affect the market price of our common stock and our ability to make distributions to our stockholders.***

Our business is highly dependent on the communications and information systems of the Investment Advisor. Certain of these systems are provided to the Investment Advisor by third-party service providers. Any failure or interruption of such systems, including as a result of the termination of an agreement with any such third-party service provider, sudden electrical or telecommunications outages, natural disasters such as earthquakes, tornadoes, and hurricanes, events arising from local or larger scale political or social matters, including terrorist attacks, and cyber-attacks could cause delays or other problems in our activities. Any of the above, in turn, could have a material adverse effect on our operating results and negatively affect the market price of our common stock and our ability to make distributions to our stockholders.

***Internal and external cyber threats, as well as other disasters, could impair our ability to conduct business effectively.***

The occurrence of a disaster, such as a cyber-attack against us or against a third-party that has access to our data or networks, a natural catastrophe, an industrial accident, failure of our disaster recovery systems, or consequential employee error, could have an adverse effect on our ability to communicate or conduct business, negatively impacting our operations and financial condition. This adverse effect can become particularly acute if those events affect our electronic data processing, transmission, storage, and retrieval systems, or impact the availability, integrity, or confidentiality of our data.

We depend heavily upon computer systems to perform necessary business functions. Despite our implementation of a variety of security measures, our computer systems, networks, and data, like those of other companies, could be subject to cyber-attacks and unauthorized access, use, alteration, or destruction, such as from physical and electronic break-ins or unauthorized tampering. If one or more of these events occurs, it could potentially jeopardize the confidential, proprietary, and other information processed, stored in, and transmitted through our computer systems and networks. Such an attack could cause interruptions or malfunctions in our operations, which could result in financial losses, litigation, regulatory penalties, client dissatisfaction or loss, reputational damage, and increased costs associated with mitigation of damages and remediation. If unauthorized parties gain access to such information and technology systems, they may be able to steal, publish, delete or modify private and sensitive information, including nonpublic personal information related to stockholders (and their beneficial owners) and material nonpublic information. The systems we have implemented to manage risks relating to these types of events could prove to be inadequate and, if compromised, could become inoperable for extended periods of time, cease to function properly or fail to adequately secure private information. Breaches such as those involving covertly introduced malware, impersonation of authorized users and industrial or other espionage may not be identified even with sophisticated prevention and detection systems, potentially resulting in further harm and preventing them from being addressed appropriately. The failure of these systems or of disaster recovery plans for any reason could cause significant interruptions in our and our Investment Advisor's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to stockholders, material nonpublic information and other sensitive information in our possession.

45

A disaster or a disruption in the infrastructure that supports our business, including a disruption involving electronic communications or other services used by us or third parties with whom we conduct business, or directly affecting our headquarters, could have a material adverse impact on our ability to continue to operate our business without interruption. Our disaster recovery programs may not be sufficient to mitigate the harm that may result from such a disaster or disruption. In addition, insurance and other safeguards might only partially reimburse us for our losses, if at all.

Third parties with which we do business may also be sources of cybersecurity or other technological risk. We outsource certain functions and these relationships allow for the storage and processing of our information, as well as client, counterparty, employee, and borrower information. While we engage in actions to reduce our exposure resulting from outsourcing, ongoing threats may result in unauthorized access, loss, exposure, destruction, or other cybersecurity incident that affects our data, resulting in increased costs and other consequences as described above.

***Terrorist attacks, acts of war or natural disasters may affect the market for our common stock, impact the businesses in which we invest and harm our business, operating results and financial condition.***

Terrorist acts, acts of war or natural disasters may disrupt our operations, as well as the operations of the businesses in which we invest. Such acts have created, and continue to create, economic and political uncertainties and have contributed to global economic instability. Future terrorist activities, military or security operations, or natural disasters could further weaken the domestic/global economies and create additional uncertainties, which may negatively impact the businesses in which we invest directly or indirectly and, in turn, could have a material adverse impact on our business, operating results and financial condition. Losses from terrorist attacks and natural disasters are generally uninsurable.

***To the extent original issue discount and PIK interest constitute a portion of our income, we will be exposed to typical risks associated with such income being required to be included in taxable and accounting income prior to receipt of cash representing such income.***

Our investments may include original issue discount ("OID") instruments and contractual PIK interest, which represents contractual interest added to a loan balance and due at the end of such loan's term. To the extent OID or PIK interest constitute a portion of our income, we are exposed to typical risks associated with such income being required to be included in taxable and accounting income prior to receipt of cash, including the following:

- OID instruments may have higher yields, which reflect the payment deferral and credit risk associated with these instruments;

- OID accruals may create uncertainty about the source of our distributions to stockholders;

- OID and PIK instruments may have unreliable valuations because their continuing accruals require continuing judgments about the collectability of the deferred payments and the value of the collateral; and

- OID and PIK instruments may represent a higher credit risk than coupon loans.

***If we cannot obtain additional capital because of either regulatory or market price constraints, we could be forced to curtail or cease our new lending and investment activities, our net asset value could decrease and our level of distributions and liquidity could be affected adversely.***

Our ability to secure additional financing and satisfy our financial obligations under indebtedness outstanding from time to time will depend upon our future operating performance, which is subject to the prevailing general economic and credit market conditions, including interest rate levels and the availability of credit generally, and financial, business and other factors, many of which are beyond our control. The prolonged continuation or worsening of current economic and capital market conditions could have a material adverse effect on our ability to secure financing on favorable terms, if at all.

If we are unable to obtain additional debt capital, then our equity investors will not benefit from the potential for increased returns on equity resulting from leverage to the extent that our investment strategy is successful, and we may be limited in our ability to make new commitments or fundings to our portfolio companies.

46

TABLE OF CONTENTS

***Our Board is authorized to reclassify any unissued shares of common stock into one or more classes of preferred stock, which could convey special rights and privileges to its owners.***

Under Maryland General Corporation Law and our charter, our Board is authorized to classify and reclassify any authorized but unissued shares of stock into one or more classes of stock, including preferred stock. Prior to the issuance of shares of each class or series, our Board will be required by Maryland law and our charter to set the terms, preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications and terms or conditions of redemption for each class or series. Thus, our Board could authorize the issuance of shares of preferred stock with terms and conditions that could have the effect of delaying, deferring or preventing a transaction or a change in control that might involve a premium price for holders of our common stock or otherwise be in their best interest. The cost of any such reclassification would be borne by our common stockholders. Certain matters under the 1940 Act require the separate vote of the holders of any issued and outstanding preferred stock. For example, holders of preferred stock would vote separately from the holders of common stock on a proposal to cease operations as a BDC. In addition, the 1940 Act provides that holders of preferred stock are entitled to vote separately from holders of common stock to elect two preferred stock directors. We currently have no plans to issue preferred stock. The issuance of preferred shares convertible into shares of common stock may also reduce the net income and net asset value per share of our common stock upon conversion, provided, that we will only be permitted to issue such convertible preferred stock to the extent we comply with the requirements of Section 61 of the 1940 Act, including obtaining common stockholder approval. These effects, among others, could have an adverse effect on your investment in our common stock.

***Provisions of the Maryland General Corporation Law and of our charter and bylaws could deter takeover attempts and have an adverse impact on the price of our common stock.***

The Maryland General Corporation Law and our charter and bylaws contain provisions that may discourage, delay or make more difficult a change in control of Capitala Finance or the removal of our directors. We are subject to the Maryland Business Combination Act, subject to any applicable requirements of the 1940 Act. Our Board has adopted a resolution exempting from the Maryland Business Combination Act any business combination between us and any other person, subject to prior approval of such business combination by our Board, including approval by a majority of our independent directors. If the resolution exempting business combinations is repealed or our Board does not approve a business combination, the Maryland Business Combination Act may discourage third parties from trying to acquire control of us and increase the difficulty of consummating such an offer. Our bylaws exempt from the Maryland Control Share Acquisition Act acquisitions of our stock by any person. If we amend our bylaws to repeal the exemption from the Maryland Control Share Acquisition Act, the Maryland Control Share Acquisition Act also may make it more difficult for a third-party to obtain control of us and increase the difficulty of consummating such a transaction. It is the position of the staff of the SEC's Division of Investment Management that if a BDC fails to opt-out of the Maryland Control Share Acquisition Act, it acts in a manner inconsistent with Section 18(i) of the 1940 Act.

We have also adopted measures that may make it difficult for a third-party to obtain control of us, including provisions of our charter classifying our Board in three classes serving staggered three-year terms, and authorizing our Board to classify or reclassify shares of our stock in one or more classes or series, to cause the issuance of additional shares of our stock, to amend our charter without stockholder approval and to increase or decrease the number of shares of stock that we have authority to issue. These provisions, as well as other provisions of our charter and bylaws, may delay, defer or prevent a transaction or a change in control that might otherwise be in the best interests of our stockholders.

The foregoing provisions are expected to discourage certain coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of us to negotiate first with our Board. However, these provisions may deprive a stockholder of the opportunity to sell such stockholder's shares at a premium to a potential acquirer. We believe that the benefits of these provisions outweigh the potential disadvantages of discouraging any such acquisition proposals because, among other things, the negotiation of such proposals may improve their terms. Our Board has considered both the positive and negative effects of the foregoing provisions and determined that they are in the best interest of our stockholders.

47

**Risks Related to Our Investments**

*Our investments are very risky and highly speculative.*

We invest primarily in first lien loans, second lien loans, subordinated debt investments and select equity investments issued by leveraged companies, each of which carries with it a significant degree of risk.

*First Lien Loans.* There is a risk that the collateral securing our loans may decrease in value over time, may be difficult to sell in a timely manner, may be difficult to appraise and may fluctuate in value based upon the success of the business and market conditions, including as a result of the inability of the portfolio company to raise additional capital, and, in some circumstances, our lien could be subordinated to claims of other creditors. In addition, deterioration in a portfolio company's financial condition and prospects, including its inability to raise additional capital, may be accompanied by deterioration in the value of the collateral for the loan. Consequently, the fact that a loan is secured does not guarantee that we will receive principal and interest payments according to the loan's terms, or at all, or that we will be able to collect on the loan should we be forced to enforce our remedies.

*Second Lien Loans.* Our second lien debt investments have a second priority security interest in all or substantially all of the assets of the borrower. As such, other creditors may rank senior to us in the event of an insolvency, which could likely in many cases result in a substantial or complete loss on such investment in the case of such insolvency. This may result in an above average amount of risk and loss of principal.

*Subordinated Loans.* Our subordinated debt investments are generally subordinated to first lien loans and may be unsecured. As such, other creditors may rank senior to us in the event of an insolvency, which could likely in many cases result in a substantial or complete loss on such investment in the case of such insolvency. This may result in an above average amount of risk and loss of principal.

*Equity Investments.* When we invest in loans, we may acquire equity securities as well. In addition, we may invest directly in the equity securities of portfolio companies.

The equity interests we receive may not appreciate in value and, in fact, may decline in value. Accordingly, we may not be able to realize gains from our equity interests, and any gains that we do realize on the disposition of any equity interests may not be sufficient to offset any other losses we experience. The portfolio currently has several significant equity positions. Distributions, dispositions, or liquidity events of these investments may affect our results of operations and cause us to have to pay a special dividend relating to the realized gains from such investment in order to minimize to the greatest extent possible our U.S. federal income or excise tax liability.

In addition, investing in lower and traditional middle-market companies involves a number of significant risks, including:

• these companies may have limited financial resources and may be unable to meet their obligations under their debt securities that we hold, which may be accompanied by a deterioration in the value of any collateral and a reduction in the likelihood of us realizing any guarantees we may have obtained in connection with our investment;

• they typically have shorter operating histories, narrower product lines and smaller market shares than larger businesses, which tend to render them more vulnerable to competitors' actions and market conditions, as well as general economic downturns;

• they are more likely to depend on the management talents and efforts of a small group of persons; therefore, the death, disability, resignation or termination of one or more of these persons could have a material adverse impact on our portfolio company and, in turn, on us;

• they generally have less predictable operating results, may from time to time be parties to litigation, may be engaged in rapidly changing businesses with products subject to a substantial risk of obsolescence, and may require substantial additional capital to support their operations, finance expansion or maintain their competitive position;

• they may have difficulty accessing the capital markets to meet future capital needs, which may limit their ability to grow or to repay their outstanding indebtedness upon maturity; and

48

- our executive officers, directors and our Investment Advisor may, in the ordinary course of business, be named as defendants in litigation arising from our investments in the portfolio companies.

***An investment strategy focused primarily on smaller privately held companies involves a high degree of risk and presents certain challenges, including the lack of available information about these companies, a dependence on the talents and efforts of only a few key portfolio company personnel and a greater vulnerability to economic downturns.***

Our portfolio consists primarily of debt and equity investments in smaller privately owned venture capital-backed companies. Investing in venture capital-backed companies involves a number of significant risks. Typically, the debt in which we will invest is not initially rated by any rating agency; however, we believe that if such investments were rated, they would be rated below investment grade. Below investment grade securities, which are often referred to as "high yield" or "junk," have predominantly speculative characteristics with respect to the issuer's capacity to pay interest and repay principal. Compared to larger publicly owned companies, these venture capital-backed companies may be in a weaker financial position and experience wider variations in their operating results, which may make them more vulnerable to economic downturns. Typically, these companies need more capital to compete; however, their access to capital is limited and their cost of capital is often higher than that of their competitors. Our portfolio companies often face intense competition from larger companies with greater financial, technical and marketing resources and their success typically depends on the managerial talents and efforts of an individual or a small group of persons. Therefore, any loss of its key employees could affect a portfolio company's ability to compete effectively and harm its financial condition. Further, some of these companies conduct business in regulated industries that are susceptible to regulatory changes. These factors could impair the cash flow of our portfolio companies and result in other events, such as bankruptcy. These events could limit a portfolio company's ability to repay its obligations to us, which may have an adverse effect on the return on, or the recovery of, our investment in these businesses. Deterioration in a borrower's financial condition and prospects may be accompanied by deterioration in the value of the loan's collateral.

Generally, little public information exists about these companies, and we are required to rely on the ability of our Investment Advisor's investment team to obtain adequate information to evaluate the potential returns from investing in these companies. If we are unable to uncover all material information about these companies, we may not make a fully informed investment decision, and we may lose money on our investments. Also, privately held companies frequently have less diverse product lines and smaller market presence than larger competitors. These factors could adversely affect our investment returns as compared to companies investing primarily in the securities of public companies.

***Many of our loans are not fully amortizing and if a borrower cannot repay or refinance such loans at maturity, our results will suffer.***

Most of the loans in which we invest are not structured to fully amortize during their lifetime. Accordingly, a significant portion of the principal amount of such a loan may be due at maturity. As of December 31, 2018, all debt instruments in our portfolio, on a fair value basis, will not fully amortize prior to maturity. In order to create liquidity to pay the final principal payment, borrowers typically must raise additional capital. If they are unable to raise sufficient funds to repay us or we have not elected to enter into a new loan agreement providing for an extended maturity, the loan will go into default, which will require us to foreclose on the borrower's assets, even if the loan was otherwise performing prior to maturity. This will deprive Capitala Finance from immediately obtaining full recovery on the loan and prevent or delay the reinvestment of the loan proceeds in other, more profitable investments.

***Our investments in leveraged portfolio companies may be risky, and you could lose all or part of your investment.***

Investment in leveraged companies involves a number of significant risks. Leveraged companies in which we invest may have limited financial resources and may be unable to meet their obligations under their loans and debt securities that we hold. Such developments may be accompanied by a deterioration in the value of any collateral and a reduction in the likelihood of our realizing any guarantees that we may

49

have obtained in connection with our investment. Smaller leveraged companies also may have less predictable operating results and may require substantial additional capital to support their operations, finance their expansion or maintain their competitive position.

### Our portfolio companies may incur debt that ranks equally with, or senior to, our investments in such companies.

Our portfolio companies may have, or may be permitted to incur, other debt that ranks equally with, or in some cases senior to, the debt in which we invest. By their terms, such debt instruments may entitle the holders to receive payment of interest or principal on or before the dates on which we are entitled to receive payments with respect to the debt instruments in which we invest. Also, in the event of insolvency, liquidation, dissolution, reorganization or bankruptcy of a portfolio company, holders of debt instruments ranking senior to our investment in that portfolio company would typically be entitled to receive payment in full before we receive any distribution. After repaying such senior creditors, such portfolio company may not have sufficient remaining assets to repay its obligation to us. In the case of debt ranking equally with debt instruments in which we invest, we would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant portfolio company.

### Second priority liens on collateral securing loans that we make to our portfolio companies may be subject to control by senior creditors with first priority liens. If there is a default, the value of the collateral may not be sufficient to repay in full both the first priority creditors and us.

Certain loans that we make are secured by a second priority security interest in the same collateral pledged by a portfolio company to secure senior debt owed by the portfolio company to commercial banks or other traditional lenders. Often the senior lender has procured covenants from the portfolio company prohibiting the incurrence of additional secured debt without the senior lender's consent. Prior to and as a condition of permitting the portfolio company to borrow money from us secured by the same collateral pledged to the senior lender, the senior lender may require assurances that it will control the disposition of any collateral in the event of bankruptcy or other default. In many such cases, the senior lender requires us to enter into an "intercreditor agreement" prior to permitting the portfolio company to borrow from us. Typically the intercreditor agreements we are requested to execute expressly subordinate our debt instruments to those held by the senior lender and further provide that the senior lender shall control: (i) the commencement of foreclosure or other proceedings to liquidate and collect on the collateral; (ii) the nature, timing and conduct of foreclosure or other collection proceedings; (iii) the amendment of any collateral document; (iv) the release of the security interests in respect of any collateral; and (v) the waiver of defaults under any security agreement. Because of the control we may cede to senior lenders under intercreditor agreements we may enter, we may be unable to realize the proceeds of any collateral securing some of our loans.

### If we make subordinated investments, the obligors or the portfolio companies may not generate sufficient cash flow to service their debt obligations to us.

We have made, and may make, subordinated investments that rank below other obligations of the obligor in right of payment. Subordinated investments are subject to greater risk of default than senior obligations as a result of adverse changes in the financial condition of the obligor or economic conditions in general. If we make a subordinated investment in a portfolio company, the portfolio company may be highly leveraged, and its relatively high debt-to-equity ratio may create increased risks that its operations might not generate sufficient cash flow to service all of its debt obligations.

### The disposition of our investments may result in contingent liabilities.

Substantially all of our investments involve loans and private securities. In connection with the disposition of an investment in loans and private securities, we may be required to make representations about the business and financial affairs of the portfolio company typical of those made in connection with the sale of a business. We may also be required to indemnify the purchasers of such investment to the extent that any such representations turn out to be inaccurate or with respect to potential liabilities. These arrangements may result in contingent liabilities that ultimately result in funding obligations that we must satisfy through our return of distributions previously made to us.

50

***There may be circumstances where our debt investments could be subordinated to claims of other creditors or we could be subject to lender liability claims.***

Even though we may have structured most of our investments as secured loans, if one of our portfolio companies were to go bankrupt, depending on the facts and circumstances, and based upon principles of equitable subordination as defined by existing case law, a bankruptcy court could subordinate all or a portion of our claim to that of other creditors and transfer any lien securing such subordinated claim to the bankruptcy estate. The principles of equitable subordination defined by case law have generally indicated that a claim may be subordinated only if its holder is guilty of misconduct or where the senior loan is re-characterized as an equity investment and the senior lender has actually provided significant managerial assistance to the bankrupt debtor. We may also be subject to lender liability claims for actions taken by us with respect to a borrower's business or instances where we exercise control over the borrower. It is possible that we could become subject to a lender's liability claim, including as a result of actions taken in rendering significant managerial assistance or actions to compel and collect payments from the borrower outside the ordinary course of business. Such risk of equitable subordination may be potentially heightened with respect to various portfolio investments that we may be deemed to control. See also "— Because we will not hold controlling equity interests in most of our portfolio companies, we may not be in a position to exercise control over our portfolio companies or to prevent decisions by management of our portfolio companies that could decrease the value of our investments."

***Economic recessions could impair our portfolio companies and harm our operating results.***

Certain of our portfolio companies may be susceptible to an economic downturn and may be unable to repay our loans during this period. Therefore, assets may become non-performing and the value of our portfolio may decrease during this period. The adverse economic conditions also may decrease the value of collateral securing some of our loans and the value of our equity investments. A recession could lead to financial losses in our portfolio and a decrease in our revenues, net income and the value of our assets.

Adverse economic conditions also may decrease the value of collateral securing some of our loans and the value of our equity investments at fair value. Unfavorable economic conditions also could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us. These events could prevent us from increasing investments and harm our operating results.

A portfolio company's failure to satisfy financial or operating covenants imposed by us or other lenders could lead to defaults and, potentially, acceleration of the time when the loans are due and foreclosure on its secured assets, which could trigger cross-defaults under other agreements and jeopardize the portfolio company's ability to meet its obligations under the debt that we hold. We may incur additional expenses to the extent necessary to seek recovery upon default or to negotiate new terms with a defaulting portfolio company. In addition, if one of our portfolio companies were to go bankrupt, depending on the facts and circumstances, including the extent to which we actually provided significant managerial assistance to that portfolio company, a bankruptcy court might re-characterize our debt holdings and subordinate all or a portion of our claim to that of other creditors.

These portfolio companies may face intense competition, including competition from companies with greater financial resources, more extensive research and development, manufacturing, marketing and service capabilities and greater number of qualified and experienced managerial and technical personnel. They may need additional financing which they are unable to secure and which we are unable or unwilling to provide, or they may be subject to adverse developments unrelated to the technologies they acquire.

***The health and performance of our portfolio companies could be adversely affected by political and economic conditions in the countries in which they conduct business.***

Some of the products of our portfolio companies are developed, manufactured, assembled, tested or marketed outside the U.S. Any conflict or uncertainty in these countries, including due to natural disasters, public health concerns, political unrest or safety concerns, could harm their business, financial condition and results of operations. In addition, if the government of any country in which their products are developed, manufactured or sold sets technical or regulatory standards for products developed or manufactured in or imported into their country that are not widely shared, it may lead some of their

51

customers to suspend imports of their products into that country, require manufacturers or developers in that country to manufacture or develop products with different technical or regulatory standards and disrupt cross-border manufacturing, marketing or business relationships which, in each case, could harm their businesses.

***The lack of liquidity in our investments may adversely affect our business.***

We generally invest in companies whose securities are not publicly traded, and whose securities will be subject to legal and other restrictions on resale or will otherwise be less liquid than publicly traded securities. There is no established trading market for the securities in which we invest. The illiquidity of these investments may make it difficult for us to sell these investments when desired. In addition, if we are required to liquidate all or a portion of our portfolio quickly, we may realize significantly less than the value at which we had previously recorded these investments. As a result, we do not expect to achieve liquidity in our investments in the near-term. Further, we may face other restrictions on our ability to liquidate an investment in a portfolio company to the extent that we have material non-public information regarding such portfolio company.

***Our failure to make follow-on investments in our portfolio companies could impair the value of our portfolio.***

Following an initial investment in a portfolio company, we may make additional investments in that portfolio company as "follow-on" investments, in order to: (i) increase or maintain in whole or in part our equity ownership percentage; (ii) exercise warrants, options *or* convertible securities that were acquired in the original or a subsequent financing; or (iii) attempt to preserve or enhance the value of our investment. We may elect not to make follow-on investments or otherwise lack sufficient funds to make those investments. We will have the discretion to make any follow-on investments, subject to the availability of capital resources. The failure to make follow-on investments may, in some circumstances, jeopardize the continued viability of a portfolio company and our initial investment, or may result in a missed opportunity for us to increase our participation in a successful operation. Even if we have sufficient capital to make a desired follow-on investment, we may elect not to make a follow-on investment because we do not want to increase our concentration of risk, we prefer other opportunities, we are subject to BDC requirements that would prevent such follow-on investments, or the follow-on investment would affect our qualification as a RIC. For example, we may be prohibited under the 1940 Act from making follow-on investments in our portfolio companies that we may be deemed to "control" or in which affiliates of our Investment Advisor are also invested.

***Our ability to enter into new transactions with our affiliates, and to restructure or exit our investments in portfolio companies that we are deemed to "control" under the 1940 Act, will be restricted by the 1940 Act, which may limit the scope of investment opportunities available to us.***

We are prohibited under the 1940 Act from participating in certain transactions with our affiliates without the prior approval of our independent directors and, in some cases, the Securities Exchange Commission ("SEC"). Any person that owns, directly or indirectly, 5% or more of our outstanding voting securities will be our affiliate for purposes of the 1940 Act and we are generally prohibited from buying or selling any security from or to such affiliate without the prior approval of our independent directors. The 1940 Act also prohibits certain "joint" transactions with certain of our affiliates, which could include concurrent investments in the same company, without prior approval of our independent directors and, in some cases, the SEC. We are prohibited from buying or selling any security from or to any person that controls us or who owns more than 25% of our voting securities or certain of that person's affiliates, or entering into prohibited joint transactions with such persons, absent the prior approval of the SEC. As a result of these restrictions, we may be prohibited from buying or selling any security (other than any security of which we are the issuer) from or to any company that is advised or managed by our Investment Advisor or its affiliates without the prior approval of the SEC, which may limit the scope of investment opportunities that would otherwise be available to us.

In the future, we may co-invest with investment funds, accounts and vehicles managed by our Investment Advisor or its affiliates when doing so is consistent with our investment strategy as well as applicable law and SEC staff interpretations. We generally will only be permitted to co-invest with such

52

investment funds, accounts and vehicles where the only term that is negotiated is price. On June 1, 2016, the SEC issued the Order. Subject to satisfaction of certain conditions to the Order, we and certain of our affiliates are now permitted, together with any future BDCs, registered closed-end funds and certain private funds, each of whose investment adviser is our investment adviser or an investment adviser controlling, controlled by, or under common control with our investment adviser, to co-invest in negotiated investment opportunities where doing so would otherwise be prohibited under the 1940 Act, providing our stockholders with access to a broader array of investment opportunities. Pursuant to the Order, we are permitted to co-invest in such investment opportunities with our affiliates if a "required majority" (as defined in Section 57(o) of the 1940 Act) of our independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to us and our stockholders and do not involve overreaching in respect of us or our stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of our stockholders and is consistent with our then-current investment objective and strategies.

In addition, within our portfolio there are investments that may be deemed to be "controlled" investments under the 1940 Act. To the extent that our investments in such portfolio companies need to be restructured or that we choose to exit these investments in the future, our ability to do so may be limited if such restructuring or exit also involves the affiliates of our Investment Advisor because such a transaction could be considered a joint transaction prohibited by the 1940 Act in the absence of our receipt of relief from the SEC in connection with such transaction. For example, if an affiliate of our Investment Advisor were required to approve a restructuring of an investment in the portfolio and the affiliate of our Investment Advisor was deemed to be our affiliate, such a restructuring transaction may constitute a prohibited joint transaction under the 1940 Act.

***Our portfolio may lack diversification among portfolio companies, which may subject us to a risk of significant loss if one or more of these companies defaults on its obligations under any of its debt instruments.***

Our portfolio may be concentrated in a limited number of portfolio companies. Beyond the asset diversification requirements associated with our RIC tax treatment under the Code, we do not have fixed guidelines for diversification, and our investments may be concentrated in relatively few companies. As our portfolio is less diversified than the portfolios of some larger funds, we are more susceptible to failure if a single loan fails. The disposition or liquidity of a significant investment may also adversely impact our net asset value and our results of operations. Similarly, the aggregate returns we realize may be significantly adversely affected if a small number of investments perform poorly or if we need to write down the value of any one investment.

***We are a non-diversified investment company within the meaning of the 1940 Act, and therefore we are not limited with respect to the proportion of our assets that may be invested in securities of a single issuer.***

We are classified as a non-diversified investment company within the meaning of the 1940 Act, which means that we are not limited by the 1940 Act with respect to the proportion of our assets that we may invest in securities of a single issuer. Beyond the asset diversification requirements associated with our RIC tax treatment under the Code, we do not have fixed guidelines for diversification. To the extent that we assume large positions in the securities of a small number of issuers or our investments are concentrated in relatively few industries, our net asset value may fluctuate to a greater extent than that of a diversified investment company as a result of changes in the financial condition or the market's assessment of the issuer. We may also be more susceptible to any single economic or regulatory occurrence than a diversified investment company.

***Our portfolio may be concentrated in a limited number of industries, which may subject us to a risk of significant loss if there is a downturn in a particular industry in which a number of our investments are concentrated.***

Our portfolio may be concentrated in a limited number of industries. A downturn in any particular industry in which we are invested could significantly impact the aggregate returns we realize. If an industry in which we have significant investments suffers from adverse business or economic conditions, as these industries have to varying degrees, a material portion of our investment portfolio could be affected adversely, which, in turn, could adversely affect our financial position and results of operations.

53

TABLE OF CONTENTS

***Because we will not hold controlling equity interests in most of our portfolio companies, we may not be in a position to exercise control over our portfolio companies or to prevent decisions by management of our portfolio companies that could decrease the value of our investments.***

We currently hold controlling equity positions in six portfolio companies. Although we may do so in the future, we expect that we will not hold controlling equity positions in most of our portfolio companies. If we do not hold a controlling equity position in a portfolio company, we are subject to the risk that the portfolio company may make business decisions with which we disagree, and that the management and/or stockholders of the portfolio company may take risks or otherwise act in ways that are adverse to our interests. Due to the lack of liquidity of the debt and equity investments that we typically hold in our portfolio companies, we may not be able to dispose of our investments in the event we disagree with the actions of a portfolio company and may therefore suffer a decrease in the value of our investments.

***Our equity ownership in a portfolio company may represent a control investment. Our ability to exit a control investment in a timely manner could result in a realized loss on the investment.***

We currently have, and may acquire in the future, control investments in portfolio companies. Our ability to divest ourselves from a debt or equity investment in a controlled portfolio company could be restricted due to illiquidity in a private stock, limited trading volume on a public company's stock, inside information on a company's performance, insider blackout periods, or other factors that could prohibit us from disposing of the investment as we would if it were not a control investment. Additionally, we may choose not to take certain actions to protect a debt investment in a control investment portfolio company. As a result, we could experience a decrease in the value of our portfolio company holdings and potentially incur a realized loss on the investment.

***If the assets securing the loans that we make decrease in value, then we may lack sufficient collateral to cover losses.***

To attempt to mitigate credit risks, we will typically take a security interest in the available assets of our portfolio companies. There is no assurance that we will obtain or properly perfect our liens.

There is a risk that the collateral securing our loans may decrease in value over time, may be difficult to sell in a timely manner, may be difficult to appraise and may fluctuate in value based upon the success of the business and market conditions, including as a result of the inability of a portfolio company to raise additional capital. In some circumstances, our lien could be subordinated to claims of other creditors. Consequently, the fact that a loan is secured does not guarantee that we will receive principal and interest payments according to the loan's terms, or that we will be able to collect on the loan should we be forced to enforce our remedies.

In addition, because we may invest in technology-related companies, a substantial portion of the assets securing our investment may be in the form of intellectual property, if any, inventory and equipment and, to a lesser extent, cash and accounts receivable. Intellectual property, if any, that is securing our loan could lose value if, among other things, the company's rights to the intellectual property are challenged or if the company's license to the intellectual property is revoked or expires, the technology fails to achieve its intended results or a new technology makes the intellectual property functionally obsolete. Inventory may not be adequate to secure our loan if our valuation of the inventory at the time that we made the loan was not accurate or if there is a reduction in the demand for the inventory.

Similarly, any equipment securing our loan may not provide us with the anticipated security if there are changes in technology or advances in new equipment that render the particular equipment obsolete or of limited value, or if the company fails to adequately maintain or repair the equipment. Any one or more of the preceding factors could materially impair our ability to recover principal in a foreclosure.

***Defaults by our portfolio companies will harm our operating results.***

A portfolio company's failure to satisfy financial or operating covenants imposed by us or other lenders could lead to defaults and, potentially, termination of its loans and foreclosure on its secured assets, which could trigger cross-defaults under other agreements and jeopardize our portfolio company's ability to meet its obligations under the debt securities that we hold. We may incur expenses to the extent necessary to

seek recovery upon default or to negotiate new terms with a defaulting portfolio company. Any extension or restructuring of our loans could adversely affect our cash flows. In addition, if one of our portfolio companies were to go bankrupt, even though we may have structured our interest as senior debt, depending on the facts and circumstances, including the extent to which we actually provided managerial assistance to that portfolio company, a bankruptcy court might recharacterize our debt holding and subordinate all or a portion of our claim to that of other creditors. If any of these occur, it could materially and adversely affect our operating results and cash flows.

***If our portfolio companies are unable to protect their proprietary, technological and other intellectual property rights, our business and prospects could be harmed, and if portfolio companies are required to devote significant resources to protecting their intellectual property rights, the value of our investment could be reduced.***

Our future success and competitive position will depend in part upon the ability of our portfolio companies to obtain, maintain and protect proprietary technology used in their products and services. The intellectual property held by our portfolio companies often represents a substantial portion of the collateral securing our investments and/or constitutes a significant portion of the portfolio companies' value that may be available in a downside scenario to repay our loans. Our portfolio companies will rely, in part, on patent, trade secret and trademark law to protect that technology, but competitors may misappropriate their intellectual property, and disputes as to ownership of intellectual property may arise. Portfolio companies may, from time to time, be required to institute litigation to enforce their patents, copyrights or other intellectual property rights, protect their trade secrets, determine the validity and scope of the proprietary rights of others or defend against claims of infringement. Such litigation could result in substantial costs and diversion of resources. Similarly, if a portfolio company is found to infringe or misappropriate a third-party's patent or other proprietary rights, it could be required to pay damages to the third-party, alter its products or processes, obtain a license from the third-party and/or cease activities utilizing the proprietary rights, including making or selling products utilizing the proprietary rights. Any of the foregoing events could negatively affect both the portfolio company's ability to service our debt investment and the value of any related debt and equity securities that we own, as well as any collateral securing our investment.

***Any unrealized depreciation we experience on our loan portfolio may be an indication of future realized losses, which could reduce our income available for distribution.***

As a BDC, we are required to carry our investments at market value or, if no market value is ascertainable, at the fair value as determined in good faith by our Board. Decreases in the market values or fair values of our investments will be recorded as unrealized depreciation. Any unrealized depreciation in our loan portfolio could be an indication of a portfolio company's inability to meet its repayment obligations to us with respect to the affected loans. This could result in realized losses in the future and ultimately in reductions of our income available for distribution in future periods.

***Prepayments of our debt investments by our portfolio companies could adversely impact our results of operations and reduce our return on equity.***

We are subject to the risk that the investments we make in our portfolio companies may be repaid prior to maturity. When this occurs, we will generally reinvest these proceeds in temporary investments or repay any revolving credit facility, depending on expected future investment in new portfolio companies. Temporary investments will typically have substantially lower yields than the debt being prepaid, and we could experience significant delays in reinvesting these amounts. Any future investment in a new portfolio company may also be at lower yields than the debt that was repaid. As a result, our results of operations could be materially adversely affected if one or more of our portfolio companies elect to prepay amounts owed to us. Additionally, prepayments could negatively impact our return on equity, which could result in a decline in the market price of our common stock.

***We may not realize gains from our equity investments.***

Certain investments that we may make include warrants or other equity securities. Investments in equity securities involve a number of significant risks, including the risk of further dilution as a result of additional issuances, inability to access additional capital and failure to pay current distributions.

Investments in preferred securities involve special risks, such as the risk of deferred distributions, credit risk, illiquidity and limited voting rights. In addition, we may from time to time make non-control, equity investments in portfolio companies. Our goal is ultimately to realize gains upon our disposition of such equity interests. However, the equity interests we receive may not appreciate in value and, in fact, may decline in value. Accordingly, we may not be able to realize gains from our equity interests, and any gains that we do realize on the disposition of any equity interests may not be sufficient to offset any other losses we experience. We also may be unable to realize any value if a portfolio company does not have a liquidity event, such as a sale of the business, recapitalization or public offering, which would allow us to sell the underlying equity interests. We will often seek puts or similar rights to give us the right to sell our equity securities back to the portfolio company issuer. We may be unable to exercise these put rights for the consideration provided in our investment documents if the issuer is in financial distress.

*We may expose ourselves to risks if we engage in hedging transactions.*

If we engage in hedging transactions, we may expose ourselves to risks associated with such transactions. We may utilize instruments such as forward contracts, currency options and interest rate swaps, caps, collars and floors to seek to hedge against fluctuations in the relative values of our portfolio positions from changes in currency exchange rates and market interest rates. Hedging against a decline in the values of our portfolio positions does not eliminate the possibility of fluctuations in the values of such positions or prevent losses if the values of such positions decline. However, such hedging can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of such portfolio positions. Such hedging transactions may also limit the opportunity for gain if the values of the underlying portfolio positions increase. It may not be possible to hedge against an exchange rate or interest rate fluctuation that is so generally anticipated that we are not able to enter into a hedging transaction at an acceptable price. Moreover, for a variety of reasons, we may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Any such imperfect correlation may prevent us from achieving the intended hedge and expose us to risk of loss. In addition, it may not be possible to hedge fully or perfectly against currency fluctuations affecting the value of securities denominated in non-U.S. currencies because the value of those securities is likely to fluctuate as a result of factors not related to currency fluctuations.

The SEC has proposed a new rule under the 1940 Act that would govern the use of derivatives (defined to include any swap, security-based swap, futures contract, forward contract, option or any similar instrument) as well as financial commitment transactions (defined to include reverse repurchase agreements, short sale borrowings and any firm or standby commitment agreement or similar agreement) by BDCs. Under the proposed rule, a BDC would be required to comply with one of two alternative portfolio limitations and manage the risks associated with derivatives transactions and financial commitment transactions by segregating certain assets. Furthermore, a BDC that engages in more than a limited amount of derivatives transactions or that uses complex derivatives would be required to establish a formalized derivatives risk management program. If the SEC adopts this rule in the form proposed, we may incur greater and indirect costs to engage in derivatives transactions or financial commitment transactions, and our ability to enter into transactions involving such instruments may be hindered, which could have an adverse effect on our business, financial condition and results of operations.

*Uncertainty relating to the LIBOR calculation process may adversely affect the value of our portfolio of the LIBOR-indexed, floating-rate debt securities.*

In the recent past, concerns have been publicized that some of the member banks surveyed by the British Bankers' Association ("BBA") in connection with the calculation of LIBOR across a range of maturities and currencies may have been under-reporting or otherwise manipulating the inter-bank lending rate applicable to them in order to profit on their derivatives positions or to avoid an appearance of capital insufficiency or adverse reputational or other consequences that may have resulted from reporting inter-bank lending rates higher than those they actually submitted. A number of BBA member banks have entered into settlements with their regulators and law enforcement agencies with respect to alleged manipulation of LIBOR, and investigations by regulators and governmental authorities in various jurisdictions are ongoing.

56

Actions by the BBA, regulators or law enforcement agencies may result in changes to the manner in which LIBOR is determined. Uncertainty as to the nature of such potential changes may adversely affect the market for LIBOR-based securities, including our portfolio of LIBOR-indexed, floating-rate debt securities. In addition, any further changes or reforms to the determination or supervision of LIBOR may result in a sudden or prolonged increase or decrease in reported LIBOR, which could have an adverse impact on the market for LIBOR-based securities or the value of our portfolio of LIBOR-indexed, floating-rate debt securities. For example, on July 27, 2017, the U.K.'s Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. It is unclear if at that time whether or not LIBOR will cease to exist or if new methods of calculating LIBOR will be established such that it continues to exist after 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large US financial institutions, is considering replacing U.S. dollar LIBOR with a new index calculated by short-term repurchase agreements, backed by Treasury securities. The future of LIBOR at this time is uncertain. If LIBOR ceases to exist, we may need to renegotiate the credit agreements extending beyond 2021 with our portfolio companies that utilize LIBOR as a factor in determining the interest rate to replace LIBOR with the new standard that is established.

***The effect of global climate change may impact the operations of our portfolio companies.***

There may be evidence of global climate change. Climate change creates physical and financial risk and some of our portfolio companies may be adversely affected by climate change. For example, the needs of customers of energy companies vary with weather conditions, primarily temperature and humidity. To the extent weather conditions are affected by climate change, energy use could increase or decrease depending on the duration and magnitude of any changes. Increases in the cost of energy could adversely affect the cost of operations of our portfolio companies if the use of energy products or services is material to their business. A decrease in energy use due to weather changes may affect some of our portfolio companies' financial condition, through decreased revenues. Extreme weather conditions in general require more system backup, adding to costs, and can contribute to increased system stresses, including service interruptions. Energy companies could also be affected by the potential for lawsuits against or taxes or other regulatory costs imposed on greenhouse gas emitters, based on links drawn between greenhouse gas emissions and climate change.

In December 2015 the United Nations, of which the U.S. is a member, adopted a climate accord (the "Paris Agreement") with the long-term goal of limiting global warming and the short-term goal of significantly reducing greenhouse gas emissions. Although the U.S. ratified the Paris Agreement on November 4, 2016, the current administration announced the U.S. would cease participation. As a result, some of our portfolio companies may become subject to new or strengthened regulations or legislation, at least through November 4, 2020 (the earliest date the U.S. may withdraw from the Paris Agreement), which could increase their operating costs and/or decrease their revenues.

***We may choose to waive or defer enforcement of covenants in the debt securities held in our portfolio, which may cause us to lose all or part of our investment in these companies.***

We structure the debt investments in our portfolio companies to include business and financial covenants placing affirmative and negative obligations on the operation of the company's business and its financial condition. However, from time to time we may elect to waive breaches of these covenants, including our right to payment, or waive or defer enforcement of remedies, such as acceleration of obligations or foreclosure on collateral, depending upon the financial condition and prospects of the particular portfolio company. These actions may reduce the likelihood of our receiving the full amount of future payments of interest or principal and be accompanied by a deterioration in the value of the underlying collateral as many of these companies may have limited financial resources, may be unable to meet future obligations and may go bankrupt. This could negatively impact our ability to pay dividends, could adversely affect our results of operations and financial condition and cause the loss of all or part of your investment.

57

***Our investments in securities rated below investment grade are speculative in nature and are subject to additional risk factors such as increased possibility of default, illiquidity of the security, and changes in value based on changes in interest rates.***

The securities that we invest in are typically rated below investment grade. Securities rated below investment grade are often referred to as "leveraged loans," "high yield" or "junk" securities and may be considered "high risk" compared to debt instruments that are rated investment grade. High yield securities are regarded as having predominantly speculative characteristics with respect to the issuer's capacity to pay interest and repay principal in accordance with the terms of the obligations and involve major risk exposure to adverse conditions. In addition, high yield securities generally offer a higher current yield than that available from higher grade issues, but typically involve greater risk. These securities are especially sensitive to adverse changes in general economic conditions, to changes in the financial condition of their issuers and to price fluctuation in response to changes in interest rates. During periods of economic downturn or rising interest rates, issuers of below investment grade instruments may experience financial stress that could adversely affect their ability to make payments of principal and interest and increase the possibility of default.

***Our investments may be in portfolio companies which may have limited operating histories and financial resources.***

We expect that our portfolio will continue to consist of investments that may have relatively limited operating histories. These companies may be particularly vulnerable to U.S. and foreign economic downturns such as the U.S. recession that began in mid-2007 and the European financial crisis, may have more limited access to capital and higher funding costs, may have a weaker financial position and may need more capital to expand or compete. These businesses also may experience substantial variations in operating results. They may face intense competition, including from companies with greater financial, technical and marketing resources. Furthermore, some of these companies do business in regulated industries and could be affected by changes in government regulation. Accordingly, these factors could impair their cash flow or result in other events, such as bankruptcy, which could limit their ability to repay their obligations to us, and may adversely affect the return on, or the recovery of, our investment in these companies. We cannot assure you that any of our investments in our portfolio companies will be successful. Our portfolio companies compete with larger, more established companies with greater access to, and resources for, further development in these new technologies. We may lose our entire investment in any or all of our portfolio companies.

### Risks Relating to our Securities

***The market price of our common stock may fluctuate significantly.***

The market price and liquidity of the expected market for shares of our common stock may be significantly affected by numerous factors, some of which are beyond our control and may not be directly related to our operating performance. These factors include:

- price and volume fluctuations in the overall stock market from time to time;

- investor demand for our shares;

- significant volatility in the market price and trading volume of securities of BDCs or other companies in our sector, which are not necessarily related to the operating performance of these companies;

- changes in regulatory policies or tax guidelines with respect to RICs, BDCs or SBICs;

- failure to qualify as a RIC, or the loss of RIC tax treatment;

- any shortfall in revenue or net income or any increase in losses from levels expected by investors or securities analysts;

- changes, or perceived changes, in the value of our portfolio investments;

- departures of the Investment Advisor's key personnel;

58

- operating performance of companies comparable to us; or

- general economic conditions and trends and other external factors.

***Our business and operation could be negatively affected if we become subject to any securities litigation or stockholder activism, which could cause us to incur significant expense, hinder execution of investment strategy and impact our stock price.***

In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. Stockholder activism, which could take many forms or arise in a variety of situations, increased in the BDC space recently. Specifically, we are currently subject to class action litigation.

On December 28, 2017, an alleged stockholder filed a putative class action lawsuit complaint, *Paskowitz v. Capitala Finance Corp., et al.,* in the United States District Court for the Central District of California (case number 2:17-cv-09251-MWF-AS) (the "*Paskowitz* Action"), against the Company and certain of its current officers on behalf of all persons who purchased or otherwise acquired the Company's common stock between January 4, 2016 and August 7, 2017. On January 3, 2018, another alleged stockholder filed a putative class action complaint, *Sandifer v. Capitala Finance Corp., et al.,* in the United States District Court for the Central District of California (case number 2:18-cv-00052-MWF-AS) (the "*Sandifer* Action"), asserting substantially similar claims on behalf of the same putative class and against the same defendants. On February 2, 2018, the Sandifer Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina. The Sandifer Action was voluntarily dismissed on February 28, 2018. On March 1, 2018, the Paskowitz Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina (case number 3:18-cv-00096-RJC-DSC). On June 19, 2018, the plaintiffs in the *Paskowitz* Action filed their amended complaint. The complaint, as currently amended, alleges certain violations of the securities laws, including, inter alia, that the defendants made certain materially false and misleading statements and omissions regarding the Company's business, operations, and prospects between January 4, 2016 and August 7, 2017. The plaintiffs in the Paskowitz Action seek compensatory damages and attorneys' fees and costs, among other relief, but did not specify the amount of damages being sought. Defendants have moved to dismiss the amended complaint. While the Company intends to vigorously defend itself in this litigation, the outcome of these legal proceedings cannot be predicted with certainty.

Estimating an amount or range of possible losses resulting from litigation proceedings is inherently difficult and requires an extensive degree of judgment, particularly where the matters involve indeterminate claims for monetary damages, are in the early stages of the proceedings, and are subject to appeal. In addition, because most legal proceedings are resolved over extended periods of time, potential losses are subject to change due to, among other things, new developments, changes in legal strategy, the outcome of intermediate procedural and substantive rulings and other parties' settlement posture and their evaluation of the strength or weakness of their case against us. For these reasons, we are currently unable to predict the ultimate timing or outcome of, or reasonably estimate the possible losses or a range of possible losses resulting from, the matters described above. Based on information currently available, the Company does not believe that any reasonably possible losses arising from the currently pending legal matters described above will be material to the Company's results of operations or financial condition. However, in light of the inherent uncertainties involved in such matters, an adverse outcome in this litigation could materially adversely affect the Company's financial condition, results of operations or cash flows in any particular reporting period.

Securities litigation and corresponding stockholder activism, if any, including potential proxy contests, could result in substantial costs and divert management's and our Board's attention and resources from our business. Additionally, such securities litigation and stockholder activism could give rise to perceived uncertainties as to our future, adversely affect our relationships with service providers and make it more difficult to attract and retain qualified personnel. Also, we may be required to incur significant legal fees and other expenses related to any securities litigation and activist stockholder matters. Further, our stock price could be subject to significant fluctuation or otherwise be adversely affected by the events, risks and uncertainties of any securities litigation and stockholder activism.

59

*Investing in our common stock may involve an above average degree of risk.*

The investments we make may result in a higher amount of risk, volatility, or loss of principal than alternative investment options. These investments in portfolio companies may be highly speculative and aggressive, and therefore, an investment in our common stock may not be suitable for investors with lower risk tolerance.

*Our shares of common stock have a limited trading history and we cannot assure you that the market price of shares of our common stock will not decline.*

Our shares of common stock have a limited trading history and we cannot assure you that a public trading market will be sustained for such shares. We cannot predict the prices at which our common stock will trade. We cannot assure you that the market price of shares of our common stock will not decline at any time. In addition, our common stock has from time to time traded below its net asset value since our inception and if our common stock continues to trade below its net asset value, we will generally not be able to sell additional shares of our common stock to the public at its market price without first obtaining the approval of our stockholders (including our unaffiliated stockholders) and our independent directors for such issuance.

*Our common stockholders will bear the expenses associated with our borrowings, and the holders of our debt securities will have certain rights senior to our common stockholders.*

All of the costs of offering and servicing our debt securities, including interest thereon, is borne by our common stockholders. The interests of the holders of any debt we may issue will not necessarily be aligned with the interests of our common stockholders. In particular, the rights of holders of our debt to receive interest or principal repayment will be senior to those of our common stockholders. In addition, we may grant a lender a security interest in a significant portion or all of our assets, even if the total amount we may borrow from such lender is less than the amount of such lender's security interest in our assets.

*Sales of substantial amounts of our common stock in the public market may have an adverse effect on the market price of our common stock.*

Sales of substantial amounts of our common stock, or the availability of such common stock for sale, could adversely affect the prevailing market prices for our common stock. If this occurs and continues for a sustained period of time, it could impair our ability to raise additional capital through the sale of securities should we desire to do so.

*Shares of our common stock have traded at a discount from net asset value and may do so in the future.*

Shares of closed-end investment companies have frequently traded at a market price that is less than the net asset value that is attributable to those shares. In part as a result of adverse economic conditions and increasing pressure within the financial sector of which we are a part, our common stock has at times traded below its net asset value per share since our IPO on September 30, 2013. Our shares could continue trade at a discount to net asset value. The possibility that our shares of common stock may trade at a discount from net asset value over the long term is separate and distinct from the risk that our net asset value will decrease. We cannot predict whether shares of our common stock will trade above, at or below its net asset value. If our common stock trades below its net asset value, we will generally not be able to issue additional shares of our common stock at its market price without first obtaining the approval for such issuance from our stockholders and our independent directors. If additional funds are not available to us, we could be forced to curtail or cease our new lending and investment activities, and our net asset value could decrease and our level of distributions could be impacted.

*You may not receive distributions, or our distributions may decline or may not grow over time, and you will experience dilution in your ownership percentage if you opt out of our dividend reinvestment plan.*

We intend to make distributions on a monthly basis to our stockholders out of assets legally available for distribution. We cannot assure you that we will achieve investment results that will allow us to make a specified level of cash distributions or year-to-year increases in cash distributions. Our ability to pay distributions might be materially and adversely affected by the impact of one or more of the risks described

60

herein. Due to the asset coverage test applicable to us under the 1940 Act as a BDC, we may be limited in our ability to make distributions. All distributions will be made at the discretion of our Board and will depend on our earnings, financial condition, maintenance of RIC tax treatment, compliance with applicable BDC, SBA regulations and such other factors as our Board may deem relevant from time to time. We cannot assure you that we will make distributions to our stockholders in the future.

All dividends declared in cash payable to stockholders that are participants in our dividend reinvestment plan are automatically reinvested in shares of our common stock. As a result, our stockholders that opt out of our dividend reinvestment plan will experience dilution in their ownership percentage of our common stock over time.

***We will have broad discretion over the use of proceeds of any successful offering of securities.***

We will have significant flexibility in applying the proceeds of any successful offering of our securities. We will also pay operating expenses, and may pay other expenses such as due diligence expenses of potential new investments, from net proceeds. Our ability to achieve our investment objective may be limited to the extent that the net proceeds of any offering, pending full investment, are used to pay operating expenses. In addition, we can provide you no assurance that the any offering will be successful, or that by increasing the size of our available equity capital, our aggregate expenses, and correspondingly, our expense ratio, will be lowered.

***The net asset value per share of our common stock may be diluted if we sell shares of our common stock in one or more offerings at prices below the then current net asset value per share of our common stock.***

At our 2019 Annual Stockholders Meeting, subject to certain determinations required to be made by our Board, we will ask our stockholders to approve our ability to sell or otherwise issue shares of our common stock, not exceeding 25% of our then outstanding common stock immediately prior to each such offering, at a price below the then current net asset value per share during a period beginning on May 2, 2019 and expiring on the earlier of the one year anniversary of the date of the 2019 Annual Stockholders Meeting and the date of our 2020 Annual Stockholders Meeting, which is expected to be held in April 2020.

If we were to sell shares of our common stock below its then current net asset value per share would be subject to the determination by our Board that such issuance is in our and our stockholders' best interests. If we were to sell shares of our common stock below its then current net asset value per share, such sales would result in an immediate dilution to the net asset value per share of our common stock. This dilution would occur as a result of the sale of shares at a price below the then current net asset value per share of our common stock and a proportionately greater decrease in the stockholders' interest in our earnings and assets and their voting interest in us than the increase in our assets resulting from such issuance. Because the number of shares of common stock that could be so issued, and the timing of any issuance is not currently known, the actual dilutive effect cannot be predicted.

Further, if our current stockholders do not purchase any shares to maintain their percentage interest, regardless of whether such offering is above or below the then current net asset value per share, their voting power will be diluted. For example, if we sell an additional 10% of our common shares at a 10% discount from net asset value, a stockholder who does not participate in that offering for its proportionate interest will suffer net asset value dilution of up to 1.0% or $10 per $1,000 of net asset value.

***Your interest in Capitala Finance may be diluted if you do not fully exercise your subscription rights in any rights offering.***

In the event we issue subscription rights to purchase shares of our common stock, stockholders who do not fully exercise their rights should expect that they will, at the completion of the offer, own a smaller proportional interest in Capitala Finance than would otherwise be the case if they fully exercised their rights.

We cannot state precisely the amount of any such dilution in share ownership because we do not know at this time what proportion of the shares would be purchased as a result of a rights offering.

61

In addition, if the subscription price in a rights offering is less than our net asset value per share, then our stockholders would experience an immediate dilution of the aggregate net asset value of their shares as a result of the rights offering. The amount of any decrease in net asset value is not predictable because it is not known at this time what the subscription price and net asset value per share will be on the expiration date of any rights offering or what proportion of the shares will be purchased as a result of such rights offering. Such dilution could be substantial.

***If we issue preferred stock, the net asset value and market value of our common stock will likely become more volatile.***

We cannot assure you that the issuance of preferred stock would result in a higher yield or return to the holders of our common stock. The issuance of preferred stock would likely cause the net asset value and market value of the common stock to become more volatile. If the dividend rate on the preferred stock were to approach the net rate of return on our investment portfolio, the benefit of leverage to the holders of the common stock would be reduced. If the dividend rate on the preferred stock were to exceed the net rate of return on our portfolio, the leverage would result in a lower rate of return to the holders of common stock than if we had not issued preferred stock. Any decline in the net asset value of our investments would be borne entirely by the holders of common stock. Therefore, if the market value of our portfolio were to decline, the leverage would result in a greater decrease in net asset value to the holders of common stock than if we were not leveraged through the issuance of preferred stock. This greater net asset value decrease would also tend to cause a greater decline in the market price for the common stock. We might be in danger of failing to maintain the required asset coverage of the preferred stock or of losing our ratings, if any, on the preferred stock or, in an extreme case, our current investment income might not be sufficient to meet the dividend requirements on the preferred stock. In order to counteract such an event, we might need to liquidate investments in order to fund a redemption of some or all of the preferred stock. In addition, we would pay (and the holders of common stock would bear) all costs and expenses relating to the issuance and ongoing maintenance of the preferred stock, including higher advisory fees if our total return exceeds the dividend rate on the preferred stock. Holders of preferred stock may have different interests than holders of common stock and may at times have disproportionate influence over our affairs.

***Holders of any preferred stock we might issue would have the right to elect members of our Board and class voting rights on certain matters.***

Holders of any preferred stock we might issue, voting separately as a single class, would have the right to elect two members of our Board at all times and in the event dividends become two full years in arrears would have the right to elect a majority of the directors until such arrearage is completely eliminated. In addition, preferred stockholders have class voting rights on certain matters, including changes in fundamental investment restrictions and conversion to open-end status, and accordingly can veto any such changes. Restrictions imposed on the declarations and payment of dividends or other distributions to the holders of our common stock and preferred stock, both by the 1940 Act and by requirements imposed by rating agencies, if any, or the terms of our credit facilities, if any, might impair our ability to maintain our RIC tax treatment under the Code for U.S. federal income tax purposes. While we would intend to redeem our preferred stock to the extent necessary to enable us to distribute our income as required to maintain our qualification as a RIC, there can be no assurance that such actions could be effected in time to meet the tax requirements.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

Our executive offices are located at 4201 Congress Street, Suite 360, Charlotte, North Carolina 28209, and are provided by our Administrator in accordance with the terms of the Administration Agreement. We believe that our office facilities are suitable and adequate for our business as it is contemplated to be conducted.

## ITEM 3. LEGAL PROCEEDINGS

Other than as described below, we and our subsidiaries are not currently subject to any material legal proceedings, nor, to our knowledge, is any material legal proceeding threatened against us or our subsidiaries. From time to time, we, or our subsidiaries may be a party to certain legal proceedings in the ordinary course of business, including proceedings relating to the enforcement of our rights under contracts with our portfolio companies. While the outcome of these legal proceedings, if any, cannot be predicted with certainty, we do not expect that these proceedings will have a material effect upon our financial condition or results of operations.

On December 28, 2017, an alleged stockholder filed a putative class action lawsuit complaint, Paskowitz v. Capitala Finance Corp., et al., in the United States District Court for the Central District of California (case number 2:17-cv-09251-MWF-AS) (the "Paskowitz Action"), against the Company and certain of its current officers on behalf of all persons who purchased or otherwise acquired the Company's common stock between January 4, 2016 and August 7, 2017. On January 3, 2018, another alleged stockholder filed a putative class action complaint, Sandifer v. Capitala Finance Corp., et al., in the United States District Court for the Central District of California (case number 2:18-cv-00052-MWF-AS) (the "Sandifer Action"), asserting substantially similar claims on behalf of the same putative class and against the same defendants. On February 2, 2018, the Sandifer Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina. The Sandifer Action was voluntarily dismissed on February 28, 2018. On March 1, 2018, the Paskowitz Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina (case number 3:18-cv-00096-RJC-DSC). On June 19, 2018, the plaintiffs in the Paskowitz Action filed their amended complaint. The complaint, as currently amended, alleges certain violations of the securities laws, including, *inter alia*, that the defendants made certain materially false and misleading statements and omissions regarding the Company's business, operations, and prospects between January 4, 2016 and August 7, 2017. The plaintiffs in the Paskowitz Action seek compensatory damages and attorneys' fees and costs, among other relief, but did not specify the amount of damages being sought. Defendants have moved to dismiss the amended complaint. While the Company intends to vigorously defend itself in this litigation, the outcome of these legal proceedings cannot be predicted with certainty.

Estimating an amount or range of possible losses resulting from litigation proceedings is inherently difficult and requires an extensive degree of judgment, particularly where the matters involve indeterminate claims for monetary damages, are in the early stages of the proceedings, and are subject to appeal. In addition, because most legal proceedings are resolved over extended periods of time, potential losses are subject to change due to, among other things, new developments, changes in legal strategy, the outcome of intermediate procedural and substantive rulings and other parties' settlement posture and their evaluation of the strength or weakness of their case against us. For these reasons, we are currently unable to predict the ultimate timing or outcome of, or reasonably estimate the possible losses or a range of possible losses resulting from, the matters described above. Based on information currently available, the Company does not believe that any reasonably possible losses arising from the currently pending legal matters described above will be material to the Company's results of operations or financial condition. However, in light of the inherent uncertainties involved in such matters, an adverse outcome in this litigation could materially adversely affect the Company's financial condition, results of operations or cash flows in any particular reporting period.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

63

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### COMMON STOCK

Our common stock is traded on the NASDAQ Global Select Market under the symbol "CPTA."

### HOLDERS

The last reported price for our common stock on March 1, 2019 was $8.30 per share. As of March 1, 2019 there were 42 holders of record of our common stock.

### DISTRIBUTIONS

In order to qualify as a RIC and to avoid corporate-level U.S. federal income tax on the income we distribute to our stockholders, we are required to distribute at least 90% of our net ordinary income and our net short-term capital gains in excess of net long-term capital losses, if any, to our stockholders on an annual basis. Additionally, we must distribute an amount at least equal to the sum of 98% of our net ordinary income (during the calendar year) plus 98.2% of our net capital gain income (during each 12-month period ending on October 31) plus any net ordinary income and capital gain net income for preceding years that were not distributed during such years and on which we paid no U.S. federal income tax to avoid a U.S. federal excise tax. We made quarterly distributions to our stockholders for the first four full quarters subsequent to our IPO. To the extent we have income available, we have made and intend to make monthly distributions thereafter. Our monthly stockholder distributions, if any, will be determined by our Board on a quarterly basis. Any distribution to our stockholders will be declared out of assets legally available for distribution.

We may not be able to achieve operating results that will allow us to make distributions at a specific level or to increase the amount of our distributions from time to time, and from time to time we may decrease the amount of our distributions. In addition, we may be limited in our ability to make distributions due to the asset coverage requirements applicable to us as a BDC under the 1940 Act. If we do not distribute a certain percentage of our income annually, we will suffer adverse tax consequences, including the possible loss of our qualification as a RIC. We cannot assure stockholders that they will receive any distributions.

To the extent our taxable earnings fall below the total amount of our distributions for that fiscal year, a portion of those distributions may be deemed a return of capital to our stockholders for U.S. federal income tax purposes. Thus, the source of a distribution to our stockholders may be the original capital invested by the stockholder rather than our income or gains. Stockholders should read any written disclosure accompanying any stockholder distribution carefully and should not assume that the source of any distribution is our ordinary income or capital gains.

We have adopted an "opt out" dividend reinvestment plan ("DRIP") for our common stockholders. As a result, if we declare a distribution, then stockholders' cash distributions will be automatically reinvested in additional shares of our common stock unless a stockholder specifically "opts out" of our DRIP. If a stockholder opts out, that stockholder will receive cash distributions. Although distributions paid in the form of additional shares of our common stock will generally be subject to U.S. federal, state and local taxes in the same manner as cash distributions, stockholders participating in our DRIP will not receive any corresponding cash distributions with which to pay any such applicable taxes.

### PERFORMANCE GRAPH

The following graph compares the cumulative return on our common stock with that of the Standard & Poor's 500 Stock Index and the NASDAQ Financial 100 index, as we do not believe there is an appropriate index of companies with an investment strategy similar to our own with which to compare the return on our common stock, for the period from December 31, 2013 through December 31, 2018. The graph assumes that on December 31, 2013, a person invested $100 in each of our common stock, the

64

8/4/2020    Case 3:18-cv-01023-MPS    Document 358-15    Filed 10/01/21    Page 68 of 174
tv514470_10k.htm - Generated by SEC Publisher

TABLE OF CONTENTS

Standard & Poor's 500 Stock Index and the NASDAQ Financial 100 index. The graph measures total stockholder return, which takes into account both changes in stock price and dividends. The graph also assumes that dividends paid are reinvested in the same class of equity securities at the frequency with which dividends are paid on such securities during the applicable fiscal year.



The graph and other information furnished under this Part II Item 5 of this Annual Report on Form 10-K shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under, or to the liabilities of Section 18 of, the 1934 Act. The stock price performance included in the above graph is not necessarily indicative of future stock price performance.

## SALES OF UNREGISTERED SECURITIES

During the year ended December 31, 2018, we issued 100,316 shares of common stock under our DRIP. The issuances were not subject to the registration requirements under the Securities Act of 1933, as amended. The cash paid for shares of common stock issued under our DRIP during the year ended December 31, 2018 was approximately $0.8 million. Other than the shares issued under our DRIP during the year ended December 31, 2018, we did not sell any unregistered equity securities.

## ISSUER PURCHASES OF EQUITY SECURITIES

None.

**ITEM 6. SELECTED CONSOLIDATED FINANCIAL DATA**

The following selected consolidated financial data of the Company as of and for the years ended December 31, 2018, 2017, 2016, 2015 and 2014 are derived from our consolidated financial statements that have been audited by Ernst & Young LLP, our independent registered public accounting firm. This consolidated financial data should be read in conjunction with our consolidated financial statements and related notes thereto included elsewhere in this Form 10-K and with Management's Discussion and Analysis of Financial Condition and Results of Operations which follows (dollars in thousands except share and per share data):

| | As of and for the year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2018** | **2017** | **2016** | **2015** | **2014** |
| **Consolidated statements of operations data:** | | | | | |
| Total investment income | $ 47,293 | $ 51,089 | $ 68,312 | $ 63,976 | $ 49,528 |
| Total expenses, net of fee waivers | 31,271 | 35,565 | 39,272 | 38,649 | 29,562 |
| Net investment income | 16,022 | 15,524 | 29,040 | 25,327 | 19,966 |
| Net realized gain (loss) from investments | (34,804) | (24,189) | (22,766) | 5,436 | 832 |
| Net unrealized appreciation (depreciation) on investments and written call option | 840 | 2,970 | 2,878 | (16,913) | (24,238) |
| Tax benefit (provision) | 1,916 | (1,289) | — | — | — |
| Net increase (decrease) in net assets resulting from operations | $ (16,026) | $ (6,984) | $ 9,152 | $ 13,850 | $ (3,440) |
| **Per share data:** | | | | | |
| Net investment income | $ 1.00 | $ 0.98 | $ 1.84 | $ 1.67 | $ 1.54 |
| Net increase (decrease) in net assets resulting from operations | $ (1.00) | $ (0.44) | $ 0.58 | $ 0.91 | $ (0.27) |
| Distributions declared | $ 1.00 | $ 1.42 | $ 1.80 | $ 2.38 | $ 1.88 |
| Net asset value per share | $ 11.88 | $ 13.91 | $ 15.79 | $ 17.04 | $ 18.56 |
| **Consolidated statements of assets and liabilities data:** | | | | | |
| Total assets | $493,165 | $534,595 | $584,415 | $632,818 | $539,864 |
| Total net assets | $190,644 | $221,887 | $250,582 | $268,802 | $240,837 |
| **Other data:** | | | | | |
| Total return[1] | 12.14% | (35.68)% | 24.07% | (20.43)% | (0.85)% |
| Number of portfolio company investments at year end | 44 | 47 | 53 | 57 | 52 |
| Total portfolio investments for the year | $107,802 | $ 82,750 | $120,844 | $260,640 | $216,276 |
| Investment repayments for the year | $123,517 | $115,810 | $163,564 | $142,713 | $ 80,197 |

---

(1)   Total investment return is calculated assuming a purchase of common shares at the current market value on the first day and a sale at the current market value on the last day of the period reported. Dividends and distributions, if any, are assumed for purposes of this calculation to be reinvested at prices obtained under the Company's dividend reinvestment plan. Total investment return does not reflect brokerage commissions.

66

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with our consolidated financial statements and related notes and other financial information appearing elsewhere in this Annual Report on Form 10-K.

Except as otherwise specified, references to "we," "us," "our," "Capitala," or the "Company", refer to Capitala Finance Corp.

### Forward-Looking Statements

This Annual Report on Form 10-K, including Management's Discussion and Analysis of Financial Condition and Results of Operations, contains forward-looking statements that involve substantial risks and uncertainties. These forward-looking statements are not historical facts, but rather are based on current expectations, estimates and projections about the Company, our current and prospective portfolio investments, our industry, our beliefs, and our assumptions. Words such as "anticipates," "expects," "intends," "plans," "will," "may," "continue," "believes," "seeks," "estimates," "would," "could," "should," "targets," "projects," and variations of these words and similar expressions are intended to identify forward-looking statements.

Some of the statements in this Annual Report on Form 10-K constitute forward-looking statements, which relate to future events or our performance or financial condition. The forward-looking statements contained in our Annual Report on Form 10-K involve risks and uncertainties, including statements as to:

- our future operating results;

- our business prospects and the prospects of our portfolio companies;

- the impact of investments that we expect to make;

- our contractual arrangements and relationships with third parties;

- the dependence of our future success on the general economy and its impact on the industries in which we invest;

- the ability of our portfolio companies to achieve their objectives;

- our expected financings and investments;

- the adequacy of our cash resources and working capital; and

- the timing of cash flows, if any, from the operations of our portfolio companies.

These statements are not guarantees of future performance and are subject to risks, uncertainties, and other factors, some of which are beyond our control and difficult to predict and could cause actual results to differ materially from those expressed or forecasted in the forward-looking statements, including without limitation:

- an economic downturn could impair our portfolio companies' ability to continue to operate or repay their borrowings, which could lead to the loss of some or all of our investments in such portfolio companies;

- a contraction of available credit and/or an inability to access the equity markets could impair our lending and investment activities;

- interest rate volatility could adversely affect our results, particularly if we use leverage as part of our investment strategy; and

- the risks, uncertainties and other factors we identify in "Risk Factors" and elsewhere in this Annual Report on Form 10-K.

Although we believe that the assumptions on which these forward-looking statements are based are reasonable, any of those assumptions could prove to be inaccurate, and as a result, the forward-looking statements based on those assumptions also could be inaccurate. Important assumptions include our ability

67

to originate new loans and investments, certain margins and levels of profitability and the availability of additional capital. In light of these and other uncertainties, the inclusion of a projection or forward-looking statement in this Annual Report on Form 10-K should not be regarded as a representation by us that our plans and objectives will be achieved. These risks and uncertainties include those described or identified in "Risk Factors" and elsewhere in our Annual Report on Form 10-K. You should not place undue reliance on these forward-looking statements, which apply only as of the date of this Annual Report on Form 10-K. We undertake no obligation to revise or update any forward-looking statements, whether as a result of new information, future events or otherwise, unless required by law or U.S. Securities and Exchange Commission ("SEC") rule or regulation.

## Overview

We are a Maryland corporation that has elected to be regulated as a business development company ("BDC") under the Investment Company Act of 1940 as amended (the "1940 Act"). Our investment objective is to generate both current income and capital appreciation through debt and equity investments. We are managed by Capitala Investment Advisors, LLC (the "Investment Advisor"), and Capitala Advisors Corp. (the "Administrator") provides the administrative services necessary for us to operate.

We provide capital to lower and traditional middle-market companies in the United States ("U.S."), with a non-exclusive emphasis on the Southeast, Southwest and Mid-Atlantic regions. We invest primarily in companies with a history of earnings growth and positive cash flow, proven management teams, products or services with competitive advantages and industry-appropriate margins. We primarily invest in companies with between $4.5 million and $30 million in trailing twelve-month earnings before interest, tax, depreciation, and amortization ("EBITDA").

We invest in first lien loans, second lien loans and subordinated loans, and, to a lesser extent, equity securities issued by lower middle-market companies and traditional middle-market companies.

As a BDC, we are required to comply with certain regulatory requirements. For instance, we generally must invest at least 70% of our total assets in "qualifying assets," including securities of private or thinly traded public U.S. companies, cash, cash equivalents, U.S. government securities and high-quality debt investments that mature in one year or less. In addition, we are only allowed to borrow money such that our asset coverage, as defined in the 1940 Act, equals at least 200% (or 150%, if certain requirements are met, after November 1, 2019) after such borrowing, with certain limited exceptions. On March 23, 2018, the Small Business Credit Availability Act (the "SBCA") was signed into law, which included various changes to regulations under the federal securities laws that impact BDCs. The SBCA included changes to the 1940 Act to allow BDCs to decrease their asset coverage requirement from 200% to 150% (i.e. the amount of debt may not exceed 66.7% of the value of our total assets), if certain requirements are met. On November 1, 2018, the Board, including a "required majority" (as such term is defined in Section 57(o) of the 1940 Act) approved the application of the modified asset coverage. As a result, our asset coverage requirements for senior securities will be changed from 200% to 150%, effective November 1, 2019. To maintain our regulated investment company ("RIC") status, we must meet specified source-of-income and asset diversification requirements. To maintain our RIC tax treatment under subchapter M of the Internal Revenue Code of 1986, as amended (the "Code") for U.S. federal income tax purposes, we must distribute at least 90% of our net ordinary income and realized net short-term capital gains in excess of realized net long-term capital losses, if any, for the taxable year.

## Corporate History

We commenced operations on May 24, 2013 and completed our initial public offering ("IPO") on September 30, 2013. The Company was formed for the purpose of (i) acquiring, through a series of transactions, an investment portfolio from the following entities: CapitalSouth Partners Fund I Limited Partnership ("Fund I"); CapitalSouth Partners Fund II Limited Partnership ("Fund II"); CapitalSouth Partners Fund III, L.P. ("Fund III Parent"); CapitalSouth Partners SBIC Fund III, L.P. ("Fund III") and CapitalSouth Partners Florida Sidecar Fund I, L.P. ("Florida Sidecar" and, collectively with Fund I, Fund II, Fund III and Fund III Parent, the "Legacy Funds"); (ii) raising capital in the IPO and (iii) continuing and expanding the business of the Legacy Funds by making additional debt and equity investments in lower middle-market and traditional middle-market companies.

68

On September 24, 2013, the Company acquired 100% of the limited partnership interests in Fund II, Fund III and Florida Sidecar and each of their respective general partners, as well as certain assets from Fund I and Fund III Parent, in exchange for an aggregate of 8,974,420 shares of the Company's common stock (the "Formation Transactions"). Fund II, Fund III and Florida Sidecar became the Company's wholly owned subsidiaries. Fund II and Fund III retained their SBIC licenses, and continued to hold their existing investments at the time of IPO and have continued to make new investments after the IPO. The IPO consisted of the sale of 4,000,000 shares of the Company's common stock at a price of $20.00 per share resulting in net proceeds to the Company of $74.25 million, after deducting underwriting fees and commissions totaling $4.0 million and offering expenses totaling $1.75 million. The other costs of the IPO were borne by the limited partners of the Legacy Funds. During the fourth quarter of 2017, Florida Sidecar transferred all of its assets to the Company and was legally dissolved as a standalone partnership.

At the time of the Formation Transactions, our portfolio consisted of: (1) approximately $326.3 million in investments; (2) an aggregate of approximately $67.1 million in cash, interest receivable and other assets; and (3) liabilities of approximately $202.2 million of U.S. Small Business Administration ("SBA") guaranteed debt payable. We have two subsidiaries licensed under the Small Business Investment Company ("SBIC") Act that have elected to be regulated as BDCs under the 1940 Act.

The Company has formed and expects to continue to form certain consolidated taxable subsidiaries (the "Taxable Subsidiaries"), which are taxed as corporations for income tax purposes. The Taxable Subsidiaries allow the Company to make equity investments in companies organized as pass-through entities while continuing to satisfy the requirements of a RIC under the Code.

**Basis of Presentation**

The Company is considered an investment company as defined in Accounting Standards Codification ("ASC") Topic 946 — *Financial Services — Investment Companies* ("ASC 946"). The accompanying consolidated financial statements have been prepared on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles ("U.S. GAAP") and pursuant to the requirements for reporting on Form 10-K and Article 6 of Regulation S-X. The consolidated financial statements of the Company include the accounts of the Company and its wholly owned subsidiaries.

The Company's financial statements as of December 31, 2018 and 2017, and for the years ended December 31, 2018, 2017, and 2016 are presented on a consolidated basis. The effects of all intercompany transactions between the Company and its subsidiaries (Fund II, Fund III, Florida Sidecar, and the Taxable Subsidiaries) have been eliminated in consolidation. All financial data and information included in these consolidated financial statements have been presented on the basis described above. In the opinion of management, the consolidated financial statements reflect all adjustments that are necessary for the fair presentation of financial results as of and for the periods presented.

**Consolidation**

As provided under Regulation S-X and ASC 946, the Company will generally not consolidate its investment in a company other than an investment company subsidiary or a controlled operating company whose business consists of providing services to the Company. Accordingly, the Company consolidated the results of the Company's wholly owned investment company subsidiaries (Fund II, Fund III, Florida Sidecar, and the Taxable Subsidiaries) in its consolidated financial statements. The Company does not consolidate its interest in Capitala Senior Loan Fund II, LLC ("CSLF II") because the investment is not considered a substantially wholly owned investment company subsidiary. Further, CSLF II is a joint venture for which shared power exists relating to the decisions that most significantly impact the economic performance of the entity. See Note 4 to the consolidated financial statements for a description of the Company's investment in CSLF II.

**Revenues**

We generate revenue primarily from the periodic cash interest we collect on our debt investments. In addition, most of our debt investments offer the opportunity to participate in a borrower's equity performance through warrant participation, direct equity ownership or otherwise, which we expect to result

69

in revenue in the form of dividends and/or capital gains. Further, we may generate revenue in the form of commitment, origination, amendment, structuring or diligence fees, monitoring fees, fees for providing managerial assistance and possibly consulting fees and performance-based fees. These fees will be recognized as they are earned.

**Expenses**

Our primary operating expenses include the payment of investment advisory fees to our Investment Advisor, our allocable portion of overhead and other expenses incurred by our Administrator in performing its obligations under an administration agreement between us and the Administrator (the "Administration Agreement") and other operating expenses as detailed below. Our investment advisory fee will compensate our Investment Advisor for its work in identifying, evaluating, negotiating, closing, monitoring and servicing our investments. We will bear all other expenses of our operations and transactions, including (without limitation):

- the cost of our organization;

- the cost of calculating our net asset value, including the cost of any third-party valuation services;

- the cost of effecting sales and repurchases of our shares and other securities;

- interest payable on debt, if any, to finance our investments;

- fees payable to third parties relating to, or associated with, making investments (such as legal, accounting, and travel expenses incurred in connection with making investments), including fees and expenses associated with performing due diligence reviews of prospective investments and advisory fees;

- transfer agent and custodial fees;

- fees and expenses associated with marketing efforts;

- costs associated with our reporting and compliance obligations under the 1940 Act, the Securities Exchange Act of 1934, as amended (the "1934 Act") other applicable federal and state securities laws and ongoing stock exchange listing fees;

- federal, state and local taxes;

- independent directors' fees and expenses;

- brokerage commissions;

- costs of proxy statements, stockholders' reports and other communications with stockholders;

- fidelity bond, directors' and officers' liability insurance, errors and omissions liability insurance and other insurance premiums;

- direct costs and expenses of administration, including printing, mailing, telephone and staff;

- fees and expenses associated with independent audits and outside legal costs; and

- all other expenses incurred by either our Administrator or us in connection with administering our business, including payments under the Administration Agreement that will be based upon our allocable portion of overhead and other expenses incurred by our Administrator in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions, and our allocable portion of any costs of compensation and related expenses of our chief compliance officer and our chief financial officer and their respective administrative support staff.

**Critical Accounting Policies and Use of Estimates**

In the preparation of our consolidated financial statements and related disclosures, we have adopted various accounting policies that govern the application of U.S. GAAP. Our significant accounting policies are described in Note 2 to the consolidated financial statements. While all of these policies are important to

70

understanding our financial statements, certain accounting policies and estimates are considered critical due to their impact on the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses for the periods covered by such financial statements. We have identified investment valuation, revenue recognition, and income taxes as our most critical accounting estimates. We continuously evaluate our estimates, including those related to the matters described below. Because of the nature of the judgments and assumptions we make, actual results could materially differ from those estimates under different assumptions or conditions. A discussion of our critical accounting policies follows.

***Valuation of Investments***

The Company applies fair value accounting to all of its financial instruments in accordance with the 1940 Act and ASC Topic 820 — *Fair Value Measurements and Disclosures* ("ASC 820"). ASC 820 defines fair value, establishes a framework used to measure fair value and requires disclosures for fair value measurements. In accordance with ASC 820, the Company has categorized its financial instruments carried at fair value, based on the priority of the valuation technique, into a three-level fair value hierarchy as discussed in Note 4 to our consolidated financial statements.

In determining fair value, our board of directors (the "Board") uses various valuation approaches, and engages a third-party independent valuation firm, which provides positive assurance on the investments it reviews. In accordance with U.S. GAAP, a fair value hierarchy for inputs is used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available.

Observable inputs are those that market participants would use in pricing the asset or liability based on market data obtained from sources independent of the Board. Unobservable inputs reflect the Board's assumptions about the inputs market participants would use in pricing the asset or liability developed based upon the best information available in the circumstances. The fair value hierarchy is categorized into three levels based on the inputs as follows:

**Level 1** — Valuations based on unadjusted quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Valuation adjustments and block discounts are not applied to Level 1 securities. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these securities does not entail a significant degree of judgment.

**Level 2** — Valuations based on quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

**Level 3** — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of valuation techniques and observable inputs can vary from security to security and is affected by a wide variety of factors including the type of security, whether the security is new and not yet established in the marketplace, and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Those estimated values do not necessarily represent the amounts that may be ultimately realized due to the occurrence of future circumstances that cannot be reasonably determined. Because of the inherent uncertainty of valuation, those estimated values may be materially higher or lower than the values that would have been used had a market for the securities existed. Accordingly, the degree of judgment exercised by the Company in determining fair value is greatest for securities categorized in Level 3. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement in its entirety falls is determined based on the lowest level input that is significant to the fair value measurement.

Fair value is a market-based measure considered from the perspective of a market participant rather than an entity-specific measure. Therefore, even when market assumptions are not readily available, the Company's own assumptions are set to reflect those that market participants would use in pricing the asset

71

or liability at the measurement date. We use prices and inputs that are current as of the measurement date, including periods of market dislocation. In periods of market dislocation, the observability of prices and inputs may be reduced for many securities. This condition could cause a security to be reclassified to a lower level within the fair value hierarchy.

In estimating the fair value of portfolio investments, the Company starts with the cost basis of the investment, which includes original issue discount and payment-in-kind ("PIK income"), if any. The transaction price is typically the best estimate of fair value at inception. When evidence supports a subsequent change to the carrying value from the original transaction price, adjustments are made to reflect the expected fair values.

As a practical expedient, the Company uses net asset value ("NAV") as the fair value for its equity investment in CSLF II. CSLF II records its underlying investments at fair value on a quarterly basis in accordance with the 1940 Act and ASC 820.

### *Valuation Techniques*

#### *Enterprise Value Waterfall Approach*

The enterprise value waterfall approach determines an enterprise value based on EBITDA multiples of publicly traded companies that are considered similar to the subject portfolio company. The Company considers a variety of items in determining a reasonable pricing multiple, including, but not limited to, operating results, budgeted projections, growth, size, risk, profitability, leverage, management depth, diversification, market position, supplier or customer dependence, asset utilization, liquidity metrics, and access to capital markets. EBITDA of the portfolio company is adjusted for non-recurring items in order to reflect a normalized level of earnings that is representative of future earnings. In certain instances, the Company may also utilize revenue multiples to determine enterprise value. When available, the Company may assign a pricing multiple or value its investments based on the value of recent investment transactions in the subject portfolio company or offers to purchase the portfolio company. The enterprise value is adjusted for financial instruments with seniority to the Company's ownership and for the effect of any instrument which may dilute the Company's investment in the portfolio company. The adjusted enterprise value is then apportioned based on the seniority and privileges of the Company's investments within the portfolio company.

The enterprise value waterfall approach is primarily utilized to value the Company's equity securities, including warrants. However, the Company may utilize the enterprise value waterfall approach to value certain debt securities.

#### *Income Approach*

The income approach utilizes a discounted cash flow methodology in which the Company estimates fair value based on the present value of expected cash flows discounted at a market rate of interest. The determination of a discount rate, or required rate of return, takes into account the portfolio company's fundamentals and perceived credit risk. Because the majority of the Company's portfolio companies do not have a public credit rating, determining a discount rate often involves assigning an implied credit rating based on the portfolio company's operating metrics compared to average metrics of similar publicly rated debt. Operating metrics include, but are not limited to, EBITDA, interest coverage, leverage ratio, return on capital, and debt to equity ratios. The implied credit rating is used to assign a base discount rate range based on publicly available yields on similarly rated debt securities. The Company may apply a premium to the discount rate utilized in determining fair value when performance metrics and other qualitative information indicate that there is an additional level of uncertainty about collectability of cash flows.

#### *Asset Approach*

The asset approach values an investment based on the value of the underlying collateral securing the investment. This approach is used when the Company has reason to believe that it will not collect all principal and interest in accordance with the contractual terms of the debt agreement.

72

*Revenue Recognition*

The Company's revenue recognition policies are as follows:

*Interest income and paid-in-kind interest income:* Interest income is recorded on the accrual basis to the extent that such amounts are expected to be collected. The Company has loans in the portfolio that contain a payment-in-kind interest ("PIK interest") provision. The PIK interest, which represents contractually deferred interest added to the loan balance that is generally due at maturity, is recorded on the accrual basis to the extent that such amounts are expected to be collected. PIK interest is not accrued if the Company does not expect the issuer to be able to pay all principal and interest when due.

*Non-accrual investments:* Management reviews all loans that become 90 days or more past due, or when there is reasonable doubt that principal or interest will be collected, for possible placement on non-accrual status. When the Company otherwise does not expect the borrower to be able to service its debt and other obligations, the Company will place the loan on non-accrual status and will generally cease recognizing interest income and PIK interest on that loan for financial reporting purposes. Interest payments received on non-accrual loans may be recognized as income or applied to principal depending upon management's judgment. The Company writes off any previously accrued and uncollected cash interest when it is determined that interest is no longer considered collectible. The Company may elect to cease accruing PIK interest and continue accruing interest income in cases where a loan is currently paying its interest income but, in management's judgment, there is a reasonable likelihood of principal loss on the loan. Non-accrual loans are returned to accrual status when the borrower's financial condition improves such that management believes current interest and principal payments are expected to be collected.

*Gains and losses on investment sales and paydowns:* Realized gains and losses on investments are recognized using the specific identification method.

*Dividend income and paid-in-kind dividends:* Dividend income is recognized on the date dividends are declared. The Company holds preferred equity investments in the portfolio that contain a payment-in-kind dividend ("PIK dividends") provision. PIK dividends, which represent contractually deferred dividends added to the equity balance, are recorded on the accrual basis to the extent that such amounts are expected to be collected. The Company will typically cease accrual of PIK dividends when the fair value of the equity investment is less than the cost basis of the investment or when it is otherwise determined by management that PIK dividends are unlikely to be collected. If management determines that a decline in fair value is temporary in nature and the PIK dividends are more likely than not to be collected, management may elect to continue accruing PIK dividends.

*Original issue discount:* Discounts received to par on loans purchased are capitalized and accreted into income over the life of the loan. Any remaining discount is accreted into income upon prepayment of the loan.

*Other income:* Origination fees (to the extent services are performed to earn such income), amendment fees, consent fees, and other fees associated with investments in portfolio companies are recognized as income when the investment transaction closes. Prepayment penalties received by the Company for debt instruments repaid prior to the maturity date are recorded as income upon receipt.

## Income Taxes

Prior to the Formation Transactions, the Legacy Funds were treated as partnerships for U.S. federal, state and local income tax purposes and, therefore, no provision has been made in the accompanying consolidated financial statements for federal, state or local income taxes. In accordance with the partnership tax law requirements, each partner would include their respective components of the Legacy Funds' taxable profits or losses, as shown on their Schedule K-1 in their respective tax or information returns. The Legacy Funds are disregarded entities for tax purposes prior to and post the Formation Transactions.

The Company has elected to be treated for U.S. federal income tax purposes and intends to comply with the requirement to qualify annually as a RIC under subchapter M of the Code and, among other things, intends to make the requisite distributions to its stockholders which will relieve the Company from U.S. federal income taxes.

73

In order to qualify as a RIC, among other requirements, the Company is required to timely distribute to its stockholders at least 90.0% of its investment company taxable income, as defined by the Code, for each fiscal tax year. The Company will be subject to a nondeductible U.S. federal excise tax of 4.0% on undistributed income if it does not distribute at least 98.0% of its ordinary income in any calendar year and 98.2% of its capital gain net income for each one-year period ending on October 31.

Depending on the level of taxable income earned in an excise tax year, the Company may choose to carry forward taxable income in excess of current year dividend distributions into the next excise tax year and pay a 4.0% U.S. excise tax on such income, as required. To the extent that the Company determines that its estimated current year annual taxable income will be in excess of estimated current year dividend distributions for excise tax purposes, the Company accrues excise tax, if any, on estimated excess taxable income as taxable income is earned. Since the Company's IPO, the Company has not accrued or paid excise tax.

The Company elected to amend its tax year end from August 31 to December 31 and has filed a tax return for the four months ended December 31, 2017. The election to change tax year end is not expected to have a material impact on the Company's consolidated statements of operations, the Company's tax status as a RIC, or the nature of distributions paid to our stockholders.

The tax periods ended December 31, 2018, December 31, 2017, August 31, 2017, and August 31, 2016, remain subject to examination by U.S. federal, state, and local tax authorities. No interest expense or penalties have been assessed for the years ended December 31, 2018, 2017, and 2016. If the Company was required to recognize interest and penalties, if any, related to unrecognized tax benefits this would be recognized as income tax expense in the consolidated statements of operations.

The Company's Taxable Subsidiaries record deferred tax assets or liabilities related to temporary book versus tax differences on the income or loss generated by the underlying equity investments held by the Taxable Subsidiaries. As of December 31, 2018 and December 31, 2017, the Company recorded a net deferred tax asset of $0.6 million and a deferred tax liability of $1.3 million, respectively. For the years ended December 31, 2018 and December 31, 2017, the Company recorded a deferred tax benefit (provision) of $1.9 million and $(1.3) million, respectively. For the year ended December 31, 2016, no tax provision was recorded.

In accordance with certain applicable U.S. treasury regulations and private letter rulings issued by the Internal Revenue Service, a RIC may treat a distribution of its own stock as fulfilling its RIC distribution requirements if each stockholder may elect to receive its entire distribution in either cash or stock of the RIC, subject to a limitation on the aggregate amount of cash to be distributed to all stockholders, which limitation must be at least 20.0% of the aggregate declared distribution. If too many stockholders elect to receive cash, each stockholder electing to receive cash will receive a pro rata amount of cash (with the balance of the distribution paid in stock). In no event will any stockholder, electing to receive cash, receive less than 20.0% of its entire distribution in cash. If these and certain other requirements are met, for U.S. federal income tax purposes, the amount of the dividend paid in stock will be equal to the amount of cash that could have been received instead of stock.

ASC Topic 740 — *Income Taxes* ("ASC 740"), provides guidance for how uncertain tax positions should be recognized, measured, presented and disclosed in the consolidated financial statements. ASC 740 requires the evaluation of tax positions taken or expected to be taken in the course of preparing the Company's tax returns to determine whether the tax positions are "more-likely-than-not" of being sustained by the applicable tax authority. Tax positions deemed to meet a "more-likely-than-not" threshold would be recorded as a tax benefit or expense in the current period. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the consolidated statements of operations. As of December 31, 2018 and December 31, 2017, there were no uncertain tax positions.

The Company is required to determine whether a tax position of the Company is more likely-than-not to be sustained upon examination by the applicable taxing authority, including resolution of any related appeals or litigation processes, based on the technical merits of the position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. De-recognition of a tax benefit previously recognized could result in the Company recording a tax liability that could negatively impact the Company's net assets.

74

U.S. GAAP provides guidance on thresholds, measurement, de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition that is intended to provide better financial statement comparability among different entities.

The Company has concluded that it was not necessary to record a liability for any such tax positions as of December 31, 2018 and 2017. However, the Company's conclusions regarding this policy may be subject to review and adjustment at a later date based on factors including, but not limited to, ongoing analyses of, and changes to, tax laws, regulations and interpretations thereof.

On December 22, 2017, the United States enacted tax reform legislation through the Tax Cuts and Jobs Act, which significantly changes the various U.S. tax laws, including a reduction in the corporate tax rate from 35% to 21%, a move from a worldwide tax system to a territorial system, as well as other changes. The Taxable Subsidiaries' provisional tax is based on the new lower blended federal and state corporate tax rate of 24.86%. The implementation of the Tax Act did not have a material impact on the Company's financial position and results of operations.

**Portfolio and Investment Activity**

The Company's investment objective is to generate both current income and capital appreciation through debt and equity investments. Both directly and through the Company's subsidiaries that are licensed by the SBA under the SBIC Act, the Company offers customized financing to business owners, management teams and financial sponsors for change of ownership transactions, recapitalizations, strategic acquisitions, business expansion and other growth initiatives. The Company invests in first lien loans, second lien loans, and subordinated loans and, to a lesser extent, equity securities issued by lower middle-market companies and traditional middle-market companies. As of December 31, 2018, our portfolio consisted of investments in 44 portfolio companies with a fair value of approximately $448.9 million.

Most of the Company's debt investments are structured as first lien loans. First lien loans may contain some minimum amount of principal amortization, excess cash flow sweep feature, prepayment penalties, or any combination of the foregoing. First lien loans are secured by a first priority lien in existing and future assets of the borrower and may take the form of term loans or delayed draw facilities. Unitranche debt, a form of first lien loan, typically involves issuing one debt security that blends the risk and return profiles of both senior secured and subordinated debt in one debt security, bifurcating the loan into a first-out tranche and last-out tranche. As of December 31, 2018, 13.7% of the fair value of our first lien loans consisted of last-out loans. As of December 31, 2017, 13.7% of the fair value of our first lien loans consisted of last-out loans. In some cases, first lien loans may be subordinated, solely with respect to the payment of cash interest, to an asset based revolving credit facility.

The Company also invests in debt instruments structured as second lien loans. Second lien loans are loans which have a second priority security interest in all or substantially all of the borrower's assets, and which are not subject to the blockage of cash interest payments to the Company at the first lien lender's discretion.

In addition to first and second lien loans, the Company may also invest in subordinated loans. Subordinated loans typically have a second lien on all or substantially all of the borrower's assets but unlike second lien loans, may be subject to the interruption of cash interest payments upon certain events of default, at the discretion of the first lien lender.

During the year ended December 31, 2018, we made approximately $107.8 million of investments and had approximately $123.5 million in repayments and sales of investments resulting in net repayments and sales of approximately $15.7 million for the year. During the year ended December 31, 2017, we made approximately $82.8 million of investments and had approximately $115.8 million in repayments and sales resulting in net repayments and sales of approximately $33.0 million for the year. During the year ended December 31, 2016, we made approximately $120.8 million of investments and had approximately $163.6 million in repayments and sales resulting in net investments of approximately $42.8 million for the year.

75

On August 31, 2016, we sold a portion of 14 securities across 10 portfolio companies to CapitalSouth Partners Florida Sidecar Fund II, L.P. ("FSC II"), including granting an option to acquire a portion of our equity investment in Eastport Holdings, LLC (the "Written Call Option"), in exchange for 100% of the partnership interests in FSC II. Concurrent with the sale of these assets to FSC II, we received cash consideration of $47.6 million from an affiliated third-party purchaser in exchange for 100% of the partnership interests of FSC II. These assets were sold to FSC II at their June 30, 2016 fair market values, resulting in a net realized gain of $0.1 million. Our Board pre-approved this transaction pursuant to Section 57(f) of the 1940 Act.

The Company collected and will periodically collect principal and interest payments related to certain of the securities purchased by FSC II. Such principal and interest payments will be remitted timely to FSC II based on its proportionate share of the security. FSC II does not have any recourse to the Company related to the non-payment of principal or interest by the underlying issuers of the securities.

The Written Call Option granted FSC II the right to purchase up to 31.25% of our equity investment in Eastport Holdings, LLC. The Written Call Option had a strike price of $1.5 million and a termination date of August 31, 2018. On August 27, 2018, FSC II exercised its option at a strike price of $1.5 million. The fair value of the Written Call Option, which had been treated as a derivative liability and recorded in the financial statement line item Written Call Option at fair value in our consolidated statements of assets and liabilities, was approximately $0.0 million and $6.8 million as of December 31, 2018 and 2017, respectively. For purposes of determining the fair value of the Written Call Option, we calculated the difference in the fair value of the underlying equity investment in Eastport Holdings, LLC and the strike price of the Written Call Option, or intrinsic value. The Written Call Option was classified as a Level 3 financial instrument.

As of December 31, 2018, our debt investment portfolio, which represented 76.4% of the fair value of our total portfolio, had a weighted average annualized yield of approximately 11.9%. As of December 31, 2018, 41.4% of the fair value of our debt investment portfolio was bearing a fixed rate of interest. As of December 31, 2017, our debt investment portfolio, which represented 75.5% of the fair value of our total portfolio, had a weighted average annualized yield of approximately 11.9%. As of December 31, 2017, 51.7% of the fair value of our debt investment portfolio was bearing a fixed rate of interest.

The weighted annualized yield is calculated based on the effective interest rate as of period end, divided by the fair value of our debt investments. The weighted average annualized yield of our debt investments is not the same as a return on investment for our stockholders but, rather, relates to a portion of our investment portfolio and is calculated before the payment of all of our fees and expenses. There can be no assurance that the weighted average yield will remain at its current level.

The following table summarizes the amortized cost and the fair value of investments and cash and cash equivalents as of December 31, 2018 (dollars in thousands):

|  | Investments at Amortized Cost | Percentage of Total | Investments at Fair Value | Percentage of Total |
|---|---|---|---|---|
| First Lien Debt | $252,174 | 54.9% | $ 237,570 | 48.7% |
| Second Lien Debt | 33,040 | 7.2 | 32,495 | 6.7 |
| Subordinated Debt | 72,562 | 15.8 | 73,113 | 15.0 |
| Equity and Warrants | 48,594 | 10.6 | 92,054 | 18.9 |
| Capitala Senior Loan Fund II, LLC | 13,600 | 3.0 | 13,695 | 2.8 |
| Cash and Cash Equivalents | 39,295 | 8.5 | 39,295 | 7.9 |
| Total | $459,265 | 100.0% | $ 488,222 | 100.0% |

76

The following table summarizes the amortized cost and the fair value of investments and cash and cash equivalents as of December 31, 2017 (dollars in thousands):

| | Investments at Amortized Cost | Percentage of Total | Investments at Fair Value | Percentage of Total |
|---|---|---|---|---|
| First Lien Debt | $257,147 | 51.8% | $ 243,489 | 45.8% |
| Second Lien Debt | 32,465 | 6.6 | 30,794 | 5.8 |
| Subordinated Debt | 120,235 | 24.2 | 103,385 | 19.5 |
| Equity and Warrants | 55,180 | 11.1 | 122,271 | 23.0 |
| Cash and Cash Equivalents | 31,221 | 6.3 | 31,221 | 5.9 |
| Total | $496,248 | 100.0% | $ 531,160 | 100.0% |

The following table shows the portfolio composition by industry grouping at fair value (dollars in thousands):

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Business Services | $ 57,946 | 12.9% | $ 70,122 | 14.0% |
| Consumer Products | 27,746 | 6.2 | 29,612 | 5.9 |
| Information Technology | 25,232 | 5.6 | 24,761 | 5.0 |
| Financial Services | 21,666 | 4.8 | 26,920 | 5.4 |
| Sales & Marketing Services | 19,496 | 4.3 | 17,388 | 3.5 |
| Telecommunications | 18,000 | 4.0 | — | |
| Food Product Manufacturer | 17,335 | 3.9 | 16,222 | 3.2 |
| Healthcare | 16,972 | 3.8 | 21,368 | 4.3 |
| Industrial Equipment Rental | 16,327 | 3.6 | 15,603 | 3.1 |
| IT Consulting | 15,233 | 3.4 | 12,231 | 2.4 |
| Retail | 14,979 | 3.3 | 15,000 | 3.0 |
| Building Products | 14,833 | 3.3 | 17,879 | 3.6 |
| Automobile Part Manufacturer | 14,384 | 3.2 | 9,285 | 1.9 |
| Healthcare Management | 13,792 | 3.1 | 9,014 | 1.8 |
| Investment Funds | 13,695 | 3.0 | — | |
| Multi-Platform Media and Consumer Products | 13,000 | 2.9 | — | — |
| Textile Equipment Manufacturer | 12,848 | 2.8 | 12,505 | 2.5 |
| Government Services | 12,109 | 2.7 | 10,320 | 2.1 |
| Computer Supply Retail | 10,597 | 2.4 | 12,551 | 2.5 |
| Oil & Gas Services | 9,861 | 2.2 | 27,774 | 5.6 |
| Conglomerate | 9,004 | 2.0 | 7,645 | 1.5 |
| Advertising & Marketing Services | 8,712 | 1.9 | 5,157 | 1.0 |
| Testing Laboratories | 7,503 | 1.7 | — | — |
| Oil & Gas Engineering and Consulting Services | 6,854 | 1.5 | 8,528 | 1.7 |
| Professional and Personal Digital Imaging | 6,674 | 1.5 | 8,810 | 1.8 |
| Electronic Machine Repair | 6,432 | 1.4 | — | — |
| Produce Distribution | 6,210 | 1.4 | 6,170 | 1.2 |
| Farming | 5,880 | 1.3 | 5,581 | 1.1 |
| Restaurant | 4,903 | 1.1 | 4,880 | 1.0 |

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Medical Device Distributor | $ 4,797 | 1.1% | $ 4,713 | 0.9% |
| Online Merchandise Retailer | 3,499 | 0.8 | 3,755 | 0.8 |
| Footwear Retail | 3,184 | 0.7 | 17,748 | 3.6 |
| QSR Franchisor | 3,018 | 0.7 | 7,650 | 1.5 |
| Logistics | 2,984 | 0.7 | — | — |
| Home Repair Parts Manufacturer | 1,722 | 0.4 | 2,767 | 0.6 |
| Household Product Manufacturer | 758 | 0.2 | 1,316 | 0.3 |
| Data Processing & Digital Marketing | 742 | 0.2 | 1,035 | 0.2 |
| Specialty Retail | — | — | 20,713 | 4.1 |
| Fuel Transportation Services | — | — | 11,588 | 2.3 |
| Transportation | — | — | 11,560 | 2.3 |
| Refrigeration/HVAC Services | — | — | 8,736 | 1.7 |
| Bowling Products | — | — | 7,186 | 1.4 |
| Consumer Electronics | — | — | 3,498 | 0.7 |
| Replacement Window Manufacturer | — | — | 1,880 | 0.4 |
| In-Home Healthcare Services | — | — | 174 | 0.1 |
| Automotive Chemicals & Lubricants | — | — | 101 | 0.0 |
| Retail Display & Security Services | — | — | 100 | 0.0 |
| Dental Practice Management | — | — | 93 | 0.0 |
| Total | $448,927 | 100.0% | $499,939 | 100.0% |

With the exception of the international investment holdings noted below, all investments made by the Company as of December 31, 2018 and December 31, 2017 were made in portfolio companies located in the U.S. The geographic composition is determined by the location of the corporate headquarters of the portfolio company, which may not be indicative of the primary source of the portfolio company's business. The following table shows the portfolio composition by geographic region at fair value as of December 31, 2018 and December 31, 2017 (dollars in thousands):

| | At December 31, 2018 | | At December 31, 2017 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| South | $ 224,856 | 50.1% | $ 254,829 | 51.0% |
| Midwest | 77,537 | 17.3 | 84,832 | 17.0 |
| West | 77,353 | 17.2 | 107,835 | 21.5 |
| Northeast | 66,303 | 14.8 | 44,428 | 8.9 |
| International | 2,878 | 0.6 | 8,015 | 1.6 |
| Total | $ 448,927 | 100.0% | $ 499,939 | 100.0% |

In addition to various risk management tools, our Investment Advisor uses an investment rating system to characterize and monitor our expected level of return on each investment in our portfolio.

As part of our valuation procedures, we risk rate all of our investments. In general, our investment rating system uses a scale of 1 to 5, with 1 being the lowest probability of default and principal loss. Our internal rating is not an exact system, but it is used internally to estimate the probability of: (i) default on our debt securities and (ii) loss of our debt principal, in the event of a default. In general, our internal rating system may also assist our valuation team in its determination of the estimated fair value of equity securities or equity-like securities. Our internal risk rating system generally encompasses both qualitative and quantitative aspects of our portfolio companies.

78

Our internal investment rating system incorporates the following five categories:

| Investment Rating | Definition |
|---|---|
| 1 | In general, the investment may be performing above our internal expectations. Full return of principal and interest is expected. Capital gain is expected. |
| 2 | In general, the investment may be performing within our internal expectations, and potential risks to the applicable investment are considered to be neutral or favorable compared to any potential risks at the time of the original investment. All new investments are initially given this rating. |
| 3 | In general, the investment may be performing below our internal expectations and therefore, investments in this category may require closer internal monitoring; however, the valuation team believes that no loss of investment return (interest and/or dividends) or principal is expected. The investment also may be out of compliance with certain financial covenants. |
| 4 | In general, the investment may be performing below internal expectations and quantitative or qualitative risks may have increased substantially since the original investment. Loss of some or all principal is expected. |
| 5 | In general, the investment may be performing substantially below our internal expectations and a number of quantitative or qualitative risks may have increased substantially since the original investment. Loss of some or all principal is expected. |

Our Investment Advisor will monitor and, when appropriate, change the investment ratings assigned to each investment in our portfolio. In connection with our valuation process, our Investment Advisor will review these investment ratings on a quarterly basis. The investment rating of a particular investment should not, however, be deemed to be a guarantee of the investment's future performance.

The following table shows the distribution of our investments on the 1 to 5 investment rating scale at fair value as of December 31, 2018 and 2017 (dollars in thousands):

| Investment Rating | As of December 31, 2018 | | As of December 31, 2017 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Investments | Investments at Fair Value | Percentage of Total Investments |
| 1 | $ 171,829 | 38.3% | $ 191,204 | 38.2% |
| 2 | 194,411 | 43.3 | 186,445 | 37.3 |
| 3 | 73,325 | 16.3 | 97,309 | 19.5 |
| 4 | 9,362 | 2.1 | 24,981 | 5.0 |
| 5 | — | — | — | — |
| Total | $ 448,927 | 100.0% | $ 499,939 | 100.0% |

As of December 31, 2018, we had debt investments in two portfolio companies on non-accrual status with an amortized cost of $20.7 million and a fair value of $9.4 million, which represented 4.9% and 2.1% of the investment portfolio, respectively. As of December 31, 2017, we had debt investments in four portfolio companies on non-accrual status with amortized cost of $50.1 million and a fair value of $25.0 million, which represented 10.8% and 5.0% of the investment portfolio, respectively.

*Capitala Senior Loan Fund II, LLC*

On December 20, 2018, Capitala and Trinity Universal Insurance Company ("Trinity"), a subsidiary of Kemper Corporation, entered into a limited liability company agreement (the "LLC Agreement") to co-manage Capitala Senior Loan Fund II, LLC ("CSLF II"). The purpose and design of the joint venture is to invest primarily in senior secured first-out loans. Capitala and Trinity have committed to provide $25.0 million of equity to CSLF II, with Capitala providing $20.0 million and Trinity providing $5.0 million.

79

Capitala and Trinity each appointed two members to CSLF II's four-person board of directors and investment committee. All material decisions with respect to CSLF II, including those involving its investment portfolio, require approval of a member on the board of directors and investment committee of at least one member representing Capitala and Trinity, respectively.

As of December 31, 2018, $13.6 million and $3.4 million in equity capital had been contributed by Capitala and Trinity, respectively. As of December 31, 2018, the Company and Trinity had $6.4 million and $1.6 million of unfunded equity capital commitments outstanding. The Company's equity investment in CSLF II is not redeemable.

Below is a summary of CSLF II's portfolio at fair value as of December 31, 2018 (dollars in thousands):

|  | December 31, 2018 |
| --- | --- |
| First lien loans[1] | $ 10,000 |
| Weighted average current interest rate on first lien loans | 7.6% |
| Number of borrowers in CSLF II | 2 |
| Largest portfolio company investment[1] | $ 5,550 |
| Total of five largest portfolio company investments[1][2] | $ 10,000 |

(1)  Based on principal amount outstanding at year end.

(2)  Only two investments outstanding at year end.

Below is CSLF II's schedule of investments as of December 31, 2018:

### Capitala Senior Loan Fund II, LLC
### Schedule of Investments
### December 31, 2018
### (in thousands)

| Portfolio Company | Industry | Type of Investment | Principal Amount | Cost | Fair Value |
| --- | --- | --- | --- | --- | --- |
| **Investments in Non-Controlled, Non-Affiliated Portfolio Companies** | | | | | |
| U.S. BioTek Laboratories, LLC | Testing Laboratories | First Lien Debt (7.8% Cash (3 month LIBOR + 5.0%, 2.0% Floor), Due 12/14/23) | $ 4,500 | $ 4,500 | $ 4,500 |
| Freedom Electronics, LLC | Electronics | First Lien Debt (7.5% Cash (1 month LIBOR + 5.0%, 2.0% Floor), Due 12/20/23) | 5,500 | 5,500 | 5,500 |
| **TOTAL INVESTMENTS IN NON-CONTROLLED, NON-AFFILIATED PORTFOLIO COMPANIES** | | | $10,000 | $10,000 | $10,000 |

80

Below is the financial information for CSLF II:

**Capitala Senior Loan Fund II, LLC**
**Statement of Assets and Liabilities**
**(in thousands)**

|  | As of December 31, 2018 |
|---|---|
| ASSETS |  |
| Investments at fair value |  |
| Non-control/non-affiliate investments (amortized cost of $10,000) | $ 10,000 |
| Cash and cash equivalents | 7,100 |
| Interest receivable | 31 |
| Total assets | $ 17,131 |
| LIABILITIES |  |
| Accounts payable | $ 12 |
| Total liabilities | $ 12 |
| NET ASSETS |  |
| Partners' capital | $ 17,119 |
| Total net assets | $ 17,119 |

**Capitala Senior Loan Fund II, LLC**
**Statement of Operations**
**(in thousands)**

|  | For the period from December 20, 2018 (commencement of operations) to December 31, 2018 |
|---|---|
| INVESTMENT INCOME |  |
| From non-controlled, non-affiliated investments: |  |
| Interest income | $ 31 |
| Fee income | 100 |
| Total investment income | $ 131 |
| EXPENSES |  |
| General and administrative expenses | $ 12 |
| Total expenses | $ 12 |
| NET INVESTMENT INCOME | $ 119 |
| NET INCREASE IN NET ASSETS RESULTING FROM OPERATIONS | $ 119 |

81

**Results of Operations**

Our operating results for the years ended December 31, 2018, 2017 and 2016 are as follows (dollars in thousands):

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2018 | 2017 | 2016 |
| Total investment income | $ 47,293 | $ 51,089 | $ 68,312 |
| Total expenses, net of incentive fee waivers | 31,271 | 35,565 | 39,272 |
| Net investment income | 16,022 | 15,524 | 29,040 |
| Total realized loss on investments | (34,804) | (24,189) | (22,766) |
| Net unrealized appreciation (depreciation) on investments | (5,955) | 7,049 | 5,594 |
| Net unrealized appreciation (depreciation) on Written Call Option | 6,795 | (4,079) | (2,716) |
| Tax benefit (provision) | 1,916 | (1,289) | — |
| Net increase (decrease) in net assets resulting from operations | $(16,026) | $ (6,984) | $ 9,152 |

**Investment income**

The composition of our investment income for the years ended December 31, 2018, 2017 and 2016 was as follows (dollars in thousands):

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2018 | 2017 | 2016 |
| Interest income | $40,357 | $40,462 | $54,990 |
| Fee income | 2,044 | 2,027 | 4,118 |
| Payment-in-kind interest and dividend income | 4,348 | 7,143 | 6,300 |
| Dividend income | 397 | 1,221 | 2,792 |
| Other Income | — | 125 | 85 |
| Interest from cash and cash equivalents | 147 | 111 | 27 |
| Total investment income | $47,293 | $51,089 | $68,312 |

The income reported as interest income and PIK interest and PIK dividend income is generally based on the stated rates as disclosed in our consolidated schedule of investments. Accretion of discounts received for purchased loans are included in interest income as an adjustment to yield. As a general rule, our interest income and PIK interest and PIK dividend income are recurring in nature.

We also generate fee income primarily through origination fees charged for new investments, and secondarily via amendment fees, consent fees, prepayment penalties, and other fees. While fee income is typically non-recurring for each investment, most of our new investments include an origination fee; as such, fee income is dependent upon our volume of directly originated investments and the fee structure associated with those investments.

We earn dividends on certain equity investments within our investment portfolio. As noted in our consolidated schedule of investments, some investments are scheduled to pay a periodic dividend, though these recurring dividends do not make up a significant portion of our total investment income. We may, and have received, more substantial one-time dividends from our equity investments.

For the year ended December 31, 2018, total investment income decreased by $3.8 million, or 7.4%, compared to the year ended December 31, 2017. The decrease from the prior year was driven primarily by a $2.8 million decline in PIK income, from $7.1 million for the year ended December 31, 2017, to $4.3 million for the year ended December 31, 2018. The decrease in PIK income was due to a decline in investments with a contractual PIK rate. Interest income declined $0.1 for the year ended December 31, 2018 compared to the year ended December 31, 2017, as a decline in average outstanding debt investments was partially offset

82

by an increase in the weighted average cash interest yield of the portfolio and a decline in average non-accrual debt investments. For the year ended December 31, 2018, we generated $1.7 million in origination fees from new deployments and $0.3 million in other fees. Comparatively, for the year ended December 31, 2017, we generated $1.2 million in origination fees from new deployments and $0.8 million in other fees. Dividend income decreased from $1.2 million for the year ended December 31, 2017 to $0.4 million for the year ended December 31, 2018, mostly driven by a decrease in one-time dividends from portfolio companies.

For the year ended December 31, 2017, total investment income decreased by $17.2 million, or 25.2%, compared to the year ended December 31, 2016. The decrease from the prior year was driven primarily by a $14.5 million decline in interest income, from $55.0 million for the year ended December 31, 2016, to $40.5 million for the year ended December 31, 2017. The decline in interest income was caused by a decline in average outstanding debt investments and an increase in average non-accrual debt investments. Fee income declined by $2.1 million compared to the prior year, from $4.1 million for the year ended December 31, 2016 to $2.0 million for the year ended December 31, 2017. For the year ended December 31, 2017, we generated $1.2 million in origination fees from new deployments and $0.8 million in other fees. Comparatively, for the year ended December 31, 2016, we generated $2.1 million in origination fees from new deployments and $2.0 million in other fees. Dividend income decreased from $2.8 million for the year ended December 31, 2016 to $1.2 million for the year ended December 31, 2017, mostly driven by a $1.8 million decrease in dividends paid by Capitala Senior Liquid Loan Fund I, LLC. PIK income increased $0.8 million compared to the prior year, from $6.3 million for the year ended December 31, 2016 to $7.1 million for the year ended December 31, 2017. The increase in PIK income was primarily due to investments restructured during the year ended December 31, 2017 that provided for an increase in the PIK rate being charged.

### *Operating expenses*

The composition of our expenses for the years ended December 31, 2018, 2017 and 2016 was as follows (dollars in thousands):

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2018 | 2017 | 2016 |
| Interest and financing expenses | $17,283 | $18,825 | $19,711 |
| Loss on extinguishment of debt | — | 2,732 | — |
| Base management fee | 9,049 | 9,780 | 10,588 |
| Incentive fees, net of incentive fee waiver | 244 | 350 | 5,169 |
| General and administrative expenses | 4,695 | 3,878 | 3,804 |
| Total expenses, net of fee waivers | $31,271 | $35,565 | $39,272 |

For the year ended December 31, 2018, operating expenses decreased by $4.3 million, or 12.1%, compared to the year ended December 31, 2017. For the year ended December 31, 2017, we recognized a $2.7 million loss on extinguishment of debt related to repayment of our 7.125% Notes due 2021 (the "2021 Notes"). Interest and financing expenses declined from $18.8 million for the year ended December 31, 2017 to $17.3 million for the year ended December 31, 2018 due to lower weighted average interest rates on our outstanding debt and lower average debt outstanding. Our base management fee declined from $9.8 million for the year ended December 31, 2017 to $9.0 million for the year ended December 31, 2018 due to lower average assets under management. Incentive fees, net of incentive fee waiver, decreased from $0.4 million to $0.2 million due to lower pre-incentive fee net investment income. General and administrative expenses increased from $3.9 million for the year ended December 31, 2017 to $4.7 million for the year ended December 31, 2018 due primarily to an increase in legal expenses relating to a shareholder lawsuit, an increase in payments made to the Administrator, and an increase in professional fees related to internal control audit services.

For the year ended December 31, 2017, operating expenses decreased by $3.7 million, or 9.4%, compared to the year ended December 31, 2016. For the year ended December 31, 2017 we recognized a $2.7 million loss on extinguishment of debt related to the repayment of our 2021 Notes. The increase in

expenses related to the loss on extinguishment of debt was offset by (i) a decline in base management fees, from $10.6 million for the year ended December 31, 2016, to $9.8 million for the year ended December 31, 2017 due to lower average assets under management, (ii) a decline in incentive fees, net of incentive fee waiver, from $5.2 million for the year ended December 31, 2016 to $0.4 million for the year ended December 31, 2017, due to lower pre-incentive fee net investment income, and (iii) a decline in interest and financing expenses, from $19.7 million for the year ended December 31, 2016 to $18.8 million for the year ended December 31, 2017, primarily due to a lower average debt balance outstanding during the period.

### Net realized gains (losses) on sales of investments

During the years ended December 31, 2018, 2017, and 2016, we recognized $(34.8) million, $(24.2) million and $(22.8) million of net realized losses on our portfolio investments, respectively.

### Net unrealized appreciation (depreciation) on investments

Net change in unrealized appreciation (depreciation) on investments reflects the net change in the fair value of our investment portfolio. For the years ended December 31, 2018, 2017, and 2016, we had $(6.0) million, $7.0 million and $5.6 million of unrealized appreciation (depreciation) on investments, respectively.

### Net unrealized depreciation on Written Call option

For the years ended December 31, 2018, 2017 and 2016 we had net unrealized appreciation (depreciation) on the Written Call Option of $6.8 million, $(4.1) million, and $(2.7) million, respectively.

### Tax benefit (provision)

For the years ended December 31, 2018 and December 31, 2017, we recorded a tax benefit (provision) of $1.9 million and $(1.3) million, respectively. For the year ended December 31, 2016, no tax provision was recorded.

### Changes in net assets resulting from operations

For the years ended December 31, 2018, 2017, and 2016 we recorded a net increase (decrease) in net assets resulting from operations of $(16.0) million, $(7.0) million, and $9.2 million, respectively. Based on the weighted average shares of common stock outstanding for the years ended December 31, 2018, 2017, and 2016 our per share net increase (decrease) in net assets resulting from operations was $(1.00), $(0.44), and $0.58, respectively.

### Summarized Financial Information of Our Unconsolidated Subsidiaries

The Company holds a control interest, as defined by the 1940 Act, in five portfolio companies that are considered significant subsidiaries under the guidance in Regulation S-X, but are not consolidated in the Company's consolidated financial statements. Below is a brief description of each such portfolio company, along with summarized financial information as of December 31, 2018 and 2017, and for the years ended December 31, 2018, 2017, and 2016.

During the year ended December 31, 2018, the Company sold its investment in Kelle's Transport Service, LLC and realized a loss of $3.7 million. During the year ended December 31, 2018, the Company wrote-off its investment in On-Site Fuel Service, Inc. and realized a loss of $16.7 million.

### AAE Acquisition, LLC

AAE Acquisition, LLC, formed on May 21, 2004 as a Delaware limited liability company, is an aerial equipment rental and services business primarily serving the Gulf Coast region. The income (loss) the Company generated from AAE Acquisition, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $1.7 million, $1.7 million, and $(1.1) million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016 respectively.

### *CableOrganizer Acquisition, LLC*

CableOrganizer Acquisition, LLC, a Delaware limited liability company that began operations on April 23, 2013, is a leading online provider of cable and wire management products. The income (loss) the Company generated from CableOrganizer Acquisition, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $(2.4) million, $1.8 million and $1.9 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

### *Eastport Holdings, LLC*

Eastport Holdings, LLC, an Ohio limited liability company organized on November 1, 2011, is a holding company consisting of marketing and advertising companies located across the U.S. The income the Company generated from Eastport Holdings, LLC, which includes all interest, dividends, PIK interest and dividends, fees, and unrealized appreciation (depreciation), was $11.4 million and $14.3 million for the years ended December 31, 2017 and December 31, 2016, respectively. On August 27, 2018, the Written Call Option associated with the Company's investment in Eastport Holdings, LLC was exercised and, as a result of the reduced ownership percentage, is no longer considered a control investment. The income the Company generated from Eastport Holdings, LLC while it was considered a control investment from January 1, 2018 to August 27, 2018 was $2.1 million. The summarized financial information disclosed below is as of August 31, 2018 and for the eight months ended August 31, 2018 as this is the period that Eastport Holdings, LLC was considered a control investment.

### *Micro Precision, LLC*

Micro Precision, LLC, formed on August 5, 2011 as a Delaware limited liability company, is a prime contractor supplying critical parts and mechanical assemblies to the U.S. Department of Defense as well as designer and manufacturer of locomotive air horns. The income the Company generated from Micro Precision, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $2.1 million, $0.0 million, and $1.8 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

### *Navis Holdings, Inc.*

Navis Holdings, Inc., incorporated in Delaware on December 21, 2010, designs and manufactures leading machinery for the global knit and woven finishing textile industries. The income the Company generated from Navis Holdings, Inc., which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation) was $0.6 million, $0.7 million, and $1.9 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

The summarized unaudited financial information of our unconsolidated subsidiaries was as follows (dollars in thousands):

| | As of | |
| --- | --- | --- |
| Balance Sheets – AAE Acquisition, LLC | December 31, 2018 | December 31, 2017 |
| Current assets | $ 7,277 | $ 6,712 |
| Noncurrent assets | 22,994 | 27,668 |
| Total assets | $ 30,271 | $ 34,380 |
| Current liabilities | $ 53,939 | $ 2,897 |
| Noncurrent liabilities | 2,122 | 51,428 |
| Total liabilities | $ 56,061 | $ 54,325 |
| Total deficit | $(25,790) | $(19,945) |

85

TABLE OF CONTENTS

| | For the year ended | | |
|---|---|---|---|
| **Statements of Operations – AAE Acquisition, LLC** | **December 31, 2018** | **December 31, 2017** | **December 31, 2016** |
| Net sales | $ 27,162 | $ 26,677 | $ 28,352 |
| Cost of goods sold | 20,098 | 20,265 | 22,402 |
| Gross profit | $ 7,064 | $ 6,412 | $ 5,950 |
| Other expenses | $ 12,768 | $ 11,916 | $ 11,812 |
| Net loss before income taxes | (5,704) | (5,504) | (5,862) |
| Income tax provision | — | — | — |
| Net loss | $ (5,704) | $ (5,504) | $ (5,862) |

| | As of | |
|---|---|---|
| **Balance Sheets – CableOrganizer Acquisition, LLC** | **December 31, 2018** | **December 31, 2017** |
| Current assets | $ 2,987 | $ 5,182 |
| Noncurrent assets | 8,459 | 8,354 |
| Total assets | $ 11,446 | $ 13,536 |
| Current liabilities | $ 13,094 | $ 5,205 |
| Noncurrent liabilities | — | 12,346 |
| Total liabilities | $ 13,094 | $ 17,551 |
| Total deficit | $ (1,648) | $ (4,015) |

| | For the year ended | | |
|---|---|---|---|
| **Statements of Operations – CableOrganizer Acquisition, LLC.** | **December 31, 2018** | **December 31, 2017** | **December 31, 2016** |
| Net sales | $ 18,115 | $ 27,133 | $ 23,277 |
| Cost of goods sold | 12,183 | 19,819 | 15,715 |
| Gross profit | $ 5,932 | $ 7,314 | $ 7,562 |
| Other expenses | $ 7,960 | $ 10,690 | $ 10,344 |
| Net loss before income taxes | (2,028) | (3,376) | (2,782) |
| Income tax provision | — | — | — |
| Net loss | $ (2,028) | $ (3,376) | $ (2,782) |

| | As of | |
|---|---|---|
| **Balance Sheets – Eastport Holdings, LLC** | **August 31, 2018** | **December 31, 2017** |
| Current assets | $ 99,483 | $ 94,396 |
| Noncurrent assets | 185,292 | 180,266 |
| Total assets | $ 284,775 | $ 274,662 |
| Current liabilities | $ 163,085 | $ 153,182 |
| Noncurrent liabilities | 60,939 | 56,272 |
| Total liabilities | $ 224,024 | $ 209,454 |
| Total equity | $ 60,751 | $ 65,208 |

86

| Statements of Operations – Eastport Holdings, LLC | For the eight months ended August 31, 2018 | For the year ended | |
| --- | --- | --- | --- |
| | | December 31, 2017 | December 31, 2016 |
| Net sales | $ 373,943 | $510,400 | $499,986 |
| Cost of goods sold | 267,395 | 364,605 | 377,036 |
| Gross profit | $ 106,548 | $145,795 | $122,950 |
| Other expenses | $ 103,811 | $135,597 | $111,677 |
| Net income before income taxes | 2,737 | 10,198 | 11,273 |
| Income tax provision | 335 | 278 | — |
| Net income | $ 2,402 | $ 9,920 | $ 11,273 |

| Balance Sheets – Micro Precision, LLC | As of | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| Current assets | $ 5,880 | $ 6,187 |
| Noncurrent assets | 19,436 | 15,864 |
| Total assets | $25,316 | $22,051 |
| Current liabilities | $ 7,712 | $ 6,511 |
| Noncurrent liabilities | 13,961 | 15,790 |
| Total liabilities | $21,673 | $22,301 |
| Total equity (deficit) | $ 3,643 | $ (250) |

| Statements of Operations – Micro Precision, LLC | For the year ended | | |
| --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Net sales | $ 12,083 | $ 14,053 | $ 17,788 |
| Cost of goods sold | 6,595 | 8,677 | 12,183 |
| Gross profit | $ 5,488 | $ 5,376 | $ 5,605 |
| Other expenses | $ 5,562 | $ 6,590 | $ 6,836 |
| Net loss before income taxes | (74) | (1,214) | (1,231) |
| Income tax provision | — | — | — |
| Net loss | $ (74) | $ (1,214) | $ (1,231) |

| Balance Sheets – Navis Holdings, Inc. | As of | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| Current assets | $ 5,868 | $ 4,723 |
| Noncurrent assets | 5,145 | 2,162 |
| Total assets | $ 11,013 | $ 6,885 |
| Current liabilities | $ 5,542 | $ 2,463 |
| Noncurrent liabilities | 8,060 | 6,738 |
| Total liabilities | $13,602 | $ 9,201 |
| Total deficit | $ (2,589) | $ (2,316) |

87

| Statements of Operations – Navis Holdings, Inc. | For the year ended | | |
| --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Net sales | $ 14,305 | $ 13,947 | $ 17,803 |
| Cost of goods sold | 8,456 | 8,729 | 10,933 |
| Gross profit | $ 5,849 | $ 5,218 | $ 6,870 |
| Other expenses | $ 5,977 | $ 4,684 | $ 5,070 |
| Net income (loss) before income taxes | (128) | 534 | 1,800 |
| Income tax provision | 20 | 1,185 | 701 |
| Net income (loss) | $ (148) | $ (651) | $ 1,099 |

### Financial Condition, Liquidity and Capital Resources

We use and intend to use existing cash primarily to originate investments in new and existing portfolio companies, pay distributions to our stockholders, and repay indebtedness.

On September 30, 2013, we issued 4,000,000 shares at $20.00 per share in our IPO, generating net proceeds of $74.25 million.

On October 17, 2014, the Company entered into a senior secured revolving credit agreement (the "Credit Facility") with ING Capital, LLC, as administrative agent, arranger, and bookrunner, and the lenders party thereto. The Credit Facility was amended on May 22, 2015, June 16, 2017, and July 19, 2018 (the "Amendments"). The Amendments were affected, among other things, in order to increase the total borrowings allowed under the Credit Facility, allow for stock repurchases, extend the maturity date, and to reduce the minimum required interest coverage ratio. The Credit Facility currently provides for borrowings up to $114.5 million and may be increased up to $200.0 million pursuant to its "accordion" feature. The Credit Facility matures on June 16, 2021. As of December 31, 2018, we had $10.0 million outstanding and $104.5 million available under the Credit Facility.

On April 13, 2015, we completed an underwritten offering of 3,500,000 shares of our common stock at a public offering price of $18.32 per share. The total proceeds received in the offering net of underwriting discounts and offering costs were approximately $61.7 million.

On May 16, 2017, we issued $70.0 million in aggregate principal amount of 6.0% fixed-rate notes due May 31, 2022 (the "2022 Notes"). On May 25, 2017, we issued an additional $5.0 million in aggregate principal amount of the 2022 Notes pursuant to a partial exercise of the underwriters' overallotment option. The 2022 Notes will mature on May 31, 2022 and may be redeemed in whole or in part at any time or from time to time at our option on or after May 31, 2019 at a redemption price equal to 100% of the outstanding principal, plus accrued and unpaid interest. Interest is payable quarterly beginning August 31, 2017. The 2022 Notes are listed on the NASDAQ Global Select Market under the trading symbol "CPTAL" with a par value $25.00 per share.

On May 26, 2017, we issued $50.0 million in aggregate principal amount of 5.75% fixed-rate convertible notes due on May 31, 2022 (the "2022 Convertible Notes"). On June 26, 2017, we issued an additional $2.1 million in aggregate principal amount of the 2022 Convertible Notes pursuant to a partial exercise of the underwriters' overallotment option. Interest is payable quarterly beginning August 31, 2017. The 2022 Convertible Notes are listed on the NASDAQ Capital Market under the trading symbol "CPTAG" with a par value $25.00 per share.

As of December 31, 2018, Fund II had $26.2 million in regulatory capital and $15.7 million in SBA-guaranteed debentures outstanding and Fund III had $75.0 million in regulatory capital and $150.0 million in SBA-guaranteed debentures outstanding. In addition to our existing SBA-guaranteed debentures, we may, if permitted by regulation, seek to issue additional SBA-guaranteed debentures as well as other forms of leverage and borrow funds to make investments. On June 10, 2014, we received an exemptive order from the SEC exempting us, Fund II and Fund III from certain provisions of the 1940 Act

88

(including an exemptive order granting relief from the asset coverage requirements for certain indebtedness issued by Fund II and Fund III as SBICs) and from certain reporting requirements mandated by the 1934 Act, with respect to Fund II and Fund III. We intend to comply with the conditions of the order.

As of December 31, 2018, we had $39.3 million in cash and cash equivalents, and our net assets totaled $190.6 million.

**Contractual Obligations**

We have entered into two contracts under which we have material future commitments: the Investment Advisory Agreement, pursuant to which the Investment Advisor serves as our investment adviser, and the Administration Agreement, pursuant to which our Administrator agrees to furnish us with certain administrative services necessary to conduct our day-to-day operations. Payments under the Investment Advisory Agreement in future periods will be equal to: (1) a percentage of the value of our gross assets; and (2) an incentive fee based on our performance. Payments under the Administration Agreement will occur on an ongoing basis as expenses are incurred on our behalf by our Administrator.

The Investment Advisory Agreement and the Administration Agreement are each terminable by either party without penalty upon 60 days' written notice to the other. If either of these agreements is terminated, the costs we incur under new agreements may increase. In addition, we will likely incur significant time and expense in locating alternative parties to provide the services we expect to receive under both our Investment Advisory Agreement and our Administration Agreement. Any new investment advisory agreement would also be subject to approval by our stockholders.

A summary of our significant contractual payment obligations as of December 31, 2018 are as follows (dollars in thousands):

| | Contractual Obligations Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Less Than 1 Year | 1 – 3 Years | 3 – 5 Years | More Than 5 Years | Total |
| SBA Debentures | $        — | $80,700 | $  85,000 | $        — | $165,700 |
| 2022 Notes | — | — | 75,000 | — | 75,000 |
| 2022 Convertible Notes | — | — | 52,088 | — | 52,088 |
| Credit Facility | — | $10,000 | — | — | $  10,000 |
| Total Contractual Obligations | $        — | $90,700 | $212,088 | $        — | $302,788 |

**Distributions**

In order to qualify as a RIC and to avoid corporate-level U.S. federal income tax on the income we distribute to our stockholders, we are required to distribute at least 90% of our net ordinary income and our net short-term capital gains in excess of net long-term capital losses, if any, to our stockholders on an annual basis. Additionally, we must distribute an amount at least equal to the sum of 98% of our net ordinary income (during the calendar year) plus 98.2% of our net capital gain income (during each 12-month period ending on October 31) plus any net ordinary income and capital gain net income for preceding years that were not distributed during such years and on which we paid no U.S. federal income tax to avoid a U.S. federal excise tax. We made quarterly distributions to our stockholders for the first four full quarters subsequent to our IPO. To the extent we have income available, we have made and intend to make monthly distributions thereafter. Our monthly stockholder distributions, if any, will be determined by our Board on a quarterly basis. Any distribution to our stockholders will be declared out of assets legally available for distribution.

We may not be able to achieve operating results that will allow us to make distributions at a specific level or to increase the amount of our distributions from time to time, and from time to time we may decrease the amount of our distributions. In addition, we may be limited in our ability to make distributions due to the asset coverage requirements applicable to us as a BDC under the 1940 Act. If we do not distribute a certain percentage of our income annually, we will suffer adverse tax consequences, including the possible loss of our qualification as a RIC. We cannot assure stockholders that they will receive any distributions.

89

To the extent our taxable earnings fall below the total amount of our distributions for that fiscal year, a portion of those distributions may be deemed a return of capital to our stockholders for U.S. federal income tax purposes. Thus, the source of a distribution to our stockholders may be the original capital invested by the stockholder rather than our income or gains. Stockholders should read any written disclosure accompanying any stockholder distribution carefully and should not assume that the source of any distribution is our ordinary income or capital gains.

We have adopted an "opt out" dividend reinvestment plan ("DRIP") for our common stockholders. As a result, if we declare a distribution, then stockholders' cash distributions will be automatically reinvested in additional shares of our common stock unless a stockholder specifically "opts out" of our DRIP. If a stockholder opts out, that stockholder will receive cash distributions. Although distributions paid in the form of additional shares of our common stock will generally be subject to U.S. federal, state and local taxes in the same manner as cash distributions, stockholders participating in our DRIP will not receive any corresponding cash distributions with which to pay any such applicable taxes.

The following tables summarize our distributions declared from January 1, 2016 through December 31, 2018:

| Date Declared | Record Date | Payment Date | Amount Per Share |
|---|---|---|---|
| January 2, 2018 | January 22, 2018 | January 30, 2018 | $0.0833 |
| January 2, 2018 | February 20, 2018 | February 27, 2018 | 0.0833 |
| January 2, 2018 | March 23, 2018 | March 29, 2018 | 0.0833 |
| April 2, 2018 | April 19, 2018 | April 27, 2018 | 0.0833 |
| April 2, 2018 | May 22, 2018 | May 30, 2018 | 0.0833 |
| April 2, 2018 | June 20, 2018 | June 28, 2018 | 0.0833 |
| July 2, 2018 | July 23, 2018 | July 30, 2018 | 0.0833 |
| July 2, 2018 | August 23, 2018 | August 30, 2018 | 0.0833 |
| July 2, 2018 | September 20, 2018 | September 27, 2018 | 0.0833 |
| October 1, 2018 | October 23, 2018 | October 30, 2018 | 0.0833 |
| October 1, 2018 | November 21, 2018 | November 29, 2018 | 0.0833 |
| October 1, 2018 | December 20, 2018 | December 28, 2018 | 0.0833 |
| Total Distributions Declared and Distributed for 2018 | | | $ 1.00 |

| Date Declared | Record Date | Payment Date | Amount Per Share |
|---|---|---|---|
| January 3, 2017 | January 20, 2017 | January 30, 2017 | $0.1300 |
| January 3, 2017 | February 20, 2017 | February 27, 2017 | 0.1300 |
| January 3, 2017 | March 23, 2017 | March 30, 2017 | 0.1300 |
| April 3, 2017 | April 19, 2017 | April 27, 2017 | 0.1300 |
| April 3, 2017 | May 23, 2017 | May 29, 2017 | 0.1300 |
| April 3, 2017 | June 21, 2017 | June 29, 2017 | 0.1300 |
| July 3, 2017 | July 21, 2017 | July 28, 2017 | 0.1300 |
| July 3, 2017 | August 23, 2017 | August 30, 2017 | 0.1300 |
| July 3, 2017 | September 20, 2017 | September 28, 2017 | 0.1300 |
| October 2, 2017 | October 23, 2017 | October 30, 2017 | 0.0833 |
| October 2, 2017 | November 21, 2017 | November 29, 2017 | 0.0833 |
| October 2, 2017 | December 20, 2017 | December 28, 2017 | 0.0833 |
| Total Distributions Declared and Distributed for 2017 | | | $ 1.42 |

90

| Date Declared | Record Date | Payment Date | Amount Per Share |
|---|---|---|---|
| January 4, 2016 | January 22, 2016 | January 28, 2016 | $0.1567 |
| January 4, 2016 | February 19, 2016 | February 26, 2016 | 0.1567 |
| January 4, 2016 | March 22, 2016 | March 30, 2016 | 0.1567 |
| April 1, 2016 | April 22, 2016 | April 28, 2016 | 0.1567 |
| April 1, 2016 | May 23, 2016 | May 30, 2016 | 0.1567 |
| April 1, 2016 | June 21, 2016 | June 29, 2016 | 0.1567 |
| July 1, 2016 | July 22, 2016 | July 29, 2016 | 0.1567 |
| July 1, 2016 | August 22, 2016 | August 30, 2016 | 0.1567 |
| July 1, 2016 | September 22, 2016 | September 29, 2016 | 0.1567 |
| September 22, 2016 | October 21, 2016 | October 28, 2016 | 0.1300 |
| September 22, 2016 | November 21, 2016 | November 29, 2016 | 0.1300 |
| September 22, 2016 | December 21, 2016 | December 29, 2016 | 0.1300 |
| Total Distributions Declared and Distributed for 2016 | | | $ 1.80 |

## Related Parties

We have entered into the Investment Advisory Agreement with the Investment Advisor. Joseph B. Alala, our chief executive officer and chairman of our Board, is the managing partner and chief investment officer of the Investment Advisor, and M. Hunt Broyhill, a member of our Board, has an indirect controlling interest in the Investment Advisor.

In addition, an affiliate of the Investment Advisor also manages CapitalSouth Partners SBIC Fund IV, L.P. ("Fund IV"), a private investment limited partnership which provides financing solutions to smaller and lower middle-market companies that had its first closing in March 2013 and obtained SBA approval for its SBIC license in April 2013. In addition to Fund IV, affiliates of the Investment Advisor may manage several affiliated funds whereby institutional limited partners in Fund IV have the opportunity to co-invest with Fund IV in portfolio investments. An affiliate of the Investment Advisor also manages Capitala Private Credit Fund V, L.P. ("Fund V"), a private investment limited partnership, and a private investment vehicle (referred to herein as "Capitala Specialty Lending Corp" or "CSLC"), both of which provide financing solutions to lower middle-market and traditional middle-market companies. The Investment Advisor and its affiliates may also manage other funds in the future that may have investment mandates that are similar, in whole and in part, with ours. To the extent permitted by the 1940 Act and interpretation of the SEC staff, the Investment Advisor and its affiliates may determine that an investment is appropriate for us and for one or more of those other funds. In such event, depending on the availability of such investment and other appropriate factors, the Investment Advisor or its affiliates may determine that we should invest side-by-side with one or more other funds. Any such investments will be made only to the extent permitted by applicable law and interpretive positions of the SEC and its staff, and consistent with the Investment Advisor's allocation procedures. We expect to make, and have made, co-investments with Fund V and/or CSLC given their similar investment strategies.

On September 10, 2015, we, Fund II, Fund III, Fund V, and the Investment Advisor filed an application for exemptive relief with the SEC to permit an investment fund and one or more other affiliated investment funds, including future affiliated investment funds, to participate in the same investment opportunities through a proposed co-investment program where such participation would otherwise be prohibited under the 1940 Act. On June 1, 2016, the SEC issued an order (the "Order") permitting this relief. Pursuant to the Order, we are permitted to co-invest in such investment opportunities with our affiliates if a "required majority" (as defined in Section 57(o) of the 1940 Act) of our independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are

91

8/4/2020                     Case 3:18-cv-01023-MPS   Document 358-15   Filed 12/01/21   Page 95 of 174
tv514470-10k - Generated by EDGAR Online
TABLE OF CONTENTS

reasonable and fair to us and our stockholders and do not involve overreaching in respect of us or our stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of our stockholders and is consistent with our then-current investment objective and strategies.

On August 31, 2016, the Company sold assets to FSC II in exchange for 100% of the partnership interests in FSC II. Concurrent with the sale of these assets to FSC II, the Company received cash consideration of $47.6 million from an affiliated third-party purchaser in exchange for 100% of the partnership interests of FSC II. The Company's Board pre-approved this transaction pursuant to Section 57(f) of the 1940 Act. Capitala Advisors Corp., the Company's Administrator, also serves as the administrator to FSC II.

The Company may invest in the same unitranche facility as CSLF II whereby CSLF II provides the first-out portion of the unitranche facility and the Company and other lenders provide the last-out portion of the unitranche facility. Under a guarantee agreement, the Company may be required to purchase its pro-rata portion of first-out loans from CSLF II upon certain triggering events, including acceleration upon payment default of the underlying borrower. As of December 31, 2018, the Company has evaluated the fair value of the guarantee under the guidance of ASC Topic 460 — *Guarantees* and determined that the fair value of the guarantee is immaterial as the risk of payment default for first-out loans in CSLF II is considered remote. The maximum exposure to credit risk as of December 31, 2018 is $4.3 million and extends to the stated maturity of the underlying loans in CSLF II.

We have entered into a license agreement with the Investment Advisor, pursuant to which the Investment Advisor has agreed to grant us a non-exclusive, royalty-free license to use the name "Capitala."

We have entered into the Administration Agreement with our Administrator. Pursuant to the terms of the Administration Agreement, our Administrator provides us with the office facilities and administrative services necessary to conduct our day-to-day operations. Mr. Alala, our chief executive officer, and chairman of our Board, is the chief executive officer, president and a director of our Administrator.

**Off-Balance Sheet Arrangements**

As of December 31, 2018, the Company had outstanding unfunded commitments related to debt and equity investments in existing portfolio companies of $6.4 million (Capitala Senior Loan Fund II, LLC), $5.0 million (Portrait Studio, LLC), $1.1 million (MC Sign Lessor, Corp), $1.0 million (U.S. BioTek Laboratories, LLC), $0.8 million (Freedom Electronics, LLC), and $0.3 million (CableOrganizer Acquisition, LLC). As of December 31, 2017, the Company had outstanding unfunded commitments related to debt investments in existing portfolio companies of $3.1 million (Portrait Studio, LLC), $2.0 million (CIS Secure Computing, Inc.), $1.0 million (Kelle's Transport Service, LLC), and $0.7 million (U.S. Well Services, LLC).

The Company may invest in the same unitranche facility as CSLF II whereby CSLF II provides the first-out portion of the unitranche facility and the Company and other lenders provide the last-out portion of the unitranche facility. Under a guarantee agreement, the Company may be required to purchase its pro-rata portion of first-out loans from CSLF II upon certain triggering events, including acceleration upon payment default of the underlying borrower. As of December 31, 2018, the Company has evaluated the fair value of the guarantee under the guidance of ASC Topic 460 — *Guarantees* and determined that the fair value of the guarantee is immaterial as the risk of payment default for first-out loans in CSLF II is considered remote. The maximum exposure to credit risk as of December 31, 2018 is $4.3 million and extends to the stated maturity of the underlying loans in CSLF II.

We have no other off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Recent Developments**

*Distributions*

On January 2, 2019 our Board declared the following distributions:

| Date Declared | Record Date | Payment Date | Distributions per Share |
|---|---|---|---|
| January 2, 2019 | January 24, 2019 | January 30, 2019 | $0.0833 |
| January 2, 2019 | February 20, 2019 | February 27, 2019 | $0.0833 |
| January 2, 2019 | March 21, 2019 | March 28, 2019 | $0.0833 |

*Portfolio Activity*

On January 4, 2019, the Company invested $9.2 million in first lien debt and $0.9 million in membership units of Reliant Account Management, LLC.

On February 1, 2019, the Company invested $3.8 million in second lien debt of AAE Acquisition, LLC.

On February 27, 2019, the Company sold its warrants in B&W Quality Growers, LLC for $5.9 million.

*Borrowings*

On February 22, 2019, the Company completed an amendment to its Credit Facility that reduced its minimum net asset value to $150.0 million and reduced the minimum required asset coverage ratio to 2:1 debt-to-equity.

On March 1, 2019, the Company prepaid $15.7 million in outstanding SBA debentures for Fund II and relinquished the related SBIC license.

93

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are subject to financial market risks, including changes in interest rates. Changes in interest rates may affect both our cost of funding and our interest income from portfolio investments and cash and cash equivalents. We may hedge against interest rate fluctuations by using standard hedging instruments such as futures, options and forward contracts subject to the requirements of the 1940 Act. For the year ended December 31, 2018, we did not engage in hedging activities.

As of December 31, 2018, we held 25 securities bearing a variable rate of interest. Our variable rate investments represent approximately 58.6% of the fair value of total debt investments. As of December 31, 2018, 4.3% of variable rate securities were yielding interest at a rate equal to the established interest rate floor or interest rate ceiling and 95.7% of variable rate securities were yielding interest at a rate above its interest rate floor or were not subject to an interest rate floor. As of December 31, 2018, we had $10.0 million outstanding on our Credit Facility, which has a variable rate of interest at one-month LIBOR + 3.0%. As of December 31, 2018, all of our other interest paying liabilities, consisting of $165.7 million in SBA-guaranteed debentures, $75.0 million in 2022 Notes, and $52.1 million in 2022 Convertible Notes, were bearing interest at a fixed rate.

Interest rate sensitivity refers to the change in earnings that may result from changes in the level of interest rates. Because we fund a portion of our investments with borrowings, our net investment income is affected by the difference between the rate at which we invest and the rate at which we borrow. As a result, there can be no assurance that a significant change in market interest rates will not have a material adverse effect on our net investment income.

Based on our December 31, 2018 consolidated statements of assets and liabilities, the following table shows the annual impact on net income (excluding the potential related incentive fee impact) of base rate changes in interest rates (considering interest rate floors for variable rate securities) assuming no changes in our investment and borrowing structure (dollars in thousands):

| Basis Point Change | Increase (decrease) in interest income | (Increase) decrease in interest expense | Increase (decrease) in net income |
|---|---|---|---|
| Up 300 basis points | $ 6,043 | $ (300) | $ 5,743 |
| Up 200 basis points | $ 4,044 | $ (200) | $ 3,844 |
| Up 100 basis points | $ 2,022 | $ (100) | $ 1,922 |
| Down 100 basis points | $ (1,915) | $ 100 | $ (1,815) |
| Down 200 basis points | $ (2,857) | $ 200 | $ (2,657) |
| Down 300 basis points | $ (2,909) | $ 250 | $ (2,659) |

94

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting | F-2 |
| **Audited Financial Statements:** | |
| Consolidated Statements of Assets and Liabilities as of December 31, 2018 and December 31, 2017 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-4 |
| Consolidated Statements of Changes in Net Assets for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-6 |
| Consolidated Schedules of Investments as of December 31, 2018 and December 31, 2017 | F-7 |
| Notes to Consolidated Financial Statements | F-20 |

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Capitala Finance Corp.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statements of assets and liabilities of Capitala Finance Corp. (the "Company"), including the consolidated schedules of investments, as of December 31, 2018 and 2017, the related consolidated statements of operations, changes in net assets, and cash flows for each of the three years in the period ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2018 and 2017, and the results of its operations, changes in its net assets, and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 framework and our report dated March 4, 2019 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our procedures included confirmation of investments owned as of December 31, 2018 and 2017, by correspondence with the custodians, agents and/or directly with management or designees of the portfolio companies, as applicable. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2013.

Charlotte, North Carolina
March 4, 2019

F-1

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Capitala Finance Corp.

**Opinion on Internal Control over Financial Reporting**

We have audited Capitala Finance Corp.'s internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Capitala Finance Corp. (the "Company") maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company, including the consolidated schedules of investments, as of December 31, 2018 and 2017, and the related consolidated statements of operations, changes in net assets, and cash flows for each of the three years in the period ended December 31, 2018, and the related notes and our report dated March 4, 2019, expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Charlotte, North Carolina
March 4, 2019

**Capitala Finance Corp.**

**Consolidated Statements of Assets and Liabilities**
**(in thousands, except share and per share data)**

| | As of | |
|---|---|---|
| | December 31, 2018 | December 31, 2017 |
| ASSETS | | |
| Investments at fair value | | |
| Non-control/non-affiliate investments (amortized cost of $280,114 and $298,132, respectively) | $286,843 | $288,374 |
| Affiliate investment (amortized cost of $72,300 and $77,336, respectively) | 92,939 | 103,957 |
| Control investments (amortized cost of $67,556 and $89,559, respectively) | 69,145 | 107,608 |
| Total investments at fair value (amortized cost of $419,970 and $465,027, respectively) | 448,927 | 499,939 |
| Cash and cash equivalents | 39,295 | 31,221 |
| Interest and dividend receivable | 3,778 | 2,976 |
| Due from related parties | — | 95 |
| Prepaid expenses | 454 | 309 |
| Deferred tax asset, net | 628 | — |
| Other assets | 83 | 55 |
| Total assets | $493,165 | $534,595 |
| | | |
| LIABILITIES | | |
| SBA debentures (net of deferred financing cost of $1,688 and $2,300, respectively) | $164,012 | $168,400 |
| 2022 Notes (net of deferred financing cost of $1,987 and $2,496, respectively) | 73,013 | 72,504 |
| 2022 Convertible Notes (net of deferred financing cost of $1,259 and $1,583, respectively) | 50,829 | 50,505 |
| Credit Facility (net of deferred financing cost of $983 and $1,293, respectively) | 9,017 | 7,707 |
| Management and incentive fees payable | 2,487 | 2,172 |
| Interest and financing fees payable | 3,063 | 3,141 |
| Trade settlement payable | — | 175 |
| Deferred tax liability, net | — | 1,289 |
| Written call option at fair value (proceeds of $0 and $20, respectively) | — | 6,815 |
| Accounts payable and accrued expenses | 100 | — |
| Total liabilities | $302,521 | $312,708 |
| | | |
| Commitments and contingencies (Note 2) | | |
| NET ASSETS | | |
| Common stock, par value $.01, 100,000,000 common shares authorized, 16,051,547 and 15,951,231 common shares issued and outstanding, respectively | $ 161 | $ 160 |
| Additional paid in capital | 241,757 | 241,027 |
| Total distributable loss | (51,274) | (19,300) |
| Total net assets | $190,644 | $221,887 |
| Total liabilities and net assets | $493,165 | $534,595 |
| Net asset value per share | $ 11.88 | $ 13.91 |

See accompanying notes to consolidated financial statements.

F-3

**Capitala Finance Corp.**

**Consolidated Statements of Operations**
**(in thousands, except share and per share data)**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| **INVESTMENT INCOME** | | | |
| Interest and fee income: | | | |
| Non-control/non-affiliate investments | $ 27,754 | $ 31,084 | $ 42,667 |
| Affiliate investments | 7,945 | 4,509 | 5,723 |
| Control investments | 6,702 | 6,896 | 10,718 |
| Total interest and fee income | 42,401 | 42,489 | 59,108 |
| Payment-in-kind interest and dividend income: | | | |
| Non-control/non-affiliate investments | 2,248 | 4,503 | 4,965 |
| Affiliate investments | 1,251 | 1,898 | 383 |
| Control investments | 849 | 742 | 952 |
| Total payment-in-kind interest and dividend income | 4,348 | 7,143 | 6,300 |
| Dividend income: | | | |
| Non-control/non-affiliate investments | 59 | 225 | 263 |
| Affiliate investments | 238 | 641 | 115 |
| Control investments | 100 | 355 | 2,414 |
| Total dividend income | 397 | 1,221 | 2,792 |
| Other income | — | 125 | 85 |
| Interest income from cash and cash equivalents | 147 | 111 | 27 |
| Total investment income | 47,293 | 51,089 | 68,312 |
| **EXPENSES** | | | |
| Interest and financing expenses | 17,283 | 18,825 | 19,711 |
| Loss on extinguishment of debt | — | 2,732 | — |
| Base management fee | 9,049 | 9,780 | 10,588 |
| Incentive fees | 244 | 1,308 | 6,842 |
| General and administrative expenses | 4,695 | 3,878 | 3,804 |
| Expenses before incentive fee waiver | 31,271 | 36,523 | 40,945 |
| Incentive fee waiver (See Note 6) | — | (958) | (1,673) |
| Total expenses, net of fee waivers | 31,271 | 35,565 | 39,272 |
| NET INVESTMENT INCOME | 16,022 | 15,524 | 29,040 |
| **REALIZED AND UNREALIZED GAIN (LOSS) ON INVESTMENTS AND WRITTEN CALL OPTION:** | | | |
| Net realized gain (loss) on investments: | | | |
| Non-control/non-affiliate investments | (15,714) | (6,682) | 1,261 |
| Affiliate investments | 2,920 | 4,926 | (24,172) |
| Control investments | (22,010) | (22,433) | 145 |
| Net realized loss on investments | (34,804) | (24,189) | (22,766) |
| Net unrealized appreciation (depreciation) on investments: | | | |
| Non-control/non-affiliate investments | 16,487 | (11,577) | (11,661) |
| Affiliate investments | (5,982) | 4,436 | 4,124 |
| Control investments | (16,460) | 14,190 | 13,131 |
| Net unrealized appreciation (depreciation) on investments | (5,955) | 7,049 | 5,594 |
| Net unrealized appreciation (depreciation) on written call option | 6,795 | (4,079) | (2,716) |
| Net realized and unrealized loss on investments and written call option | (33,964) | (21,219) | (19,888) |
| Tax benefit (provision) | 1,916 | (1,289) | — |
| Total net realized and unrealized loss on investments and written call option, net of taxes | (32,048) | (22,508) | (19,888) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ (16,026) | $ (6,984) | $ 9,152 |
| NET INCREASE (DECREASE) IN NET ASSETS PER SHARE RESULTING FROM OPERATIONS – BASIC AND DILUTED | $ (1.00) | $ (0.44) | $ 0.58 |
| WEIGHTED AVERAGE COMMON STOCK OUTSTANDING – BASIC AND DILUTED | 15,993,436 | 15,903,167 | 15,819,175 |
| DISTRIBUTIONS PAID PER SHARE | $ 1.00 | $ 1.42 | $ 1.80 |

See accompanying notes to consolidated financial statements.

F-4

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Statements of Changes in Net Assets**
**(in thousands, except share data)**

| | Common Stock | | Additional Paid in Capital | Total Distributable Earnings (Loss) | Total |
|---|---|---|---|---|---|
| | Number of Shares | Par Value | | | |
| BALANCE, December 31, 2015 | 15,777,345 | $158 | $239,104 | $ 29,540 | $268,802 |
| Net investment income | — | — | — | 29,040 | 29,040 |
| Net realized loss on investments | — | — | — | (22,766) | (22,766) |
| Net unrealized appreciation on investments | — | — | — | 5,594 | 5,594 |
| Net unrealized depreciation on written call option | — | — | — | (2,716) | (2,716) |
| Distributions to Shareholders: | | | | | |
| Stock issued under dividend reinvestment plan | 90,700 | 1 | 1,102 | — | 1,103 |
| Distributions declared | — | — | — | (28,475) | (28,475) |
| Tax reclassification of stockholders' equity in accordance with generally accepted accounting principles | — | — | (22) | 22 | — |
| BALANCE, December 31, 2016 | 15,868,045 | $159 | $240,184 | $ 10,239 | $250,582 |
| Net investment income | — | — | — | 15,524 | 15,524 |
| Net realized loss on investments | — | — | — | (24,189) | (24,189) |
| Net unrealized appreciation on investments | — | — | — | 7,049 | 7,049 |
| Net unrealized depreciation on written call option | — | — | — | (4,079) | (4,079) |
| Tax provision | — | — | — | (1,289) | (1,289) |
| Distributions to Shareholders: | | | | | |
| Stock issued under dividend reinvestment plan | 83,186 | 1 | 864 | — | 865 |
| Distributions declared | — | — | — | (22,576) | (22,576) |
| Tax reclassification of stockholders' equity in accordance with generally accepted accounting principles | — | — | (21) | 21 | — |
| BALANCE, December 31, 2017 | 15,951,231 | $160 | $241,027 | $ (19,300) | $221,887 |
| Net investment income | — | — | — | 16,022 | 16,022 |
| Net realized loss on investments | — | — | — | (34,804) | (34,804) |
| Net unrealized depreciation on investments | — | — | — | (5,955) | (5,955) |
| Net unrealized appreciation on written call option | — | — | — | 6,795 | 6,795 |
| Tax benefit | — | — | — | 1,916 | 1,916 |
| Distributions to Shareholders: | | | | | |
| Stock issued under dividend reinvestment plan | 100,316 | 1 | 768 | — | 769 |
| Distributions declared | — | — | — | (15,986) | (15,986) |
| Tax reclassification of stockholders' equity in accordance with generally accepted accounting principles | — | — | (38) | 38 | — |
| BALANCE, December 31, 2018 | 16,051,547 | $161 | $241,757 | $ (51,274) | $190,644 |

See accompanying notes to consolidated financial statements.

F-5

**Capitala Finance Corp.**

**Consolidated Statements of Cash Flows**
**(in thousands)**

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net increase (decrease) in net assets resulting from operations | $ (16,026) | $ (6,984) | $ 9,152 |
| Adjustments to reconcile net increase (decrease) in net assets resulting from operations to net cash provided by operating activities: | | | |
| Purchase of investments | (107,802) | (82,750) | (120,844) |
| Repayments and sales of investments | 123,517 | 115,810 | 163,564 |
| Net realized loss on investments | 34,804 | 24,189 | 22,766 |
| Net unrealized (appreciation) depreciation on investments | 5,955 | (7,049) | (5,594) |
| Payment-in-kind interest and dividends | (4,348) | (7,143) | (6,300) |
| Accretion of original issue discount on investments | (1,114) | (1,357) | (2,775) |
| Proceeds (payments) from written call option | (20) | — | 20 |
| Net unrealized (appreciation) depreciation on written call option | (6,795) | 4,079 | 2,716 |
| Amortization of deferred financing fees | 1,885 | 2,100 | 2,149 |
| Loss on extinguishment of debt | — | 2,732 | — |
| Tax provision (benefit) | (1,916) | 1,289 | — |
| Changes in assets and liabilities: | | | |
| Interest and dividend receivable | (802) | 2,759 | (345) |
| Due from related parties | 95 | 87 | 74 |
| Prepaid expenses | (145) | 197 | (3) |
| Other assets | (28) | 17 | 36 |
| Due to related parties | — | (35) | 29 |
| Management and incentive fees payable | 315 | (4,254) | 4,739 |
| Interest and financing fees payable | (78) | 484 | (330) |
| Accounts payable and accrued expenses | 100 | (536) | 69 |
| Trade settlement payable | (175) | 175 | — |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 27,422 | 43,810 | 69,123 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Paydowns on SBA debentures | (5,000) | — | (13,500) |
| Proceeds from Credit Facility | 31,000 | 9,000 | 29,000 |
| Payments to Credit Facility | (30,000) | (44,000) | (55,000) |
| Issuance of 2022 Notes | — | 75,000 | — |
| Issuance of 2022 Convertible Notes | — | 52,088 | — |
| Repayment of 2021 Notes | — | (113,438) | — |
| Distributions paid to shareholders | (15,217) | (21,711) | (27,372) |
| Deferred financing fees paid | (131) | (5,809) | (75) |
| NET CASH USED IN FINANCING ACTIVITIES | (19,348) | (48,870) | (66,947) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 8,074 | (5,060) | 2,176 |
| CASH AND CASH EQUIVALENTS, beginning of year | 31,221 | 36,281 | 34,105 |
| CASH AND CASH EQUIVALENTS, end of year | $ 39,295 | $ 31,221 | $ 36,281 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash paid for interest | $ 14,139 | $ 15,503 | $ 17,591 |
| SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING TRANSACTIONS | | | |
| Distributions paid through dividend reinvestment plan share issuances | $ 769 | $ 865 | $ 1,103 |

See accompanying notes to consolidated financial statements.

F-6

**Capitala Finance Corp.**

**Consolidated Schedule of Investments**
**(in thousands, except for units/shares)**
**December 31, 2018**

| Portfolio Company, Country[(1),(2),(3),(4),(19)] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Non-control/non-affiliated investments – 150.4% | | | | | | |
| Non-control/non-affiliated investments – United States | | | | | | |
| 3 Bridge Solutions, LLC | IT Consulting | First Lien Debt (11.3% Cash (1 month LIBOR + 9.0%, 1.0% Floor), Due 12/4/22) | $ 13,954 | $13,954 | $13,954 | 7.3% |
| 3 Bridge Solutions, LLC | IT Consulting | Preferred Units (965 units, 8.0% PIK)[(5)] | | 1,049 | 1,049 | 0.6% |
| 3 Bridge Solutions, LLC | IT Consulting | Membership Units (39,000 units) | | 10 | 230 | 0.1% |
| | | | | 15,013 | 15,233 | 8.0% |
| Alternative Biomedical Solutions, LLC | Healthcare | First Lien Debt (9.5% Cash (1 month LIBOR + 7.0%, 1.0% Floor), Due 12/18/22) | 118 | 118 | 118 | 0.1% |
| Alternative Biomedical Solutions, LLC | Healthcare | First Lien Debt (12.4% Cash, Due 12/18/22)[(6)] | 13,000 | 13,000 | 10,370 | 5.4% |
| Alternative Biomedical Solutions, LLC | Healthcare | Membership Units (20,092 units) | | 800 | — | 0.0% |
| | | | | 13,918 | 10,488 | 5.5% |
| American Clinical Solutions, LLC | Healthcare | First Lien Debt (10.5% Cash, 2.0% PIK, Due 6/11/20)[(7)] | 9,293 | 8,918 | 6,484 | 3.4% |
| | | | | 8,918 | 6,484 | 3.4% |
| AmeriMark Direct, LLC | Consumer Products | First Lien Debt (12.8% Cash, Due 9/8/21) | 18,300 | 18,029 | 18,300 | 9.6% |
| | | | | 18,029 | 18,300 | 9.6% |
| B&W Quality Growers, LLC | Farming | Membership Unit Warrants (91,739 Units) | | — | 5,880 | 3.1% |
| | | | | — | 5,880 | 3.1% |
| BigMouth, Inc. | Consumer Products | First Lien Debt (14.3% Cash, Due 11/14/21)[(6)] | 9,094 | 9,094 | 9,094 | 4.8% |
| BigMouth, Inc. | Consumer Products | Series A Preferred Stock (350,000 shares, 8.0% PIK)[(5)] | | 411 | 352 | 0.2% |
| | | | | 9,505 | 9,446 | 5.0% |
| Bluestem Brands, Inc. | Online Merchandise Retailer | First Lien Debt (10.0% Cash (1 month LIBOR + 7.5%, 1.0% Floor), Due 11/7/20) | 3,779 | 3,762 | 3,499 | 1.8% |
| | | | | 3,762 | 3,499 | 1.8% |
| Burke America Parts Group, LLC | Home Repair Parts Manufacturer | Membership Units (14 units) | | 5 | 1,722 | 0.9% |
| | | | | 5 | 1,722 | 0.9% |
| California Pizza Kitchen, Inc. | Restaurant | Second Lien Debt (12.5% Cash (1 month LIBOR + 10.0%, 1.0% Floor), Due 8/23/23) | 5,000 | 4,903 | 4,903 | 2.6% |
| | | | | 4,903 | 4,903 | 2.6% |
| Cedar Ultimate Parent, LLC | Consumer Electronics | Series C Preferred Stock (4,759,250 units) | | 958 | — | 0.0% |
| Cedar Ultimate Parent, LLC | Consumer Electronics | Series D Preferred Stock (16,562,190 units) | | — | — | 0.0% |
| Cedar Ultimate Parent, LLC | Consumer Electronics | Series E Common Units (190,370 units) | | — | — | 0.0% |
| | | | | 958 | — | 0.0% |
| Chicken Soup for the Soul, LLC | Multi-platform Media and Consumer Products | First Lien Debt (10.9% Cash (1 month LIBOR + 8.5%, 1.5% Floor), Due 12/13/20) | 13,000 | 13,000 | 13,000 | 6.8% |
| | | | | 13,000 | 13,000 | 6.8% |

See accompanying notes to consolidated financial statements.

F-7

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2018**

| Portfolio Company, Country[1],[2],[3],[4],[19] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| CIS Secure Computing, Inc. | Government Services | First Lien Debt (10.8% Cash (1 month LIBOR + 8.5%, 1.0% Floor), 1.0% PIK, Due 9/14/22) | $10,428 | $10,428 | $10,428 | 5.5% |
| CIS Secure Computing, Inc. | Government Services | Common Stock (46,163 shares) | | 1,000 | 1,681 | 0.9% |
| | | | 11,428 | 12,109 | | 6.4% |
| Corporate Visions, Inc. | Sales & Marketing Services | Subordinated Debt (9.0% Cash, 2.0% PIK, Due 11/29/21) | 18,940 | 18,940 | 18,679 | 9.8% |
| Corporate Visions, Inc. | Sales & Marketing Services | Common Stock (15,750 shares) | | 1,575 | 817 | 0.4% |
| | | | 20,515 | 19,496 | | 10.2% |
| Currency Capital, LLC | Financial Services | First Lien Debt (13.4% Cash (1 month LIBOR + 11.0%, 0.5% Floor), Due 1/2/20)[8] | 16,788 | 16,788 | 16,788 | 8.8% |
| Currency Capital, LLC | Financial Services | Class A Preferred Units (2,000,000 units)[8] | | 2,000 | 2,000 | 1.0% |
| | | | 18,788 | 18,788 | | 9.8% |
| Flavors Holdings, Inc. | Food Product Manufacturer | First Lien Debt (8.6% Cash (3 month LIBOR + 5.8%, 1.0% Floor), Due 4/3/20) | 6,300 | 6,241 | 6,070 | 3.2% |
| Flavors Holdings, Inc. | Food Product Manufacturer | Second Lien Debt (12.8% Cash (3 month LIBOR + 10.0%, 1.0% Floor), Due 10/3/21) | 12,000 | 11,809 | 11,265 | 5.9% |
| | | | 18,050 | 17,335 | | 9.1% |
| Freedom Electronics, LLC | Electronic Machine Repair | First Lien Debt (8.7% Cash (1 month LIBOR + 6.25%, 2.0% Floor), Due 12/20/23)[9] | 250 | 250 | 250 | 0.1% |
| Freedom Electronics, LLC | Electronic Machine Repair | First Lien Debt (9.1% Cash, Due 12/20/23)[6] | 6,000 | 6,000 | 6,000 | 3.1% |
| Freedom Electronics, LLC | Electronic Machine Repair | Membership Units (181,818 units) | | 182 | 182 | 0.1% |
| | | | 6,432 | 6,432 | | 3.3% |
| Installs, LLC | Logistics | First Lien Debt (9.3% Cash (1 month LIBOR + 7.0%, 1.8% Floor), Due 6/20/23) | 2,984 | 2,984 | 2,984 | 1.6% |
| | | | 2,984 | 2,984 | | 1.6% |
| MC Sign Lessor Corp. | Advertising & Marketing Services | First Lien Debt (9.3% Cash (1 month LIBOR + 7.0%, 1.0% Floor), Due 12/22/22)[10] | — | — | — | 0.0% |
| MC Sign Lessor Corp. | Advertising & Marketing Services | First Lien Debt (9.3% Cash (1 month LIBOR + 7.0%, 1.0% Floor), Due 12/22/22)[11] | 3,905 | 3,905 | 3,905 | 2.0% |
| | | | 3,905 | 3,905 | | 2.0% |
| Nth Degree, Inc. | Business Services | First Lien Debt (13.9% Cash (1 month LIBOR + 11.5%, 1.0% Floor), 2.0% PIK, Due 3/29/23)[12] | 7,346 | 7,346 | 7,346 | 3.9% |
| Nth Degree, Inc. | Business Services | Preferred Stock (2,400 Units, 10.0% PIK dividend)[5] | | 3,244 | 16,490 | 8.6% |
| | | | 10,590 | 23,836 | | 12.5% |
| Sequoia Healthcare Management, LLC | Healthcare Management | First Lien Debt (10.8% Cash (1 month LIBOR + 8.5%, 1.8% Floor), Due 8/21/23) | 13,792 | 13,792 | 13,792 | 7.2% |
| | | | 13,792 | 13,792 | | 7.2% |

See accompanying notes to consolidated financial statements.

F-8

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2018**

| Portfolio Company, Country[(1),(2),(3),(4),(19)] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Sunset Digital Holdings, LLC | Telecommunications | First Lien Debt (9.6% Cash (1 month LIBOR + 7.3%, 1.5% Floor), Due 8/2/19) | $18,000 | $ 18,000 | $ 18,000 | 9.4% |
| | | | | 18,000 | 18,000 | 9.4% |
| Sur La Table, Inc. | Retail | First Lien Debt (12.0% Cash, Due 7/28/20) | 15,000 | 15,000 | 14,979 | 7.9% |
| | | | | 15,000 | 14,979 | 7.9% |
| Taylor Precision Products, Inc. | Household Product Manufacturer | Series C Preferred Stock (379 shares) | | 758 | 758 | 0.4% |
| | | | | 758 | 758 | 0.4% |
| U.S. BioTek Laboratories, LLC | Testing laboratories | First Lien Debt (10.1% Cash, Due 12/14/23)[(6)(13)] | 7,000 | 7,000 | 7,000 | 3.7% |
| U.S. BioTek Laboratories, LLC | Testing laboratories | Class A Preferred Units (500 Units, 10.0% PIK)[(5)] | | 502 | 502 | 0.3% |
| U.S. BioTek Laboratories, LLC | Testing laboratories | Class C Units (500 Units) | | 1 | 1 | 0.0% |
| | | | | 7,503 | 7,503 | 4.0% |
| U.S. Well Services, Inc. | Oil & Gas Services | Class A Common Stock (77,073 shares)[(8)] | | 771 | 632 | 0.3% |
| U.S. Well Services, Inc. | Oil & Gas Services | Class B Common Stock (1,125,426 shares)[(8)] | | 6,701 | 9,229 | 4.9% |
| | | | | 7,472 | 9,861 | 5.2% |
| Vology, Inc. | Information Technology | Subordinated Debt (15.0% Cash (1 month LIBOR + 14.0%, 1.0% Ceiling), 4.0% PIK Due 6/30/20) | 8,720 | 8,720 | 8,645 | 4.5% |
| | | | | 8,720 | 8,645 | 4.5% |
| Xirgo Technologies, LLC | Information Technology | Subordinated Debt (11.5% Cash, Due 3/1/22) | 15,750 | 15,750 | 15,750 | 8.3% |
| Xirgo Technologies, LLC | Information Technology | Membership Units (600,000 units) | | 600 | 837 | 0.4% |
| | | | | 16,350 | 16,587 | 8.7% |
| **Sub Total Non-control/non-affiliated investments – United States** | | | | 268,298 | 283,965 | 148.9% |
| **Non-control/non-affiliated investments – Brazil** | | | | | | |
| Velum Global Credit Management, LLC | Financial Services | First Lien Debt (15.0% PIK, Due 12/31/17)[(7)(8)(12)] | 14,277 | 11,816 | 2,878 | 1.5% |
| | | | | 11,816 | 2,878 | 1.5% |
| **Sub Total Non-control/non-affiliated investments – Brazil** | | | | 11,816 | 2,878 | 1.5% |
| **Sub Total Non-control/non-affiliated investments** | | | | $280,114 | $286,843 | 150.4% |
| **Affiliate Investments – 48.8%** | | | | | | |
| **Affiliate investments – United States** | | | | | | |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | First Lien Debt (12.0% Cash, 1.0% PIK, Due 3/23/21) | $14,801 | $ 14,801 | $ 14,384 | 7.5% |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | Common Stock Class A (1,253,198 shares) | | 1,504 | — | 0.0% |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | Common Stock Class B (900,000 shares) | | 300 | — | 0.0% |
| | | | | 16,605 | 14,384 | 7.5% |
| City Gear, LLC | Footwear Retail | Membership Unit Warrants (11.4% fully diluted)[(14)] | | — | 3,184 | 1.7% |
| | | | | — | 3,184 | 1.7% |
| Eastport Holdings, LLC | Business Services | Subordinated Debt (15.8% Cash (3 month LIBOR + 13.0%, 0.5% Floor), Due 4/29/20) | 16,500 | 15,496 | 16,500 | 8.7% |

See accompanying notes to consolidated financial statements.

F-9

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2018**

| Portfolio Company, Country[(1),(2),(3),(4),(19)] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Eastport Holdings, LLC | Business Services | Membership Units (22.9% ownership) | | $ 3,263 | $17,610 | 9.2% |
| | | | | 18,759 | 34,110 | 17.9% |
| GA Communications, Inc. | Advertising & Marketing Services | Series A-1 Preferred Stock (1,998 shares, 8.0% PIK Dividend)[(5)] | | 3,179 | 3,482 | 1.8% |
| GA Communications, Inc. | Advertising & Marketing Services | Series B-1 Common Stock (200,000 shares) | | 2 | 1,325 | 0.7% |
| | | | | 3,181 | 4,807 | 2.5% |
| J&J Produce Holdings, Inc. | Produce Distribution | Subordinated Debt (13.0% Cash, Due 6/16/19)[(12)] | $ 6,406 | 6,406 | 6,210 | 3.3% |
| J&J Produce Holdings, Inc. | Produce Distribution | Common Stock (8,182 shares) | | 818 | — | 0.0% |
| J&J Produce Holdings, Inc. | Produce Distribution | Common Stock Warrants (6,369 shares) | | — | — | 0.0% |
| | | | | 7,224 | 6,210 | 3.3% |
| LJS Partners, LLC | QSR Franchisor | Common Stock (1,587,848 shares) | | 1,188 | 3,018 | 1.6% |
| | | | | 1,188 | 3,018 | 1.6% |
| MMI Holdings, LLC | Medical Device Distributor | First Lien Debt (12.0% Cash, Due 1/31/20)[(12)] | 2,600 | 2,600 | 2,600 | 1.4% |
| MMI Holdings, LLC | Medical Device Distributor | Subordinated Debt (6.0% Cash, Due 1/31/20)[(12)] | 400 | 388 | 400 | 0.2% |
| MMI Holdings, LLC | Medical Device Distributor | Preferred Units (1,000 units, 6.0% PIK Dividend)[(5)] | | 1,474 | 1,612 | 0.8% |
| MMI Holdings, LLC | Medical Device Distributor | Common Membership Units (45 units) | | — | 185 | 0.1% |
| | | | | 4,462 | 4,797 | 2.5% |
| Sierra Hamilton Holdings Corporation | Oil & Gas Engineering and Consulting Services | Common Stock (15,068,000 shares) | | 6,958 | 6,854 | 3.6% |
| | | | | 6,958 | 6,854 | 3.6% |
| US Bath Group, LLC | Building Products | First Lien Debt (11.4% Cash (1 month LIBOR + 9.0%, 1.0% Floor), Due 1/2/23) | 12,750 | 12,750 | 12,750 | 6.7% |
| US Bath Group, LLC | Building Products | Membership Units (500,000 units) | | 500 | 2,083 | 1.1% |
| | | | | 13,250 | 14,833 | 7.8% |
| V12 Holdings, Inc. | Data Processing & Digital Marketing | Subordinated Debt[(15)] | — | 673 | 742 | 0.4% |
| | | | | 673 | 742 | 0.4% |
| **Sub Total Affiliate investments – United States** | | | | $72,300 | $92,939 | 48.8% |
| **Control Investments – 36.3%** | | | | | | |
| **Control investments – United States** | | | | | | |
| AAE Acquisition, LLC | Industrial Equipment Rental | Second Lien Debt (6.0% Cash, Due 8/24/19)[(12)] | $16,327 | $16,327 | $16,327 | 8.6% |
| AAE Acquisition, LLC | Industrial Equipment Rental | Membership Units (2.2% fully diluted) | | 17 | — | 0.0% |
| AAE Acquisition, LLC | Industrial Equipment Rental | Warrants (37.8% fully diluted) | | — | — | 0.0% |
| | | | | 16,344 | 16,327 | 8.6% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | First Lien Debt (10.0% Cash, Due 5/24/19)[(16)] | 1,708 | 1,708 | 1,708 | 0.9% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | First Lien Debt (12.0% Cash, 4.0% PIK, Due 6/30/19)[(12)] | 8,889 | 8,889 | 8,889 | 4.6% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | Preferred Units (4,000,000 units) | | 2,354 | — | 0.0% |

See accompanying notes to consolidated financial statements.

F-10

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2018**

| Portfolio Company, Country[(1),(2),(3),(4),(19)] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| CableOrganizer Acquisition, LLC | Computer Supply Retail | Common Stock (21.3% fully diluted) | | $ 1,394 | $ — | 0.0% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | Common Stock Warrants (10.0% fully diluted) | | — | — | 0.0% |
| | | | | 14,345 | 10,597 | 5.5% |
| Capitala Senior Loan Fund II, LLC | Investment Funds | Membership Units (80% ownership)[(8)(17)] | | 13,600 | 13,695 | 7.2% |
| | | | | 13,600 | 13,695 | 7.2% |
| Micro Precision, LLC | Conglomerate | Subordinated Debt (10.0% Cash, Due 1/1/19)[(12)] | $1,862 | 1,862 | 1,862 | 1.0% |
| Micro Precision, LLC | Conglomerate | Subordinated Debt (14.0% Cash, 4.0% PIK, Due 1/1/19)[(12)] | 4,325 | 4,325 | 4,325 | 2.3% |
| Micro Precision, LLC | Conglomerate | Series A Preferred Units (47 units) | | 1,629 | 2,817 | 1.5% |
| | | | | 7,816 | 9,004 | 4.8% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | First Lien Debt (15.0% Cash, Due 10/30/20)[(12)] | 7,500 | 7,500 | 7,500 | 3.9% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | Class A Preferred Stock (1,000 shares, 10.0% Cash Dividend)[(5)] | | 1,000 | 1,000 | 0.5% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | Common Stock (300,000 shares) | | 1 | 4,348 | 2.3% |
| | | | | 8,501 | 12,848 | 6.7% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | First Lien Debt (9.0% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 2.0% Ceiling), Due 12/31/22)[(18)] | — | — | — | 0.0% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | First Lien Debt (9.4% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 5.0% Ceiling), Due 12/31/22) | 4,500 | 4,500 | 4,500 | 2.4% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | Preferred Units (4,350,000 Units) | | 2,450 | 2,174 | 1.1% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | Membership Units (150,000 Units) | | — | — | 0.0% |
| | | | | 6,950 | 6,674 | 3.5% |
| **Sub Total Control investments – United States** | | | | $ 67,556 | $ 69,145 | 36.3% |
| **TOTAL INVESTMENTS – 235.5%** | | | | **$419,970** | **$448,927** | **235.5%** |

(1) All investments valued using unobservable inputs (Level 3).

(2) All investments valued by the Board of Directors.

(3) All debt investments are income producing, unless otherwise noted. Equity and warrant investments are non-income producing, unless otherwise noted.

(4) Percentages are based on net assets of $190,644 as of December 31, 2018.

(5) The equity investment is income producing, based on rate disclosed.

(6) The cash rate equals the approximate current yield on our last-out portion of the unitranche facility.

(7) Non-accrual investment.

(8) Indicates assets that the Company believes do not represent "qualifying assets" under Section 55(a) of the Investment Company Act of 1940, as amended. Qualifying assets must represent at least 70% of the Company's total assets at the time of acquisition of any additional non-qualifying assets. As of December 31, 2018, 9.2% of the Company's total assets were non-qualifying assets.

See accompanying notes to consolidated financial statements.

F-11

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2018**

(9)   The investment has a $0.8 million unfunded commitment.

(10)  The investment has a $0.5 million unfunded commitment.

(11)  The investment has a $0.6 million unfunded commitment.

(12)  The maturity date of the original investment has been extended.

(13)  The investment has a $1.0 million unfunded commitment.

(14)  The investment has been exited. The residual value reflects estimated earnout to be settled post-closing.

(15)  The investment has been exited. The residual value reflects estimated escrow and earnout to be settled post-closing.

(16)  The investment has a $0.3 million unfunded commitment.

(17)  The investment has a $6.4 million unfunded commitment.

(18)  The investment has a $5.0 million unfunded commitment.

(19)  Capitala Finance Corp. generally acquires its investments in private transactions exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"). These investments are generally subject to certain limitations on resale, and may be deemed to be "restricted securities" under the Securities Act.

See accompanying notes to consolidated financial statements.

F-12

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Schedule of Investments**
**(in thousands, except for units/shares)**
**December 31, 2017**

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Non-control/non-affiliated investments – 130.0% | | | | | | |
| Non-control/non-affiliated investments – United States | | | | | | |
| 3 Bridge Solutions, LLC | IT Consulting | First Lien Debt (10.4% Cash (1 month LIBOR + 9.0%, 1.0% Floor), Due 12/4/22) | $ 11,250 | $11,250 | $11,250 | 5.1% |
| 3 Bridge Solutions, LLC | IT Consulting | Preferred Units (965 units, 8.0% PIK)[5] | | 971 | 971 | 0.4% |
| 3 Bridge Solutions, LLC | IT Consulting | Membership Units (39,000 units) | | 10 | 10 | 0.0% |
| | | | | 12,231 | 12,231 | 5.5% |
| Alternative Biomedical Solutions, LLC | Healthcare | First Lien Debt (11.7% Cash, Due 12/18/22)[6] | 13,000 | 13,000 | 13,000 | 5.9% |
| Alternative Biomedical Solutions, LLC | Healthcare | Membership Units (20,092 units) | | 800 | 800 | 0.4% |
| | | | | 13,800 | 13,800 | 6.3% |
| American Clinical Solutions, LLC | Healthcare | First Lien Debt (10.5% Cash, 1.0% PIK, Due 6/11/20) | 9,068 | 9,068 | 7,568 | 3.4% |
| | | | | 9,068 | 7,568 | 3.4% |
| American Exteriors, LLC | Replacement Window Manufacturer | First Lien Debt (10.0% PIK, Due 1/1/19)[7],[8] | 8,287 | 5,679 | 1,880 | 0.8% |
| American Exteriors, LLC | Replacement Window Manufacturer | Common Stock Warrants (10.0% fully diluted) | | — | — | 0.0% |
| | | | | 5,679 | 1,880 | 0.8% |
| AmeriMark Direct, LLC | Consumer Products | First Lien Debt (12.8% Cash, Due 9/8/21) | 19,100 | 18,713 | 19,100 | 8.6% |
| | | | | 18,713 | 19,100 | 8.6% |
| B&W Quality Growers, LLC | Farming | Membership Unit Warrants (91,739 Units) | | — | 5,581 | 2.5% |
| | | | | — | 5,581 | 2.5% |
| BigMouth, Inc. | Consumer Products | First Lien Debt (13.3% Cash, Due 11/14/21)[6] | 9,790 | 9,790 | 9,790 | 4.4% |
| BigMouth, Inc. | Consumer Products | Series A Preferred Stock (350,000 shares, 8.0% PIK)[5] | | 382 | 722 | 0.3% |
| | | | | 10,172 | 10,512 | 4.7% |
| Bluestem Brands, Inc. | Online Merchandise Retailer | First Lien Debt (9.1% Cash (1 month LIBOR + 7.5%, 1.0% Floor), Due 11/7/20) | 4,029 | 3,965 | 3,755 | 1.7% |
| | | | | 3,965 | 3,755 | 1.7% |
| Brunswick Bowling Products, Inc. | Bowling Products | First Lien Debt (8.0% Cash (1 month LIBOR + 6.0%, 2.0% Floor), Due 5/22/20) | 1,600 | 1,600 | 1,600 | 0.7% |
| Brunswick Bowling Products, Inc. | Bowling Products | First Lien Debt (16.3% Cash (1 month LIBOR + 14.3%, 2.0% Floor), Due 5/22/20) | 5,586 | 5,586 | 5,586 | 2.5% |
| | | | | 7,186 | 7,186 | 3.2% |
| Burke America Parts Group, LLC | Home Repair Parts Manufacturer | Membership Units (14 units) | | 5 | 2,767 | 1.2% |
| | | | | 5 | 2,767 | 1.2% |
| California Pizza Kitchen, Inc. | Restaurant | Second Lien Debt (11.6% Cash (1 month LIBOR + 10.0%, 1.0% Floor), Due 8/23/23) | 5,000 | 4,880 | 4,880 | 2.2% |
| | | | | 4,880 | 4,880 | 2.2% |

See accompanying notes to consolidated financial statements.

F-13

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2017**

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Caregiver Services, Inc. | In-Home Healthcare Services | Common Stock (293,186 shares) | | $ 258 | $ 54 | 0.0% |
| Caregiver Services, Inc. | In-Home Healthcare Services | Common Stock Warrants (655,908 units)[9] | | 264 | 120 | 0.1% |
| | | | | 522 | 174 | 0.1% |
| Cedar Electronics Holding Corp. | Consumer Electronics | Subordinated Debt (12.0% Cash, Due 12/26/20)[7] | $21,550 | 21,550 | 3,498 | 1.6% |
| | | | | 21,550 | 3,498 | 1.6% |
| CIS Secure Computing, Inc. | Government Services | First Lien Debt (9.9% Cash (1 month LIBOR + 8.5%, 1.0% Floor), 1.0% PIK, Due 9/14/22)[10] | 9,116 | 9,116 | 9,116 | 4.1% |
| CIS Secure Computing, Inc. | Government Services | Common Stock (46,163 shares) | | 1,000 | 1,204 | 0.5% |
| | | | | 10,116 | 10,320 | 4.6% |
| Corporate Visions, Inc. | Sales & Marketing Services | Subordinated Debt (9.0% Cash, 2.0% PIK, Due 11/29/21) | 18,159 | 18,159 | 16,995 | 7.7% |
| Corporate Visions, Inc. | Sales & Marketing Services | Common Stock (15,750 shares) | | 1,575 | 393 | 0.2% |
| | | | | 19,734 | 17,388 | 7.9% |
| Currency Capital, LLC | Financial Services | First Lien Debt (12.4% Cash (1 month LIBOR + 11.0%, 0.5% Floor) Due 1/20/22)[11] | 17,000 | 17,000 | 17,000 | 7.7% |
| Currency Capital, LLC | Financial Services | Class A Preferred Units (2,000,000 units)[11] | | 2,000 | 1,905 | 0.9% |
| | | | | 19,000 | 18,905 | 8.6% |
| Flavors Holdings, Inc. | Food Product Manufacturer | First Lien Debt (7.4% Cash (3 month LIBOR + 5.8%, 1.0% Floor), Due 4/3/20) | 6,700 | 6,589 | 5,911 | 2.7% |
| Flavors Holdings, Inc. | Food Product Manufacturer | Second Lien Debt (11.7% Cash (3 month LIBOR + 10.0%, 1.0% Floor), Due 10/3/21) | 12,000 | 11,740 | 10,311 | 4.6% |
| | | | | 18,329 | 16,222 | 7.3% |
| Nth Degree, Inc. | Business Services | First Lien Debt (8.4% Cash (1 month LIBOR + 7.0%, 1.0% Floor), 1.0% PIK, Due 12/14/20) | 8,833 | 8,833 | 8,833 | 4.0% |
| Nth Degree, Inc. | Business Services | First Lien Debt (12.9% Cash (1 month LIBOR + 11.5%, 1.0% Floor), 2.0% PIK, Due 12/14/20) | 7,200 | 7,200 | 7,200 | 3.2% |
| Nth Degree, Inc. | Business Services | Preferred Stock (2,400 Units, 10.0% PIK Dividend)[5] | | 2,938 | 11,140 | 5.0% |
| | | | | 18,971 | 27,173 | 12.2% |
| Sequoia Healthcare Management, LLC | Healthcare Management | First Lien Debt (12.0% Cash, 4.0% PIK, Due 7/17/19) | 9,014 | 8,964 | 9,014 | 4.1% |
| | | | | 8,964 | 9,014 | 4.1% |
| Spectra Services Holdings, LLC | Refrigeration/ HVAC services | First Lien Debt (10.0% Cash, 4.0% PIK, Due 12/27/22) | 7,450 | 7,450 | 7,450 | 3.4% |
| Spectra Services Holdings, LLC | Refrigeration/ HVAC services | Class A Units (1,283,824 units, 4.0% Cash Dividend, 11.0% PIK Dividend)[5] | | 1,286 | 1,286 | 0.6% |
| Spectra Services Holdings, LLC | Refrigeration/ HVAC services | Class B Units (257 units) | | — | — | 0.0% |
| | | | | 8,736 | 8,736 | 4.0% |

See accompanying notes to consolidated financial statements.

F-14

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2017**

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Sur La Table, Inc. | Retail | First Lien Debt (12.0% Cash, Due 7/28/20) | $15,000 | $ 15,000 | $ 15,000 | 6.8% |
| | | | | 15,000 | 15,000 | 6.8% |
| Taylor Precision Products, Inc. | Household Product Manufacturer | Series C Preferred Stock (379 shares) | | 758 | 1,316 | 0.6% |
| | | | | 758 | 1,316 | 0.6% |
| Vintage Stock, Inc. | Specialty Retail | First Lien Debt (13.9% Cash (1 month LIBOR + 12.5%, 0.5% Floor), 3.0% PIK, Due 11/3/21) | 20,713 | 20,713 | 20,713 | 9.3% |
| | | | | 20,713 | 20,713 | 9.3% |
| Vology, Inc. | Information Technology | Subordinated Debt (15.0% Cash (3 month LIBOR + 14.0%, 1.0% Ceiling), 4.0% PIK Due 6/30/20) | 8,374 | 8,374 | 8,374 | 3.8% |
| | | | | 8,374 | 8,374 | 3.8% |
| Western Windows Systems, LLC | Building Products | First Lien Debt (11.9% Cash, Due 7/31/20)[6] | 10,500 | 10,500 | 10,500 | 4.7% |
| Western Windows Systems, LLC | Building Products | Membership Units (39,860 units) | | 3,000 | 7,379 | 3.3% |
| | | | | 13,500 | 17,879 | 8.0% |
| Xirgo Technologies, LLC | Information Technology | Subordinated Debt (11.5% Cash, Due 3/1/22) | 15,750 | 15,750 | 15,750 | 7.1% |
| Xirgo Technologies, LLC | Information Technology | Membership Units (600,000 units) | | 600 | 637 | 0.3% |
| | | | | 16,350 | 16,387 | 7.4% |
| **Sub Total Non-control/non-affiliated investments – United States** | | | | 286,316 | 280,359 | 126.4% |
| **Non-control/non-affiliated investments – Brazil** | | | | | | |
| Velum Global Credit Management, LLC | Financial Services | First Lien Debt (15.0% PIK, Due 12/31/17)[7],[8],[11],[12] | 12,275 | 11,816 | 8,015 | 3.6% |
| | | | | 11,816 | 8,015 | 3.6% |
| **Sub Total Non-control/non-affiliated investments – Brazil** | | | | 11,816 | 8,015 | 3.6% |
| **Sub Total Non-control/non-affiliated investments** | | | | $298,132 | $288,374 | 130.0% |
| **Affiliate investments – 46.8%** | | | | | | |
| **Affiliate investments – United States** | | | | | | |
| AAE Acquisition, LLC | Industrial Equipment Rental | Second Lien Debt (8.0% Cash, 4.0% PIK, Due 8/24/19)[8] | $15,846 | $ 15,846 | $ 15,603 | 7.0% |
| AAE Acquisition, LLC | Industrial Equipment Rental | Membership Units (2.2% fully diluted) | | 17 | — | 0.0% |
| AAE Acquisition, LLC | Industrial Equipment Rental | Warrants (37.8% fully diluted) | | — | — | 0.0% |
| | | | | 15,863 | 15,603 | 7.0% |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | Subordinated Debt (14.0% Cash, Due 8/9/19)[13] | 3,000 | 3,000 | 3,000 | 1.4% |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | Subordinated Debt (12.0% Cash, Due 8/9/19)[13] | 5,828 | 5,828 | 5,828 | 2.6% |
| Burgaflex Holdings, LLC | Automobile Part Manufacturer | Common Stock (1,253,198 shares) | | 1,504 | 457 | 0.2% |
| | | | | 10,332 | 9,285 | 4.2% |
| City Gear, LLC | Footwear Retail | Subordinated Debt (13.0% Cash, Due 10/20/19)[8] | 8,231 | 8,231 | 8,231 | 3.7% |
| City Gear, LLC | Footwear Retail | Preferred Membership Units (2.8% fully diluted, 9.0% Cash Dividend)[5] | | 1,269 | 1,269 | 0.6% |

See accompanying notes to consolidated financial statements.

F-15

## Capitala Finance Corp.

### Consolidated Schedule of Investments – (continued)
### (in thousands, except for units/shares)
### December 31, 2017

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| City Gear, LLC | Footwear Retail | Membership Unit Warrants (11.4% fully diluted) | $ — | $ — | $ 8,248 | 3.7% |
| | | | | 9,500 | 17,748 | 8.0% |
| GA Communications, Inc. | Advertising & Marketing Services | Series A-1 Preferred Stock (1,998 shares, 8.0% PIK Dividend)[5] | | 2,902 | 3,225 | 1.5% |
| GA Communications, Inc. | Advertising & Marketing Services | Series B-1 Common Stock (200,000 shares) | | 2 | 1,932 | 0.9% |
| | | | | 2,904 | 5,157 | 2.4% |
| J&J Produce Holdings, Inc. | Produce Distribution | Subordinated Debt (6.0% Cash, 7.0% PIK, Due 6/16/19)[8] | $6,368 | 6,368 | 6,170 | 2.8% |
| J&J Produce Holdings, Inc. | Produce Distribution | Common Stock (8,182 shares) | | 818 | — | 0.0% |
| J&J Produce Holdings, Inc. | Produce Distribution | Common Stock Warrants (6,369 shares) | | — | — | 0.0% |
| | | | | 7,186 | 6,170 | 2.8% |
| LJS Partners, LLC | QSR Franchisor | Common Stock (1,500,000 shares) | | 896 | 7,650 | 3.4% |
| | | | | 896 | 7,650 | 3.4% |
| MMI Holdings, LLC | Medical Device Distributor | First Lien Debt (12.0% Cash, Due 1/31/19)[8] | 2,600 | 2,600 | 2,600 | 1.2% |
| MMI Holdings, LLC | Medical Device Distributor | Subordinated Debt (6.0% Cash, Due 1/31/19)[8] | 400 | 388 | 400 | 0.2% |
| MMI Holdings, LLC | Medical Device Distributor | Preferred Units (1,000 units, 6.0% PIK Dividend)[5] | | 1,381 | 1,520 | 0.7% |
| MMI Holdings, LLC | Medical Device Distributor | Common Membership Units (45 units) | | — | 193 | 0.1% |
| | | | | 4,369 | 4,713 | 2.2% |
| MTI Holdings, LLC | Retail Display & Security Services | Membership Units (2,000,000 units)[14] | | — | 100 | 0.0% |
| | | | | — | 100 | 0.0% |
| Sierra Hamilton Holdings Corporation | Oil & Gas Engineering and Consulting Services | Common Stock (15,068,000 shares) | | 6,958 | 8,528 | 3.8% |
| | | | | 6,958 | 8,528 | 3.8% |
| Source Capital Penray, LLC | Automotive Chemicals & Lubricants | Membership Units (11.3% ownership)[14] | | — | 101 | 0.0% |
| | | | | — | 101 | 0.0% |
| STX Healthcare Management Services, Inc. | Dental Practice Management | Common Stock (1,200,000 shares)[14] | | — | 93 | 0.0% |
| | | | | — | 93 | 0.0% |
| U.S. Well Services, LLC | Oil & Gas Services | First Lien Debt (7.4% Cash (1 month LIBOR + 6.0%, 1.0% Floor), Due 2/2/22)[13] | 2,299 | 2,299 | 2,299 | 1.0% |
| U.S. Well Services, LLC | Oil & Gas Services | First Lien Debt (12.4% PIK (1 month LIBOR + 11.0%, 1.0% Floor), Due 2/2/22) | 9,516 | 9,516 | 9,516 | 4.3% |
| U.S. Well Services, LLC | Oil & Gas Services | Class A Units (5,680,688 Units) | | 6,259 | 15,004 | 6.8% |
| U.S. Well Services, LLC | Oil & Gas Services | Class B Units (2,076,298 Units) | | 441 | 955 | 0.4% |
| | | | | 18,515 | 27,774 | 12.5% |

See accompanying notes to consolidated financial statements.

F-16

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2017**

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| V12 Holdings, Inc. | Data Processing & Digital Marketing | Subordinated Debt[19] | $ — | $ 813 | $ 1,035 | 0.5% |
| | | | | 813 | 1,035 | 0.5% |
| **Sub Total Affiliate investments – United States** | | | | $77,336 | $103,957 | 46.8% |
| | | | | | | |
| **Control investments – 48.5%** | | | | | | |
| **Control investments – United States** | | | | | | |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | First Lien Debt (12.0% Cash, 4.0% PIK, Due 5/24/18) | $12,373 | $12,373 | $ 12,373 | 5.6% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | Common Stock (21.3% fully diluted) | | 1,394 | 118 | 0.1% |
| CableOrganizer Acquisition, LLC | Computer Supply Retail | Common Stock Warrants (10.0% fully diluted) | | — | 60 | 0.0% |
| | | | | 13,767 | 12,551 | 5.7% |
| Eastport Holdings, LLC | Business Services | Subordinated Debt (14.5% Cash (3 month LIBOR + 13.0%, 0.5% Floor), Due 4/29/20) | 16,500 | 14,738 | 16,500 | 7.4% |
| Eastport Holdings, LLC | Business Services | Membership Units (33.3% ownership)[16] | | 4,733 | 26,449 | 11.9% |
| | | | | 19,471 | 42,949 | 19.3% |
| Kelle's Transport Service, LLC | Transportation | First Lien Debt (4.0% Cash, Due 2/15/20)[17] | 2,000 | 2,000 | 2,000 | 0.9% |
| Kelle's Transport Service, LLC | Transportation | First Lien Debt (1.5% Cash, Due 2/15/20)[8] | 13,674 | 13,669 | 9,560 | 4.3% |
| Kelle's Transport Service, LLC | Transportation | Membership Units (27.5% fully diluted) | | — | — | 0.0% |
| | | | | 15,669 | 11,560 | 5.2% |
| Micro Precision, LLC | Conglomerate | Subordinated Debt (10.0% Cash, Due 9/15/18)[8] | 1,862 | 1,862 | 1,862 | 0.8% |
| Micro Precision, LLC | Conglomerate | Subordinated Debt (14.0% Cash, 4.0% PIK, Due 9/15/18)[8] | 4,154 | 4,154 | 4,154 | 1.9% |
| Micro Precision, LLC | Conglomerate | Series A Preferred Units (47 units) | | 1,629 | 1,629 | 0.7% |
| | | | | 7,645 | 7,645 | 3.4% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | First Lien Debt (15.0% Cash, Due 10/30/20)[8] | 6,500 | 6,500 | 6,500 | 2.9% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | Class A Preferred Stock (1,000 shares, 10.0% Cash Dividend)[5] | | 1,000 | 1,000 | 0.5% |
| Navis Holdings, Inc. | Textile Equipment Manufacturer | Common Stock (300,000 shares) | | 1 | 5,005 | 2.3% |
| | | | | 7,501 | 12,505 | 5.7% |
| On-Site Fuel Service, Inc. | Fuel Transportation Services | Subordinated Debt (18.0% Cash, Due 12/19/18)[7][8] | 14,072 | 11,020 | 11,588 | 5.2% |
| On-Site Fuel Service, Inc. | Fuel Transportation Services | Series A Preferred Stock (32,782 shares) | | 3,278 | — | 0.0% |
| On-Site Fuel Service, Inc. | Fuel Transportation Services | Series B Preferred Stock (23,648 shares) | | 2,365 | — | 0.0% |
| On-Site Fuel Service, Inc. | Fuel Transportation Services | Common Stock (33,058 shares) | | 33 | — | 0.0% |
| | | | | 16,696 | 11,588 | 5.2% |

See accompanying notes to consolidated financial statements.

F-17

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2017**

| Portfolio Company, Country[1],[2],[3],[4],[20] | Industry | Type of Investment | Principal Amount | Cost | Fair Value | % of Net Assets |
|---|---|---|---|---|---|---|
| Portrait Studio, LLC | Professional and Personal Digital Imaging | First Lien Debt (8.6% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 2.0% Ceiling), Due 12/31/22)[18] | $1,860 | $ 1,860 | $ 1,860 | 0.9% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | First Lien Debt (8.6% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 5.0% Ceiling), Due 12/31/22) | 4,500 | 4,500 | 4,500 | 2.0% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | Preferred Units (4,350,000 Units) | | 2,450 | 2,450 | 1.1% |
| Portrait Studio, LLC | Professional and Personal Digital Imaging | Membership Units (150,000 Units) | | — | — | 0.0% |
| | | | | 8,810 | 8,810 | 4.0% |
| **Sub Total Control investments – United States** | | | | $ 89,559 | $107,608 | 48.5% |
| **TOTAL INVESTMENTS – 225.3%** | | | | **$465,027** | **$499,939** | **225.3%** |
| | | | | | | |
| **Derivatives – (3.1)%** | | | | | | |
| **Derivatives – United States** | | | | | | |
| Eastport Holdings, LLC | Business Services | Written Call Option[16] | | $ (20) | $ (6,815) | (3.1)% |
| **Sub Total Derivatives – United States** | | | | $ (20) | $ (6,815) | (3.1)% |
| **TOTAL DERIVATIVES – (3.1)%** | | | | **$ (20)** | **$ (6,815)** | **(3.1)%** |

(1)   All investments valued using unobservable inputs (Level 3).

(2)   All investments valued by the Board of Directors.

(3)   All debt investments are income producing, unless otherwise noted. Equity and warrant investments are non-income producing, unless otherwise noted.

(4)   Percentages are based on net assets of $221,887 as of December 31, 2017.

(5)   The equity investment is income producing, based on rate disclosed.

(6)   The cash rate equals the approximate current yield on our last-out portion of the unitranche facility.

(7)   Non-accrual investment.

(8)   The maturity date of the original investment has been extended.

(9)   The equity investment has an excercisable put option.

(10)   The investment has a $2.0 million unfunded commitment.

(11)   Indicates assets that the Company believes do not represent "qualifying assets" under Section 55(a) of the Investment Company Act of 1940, as amended. Qualifying assets must represent at least 70% of the Company's total assets at the time of acquisition of any additional non-qualifying assets. As of December 31, 2017, 5.0% of the Company's total assets were non-qualifying assets.

(12)   The company is headquartered in Brazil.

(13)   In addition to the stated rate, the Company is charging 3% default interest on the investment.

(14)   The investment has been exited. The residual value reflects estimated escrow to be settled post-closing.

(15)   The investment has a $0.7 million unfunded commitment.

See accompanying notes to consolidated financial statements.

F-18

TABLE OF CONTENTS

**Capitala Finance Corp.**

**Consolidated Schedule of Investments – (continued)**
**(in thousands, except for units/shares)**
**December 31, 2017**

(16) The Company has written a call option that enables CapitalSouth Partners Florida Sidecar Fund II, L.P. to purchase up to 31.25% of the Company's interest at a strike price of $1.5 million. As of December 31, 2017, the fair value of the written call option is approximately $6.8 million. See Note 4 to the consolidated financial statements for further detail on the written call option transaction.

(17) The investment has a $1.0 million unfunded commitment.

(18) The investment has a $3.1 million unfunded commitment.

(19) The investment has been exited. The residual value reflects estimated escrow and earnout to be settled post-closing.

(20) Capitala Finance Corp. generally acquires its investments in private transactions exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"). These investments are generally subject to certain limitations on resale, and may be deemed to be "restricted securities" under the Securities Act.

See accompanying notes to consolidated financial statements.

F-19

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 1. Organization**

Capitala Finance Corp. (the "Company", "we", "us", and "our") is an externally managed non-diversified closed-end management investment company incorporated in Maryland that has elected to be regulated as a business development company ("BDC") under the Investment Company Act of 1940, as amended (the "1940 Act"). The Company commenced operations on May 24, 2013 and completed its initial public offering ("IPO") on September 30, 2013. The Company is managed by Capitala Investment Advisors, LLC (the "Investment Advisor"), an investment adviser that is registered as an investment adviser under the Investment Advisers Act of 1940, as amended, and Capitala Advisors Corp. (the "Administrator") provides the administrative services necessary for the Company to operate. For United States ("U.S.") federal income tax purposes, the Company has elected to be treated, and intends to comply with the requirements to continue to qualify annually, as a regulated investment company ("RIC") under subchapter M of the Internal Revenue Code of 1986, as amended (the "Code").

The Company's investment objective is to generate both current income and capital appreciation through debt and equity investments. Both directly and through our subsidiaries that are licensed by the U.S. Small Business Administration ("SBA") under the Small Business Investment Company ("SBIC"), the Company offers customized financing to business owners, management teams and financial sponsors for change of ownership transactions, recapitalizations, strategic acquisitions, business expansion and other growth initiatives. The Company invests in first lien loans, second lien loans, subordinated loans, and, to a lesser extent, equity securities issued by lower middle-market companies and traditional middle-market companies.

The Company was formed for the purpose of: (i) acquiring, through a series of transactions, an investment portfolio from the following entities: CapitalSouth Partners Fund I Limited Partnership ("Fund I"); CapitalSouth Partners Fund II Limited Partnership ("Fund II"); CapitalSouth Partners Fund III, L.P. ("Fund III Parent"); CapitalSouth Partners SBIC Fund III, L.P. ("Fund III") and CapitalSouth Partners Florida Sidecar Fund I, L.P. ("Florida Sidecar" and, collectively with Fund I, Fund II, Fund III and Fund III Parent, the "Legacy Funds"); (ii) raising capital in the IPO and (iii) continuing and expanding the business of the Legacy Funds by making additional debt and equity investments in lower middle-market and traditional middle-market companies.

On September 24, 2013, the Company acquired 100% of the limited partnership interests in Fund II, Fund III and Florida Sidecar and each of their respective general partners, as well as certain assets from Fund I and Fund III Parent, in exchange for an aggregate of 8,974,420 shares of the Company's common stock (the "Formation Transactions"). Fund II, Fund III and Florida Sidecar became the Company's wholly owned subsidiaries. Fund II and Fund III retained their SBIC licenses, continued to hold their existing investments at the time of the IPO and have continued to make new investments. The IPO consisted of the sale of 4,000,000 shares of the Company's common stock at a price of $20.00 per share, resulting in net proceeds to the Company of $74.25 million, after deducting underwriting fees and commissions totaling $4.0 million and offering expenses totaling $1.75 million. The other costs of the IPO were borne by the limited partners of the Legacy Funds. During the fourth quarter of 2017, Florida Sidecar transferred all of its assets to the Company and was legally dissolved as a standalone partnership.

The Company has formed and expects to continue to form certain consolidated taxable subsidiaries (the "Taxable Subsidiaries"), which are taxed as corporations for income tax purposes. The Taxable Subsidiaries allow the Company to make equity investments in companies organized as pass-through entities while continuing to satisfy the requirements of a RIC under the Code.

**Note 2. Summary of Significant Accounting Policies**

**Basis of Presentation**

The Company is considered an investment company as defined in Accounting Standards Codification ("ASC") Topic 946 — *Financial Services — Investment Companies* ("ASC 946"). The accompanying

F-20

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

### Note 2. Summary of Significant Accounting Policies – (continued)

consolidated financial statements have been prepared on the accrual basis of accounting in conformity with U.S. generally accepted accounting principles ("U.S. GAAP") and pursuant to the requirements for reporting on Form 10-K and Article 6 of Regulation S-X. The consolidated financial statements of the Company include the accounts of the Company and its wholly owned subsidiaries, including Fund II, Fund III, Florida Sidecar, and the Taxable Subsidiaries.

The Company's financial statements as of December 31, 2018 and December 31, 2017 and for the years ended December 31, 2018, 2017 and 2016 are presented on a consolidated basis. The effects of all intercompany transactions between the Company and its subsidiaries (Fund II, Fund III, Florida Sidecar, and the Taxable Subsidiaries) have been eliminated in consolidation. All financial data and information included in these consolidated financial statements have been presented on the basis described above. In the opinion of management, the consolidated financial statements reflect all adjustments that are necessary for the fair presentation of financial results as of and for the periods presented.

### Use of Estimates in the Preparation of Financial Statements

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates under different assumptions and conditions. The most significant estimates in the preparation of the consolidated financial statements are investment valuation, revenue recognition, and income taxes.

### Consolidation

As provided under ASC 946, the Company will generally not consolidate its investment in a company other than a substantially wholly owned investment company subsidiary or a controlled operating company whose business consists of providing services to the Company. Accordingly, the Company consolidated the results of the Company's wholly owned investment company subsidiaries (Fund II, Fund III, Florida Sidecar, and the Taxable Subsidiaries) in its consolidated financial statements. The Company does not consolidate its interest in Capitala Senior Loan Fund II, LLC ("CSLF II") because the investment is not considered a substantially wholly owned investment company subsidiary. Further, CSLF II is a joint venture for which shared power exists relating to the decisions that most significantly impact the economic performance of the entity. See Note 4 to the consolidated financial statements for a description of the Company's investment in CSLF II.

### Segments

In accordance with ASC Topic 280 — *Segment Reporting* ("ASC 280"), the Company has determined that it has a single reporting segment and operating unit structure. While the Company invests in several industries and geographic locations, all investments share similar business and economic risks. As such, all investment activities have been aggregated into a single segment.

### Cash and Cash Equivalents

The Company considers cash equivalents to be highly liquid investments with original maturities of three months or less at the date of purchase. The Company deposits its cash in financial institutions and, at times, such balances may be in excess of the Federal Deposit Insurance Corporation insurance limits.

### Investment Classification

In accordance with the provisions of the 1940 Act, the Company classifies its investments by level of control. As defined in the 1940 Act, "Control Investments" are investments in those companies that the Company is deemed to "Control." "Affiliate Investments" are investments in those companies that are

F-21

8/4/2020                    Case 3:18-cv-01023-MPS   Document 353-15   Filed 12/01/21   Page 120 of 174
tv514470-10k - none - 11.9249s
TABLE OF CONTENTS

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 2. Summary of Significant Accounting Policies – (continued)**

"Affiliated Companies" of the Company, as defined in the 1940 Act, other than Control Investments. "Non-Control/Non-Affiliate Investments" are those investments that are neither Control Investments nor Affiliate Investments. Generally under the 1940 Act, the Company is deemed to control a company in which it has invested if the Company owns more than 25% of the voting securities of such company and/or has greater than 50% representation on its board or has the power to exercise control over management or policies of such portfolio company. The Company is deemed to be an affiliate of a company in which the Company has invested if it owns between 5% and 25% of the voting securities of such company.

**Valuation of Investments**

The Company applies fair value accounting to all of its financial instruments in accordance with the 1940 Act and ASC Topic 820 — *Fair Value Measurements and Disclosures* ("ASC 820"). ASC 820 defines fair value, establishes a framework used to measure fair value and requires disclosures for fair value measurements. In accordance with ASC 820, the Company has categorized its financial instruments carried at fair value, based on the priority of the valuation technique, into a three-level fair value hierarchy, as discussed in Note 4.

In determining fair value, the Company's board of directors (the "Board") uses various valuation approaches, and engages a third-party valuation firm, which provides an independent valuation of certain investments it reviews. In accordance with U.S. GAAP, a fair value hierarchy for inputs is used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available.

Observable inputs are those that market participants would use in pricing the asset or liability based on market data obtained from sources independent of the Board. Unobservable inputs reflect the Board's assumptions about the inputs market participants would use in pricing the asset or liability developed based upon the best information available in the circumstances.

The availability of valuation techniques and observable inputs can vary from security to security and is affected by a wide variety of factors including the type of security, whether the security is new and not yet established in the marketplace, and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Those estimated values do not necessarily represent the amounts that may be ultimately realized due to the occurrence of future circumstances that cannot be reasonably determined. Because of the inherent uncertainty of valuation, those estimated values may be materially higher or lower than the values that would have been used had a market for the securities existed. Accordingly, the degree of judgment exercised by the Board in determining fair value is greatest for securities categorized in Level 3. In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes, the level in the fair value hierarchy within which the fair value measurement in its entirety falls is determined based on the lowest level input that is significant to the fair value measurement.

Fair value is a market-based measure considered from the perspective of a market participant rather than an entity-specific measure. Therefore, even when market assumptions are not readily available, the Company's own assumptions are set to reflect those that market participants would use in pricing the asset or liability at the measurement date. The Company uses prices and inputs that are current as of the measurement date, including periods of market dislocation. In periods of market dislocation, the observability of prices and inputs may be reduced for many securities. This condition could cause a security to be reclassified to a lower level within the fair value hierarchy.

F-22

# CAPITALA FINANCE CORP.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 2. Summary of Significant Accounting Policies – (continued)**

In estimating the fair value of portfolio investments, the Company starts with the cost basis of the investment, which includes original issue discount and payment-in-kind ("PIK") income, if any. The transaction price is typically the best estimate of fair value at inception. When evidence supports a subsequent change to the carrying value from the original transaction price, adjustments are made to reflect the expected fair values.

As a practical expedient, the Company uses net asset value ("NAV") as the fair value for its equity investment in CSLF II. CSLF II records its underlying investments at fair value on a quarterly basis in accordance with the 1940 Act and ASC 820.

The valuation methodologies summarized below are utilized by the Company in estimating fair value.

*Enterprise Value Waterfall Approach*

The enterprise value waterfall approach determines an enterprise value based on earnings before interest, tax, depreciation and amortization ("EBITDA") multiples of publicly traded companies that are considered similar to the subject portfolio company. The Company considers a variety of items in determining a reasonable pricing multiple, including, but not limited to, operating results, budgeted projections, growth, size, risk, profitability, leverage, management depth, diversification, market position, supplier or customer dependence, asset utilization, liquidity metrics, and access to capital markets. EBITDA of the portfolio company is adjusted for non-recurring items in order to reflect a normalized level of earnings that is representative of future earnings. In certain instances, the Company may also utilize revenue multiples to determine enterprise value. When available, the Company may assign a pricing multiple or value its investments based on the value of recent investment transactions in the subject portfolio company or offers to purchase the portfolio company. The enterprise value is adjusted for financial instruments with seniority to the Company's ownership and for the effect of any instrument which may dilute the Company's investment in the portfolio company. The adjusted enterprise value is then apportioned based on the seniority and privileges of the Company's investments within the portfolio company.

The enterprise value waterfall approach is primarily utilized to value the Company's equity securities, including warrants. However, the Company may utilize the enterprise value waterfall approach to value certain debt securities.

*Income Approach*

The income approach utilizes a discounted cash flow methodology in which the Company estimates fair value based on the present value of expected cash flows discounted at a market rate of interest. The determination of a discount rate, or required rate of return, takes into account the portfolio company's fundamentals and perceived credit risk. Because the majority of the Company's portfolio companies do not have a public credit rating, determining a discount rate often involves assigning an implied credit rating based on the portfolio company's operating metrics compared to average metrics of similar publicly rated debt. Operating metrics include, but are not limited to, EBITDA, interest coverage, leverage ratios, return on capital, and debt to equity ratios. The implied credit rating is used to assign a base discount rate range based on publicly available yields on similarly rated debt securities. The Company may apply a premium to the discount rate utilized in determining fair value when performance metrics and other qualitative information indicate that there is an additional level of uncertainty about collectability of cash flows.

*Asset Approach*

The asset approach values an investment based on the value of the underlying collateral securing the investment. This approach is used when the Company has reason to believe that it will not collect all principal and interest in accordance with the contractual terms of the debt agreement.

F-23

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### December 31, 2018

### Note 2. Summary of Significant Accounting Policies – (continued)

**Revenue Recognition**

The Company's revenue recognition policies are as follows:

*Interest income and paid-in-kind interest income:*   Interest income is recorded on the accrual basis to the extent that such amounts are expected to be collected. The Company has loans in the portfolio that contain a payment-in-kind interest ("PIK interest") provision. The PIK interest, which represents contractually deferred interest added to the loan balance that is generally due at maturity, is recorded on an accrual basis to the extent that such amounts are expected to be collected. PIK interest is not accrued if the Company does not expect the issuer to be able to pay all principal and interest when due.

*Non-accrual investments:*   Management reviews all loans that become 90 days or more past due, or when there is reasonable doubt that principal or interest will be collected, for possible placement on non-accrual status. When the Company otherwise does not expect the borrower to be able to service its debt and other obligations, the Company will place the loan on non-accrual status and will generally cease recognizing interest income and PIK interest on that loan for financial reporting purposes. Interest payments received on non-accrual loans may be recognized as income or applied to principal depending upon management's judgment. The Company writes off any previously accrued and uncollected interest when it is determined that interest is no longer considered collectible. The Company may elect to cease accruing PIK interest and continue accruing interest income in cases where a loan is currently paying its interest income but, in management's judgment, there is a reasonable likelihood of principal loss on the loan. Non-accrual loans are returned to accrual status when the borrower's financial condition improves such that management believes current interest and principal payments are expected to be collected.

*Gains and losses on investment sales and paydowns:*   Realized gains and losses on investments are recognized using the specific identification method.

*Dividend income and paid-in-kind dividends:*   Dividend income is recognized on the date dividends are declared. The Company holds preferred equity investments in the portfolio that contain a payment-in-kind dividend ("PIK dividends") provision. PIK dividends, which represent contractually deferred dividends added to the equity balance, are recorded on the accrual basis to the extent that such amounts are expected to be collected. The Company will typically cease accrual of PIK dividends when the fair value of the equity investment is less than the cost basis of the investment or when it is otherwise determined by management that PIK dividends are unlikely to be collected. If management determines that a decline in fair value is temporary in nature and the PIK dividends are more likely than not to be collected, management may elect to continue accruing PIK dividends.

*Original issue discount:*   Discounts received to par on loans purchased are capitalized and accreted into income over the life of the loan. Any remaining discount is accreted into income upon prepayment of the loan.

*Other income:*   Origination fees (to the extent services are performed to earn such income), amendment fees, consent fees, and other fees associated with investments in portfolio companies are recognized as income when the investment transaction closes. Prepayment penalties received by the Company for debt instruments repaid prior to maturity date are recorded as income upon receipt.

**Loan Sales**

The Company follows the guidance in ASC Topic 860 — *Transfers and Servicing* ("ASC 860") when accounting for loan participations and partial loan sales as it relates to concluding on sales accounting treatment for such transactions. Based on the Company's analysis of all loan participations and partial sales completed, the Company believes that all such transactions meet the criterion required by ASC 860 to qualify for sales accounting treatment.

F-24

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

### Note 2. Summary of Significant Accounting Policies – (continued)

**General and Administrative Expenses**

General and administrative expenses are paid as incurred. The Company's administrative expenses include personnel and overhead expenses allocable to the Company paid by and reimbursed to the Administrator under an administration agreement between the Company and the Administrator (the "Administration Agreement"). Other operating expenses such as legal and audit fees, director fees, and director and officer insurance are generally paid directly by the Company.

**Deferred Financing Fees**

Costs incurred to issue the Company's debt obligations are capitalized and are amortized over the term of the debt agreements under the effective interest method.

**Earnings per share**

The Company's earnings per share ("EPS") amounts have been computed based on the weighted-average number of shares of common stock outstanding for the period. Basic EPS is computed by dividing net increase (decrease) in net assets resulting from operations by the weighted average number of shares of common stock outstanding during the period of computation. Diluted EPS is computed by dividing net increase (decrease) in net assets resulting from operations, adjusted for the change in net assets resulting from the exercise of the dilutive shares, by the weighted average number of shares of common stock assuming all potentially dilutive shares had been issued. Diluted EPS reflects the potential dilution using the as-if-converted method for convertible debt, which could occur if all potentially dilutive securities were exercised.

**Commitments and Contingencies**

As of December 31, 2018, the Company had outstanding unfunded commitments related to debt and equity investments in existing portfolio companies of $6.4 million (Capitala Senior Loan Fund II, LLC), $5.0 million (Portrait Studio, LLC), $1.1 million (MC Sign Lessor, Corp), $1.0 million (U.S. BioTek Laboratories, LLC), $0.8 million (Freedom Electronics, LLC), and $0.3 million (CableOrganizer Acquisition, LLC). As of December 31, 2017, the Company had outstanding unfunded commitments related to debt investments in existing portfolio companies of $3.1 million (Portrait Studio, LLC), $2.0 million (CIS Secure Computing, Inc.), $1.0 million (Kelle's Transport Service, LLC), and $0.7 million (U.S. Well Services, LLC).

The Company may invest in the same unitranche facility as CSLF II whereby CSLF II provides the first-out portion of the unitranche facility and the Company and other lenders provide the last-out portion of the unitranche facility. Under a guarantee agreement, the Company may be required to purchase its pro-rata portion of first-out loans from CSLF II upon certain triggering events, including acceleration upon payment default of the underlying borrower. As of December 31, 2018, the Company has evaluated the fair value of the guarantee under the guidance of ASC Topic 460 — *Guarantees* and determined that the fair value of the guarantee is immaterial as the risk of payment default for first-out loans in CSLF II is considered remote. The maximum exposure to credit risk as of December 31, 2018 is $4.3 million and extends to the stated maturity of the underlying loans in CSLF II.

In the ordinary course of business, the Company may enter into contracts or agreements that contain indemnifications or warranties. Future events could occur that could lead to the execution of these provisions against the Company. Based on its history and experience, management believes that the likelihood of such an event is remote.

On December 28, 2017, an alleged stockholder filed a putative class action lawsuit complaint, Paskowitz v. Capitala Finance Corp., et al., in the United States District Court for the Central District of California (case number 2:17-cv-09251-MWF-AS) (the "Paskowitz Action"), against the Company and

F-25

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

### Note 2. Summary of Significant Accounting Policies – (continued)

certain of its current officers on behalf of all persons who purchased or otherwise acquired the Company's common stock between January 4, 2016 and August 7, 2017. On January 3, 2018, another alleged stockholder filed a putative class action complaint, Sandifer v. Capitala Finance Corp., et al., in the United States District Court for the Central District of California (case number 2:18-cv-00052-MWF-AS) (the "Sandifer Action"), asserting substantially similar claims on behalf of the same putative class and against the same defendants. On February 2, 2018, the Sandifer Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina. The Sandifer Action was voluntarily dismissed on February 28, 2018. On March 1, 2018, the Paskowitz Action was transferred, on stipulation of the parties, to the United States District Court for the Western District of North Carolina (case number 3:18-cv-00096-RJC-DSC). On June 19, 2018, the plaintiffs in the Paskowitz Action filed their amended complaint. The complaint, as currently amended, alleges certain violations of the securities laws, including, *inter alia*, that the defendants made certain materially false and misleading statements and omissions regarding the Company's business, operations, and prospects between January 4, 2016 and August 7, 2017. The plaintiffs in the Paskowitz Action seek compensatory damages and attorneys' fees and costs, among other relief, but did not specify the amount of damages being sought. Defendants have moved to dismiss the amended complaint. While the Company intends to vigorously defend itself in this litigation, the outcome of these legal proceedings cannot be predicted with certainty.

Estimating an amount or range of possible losses resulting from litigation proceedings is inherently difficult and requires an extensive degree of judgment, particularly where the matters involve indeterminate claims for monetary damages, are in the early stages of the proceedings, and are subject to appeal. In addition, because most legal proceedings are resolved over extended periods of time, potential losses are subject to change due to, among other things, new developments, changes in legal strategy, the outcome of intermediate procedural and substantive rulings and other parties' settlement posture and their evaluation of the strength or weakness of their case against us. For these reasons, we are currently unable to predict the ultimate timing or outcome of, or reasonably estimate the possible losses or a range of possible losses resulting from, the matters described above. Based on information currently available, the Company does not believe that any reasonably possible losses arising from the currently pending legal matters described above will be material to the Company's results of operations or financial condition. However, in light of the inherent uncertainties involved in such matters, an adverse outcome in this litigation could materially and adversely affect the Company's financial condition, results of operations or cash flows in any particular reporting period.

In the ordinary course of business, the Company may directly or indirectly be a defendant or plaintiff in legal actions with respect to bankruptcy, insolvency or other types of proceedings. Such lawsuits may involve claims that could adversely affect the value of certain financial instruments owned by the Company or result in direct losses to the Company. In management's opinion, no direct losses with respect to litigation contingencies were probable as of December 31, 2018 and December 31, 2017. Management is of the opinion that the ultimate resolution of such claims, if any, will not materially affect the Company's business, financial position, results of operations or liquidity. Furthermore, in management's opinion, it is not possible to estimate a range of reasonably possible losses with respect to litigation contingencies.

**Income Taxes**

The Company has elected to be treated for U.S. federal income tax purposes and intends to comply with the requirements to qualify annually as a RIC under subchapter M of the Code and, among other things, intends to make the requisite distributions to its stockholders which will relieve the Company from U.S. federal income taxes.

In order to qualify as a RIC, among other requirements, the Company is required to timely distribute to its stockholders at least 90.0% of its investment company taxable income, as defined by the Code, for each fiscal tax year. The Company will be subject to a nondeductible U.S. federal excise tax of 4.0% on

F-26

CAPITALA FINANCE CORP.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

### Note 2. Summary of Significant Accounting Policies – (continued)

undistributed income if it does not distribute at least 98.0% of its ordinary income in any calendar year and 98.2% of its capital gain net income for each one-year period ending on October 31.

Depending on the level of taxable income earned in an excise tax year, the Company may choose to carry forward taxable income in excess of current year dividend distributions into the next excise tax year and pay a 4.0% excise tax on such income, as required. To the extent that the Company determines that its estimated current year annual taxable income will be in excess of estimated current year dividend distributions for excise tax purposes, the Company accrues excise tax, if any, on estimated excess taxable income as taxable income is earned. Since the Company's IPO, the Company has not accrued or paid excise tax.

The Company elected to amend its tax year end from August 31 to December 31 and has filed a tax return for the four months ended December 31, 2017. The election to change the tax year end is not expected to have a material impact on the Company's consolidated statements of operations, the Company's tax status as a RIC, or the nature of distributions paid to our stockholders. The tax periods ended December 31, 2018, December 31, 2017, August 31, 2017 and August 31, 2016 remain subject to examination by U.S. federal, state, and local tax authorities. No interest expense or penalties have been assessed for the years ended December 31, 2018, 2017 and 2016. If the Company was required to recognize interest and penalties, if any, related to unrecognized tax benefits this would be recognized as income tax expense in the consolidated statements of operations.

The Company's Taxable Subsidiaries record deferred tax assets or liabilities related to temporary book versus tax differences on the income or loss generated by the underlying equity investments held by the Taxable Subsidiaries. As of December 31, 2018 and December 31, 2017, the Company recorded a net deferred tax asset of $0.6 million and a deferred tax liability of $1.3 million, respectively. For the years ended December 31, 2018 and December 31, 2017, the Company recorded a deferred tax benefit (provision) of $1.9 million and $(1.3) million, respectively. For the year ended December 31, 2016, no tax provision was recorded.

In accordance with certain applicable U.S. Treasury regulations and guidance issued by the Internal Revenue Service, a RIC may treat a distribution of its own stock as fulfilling its RIC distribution requirements if each stockholder may elect to receive its entire distribution in either cash or stock of the RIC, subject to a limitation on the aggregate amount of cash to be distributed to all stockholders, which limitation must be at least 20.0% of the aggregate declared distribution. If too many stockholders elect to receive cash, the cash available for distribution must be allocated among the stockholders electing to receive cash (with the balance of the distribution paid in stock). In no event will any stockholder, electing to receive cash, receive the lesser of (a) the portion of the distribution such stockholder has elected to receive in cash or (b) an amount equal to his or her entire distribution times the percentage limitation on cash available for distribution. If these and certain other requirements are met, for U.S. federal income tax purposes, the amount of the dividend paid in stock will be equal to the amount of cash that could have been received instead of stock. For income tax purposes, the Company has paid distributions on its common stock from ordinary income in the amount of $16.0 million, $6.1 million, $25.2 million, and $24.5 million during the tax periods ended December 31, 2018, December 31, 2017, August 31, 2017, and August 31, 2016, respectively.

ASC Topic 740 — *Income Taxes* ("ASC 740"), provides guidance for how uncertain tax positions should be recognized, measured, presented and disclosed in the financial statements. ASC 740 requires the evaluation of tax positions taken or expected to be taken in the course of preparing the Company's tax returns to determine whether the tax positions are "more-likely-than-not" to be sustained by the applicable tax authority. Tax positions deemed to meet a "more-likely-than-not" threshold would be recorded as a tax benefit or expense in the current period. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the consolidated statements of operations. As of December 31, 2018 and December 31, 2017, there were no uncertain tax positions.

F-27

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**December 31, 2018**

**Note 2. Summary of Significant Accounting Policies – (continued)**

The Company is required to determine whether a tax position of the Company is more likely-than-not to be sustained upon examination by the applicable taxing authority, including resolution of any related appeals or litigation processes, based on the technical merits of the position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. De-recognition of a tax benefit previously recognized could result in the Company recording a tax liability that could negatively impact the Company's net assets.

U.S. GAAP provides guidance on thresholds, measurement, de-recognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition that is intended to provide better financial statement comparability among different entities.

On December 22, 2017, the United States enacted tax reform legislation through the Tax Cuts and Jobs Act, which significantly changes the existing U.S. tax laws, including a reduction in the corporate tax rate from 35% to 21%, a move from a worldwide tax system to a territorial system, as well as other changes. The Taxable Subsidiaries' provisional tax is based on the new lower blended federal and state corporate tax rate of 24.86%. The implementation of the Tax Act did not have a material impact on the Company's financial position and results of operations.

**Distributions**

Distributions to common stockholders are recorded as payable on the declaration date. The amount to be paid out as a dividend is determined by the Board. Net capital gains, if any, are generally distributed at least annually, although we may decide to retain such capital gains for reinvestment.

The Company has adopted an "opt out" dividend reinvestment plan ("DRIP") for the Company's common stockholders. As a result, if the Company declares a distribution, then stockholders' cash distributions will be automatically reinvested in additional shares of the Company's common stock unless a stockholder specifically "opts out" of our DRIP. If a stockholder opts out, that stockholder will receive cash distributions. Although distributions paid in the form of additional shares of our common stock will generally be subject to U.S. federal, state and local taxes in the same manner as cash distributions, stockholders participating in the Company's DRIP will not receive any corresponding cash distributions with which to pay any such applicable taxes.

**Company Investment Risk, Concentration of Credit Risk, and Liquidity Risk**

The Investment Advisor has broad discretion in making investments for the Company. Investments will generally consist of debt and equity instruments that may be affected by business, financial market or legal uncertainties. Prices of investments may be volatile, and a variety of factors that are inherently difficult to predict, such as domestic or international economic and political developments, may significantly affect the results of the Company's activities and the value of its investments. In addition, the value of the Company's portfolio may fluctuate as the general level of interest rates fluctuate.

The value of the Company's investments may be detrimentally affected to the extent, among other things, that a borrower defaults on its obligations, there is insufficient collateral and/or there are extensive legal and other costs incurred in collecting on a defaulted loan, observable secondary or primary market yields for similar instruments issued by comparable companies increase materially or risk premiums required in the market between smaller companies, such as our borrowers, and those for which market yields are observable increase materially.

The Investment Advisor may attempt to minimize this risk by maintaining low debt-to-liquidation values with each debt investment and the collateral underlying the debt investment.

F-28

CAPITALA FINANCE CORP.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 2. Summary of Significant Accounting Policies – (continued)**

The Company's assets may, at any time, include securities and other financial instruments or obligations that are illiquid or thinly traded, making purchase or sale of such securities and financial instruments at desired prices or in desired quantities difficult. Furthermore, the sale of any such investments may be possible only at substantial discounts, and it may be extremely difficult to value any such investments accurately.

**Note 3. Recent Accounting Pronouncements**

In August 2018, the FASB issued Accounting Standards Update 2018-13, Disclosure Framework — Changes to the Disclosure Requirement for Fair Value Measurement. The FASB issued the amendments as part of the disclosure framework project which is intended to improve the effectiveness of fair value disclosures in the notes to the financial statements by facilitating clear communication of the information required by U.S. GAAP that is most important to users of the financial statements. The standard is effective for interim and annual reporting periods in fiscal years that begin after December 15, 2019. Management is currently evaluating the impact these changes will have on the Company's consolidated financial statements and disclosures.

In October 2018, the SEC adopted amendments (the "Amendments") to certain disclosure requirements that have become redundant, duplicative, overlapping, outdated, or superseded, in light of other SEC disclosure requirements, U.S. GAAP requirements, or changes in the information environment. In part, the Amendments require an investment company to present distributable earnings in total, rather than showing the three components of distributable earnings. The compliance date for the Amendments is for all filings on or after November 5, 2018. Management has adopted the Amendments and included the required disclosures in the Company's consolidated financial statements.

In May 2014, the FASB issued Accounting Standards Update 2014-09, Revenue from Contracts with Customers (ASC Topic 606) ("ASU 2014-09"). ASU 2014-09 supersedes the revenue recognition requirements under ASC Topic 605, Revenue Recognition, and most industry-specific guidance throughout the ASC. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which an entity expects to be entitled in exchange for those goods or services. The new guidance significantly enhances comparability of revenue recognition practices across entities, industries, jurisdictions and capital markets. Additionally, the guidance requires improved disclosures as to the nature, amount, timing and uncertainty of revenue that is recognized. The new guidance became effective for the annual reporting period beginning January 1, 2018, including interim periods within that reporting period. The Company completed its assessment in evaluating the potential impact on its consolidated financial statements and based on its assessment, determined that its financial contracts are excluded from the scope of ASU 2014-09. As a result of the scope exception for financial contracts, the Company's management has determined that there will be no material changes to the recognition, timing, and classification of revenues and expenses; additionally, the Company's management determined that the adoption of ASU 2014-09 does not have a significant impact on its consolidated financial statement disclosures.

**Note 4. Investments and Fair Value Measurements**

The Company's investment objective is to generate both current income and capital appreciation through debt and equity investments. Both directly and through the Company's subsidiaries that are licensed by the SBA under the SBIC Act, the Company offers customized financing to business owners, management teams and financial sponsors for change of ownership transactions, recapitalizations, strategic acquisitions, business expansion and other growth initiatives. The Company invests in first lien loans,

F-29

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

### Note 4. Investments and Fair Value Measurements – (continued)

second lien loans, and subordinated loans and, to a lesser extent, equity securities issued by lower middle-market companies and traditional middle-market companies. As of December 31, 2018, our portfolio consisted of investments in 44 portfolio companies with a fair value of approximately $448.9 million.

Most of the Company's debt investments are structured as first lien loans. First lien loans may contain some minimum amount of principal amortization, excess cash flow sweep feature, prepayment penalties, or any combination of the foregoing. First lien loans are secured by a first priority lien in existing and future assets of the borrower and may take the form of term loans or delayed draw facilities. Unitranche debt, a form of first lien loan, typically involves issuing one debt security that blends the risk and return profiles of both senior secured and subordinated debt in one debt security, bifurcating the loan into a first-out tranche and last-out tranche. As of December 31, 2018, 13.7% of the fair value of our first lien loans consisted of last-out loans. As of December 31, 2017, 13.7% of the fair value of our first lien loans consisted of last-out loans. In some cases, first lien loans may be subordinated, solely with respect to the payment of cash interest, to an asset based revolving credit facility.

The Company also invests in debt instruments structured as second lien loans. Second lien loans are loans which have a second priority security interest in all or substantially all of the borrower's assets, and which are not subject to the blockage of cash interest payments to the Company at the first lien lender's discretion.

In addition to first and second lien loans, the Company may also invest in subordinated loans. Subordinated loans typically have a second lien on all or substantially all of the borrower's assets, but unlike second lien loans, may be subject to the interruption of cash interest payments upon certain events of default, at the discretion of the first lien lender.

During the year ended December 31, 2018, the Company made approximately $107.8 million of investments and had approximately $123.5 million in repayments and sales, resulting in net repayments and sales of approximately $15.7 million for the year. During the year ended December 31, 2017, the Company made approximately $82.8 million of investments and had approximately $115.8 million in repayments and sales resulting in net repayments and sales of approximately $33.0 million for the year. During the year ended December 31, 2016, the Company made approximately $120.8 million of investments and had approximately $163.6 million in repayments and sales resulting in net repayments and sales of approximately $42.8 million for the year.

During the year ended December 31, 2018, the Company funded $6.5 million of previously committed capital to existing portfolio companies. During the year ended December 31, 2018, the Company funded $101.3 million of investments in portfolio companies for which it was not previously committed to fund. During the year ended December 31, 2017, the Company funded $5.9 million of previously committed capital to existing portfolio companies. During the year ended December 31, 2017, the Company funded $76.9 million of investments in portfolio companies for which it was not previously committed to fund. During the year ended December 31, 2016, the Company funded $2.8 million of previously committed capital to existing portfolio companies. During the year ended December 31, 2016, the Company funded $118.0 million of investments in portfolio companies for which it was not previously committed to fund. During the years ended December 31, 2018 and 2016, the Company did not assist any portfolio companies in obtaining indirect financing. During the year ended December 31, 2017, the Company assisted one portfolio company in obtaining indirect financing by providing a limited guarantee. During the years ended December 31, 2018, 2017, and 2016, the Company did not lead any syndicates.

On August 31, 2016, the Company sold a portion of 14 securities across 10 portfolio companies to CapitalSouth Partners Florida Sidecar Fund II, L.P. ("FSC II"), including granting an option to acquire a portion of the Company's equity investment in Eastport Holdings, LLC (the "Written Call Option"), in

F-30

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

exchange for 100% of the partnership interests in FSC II. Concurrent with the sale of these assets to FSC II, the Company received cash consideration of $47.6 million from an affiliated third-party purchaser in exchange for 100% of the partnership interests of FSC II. These assets were sold to FSC II at their June 30, 2016 fair market values, resulting in a net realized gain of $0.1 million. The Company's Board pre-approved this transaction pursuant to Section 57(f) of the 1940 Act.

The Company collected and will periodically collect principal and interest payments related to certain of the securities purchased by FSC II. Such principal and interest payments will be remitted timely to FSC II based on its proportionate share of the security. FSC II does not have any recourse to the Company related to the non-payment of principal or interest by the underlying issuers of the securities.

The Written Call Option granted FSC II the right to purchase up to 31.25% of the Company's equity investment in Eastport Holdings, LLC. The Written Call Option had a strike price of $1.5 million and a termination date of August 31, 2018. On August 27, 2018, FSC II exercised its option at a strike price of $1.5 million. The fair value of the Written Call Option, which has been treated as a derivative liability and recorded in the financial statement line item Written Call Option at fair value in the Company's consolidated statements of assets and liabilities, was approximately $0.0 million and $6.8 million as of December 31, 2018 and December 31, 2017, respectively. For purposes of determining the fair value of the Written Call Option, the Company calculated the difference in the fair value of the underlying equity investment in Eastport Holdings, LLC and the strike price of the Written Call Option, or intrinsic value. The Written Call Option was classified as a Level 3 financial instrument.

The composition of our investments as of December 31, 2018, at amortized cost and fair value was as follows (dollars in thousands):

| | Investments at Amortized Cost | Percentage of Total | Investments at Fair Value | Percentage of Total |
|---|---|---|---|---|
| First Lien Debt | $252,174 | 60.0% | $237,570 | 52.9% |
| Second Lien Debt | 33,040 | 7.9 | 32,495 | 7.2 |
| Subordinated Debt | 72,562 | 17.3 | 73,113 | 16.3 |
| Equity and Warrants | 48,594 | 11.6 | 92,054 | 20.5 |
| Capitala Senior Loan Fund II, LLC | 13,600 | 3.2 | 13,695 | 3.1 |
| Total | $419,970 | 100.0% | $448,927 | 100.0% |

The composition of our investments as of December 31, 2017, at amortized cost and fair value was as follows (dollars in thousands):

| | Investments at Amortized Cost | Percentage of Total | Investments at Fair Value | Percentage of Total |
|---|---|---|---|---|
| First Lien Debt | $257,147 | 55.3% | $243,489 | 48.7% |
| Second Lien Debt | 32,465 | 7.0 | 30,794 | 6.1 |
| Subordinated Debt | 120,235 | 25.8 | 103,385 | 20.7 |
| Equity and Warrants | 55,180 | 11.9 | 122,271 | 24.5 |
| Total | $465,027 | 100.0% | $499,939 | 100.0% |

As noted above, the Company values all investments in accordance with ASC 820. ASC 820 requires enhanced disclosures about assets and liabilities that are measured and reported at fair value. As defined in ASC 820, fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

F-31

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

ASC 820 establishes a hierarchal disclosure framework which prioritizes and ranks the level of market price observability of inputs used in measuring investments at fair value. Market price observability is affected by a number of factors, including the type of investment and the characteristics specific to the investment. Investments with readily available active quoted prices or for which fair value can be measured from actively quoted prices generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

Based on the observability of the inputs used in the valuation techniques, the Company is required to provide disclosures on fair value measurements according to the fair value hierarchy. The fair value hierarchy ranks the observability of the inputs used to determine fair values. Investments carried at fair value are classified and disclosed in one of the following three categories:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access.

- Level 2 — Valuations based on inputs other than quoted prices in active markets, which are either directly or indirectly observable.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

In addition to using the above inputs in investment valuations, the Company continues to employ the valuation policy approved by the Board that is consistent with ASC 820 (see Note 2). Consistent with the Company's valuation policy, the Company evaluates the source of inputs, including any markets in which its investments are trading, in determining fair value.

In estimating fair value of portfolio investments, the Company starts with the cost basis of the investment, which includes amortized original issue discount and PIK income, if any. The transaction price is typically the best estimate of fair value at inception. When evidence supports a subsequent change to the carrying value from the original transaction price, adjustments are made to reflect the expected fair values.

The following table presents the fair value measurements of investments, by major class, as of December 31, 2018 (dollars in thousands), according to the fair value hierarchy:

| | Fair Value Measurements[1] | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| First Lien Debt | $ — | $ — | $ 237,570 | $ 237,570 |
| Second Lien Debt | — | — | 32,495 | 32,495 |
| Subordinated Debt | — | — | 73,113 | 73,113 |
| Equity and Warrants | — | — | 92,054 | 92,054 |
| Total | $ — | $ — | $ 435,232 | $ 435,232 |

(1)  Excludes our $13.7 million investment in CSLF II, measured at NAV.

F-32

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

The following table presents fair value measurements of investments, by major class, as of December 31, 2017 (dollars in thousands), according to the fair value hierarchy:

|  | Fair Value Measurements | | | |
|---|---|---|---|---|
|  | Level 1 | Level 2 | Level 3 | Total |
| First Lien Debt | $ — | $ — | $ 243,489 | $ 243,489 |
| Second Lien Debt | — | — | 30,794 | 30,794 |
| Subordinated Debt | — | — | 103,385 | 103,385 |
| Equity and Warrants | — | — | 122,271 | 122,271 |
| Total | $ — | $ — | $ 499,939 | $ 499,939 |

The following table presents fair value measurements of the Written Call Option as of December 31, 2017 (dollars in thousands), according to the fair value hierarchy:

|  | Fair Value Measurements | | | |
|---|---|---|---|---|
|  | Level 1 | Level 2 | Level 3 | Total |
| Written Call Option | $ — | $ — | $ (6,815) | $ (6,815) |
| Total | $ — | $ — | $ (6,815) | $ (6,815) |

The following table provides a reconciliation of the beginning and ending balances for investments that use Level 3 inputs for the year ended December 31, 2018 (dollars in thousands):

|  | First Lien Debt | Second Lien Debt | Subordinated Debt | Equity and Warrants | Total[1] |
|---|---|---|---|---|---|
| Balance as of January 1, 2018 | $243,489 | $30,794 | $103,385 | $122,271 | $ 499,939 |
| Reclassifications | 16,723 | — | (20,806) | 4,083 | — |
| Repayments/sales | (95,294) | — | (8,463) | (19,760) | (123,517) |
| Purchases | 92,421 | — | — | 1,781 | 94,202 |
| Payment in-kind interest and dividends accrued | 1,712 | 482 | 1,337 | 817 | 4,348 |
| Accretion of original issue discount | 264 | 93 | 757 | — | 1,114 |
| Realized gain (loss) from investments | (20,799) | — | (20,499) | 6,494 | (34,804) |
| Net unrealized appreciation (depreciation) on investments | (946) | 1,126 | 17,402 | (23,632) | (6,050) |
| Balance as of December 31, 2018 | $237,570 | $32,495 | $ 73,113 | $ 92,054 | $ 435,232 |

(1)  Excludes our $13.7 million investment in CSLF II, measured at NAV.

The following table provides a reconciliation of the beginning and ending balances for the Written Call Option that use Level 3 inputs for the year ended December 31, 2018 (dollars in thousands):

|  | Written Call Option |
|---|---|
| Balance as of January 1, 2018 | $ (6,815) |
| Payment from Written Call Option | 20 |
| Net unrealized appreciation on Written Call Option | 6,795 |
| Balance as of December 31, 2018 | $ — |

F-33

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

The following table provides a reconciliation of the beginning and ending balances for investments that use Level 3 inputs for the year ended December 31, 2017 (dollars in thousands):

|  | First Lien Debt | Second Lien Debt | Subordinated Debt | Equity and Warrants | Total |
|---|---|---|---|---|---|
| Balance as of January 1, 2017 | $226,578 | $ 71,483 | $150,232 | $ 93,346 | $ 541,639 |
| Reclassifications | (7,109) | — | (9,000) | 16,109 | — |
| Repayments/sales | (26,409) | (45,804) | (22,092) | (21,505) | (115,810) |
| Purchases | 69,722 | 4,000 | 2,730 | 6,298 | 82,750 |
| Payment in-kind interest and dividends accrued | 4,378 | 846 | 987 | 932 | 7,143 |
| Accretion of original issue discount | 274 | 322 | 761 | — | 1,357 |
| Realized gain (loss) from investments | (28,356) | (1,456) | (2,000) | 7,623 | (24,189) |
| Net unrealized appreciation (depreciation) on investments | 4,411 | 1,403 | (18,233) | 19,468 | 7,049 |
| Balance as of December 31, 2017 | $243,489 | $ 30,794 | $103,385 | $ 122,271 | $ 499,939 |

The following table provides a reconciliation of the beginning and ending balances for the Written Call Option that use Level 3 inputs for the year ended December 31, 2017 (dollars in thousands):

|  | Written Call Option |
|---|---|
| Balance as of January 1, 2017 | $ (2,736) |
| Net unrealized depreciation on Written Call Option | (4,079) |
| Balance as of December 31, 2017 | $ (6,815) |

The net change in unrealized depreciation on investments held as of December 31, 2018 and December 31, 2017, was $(32.7) million and $(1.6) million, respectively, and is included in net unrealized depreciation on investments in the consolidated statements of operations.

F-34

## CAPITALA FINANCE CORP.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

#### Note 4. Investments and Fair Value Measurements – (continued)

The valuation techniques and significant unobservable inputs used in recurring Level 3 fair value measurements of assets as of December 31, 2018 were as follows:

| | Fair Value[2] (in millions) | Valuation Approach | Unobservable Input | Range (Weighted Average) |
|---|---|---|---|---|
| First lien debt | $ 195.1 | Income | Required Rate of Return | 9.2% – 16.0% (12.1%) |
| | | | Leverage Ratio | 1.0x – 13.5x (4.3x) |
| | | | Adjusted EBITDA | $1.7 million – $118.7 million ($17.6 million) |
| First lien debt | $ 42.5 | Enterprise Value Waterfall and Asset[1] | EBITDA Multiple | 4.0x – 6.0x (5.3x) |
| | | | Adjusted EBITDA | $0.6 million – $3.7 million ($2.3 million) |
| | | | Revenue Multiple | 0.9x – 0.9x (0.9x) |
| | | | Revenue | $13.0 million – $13.0 million ($13.0 million) |
| Second lien debt | $ 16.2 | Income | Required Rate of Return | 12.5% – 15.5% (14.6%) |
| | | | Leverage Ratio | 4.6x – 5.0x (4.8x) |
| | | | Adjusted EBITDA | $67.0 million – $79.2 million ($75.5 million) |
| Second lien debt | $ 16.3 | Enterprise Value Waterfall and Asset | EBITDA Multiple | 5.6x – 5.6x (5.6x) |
| | | | Adjusted EBITDA | $9.2 million – $9.2 million ($9.2 million) |
| Subordinated debt | $ 49.3 | Income | Required Rate of Return | 11.5% – 20.0% (14.1%) |
| | | | Leverage Ratio | 3.1x – 9.1x (5.7x) |
| | | | Adjusted EBITDA | $1.7 million – $15.8 million ($10.5 million) |
| Subordinated debt | $ 23.8 | Enterprise Value Waterfall and Asset[1] | EBITDA Multiple | 6.0x – 8.0x (7.9x) |
| | | | Adjusted EBITDA | $1.7 million – $3.1 million ($3.0 million) |
| | | | Revenue Multiple | 0.4x – 0.4x (0.4x) |
| | | | Revenue | $568.2 million – $568.2 million ($568.2 million) |
| Equity and warrants | $ 92.1 | Enterprise Value Waterfall | EBITDA Multiple | 3.3x – 14.0x (6.5x) |
| | | | Adjusted EBITDA | $1.7 million – $112.3 million ($27.8 million) |
| | | | Revenue Multiple | 0.4x – 0.4x (0.4x) |
| | | | Revenue | $164.6 million – $568.2 million ($455.1 million) |

(1)  $0.7 million in subordinated debt and $2.9 million in first lien debt were valued using the asset approach.

(2)  Excludes our $13.7 million investment in CSLF II, measured at NAV.

F-35

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

The valuation techniques and significant unobservable inputs used in recurring Level 3 fair value measurements of assets and (liabilities) as of December 31, 2017 were as follows:

| | Fair Value (in millions) | Valuation Approach | Unobservable Input | Range (Weighted Average) |
|---|---|---|---|---|
| First lien debt | $ 211.2 | Income | Required Rate of Return | 8.6% – 21.2% (13.5%) |
| | | | Leverage Ratio | 1.7x – 7.0x (3.6x) |
| | | | Adjusted EBITDA | $1.8 million – $131.2 million ($21.1 million) |
| First lien debt | $ 32.3 | Enterprise Value Waterfall and Asset[1] | EBITDA Multiple | 4.0x – 7.0x (5.5x) |
| | | | Adjusted EBITDA | $2.1 million – $3.1 million ($2.6 million) |
| Second lien debt | $ 30.8 | Income | Required Rate of Return | 11.6% – 17.6% (14.4%) |
| | | | Leverage Ratio | 4.9x – 7.0x (6.0x) |
| | | | Adjusted EBITDA | $7.3 million – $78.5 million ($41.1 million) |
| Subordinated debt | $ 64.4 | Income | Required Rate of Return | 11.5% – 19.0% (14.2%) |
| | | | Leverage Ratio | 3.2x – 8.1x (5.6x) |
| | | | Adjusted EBITDA | $3.2 million – $15.1 million ($9.7 million) |
| Subordinated debt | $ 39.0 | Enterprise Value Waterfall and Asset[1] | EBITDA Multiple | 6.0x – 7.5x (7.2x) |
| | | | Adjusted EBITDA | $1.8 million – $30.1 million ($21.2 million) |
| | | | Revenue Multiple | 0.2x – 0.2x (0.2x) |
| | | | Revenue | $150.7 million – $150.7 million ($150.7 million) |
| Equity and warrants | $ 122.3 | Enterprise Value Waterfall | EBITDA Multiple | 3.5x – 14.5x (7.9x) |
| | | | Adjusted EBITDA | $1.8 million – $77.6 million ($24.3 million) |
| Written Call Option | $ (6.8) | Enterprise Value Waterfall | EBITDA Multiple | 7.25x – 7.25x (7.25x) |
| | | | Adjusted EBITDA | $30.1 million – $30.1 million ($30.1 million) |

(1) $1.0 million in subordinated debt and $1.9 million in first lien debt were valued using the asset approach.

The significant unobservable inputs used in the valuation of the Company's investments are required rate of return, adjusted EBITDA, EBITDA multiples, revenue, revenue multiples, and leverage ratios. Changes in any of these unobservable inputs could have a significant impact on the Company's estimate of fair value. An increase (decrease) in the required rate of return or leverage will result in a lower (higher) estimate of fair value while an increase (decrease) in adjusted EBITDA, EBITDA multiples, revenue, or revenue multiples will result in a higher (lower) estimate of fair value.

***Capitala Senior Loan Fund II, LLC***

On December 20, 2018, Capitala and Trinity Universal Insurance Company ("Trinity"), a subsidiary of Kemper Corporation, entered into a limited liability company agreement (the "LLC Agreement") to co-manage Capitala Senior Loan Fund II, LLC ("CSLF II"). The purpose and design of the joint venture is to invest primarily in senior secured first-out loans. Capitala and Trinity have committed to provide $25.0 million of equity to CSLF II, with Capitala providing $20.0 million and Trinity providing $5.0 million.

Capitala and Trinity each appointed two members to CSLF II's four-person board of directors and investment committee. All material decisions with respect to CSLF II, including those involving its

F-36

## CAPITALA FINANCE CORP.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 4. Investments and Fair Value Measurements – (continued)**

investment portfolio, require approval of a member on the board of directors and investment committee of at least one member representing Capitala and Trinity, respectively.

As of December 31, 2018, $13.6 million and $3.4 million in equity capital had been contributed by Capitala and Trinity, respectively. As of December 31, 2018, the Company and Trinity had $6.4 million and $1.6 million of unfunded equity capital commitments outstanding. The Company's equity investment in CSLF II is not redeemable.

Below is a summary of CSLF II's portfolio at fair value as of December 31, 2018 (dollars in thousands):

|  | December 31, 2018 |
| --- | --- |
| First lien loans[1] | $ 10,000 |
| Weighted average current interest rate on first lien loans | 7.6% |
| Number of borrowers in CSLF II | 2 |
| Largest portfolio company investment[1] | $ 5,550 |
| Total of five largest portfolio company investments[1][2] | $ 10,000 |

(1) Based on principal amount outstanding at year end.

(2) Only two investments outstanding at year end.

Below is CSLF II's schedule of investments as of December 31, 2018:

### Capitala Senior Loan Fund II, LLC
### Schedule of Investments
### December 31, 2018
### (in thousands)

| Portfolio Company | Industry | Type of Investment | Principal Amount | Cost | Fair Value |
| --- | --- | --- | --- | --- | --- |
| **Investments in Non-Controlled, Non-Affiliated Portfolio Companies** | | | | | |
| U.S. BioTek Laboratories, LLC | Testing Laboratories | First Lien Debt (7.8% Cash (3 month LIBOR + 5.0%, 2.0% Floor), Due 12/14/23) | $ 4,500 | $ 4,500 | $ 4,500 |
| Freedom Electronics, LLC | Electronics | First Lien Debt (7.5% Cash (1 month LIBOR + 5.0%, 2.0% Floor), Due 12/20/23) | 5,500 | 5,500 | 5,500 |
| **TOTAL INVESTMENTS IN NON-CONTROLLED, NON-AFFILIATED PORTFOLIO COMPANIES** | | | $10,000 | $10,000 | $10,000 |

F-37

Case 3:18-cv-01023-MPS    Document 353-15    Filed 12/01/21    Page 136 of 174

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 4. Investments and Fair Value Measurements – (continued)**

Below is the financial information for CSLF II:

**Capitala Senior Loan Fund II, LLC**
**Statement of Assets and Liabilities**
**(in thousands)**

|  | As of December 31, 2018 |
|---|---|
| ASSETS |  |
| Investments at fair value |  |
| Non-control/non-affiliate investments (amortized cost of $10,000) | $ 10,000 |
| Cash and cash equivalents | 7,100 |
| Interest receivable | 31 |
| Total assets | $ 17,131 |
| LIABILITIES |  |
| Accounts payable | $ 12 |
| Total liabilities | $ 12 |
| NET ASSETS |  |
| Partners' capital | $ 17,119 |
| Total net assets | $ 17,119 |

**Capitala Senior Loan Fund II, LLC**
**Statement of Operations**
**(in thousands)**

|  | For the period from December 20, 2018 (commencement of operations) to December 31, 2018 |
|---|---|
| INVESTMENT INCOME |  |
| From non-controlled, non-affiliated investments: |  |
| Interest income | $ 31 |
| Fee income | 100 |
| Total investment income | $ 131 |
| EXPENSES |  |
| General and administrative expenses | $ 12 |
| Total expenses | $ 12 |
| NET INVESTMENT INCOME | $ 119 |
| NET INCREASE IN NET ASSETS RESULTING FROM OPERATIONS | $ 119 |

F-38

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**December 31, 2018**

**Note 5. Transactions With Affiliated Companies**

During the year ended December 31, 2018, the Company had investments in portfolio companies designated as affiliates under the 1940 Act. Transactions with affiliates were as follows (dollars in thousands):

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2017 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2018 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| ***Affiliate investments*** | | | | | | | | | |
| AAE Acquisition, LLC | Second Lien Debt (6.0% Cash, Due 8/24/19) | $ — | $ 479 | $ 15,603 | $ 320 | $(16,165) | $ — | $ 242 | $ — |
| AAE Acquisition, LLC | Membership Units (2.2% fully diluted) | | — | — | — | (17) | — | 17 | |
| AAE Acquisition, LLC | Warrants (37.8% fully diluted) | | — | — | — | — | — | — | |
| | | | 479 | 15,603 | 320 | (16,182) | — | 259 | — |
| Burgaflex Holdings, LLC | First Lien Debt (12.0% Cash, 1.0% PIK, Due 3/23/21) | 14,801 | 1,390 | — | 14,801 | — | — | (417) | 14,384 |
| Burgaflex Holdings, LLC | Subordinated Debt (14% Cash, Due 8/9/19) | — | 116 | 3,000 | — | (3,000) | — | — | — |
| Burgaflex Holdings, LLC | Subordinated Debt (12% Cash, Due 8/9/19) | — | 199 | 5,828 | — | (5,828) | — | — | — |
| Burgaflex Holdings, LLC | Common Stock Class A (1,253,198 shares) | | — | 457 | — | — | — | (457) | — |
| Burgaflex Holdings, LLC | Common Stock Class B (900,000 shares) | | — | — | 300 | — | — | (300) | — |
| | | | 1,705 | 9,285 | 15,101 | (8,828) | — | (1,174) | 14,384 |
| Chef'n Corporation | Series A Preferred Stock (1,000,000 shares) | | — | — | — | (644) | 644 | — | — |
| | | | — | — | — | (644) | 644 | — | — |
| City Gear, LLC | Subordinated Debt (13.0% Cash, Due 10/20/19) | — | 918 | 8,231 | — | (8,231) | — | — | — |
| City Gear, LLC[5] | Preferred Membership Units (2.8% fully diluted, 9.0% Cash Dividend) | | 117 | 1,269 | — | (1,269) | — | — | — |
| City Gear, LLC | Membership Unit Warrants (11.4% fully diluted) | | — | 8,248 | — | (1,908) | 1,908 | (5,064) | 3,184 |
| | | | 1,035 | 17,748 | — | (11,408) | 1,908 | (5,064) | 3,184 |
| Eastport Holdings, LLC | Subordinated Debt (15.8% Cash (3 month LIBOR + 13.0%, 0.5% Floor), Due 4/29/20) | 16,500 | 1,168 | — | 15,496 | — | — | 1,004 | 16,500 |
| Eastport Holdings, LLC | Membership Units (22.9% ownership) | | — | — | 4,733 | (1,470) | — | 14,347 | 17,610 |
| | | | 1,168 | — | 20,229 | (1,470) | — | 15,351 | 34,110 |

F-39

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

### Note 5. Transactions With Affiliated Companies – (continued)

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2017 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2018 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| GA Communications, Inc.[5] | Series A-1 Preferred Stock (1,998 shares, 8.0% PIK Dividend) | | $ — | $3,225 | $276 | $ — | $ — | $ (19) | $3,482 |
| GA Communications, Inc. | Series B-1 Common Stock (200,000 shares) | | — | 1,932 | — | — | — | (607) | 1,325 |
| | | | — | 5,157 | 276 | — | — | (626) | 4,807 |
| J&J Produce Holdings, Inc. | Subordinated Debt (13.0% Cash, Due 6/16/19) | $6,406 | 805 | 6,170 | 38 | — | — | 2 | 6,210 |
| J&J Produce Holdings, Inc. | Common Stock (8,182 shares) | | | | | | | | |
| J&J Produce Holdings, Inc. | Common Stock Warrants (6,369 shares) | | — | — | — | — | — | — | — |
| | | | 805 | 6,170 | 38 | — | — | 2 | 6,210 |
| LJS Partners, LLC | Common Stock (1,587,848 shares) | | — | 7,650 | 293 | — | — | (4,925) | 3,018 |
| | | | — | 7,650 | 293 | — | — | (4,925) | 3,018 |
| MJC Holdings, LLC | Series A Preferred Units (2,000,000 units) | | — | — | — | (28) | 28 | — | — |
| | | | — | — | — | (28) | 28 | — | — |
| MMI Holdings, LLC | First Lien Debt (12.0% Cash, Due 1/31/20) | 2,600 | 317 | 2,600 | — | — | — | — | 2,600 |
| MMI Holdings, LLC | Subordinated Debt (6.0% Cash, Due 1/31/20) | 400 | 24 | 400 | — | — | — | — | 400 |
| MMI Holdings, LLC[5] | Preferred Units (1,000 units, 6.0% PIK Dividend) | | — | 1,520 | 92 | — | — | — | 1,612 |
| MMI Holdings, LLC | Common Membership Units (45 units) | | — | 193 | — | — | — | (8) | 185 |
| | | | 341 | 4,713 | 92 | — | — | (8) | 4,797 |
| MTI Holdings, LLC | Membership Units (2,000,000 units) | | — | 100 | — | (139) | 139 | (100) | — |
| | | | — | 100 | — | (139) | 139 | (100) | — |
| Sierra Hamilton Holdings Corporation | Common Stock (15,068,000 shares) | | — | 8,528 | — | — | — | (1,674) | 6,854 |
| | | | — | 8,528 | — | — | — | (1,674) | 6,854 |
| Source Capital Penray, LLC | Membership Units (11.3% ownership) | | 121 | 101 | — | — | — | (101) | — |
| | | | 121 | 101 | — | — | — | (101) | — |
| STX Healthcare Management Services, Inc. | Common Stock (1,200,000 shares) | | — | 93 | — | (108) | 108 | (93) | — |
| | | | — | 93 | — | (108) | 108 | (93) | — |

F-40

# CAPITALA FINANCE CORP.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 5. Transactions With Affiliated Companies – (continued)**

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2017 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2018 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| US Bath Group, LLC | First Lien Debt (11.4% Cash (1 month LIBOR + 9.0%, 1.0% Floor), Due 1/2/23) | $12,750 | $1,806 | $ — | $15,000 | $ (2,250) | $ — | $ — | $12,750 |
| US Bath Group, LLC | Membership Units (500,000 units) | | — | — | 500 | — | | 1,583 | 2,083 |
| | | | 1,806 | — | 15,500 | (2,250) | | 1,583 | 14,833 |
| U.S. Well Services, LLC | First Lien Debt (8.3% Cash (1 month LIBOR + 6.0%, 1.0% Floor), Due 2/2/22) | — | 156 | 2,299 | — | (2,299) | | | — |
| U.S. Well Services, LLC | First Lien Debt (13.3% PIK (1 month LIBOR + 11.0%, 1.0% Floor), Due 2/2/22) | — | 567 | 9,516 | 409 | (9,925) | | | — |
| U.S. Well Services, LLC | Class A Units (5,680,688 Units) | — | | 15,004 | | (6,260) | | (8,744) | — |
| U.S. Well Services, LLC | Class B Units (2,076,298 Units) | — | | 955 | | (441) | | (514) | — |
| | | | 723 | 27,774 | 409 | (18,925) | | (9,258) | — |
| V12 Holdings, Inc. | Subordinated Debt | — | — | 1,035 | — | (232) | 93 | (154) | 742 |
| | | | — | 1,035 | — | (232) | 93 | (154) | 742 |
| ***Total Affiliate investments*** | | $8,183 | $103,957 | $52,258 | $(60,214) | $ 2,920 | $(5,982) | $92,939 | |
| ***Control investments*** | | | | | | | | | |
| AAE Acquisition, LLC | Second Lien Debt (6.0% Cash, Due 8/24/19) | $16,327 | $ 488 | $ — | $16,327 | $ — | $ — | $ — | $16,327 |
| AAE Acquisition, LLC | Membership Units (2.2% fully diluted) | | — | — | 17 | | | (17) | — |
| AAE Acquisition, LLC | Warrants (37.8% fully diluted) | | — | — | | | | | — |
| | | | 488 | — | 16,344 | | | (17) | 16,327 |
| CableOrganizer Acquisition, LLC | First Lien Debt (10.0% Cash, Due 5/24/19) | 1,708 | 121 | — | 1,708 | | | — | 1,708 |
| CableOrganizer Acquisition, LLC | First Lien Debt (12.0% Cash, 4.0% PIK, Due 6/30/19) | 8,889 | 1,173 | 12,373 | 515 | (2,354) | (1,646) | 1 | 8,889 |
| CableOrganizer Acquisition, LLC | Preferred Units (4,000,000 units) | | | — | 2,354 | | | (2,354) | — |
| CableOrganizer Acquisition, LLC | Common Stock (21.3% fully diluted) | | — | 118 | — | | | (118) | — |
| CableOrganizer Acquisition, LLC | Common Stock Warrants (10.0% fully diluted) | | — | 60 | | | | (60) | — |
| | | | 1,294 | 12,551 | 4,577 | (2,354) | (1,646) | (2,531) | 10,597 |

F-41

TABLE OF CONTENTS

# CAPITALA FINANCE CORP.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 5. Transactions With Affiliated Companies – (continued)**

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2017 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2018 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Capitala Senior Loan Fund II, LLC | Membership Units (80% ownership) | | $ — | $ — | $13,600 | $ — | $ — | $ 95 | $13,695 |
| | | | — | — | 13,600 | | | 95 | 13,695 |
| Eastport Holdings, LLC | Subordinated Debt (15.8% Cash (3 month LIBOR + 13.0%, 0.5% Floor), Due 4/29/20) | $ — | 2,144 | 16,500 | 493 | (15,231) | — | (1,762) | — |
| Eastport Holdings, LLC | Membership Units (22.9% ownership) | | — | 26,449 | | (4,733) | — | (21,716) | — |
| | | | 2,144 | 42,949 | 493 | (19,964) | — | (23,478) | — |
| Kelle's Transport Service, LLC | First Lien Debt (4.0% Cash, Due 2/15/20) | — | 82 | 2,000 | 1,300 | (3,300) | | | — |
| Kelle's Transport Service, LLC | First Lien Debt (2.2% Cash, Due 2/15/20) | — | 126 | 9,560 | | (10,000) | (3,669) | 4,109 | — |
| Kelle's Transport Service, LLC | Membership Units (27.5% fully diluted) | | | | | | | | — |
| | | | 208 | 11,560 | 1,300 | (13,300) | (3,669) | 4,109 | — |
| Micro Precision, LLC | Subordinated Debt (10.0% Cash, Due 1/1/19) | 1,862 | 186 | 1,862 | — | — | — | — | 1,862 |
| Micro Precision, LLC | Subordinated Debt (14.0% Cash, 4.0% PIK, Due 1/1/19) | 4,325 | 601 | 4,154 | 171 | — | — | — | 4,325 |
| Micro Precision, LLC | Series A Preferred Units (47 units) | | — | 1,629 | — | — | — | 1,188 | 2,817 |
| | | | 787 | 7,645 | 171 | — | — | 1,188 | 9,004 |
| Navis Holdings, Inc. | First Lien Debt (15.0% Cash, Due 10/30/20) | 7,500 | 1,149 | 6,500 | 1,000 | — | — | — | 7,500 |
| Navis Holdings, Inc.[5] | Class A Preferred Stock (1,000 shares, 10.0% Cash Dividend) | | 100 | 1,000 | | | | — | 1,000 |
| Navis Holdings, Inc. | Common Stock (300,000 shares) | | — | 5,005 | | — | — | (657) | 4,348 |
| | | | 1,249 | 12,505 | 1,000 | — | — | (657) | 12,848 |
| On-Site Fuel Service, Inc. | First Lien Debt (18.0% Cash, Due 12/19/18) | — | 30 | — | 11,020 | — | (11,020) | — | — |
| On-Site Fuel Service, Inc. | Subordinated Debt (18.0% Cash, Due 12/19/18) | — | | 11,588 | — | (11,020) | — | (568) | — |
| On-Site Fuel Service, Inc. | Series A Preferred Stock (32,782 shares) | | | | | | (3,278) | 3,278 | — |
| On-Site Fuel Service, Inc. | Series B Preferred Stock (23,648 shares) | | | | | | (2,364) | 2,364 | — |
| On-Site Fuel Service, Inc. | Common Stock (33,058 shares) | | | | | | (33) | 33 | — |
| | | | 30 | 11,588 | 11,020 | (11,020) | (16,695) | 5,107 | — |

F-42

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

### Note 5. Transactions With Affiliated Companies – (continued)

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2017 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2018 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Portrait Studio, LLC | First Lien Debt (9.0% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 2.0% Ceiling), Due 12/31/22 | $ — | $ 167 | $ 1,860 | $ 2,400 | $ (4,260) | $ — | $ — | $ — |
| Portrait Studio, LLC | First Lien Debt (9.4% Cash (1 month LIBOR + 7.0%, 1.0% Floor, 5.0% Ceiling), Due 12/31/22 | 4,500 | 435 | 4,500 | — | — | — | — | 4,500 |
| Portrait Studio, LLC | Preferred Units (4,350,000 Units) | | — | 2,450 | — | — | — | (276) | 2,174 |
| Portrait Studio, LLC | Membership Units (150,000 Units) | — | — | — | — | — | — | — | — |
| | | | 602 | 8,810 | 2,400 | (4,260) | — | (276) | 6,674 |
| ***Total Control investments*** | | | $6,802 | $107,608 | $50,905 | $(50,898) | $(22,010) | $(16,460) | $69,145 |

(1) Represents the total amount of interest, original issue discount, fees or dividends credited to income for the portion of the year an investment was included in Affiliate or Control categories, respectively.

(2) Gross additions include increases in the cost basis of investments resulting from new portfolio investments, follow-on investments, accrued PIK and accretion of OID. Gross additions also include transfers into Affiliate or Control classification.

(3) Gross reductions include decreases in the cost basis of investments resulting from principal repayments and sales. Gross reductions also includes transfers out of Affiliate or Control classification.

(4) All debt investments are income producing. Equity and warrant investments are non-income producing, unless otherwise noted.

(5) The equity investment is income producing, based on rate disclosed.

F-43

CAPITALA FINANCE CORP.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

### Note 5. Transactions With Affiliated Companies – (continued)

During the year ended December 31, 2017, the Company had investments in portfolio companies designated as affiliates under the 1940 Act. Transactions with affiliates were as follows (dollars in thousands):

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2016 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2017 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| **_Affiliate investments_** | | | | | | | | | |
| AAE Acquisition, LLC | Second Lien Debt (8.0% Cash, 4.0% PIK, Due 8/24/19) | $ 15,846 | $ 757 | $ — | $15,846 | $ — | $ — | $ (243) | $ 15,603 |
| AAE Acquisition, LLC | Membership Units (2.2% fully diluted) | | — | — | 16 | — | — | (16) | — |
| AAE Acquisition, LLC | Warrants (37.8% fully diluted) | | — | — | — | — | — | — | — |
| | | | 757 | — | 15,862 | — | — | (259) | 15,603 |
| Burgaflex Holdings, LLC | Subordinated Debt (14.0% Cash, Due 8/9/19) | 3,000 | 515 | 3,000 | — | — | — | — | 3,000 |
| Burgaflex Holdings, LLC | Subordinated Debt (12.0% Cash, Due 8/9/19) | 5,828 | 886 | 5,828 | — | — | — | — | 5,828 |
| Burgaflex Holdings, LLC | Common Stock (1,253,198 shares) | | — | 1,248 | — | — | — | (791) | 457 |
| | | | 1,401 | 10,076 | — | — | — | (791) | 9,285 |
| City Gear, LLC | Subordinated Debt (13.0% Cash, Due 10/20/19) | 8,231 | 1,085 | 8,231 | — | — | — | — | 8,231 |
| City Gear, LLC[5] | Preferred Membership Units (2.8% fully diluted, 9.0% Cash Dividend) | | 115 | 1,269 | — | — | — | — | 1,269 |
| City Gear, LLC | Membership Unit Warrants (11.4% fully diluted) | | — | 9,736 | — | — | — | (1,488) | 8,248 |
| | | | 1,200 | 19,236 | — | — | — | (1,488) | 17,748 |
| GA Communications, Inc.[5] | Series A-1 Preferred Stock (1,998 shares, 8.0% PIK Dividend) | | — | 2,864 | 255 | — | — | 106 | 3,225 |
| GA Communications, Inc. | Series B-1 Common Stock (200,000 shares) | | — | 1,046 | — | — | — | 886 | 1,932 |
| | | | — | 3,910 | 255 | — | — | 992 | 5,157 |
| J&J Produce Holdings, Inc. | Subordinated Debt (6.0% Cash, 7.0% PIK, Due 6/16/19) | 6,368 | 632 | 6,182 | 186 | — | — | (198) | 6,170 |
| J&J Produce Holdings, Inc. | Common Stock (8,182 shares) | | — | — | — | — | — | — | — |
| J&J Produce Holdings, Inc. | Common Stock Warrants (6,369 shares) | | — | — | — | — | — | — | — |
| | | | 632 | 6,182 | 186 | — | — | (198) | 6,170 |

F-44

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 5. Transactions With Affiliated Companies – (continued)**

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2016 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2017 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| LJS Partners, LLC | Common Stock (1,500,000 shares) | | $ — | $8,497 | $ — | $ (630) | $ — | $ (217) | $ 7,650 |
| | | | — | 8,497 | | (630) | | (217) | 7,650 |
| MJC Holdings, LLC | Series A Preferred Units (2,000,000 units) | | — | 5,011 | — | (5,473) | 4,473 | (4,011) | — |
| | | | — | 5,011 | | (5,473) | 4,473 | (4,011) | — |
| MMI Holdings, LLC | First Lien Debt (12.0% Cash, Due 1/31/19) | $2,600 | 317 | 2,600 | — | — | — | — | 2,600 |
| MMI Holdings, LLC | Subordinated Debt (6.0% Cash, Due 1/31/19) | 400 | 24 | 400 | — | — | — | — | 400 |
| MMI Holdings, LLC[5] | Preferred Units (1,000 units, 6.0% PIK Dividend) | | — | 1,433 | 85 | | | 2 | 1,520 |
| MMI Holdings, LLC | Common Membership Units (45 units) | | — | 228 | — | — | — | (35) | 193 |
| | | | 341 | 4,661 | 85 | | | (33) | 4,713 |
| MTI Holdings, LLC | Membership Units (2,000,000 units) | | — | 537 | — | (437) | 437 | (437) | 100 |
| | | | — | 537 | | (437) | 437 | (437) | 100 |
| Sierra Hamilton Holdings Corporation | Common Stock (15,068,000 shares) | | — | — | 6,958 | — | — | 1,570 | 8,528 |
| | | | — | | 6,958 | | | 1,570 | 8,528 |
| Source Capital Penray, LLC | Subordinated Debt (13.0% Cash, Due 4/8/19) | — | 78 | 1,425 | — | (1,425) | — | — | — |
| Source Capital Penray, LLC | Membership Units (11.3% ownership) | | 526 | 805 | — | (750) | — | 46 | 101 |
| | | | 604 | 2,230 | | (2,175) | | 46 | 101 |
| STX Healthcare Management Services, Inc. | Common Stock (1,200,000 shares) | | — | 109 | — | (16) | 16 | (16) | 93 |
| | | | — | 109 | | (16) | 16 | (16) | 93 |
| U.S. Well Services, LLC | First Lien Debt (7.4% Cash (1 month LIBOR + 6.0%, 1.0% Floor), Due 2/2/22) | 2,299 | 132 | — | 2,299 | — | — | — | 2,299 |
| U.S. Well Services, LLC | First Lien Debt (12.4% PIK (1 month LIBOR + 11.0%, 1.0% Floor), Due 2/2/22) | 9,516 | 83 | — | 9,516 | — | — | — | 9,516 |
| U.S. Well Services, LLC | Class A Units (5,680,688 shares) | | — | — | 6,260 | — | — | 8,744 | 15,004 |
| U.S. Well Services, LLC | Class B Units (2,076,298 Units) | | — | — | 441 | — | — | 514 | 955 |
| | | | 215 | — | 18,516 | | | 9,258 | 27,774 |

F-45

CAPITALA FINANCE CORP.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 5. Transactions With Affiliated Companies – (continued)**

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2016 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2017 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| V12 Holdings, Inc. | Subordinated Debt | $ — | $ — | $ 1,015 | $ — | $ — | $ — | $ 20 | $ 1,035 |
| | | | — | 1,015 | | | | 20 | 1,035 |
| ***Total Affiliate investments*** | | | $5,150 | $61,464 | $41,862 | $(8,731) | $4,926 | $ 4,436 | $103,957 |
| ***Control investments*** | | | | | | | | | |
| CableOrganizer Acquisition, LLC | First Lien Debt (12.0% Cash, 4.0% PIK, Due 5/24/18) | $12,373 | $1,473 | $11,882 | $ 491 | $ — | $ — | $ — | $ 12,373 |
| CableOrganizer Acquisition, LLC | Common Stock (21.3% fully diluted) | | — | 200 | — | — | — | (82) | 118 |
| CableOrganizer Acquisition, LLC | Common Stock Warrants (10.0% fully diluted) | | — | 101 | — | — | — | (41) | 60 |
| | | | 1,473 | 12,183 | 491 | | | (123) | 12,551 |
| Capitala Senior Liquid Loan Fund I, LLC | Common Stock (80.0% Ownership) | | 5 | — | — | — | — | — | — |
| | | | 5 | — | | | | | |
| Eastport Holdings, LLC | Subordinated Debt (14.5% Cash (3 month LIBOR + 13.0%, 0.5% Floor), Due 4/29/20) | 16,500 | 3,138 | 16,500 | 757 | — | — | (757) | 16,500 |
| Eastport Holdings, LLC | Membership Units (33.3% ownership) | | — | 13,395 | — | — | — | 13,054 | 26,449 |
| | | | 3,138 | 29,895 | 757 | | | 12,297 | 42,949 |
| Kelle's Transport Service, LLC | First Lien Debt (4.0% Cash, Due 2/15/20) | 2,000 | 22 | — | 2,000 | — | — | — | 2,000 |
| Kelle's Transport Service, LLC | First Lien Debt (1.5% Cash, Due 2/15/20) | 13,674 | 77 | — | 13,669 | — | — | (4,109) | 9,560 |
| Kelle's Transport Service, LLC | Membership Units (27.5% fully diluted) | | — | — | — | — | — | — | — |
| | | | 99 | — | 15,669 | | | (4,109) | 11,560 |
| Micro Precision, LLC | Subordinated Debt (10.0% Cash, Due 9/15/18) | 1,862 | 186 | 1,862 | — | — | — | — | 1,862 |
| Micro Precision, LLC | Subordinated Debt (14.0% Cash, 4.0% PIK, Due 9/15/18) | 4,154 | 577 | 3,989 | 165 | — | — | — | 4,154 |
| Micro Precision, LLC | Series A Preferred Units (47 units) | | — | 2,523 | — | — | — | (894) | 1,629 |
| | | | 763 | 8,374 | 165 | | | (894) | 7,645 |
| Navis Holdings, Inc. | First Lien Debt (15.0% Cash, Due 10/30/20) | 6,500 | 989 | 6,500 | — | — | — | — | 6,500 |
| Navis Holdings, Inc.[5] | Class A Preferred Stock (1,000 shares, 10.0% Cash Dividend) | | 100 | 1,000 | — | — | — | — | 1,000 |

https://www.sec.gov/Archives/edgar/data/1571329/000114420419011984/tv514470-10k.htm

# CAPITALA FINANCE CORP.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 5. Transactions With Affiliated Companies – (continued)**

| Company[4] | Type of Investment | Principal Amount | Amount of Interest, Fees or Dividends Credited to Income[1] | December 31, 2016 Fair Value | Gross Additions[2] | Gross Reductions[3] | Realized Gain/(Loss) | Unrealized Gain/(Loss) | December 31, 2017 Fair Value |
|---|---|---|---|---|---|---|---|---|---|
| Navis Holdings, Inc. | Common Stock (300,000 shares) | | $ 250 | $ 5,634 | $ — | $ — | $ — | $ (629) | $ 5,005 |
| | | | 1,339 | 13,134 | — | — | — | (629) | 12,505 |
| On-Site Fuel Service, Inc. | Subordinated Debt (18.0% Cash, Due 12/19/18)[6] | $14,072 | — | 10,303 | 1,182 | — | — | 103 | 11,588 |
| On-Site Fuel Service, Inc. | Series A Preferred Stock (32,782 shares) | | — | — | — | — | — | — | — |
| On-Site Fuel Service, Inc. | Series B Preferred Stock (23,648 shares) | | — | — | — | — | — | — | — |
| On-Site Fuel Service, Inc. | Common Stock (33,058 shares) | | — | — | — | — | — | — | — |
| | | | — | 10,303 | 1,182 | — | — | 103 | 11,588 |
| Portrait Studio, LLC | First Lien Debt (8.6% Cash (1 month LIBOR + 7.0%, 2.0% Ceiling), Due 12/31/22) | 1,860 | — | — | 1,860 | — | — | — | 1,860 |
| Portrait Studio, LLC | First Lien Debt (8.6% Cash (1 month LIBOR + 7.0%, 5.0% Ceiling), Due 12/31/22) | 4,500 | — | — | 4,500 | — | — | — | 4,500 |
| Portrait Studio, LLC | Preferred Units (4,350,000 Units) | | — | — | 2,450 | — | — | — | 2,450 |
| Portrait Studio, LLC | Membership Units (150,000 Units) | | — | — | — | — | — | — | — |
| | | | — | — | 8,810 | — | — | — | 8,810 |
| Print Direction, Inc. | First Lien Debt (10.0% Cash 2.0% PIK, due 2/24/19) | — | 434 | 12,761 | 2,087 | — | (19,403) | 4,555 | — |
| Print Direction, Inc. | Common Stock (18,543 shares) | | — | — | 40 | — | (3,030) | 2,990 | — |
| Print Direction, Inc. | Common Stock Warrants (820 shares) | | — | — | — | — | — | — | — |
| | | | 434 | 12,761 | 2,127 | — | (22,433) | 7,545 | — |
| ***Total Control investments*** | | | $7,251 | $86,650 | $29,201 | $ — | $(22,433) | $14,190 | $107,608 |

(1) Represents the total amount of interest, original issue discount, fees or dividends credited to income for the portion of the year an investment was included in Affiliate or Control categories, respectively.

(2) Gross additions include increases in the cost basis of investments resulting from new portfolio investments, follow-on investments and accrued PIK and OID. Gross additions also include transfers into an Affiliate or Control classification.

(3) Gross reductions include decreases in the cost basis of investments resulting from principal repayments and sales. Gross reductions also includes transfers out of Affiliate or Control classification.

(4) All debt investments are income producing. Equity and warrant investments are non-income producing, unless otherwise noted.

F-47

# CAPITALA FINANCE CORP.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 5. Transactions With Affiliated Companies – (continued)**

(5)   The equity investment is income producing, based on rate disclosed.

(6)   Non-accrual investment.

**Note 6. Agreements**

On September 24, 2013, the Company entered into an investment advisory agreement (the "Investment Advisory Agreement") with our Investment Advisor, which was initially approved by the Board on June 10, 2013. Unless earlier terminated in accordance with its terms, the Investment Advisory Agreement will remain in effect if approved annually by the Board or by a majority of our outstanding voting securities, including, in either case, by a majority of our non-interested directors. The Investment Advisory Agreement was most recently re-approved by the Board, including a majority of our non-interested directors, at an in-person meeting on July 26, 2018. Subject to the overall supervision of the Board, the Investment Advisor manages our day-to-day operations and provides investment advisory and management services to us. Under the terms of the Investment Advisory Agreement, the Investment Advisor:

- determines the composition of our portfolio, the nature and timing of the changes to our portfolio and the manner of implementing such changes;

- identifies, evaluates and negotiates the structure of the investments we make (including performing due diligence on our prospective portfolio companies);

- closes and monitors the investments we make; and

- provides us with other investment advisory, research and related services as we may from time to time require.

The Investment Advisor's services under the Investment Advisory Agreement are not exclusive, and it is free to furnish similar services to other entities so long as its services to us are not impaired.

The Investment Advisory Agreement provides that, absent willful misfeasance, bad faith or negligence in the performance of its duties or by reason of the reckless disregard of its duties and obligations, the Investment Advisor and its officers, managers, partners, agents, employees, controlling persons, members and any other person or entity affiliated with it are entitled to indemnification from the Company for any damages, liabilities, costs and expenses (including reasonable attorneys' fees and amounts reasonably paid in settlement) arising from the rendering of our Investment Advisor's services under the Investment Advisory Agreement or otherwise as Investment Advisor for the Company.

Pursuant to the Investment Advisory Agreement, the Company has agreed to pay the Investment Advisor a fee for investment advisory and management services consisting of two components — a base management fee and an incentive fee.

The base management fee is calculated at an annual rate of 1.75% of the gross assets, which are the total assets reflected on the consolidated statements of assets and liabilities and includes any borrowings for investment purposes. Although the Company does not anticipate making significant investments in derivative financial instruments, the fair value of any such investments, which will not necessarily equal their notional value, will be included in the calculation of gross assets. For services rendered under the Investment Advisory Agreement, the base management fee is payable quarterly in arrears. The base management fee is calculated based on the average value of the gross assets at the end of the two most recently completed calendar quarters, and appropriately adjusted for any share issuances or repurchases during the current calendar quarter.

The incentive fee consists of the following two parts:

F-48

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 6. Agreements – (continued)**

The first part of the incentive fee is calculated and payable quarterly in arrears based on the pre-incentive fee net investment income for the immediately preceding calendar quarter. For this purpose, pre-incentive fee net investment income means interest income, dividend income and any other income (including any other fees (other than fees for providing managerial assistance), such as commitment, origination, structuring, diligence and consulting fees or other fees that we receive from portfolio companies) accrued during the calendar quarter, minus our operating expenses for the quarter (including the base management fee, expenses payable under the Administration Agreement to our Administrator, and any interest expense and dividends paid on any issued and outstanding preferred stock, but excluding the incentive fee). Pre-incentive fee net investment income includes, in the case of investments with a deferred interest feature (such as original issue discount, debt instruments with PIK interest and zero coupon securities), accrued income that we have not yet received in cash. Pre-incentive fee net investment income does not include any realized capital gains, computed net of all realized capital losses or unrealized capital appreciation or depreciation. Pre-incentive fee net investment income, expressed as a rate of return on the value of our net assets at the end of the immediately preceding calendar quarter, is compared to a hurdle of 2.0% per quarter (8.0% annualized). The net investment income used to calculate this part of the incentive fee is also included in the amount of the gross assets used to calculate the 1.75% base management fee. The Company pays the Investment Advisor an incentive fee with respect to the pre-incentive fee net investment income in each calendar quarter as follows:

- no incentive fee in any calendar quarter in which the pre-incentive fee net investment income does not exceed the hurdle of 2.0%;

- 100% of the pre-incentive fee net investment income with respect to that portion of such pre-incentive fee net investment income, if any, that exceeds the hurdle but is less than 2.5% in any calendar quarter (10.0% annualized). The Company refers to this portion of the pre-incentive fee net investment income (which exceeds the hurdle but is less than 2.5%) as the "catch-up." The "catch-up" is meant to provide the Investment Advisor with 20% of the pre-incentive fee net investment income as if a hurdle did not apply if this net investment income exceeds 2.5% in any calendar quarter; and

- 20% of the amount of the pre-incentive fee net investment income, if any, that exceeds 2.5% in any calendar quarter (10.0% annualized) is payable to the Investment Advisor (once the hurdle is reached and the catch-up is achieved, 20% of all pre-incentive fee investment income thereafter is allocated to the Investment Advisor).

The Investment Advisor has voluntarily agreed to waive all or such portion of the quarterly incentive fees earned by the Investment Advisor that would otherwise cause the Company's quarterly net investment income to be less than the distribution payments declared by the Board. Quarterly incentive fees are earned by the Investment Advisor pursuant to the Investment Advisory Agreement. Incentive fees subject to the waiver cannot exceed the amount of incentive fees earned during the period, as calculated on a quarterly basis. The Investment Advisor will not be entitled to recoup any amount of incentive fees that it waives. The waiver was effective in the fourth quarter of 2015 and will continue unless otherwise publicly disclosed by the Company.

The second part of the incentive fee is determined and payable in arrears as of the end of each calendar year (or upon termination of the Investment Advisory Agreement, as of the termination date), and will equal 20% of our realized capital gains, if any, on a cumulative basis from inception through the end of each calendar year, computed net of all realized capital losses and unrealized capital depreciation on a cumulative basis, less the aggregate amount of any previously paid capital gain incentive fees with respect to each of the investments in our portfolio.

The Company will defer cash payment of the portion of any incentive fee otherwise earned by the Investment Advisor that would, when taken together with all other incentive fees paid to the Investment

F-49

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 6. Agreements – (continued)**

Advisor during the most recent 12 full calendar month period ending on or prior to the date such payment is to be made, exceed 20% of the sum of (a) the pre-incentive fee net investment income during such period, (b) the net unrealized appreciation or depreciation during such period and (c) the net realized capital gains or losses during such period. Any deferred incentive fees will be carried over for payment in subsequent calculation periods to the extent such payment is payable under the Investment Advisory Agreement. As of December 31, 2018 and December 31, 2017, the Company had incentive fees payable to the Investment Advisor of $2.5 million and $2.2 million, respectively.

For the years ended December 31, 2018, 2017 and 2016, the Company incurred $9.0 million, $9.8 million and $10.6 million in base management fees, respectively. The Company incurred $0.2 million, $1.3 million and $6.8 million in incentive fees related to pre-incentive fee net investment income for the years ended December 31, 2018, 2017 and 2016, respectively. For the years ended December 31, 2018, 2017 and 2016, our Investment Advisor waived incentive fees of $0.0 million, $1.0 million and $1.7 million, respectively.

On September 24, 2013, the Company entered into the Administration Agreement, pursuant to which the Administrator has agreed to furnish the Company with office facilities, equipment and clerical, bookkeeping and record keeping services at such facilities. The Administrator also performs, or oversees the performance of the required administrative services, which include, among other things, being responsible for the financial records that the Company is required to maintain and preparing reports to our stockholders. In addition, the Administrator assists in determining and publishing the net asset value, oversees the preparation and filing of the tax returns and the printing and dissemination of reports to the stockholders, and generally oversees the payment of the expenses and the performance of administrative and professional services rendered to the Company by others.

Payments under the Administration Agreement are equal to an amount based upon the allocable portion of the Administrator's overhead in performing its obligations under the Administration Agreement, including rent, the fees and expenses associated with performing compliance functions and the allocable portion of the compensation of the chief financial officer and the chief compliance officer, and their respective administrative support staff. Under the Administration Agreement, the Administrator will also provide, on the Company's behalf, managerial assistance to those portfolio companies that request such assistance. Unless terminated earlier in accordance with its terms, the Administration Agreement will remain in effect if approved annually by the Board. The Board most recently approved the renewal of the Administration Agreement on July 26, 2018. To the extent that the Administrator outsources any of its functions, the Company will pay the fees associated with such functions on a direct basis without any incremental profit to our Administrator. Stockholder approval is not required to amend the Administration Agreement.

For the years ended December 31, 2018, 2017, and 2016, the Company paid the Administrator $1.4 million, $1.1 million and $1.1 million, respectively, for the Company's allocable portion of the Administrator's overhead.

The Administration Agreement provides that, absent willful misfeasance, bad faith or negligence in the performance of its duties or by reason of the reckless disregard of its duties and obligations, our Administrator and its officers, managers, partners, agents, employees, controlling persons, members and any other person or entity affiliated with it are entitled to indemnification from the Company for any damages, liabilities, costs and expenses (including reasonable attorneys' fees and amounts reasonably paid in settlement) arising from the rendering of our Administrator's services under the Administration Agreement or otherwise as Administrator for the Company.

F-50

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 7. Related Party Transactions**

At December 31, 2018 and December 31, 2017, the Company had the following receivables from (payables to) related parties relating to certain management fees, incentive fees, reimbursable expenses, and other payments owed to related parties (dollars in thousands):

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| CapitalSouth Corporation | $ — | $ 74 |
| CapitalSouth Partners Florida Sidecar Fund II, L.P. | — | 21 |
| Capitala Investment Advisors, LLC | (2,487) | (2,172) |
| Total | $ (2,487) | $ (2,077) |

These amounts are reflected in the accompanying consolidated statements of assets and liabilities under the captions, "Due from related parties" and "Management and incentive fees payable."

On August 31, 2016, the Company sold assets to FSC II in exchange for 100% of the partnership interests in FSC II. Concurrent with the sale of these assets to FSC II, the Company received cash consideration of $47.6 million from an affiliated third-party purchaser in exchange for 100% of the partnership interests of FSC II. The Company's Board pre-approved this transaction pursuant to Section 57(f) of the 1940 Act. The Administrator also serves as the administrator to FSC II. See Note 4 for a further description of this transaction.

The Company may invest in the same unitranche facility as CSLF II whereby CSLF II provides the first-out portion of the unitranche facility and the Company and other lenders provide the last-out portion of the unitranche facility. Under a guarantee agreement, the Company may be required to purchase its pro-rata portion of first-out loans from CSLF II upon certain triggering events, including acceleration upon payment default of the underlying borrower. As of December 31, 2018, the Company has evaluated the fair value of the guarantee under the guidance of ASC Topic 460 — *Guarantees* and determined that the fair value of the guarantee is immaterial as the risk of payment default for first-out loans in CSLF II is considered remote. The maximum exposure to credit risk as of December 31, 2018 is $4.3 million and extends to the stated maturity of the underlying loans in CSLF II.

**Note 8. Borrowings**

*SBA Debentures*

The Company, through its two wholly owned subsidiaries, uses debenture leverage provided through the SBA to fund a portion of its investment portfolio. As of December 31, 2018 and December 31, 2017, the Company had $165.7 million and $170.7 million, respectively, of SBA-guaranteed debentures outstanding. The Company has issued all SBA-guaranteed debentures that were permitted under each of the Legacy Funds' respective SBIC licenses (as applicable), and there are no unused SBA debenture commitments remaining. SBA-guaranteed debentures are secured by a lien on all assets of Fund II and Fund III. As of December 31, 2018 and December 31, 2017, Fund II and Fund III had total assets of approximately $332.7 million and $341.5 million, respectively. On June 10, 2014, the Company received an exemptive order from the SEC exempting the Company, Fund II, and Fund III from certain provisions of the 1940 Act (including an exemptive order granting relief from the asset coverage requirements for certain indebtedness issued by Fund II and Fund III as SBICs) and from certain reporting requirements mandated by the Securities Exchange Act of 1934, as amended, with respect to Fund II and Fund III. The Company intends to comply with the conditions of the order.

F-51

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 8. Borrowings – (continued)**

The following table summarizes the interest expense and annual charges, deferred financing costs, average balance outstanding, and average stated interest and annual charge rate on the SBA-guaranteed debentures for the years ended December 31, 2018, 2017 and 2016 (dollars in thousands):

| | For the year ended | | |
| --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Interest expense and annual charges | $ 6,244 | $ 6,336 | $ 6,873 |
| Deferred financing costs | 612 | 611 | 627 |
| Total interest and financing expenses | $ 6,856 | $ 6,947 | $ 7,500 |
| Average outstanding balance | $169,028 | $170,700 | $178,695 |
| Average stated interest and annual charge rate | 3.69% | 3.71% | 3.83% |

As of December 31, 2018 and December 31, 2017, the Company's issued and outstanding SBA-guaranteed debentures mature as follows (dollars in thousands):

| Fixed Maturity Date | Interest Rate | SBA Annual Charge | December 31, 2018 | December 31, 2017 |
| --- | --- | --- | --- | --- |
| March 1, 2019 | 4.620% | 0.941% | $ — | $ 5,000 |
| September 1, 2020 | 3.215% | 0.285% | 19,000 | 19,000 |
| March 1, 2021 | 4.084% | 0.515% | 15,700 | 15,700 |
| March 1, 2021 | 4.084% | 0.285% | 46,000 | 46,000 |
| March 1, 2022 | 2.766% | 0.285% | 10,000 | 10,000 |
| March 1, 2022 | 2.766% | 0.515% | 50,000 | 50,000 |
| March 1, 2023 | 2.351% | 0.515% | 25,000 | 25,000 |
| | | | $165,700 | $170,700 |

*2021 Notes*

On June 16, 2014, the Company issued $113.4 million in aggregate principal amount of 7.125% fixed-rate notes due 2021 (the "2021 Notes"). On May 26, 2017, the Company caused notices to be issued to the holders of its 2021 Notes regarding the Company's exercise of its option to redeem all of the issued and outstanding 2021 Notes. The Company redeemed all $113.4 million in aggregate principal amount of the 2021 Notes on June 25, 2017. The Notes were redeemed at 100% of their principal amount ($25 per Note), plus the accrued and unpaid interest thereon from June 16, 2017, through, but excluding, June 25, 2017. As a result of the redemption, the Company recognized a loss on the extinguishment of debt of $2.7 million for the year ended December 31, 2017, due to the amortization of the deferred financing costs remaining on the 2021 Notes.

8/4/2020    Case 3:18-cv-01023-MPS    Document 353-15    Filed 12/01/21    Page 151 of 174
tv514470-10k - none - 15.2349...

TABLE OF CONTENTS

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 8. Borrowings – (continued)**

The following table summarizes the interest expense, deferred financing costs, average outstanding balance and average stated interest rate on the 2021 Notes for the years ended December 31, 2018, 2017, and 2016 (dollars in thousands):

|  | For the year ended | | |
| --- | --- | --- | --- |
|  | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Interest expense | $    — | $ 3,908 | $ 8,082 |
| Deferred financing costs | — | 293 | 557 |
| Total interest and financing expenses | $    — | $ 4,201 | $ 8,639 |
| Average outstanding balance | $    — | $53,766 | $113,438 |
| Average stated interest rate | —% | 7.13% | 7.13% |

*2022 Notes*

On May 16, 2017, the Company issued $70.0 million in aggregate principal amount of 6.0% fixed-rate notes due May 31, 2022 (the "2022 Notes"). On May 25, 2017, the Company issued an additional $5.0 million in aggregate principal amount of the 2022 Notes pursuant to a partial exercise of the underwriters' overallotment option. The 2022 Notes will mature on May 31, 2022 and may be redeemed in whole or in part at any time or from time to time at the Company's option on or after May 31, 2019 at a redemption price equal to 100% of the outstanding principal, plus accrued and unpaid interest. Interest was payable quarterly beginning August 31, 2017.

The following table summarizes the interest expense, deferred financing costs, average outstanding balance, and average stated interest rate on the 2022 Notes for the years ended December 31, 2018, 2017, and 2016 (dollars in thousands):

|  | For the year ended | | |
| --- | --- | --- | --- |
|  | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Interest expense | $ 4,500 | $ 2,812 | $    — |
| Deferred financing costs | 509 | 303 | — |
| Total interest and financing expenses | $ 5,009 | $ 3,115 | $    — |
| Average outstanding balance | $75,000 | $47,137 | $    — |
| Average stated interest rate | 6.0% | 6.0% | — |

*2022 Convertible Notes*

On May 26, 2017, the Company issued $50.0 million in aggregate principal amount of 5.75% fixed-rate convertible notes due May 31, 2022 (the "2022 Convertible Notes"). On June 26, 2017, the Company issued an additional $2.1 million in aggregate principal amount of the 2022 Convertible Notes pursuant to a partial exercise of the underwriters' overallotment option. Interest was payable quarterly beginning August 31, 2017.

The 2022 Convertible Notes are convertible, at the holder's option, into shares of the Company's common stock at any time on or prior to the close of business on the business day immediately preceding the maturity date. The conversion rate for the 2022 Convertible Notes is initially 1.5913 shares per $25.00 principal amount of 2022 Convertible Notes (equivalent to an initial conversion price of approximately $15.71 per share of common stock). The initial conversion premium is approximately 14.0%.

F-53

# CAPITALA FINANCE CORP.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 8. Borrowings – (continued)**

Upon conversion, the Company will deliver shares of its common stock (and cash in lieu of fractional shares). The conversion rate is subject to adjustment if certain events occur as outlined in the supplemental indenture relating to the 2022 Convertible Notes. The Company has determined that the embedded conversion option in the 2022 Convertible Notes is not required to be separately accounted for as a derivative under U.S. GAAP.

In addition, pursuant to a "fundamental change", as defined in the supplemental indenture relating to the 2022 Convertible Notes, holders of the 2022 Convertible Notes may require the Company to repurchase for cash all or part of their 2022 Convertible Notes at a repurchase price equal to 100.0% of the principal amount of the 2022 Convertible Notes to be repurchased, plus accrued and unpaid interest through, but excluding, the repurchase date. The 2022 Convertible Notes are not redeemable prior to maturity and no "sinking fund" is provided for the 2022 Convertible Notes.

The following table summarizes the interest expense, deferred financing costs, average outstanding balance, and average stated interest rate on the 2022 Convertible Notes for the years ended December 31, 2018, 2017, and 2016 (dollars in thousands):

|  | For the year ended | | |
|  | December 31, 2018 | December 31, 2017 | December 31, 2016 |
|---|---|---|---|
| Interest expense | $ 2,995 | $ 1,789 | $ — |
| Deferred financing costs | 324 | 180 | — |
| Total interest and financing expenses | $ 3,319 | $ 1,969 | $ — |
| Average outstanding balance | $52,088 | $31,218 | $ — |
| Average stated interest rate | 5.75% | 5.75% | — |

***Credit Facility***

On October 17, 2014, the Company entered into a senior secured revolving credit agreement (the "Credit Facility") with ING Capital, LLC, as administrative agent, arranger, and bookrunner, and the lenders thereto. The Credit Facility was amended on May 22, 2015, June 16, 2017, and July 19, 2018 (the "Amendments"). The Amendments were affected, among other things, in order to increase the total borrowings allowed under the Credit Facility, allow for stock repurchases, extend the maturity date, and to reduce the minimum required interest coverage ratio. The Credit Facility currently provides for borrowings up to $114.5 million and may be increased up to $200.0 million pursuant to its "accordion" feature. The Credit Facility matures on June 16, 2021.

Borrowings under the Credit Facility bear interest, at the Company's election, at a rate per annum equal to (i) the one, two, three or six month LIBOR, as applicable, plus 3.00% or (ii) 2.00% plus the highest of (A) a prime rate, (B) the Federal Funds rate plus 0.5% and (C) three month LIBOR plus 1.0%. The Company's ability to elect LIBOR indices with various tenors (e.g., one, two, three or six month LIBOR) on which the interest rates for borrowings under the Credit Facility are based, provides the company with increased flexibility to manage interest rate risks as compared to a borrowing arrangement that does not provide for such optionality. Once a particular LIBOR rate has been selected, the interest rate on the applicable amount borrowed will reset after the applicable tenor period and be based on the then applicable selected LIBOR rate (e.g., borrowings for which the Company has elected the one month LIBOR rate will reset on the one month anniversary of the period based on the then selected LIBOR rate). For any given borrowing under the Credit Facility, the Company intends to elect what it believes to be an appropriate LIBOR rate taking into account the Company's needs at the time as well as the Company's view of future interest rate movements. The Credit Facility provides for the ability to step-down the pricing of the Credit

F-54

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**December 31, 2018**

**Note 8. Borrowings – (continued)**

Facility from LIBOR plus 3.00% to LIBOR plus 2.75% when certain conditions are met. The Company will also pay an unused commitment fee at a rate of 2.50% per annum on the amount (if positive) by which 40% of the aggregate commitments under the Credit Facility exceeds the outstanding amount of loans under the Credit Facility and 0.50% per annum on any remaining unused portion of the Credit Facility.

The following table summarizes the interest expense, deferred financing costs, unused commitment fees, average outstanding balance, and average stated interest rate on the Credit Facility for the years ended December 31, 2018, 2017, and 2016 (dollars in thousands):

|  | For the year ended | | |
| --- | --- | --- | --- |
|  | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Interest expense | $ 305 | $ 908 | $ 2,303 |
| Deferred financing costs | 441 | 713 | 965 |
| Unused commitment fees | 1,353 | 972 | 304 |
| Total interest and financing expenses | $2,099 | $ 2,593 | $ 3,572 |
| Average outstanding balance | $6,304 | $22,493 | $64,625 |
| Average stated interest rate | 4.89% | 4.08% | 3.51% |

As of December 31, 2018 and December 31, 2017, the Company had $10.0 million and $9.0 million, respectively, outstanding under the Credit Facility. The Credit Facility is secured by investments and cash held by the Company, exclusive of assets held at our two SBIC subsidiaries. Assets pledged to secure the Credit Facility had a carrying value of $158.9 million and $192.4 million, respectively, at December 31, 2018 and December 31, 2017. As part of the terms of the Credit Facility, the Company may not make cash distributions with respect to any taxable year that exceed 110% (125% if the Company is not in default and our covered debt does not exceed 85% of the borrowing base) of the amounts required to be distributed to maintain eligibility as a RIC and to reduce our tax liability to zero for taxes imposed on our investment company taxable income and net capital gains.

*Financial Instruments Disclosed, But Not Carried, At Fair Value*

The following table presents the carrying value and fair value of the Company's financial liabilities disclosed, but not carried, at fair value as of December 31, 2018, and the level of each financial liability within the fair value hierarchy (dollars in thousands):

|  | Carrying Value[(1)] | Fair Value | Level 1 | Level 2 | Level 3 |
| --- | --- | --- | --- | --- | --- |
| SBA debentures | $165,700 | $165,436 | $ — | $ — | $165,436 |
| 2022 Notes | 75,000 | 74,700 | 74,700 | — | — |
| 2022 Convertible Notes | 52,088 | 49,546 | 49,546 | — | — |
| Credit Facility | 10,000 | 10,030 | — | — | 10,030 |
| **Total** | $302,788 | $299,712 | $124,246 | $ — | $175,466 |

(1)   Carrying value equals the gross principal outstanding at period end.

## CAPITALA FINANCE CORP.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### December 31, 2018

**Note 8. Borrowings – (continued)**

The following table presents the carrying value and fair value of the Company's financial liabilities disclosed, but not carried, at fair value as of December 31, 2017, and the level of each financial liability within the fair value hierarchy (dollars in thousands):

| | Carrying Value[1] | Fair Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| SBA debentures | $170,700 | $173,373 | $ — | $ — | $173,373 |
| 2022 Notes | 75,000 | 75,600 | 75,600 | — | — |
| 2022 Convertible Notes | 52,088 | 51,775 | 51,775 | — | — |
| Credit Facility | 9,000 | 9,038 | — | — | 9,038 |
| **Total** | $306,788 | $309,786 | $127,375 | $ — | $182,411 |

(1) Carrying value equals the gross principal outstanding at period end.

The estimated fair value of the Company's SBA debentures was based on future contractual cash payments discounted at market interest rates to borrow from the SBA as of the measurement date.

The estimated fair value of the 2022 Notes and 2022 Convertible Notes was based on their respective closing prices as of the measurement date as they are traded on the NASDAQ Global Select Market under the ticker "CPTAL" (2022 Notes) and on the NASDAQ Capital Market under the ticker "CPTAG" (2022 Convertible Notes).

The estimated fair value of the Credit Facility was based on future contractual cash payments discounted at estimated market interest rates for similar debt.

**Note 9. Income Taxes**

The Company has elected to be treated as a RIC under subchapter M of the Code. As a RIC, the Company is not taxed on any investment company taxable income or capital gains which it distributes to stockholders. The Company intends to make the requisite distributions to its stockholders which will relieve the Company from U.S. federal income taxes. The Company elected to amend its tax year end from August 31 to December 31 and has filed a tax return for the four months ended December 31, 2017. The election to change the tax year end is not expected to have a material impact on the Company's consolidated statements of operations, the Company's tax status as a RIC, or the nature of distributions paid to our stockholders.

Dividends from net investment income and distributions from net realized capital gains are determined in accordance with U.S. federal tax regulations, which may differ from amounts in accordance with U.S. GAAP and those differences could be material.

Permanent differences between taxable income and net investment income for financial reporting purposes are reclassified among the capital accounts in the financial statements to reflect their tax character. During the periods ended December 31, 2018, December 31, 2017, August 31, 2017 and August 31, 2016, the Company reclassified for book purposes amounts arising from permanent differences in the book and tax basis of partnership investments sold, sales relating to defaulted bond accruals, and book and tax character of distributions paid. Such reclassifications are reported in "Tax reclassifications of stockholders' equity in accordance with generally accepted accounting principles" in the statements of changes in net assets for the years ended December 31, 2018, 2017 and 2016, respectively.

F-56

CAPITALA FINANCE CORP.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 9. Income Taxes – (continued)**

The following permanent differences due to adjustments for the realized gains (losses) upon disposition of partnership interests and for the transfer of distributions between accumulated capital gains and accumulated net investment income were reclassified for tax purposes for the tax periods ended December 31, 2018, December 31, 2017, August 31, 2017 and August 31, 2016 (dollars in thousands):

| | Tax year ended December 31, 2018 | Tax period ended December 31, 2017 | Tax year ended August 31, 2017 | Tax year ended August 31, 2016 |
|---|---|---|---|---|
| Increase (decrease) in accumulated net investment income | $ 38 | $ — | $ (67) | $ 13,838 |
| Increase (decrease) in accumulated net realized gains on investments | — | — | 88 | (13,816) |
| Decrease in capital in excess of par value | (38) | — | (21) | (22) |

For the tax periods ended December 31, 2018, December 31, 2017, August 31, 2017 and August 31, 2016, the tax basis components of distributable earnings were as follows (dollars in thousands):

| | Tax year ended December 31, 2018 | Tax period ended December 31, 2017 | Tax year ended August 31, 2017 | Tax year ended August 31, 2016 |
|---|---|---|---|---|
| Undistributed ordinary income | $ 1,016 | $ 9,851 | $ 8,999 | $ 5,646 |
| Accumulated capital losses | (79,063) | (44,078) | (43,618) | (44,296) |
| Unrealized appreciation | 6,519 | 34,065 | 25,994 | 47,837 |
| Other temporary differences | (610) | (9,426) | (8,276) | (2,570) |
| Total | $(72,138) | $ (9,588) | $(16,901) | $ 6,617 |

Capital losses in excess of capital gains earned in a tax year may generally be carried forward and used to offset capital gains, subject to certain limitations. Under the Regulated Investment Company Modernization Act of 2010, capital losses incurred after September 30, 2011 will not be subject to expiration. As of December 31, 2018, the company has a short-term capital loss carry forward of $4.2 million and a long-term capital loss carry forward of $74.8 million.

Taxable income generally differs from net increase (decrease) in net assets resulting from operations for financial reporting purposes due to temporary and permanent differences in the recognition of income and expenses and generally excludes unrealized appreciation (depreciation) on investments as investment gains and losses are not included in taxable income until they are realized.

The following table reconciles net increase (decrease) in net assets resulting from operations to taxable income for the tax periods ended December 31, 2018, December 31, 2017, August 31, 2017 and August 31, 2016 (dollars in thousands):

| | Tax year ended December 31, 2018 | Tax period ended December 31, 2017 | Tax year ended August 31, 2017 | Tax year ended August 31, 2016 |
|---|---|---|---|---|
| Net increase (decrease) in net assets resulting from operations | $(16,026) | $(17,150) | $ 1,647 | $ 10,291 |
| Net change in unrealized (appreciation) depreciation on investments | (840) | (1,698) | 18,518 | (20,809) |
| Capital loss carryforward (utilization) | 34,985 | 460 | (679) | 44,296 |
| Tax provision (benefit) | (1,916) | 1,289 | — | — |

F-57

8/4/2020    Case 3:18-cv-01023-MPS   Document 353-15   Filed 12/01/21   Page 156 of 174
tv514470-10k - none - 11.24249s
TABLE OF CONTENTS

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 9. Income Taxes – (continued)**

|  | Tax year ended December 31, 2018 | Tax period ended December 31, 2017 | Tax year ended August 31, 2017 | Tax year ended August 31, 2016 |
|---|---|---|---|---|
| Other deductions for book in excess of deductions for tax | (9,051) | 24,981 | 9,053 | (3,654) |
| Total taxable income | $ 7,152 | $ 7,882 | $28,539 | $ 30,124 |

For income tax purposes, distributions paid to stockholders are reported as ordinary income, return of capital, long term capital gains or a combination thereof. The tax character of distributions paid for the tax periods ended December 31, 2018, December 31, 2017, August 31, 2017, and August 31, 2016 (dollars in thousands):

|  | Tax year ended December 31, 2018 | Tax period ended December 31, 2017 | Tax Year ended August 31, 2017 | Tax year ended August 31, 2016 |
|---|---|---|---|---|
| Ordinary income | $ 15,986 | $ 6,052 | $ 25,187 | $ 24,478 |
| Long-term capital gains | — | — | — | 8,378 |
| Return of capital | — | — | — | — |
| Total | $ 15,986 | $ 6,052 | $ 25,187 | $ 32,856 |

For U.S. federal income tax purposes, as of December 31, 2018, the aggregate net unrealized appreciation for all securities was $6.5 million. As of December 31, 2018, gross unrealized appreciation was $31.9 million and gross unrealized depreciation was $25.4 million. The aggregate cost of securities for U.S. federal income tax purposes was $442.4 million. For U.S. federal income tax purposes, as of December 31, 2017, the aggregate net unrealized appreciation for all securities was $34.1 million. As of December 31, 2017, gross unrealized appreciation was $79.7 million and gross unrealized depreciation was $45.6 million. The aggregate cost of securities for U.S. federal income tax purposes was $465.9 million as of December 31, 2017.

The Company has formed and expects to continue to form certain Taxable Subsidiaries, which are taxed as corporations for income tax purposes. These Taxable Subsidiaries allow the Company to make equity investments in companies organized as pass-through entities while continuing to satisfy the requirements of a RIC under the Code. The Taxable Subsidiaries are wholly owned consolidated subsidiaries of the Company.

The Company acquired the non-controlling interest in Print Direction, Inc. on December 1, 2017 and converted the entity to CPTA Master Blocker, Inc. (Georgia), retaining its net operating losses in the transaction pursuant to Section 351 of the Code. As of December 31, 2018, the Taxable Subsidiaries had net operating losses for U.S. federal income tax purposes of approximately $11.9 million. If not utilized, $6.0 million of these net operating losses will expire in the year ended December 31, 2037, $2.4 million of these net operating losses will expire in the year ended December 31, 2036, and $3.5 million of these net operating losses have no expiration.

On December 22, 2017, the United States enacted tax reform legislation through the Tax Cuts and Jobs Act, which significantly changes the existing U.S. tax laws, including a reduction in the corporate tax rate from 35% to 21%, a move from a worldwide tax system to a territorial system, as well as other changes. The Taxable Subsidiaries' provisional tax is based on the new lower blended federal and state corporate tax rate of 24.86%. The implementation of the Tax Act did not have a material impact on the Company's financial position and results of operations.

F-58

8/4/2020    Case 3:18-cv-01023-MPS    Document 353-15   Filed 12/01/21    Page 157 of 174
tv514470-10k.htm - Generated by EDGAR Online

TABLE OF CONTENTS

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 9. Income Taxes – (continued)**

Deferred U.S. federal income taxes reflect the net tax effect of temporary differences between the carrying amount of assets and liabilities for financial reporting and U.S. federal income tax purposes. Components of deferred tax assets (liabilities) as of December 31, 2018 and 2017 are as follows (dollars in thousands):

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 2,963 | $ 2,216 |
| Other deferred tax assets | 58 | — |
| Less valuation allowance | (364) | (363) |
| | 2,657 | 1,853 |
| Deferred tax liabilities: | | |
| Net unrealized appreciation on investments | (825) | (2,809) |
| Basis reduction in partnership investments | (1,204) | (333) |
| | (2,029) | (3,142) |
| Net deferred tax asset (liability) | $ 628 | $(1,289) |

At December 31, 2018 and December 31, 2017, the valuation allowance on deferred tax assets was $0.4 million which represents the state tax effect of net operating losses that we do not believe we will realize through future taxable income. The Company believes it is more likely than not that there is an ability to realize its remaining deferred tax assets through future table income. Any adjustments to the Company's valuation allowance will depend on estimates of future taxable income and will be made in the period such determination is made.

Total income tax expense (benefit) differs from the amount computed by applying the federal statutory income tax rate of 21% to net investment loss and net realized and unrealized appreciation (depreciation) on investments for the years ended December 31, 2018, 2017, and 2016, as follows (dollars in thousands):

| | For the year ended | | |
|---|---|---|---|
| | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Tax expense (benefit) at statutory rates | $(1,447) | $1,998 | $ — |
| State income tax expense (benefit), net of federal benefit | (266) | 188 | — |
| Tax benefit on net operating losses | — | (908) | — |
| Adjustment to unrealized appreciation | (159) | — | — |
| Other adjustments | (40) | — | — |
| Tax expense on permanent items | — | 140 | — |
| Revaluation for federal rate change | — | (492) | — |
| Revaluation for state rate change | (5) | | |
| Change in valuation allowance | 1 | 363 | — |
| Total tax provision (benefit), net | $(1,916) | $1,289 | $ — |

Total income taxes are computed by applying the federal statutory rate of 21% plus an estimated blended state rate of 3.86%.

F-59

CAPITALA FINANCE CORP.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 9. Income Taxes – (continued)**

For the years ended December 31, 2018, 2017 and 2016, the components of the Company's tax provision include the following:

|  | For the year ended | | |
|  | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| --- | --- | --- | --- |
| Deferred tax provision (benefit) | | | |
| Federal | $(1,615) | $ 778 | $ — |
| State | (302) | 148 | — |
| Less valuation allowance | 1 | 363 | — |
| Total tax provision (benefit), net | $(1,916) | $1,289 | $ — |

**Note 10. Directors' Fees**

Our independent directors receive an annual fee of $50,000. They also receive $5,000 plus reimbursement of reasonable out-of-pocket expenses incurred in connection with attending each board meeting and $5,000 plus reimbursement of reasonable out-of-pocket expenses incurred in connection with attending each committee meeting. In addition, the chairman of the audit committee receives an annual fee of $10,000 and each chairman of any other committee receives an annual fee of $5,000 for their additional services, if any, in these capacities. For the years ended December 31, 2018, 2017 and 2016, the Company recognized directors' fees expense of $0.4 million. No compensation is expected to be paid to directors who are "interested persons" of the Company, as such term is defined in Section 2(a)(19) of the 1940 Act.

**Note 11. Stockholders' Equity**

On September 24, 2013, we issued 8,974,420 shares of common stock to the limited partners of the Legacy Funds, in exchange for 100% of their membership interests or certain investment assets of such Legacy Funds, as the case may be. On September 30, 2013, we issued 4,000,000 shares of common stock in connection with the closing of our IPO. The shares issued in the IPO were priced at $20.00 per share. We received proceeds of $74.25 million in the IPO, net of underwriters' discounts and commissions of $5.75 million.

On April 13, 2015, the Company completed an underwritten offering of 3,500,000 shares of its common stock at a public offering price of $18.32 per share. The total proceeds received in the offering net of underwriting discounts and offering costs were approximately $61.7 million. As of December 31, 2018, the Company had 16,051,547 shares of common stock outstanding.

**Note 12. Summarized Financial Information of Our Unconsolidated Subsidiaries**

The Company holds a control interest, as defined by the 1940 Act, in five portfolio companies that are considered significant subsidiaries under the guidance in Regulation S-X, but are not consolidated in the Company's consolidated financial statements. Below is a brief description of each such portfolio company, along with summarized financial information as of December 31, 2018 and 2017, and for the years ended December 31, 2018, 2017, and 2016.

During the year ended December 31, 2018, the Company sold its investment in Kelle's Transport Service, LLC and realized a loss of $3.7 million. During the year ended December 31, 2018, the Company wrote-off its investment in On-Site Fuel Service, Inc. and realized a loss of $16.7 million.

F-60

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 12. Summarized Financial Information of Our Unconsolidated Subsidiaries – (continued)**

*AAE Acquisition, LLC*

AAE Acquisition, LLC, formed on May 21, 2004 as a Delaware limited liability company, is an aerial equipment rental and services business primarily serving the Gulf Coast region. The income (loss) the Company generated from AAE Acquisition, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $1.7 million, $1.7 million, and $(1.1) million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

*CableOrganizer Acquisition, LLC*

CableOrganizer Acquisition, LLC, a Delaware limited liability company that began operations on April 23, 2013, is a leading online provider of cable and wire management products. The income (loss) the Company generated from CableOrganizer Acquisition, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $(2.4) million, $1.8 million, and $1.9 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

*Eastport Holdings, LLC*

Eastport Holdings, LLC, an Ohio limited liability company organized on November 1, 2011, is a holding company consisting of marketing and advertising companies located across the U.S. The income the Company generated from Eastport Holdings, LLC, which includes all interest, dividends, PIK interest and dividends, fees, and unrealized appreciation (depreciation), was $11.4 million and $14.3 million for the years ended December 31, 2017 and December 31, 2016, respectively. On August 27, 2018, the Written Call Option associated with the Company's investment in Eastport Holdings, LLC was exercised and, as a result of the reduced ownership percentage, is no longer considered a control investment. The income the Company generated from Eastport Holdings, LLC while it was considered a control investment from January 1, 2018 to August 27, 2018 was $2.1 million. The summarized financial information disclosed below is as of August 31, 2018 and for the eight months ended August 31, 2018 as this is the period that Eastport Holdings, LLC was considered a control investment.

*Micro Precision, LLC*

Micro Precision, LLC, formed on August 5, 2011 as a Delaware limited liability company, is a prime contractor supplying critical parts and mechanical assemblies to the U.S. Department of Defense as well as designer and manufacturer of locomotive air horns. The income (loss) the Company generated from Micro Precision, LLC, which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation), was $2.1 million, $0.0 million, and $1.8 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

*Navis Holdings, Inc.*

Navis Holdings, Inc., incorporated in Delaware on December 21, 2010, designs and manufactures leading machinery for the global knit and woven finishing textile industries. The income the Company generated from Navis Holdings, Inc., which includes all interest, dividends, PIK interest and PIK dividends, fees, and unrealized appreciation (depreciation) was $0.6 million, $0.7 million, and $1.9 million for the years ended December 31, 2018, December 31, 2017, and December 31, 2016, respectively.

F-61

CAPITALA FINANCE CORP.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
December 31, 2018

**Note 12. Summarized Financial Information of Our Unconsolidated Subsidiaries – (continued)**

The summarized unaudited financial information of our unconsolidated subsidiaries was as follows (dollars in thousands):

|  | As of | |
| --- | --- | --- |
| **Balance Sheets – AAE Acquisition, LLC** | December 31, 2018 | December 31, 2017 |
| Current assets | $ 7,277 | $ 6,712 |
| Noncurrent assets | 22,994 | 27,668 |
| Total assets | $ 30,271 | $ 34,380 |
| Current liabilities | $ 53,939 | $ 2,897 |
| Noncurrent liabilities | 2,122 | 51,428 |
| Total liabilities | $ 56,061 | $ 54,325 |
| Total deficit | $(25,790) | $(19,945) |

|  | For the year ended | | |
| --- | --- | --- | --- |
| **Statements of Operations – AAE Acquisition, LLC** | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Net sales | $27,162 | $26,677 | $28,352 |
| Cost of goods sold | 20,098 | 20,265 | 22,402 |
| Gross profit | $ 7,064 | $ 6,412 | $ 5,950 |
| Other expenses | $12,768 | $11,916 | $11,812 |
| Net loss before income taxes | (5,704) | (5,504) | (5,862) |
| Income tax provision | — | — | — |
| Net loss | $ (5,704) | $ (5,504) | $ (5,862) |

|  | As of | |
| --- | --- | --- |
| **Balance Sheets – CableOrganizer Acquisition, LLC** | December 31, 2018 | December 31, 2017 |
| Current assets | $ 2,987 | $ 5,182 |
| Noncurrent assets | 8,459 | 8,354 |
| Total assets | $11,446 | $13,536 |
| Current liabilities | $13,094 | $ 5,205 |
| Noncurrent liabilities | — | 12,346 |
| Total liabilities | $13,094 | $17,551 |
| Total deficit | $ (1,648) | $ (4,015) |

|  | For the year ended | | |
| --- | --- | --- | --- |
| **Statements of Operations – CableOrganizer Acquisition, LLC.** | December 31, 2018 | December 31, 2017 | December 31, 2016 |
| Net sales | $18,115 | $27,133 | $23,277 |
| Cost of goods sold | 12,183 | 19,819 | 15,715 |
| Gross profit | $ 5,932 | $ 7,314 | $ 7,562 |
| Other expenses | $ 7,960 | $10,690 | $10,344 |
| Net loss before income taxes | (2,028) | (3,376) | (2,782) |
| Income tax provision | — | — | — |
| Net loss | $ (2,028) | $ (3,376) | $ (2,782) |

F-62

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 12. Summarized Financial Information of Our Unconsolidated Subsidiaries – (continued)**

| | As of | |
| --- | --- | --- |
| **Balance Sheets – Eastport Holdings, LLC** | **August 31, 2018** | **December 31, 2017** |
| Current assets | $ 99,483 | $ 94,396 |
| Noncurrent assets | 185,292 | 180,266 |
| Total assets | $284,775 | $274,662 |
| Current liabilities | $163,085 | $153,182 |
| Noncurrent liabilities | 60,939 | 56,272 |
| Total liabilities | $224,024 | $209,454 |
| Total equity | $ 60,751 | $ 65,208 |

| | **For the eight months ended August 31, 2018** | For the year ended | |
| --- | --- | --- | --- |
| **Statements of Operations – Eastport Holdings, LLC** | | **December 31, 2017** | **December 31, 2016** |
| Net sales | $ 373,943 | $510,400 | $499,986 |
| Cost of goods sold | 267,395 | 364,605 | 377,036 |
| Gross profit | $ 106,548 | $145,795 | $122,950 |
| Other expenses | $ 103,811 | $135,597 | $111,677 |
| Net income before income taxes | 2,737 | 10,198 | 11,273 |
| Income tax provision | 335 | 278 | — |
| Net income | $ 2,402 | $ 9,920 | $ 11,273 |

| | As of | |
| --- | --- | --- |
| **Balance Sheets – Micro Precision, LLC** | **December 31, 2018** | **December 31, 2017** |
| Current assets | $ 5,880 | $ 6,187 |
| Noncurrent assets | 19,436 | 15,864 |
| Total assets | $25,316 | $22,051 |
| Current liabilities | $ 7,712 | $ 6,511 |
| Noncurrent liabilities | 13,961 | 15,790 |
| Total liabilities | $21,673 | $22,301 |
| Total equity (deficit) | $ 3,643 | $ (250) |

| | For the year ended | | |
| --- | --- | --- | --- |
| **Statements of Operations – Micro Precision, LLC** | **December 31, 2018** | **December 31, 2017** | **December 31, 2016** |
| Net sales | $12,083 | $14,053 | $17,788 |
| Cost of goods sold | 6,595 | 8,677 | 12,183 |
| Gross profit | $ 5,488 | $ 5,376 | $ 5,605 |
| Other expenses | $ 5,562 | $ 6,590 | $ 6,836 |
| Net loss before income taxes | (74) | (1,214) | (1,231) |
| Income tax provision | — | — | — |
| Net loss | $ (74) | $(1,214) | $(1,231) |

F-63

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**December 31, 2018**

**Note 12. Summarized Financial Information of Our Unconsolidated Subsidiaries – (continued)**

| | As of | |
|---|---|---|
| **Balance Sheets – Navis Holdings, Inc.** | **December 31, 2018** | **December 31, 2017** |
| Current assets | $ 5,868 | $ 4,723 |
| Noncurrent assets | 5,145 | 2,162 |
| Total assets | $11,013 | $ 6,885 |
| Current liabilities | $ 5,542 | $ 2,463 |
| Noncurrent liabilities | 8,060 | 6,738 |
| Total liabilities | $13,602 | $ 9,201 |
| Total deficit | $ (2,589) | $(2,316) |

| | For the year ended | | |
|---|---|---|---|
| **Statements of Operations – Navis Holdings, Inc.** | **December 31, 2018** | **December 31, 2017** | **December 31, 2016** |
| Net sales | $14,305 | $13,947 | $17,803 |
| Cost of goods sold | 8,456 | 8,729 | 10,933 |
| Gross profit | $ 5,849 | $ 5,218 | $ 6,870 |
| Other expenses | $ 5,977 | $ 4,684 | $ 5,070 |
| Net income (loss) before income taxes | (128) | 534 | 1,800 |
| Income tax provision | 20 | 1,185 | 701 |
| Net income (loss) | $ (148) | $ (651) | $ 1,099 |

**Note 13. Earnings Per Share**

In accordance with the provisions of ASC Topic 260 — *Earnings per Share* ("ASC 260"), basic earnings per share is computed by dividing earnings available to common stockholders by the weighted average number of shares outstanding during the period. Other potentially dilutive common shares, and the related impact to earnings, are considered when calculating earnings per share. For the years ended December 31, 2018 and 2017, 3.3 million in convertible shares related to the 2022 Convertible Notes were considered anti-dilutive. For the year ended December 31, 2016, there were no potentially dilutive shares.

The following information sets forth the computation of the weighted average basic and diluted net increase (decrease) in net assets per share resulting from operations for the years ended December 31, 2018, 2017 and 2016 (dollars in thousands, except share and per share data):

| | For the year ended | | |
|---|---|---|---|
| **Basic and diluted** | **December 31, 2018** | **December 31, 2017** | **December 31, 2016** |
| Net increase (decrease) in net assets resulting from operations | $ (16,026) | $ (6,984) | $ 9,152 |
| Weighted average common stock outstanding – basic and diluted | 15,993,436 | 15,903,167 | 15,819,175 |
| Net increase (decrease) in net assets per share resulting from operations – basic and diluted | $ (1.00) | $ (0.44) | $ 0.58 |

F-64

CAPITALA FINANCE CORP.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 14. Distributions**

The Company's distributions are recorded as payable on the declaration date. Stockholders have the option to receive payment of the distribution in cash, shares of common stock, or a combination of cash and common stock.

The following tables summarize the Company's distribution declarations during the years ended December 31, 2018, 2017 and 2016 (in thousands, except share and per share data):

| Date Declared | Record Date | Payment Date | Amount Per Share | Cash Distribution | DRIP Shares Issued | DRIP Share Value |
|---|---|---|---|---|---|---|
| January 2, 2018 | January 22, 2018 | January 30, 2018 | $0.0833 | $ 1,275 | 7,280 | $ 54 |
| January 2, 2018 | February 20, 2018 | February 27, 2018 | 0.0833 | 1,275 | 8,076 | 54 |
| January 2, 2018 | March 23, 2018 | March 29, 2018 | 0.0833 | 1,274 | 7,631 | 56 |
| April 2, 2018 | April 19, 2018 | April 27, 2018 | 0.0833 | 1,278 | 7,006 | 53 |
| April 2, 2018 | May 22, 2018 | May 30, 2018 | 0.0833 | 1,277 | 6,875 | 54 |
| April 2, 2018 | June 20, 2018 | June 28, 2018 | 0.0833 | 1,280 | 6,591 | 52 |
| July 2, 2018 | July 23, 2018 | July 30, 2018 | 0.0833 | 1,279 | 6,515 | 53 |
| July 2, 2018 | August 23, 2018 | August 30, 2018 | 0.0833 | 1,277 | 6,699 | 56 |
| July 2, 2018 | September 20, 2018 | September 27, 2018 | 0.0833 | 1,249 | 10,066 | 84 |
| October 1, 2018 | October 23, 2018 | October 30, 2018 | 0.0833 | 1,249 | 10,918 | 85 |
| October 1, 2018 | November 21, 2018 | November 29, 2018 | 0.0833 | 1,249 | 11,342 | 86 |
| October 1, 2018 | December 20, 2018 | December 28, 2018 | 0.0833 | 1,255 | 11,317 | 82 |
| | Total Distributions Declared and Distributed for 2018 | | $ 1.00 | $15,217 | 100,316 | $769 |

| Date Declared | Record Date | Payment Date | Amount Per Share | Cash Distribution | DRIP Shares Issued | DRIP Share Value |
|---|---|---|---|---|---|---|
| January 3, 2017 | January 20, 2017 | January 30, 2017 | $0.1300 | $ 1,993 | 5,304 | $ 70 |
| January 3, 2017 | February 20, 2017 | February 27, 2017 | 0.1300 | 1,993 | 5,195 | 70 |
| January 3, 2017 | March 23, 2017 | March 30, 2017 | 0.1300 | 1,998 | 4,948 | 67 |
| April 3, 2017 | April 19, 2017 | April 27, 2017 | 0.1300 | 1,996 | 5,164 | 69 |
| April 3, 2017 | May 23, 2017 | May 29, 2017 | 0.1300 | 1,990 | 5,880 | 76 |
| April 3, 2017 | June 21, 2017 | June 29, 2017 | 0.1300 | 1,969 | 7,959 | 97 |
| July 3, 2017 | July 21, 2017 | July 28, 2017 | 0.1300 | 1,995 | 5,889 | 73 |
| July 3, 2017 | August 23, 2017 | August 30, 2017 | 0.1300 | 1,957 | 13,162 | 111 |
| July 3, 2017 | September 20, 2017 | September 28, 2017 | 0.1300 | 1,989 | 9,085 | 80 |
| October 2, 2017 | October 23, 2017 | October 30, 2017 | 0.0833 | 1,280 | 5,876 | 48 |
| October 2, 2017 | November 21, 2017 | November 29, 2017 | 0.0833 | 1,278 | 6,856 | 49 |
| October 2, 2017 | December 20, 2017 | December 28, 2017 | 0.0833 | 1,273 | 7,868 | 55 |
| | Total Distributions Declared and Distributed for 2017 | | $ 1.42 | $21,711 | 83,186 | $865 |

F-65

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 14. Distributions – (continued)**

| Date Declared | Record Date | Payment Date | Amount Per Share | Cash Distribution | DRIP Shares Issued | DRIP Share Value |
|---|---|---|---|---|---|---|
| January 4, 2016 | January 22, 2016 | January 28, 2016 | $0.1567 | $ 2,392 | 8,135 | $ 80 |
| January 4, 2016 | February 19, 2016 | February 26, 2016 | 0.1567 | 2,405 | 7,076 | 70 |
| January 4, 2016 | March 22, 2016 | March 30, 2016 | 0.1567 | 2,397 | 7,079 | 77 |
| April 1, 2016 | April 22, 2016 | April 28, 2016 | 0.1567 | 2,392 | 6,625 | 85 |
| April 1, 2016 | May 23, 2016 | May 30, 2016 | 0.1567 | 2,372 | 8,147 | 104 |
| April 1, 2016 | June 21, 2016 | June 29, 2016 | 0.1567 | 2,369 | 8,229 | 108 |
| July 1, 2016 | July 22, 2016 | July 29, 2016 | 0.1567 | 2,382 | 7,025 | 98 |
| July 1, 2016 | August 22, 2016 | August 30, 2016 | 0.1567 | 2,391 | 6,256 | 90 |
| July 1, 2016 | September 22, 2016 | September 29, 2016 | 0.1567 | 2,380 | 8,242 | 101 |
| September 22, 2016 | October 21, 2016 | October 28, 2016 | 0.1300 | 1,977 | 6,619 | 82 |
| September 22, 2016 | November 21, 2016 | November 29, 2016 | 0.1300 | 1,926 | 11,384 | 136 |
| September 22, 2016 | December 21, 2016 | December 29, 2016 | 0.1300 | 1,989 | 5,883 | 72 |
| | | Total Distributions Declared and Distributed for 2016 | $ 1.80 | $27,372 | 90,700 | $1,103 |

F-66

# CAPITALA FINANCE CORP.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### December 31, 2018

**Note 15. Financial Highlights**

The following is a schedule of financial highlights for the years ended December 31, 2018, 2017, 2016, 2015 and 2014 (dollars in thousands, except share and per share data):

| | For the year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| **Per share data:** | | | | | |
| Net asset value at beginning of year | $ 13.91 | $ 15.79 | $ 17.04 | $ 18.56 | $ 20.71 |
| Net investment income[1] | 1.00 | 0.98 | 1.84 | 1.67 | 1.54 |
| Net realized gain (loss) on investments[1] | (2.18) | (1.52) | (1.44) | 0.35 | 0.06 |
| Net unrealized appreciation (depreciation) on investments[1] | (0.37) | 0.44 | 0.35 | (1.11) | (1.87) |
| Net unrealized appreciation (depreciation) on Written Call Option[1] | 0.43 | (0.26) | (0.17) | — | — |
| Tax benefit (provision)[1] | 0.12 | (0.08) | — | — | — |
| Distributions declared from net investment income | (1.00) | (1.42) | (1.80) | (1.88) | (1.88) |
| Distributions declared from net realized gains | — | — | — | (0.50) | — |
| Issuance of common stock | — | — | — | (0.15) | — |
| Accretive impact of stock repurchase | — | — | — | 0.13 | — |
| Other[7] | (0.03) | (0.02) | (0.03) | (0.03) | — |
| Net asset value at end of year | $ 11.88 | $ 13.91 | $ 15.79 | $ 17.04 | $ 18.56 |
| Net assets at end of year | $ 190,644 | $ 221,887 | $ 250,582 | $ 268,802 | $ 240,837 |
| Shares outstanding at end of year | 16,051,547 | 15,951,231 | 15,868,045 | 15,777,345 | 12,974,420 |
| Per share market value at end of year | $ 7.17 | $ 7.28 | $ 12.93 | $ 12.08 | $ 17.87 |
| Total return based on market value[2] | 12.14% | (35.68)% | 24.07% | (20.43)% | (0.85)% |
| **Ratio/Supplemental data:** | | | | | |
| Ratio of net investment income to average net assets | 7.60% | 6.54% | 11.32% | 9.55% | 7.78% |
| Ratio of incentive fee, net of incentive fee waiver, to average net assets[6] | 0.12% | 0.15% | 2.01% | 1.88% | 1.11% |
| Ratio of interest and financing expenses to average net assets | 8.20% | 7.94% | 7.68% | 7.17% | 5.21% |
| Ratio of loss on extinguishment of debt to average net assets | —% | 1.15% | —% | —% | —% |
| Ratio of tax (benefit) provision to average net assets | (0.91)% | 0.54% | —% | —% | —% |
| Ratio of other operating expenses net of management fee waiver to average net assets[8] | 6.52% | 5.75% | 5.61% | 5.52% | 5.20% |
| Ratio of total expenses including tax provision, net of fee waivers to average net assets[6][8] | 13.93% | 15.53% | 15.30% | 14.57% | 11.52% |
| Portfolio turnover rate[3] | 22.69% | 16.34% | 21.33% | 25.99% | 18.62% |
| Average debt outstanding[4] | $ 302,420 | $ 325,314 | $ 356,758 | $ 324,824 | $ 255,268 |
| Average debt outstanding per common share | $ 18.84 | $ 20.39 | $ 22.48 | $ 20.59 | $ 19.67 |
| Asset coverage ratio per unit[5] | $ 2,391 | $ 2,630 | $ 2,592 | $ 2,465 | $ 1,788 |

---

(1)　Based on daily weighted average balance of shares outstanding during the period.

F-67

**CAPITALA FINANCE CORP.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 15. Financial Highlights – (continued)**

(2) Total investment return is calculated assuming a purchase of common shares at the current market value on the first day and a sale at the current market value on the last day of the period reported. Dividends and distributions, if any, are assumed for purposes of this calculation to be reinvested at prices obtained under the Company's DRIP. Total investment return does not reflect brokerage commissions.

(3) Portfolio turnover rate is calculated using the lesser of year-to-date sales or year-to-date purchases over the average of the invested assets at fair value.

(4) Based on daily weighted average balance of debt outstanding during the period.

(5) Asset coverage per unit is the ratio of the carrying value of our total consolidated assets, less all liabilities and indebtedness not represented by senior securities, to the aggregate amount of senior securities representing indebtedness. We have excluded our SBA-guaranteed debentures from the asset coverage calculation as of December 31, 2018, 2017, 2016, and 2015 pursuant to the exemptive relief granted by the SEC in June 2014 that permits us to exclude such debentures from the definition of senior securities in the 200% asset coverage ratio we are required to maintain under the 1940 Act. Asset coverage per unit is expressed in terms of dollar amounts per $1,000 of indebtedness.

(6) The ratio of waived incentive fees to average net assets was 0.00%, 0.40%, 0.65%, and 0.40% for the years ended December 31, 2018, 2017, 2016 and 2015, respectively. There were no waived incentive fees for the year ended December 31, 2014.

(7) Includes the impact of different share amounts used in calculating per share data as a result of calculating certain per share data based on weighted average shares outstanding during the period and certain per share data based on shares outstanding as of a period end or transaction date.

(8) The ratio of waived management fees to average net assets was 0.09% for the year ended December 31, 2014. There were no waived management fees for the years ended December 31, 2018, 2017, 2016 and 2015.

**Note 16. Selected Quarterly Financial Data (Unaudited)**

| | For the quarter ended | | | |
|---|---|---|---|---|
| (Dollars in thousands, except per share data) | December 31, 2018 | September 30, 2018 | June 30, 2018 | March 31, 2018 |
| Total investment income | $11,308 | $ 11,530 | $11,882 | $12,572 |
| Net investment income | $ 3,501 | $ 3,851 | $ 4,231 | $ 4,438 |
| Net increase (decrease) in net assets resulting from operations | $(9,201) | $(11,916) | $ 4,948 | $ 141 |
| Net investment income per share[1] | $ 0.22 | $ 0.24 | $ 0.26 | $ 0.28 |
| Net increase (decrease) in net assets resulting from operations per share[1] | $ (0.57) | $ (0.74) | $ 0.31 | $ 0.01 |
| Net asset value per share at end of period | $ 11.88 | $ 12.71 | $ 13.71 | $ 13.66 |

F-68

**CAPITALA FINANCE CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**December 31, 2018**

**Note 16. Selected Quarterly Financial Data (Unaudited) – (continued)**

| | For the quarter ended | | | |
|---|---|---|---|---|
| (Dollars in thousands, except per share data) | December 31, 2017 | September 30, 2017 | June 30, 2017 | March 31, 2017 |
| Total investment income | $11,600 | $12,312 | $12,362 | $14,815 |
| Net investment income | $ 4,220 | $ 4,410 | $ 703 | $ 6,191 |
| Net increase (decrease) in net assets resulting from operations | $ (587) | $ (5,753) | $ (5,525) | $ 4,881 |
| Net investment income per share[1] | $ 0.26 | $ 0.28 | $ 0.04 | $ 0.39 |
| Net increase (decrease) in net assets resulting from operations per share[1] | $ (0.04) | $ (0.36) | $ (0.35) | $ 0.31 |
| Net asset value per share at end of period | $ 13.91 | $ 14.21 | $ 14.97 | $ 15.71 |

(1)  Calculated based on weighted average shares outstanding during the quarter.

**Note 17. Subsequent Events**

Management has evaluated subsequent events through the date of issuance of the consolidated financial statements included herein. There have been no subsequent events that occurred during such period that would be required to be recognized in the consolidated financial statements as of December 31, 2018.

*Distributions*

On January 2, 2019, the Company's Board declared normal monthly distributions for January, February, and March of 2019 as set forth below:

| Date Declared | Record Date | Payment Date | Distributions per Share |
|---|---|---|---|
| January 2, 2019 | January 24, 2019 | January 30, 2019 | $ 0.0833 |
| January 2, 2019 | February 20, 2019 | February 27, 2019 | $ 0.0833 |
| January 2, 2019 | March 21, 2019 | March 28, 2019 | $ 0.0833 |

*Portfolio Activity*

On January 4, 2019, the Company invested $9.2 million in first lien debt and $0.9 million in membership units of Reliant Account Management, LLC.

On February 1, 2019, the Company invested $3.8 million in second lien debt of AAE Acquisition, LLC.

On February 27, 2019, the Company sold its warrants in B&W Quality Growers, LLC for $5.9 million.

*Borrowings*

On February 22, 2019, the Company completed an amendment to its Credit Facility that reduced its minimum net asset value to $150.0 million and reduced the minimum required asset coverage ratio to 2:1 debt-to-equity.

On March 1, 2019, the Company prepaid $15.7 million in outstanding SBA debentures for Fund II and relinquished the related SBIC license.

F-69

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### *(a) Evaluation of Disclosure Controls and Procedures*

As of December 31, 2018 (the end of the period covered by this report), we, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended). Based on that evaluation, our management, including the Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective and provided reasonable assurance that information required to be disclosed in our periodic SEC filings is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. However, in evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of such possible controls and procedures.

### *(b) Report of Management on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Management performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2018 based upon the criteria in the 2013 Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on management's assessment, management determined that the Company's internal control over financial reporting was effective as of December 31, 2018.

The Company's independent registered public accounting firm that audited the financial statements has issued an audit report on the effectiveness of our internal control over financial reporting as of December 31, 2018. This report appears on page F-2 of this Annual Report on Form 10-K.

### *(c) Changes in Internal Controls Over Financial Reporting*

Management has not identified any change in the Company's internal control over financing reporting that occurred during the fourth quarter of 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

None.

96

## PART III

We will file a definitive Proxy Statement for our 2019 Annual Meeting of Stockholders with the Securities and Exchange Commission (the "SEC"), pursuant to Regulation 14A, not later than 120 days after the end of our fiscal year. Accordingly, certain information required by Part III has been omitted under General Instruction G(3) to Form 10-K. Only those sections of our definitive Proxy Statement that specifically address the items set forth herein are incorporated by reference.

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by Item 10 is hereby incorporated by reference from our definitive Proxy Statement relating to our 2019 Annual Meeting of Stockholders, to be filed with the SEC within 120 days following the end of our fiscal year.

### ITEM 11. EXECUTIVE COMPENSATION

The information required by Item 11 is hereby incorporated by reference from our definitive Proxy Statement relating to our 2019 Annual Meeting of Stockholders, to be filed with the SEC within 120 days following the end of our fiscal year.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by Item 12 is hereby incorporated by reference from our definitive Proxy Statement relating to our 2019 Annual Meeting of Stockholders, to be filed with the SEC within 120 days following the end of our fiscal year.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by Item 13 is hereby incorporated by reference from our definitive Proxy Statement relating to our 2019 Annual Meeting of Stockholders, to be filed with the SEC within 120 days following the end of our fiscal year.

### ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by Item 14 is hereby incorporated by reference from our definitive Proxy Statement relating to our 2019 Annual Meeting of Stockholders, to be filed with the SEC within 120 days following the end of our fiscal year.

# PART IV

## ITEM 15. EXHIBITS AND CONSOLIDATED FINANCIAL STATEMENT SCHEDULES

    a.    The following documents are filed as part of this Annual Report:

The following consolidated financial statements are set forth in Item 8:

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting | F-2 |
| **Audited Financial Statements:** | |
| Consolidated Statements of Assets and Liabilities as of December 31, 2018 and December 31, 2017 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-4 |
| Consolidated Statements of Changes in Net Assets for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2018, December 31, 2017 and December 31, 2016 | F-6 |
| Consolidated Schedules of Investments as of December 31, 2018 and December 31, 2017 | F-7 |
| Notes to Consolidated Financial Statements | F-20 |

98

TABLE OF CONTENTS

b. Exhibits

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Articles of Amendment and Restatement[1] |
| 3.2 | Certificate of Limited Partnership of CapitalSouth Partners Fund II Limited Partnership[2] |
| 3.3 | Certificate of Limited Partnership of CapitalSouth Partners SBIC Fund III, L.P.[2] |
| 3.4 | Bylaws[1] |
| 3.5 | Form of Amended and Restated Limited Partnership Agreement of CapitalSouth Partners Fund II Limited Partnership[3] |
| 3.6 | Form of Amended and Restated Agreement of Limited Partnership of CapitalSouth Partners SBIC Fund III, L.P.[3] |
| 4.1 | Form of Common Stock Certificate[1] |
| 4.2 | Form of Base Indenture[4] |
| 4.3 | Form of Second Supplemental Indenture relating to the 6.00% notes due 2022, by and between the Registrant and U.S. Bank National Association, as trustee, including the form of Global Note[8] |
| 4.4 | Form of the Third Supplemental Indenture relating to the 5.75% convertible notes due 2022, by and between the Registrant and U.S. Bank National Association, as trustee, including the form of Global Note[9] |
| 10.1 | Form of Dividend Reinvestment Plan[1] |
| 10.2 | Form of Investment Advisory Agreement by and between Registrant and Capitala Investment Advisors, LLC[1] |
| 10.3 | Form of Custodian Agreement[1] |
| 10.4 | Form of Administration Agreement by and between Registrant and Capitala Advisors Corp.[1] |
| 10.5 | Form of Indemnification Agreement by and between Registrant and each of its directors[1] |
| 10.6 | Form of Trademark License Agreement by and between Registrant and Capitala Investment Advisors, LLC[1] |
| 10.7 | Form of Senior Secured Revolving Credit Agreement dated October 17, 2014, among Capitala Finance Corp., as Borrower, the lenders party thereto, and ING Capital LLC, as Administrative Agent, Arranger and Bookrunner[5] |
| 10.8 | Form of Guarantee, Pledge and Security Agreement dated October 17, 2014, among Capitala Finance Corp., as Borrower, the subsidiary guarantors party thereto, ING Capital LLC, as Revolving Administrative Agent for the Revolving Lenders and as Collateral Agent, and each Financing Agent and Designated Indebtedness Holder party thereto[5] |
| 10.9 | Form of Incremental Assumption Agreement, dated January 6, 2015, relating to the Senior Secured Revolving Credit Agreement, dated as of October 17, 2014, among Capitala Finance Corp., as borrower, the lenders from time to time party thereto, and ING Capital LLC, as administrative agent, arranger and bookrunner[6] |
| 10.10 | Form of Incremental Assumption Agreement, dated August 19, 2015, relating to the Senior Secured Revolving Credit Agreement, dated as of October 17, 2014, among Capitala Finance Corp., as borrower, the lenders from time to time party thereto, and ING Capital LLC, as administrative agent, arranger and bookrunner[8] |
| 10.11 | Form of Amendment No. 2 to Senior Secured Revolving Credit Agreement dated June 16, 2017, among Capitala Finance Corp., as Borrower, the lenders party thereto, and ING Capital LLC, as administrative agent, arranger, and bookrunner[10] |
| 10.12 | Form of Amendment No. 1 to Guarantee, Pledge and Security Agreement dated June 16, 2017, among Capitala Finance Corp., as Borrower, the subsidiary guarantors party thereto, ING Capital LLC, as Revolving Administrative Agent for the Revolving Lenders and as Collateral Agent, and each Financing Agent and Designated Indebtedness Holder party thereto[10] |
| 10.13 | Form of Amendment No. 3, dated as of July 19, 2018, to the Senior Secured Revolving Credit Agreement, dated as of October 17, 2014, among Capitala Finance Corp., as borrower, the lenders from time to time party thereto, and ING Capital LLC, as administrative agent, arranger and bookrunner, and First National Bank of Pennsylvania, as documentation agent.[11] |

99

| Exhibit Number | Description of Document |
|---|---|
| 10.14 | Form of Amendment No. 4, dated as of February 22, 2019, to the Senior Secured Revolving Credit Agreement, dated as of October 17, 2014, among Capitala Finance Corp., as borrower, the lenders from time to time party thereto, and ING Capital LLC, as administrative agent, arranger and bookrunner, and First National Bank of Pennsylvania, as documentation agent.[12] |
| 10.15 | Second Amended and Restated Limited Liability Company Agreement of Capitala Senior Loan Fund II, LLC (filed herewith) |
| 14.1 | Code of Business Conduct[1] |
| 14.2 | Code of Ethics[13] |
| 21.1 | List of Subsidiaries (filed herewith) |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14 of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14 of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.1 | Certification of Chief Executive Officer 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 32.2 | Certification of Chief Financial Officer 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |

(1) Previously filed in connection with the Pre-Effective Amendment No. 1 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-188956) filed on September 9, 2013.

(2) Previously filed in connection with Pre-Effective Amendment No. 2 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-188956) filed on September 16, 2013.

(3) Previously filed in connection with Pre-Effective Amendment No. 5 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-188956) filed on September 24, 2013.

(4) Previously filed in connection with Pre-Effective Amendment No. 2 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-193374) filed on May 21, 2014.

(5) Previously filed in connection with Capitala Finance Corp.'s report on Form 8-K filed on October 21, 2014.

(6) Previously filed in connection with Capitala Finance Corp.'s report on Form 8-K filed on January 8, 2015.

(7) Previously filed in connection with Capitala Finance Corp.'s report on Form 8-K filed on August 25, 2015.

(8) Previously filed in connection with Post-Effective Amendment No. 5 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-204582) filed on May 16, 2017.

(9) Previously filed in connection with Post-Effective Amendment No. 6 to Capitala Finance Corp.'s registration statement on Form N-2 (File No. 333-204582) filed on May 26, 2017.

(10) Previously filed in connection with Capitala Finance Corp.'s report on Form 8-K filed on June 21, 2017.

(11) Previously filed in connection with Capitala Finance Corp.'s report on Form 8-K filed on July 20, 2018.

(12) Previously filed in connection with Capitala Finance Corp's report on Form 8-K filed on February 28, 2019.

(13) Previously filed in connection with Capitala Finance Corp.'s Annual Report on Form 10-K filed on February 27, 2018.

c. Consolidated Financial Statement Schedules

100

No consolidated financial statement schedules are filed herewith because (1) such schedules are not required or (2) the information has been presented in the aforementioned consolidated financial statements.

**ITEM 16. FORM 10-K SUMMARY**

None.

101

TABLE OF CONTENTS

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  | Capitala Finance Corp. |
|---|---|---|
| Date: March 4, 2019 | By | /s/ Joseph B. Alala III |
|  |  | Joseph B. Alala III |
|  |  | Chief Executive Officer |
|  |  | *(Principal Executive Officer)* |
|  |  | Capitala Finance Corp. |
| Date: March 4, 2019 | By | /s/ Stephen A. Arnall |
|  |  | Stephen A. Arnall |
|  |  | Chief Financial Officer |
|  |  | *(Principal Financial Officer)* |
|  |  | Capitala Finance Corp. |
| Date: March 4, 2019 | By | /s/ Kevin A. Koonts |
|  |  | Kevin A. Koonts |
|  |  | Chief Accounting Officer |
|  |  | *(Principal Accounting Officer)* |
|  |  | Capitala Finance Corp. |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Joseph B. Alala III<br>Joseph B. Alala III | Chief Executive Officer, President and Chairman of the Board of Directors<br>*(Principal Executive Officer)* | March 4, 2019 |
| /s/ M. Hunt Broyhill<br>M. Hunt Broyhill | Director | March 4, 2019 |
| /s/ R. Charles Moyer<br>R. Charles Moyer | Director | March 4, 2019 |
| /s/ Larry W. Carroll<br>Larry W. Carroll | Director | March 4, 2019 |
| /s/ H. Paul Chapman<br>H. Paul Chapman | Director | March 4, 2019 |

102