# EXHIBIT 79

Page 1

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 2
      NOVAFUND ADVISORS, LLC,
 3
                  Plaintiff,              No. 3:18-cv-1023
 4                                           (MPS)
         vs.
 5
      CAPITALA GROUP, LLC,
 6
                  Defendant.
 7    -----------------------------x
 8    DOCKET NO. FST-CV-20-6045528-S    SUPERIOR COURT
 9    NOVAFUND ADVISORS, LLC,           JUDICIAL DISTRICT
                                        STAMFORD/NORWALK
10                Plaintiff,
                                        AT STAMFORD
11    vs.
12    SANDLER, O'NEILL & PARTNERS,
      LP,
13
                  Defendant.
14    -----------------------------x
15
16
17
                  VIRTUAL ZOOM VIDEOTAPED
18       30(b)(6) AND INDIVIDUAL DEPOSITION OF
                  JOSEPH ALALA, III
19
                  (Taken by Plaintiff)
20
                  Charlotte, North Carolina
21
                  Friday, February 5, 2021
22
23
24
      Reported by Andrea L. Kingsley, RPR
25
```

Page 6

1              P R O C E E D I N G S
2                    THE VIDEOGRAPHER:  We are going on
3        the record at 9:05 a.m., Friday, February 5,
4        2021.  This is media unit number 1 of the
5        remote video recorded deposition of Joseph
6        Alala taken in the matter of NovaFund
7        Advisors, LLC, versus Capitala Group, LLC, in
8        the United States District Court, District of
9        Connecticut, case number 3:18-cv-1023 (MPS),
10       and NovaFund Advisors, LLC, versus Sandler
11       O'Neill & Partners, LP, in the Judicial
12       District of Stamford/Norwalk at Stamford,
13       number FST-CV-20-6045528-S.
14              The witness for this remote video
15       deposition is located at 4201 Congress Street,
16       Charlotte, North Carolina 28209.  My name is
17       David Cooper.  I'm a certified legal
18       videographer with Veritext.
19              Will counsel and all attending please
20       identify themselves and who they represent.
21                    MS. O'TOOLE:  Good morning.  This
22       is Jill O'Toole on behalf of NovaFund
23       Advisors, plaintiff.
24                    MR. SHAPIRO:  Good morning.
25       Jonathan Shapiro on behalf of defendants

1      Capitala Private Advisors, Capitala Investment
2      Advisors and Capitala Specialty Lending Corp.
3                MR. SMITH:  Good morning.  Kevin
4      Smith of Wiggin and Dana on behalf of Sandler
5      O'Neill.
6                MR. FOLSOM:  Chris Folsom from
7      Aeton Law Partners also on behalf of
8      defendants Capitala Private Advisors, Capitala
9      Investment Advisors and Capitala Specialty
10     Lending Corporation.
11               MR. CORP:  I'm Robert Corp on
12     behalf of plaintiffs NovaFund Advisors.
13               MS. BAKER:  Alison Baker also on
14     behalf of plaintiff NovaFund Advisors.
15               THE VIDEOGRAPHER:  The court
16     reporter Andrea Kingsley will now swear in the
17     witness.
18               JOSEPH ALALA, being duly sworn, was
19       examined and testified as follows:
20   EXAMINATION BY
21   MS. O'TOOLE:
22       Q.    Good morning, Mr. Alala.
23       A.    Morning.
24       Q.    Before we again, I just want to cover a
25   few ground rules.  You did complete and execute an

1             You agree that you have a website for
2    your company; correct?
3                 MR. SHAPIRO:  Objection.  You can
4        answer.
5        A.    When you say my company, I don't know
6    what you mean.
7        Q.    Okay.  That's fair.  If there's any time
8    where I ask a question and you don't understand,
9    just let me know and I can rephrase it.
10            You agree that there is a website
11   www.capitalagroup.com?
12       A.    Correct.
13       Q.    What is that a website for?
14       A.    It's a website that -- it's for
15   marketing.
16       Q.    What companies is it for?
17       A.    I haven't looked at all the companies on
18   there but just marketing for different Capitala
19   entities.
20       Q.    Can you identify any of the Capitala
21   entities that use that website?
22       A.    No.  I haven't been on the website in a
23   while.
24       Q.    Did you authorize the setup of that
25   website?

Page 22

1      A.   It's the way I think about things.  It
2  could be holdco or anything.
3      Q.   Is that short, though, for holding
4  company?
5      A.   Some people use it for that.
6      Q.   Is there a specific Capitala entity that
7  you were referring to as the "Holdco"?
8      A.   No.
9      Q.   Is there a holding company for any of
10 the Capitala entities?
11     A.   Oh, I would have to see which entity and
12 look at the documents.  Structure documents.
13     Q.   How many different Capitala entities are
14 within the Capitala enterprise?
15          MR. SHAPIRO:  Objection.
16     A.   God, I have no idea.
17     Q.   Do you think it's more than 15?
18     A.   Definitely more than 15.  I would say
19 between 15 and 150.
20     Q.   I'm sorry, did you say 15 and 100?
21     A.   I said between 15 and 150.
22     Q.   Oh.  Gotcha.  Thank you.
23          Just going back to the web page where it
24 says that you have an active role on the investment
25 committees of each fund, I want to identify some of

