# EXHIBIT 82

Page 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

NOVAFUND ADVISORS, LLC,            )
                                   )
       Plaintiff,                  )
                                   )
   vs.                             ) No. 3:18-cv-1023(MPS)
                                   )
CAPITALA GROUP, LLC, et al.,       )
                                   )
       Defendants.                 )

CONFIDENTIAL - ATTORNEYS' EYES ONLY

         30(b)(6) deposition of KEMPER CORPORATION, by
and through its representative JONATHAN WILSON, taken
remotely before NADINE J. WATTS, CSR, RPR, and Notary
Public, pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining to the
taking of depositions, at 8:15 a.m. Central Time on the
23rd day of December, A.D., 2020.

Page 27

1  capital call I mean our first time deploying capital in
2  to it -- is October 3rd.
3      Q   Okay.
4      A   So the actual legal close might -- You could be
5  correct then.
6      Q   Okay.  That's fair.  What amounts were invested
7  by Kemper in the first closing of Fund V?
8      A   15 million.
9      Q   And that amount was technically invested by
10 Trinity Universal Insurance Company, right?
11     A   That is correct.
12     Q   I'm going to show you what has been marked as PX
13 56.
14         (Document marked as Deposition
15          Exhibit PX 56 for identification.)
16     Q   Yes, and just -- Sorry, it was an artful
17 question by me, so I'm going to rephrase it.  I had
18 asked you what amounts were invested by Kemper in the
19 first closing.  I'm going to ask what amounts were
20 committed by Kemper in the first closing of Fund V?
21     A   Yes, 15 million.  That's how I interpreted your
22 question.
23     Q   Yes.  Thank you.
24         So the next exhibit is PX 56.  It's tab 22 in

Page 143

1  accommodate that request.
2           I hope that works for everybody.  If for some
3  reason somebody thinks that's unreasonable, we can
4  address it at that time.
5       MR. CORP:  Q  Great.  Before I lose any more time,
6  I'm going to get back to my part of the deposition.
7  Thank you.
8           So moving along, the next document is going to
9  be marked as PX 63.  It's tab 25 in your binder.  It's
10 Bates stamped as KEMPER 002337.
11          (Document marked as Deposition
12          Exhibit PX 63 for identification.)
13     A   Yes, I see that.
14     Q   And do you recognize this document?
15     A   This is our internal -- you know, we call it a
16 straight ticket for this -- for this investment.  This
17 is Alternative Biomedical Solutions, LLC.
18     Q   And so is the entirety of this document, all 41
19 pages, is it all part of the trade ticket?
20         It very well might be.  I don't know what your
21 trade tickets look like, but I was just trying to
22 understand -- My layman's eye, I was just a little bit
23 confused by the collection of pages here.
24     MR. FURTON:  I'm going to clarify.  When you say

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

1   MR. CORP:  Q   Okay.
2        A    The next page is wire instructions directly from
3   the fund's flow to kind of verify the amounts that need
4   to be on our Kemper wire page, on the page before.  The
5   following page is a summary of the deal from a Kemper
6   standpoint.
7        Q    Okay.
8        A    So now I'm on 2341.  It's just showing
9   calculations of yields.
10       Q    Okay.
11       A    And then 2342 through 2354 is the balance of the
12  trade ticket.  And we pull that information from credit
13  documents to give the key economic terms that kind of
14  support the security or loan that we are purchasing.  So
15  I would say the trade ticket component ends at 2354.
16       Q    Okay.
17       A    And potentially 2356.  I just -- I don't recall.
18  That's the cash flows, the contractual cash flows, from
19  this loan.
20       Q    Okay, understood.  That's very helpful.  Thank
21  you.
22            On the first page of this document -- Or I
23  guess I'll say on the first page of this exhibit -- For
24  the record, the exhibit is KEMPER 002337 through KEMPER

Page 146

1  0023376, which is a collection of documents I suppose,
2  but it's one exhibit proper.
3         On the first page of the exhibit the header is
4  United Insurance Company of America.  Do you see that?
5     A   Yes.
6     Q   What is United Insurance Company of America?
7     A   It's a wholly owned subsidiary of Kemper Corp.
8     Q   Okay.  Was United Insurance Company of America
9  used to warehouse assets for Capitala?
10       MR. FURTON:  Objection as to form.
11       THE WITNESS:  In this case, it was.  I'd have to see
12  the other documents to make sure it was used in the
13  same -- United Insurance was used for those as well.
14  But in this case, yes.
15       MR. CORP:  Q   Okay.  So it's possible that there
16  were other Kemper entities that were doing the
17  warehousing in connection with Fund V that we talked
18  about earlier?
19    A   So, again, I'd have to see it.  United Insurance
20  Company of America, Trinity Universal Insurance Company
21  and Kemper Corp., but nothing here involves Kemper Corp.
22    Q   Okay.
23    A   We make all -- All of the investments that I'm
24  responsible for we'll make out of Trinity Universal

