# EXHIBIT 84

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3              DISTRICT OF CONNECTICUT
 4
 5   NOVAFUND ADVISORS, LLC,     )
                                 )
 6            Plaintiff,         )
                                 )
 7        vs.                    )   No.
                                 )   3:18-cv-1023(MPS)
 8   CAPITALA GROUP, LLC, et     )
     al.,                        )
 9                               )
              Defendants.        )
10   ------------------------    )
11
12
13
14
15                 January 8, 2021
16                   9:38 a.m.
17
18        Videoconferenced deposition of JASON
19   MENT, held virtually with the witness located
20   in Larchmont, New York, pursuant to Rule
21   30(b)(6) notice, before Laurie A. Collins, a
22   Registered Professional Reporter and Notary
23   Public of the State of New York.
24
25
```

```
                                                     Page 14
 1                       Ment
 2   What do you mean by -- you referred to coinvesting
 3   alongside a sponsor's fund.  What is sponsor fund?
 4        A.    Sponsor is an investment management
 5   firm that organizes private capital.
 6        Q.    And by "private capital" what do you
 7   mean?
 8        A.    Money that is organized in an
 9   investment vehicle that is not registered on the
10   Investment Company Act of 1940.
11        Q.    So that would be different than, for
12   example, an individual who might buy a share of
13   Coca-Cola, for example, which would be a public
14   security; right?
15        A.    Materially different, yes.
16        Q.    Mr. Ment, you graduated from Cornell
17   University with a bachelor of science; correct?
18        A.    Correct.
19        Q.    What year?
20        A.    1999.
21        Q.    And you also have a law degree from New
22   York University School of Law?
23        A.    Correct.
24        Q.    I'd like to show you what we've marked
25   as Plaintiff's Exhibit PX 65, which is a subpoena
```

Page 37

1           Ment
2      A.    For the purposes of -- I think that may
3    prove to be confusing.
4      Q.    Okay.  Let's take it this way:  For
5    ease of reference at times when I refer to the
6    term "StepStone Group" I'll be referring to both
7    StepStone Group and Swiss Capital --
8      A.    Okay.
9      Q.    -- as you defined them.  And if it
10   becomes necessary to talk about a legal or
11   technical distinction between the entities, we can
12   do that at that time.
13     A.    Okay.
14     Q.    All right.  Thank you.
15           Are you also familiar with a company
16   called Capitala?
17     A.    I don't think that's the full company
18   name, but I'm familiar with a sponsor called
19   Capitala, yes.
20     Q.    What's the full entity name that you're
21   familiar with as the --
22     A.    I don't know what the full company name
23   is, but I'm pretty sure it's probably not just a
24   single word.
25     Q.    Okay.

1                    Ment
2       A.    So SCIHDL, or Swiss Capital Invest
3  Holdings -- can I do that?  Can I call it SCIHDL?
4       Q.    That was going to be my next question.
5       A.    We do SCAI and SCIHDL for the two Swiss
6  Capital entities.
7       Q.    Okay.
8       A.    So SCIHDL is the investment manager of
9  the SMA that was set up with Capitala, and then
10 investment -- the investment advisor function is
11 delegated -- SCIHDL as a manager has the power to
12 delegate, and it has delegated the authority to
13 Capitala.  I'd have to look at the IAA as to
14 whether or not the counterparty to the IAA is
15 SCIHDL or SMA.  It can be structured either way.
16      Q.    Let me do this.  If you could, could
17 you turn to PX 9.  I'd have you look at PX 9 and
18 PX 10 at the same time.  And those will be in the
19 Exhibit Share folder that you have access to.
20 They are also printed out, and those are at
21 respectively -- PX 9 is at Tab 4 of your binder
22 and PX 10 is at Tab 5.
23            (Pause.)
24      A.    Okay.  Got it.
25      Q.    So let's start with PX 9.  Do you

1                  Ment
2  recognize this document?
3       A.    From the production.
4       Q.    Yes.
5       A.    Yes.
6       Q.    And what is it?
7       A.    An e-mail from Shane Geraghty at Dillon
8  Eustace, who is Irish counsel, to Swiss Cap.
9       Q.    And is there a version -- you mentioned
10 the investment advisory agreement before; correct?
11      A.    Yep.
12      Q.    Is that sometimes referred to as an
13 IAA?
14      A.    Yes.
15      Q.    And do you recognize the document
16 that's attached to Mr. Geraghty's e-mail?
