# EXHIBIT 85

Page 1

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
 2   _____/
 3                  CASE NO.:  3:18-CV-1023 (MPS)
 4   NOVAFUND ADVISORS, LLC
 5             Plaintiff,
 6   vs.
 7   CAPITALA GROUP, LLC,
 8             Defendant.
     _____/
 9
                  DOCKET NO. FST-CV-20-6045528-S
10                Superior Court Judicial District
                  Stamfod/Norwalk at Stamford
11
     NOVAFUND ADVISORS, LLC,
12
               Plaintiff,
13   vs.
14   SANDLER, O'NEILL & PARTNERS, LP
15             Defendant.
     _____/
16
              DEPOSITION OF CASEY SWERCHECK
17
18
19
20
21        Wednesday, February 17, 2021
              9:37 a.m. - 5:25 p.m.
22            Remote Proceedings
23
24        Stenographically Reported By:
          Gina Rodriguez, RPR, CRR, CCP
25
```

Page 16

1      Q.   How did it come out that you had got a job
2  offer at Capitala?
3      A.   Well, simply put, Hamilton Lane wanted to
4  he move us back to -- things were going well, that
5  program grew in scale.  We started with 250 million
6  under management, that program today is a billion.
7  They were happy with how things were going, but they
8  simply wanted to move us back to Philadelphia.  And
9  my wife being from Pittsburgh, we had one winter in
10 South Florida, and we said no.
11     Q.   And when you began at Capitala, what was
12 your title?
13          MR. SHAPIRO:  Objection.
14     A.   I joined as a vice president.
15 BY MS. O'TOOLE:
16     Q.   Who was your employer?
17     A.   You mean the entity or who did I work for?
18     Q.   Both.
19     A.   I always viewed my role as reporting
20 directly to Joe.  When I started, my role was focused
21 almost squarely on fundraising -- or, excuse me, on
22 deal sourcing within the Florida market.
23          Capitala always had sort of a
24 hub-and-spoke model, which you've probably come to
25 realize, with the headquarters in Charlotte, and

Page 17

1  then multiple sourcing offices around the country.
2  Florida was a key market for the firm, but there was
3  no office at the time in Florida.  So Joe wanted to
4  establish one.
5       Q.   And I believe in your answer you referred
6  both to the entity and who you reported to.  So what
7  entity was --
8       A.   Oh, I'm sorry.
9       Q.   That's okay.
10      A.   Yeah, a lot of entities within Capitala.  I
11 can't recall which one actually signed my paychecks,
12 put it that way.
13      Q.   Okay.
14           And when did you -- when you began working
15 for Capitala, physically where were you located?
16      A.   Fort Lauderdale.
17      Q.   Okay.  So Florida, not in North Carolina?
18      A.   That's correct.
19      Q.   Have you ever worked out of the North
20 Carolina office?
21      A.   No.
22      Q.   Okay.  And how long did you work at
23 Capitala?
24           MR. SHAPIRO:  Objection.
25      A.   I left in -- let's see.

1       A.    I'm familiar with Sandler O'Neill.
2       Q.    Okay.  Is it all right with you if we call
3  them "Sandler" today?
4       A.    Yes.
5       Q.    Okay.  Are you familiar with the term
6  "Capitala Group"?
7       A.    Yes.
8       Q.    What's that mean to you?
9       A.    That's a private equity firm in North
10 Carolina.
11      Q.    When you -- is it fair to say that you've
12 used the term "Capitala Group" before during the
13 course of your tenure?
14      A.    Yes.
15      Q.    When you used the term "Capitala Group,"
16 what entities are you referring to, if any?
17      A.    None specifically, but the organization.
18      Q.    And in your experience, was it common for
19 employees to refer to it as "Capitala" or "Capitala
20 Group"?
21            MR. SHAPIRO:  Object to the form.
22      A.    "Capitala."
23 BY MS. O'TOOLE:
24      Q.    Pardon?
25      A.    "Capitala."

Page 27

1    A.   I believe it was "Capitala Group," but I
2  don't recall.
3  BY MS. O'TOOLE:
4    Q.   Okay.  Did you have a business card while
5  you were working at Capitala?
6    A.   I did.
7    Q.   What name was on your business card?
8    A.   Capitala Group.
9    Q.   And did you have an understanding of what
10 entities that was meant to be a reference to?
11   A.   I didn't.
12        MR. SHAPIRO:  Objection.
13 BY MS. O'TOOLE:
14   Q.   And, Mr. Swercheck, I should have said:  As
15 one of the ground rules today, you may have -- there
16 may objections asserted by either Attorney Shapiro or
17 Attorney Smith, so after I ask a question, you may
18 just want to give them a moment's pause to allow them
19 to object.