```
1         Q.    If somebody asked you what CSLC is, how
2    would you describe it?
3         A.    I would describe it -- who's asking?
4         Q.    Say somebody on the street stops you and
5    says, "Mr. Alala, what is CSLC?"
6         A.    For marketing purposes, it's a permanent
7    capital vehicle that makes investments.
8         Q.    Whose money is it using to make
9    investments?
10        A.    Other people's money.  Investors' money.
11        Q.    I thought you said it has no investors.
12        A.    No, it's the marketing arm.
13        Q.    Marketing arm of what?
14        A.    Of doing small business investment.
15        Q.    Who's doing the small business
16   investing?
17        A.    The other investors invest.  It's just a
18   marketing entity.
19        Q.    Who is it a marketing entity for?
20        A.    For Capitala.
21        Q.    Which Capitala entity?
22        A.    Any investor that comes through it.
23   It's just a marketing entity.
24        Q.    I'm not trying to be difficult but I
25   don't understand.  How can an investor come through
```

Page 27

1  it if it has no investors?
2      A.   Well, it's just matching an opportunity
3  to an investor.  It doesn't come through the
4  vehicle.  It doesn't invest in that vehicle to
5  invest in a company.
6      Q.   Can you give me an example of how CSLC
7  has been used as a marketing arm?
8      A.   We find an investment and we put an
9  investor in it and they invest directly into the
10 opportunity.
11     Q.   So that could be an investor, for
12 example, that -- when you find an investment that
13 could be, for example, a loan; correct?
14     A.   Yes.
15     Q.   Is this correct:  You might identify a
16 company that you would like -- that you think it
17 would be a good opportunity for Capitala to make a
18 loan to?
19     A.   Yes.
20     Q.   But then -- and you identify the loan as
21 an investment, and then the investor actually makes
22 the loan; is that correct?
23     A.   Yes.
24     Q.   So in your example, what is CSLC's role,
25 in that example?

```
 1         A.    That's fine.
 2         Q.    What is the purpose of CG LLC if any?
 3         A.    Well, there is no purpose.  It's
 4   dissolved.
 5         Q.    When did it dissolve?
 6         A.    It dissolved past 12 to 18 months.
 7         Q.    Do you know if it dissolved in June of
 8   2020?
 9         A.    I would have to see the dissolution
10   papers.
11         Q.    Before it dissolved, did CG LLC have a
12   purpose?
13         A.    Yes.
14         Q.    What was it?
15         A.    It was providing advisory services to
16   small businesses.
17         Q.    What kind of advisory services?
18         A.    Anything.
19         Q.    Can you give an example?
20         A.    Yeah.  We had a client that was -- we
21   were helping find -- acquisitions for.  So buy-side
22   advisory services for that client.
23         Q.    I'm so sorry, Mr. Alala, I didn't catch
24   that last answer.  Would you mind repeating that?
25         A.    We had a client that we were performing
```

Page 38