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 147

1 Insurance Company, the Fund V commitment. Individual
2 loans, we generally make them out of United Insurance
3 Company of America.
4     Q   So within the same exhibit, if not the same
5 document, I'm going to ask you to turn to the Bates
6 ending in 372. I'm looking at both -- What is the
7 document on page 372? Is it in connection with the
8 prior page, on 371, or is it -- is this wire transfer
9 request like a standalone document?
10     A   371 is not related to 372.
11     Q   Okay. Is 372 related to 373?
12     A   Yes.
13     Q   Is it related to 374?
14     A   Yes.
15     Q   So what are -- What is 372 through 374?
16     A   So we made a warehouse loan under the warehouse
17 construct to CIS Secure Computing, Inc. That term loan
18 was made -- I don't see the trade ticket here. But at
19 the beginning of this exhibit, that's for a different
20 Alternative Biomedical Solutions warehouse.
21         So there was a trade made for the warehouse --
22 or for a warehouse asset to CIS Secure Computing, Inc.
23 And my recollection, this is using this information, the
24 economic arrangement we made with Capitala for this

Page 148

1 warehouse asset was -- we would split the upfront fees.
2     Q   Go ahead. Sorry.
3     A   And so the mechanics of how this worked
4 necessitated us to pay a wire directly to Capitala for
5 that -- the closing of that particular deal.
6     Q   Okay. Is that -- Is this transaction related to
7 Fund V?
8     A   Only in the sense that we would have made this
9 investment in connection with warehousing at -- for Fund
10 V.
11     Q   And page 372 and the wire -- on the transfer to
12 part of the wire, the account name that the wire's being
13 made to is Capitala Investment Advisors, correct?
14     A   Yes, that's what it says.
15     Q   The following page, 373, appears to be an
16 invoice from Capitala Investment Advisors to United
17 Insurance Company related to this warehousing in
18 connection with Fund V, correct?
19     MR. SHAPIRO: Object to the form.
20     THE WITNESS: Correct. That's just the notice that
21 we require in writing wire instructions and amounts for
22 support purposes.
23     MR. CORP:  Q   Okay. Why -- If you know, why were
24 payments being made to Capitala Investment Advisors?

Page 149

1    MR. SHAPIRO:  Object to the form.
2    THE WITNESS:  I don't know why that entity was
3    chosen.
4    MR. CORP:  Q   Okay.  And does the handwriting on
5    373 -- How does the handwriting on 373 relate to the
6    calculations that are done on 374 about which -- who is
7    getting what fees?
8    A   I'm just reading.  I'm familiarizing myself.
9    Hang on.
10        So the handwriting on 373 is -- The first 50
11   percent of upfront fees to be paid to Capitala
12   post-close, that's my handwriting.  Refer to CIS Secure
13   Computing Trade, that is an analyst of mine's
14   handwriting.  2374, recons, how they come up with that
15   amount.
16   Q   Okay.
17   A   So they tell us 68,185,000.  Our own process is
18   to say, is that the right amount, do we agree with that.
19   That's what this worksheet is saying.
20   Q   Okay.  Do you recall how many transactions were
21   made -- Do you recall how many instances there were
22   where Kemper warehoused assets in connection with Fund
23   V, similar to the one that we're looking at here?
24   MR. SHAPIRO:  Object to the form.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1   A   Yes, I'm CC'd.
2   Q   What is this document?
3   A   An e-mail to Nayef and myself and -- asking if
4   Kemper or Hamilton Lane would like to charge any legal
5   fees back to Fund V.
6   Q   And you're not aware that Kemper has been
7   charging legal fees to the Fund V?
8   A   I am not aware of that.
9   Q   The final full paragraph in Mr. Alala's e-mail
10  states, the principals involved in this fraud are bad
11  people and we suggest nobody do business with them and
12  their respective placement agent firms.  Do you see
13  that?
14  A   I see that.
15  Q   What is your reaction to that e-mail, to that
16  language?
17  A   We didn't have the relationship with NovaFund
18  prior to the Fund V.  You know, I don't know what my
19  take would be if they knocked on my door tomorrow.  But
20  I don't take that as beyond anything of there's a
21  challenge certainly in the relationship there.  But we
22  didn't make any business decisions, you know, preemptive
23  or reactive from that paragraph.
24  Q   Have the communications with Mr. Alala about

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 158

1   NovaFund impacted how Kemper sees NovaFund?
2        MR. SHAPIRO:  Object to the form.
3        THE WITNESS:  Yes, I think it's -- It's not --
4   Again, we had no relationship prior to.  So I don't have
5   good interactions to counterbalance there.
6             I'm objective enough to realize it's coming
7   very one sided here.  So I think I'd take it with a
8   little bit of a grain of salt.  But with no prior
9   relationship to NovaFund, I don't have anything else to
10  really compare that to.
11       MR. CORP:  Q   Okay.  So is it fair to say the
12  communications with Mr. Alala about NovaFund would color
13  any outreach by the placement agents associated with
14  NovaFund if they were to reach out to Kemper?
15       MR. FURTON:  Objection to form.
16       MR. SHAPIRO:  Object.
17       THE WITNESS:  It seems kind of hypothetical, but I
18  can't not unhear what I've heard.
19       MR. CORP:  Q   Fair enough.  My last document is
20  going to be PX 54, which is tab 27 in your binder.  Just
21  like a couple really quick questions.  I'm going to push
22  60 seconds over my deadline, but I'm pretty good here.
23       MR. FURTON:  That's fine, Robert.
24             (Previously marked Deposition

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

1      Witness my official signature and seal as
2   Notary Public in and for Cook County, Illinois on this
3   6th day of January, A.D. 2021.
4
                              *Nadine J. Watts*
5                        _____
                         NADINE J. WATTS, CSR, RPR
6                        License No. 084-002736
                         Notary Public
7                        One North Franklin Street
                         Suite 3000
8                        Chicago, Illinois 60606
                         Phone:  (312) 442-9087