17      A.    Yep.
18      Q.    And what is that?
19      A.    It is the IAA for Capitala.
20      Q.    Is it consistent with your
21 understanding that there are two -- that -- sorry.
22            Do you agree that StepStone has two
23 SMAs with Capitala?
24            MR. SHAPIRO:  Object to the form.
25      A.    Yes.  There's an onshore and offshore.

Page 48

1                         Ment
2       Q.    Okay.
3             And how do you at StepStone refer to
4    the separately managed accounts at Capitala?  Did
5    I refer to that correctly?
6             MR. SHAPIRO:  Object to the form.
7       A.    How does StepStone -- I don't refer to
8    them.  Other than in connection with this
9    subpoena, I never would have talked about it.
10      Q.    In your corporate representative
11   capacity, is it correct that internally within
12   StepStone there are references to separately
13   managed accounts that were established with
14   Capitala?
15            MR. SHAPIRO:  Object to the form.
16      A.    Yes.
17      Q.    And you mentioned an onshore and an
18   offshore.
19      A.    Yes.
20      Q.    And is it correct that the attachment
21   to Exhibit 9 is the amended and restated
22   investment advisory agreement for the onshore
23   separately managed account with Capitala?
24      A.    That's right.
25      Q.    And do you see on the first page

1      Ment
2  there's a reference to the Swiss Capital Capitala
3  Private Debt Fund LP?
4      A.    Yes.
5      Q.    What's that?
6      A.    That would be the onshore SMA over
7  which Capitala was granted investment advisory
8  authority.
9      Q.    And what's your understanding of the
10 purpose of this IAA?
11     A.    It sets forth the obligations and
12 responsibilities of each party as it relates to
13 the prosecution of the investment strategy that's
14 been negotiated by the parties to invest the SMA
15 into credit opportunities.
16     Q.    Is it accurate to say that this
17 investment advisory agreement for the onshore SMA
18 is the document that governs the delegation of the
19 authority by SCIHDL as the investment manager to
20 the Capitala entity that's been designated as the
21 investment manager?
22     A.    That's right.
23     Q.    And for PX 10, do you recognize that
24 document?
25     A.    Yes.

1                         Ment
2        Q.    And what is this?
3        A.    This relates to the offshore SMA, but
4    same -- same purpose.
5        Q.    And is the offshore SMA the -- is the
6    correct name of the offshore SMA the, quote, Swiss
7    Capital Capitala Private Debt Offshore SP?
8        A.    Yeah.
9        Q.    And is it your understanding that the
10   investment advisory agreement that's attached to
11   PX -- going back to PX 9, is it your understanding
12   that that's the fully executed version of the
13   amended and restated investment advisory agreement
14   for the onshore SMA?
15              MR. SHAPIRO:   Object to the form.
16       A.    It appears to be, yes.
17       Q.    Is it correct that the amended and
18   restated investment advisory agreement for the
19   Swiss Capital Capitala Private Debt Fund LP was
20   executed in or about July 2nd of 2018?
21              MR. SHAPIRO:   Object to the form.
22       A.    That is my understanding.
23       Q.    Is it also your understanding that for
24   PC 10 the investment -- it's the fully executed
25   investment advisory agreement for the offshore

Page 134

1  Ment
2  managed account.  Among the other items listed
3  there, there are four dashes there.  Do you see
4  that?
5      A.    Yes, I see it.
6      Q.    What does it mean to work with Capitala
7  to onboard them onto the StepStone credit debt
8  platform via a separately managed account?
9      A.    Similar to establish was before one way
10 that we could talk about it.
11           Hi, Elaine.
12           Establish is one way to talk about it.
13 Onboard would be another way Swiss Capital talks
14 about the same thing, which is their onboarding
15 process is to establish an SMA vehicle and
16 negotiate the agreement with the sponsor who is
17 going to have investment authority over the
18 account.  So these are all part and parcel of the
19 same thing.  And so that's what that means.
20     Q.    And is it also fair to say that at the
21 time what Swiss Capital was anticipating was
22 having an allocation of about $100 million or more
23 per year to that SMA?
24     A.    Yes, that we would expect to allocate
25 that much.  That would not be a binding

Page 160

1    Ment
2    would originate $150 million of loans for the SMA
3    each year.
4        Q.   Does that also necessarily require
5    there to have been at least $150 million of funds
6    that could be used for the deployment by Capitala?