20        And I do apologize because I didn't -- I
21 think that there was an objection at the same time
22 as your answer.  So I didn't catch your last answer.
23   A.   The question was:  What entities did
24 "Capitala Group" refer to?
25   Q.   Yes.

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 28

1    A.   Yeah, again, "Capitala Group," to me,
2  referred to the private equity firm in North Carolina
3  that I worked for.  I didn't spend a lot of time
4  trying to parse the underlying entities and legal
5  formations within Capitala.
6    Q.   To your knowledge, how many entities were
7  there associated with Capitala during your tenure?
8    A.   I don't recall.
9    Q.   Is it more than -- to your knowledge, was
10 it more than ten?
11   A.   I don't recall.
12   Q.   Okay.
13        Did you -- was there a specific website
14 for the Florida office of Capitala Group?
15   A.   No.
16   Q.   How many people worked out of the South
17 Florida office?
18   A.   One.
19   Q.   Just you?
20   A.   Just me.
21   Q.   Was that office space leased or owned, if
22 you know?
23   A.   Leased.
24   Q.   Do you know which entity signed the lease?
25   A.   I don't.

Page 128

1  through activities in the capital markets with third
2  parties, and these are sort of our house accounts, so
3  to speak.
4  BY MS. O'TOOLE:
5       Q.   Did you ever tell NovaFund that they could
6  not contact any investors on the carve-out list?
7       A.   About Fund V?
8       Q.   Yes.
9       A.   Yes.
10      Q.   When?
11      A.   We did in phone calls over time with --
12  with Nova.
13      Q.   Do you recall what time period?
14      A.   Throughout.  Again, a carve-out list is a
15  pretty common component of a placement agent
16  agreement.  So this wasn't something that needed to
17  be harped on, right?  We had agreed to a framework of
18  a carve-out list, and a max -- a cap of how much can
19  be raised from that universe.
20      Q.   Did you ever tell NovaFund that you
21  considered the carve-out list to be a do-not-call
22  list?
23      A.   It would -- I don't recall if we had that
24  conversation specifically.
25      Q.   And do you -- do you know if NovaFund -- do

Page 149

1  Q. Yes.
2  A. No, I don't recall.
3  Q. Do you believe -- is that because you
4  believe there were no such calls?
5       MR. SMITH: Objection.
6  A. Those -- there may have been. I was not a
7  part of, if there were.
8  BY MS. O'TOOLE:
9  Q. But you don't -- I appreciate that I'm
10 asking a double negative.
11      You don't remember participating in any
12 calls where NovaFund, Sandler, and Capitala were all
13 on, right?
14 A. I don't recall participating in those
15 calls, no.
16 Q. Okay. Are you familiar with an entity
17 known as Knights of Columbus?
18 A. I am -- I'm not.
19 Q. Do you know if that -- you don't know if
20 that's a potential investor?
21 A. I don't recall that name specifically as it
22 relates to Fund V.
23 Q. Okay. Let me show you what has been
24 previously marked as Exhibit 173.
25      Okay. Do you recognize this email chain?

Page 150

1       A.   Okay.
2       Q.   Do you recognize this document?
3       A.   I don't recall this exchange specifically,
4  no.
5       Q.   Okay.  Do you see the email that begins the
6  email chain from Kallie Hapgood on November 8th at
7  10:28 p.m.?
8       A.   At the bottom of this, yes.
9       Q.   Yeah.  Do you see it says:  "Casey, have
10 you reached out to Knights of Columbus in New Haven,
11 Connecticut?  I believe they are carve-out."
12           Do you see that?
13      A.   Yes.
14      Q.   Do you recall Ms. Hapgood reaching out to
15 you -- and she was with NovaFund, right?
16      A.   Right.
17      Q.   Okay.  Do you remember her -- does seeing
18 this refresh your recollection that in early November
19 she reached out to you to see if she could contact
20 Knights of Columbus?
21      A.   Do I recall her reaching out about
22 contacting them?
23      Q.   Yes.
24      A.   Yes.
25      Q.   Okay.  And you copied in Mr. Alala,

1  correct?
2       A.   Correct.
3       Q.   And you then respond to her on November 9th
4  at 7:42 a.m. saying:  "Kallie, I talked to Joe, and
5  we realized this name was inadvertently put on the
6  list."
7            Were you referring to the carve-out list?
8       A.   I can't recall specifically, but I believe
9  so.