```
1     buy-side advisory services for.  That was an
2     example.
3          Q.   What client was that?
4          A.   I have to get the name of it.
5          Q.   Did that client that CG LLC provided
6     buy-side advisory services for compensate CG LLC in
7     any way?
8          A.   Yes.
9          Q.   How much in compensation did CG LLC
10    receive for that?
11         A.   I would have to see the numbers.
12         Q.   When was that, do you know?
13         A.   It was over the past several years.
14         Q.   What is a buy-side advisory service?
15         A.   They were looking to buy some sort of
16    fin tech IT companies internationally and we were
17    helping them trying to find those.
18         Q.   And you don't remember the name of this
19    company?
20         A.   I wasn't -- it had an employee that did
21    most of the work.  I wasn't the main one providing
22    the work.
23         Q.   You're saying CG LLC had an employee?
24         A.   Yes.
25         Q.   Which employee was that?
```

```
 1         A.    It was technically -- it was an LLC that
 2   was run by Rick Dunham.
 3         Q.    You're saying that Rick Dunham was the
 4   employee?
 5         A.    I think it actually paid his LLC versus
 6   paying him as an employee.  I think it was a 1099.
 7         Q.    What was his company called?
 8         A.    I can't recall.
 9         Q.    Do I understand this correctly, CG LLC
10   contracted with Mr. Rick Dunham or his company to
11   provide the buy-side services that were provided to
12   this client you referred to that you don't know the
13   name of?
14         A.    Yes.
15         Q.    Are there any other instances where CG
16   LLC provided advisory services to a small business?
17         A.    Yes.  We got some fees from referring
18   deals out.  Things like that.  Yup.
19         Q.    Fees from -- I missed the end of that.
20   Fees for what?
21         A.    Referring deals to other groups.
22         Q.    How much?
23         A.    I would have to see the financials.
24         Q.    Do you know when that was?
25         A.    Past few years.
```