7        A.   Again, it's -- you're using the word
8    "commitment," and for better or worse it's our
9    structure softer than that.
10       Q.   I appreciate that.  My follow-up
11   question was, because you had said it would -- if
12   I understood your testimony correctly, it was
13   that -- the expectation was that Capitala would
14   originate loans in the amount of 150 million a
15   year; right?
16            And my follow-up question is does that
17   also mean -- does it necessarily mean there would
18   have had to have been at least 150 million in the
19   SMA in order for Capitala to make those loans.
20       A.   There's no money in the SMA.  Like the
21   SMA is not sitting on cash; right?  It has -- it
22   has soft commitments from the underlying client
23   SMAs to fund -- these are all within our
24   discretion; right?  Like we move -- Swiss Capital
25   moves the money.

1              Ment
2          So therefore the -- there is sufficient
3    capital behind the Capitala SMA to fund the loans
4    if the sponsor is able to originate sufficient
5    loans and we don't kill the SMA or kill the
6    investment period of the SMA.
7        Q.   So you agree if Capitala originated
8    $150 million of loans at some point there would be
9    a deposit into the SMA of $150 million in order to
10   fund those loans?
11       A.   If they originated 150 million of loans
12   that were in mandate or waived as being out of
13   mandate prior to us turning off deployment, yes.
14       Q.   Does page 3 of this document also
15   reflect what the anticipated fee structure would
16   be for the SMA?
17       A.   Yes.
18       Q.   And would these be the expected fees to
19   be paid to Capitala as opposed to a Swiss Capital
20   entity?
21       A.   That's right.
22       Q.   And under the investment period it
23   says, SMA as part of the SC private debt platform.
24          Is that the Swiss Capital private debt
25   platform?

Page 182

1   Ment - Confidential - Attorneys' Eyes Only
2   a week or so later.  That's around right.
3        Q.   Does it seem consistent with your
4   recollection that the risk committee approved the
5   SMAs as of -- on or about April 11th of 2018?
6             MR. SHAPIRO:  Objection.
7        A.   I have no recollection, but certainly
8   that's what the earlier report that we looked at
9   kind of was targeting a date around then.  And it
10  would have been done before the 18th when the SMAs
11  were signed, so that seems reasonable.
12       Q.   With respect to the executed versions
13  of the IAAs, just a couple quick follow-up
14  questions.  Is it correct that --
15       A.   Are we turning back to those?
16       Q.   I don't think we need to.  But I think
17  you can answer this without a document.
18            Is it correct that SCIHDL is authorized
19  and regulated by the Central Bank of Ireland?
20       A.   Yes, it is.
21       Q.   And is it also correct that SCIHDL is a
22  subsidiary of Swiss Capital Alternative
23  Investments AG?
24       A.   Yes, it is.
25       Q.   Before we were talking about how the

Page 183

Ment - Confidential - Attorneys' Eyes Only

1   flow of funds would work once the SMAs were
2   approved and set up.  Let me ask a couple of
3   follow-up questions, because I think you walked
4   through that before nicely.
5           Once the SMAs were set up, is it
6   correct that Capitala could then begin deploying
7   capital and arranging the loan?
8       A.    That would be my understanding.  I
9   didn't read the IAA word for word.  But unless
10  there's something in there that would prevent
11  that, that's generally how it would work, yeah.
12      Q.    Is it also correct that once the SMAs
13  were set up the loans could be made by the two
14  StepStone SMAs -- let me just start with that.  Is
15  that correct?
16          MR. SHAPIRO:  Objection.
17      A.    I don't understand the difference
18  between this question and the last question.
19      Q.    Once loans were -- once Capitala could
20  start making loans for the SMAs, could they also
21  be making -- could it be the case that the loan
22  was also made by other entities on Capitala's
23  platform?
24          MR. SHAPIRO:  Objection.

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400

Page 190

1              Ment
2  into loans, the money that's being repaid from the
3  loans, and therefore the net funded amount,
4  totaling to the net invested capital in the
5  far-right column.
6       Q.    Does this document reflect the cash
7  flows related to the StepStone Capitala SMAs?
8       A.    It doesn't say that anywhere, does it?
9  I hope so.
10            MR. MICHAEL:  I'm happy to stipulate
11       that that's what this is, and the top left
12       corner talks about onshore deployment, which
13       is another --
14       A.    Yeah -- I'm going to say yes.  I don't
15  know if this is Capitala's onshore or, you know,
16  Aria's onshore.  It doesn't say that on here.  But
17  if we produced it in response to a request for
18  something like this, then I will trust that we
19  didn't totally step in the poop here.