10      Q.   Okay.  And you said:  "If you have the
11 ability to set up a meeting, please do so," right?
12      A.   Yes, I see that.
13      Q.   Okay.  And was that -- is it fair that you
14 were telling Ms. Hapgood it was -- you were giving
15 her the green light if she could reach out to Knights
16 of Columbus to set up a meeting about Fund V, she
17 should go ahead and do that, right?
18           MR SM:  Objection.
19      A.   Yes.
20 BY MS. O'TOOLE:
21      Q.   And in Mr. Alala's response to you, he
22 says:  "Casey Sandler has this relationship.  We can
23 remove from them, but Steve needs to think on that."
24           Do you see that?
25      A.   Yes.

Page 152

1       Q.   And you responded that -- you suggested:
2  "Kallie reach out as it sounds like she already has
3  the meeting teed up.  That is the path of more
4  certainty."
5            What did you mean by that?
6       A.   It sounds like this is one of the meetings
7  that -- again, Sandler had a handful of relationships
8  that might have been more institutional entities.
9            I still don't know who Knights of Columbus
10 is, but to the extent that Kallie had a line of
11 sight on a meeting, that we thought we should take
12 it.
13      Q.   Okay.  And when Mr. Alala wrote:  "Steve
14 needs to tell Sandler," what did you understand that
15 mean?
16      A.   If this was a relationship that they had,
17 whether or not this was -- this was one that was part
18 of -- was going to be part of their focus.
19      Q.   And did you understand Mr. Alala to be
20 saying that Steve Arnall needed to tell Sandler
21 O'Neill that NovaFund would be reaching out to
22 Knights of Columbus?
23      A.   I don't know what Mr. Alala was thinking at
24 this point.
25      Q.   And, again, I'm not asking what he was

1  thinking; I was asking what your interpretation was
2  at the time.
3          Was it your understanding, after having
4  read this, that he was saying to Mr. Arnall that --
5  sorry -- that he was saying Mr. Arnall needs to let
6  Sandler know that NovaFund would be reaching out to
7  Knights of Columbus?
8          MR. SMITH:  Objection.
9      A.  I don't recall what I was thinking at the
10 time.
11 BY MS. O'TOOLE:
12     Q.  Okay.  And then Mr. Arnall tells you:
13 "Casey, please tell Nova not to set up a meeting with
14 them.  This one is for Sandler."
15          Do you see that?
16     A.  Yes.
17     Q.  You then ask:  "Why not go for the sure
18 thing," right?
19     A.  Yes.
20     Q.  So is it fair to say this is a
21 back-and-forth debate between you and Mr. Arnall
22 about whether NovaFund or Sandler should reach out to
23 Knights of Columbus?
24          MR. SHAPIRO:  Objection.
25          MR. SMITH:  Objection.

Page 154

1    A.   I don't recall, specifically, the context.
2  BY MS. O'TOOLE:
3    Q.   Okay.  Mr. Arnall says, in response to you:
4  "Because it is on their carve-out list.  It's why we
5  have the list."
6         Did -- what did you understand Mr. Arnall
7  to mean by:  "It's why we have the list"?
8    A.   That there was a subset of investors,
9  again, very different than what NovaFund was to be
10 focused on, that Sandler would reach out to on our
11 behalf.
12   Q.   Not NovaFund, right?
13   A.   They were part of our carve-out list, yes.
14   Q.   You then respond:  "This is the issue of
15 having two agents, one of which is in the dark about
16 the other."
17        Do you see that?
18   A.   Yes.
19   Q.   And by that you meant that NovaFund was in
20 the dark about Sandler, correct?
21        MR. SMITH:  Objection.
22   A.   I don't recall specifically what I meant by
23 this.
24 BY MS. O'TOOLE:
25   Q.   Which agent were you saying was in the dark

Page 155

1  about the other one?
2       A.   I don't recall specifically.
3       Q.   Okay.
4            And do you agree that Sandler did not set
5  up a meeting, ultimately, with Knights of Columbus?
6       A.   I don't recall where we shook out on this
7  one.
8       Q.   Okay.  Do you -- do you know whether or not
9  Sandler even reached out to set up a meeting with
10 Knights of Columbus?
11      A.   I don't recall.
12      Q.   Capitala didn't set up a meeting with
13 Knights of Columbus for Fund V, right?
14      A.   That's correct.
15      Q.   Is it also correct that Capitala did not
16 even reach out to Knights of Columbus directly for a
17 Fund V investment?
18      A.   Directly on our own behalf, no, we did not.
19      Q.   May I please have you look at what we have
20 previously marked as Exhibit 175.