```
 1        Q.    What deals did you refer to other
 2   groups?
 3        A.    I have no idea.  There's so many of
 4   them.
 5        Q.    What other groups?
 6        A.    Other investment bank type groups that
 7   would take it and go get a fee from it.
 8        Q.    How did CG LLC receive its compensation,
 9   payments?
10        A.    From its customers.
11        Q.    But how?  So did it receive it by wire,
12   by check?
13        A.    I don't know.
14        Q.    Can you think of the names of any
15   specific clients for which CG LLC provided advisory
16   services?
17        A.    No.
18        Q.    Are you the chairman and CEO of CG LLC?
19        A.    I don't think there is a chairman or
20   CEO.
21        Q.    What positions if any did you hold with
22   CG LLC before it dissolved?
23        A.    I was probably managing member.
24        Q.    Are you still the managing member?
25        A.    It's dissolved.
```

1        quick questions.
2             Q.    I would like to see Mr. Alala if we can
3    agree on an abbreviation for some of the various
4    entities that have Capitala in their name.  Do you
5    ever refer to them like together as Capitala?
6             A.    Whoa, what?
7             Q.    I'm trying to figure out if there's a
8    way for us to agree on any abbreviations for some of
9    the entities that have Capitala in their name.  With
10   that in mind, let me ask you a couple questions.
11            Do you ever use the term Capitala?
12            A.    Capitala?
13            Q.    Yes.  Do you ever use that term?
14            A.    Yes.
15            Q.    When you use the term Capitala, what
16   entities are you referring to?
17            A.    Oh, my God, there's so many of them.
18   That's why we have to be very technical on how we
19   acronym these things.
20            Q.    Okay.  So when you use the term
21   Capitala, you could be using it to describe any
22   number of different Capitala entities; is that fair?
23            A.    I mean, if I'm just saying Capitala you
24   would have to be more defined.
25            Q.    You can disagree with this.  Is it all

1      A.     I would have to look at the GP docs, but
2    typically that's what it is.
3              MR. SHAPIRO:  Jill, whenever you
4       get a second for a break, let me know.
5              MS. O'TOOLE:  Sure.
6      Q.     As corporate representative of CIA or
7    CPA, you don't know who the general partner for Fund
8    V is?
9      A.     I don't know the exact name.
10     Q.     Do you know roughly what the name is?
11     A.     Capitala something.
12     Q.     Is it part of the Capitala family?  I
13    think you used that term before.
14     A.     I mean, there's a lot of Capitala
15    entities, yes.  The name is Capitala.
16             MS. O'TOOLE:  Jon, just bear with
17       me for a moment if you can.
18     Q.     Did you agree the term sheet was signed
19    on or about May 9, 2016?
20     A.     It was spring of '16, yes.
21     Q.     Do you believe it was in early May 2016?
22     A.     I believe that's the spring time frame,
23    yes.
24     Q.     By the time NovaFund was hired, Capitala
25    already had a draft of a private placement

1     '16.
2          Q.   Do you agree that CG LLC never
3     terminated the term sheet with NovaFund?
4               MR. SHAPIRO:  Objection.
5          A.   I am not sure.
6          Q.   Do you recall ever telling NovaFund that
7     CG LLC was terminating the term sheet?
8               MR. SHAPIRO:  Objection.
9          A.   I'm not sure.
10         Q.   Do you agree that NovaFund never
11    terminated the term sheet with CG LLC?
12         A.   I'm not sure.
13         Q.   Do you remember anybody from NovaFund
14    ever calling you and telling you that they were
15    terminating the term sheet?
16         A.   I don't recall any.
17         Q.   Do you agree that the first closing for
18    Fund V was in fact the only closing for Fund V?
19         A.   Yes.
20              MS. O'TOOLE:  I think we're at a
21         good point for a break.  May we please go off
22         the record.
23              THE VIDEOGRAPHER:  The time is
24         approximately 11:51:56 a.m.  We are now off
25         the record.

Page 119

1    the court notifying CG LLC that if it did not obtain
2    replacement counsel, CG LLC could be defaulted?
3         A.    No.
4         Q.    Did you understand that at some point in
5    time a default could be taken against CG LLC in the
6    federal action?
7         A.    Yeah.  Yeah.
8         Q.    Were you okay with that?
9         A.    Never okay with a default, but the
10   entity had to be dissolved, it couldn't support
11   itself anymore.
12        Q.    Why couldn't CG LLC support itself
13   anymore?
14        A.    It burned through all its resources.
15        Q.    What resources?
16        A.    Resources to pay legal bills.
17        Q.    Did CG LLC have any income in 2019?
18        A.    I'm not sure.
19        Q.    Did CG LLC have any income in 2020?
20        A.    I'm not sure.
21        Q.    Do you know if CG LLC had any income in
22   2018?
23        A.    I'm not sure.
24        Q.    2017?
25        A.    I'm not sure.

Page 120

1      Q.    2016?
2      A.    Not sure.
3      Q.    Was the plan to allow CG LLC to dissolve
4   so that it had no assets?
5            MR. SHAPIRO:  Objection.
6      A.    No.  It dissolved because it had no
7   assets.  It used them all.
8      Q.    Is it also fair to say then that in
9   2020, CG LLC had no source of income?
10           MR. SHAPIRO:  Objection.
11     A.    I don't know.  I would have to look at
12  the tax returns.
13     Q.    Meaning your personal tax returns?
14     A.    Yes.
15     Q.    Did CG LLC file any tax returns?
16     A.    No.  It was wholly owned by me so it's
17  on my tax returns.
18           MR. SHAPIRO:  Objection.
19     Q.    Do you agree that CG LLC was -- agreed
20  to have RBH file the motion to withdraw as counsel?
21     A.    I know we told them we're not paying
22  them anymore.  So I don't know if we agreed to it
23  or what.
24     Q.    Why did you tell them that you weren't
25  going to pay them anymore?

Page 269



Page 270



Page 325

STATE OF NORTH CAROLINA

WAKE COUNTY

REPORTER'S CERTIFICATE

I, Andrea L. Kingsley, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me on Friday, the February 5, 2021, the person hereinbefore named, who was by me duly sworn via Virtual Zoom to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand this the 9th day of February, 2021.



Andrea L. Kingsley, Notary Public

Notary Public #201903800023