20       Q.    Okay. And I'm going to trust your
21  counsel's willingness to -- break his willingness
22  to stipulate that this does in fact relate to the
23  StepStone Capitala SMA.
24            What system is used to generate this
25  report?

Page 191

1            Ment
2      A.    This comes out of Aria.
3      Q.    And can you describe generally what the
4  Aria system is and what the purpose -- why is it
5  used?
6      A.    It's a system that was developed by
7  Swiss Capital that is at root a database, and it
8  is a means by which to track information about the
9  portfolios that we manage or that they manage and
10 therefore includes client SMA information, sponsor
11 SMA information, and then individual loan detail
12 as well.
13           So it's a database of all of that.
14     Q.    And is PX 88 a report generated from
15 the Aria system?
16     A.    That's my understanding, yes.
17     Q.    And is it your experience in dealing
18 with Aria that the reports generated from that
19 system are generated in the ordinary course of --
20 let me back up, actually.
21           Is it -- do you agree that the data and
22 information maintained in the Aria system is
23 maintained in the ordinary course of Swiss
24 Capital's regularly conducted business activities?
25     A.    Yes.

1                    Ment
2  deployment."  What does that mean?
3       A.    That this would be the deployment for
4  the onshore SMA.
5       Q.    I'm basically going to ask you to give
6  me a road map so we understand what the different
7  column headings mean.  So same page, column
8  heading committed to DL, what does that mean?
9       A.    Let me just zoom this up here a little
10 bit.
11            Okay.  So I believe that this is
12 showing how much was committed to the onshore SMA
13 at that date.
14      Q.    Do you know what the acronym Aria
15 stands for?
16      A.    I don't know if it is an acronym.
17      Q.    Okay.  I thought you earlier said it
18 was --
19      A.    I said it's like -- it's four letters
20 and it's all caps.  I actually don't know if it's
21 an acronym.  But the guy who used to run the
22 private debt business is totally into opera, so it
23 could be that.  I have no idea.
24      Q.    Next column, committed to DL net, do
25 you know what that means?

Page 203

1                     Ment
2       A.    Yes.
3       Q.    What does that column heading mean?
4       A.    I don't know what the base reference
5   is, but presumably there's a loan commitment and
6   then there's the actual amount funded.  And
7   whether that means some wasn't funded and could be
8   called over time or some amount of that was --
9   went to fees or what-have-you, I can't -- I can't
10  say.
11            It's probably a little bit different
12  for some rather than others.  Some look like they
13  could have been related to some type of fee
14  structure, and then others it looks like -- for
15  instance, the American Landscaping Partners, that
16  looks like a delayed draw facility where it's
17  drawn over time.
18      Q.    I was going to ask what a delayed draw
19  facility was.  Is that just a loan that's been
20  made by the borrower has the option to just take
21  the amount of the money over time?
22      A.    That's right.
23      Q.    What does the funded to borrowers
24  column mean?
25      A.    I read that to mean the amount that was

|   | Page 213 |
|---|---|

1                      Ment

2 situations.

3     Q.    How about any clarifications on the DL

4 loans repaid or DL loans funded net or net

5 invested capital over time column headings?

6     A.    I think the rest we kind of -- we

7 covered already.

8     Q.    Okay.  Okay.

9          All right.  Just stepping back for a

10 minute, Mr. Ment, do you agree that when an

11 investment is made by the SMAs capital from those

12 SMAs is then deployed?

13     A.    I'm sorry, say it one more time.

14     Q.    Sure.  So if a loan is made by the SMA,

15 is it also the case that capital from those SMAs

16 is deployed to make those loans?

17     A.    If the loan is funded, capital would be

18 deployed to fund the loan.  Again, the loan could

19 be committed but not have cash move.

20     Q.    In the instance where a loan might be

21 on a delayed draw, then capital would be deployed

22 as the loan is drawn; is that correct?

23     A.    Sure.  Again, subject to any

24 discount -- subject to any discount that deducts

25 against the funded amount versus the borrowed

Veritext Legal Solutions
212-267-6868                    www.veritext.com                  516-608-2400

Page 311

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That JASON MENT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January 2021.

*[Signature]*

LAURIE A. COLLINS, RPR