21           Do you recognize this email chain?
22      A.   I see it.  I don't -- I don't recall the
23 exchange.
24      Q.   Okay.  Do you see in your email to
25 Ms. Hapgood, you say:  "Knights of Columbus is an

Page 169

1    Q.   Okay.  I would like to show you what we'll
2  mark as Exhibit 201, which is a document bearing
3  Bates Stamp Number CAP_0047487.
4         (Thereupon, marked as Exhibit 201.)
5  BY MS. O'TOOLE:
6    Q.   And while that's loading, do you know
7  somebody named Kyle Largent from Gladstone Investment
8  Corporation?
9    A.   I can't say that name rings a bell.
10   Q.   Are you familiar with a company called
11 Gladstone Investment Corporation?
12   A.   No, I can't say off the top of my head that
13 I can.
14   Q.   Okay.  Do you see Exhibit 201 on the
15 screen?
16   A.   Yes.
17   Q.   Okay.  Do you recognize this email chain?
18   A.   I don't recall this email chain.
19   Q.   Okay.  Do you see Mr. -- who is Randall --
20 and I may not pronounce his name correctly?
21   A.   Fontes.
22   Q.   Fontes.
23        Who he is?
24   A.   Randall was a -- is a managing director
25 with Capitala and runs their Atlanta office.

Page 190

1  recommendations with you in the middle of -- in
2  mid-December 2016?
3       A.   I don't recall having the specific
4  discussion with them on this, but I'm sure we had
5  that discussion.
6       Q.   Do you remember generally that they were
7  making recommendations along this -- you know, along
8  the substantive points that are raised on this page?
9       A.   Candidly, at this point, they had already
10 been underperforming the mandate pretty severely, and
11 I don't remember a whole lot of interaction with
12 them.
13      Q.   As of mid-December 2016?
14      A.   Yes.
15      Q.   Okay.  When did you first tell NovaFund
16 that they could start reaching out to investors to
17 market Fund V?
18      A.   I don't recall a specific date, but it
19 would have been around the time of the first close on
20 the fund.
21      Q.   It would have been after the first close of
22 the fund, right?
23      A.   It may have been before the first close of
24 the fund.
25      Q.   The first close of the fund was

Page 191

1  August 31st, 2016?
2      A.   Yes.
3      Q.   Okay.  And do you recall any emails where
4  you -- where NovaFund was instructed to wait until
5  after the first close to begin marketing to
6  investors?
7      A.   That, I don't recall.
8      Q.   Okay.  Do you recall NovaFund telling you
9  in December 2016 that Capitala should shift to a
10 first lien strategy?
11          MR. SHAPIRO:  Objection.
12     A.   I don't recall that discussion with them
13 specifically.  I remember a lot of discussion around
14 that in investment committee and with our board for
15 the public BDC.
16 BY MS. O'TOOLE:
17     Q.   And on page 4, there's a summary.  Do you
18 see that page?
19     A.   No.  I don't.  I only see three pages.
20          MR. SMITH:  Hey, Jill, I am so sorry.  Can
21      we take just a two-minute break?  I need to make
22      a quick phone call.
23          MS. O'TOOLE:  Sure.
24          MR. SMITH:  Thank you.
25     (Recess was held from 3:23 p.m. until 3:30 p.m.)

Page 271

1  think Nova was trying, at that point, too hard.
2      Q.   Well -- and you said -- and you believe
3  that that happened sometime in 2017 after
4  Mr. Wheelahan's email?
5      A.   Yes.
6      Q.   Okay.  So is it fair to say that you
7  believe at some point NovaFund was told they could
8  begin meeting with investors again?
9      A.   I -- I do believe we got to that point
10 where we tried to find a path of resolution with
11 NovaFund, yes.
12     Q.   Okay.  And would it -- after Mr. Alala sent
13 his email threatening litigation on February 16th,
14 2017, did you have the expectation that NovaFund was
15 going to be reaching out to coordinate investor
16 meetings at that point in time?
17         MR. SHAPIRO:  Objection.
18     A.   I don't believe it was our expectation at
19 that very moment in time that they be reaching out on
20 our behalf, no.
21         MS. O'TOOLE:  Okay.  All right.  Well, why
22     don't we stop here and go off the record.
23         (Discussion off the record.)
24
25

Page 275

CERTIFICATE OF REPORTER

I, GINA RODRIGUEZ, Registered Professional Reporter, Certified Realtime Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of CASEY SWERCHECK; pages 1 through 271; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 5th day of March, 2021.

GINA RODRIGUEZ, RPR, CRR