# EXHIBIT 86

Page 1

1

UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3    NOVAFUND ADVISORS, LLC,

4              Plaintiff,                No. 3:18-cv-1023
                                         (MPS)

5        vs.

6    CAPITALA GROUP, LLC,

7              Defendant.

8

9

10

             VIRTUAL ZOOM DEPOSITION OF

11             RICHARD WHEELAHAN, ESQ.

12              (Taken by Plaintiff)

13           Charlotte, North Carolina

14            Tuesday, August 4, 2020

15

16

17

18

19   Reported by Andrea L. Kingsley, RPR

20

21

22

23

24

25

```
                                        Page 10
```

1      Q.    Did you have the opportunity during that

2   deposition to read and sign your transcript

3   afterwards?

4      A.    No.

5      Q.    Do you understand that you are under

6   oath today?

7      A.    Yes.

8      Q.    Do you understand that to mean you must

9   tell the truth?

10      A.    Yes.

11      Q.    Could you briefly describe your

12   educational background?

13      A.    I have a BA in political science and a

14   BA in Russian from Appalachian State University and

15   then a JD from the University of North Carolina

16   School of Law.

17      Q.    How long did you work at Capitala?

18      A.    From April 2010 until October 7, 2018.

19      Q.    Did you leave Capitala effective October

20   8, 2019?

21                  THE REPORTER:  Hold on.  I'm

22         hearing a lot of interference.

23                  THE VIDEOGRAPHER:  There's some

24         feedback on the line.

25                  (Discussion off the record.)

1    Q.   Mr. Wheelahan, did you leave Capitala
2  effective October 8, 2019?
3    A.   Yes.
4    Q.   Is it your understanding Capitala is
5  aware you're testifying today?
6    A.   Yes.
7    Q.   How do you know that?
8    A.   The fact that I'm testifying in this
9  deposition came up in open court in Mecklenburg
10  County a week and a half ago.
11    Q.   What matter were you involved in that
12  took place in court about a week and a half ago?
13    A.    It is a civil complaint that Capitala
14  filed against me personally regarding allegations
15  that I violated my non-disparagement agreement with
16  the firm when I left.
17    Q.   Do I understand correctly then there was
18  a proceeding in that other state court matter and
19  during the course of that court hearing the fact of
20  this deposition came up?
21    A.   Yes.
22    Q.   I would like to go through with you a
23  few positions you held at Capitala.  Just starting
24  with the basics.  What was the name of the Capitala
25  entity that was your employer?

```
                                              Page 14

 1                  THE VIDEOGRAPHER:  We are now on

 2       the record.  The time is 10:25 a.m.  back from

 3       break.

 4       Q.    Mr. Wheelahan, we have shown you what

 5   has been marked as Plaintiff's Exhibit 1.  Do you

 6   see that?

 7       A.    Yes.

 8       Q.    Do you recognize that?

 9       A.    Yes.

10       Q.    What is it?

11       A.    The affidavit of Joe Alala in support of

12   his complaint filed against me in Mecklenburg

13   County.

14       Q.    In the state court action that you were

15   referencing?

16       A.    Correct.

17       Q.    Who is Mr. Joseph Alala?

18       A.    He is the founder and CEO of Capitala

19   Group.

20       Q.    May I have you please turn to paragraph

21   9 of the affidavit.  Sorry.  Let's start first with

22   looking at page 9 of the affidavit which should be

23   the signature page.

24             Do you recognize that signature?

25       A.    Yes.
```

Page 15

```
 1        Q.    Who's signature is it?
 2        A.    Joe Alala's.
 3        Q.    How is it that you recognize the
 4   signature?
 5        A.    I've seen his signature on documents
 6   over the course of the last 10 years.
 7        Q.    Is it fair to say that you have seen
 8   Mr. Alala's signature hundreds of times?
 9        A.    Yes.
10        Q.    And that you feel comfortable
11   recognizing his signature?
12        A.    Yes.
13        Q.    Was this affidavit served on you in
14   connection with the North Carolina state court
15   action?
16        A.    It was not served.  I received an e-mail
17   from Robinson Bradshaw & Hinson, counsel to
18   Capitala in the action.
19        Q.    Does that e-mail include the affidavit?
20        A.    Yes.
21        Q.    Let me have you look at paragraph 4
22   please.  It states, "That Capitala Advisors Corp.
23   employs the individual who provides services for the
24   various Capitala entities."  Do you see that?
25        A.    Yes.
```

1      Q.     Do you agree with that statement?

2      A.     Yes.

3      Q.     Was there any other Capitala entity that

4  was served as the employer for the individuals that

5  provided services to the Capitala entities?

6      A.     No.  Not as the employer.

7      Q.     In paragraph 5 it states that, "Capitala

8  Finance Corp., CPTA, is a publicly traded business

9  development company with its common stock and

10 certain bonds listed and traded publicly on the

11 NASDAQ."

12          Do you see that?

13     A.     Yes.

14     Q.     Do you agree with that statement?

15     A.     Yes.

16     Q.     What is a business development company?

17     A.     It is a regulated investment company

18 that doesn't incur federal income tax by statutory

19 creation.

20     Q.     What does it mean for a BDC to be

21 publicly traded?

22     A.     It means that the equity interest in the

23 BDC are freely transferrable in that they are

24 traded on a public stock exchange so any investor

25 can buy and sell shares.

Page 18

1      A.    Yes.

2      Q.    What is CIA?

3      A.    Capitala Investment Advisors, LLC, a

4   registered investment advisor.

5      Q.    In the affidavit, paragraph 8, it also

6   states that in 2015, you, "Became the general

7   counsel as well as chief compliance officer to

8   Capitala."  Do you see that?

9      A.    I do see that.

10     Q.    Do you agree with that statement?

11     A.    No.

12     Q.    Why not?

13     A.    I was appointed chief compliance officer

14  of Capitala Investment Advisors and Capitala

15  Finance Corp. in August of 2013, and in 2015 it was

16  when I became general counsel of Capitala

17  Investment Advisors.

18     Q.    In paragraph 9 it states that you served

19  as, "General counsel and chief compliance officer to

20  all of the Capitala entities including CTPA."

21           Do you see that?

22     A.    Yes.

23     Q.    Do you believe that's a typo, it should

24  be CPTA?

25     A.    I do.

1        Q.     Do you agree with that statement?

2        A.     No.  I was not the general counsel of

3    CPTA.

4        Q.     Was there any other entity for which you

5    were not a lawyer that was affiliated with Capitala?

6        A.     Yes.  Many.

7        Q.     So let's try this the other way around.

8    What were the entities for which you served as a

9    lawyer?

10       A.     Capitala Investment Advisors, LLC and

11   Capitala private Advisors, LLC.

12       Q.     Is it fair to say that it's your

13   testimony those are the only two Capitala entities

14   for which you served as a lawyer?

15       A.     That is my understanding, yes.

16       Q.     Were you ever a lawyer for Capitala

17   Group, LLC?

18       A.     No.

19       Q.     Is it fair to say that in the time

20   period between 2010 and 2015, you did not serve in a

21   legal capacity for Capitala?

22       A.     I think that's accurate.  I think -- I

23   agree with that statement.

24       Q.     Let me try it a different way which is:

25   Do you know the first time you became a lawyer for

Page 20

1   any of the Capitala entities?

2        A.    It was the morning in 2015 in which I

3   woke up to an e-mail telling me I was the general

4   counsel of the investment advisors or investment

5   advisor.

6        Q.    Today I want to keep in mind the fact

7   that at some point in time during your tenure with

8   Capitala, you served in a legal capacity.  So in

9   that respect, you were privy to certain

10  attorney/client privileged information during the

11  course of your employment.  It's not my intention

12  today to inquire about attorney/client privileged

13  information.  So if I ask a question and you think

14  that the answer would call for the disclosure of

15  privileged information, please let me know I will

16  ask you just to limit your answer to the

17  non-privileged information.  Okay?

18       A.    Okay.

19       Q.    So for purposes of today's deposition, I

20  would like to use Capitala as a shorthand when

21  referring to all of the entities and investment

22  vehicles that are affiliated with Capitala in the

23  broadest sense; is that okay?

24       A.    Yes.

25       Q.    And then if I want to ask you a question

```
                                              Page 21
 1   about one of the specific Capitala entities or
 2   investment vehicles, I will refer to those by their
 3   specific name; okay?
 4        A.    Okay.
 5        Q.    Super.
 6              Are you familiar with a Capitala entity
 7   that is Capitala Group, LLC?
 8        A.    Yes.
 9        Q.    Do you understand that that is the named
10   defendant in the action that's the subject of this
11   deposition?
12        A.    Yes.
13        Q.    What is Capitala Group, LLC?
14        A.    It is an entity that was the signatory
15   to term sheets, non-disclosure agreements, things
16   that were thought of as not substantive or
17   preliminary in a sense.
18        Q.    What do you mean by that?
19        A.    It was a relatively meaningless entity.
20        Q.    How so?
21        A.    No assets, no operations, no real
22   structure.
23        Q.    We'll come back to that in a little bit.
24   Let me have you look at what we will mark as
25   Plaintiff's Exhibit 2 which is the term sheet.
```

```
                                             Page 22
 1    While that's being pulled up on the screen, let me

 2    just ask you, did you negotiate the term sheet on

 3    behalf of Capitala?

 4         A.    I did.

 5         Q.    Who did you negotiate it with?

 6         A.    With NovaFund Advisors.

 7         Q.    Did you speak with anyone in particular

 8    at NovaFund?

 9         A.    I recall speaking to Brian Kelly

10    primarily with respect to the first term sheet.

11    The first version -- the pre-amended term sheet.

12         Q.    Did you ever speak to Mr. James Howe or

13    Mr. Mark McAndrews when negotiating the term sheet?

14         A.    Yes.

15         Q.    Is it fair to say that Mr. Kelly was

16    your main point of contact at NovaFund?

17         A.    Yes.

18         Q.    Mr. Wheelahan, do you see what has been

19    marked as Plaintiff's Exhibit 2?

20         A.    Yes.

21               (Plaintiff's Exhibit 2, Term Sheet

22         Proposal for Capitala Private Credit Fund V,

23         LP, marked for identification, as of this

24         date.)

25         Q.    We also sent paper documents in advance
```

```
                                            Page 23
 1    of your deposition.  If you have that paper set,
 2    this is what is behind tab number 6 and it bears
 3    Bates stamp NF 25770.
 4         A.    Okay.
 5         Q.    Do you recognize the term sheet?
 6         A.    I do.
 7         Q.    Is this the term sheet that you
 8    negotiated with NovaFund?
 9         A.    Yes.
10         Q.    Is this the executed version of the term
11    sheet?
12         A.    Yes.
13         Q.    What is it that Capitala engaged
14    NovaFund to do?
15         A.    To help Capitala raise capital
16    commitments for primarily Private Credit Fund V.
17         Q.    Why do you say primarily?
18         A.    Because at the time we would be happy to
19    have capital raised in any format that paid us for
20    it.
21         Q.    If NovaFund had assisted Capitala in
22    raising capital for any other format, was it
23    Capitala's intention to pay NovaFund for those
24    services?
25         A.    That is what I recall, yes.
```

```
                                         Page 25
```

1    partnership; correct?

2          A.    Yes.

3          Q.    Does that mean that as an investor

4    decides to invest in Fund V they become a limited

5    partner in Fund V?

6          A.    Yes.

7          Q.    And if Fund V decides to invest the

8    investors' money, it may go make a loan; correct?

9          A.    Yes.

10         Q.    But the loan is directly owned by the

11   fund as opposed to the investors; correct?

12         A.    Yes.

13         Q.    Let me have you turn to page 2 of the

14   term sheet please.  Do you see up at the top there's

15   a section entitled, "Fee Proposal"?

16         A.    Yes.

17         Q.    And the language says, "As compensation

18   for the advisory and exclusive placement services to

19   be provided by NovaFund hereunder, Capitala agrees

20   to pay NovaFund a monthly fee of $20,000."

21               Do you see that?

22         A.    Yes.

23         Q.    And then it also says that Capitala will

24   agree to compensate NovaFund for an amount equal to

25   1.5 percent of the amount of equity capital that any

Page 26

```
 1    target investor commits to the fund or a separately
 2    managed account (defined as success fee)."
 3             Do you see that?
 4        A.    Yes.
 5        Q.    Are target investors defined under the
 6    term sheet to be North American, European,
 7    Australian and Asian investors?
 8        A.    Yes.
 9        Q.    Was it your understanding -- what was
10    your understanding of how Capitala would compensate
11    NovaFund under the term sheet?
12        A.    That we would pay a monthly retainer
13    that is offset dollar for dollar by the success fee
14    earned which is calculated at the lesser of 1 and a
15    half percent of the target investor's commitment to
16    any fund or SMA, the lesser of that or one year's
17    management fee in respect of that commitment to
18    either the fund or an SMA.
19        Q.    Do you see in the next section of the
20    term sheet it says, "Should Capitala agree to a
21    lower management fee then 1.5 percent for any target
22    investor, NovaFund will earn a fee equal to one year
23    of the company's management fee from the target
24    investor but in no case less than 1 percent of
25    committed capital for the target investors."
```

```
                                              Page 27
 1              Do you see that?
 2        A.    Yes.   That is correct.
 3        Q.    And so is it the case that in no event
 4   NovaFund's fee could not be less than 1 percent of
 5   committed capital for the target investors?
 6        A.    Correct.
 7        Q.    What's the difference between committed
 8   capital and invested capital, if anything?
 9        A.    When making an investment in either a
10   fund or an SMA, it is typical that the investor
11   commits to fund its investment over a period of
12   time, and so if the investor makes a $1,000,000
13   capital commitment, it may take two to five years
14   for that capital to get paid in; whereas paid in
15   capital means what they actually funded to date for
16   that fund or SMA.
17        Q.    Is it also the case that an investor may
18   tell -- may say I want to invest in Fund V and so in
19   effect it's committed to its capital but it hasn't
20   yet signed the limited partnership agreement?
21        A.    Well, typically, the capital commitment
22   doesn't exist until the investor has signed its
23   subscription agreement and also the LPA -- or the
24   subscription agreement to the LPA at that time.
25   That subscription agreement is what binds the
```

```
                                              Page 28
 1    investor to the terms of the limited partnership
 2    agreement.
 3         Q.    Do you agree that NovaFund had the right
 4    to fees once an investor committed to investing as
 5    opposed to when the investor may actually have
 6    invested?
 7         A.    Yes.
 8         Q.    What is your understanding based on?
 9         A.    It is based on -- well, first market
10    convention.  Placement agents don't wait five years
11    for their success fee to get paid.  I wouldn't call
12    it common sense but I would call it basic
13    understanding in asset management.
14              Secondly -- I'm going to look at the
15    term sheet.  It was supposed to be paid quarterly
16    based on invested capital with NovaFund -- I'm
17    reading the term sheet -- NovaFund was to be paid
18    within 30 months it's full success fee under any
19    circumstance.
20         Q.    Is your understanding also based on
21    discussions that you had with NovaFund in
22    negotiating the term sheet?
23         A.    Yes.
24         Q.    There is a reference in the success fee
25    section to a separately managed account.  Do you see
```

```
                                            Page 29
 1   that?
 2        A.    Yes.
 3        Q.    At the time that Capitala signed the
 4   term sheet, what was your understanding of what a
 5   separately managed account is?
 6        A.    Either what's known as a fund of one, in
 7   other words, a limited partnership that has one
 8   limited partner in which Capitala -- a Capitala
 9   affiliate is the general partner, or an account
10   held on the balance sheet of an institutional
11   investor in which a Capitala entity serves as the
12   investment advisor, not the general partner of the
13   fund.
14        Q.    Was it your understanding that if an
15   investor committed to a separately managed account
16   using either of those scenarios that NovaFund could
17   receive fees?
18        A.    Yes.
19        Q.    In your experience, how does a
20   separately managed account differ from a pooled
21   vehicle like Fund V?
22        A.    It has one investor.  One investor in
23   the vehicle as opposed to multiple.
24        Q.    Have you heard -- do you sometimes refer
25   to a separately managed account as an SMA?
```

1      Q.    Is it fair to say that at the time

2  Capitala signed the term sheet, you understood that

3  Capitala would have to pay NovaFund fees if an

4  investor committed to a fund of one or a true SMA?

5      A.    Yes.

6      Q.    Let me have you take a look back at the

7  term sheet.  Do you see that there is in the

8  definition of the success fee that we were just

9  looking at where it gives the range of 1 and a half

10  percent to 1 percent, it says, "Provided, however,

11  that no success fee shall be earned by NovaFund in

12  respect of capital raised for traded credit vehicles

13  with distinct investment strategies from the fund."

14          Do you see that?

15      A.    Yes.

16      Q.    What is a traded credit vehicle?

17      A.    Traded credit vehicles are either pooled

18  or single investor investment vehicles that buy

19  loans and high yield bonds which are CUSIP

20  designated.

21      Q.    Does that mean -- by being CUSIP

22  designated, does that mean that they are traded on a

23  nationally recognized exchange?

24      A.    It could be, or they're settled through

25  private platforms that could be linked to Bloomberg

Page 36

1    fund or executive of Capitala or any of their
2    respective officers, directors and employees and any
3    such officers, directors or employees immediate
4    family members (and any investment vehicles
5    controlled by or established primarily for the
6    benefit of any such officer, director, employee
7    and/or his or her immediate family members) or if or
8    their own accounts?
9            Do you see that?
10   A.    Yes.
11   Q.    Did I read that correctly?
12   A.    Yes.
13   Q.    Is that known as an exception for family
14   and friends?
15   A.    Yes.
16   Q.    Can you give an example of that?
17   A.    A trust that was established and settled
18   for the benefit of Joe Alala would be carved out.
19   Q.    Meaning that NovaFund could not earn a
20   fee if that trust that was established for Mr. Alala
21   contributed capital to Fund V or an SMA?
22   A.    Correct.
23   Q.    The general partner, the term general
24   partner is capitalized in the term sheet but it's
25   not defined.  Who is the general partner of Fund V?

Page 37

1      A.    Capitala PCF-V, LLC.

2      Q.    And the term manager is a capitalized

3  term in the term sheet but it's not defined.  What

4  was your understanding of Fund V's manager at the

5  time the term sheet was executed?

6      A.    Either Capitala -- I'm sorry, either CIA

7  or CPA.  Eventually it was CPA, but at the time it

8  may have been CIA.

9      Q.    Why do you say that?

10     A.    Because we'd formed a second investment

11 advisor that we registered with the SEC in order to

12 advise the private funds as opposed to the BDC.

13     Q.    Is it okay with you today that sometimes

14 we'll refer to Capitala Private Advisors, LLC as

15 CPA?

16     A.    Yes.

17     Q.    Is it also all right if we refer to

18 Capitala Investment Advisors as CIA?

19     A.    Yes.

20     Q.    Do you know approximately when CPA was

21 formed?

22     A.    Unfortunately, I don't recall, but it's

23 public, it's available from the SEC's website.

24     Q.    At the time that you were negotiating

25 the term sheet with NovaFund, did you ever tell them

Page 54

1    couple follow up questions about some testimony you

2    gave just before the break.

3              Did I understand you to say that

4    Capitala -- sorry -- that after Fund V was

5    established, Capitala had sponsored a separately

6    managed account with StepStone; is that correct?

7         A.    No.  StepStone sponsors the -- that may

8    be what I said.  StepStone sponsors the SMA.

9    Capitala Private Advisors serves as the investment

10   advisor to that SMA.

11        Q.    Is it your understanding that if an SMA

12   was set up as part of the process for raising

13   capital for Fund V that NovaFund could earn fees on

14   investments in that SMA?

15        A.    Yes.

16        Q.    Was it your understanding that if

17   StepStone set up an SMA in connection with raising

18   capital for Fund V, that NovaFund could earn fees on

19   the investments made to that SMA?

20        A.    Correct.

21        Q.    Under that circumstance, where an SMA is

22   formed in connection with raising capital for Fund

23   V, do you agree that the placement agent would earn

24   success fees?

25        A.    Yes.

```
                                                    Page 59
 1   you agree with his testimony?
 2        A.    No.
 3        Q.    Why is that?
 4        A.    Because they have done an SMA with Firm
 5   1 being StepStone.
 6        Q.    And, in fact, StepStone formed two SMAs
 7   with Capitala after March of 2018; correct?
 8        A.    Correct.
 9        Q.    And do you agree that the two StepStone
10   SMAs were established in connection with the process
11   of raising capital for Fund V?
12        A.    Yes.
13        Q.    StepStone required Capitala to answer
14   certain due diligence questions and to complete a
15   due diligence questionnaire; correct?
16        A.    Yes.
17        Q.    Do you recall of those -- if Capitala
18   submitted the answers to those due diligence
19   questions on or about October 6, '17?
20        A.    Yes, that's right.
21        Q.    Do you recall if those due diligence
22   questions were submitted on a format that was in
23   reference to Fund V?
24        A.    I don't recall.
25        Q.    Let me show you what we will mark as
```

Page 87

1        Q.     The offshore IAA is dated April 13,

2    2018?

3        A.     Yes.

4        Q.     And, again, I will have you turn to the

5    last couple of pages of this exhibit.  Do you

6    recognize the signatures on Capitala's behalf?

7        A.     Yes.

8        Q.     Who signed?

9        A.     Joe Alala and Lynne Girts was the

10   witness.

11       Q.     Who is Lynne Girts?

12       A.     She's administrative officer of the

13   Investment Advisors and Capitala Advisors Corp.

14       Q.     Are you sort of able to give a high

15   level layman's difference between the onshore and

16   offshore IAA?

17       A.     Yes.  The onshore IAA was -- they both

18   got terms and conditions upon which Capitala

19   Private Advisors provides the investment management

20   services to the SMAs.  The only difference is that

21   for the non-treaty or offshore vehicle, that SMA

22   never makes loans at the time the loans are

23   originated.  That entity buys loans from the

24   onshore or treaty vehicle after the expiration

25   number of weeks when they're, quote, unquote,

Page 88

```
 1    seasoned.  That keeps the non-treaty investors from
 2    bearing the expense of withholding tax in the U.S.
 3    due to the type of lending that Capitala is doing.
 4         Q.    So it's maybe a similar answer, but
 5    what's the difference between the onshore and
 6    offshore SMAs?
 7         A.    The onshore SMA is engaged in what is
 8    called origination activity by making loans at the
 9    time the loans are made.  The offshore SMA
10    purchases loans after the time that they were
11    initially made.
12         Q.    That's better for tax purposes?
13         A.    Yes.
14         Q.    You used the term seasoned before;
15    correct?
16         A.    Yes.
17         Q.    What is your understanding of what
18    season and sell means?
19         A.    Season and sell means that the ultimate
20    investor holding the loan did not fund the loan at
21    the time it was originated.  The loan was
22    originated and there was an original lender that
23    subsequent -- that after the expiration of between
24    two weeks and several months, sells all or a
25    portion of that loan to the non-treaty investor so
```

Page 89

```
 1    that the non-treaty investor avoids taxation --
 2    withholding of taxation in respect of that ECI.
 3        Q.    Let's say that the onshore SMA
 4    originates a $25 million loan.  Okay?  Does that
 5    mean that the onshore SMA actually makes a direct
 6    loan to a company in the amount of 25 million?
 7        A.    Yes.
 8        Q.    And then some portion after a period of
 9    time, the onshore SMA can sell a portion of that
10    loan to the offshore SMA?
11        A.    Yes.
12        Q.    Who decides how much of the original
13    loans get sold to the offshore vehicle?
14        A.    StepStone.
15        Q.    What role does -- you said that CPA
16    would be acting as a sub advisor under the terms of
17    the IAAs?
18        A.    Yes.
19        Q.    What role did CPA play?
20        A.    That's the sub advisory role.  They were
21    providing the same investment management decisions
22    or investment management services that they provide
23    other funds like Fund V.
24        Q.    So can you give us an example of what
25    CPA would do on a day-to-day basis as it relates to
```

Page 90

1    the two StepStone SMAs?

2        A.    Identify perspective investment

3    opportunities, negotiate -- negotiate and conduct

4    due diligence on and enter into investments into

5    portfolio companies on behalf of the SMA, make

6    decisions regarding the loan, enforce the terms and

7    conditions of the loan on behalf of the SMAs as

8    lenders, and then, ultimately, realize the

9    repayment of principal and interest in the

10   underlying loans on behalf of the SMAs.

11       Q.    When you said that CPA would identify

12   perspective investment for the SMAs, does that mean

13   that they would identify certain companies located

14   in the U.S. for which the SMAs may want to make

15   loans to?

16       A.    Yes.

17       Q.    Because the ultimate investment that's

18   made by the SMAs is a loan from the SMAs to a U.S.

19   based company; correct?

20       A.    Yes.

21       Q.    Is it also correct to say that there are

22   two account holders -- there's an account holder for

23   each SMA?

24       A.    Account holder?  Yes.  That's right.

25       Q.    So the account holder for the onshore

```
                                          Page 92
1    of any of the underlying investors to Capitala or
2    to me.
3         Q.    What was your understanding at the time
4    of how the money was getting deposited into the SMA
5    bank account?
6         A.    That StepStone had discretionary
7    authority to demand funds just like any GP does of
8    his LPs and it was calling that capital from its
9    clients and depositing that money into the bank
10   account.
11        Q.    We are getting close to the lunch hour.
12   I want to check in.  Are you okay to keep going for
13   a little bit or do you want to stop for a lunch
14   break?
15        A.    I'm fine.
16        Q.    Capitala issued a press release in
17   connection with the finalization of the SMA with
18   StepStone; correct?
19        A.    Yes.
20        Q.    Was it also correct that Capitala wanted
21   to keep StepStone's name secret?
22        A.    Yes.
23        Q.    But Capitala also wanted to make the
24   announcement public; right?
25        A.    Yes.
```

Page 95

1  Capitala Group and it's dated April 26, 2018, with
2  the subject line, "Capitala Group Announces $1
3  Billion of New Permanent Capital for New Senior Debt
4  Focus."  Do you see that?
5       A.    Yes.
6       Q.    Is that the press release that was
7  issued in connection with the finalization of the
8  SMAs of StepStone?
9       A.    That is the e-mail that was based on the
10  press release that was issued, yes.
11      Q.    Is the e-mail that's based on the press
12  release, does it contain the same content as the
13  press release?
14      A.    Yes.
15      Q.    Did Capitala at the time endeavor to
16  provide true and accurate information in the press
17  releases it issued?
18      A.    Yes.
19      Q.    In the first sentence of that it says,
20  "Capitala Group (Capitala) announced today that it
21  has successfully raised 1 billion dollars in a new
22  permanent capital vehicle."  Do you see that?
23      A.    Yes.
24      Q.    And then it states that, "Funding for
25  the new venture CSLC was raised from global

1   company at the same time on the same terms.

2        Q.    Did that actually happen?

3        A.    I believe so.  I'm a little stale but I

4   believe so.

5        Q.    We were talking a little bit before

6   break about the formation of Capitala Specialty

7   Lending Corp., CSLC.  What was its purpose?

8        A.    It's purpose was twofold.  It was to

9   receive the fee income that Capitala was entitled

10  to under the investment advisory agreements.  And

11  also as a marketing identifier or d/b/a for the

12  SMAs that had a nice ring to it, that could be used

13  to project the new capitalization of Capitala

14  without identifying the investor.

15       Q.    Aside from those two things, did it have

16  any business purpose?

17       A.    No.

18       Q.    Did it have any investors of its own?

19       A.    Every entity has an equity holder but

20  there were no strategic investors, if you will, in

21  the entity.

22       Q.    Who was the equity owner of CSLC?

23       A.    I don't know who that was ultimately.

24       Q.    But it's fair to say there were no

25  investors outside of Capitala that invested in CSLC?

```
 1        A.     That's my understanding.
 2        Q.     Did CSLC have any funds coming into it
 3   aside from the fee income that you described as
 4   being coming through from the IAAs?
 5        A.     No, I'm not aware of any.
 6        Q.     In other words, did CSLC have any other
 7   source of funds?
 8        A.     Well, the sources of funds were the
 9   portfolio companies that were procuring credit and
10   from the SMAs themselves pursuant to their
11   management fee agreement or management fee payment.
12   But both of those incoming cash flows were given to
13   CSLC by operation of the investment advisory
14   agreements.
15        Q.     What do you mean the portfolio companies
16   procuring credit?
17        A.     If you look at the advisory agreement,
18   it talks about instead of fee payment which is
19   carrying interest down the road, it talks about
20   management fee which is some number of basis points
21   on deployed capital.  And then it talks about the
22   closing fees.  So it says something along the lines
23   of Capitala's entitled to up to 100 -- it's
24   entitled to management -- closing fee income on new
25   loans to the extent that such closing fees exceed
```

Page 120

1      Q.    Were you required to approve them before
2   they were submitted?
3      A.    Yes.
4      Q.    And is it fair to say that you reviewed
5   them before they were submitted to the SEC?
6      A.    Yes.
7      Q.    Let me show you what we will mark as
8   Plaintiff's Exhibit 14 which is an annual report for
9   Capitala Finance Corp. for the year ended December
10  31, 2018.
11                  MR. CORP:  This is 13.
12     Q.    So I'm showing you Plaintiff's Exhibit
13  13.
14                  (Plaintiff's Exhibit 13, 2018
15        annual report for CSC, marked for
16        identification, as of this date.)
17     Q.    This should be the 2018 annual report
18  for CSC.
19     A.    Yes.
20     Q.    Do you recognize this?
21     A.    Yes.
22     Q.    What is it?
23     A.    It's Capitala Finance Corp.'s 10-K for
24  fiscal year ending December 31, 2018.
25     Q.    This would have been filed in March of

```
                                          Page 121

 1    2019?

 2         A.    March or April.  There about.

 3         Q.    Do you recall reviewing this particular

 4    annual report before it was submitted?

 5         A.    Yes.

 6         Q.    Let me have you turn to -- it should be

 7    the bottom of page 2, top of page 3.  Do you see a

 8    sentence that says at the bottom of the page 2 --

 9              MS. O'TOOLE:  Robert, I'm not sure

10         if you're able to highlight this.

11         Q.    "An affiliate of the investment advisor

12    also manages Capitala Private Credit Fund V, LP,

13    Fund V."  Do you see that?

14         A.    Yes.

15         Q.    It continues.  It says, "Fund V, a

16    private investment limited partnership and a private

17    investment vehicle referred to here in as Capitala

18    Specialty Lending Corp. or CSLC, both of which

19    provide financing solutions to lower middle market

20    and traditional middle market companies."

21              Do you see that?

22         A.    Yes.

23         Q.    And the affiliate of the investment

24    advisor in that sentence is CPA; correct?

25         A.    Yes.
```

Page 122

1          Q.     Do you believe that that is a truthful
2     and accurate statement?
3          A.     Yes.
4          Q.     At the end of that paragraph it says,
5     "We do not expect to make co-investments or
6     otherwise compete for investment opportunities with
7     Fund IV because it's focus and investment strategy
8     differ from our own, however, we do expect to make
9     and have made co-investments with Fund V and/or CSLC
10    given their similar investment strategy."
11               Do you see that?
12         A.     Yes.
13         Q.     Do you believe that's a truthful and
14    accurate statement?
15         A.     Yes.
16         Q.     Do you agree that the representation
17    that was being made in this annual report is that
18    the investment strategy for Fund V is the same as
19    the investment strategy for CSLC?
20         A.     Yes.
21         Q.     In other words, that's a way of saying
22    that the investment strategy for Fund V is the same
23    investment strategy for StepStone SMAs; correct?
24         A.     Correct.
25         Q.     Do you agree or disagree with the

Page 153



Page 154



Page 155



Page 160



Page 161



Page 163



```
                                        Page 169
1    tab 8 of your material and it should have a cover
2    e-mail from Jennifer Gentry with a G dated September
3    22, 2016 bearing Bates stamp CAP 007088.  Do you see
4    that?
5         A.    I do.
6         Q.    Do you recognize the document that is
7    attached to that cover e-mail?
8         A.    Yes.
9         Q.    What is that?
10        A.    That's the PPM for Fund V.
11        Q.    Is that also known as the private
12   placement memorandum?
13        A.    Yes.
14        Q.    Did you help prepare this?
15        A.    I did.
16        Q.    On page 1 of the PPM which should be on
17   the page bearing Bates stamp 7095.  At the very
18   bottom it says, "Attractive track record."
19              Do you see that?
20        A.    I do.
21        Q.    And it says, "Since 1998, Capitala
22   Private Advisors, LLC, and its affiliates and
23   related entities collectively Capitala," and then it
24   continues.
25              Do you see that?
```

Page 170

Page 171



1   the Limited Partnership of Fund V.

2        A.    Got it.

3        Q.    Do you have that in front of you?

4        A.    I do.

5        Q.    Do you recognize this?

6        A.    I do.

7        Q.    What is this?

8        A.    This is the Amended and Restated

9   Agreement of Limited Partnership for the Private

10  Credit Fund V as of that date prior to a subsequent

11  amendment of the LPA.

12       Q.    Did this happen to be the LP agreement

13  with the Kemper entity?

14       A.    Yes.  And with Hamilton Lane advisory

15  clients.

16       Q.    I would like to ask you a question if

17  you may turn to Exhibit A.

18       A.    Okay.

19       Q.    Which should be on page Kemper 89.

20       A.    Got it.

21       Q.    Do you recognize this document?

22       A.    I do.

23       Q.    What is this?

24       A.    It's the investment allocation policy

25  for Capitala Group.

Page 173



Page 180



Page 181



Page 183



Page 184



Page 185



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 186



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 195



Page 196



Page 197

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 201



Page 202



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

[redacted]

Page 204



[redacted]

Page 206



Page 207



Page 208



Page 209



Page 210



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 211



Page 221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 222

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 223



Page 224



Page 225

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 229

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 230



Page 231



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 233



Page 234



Page 235



Page 237

1      Q.    Mr. Wheelahan, we're going to mark your
2  text messages as Plaintiff's Exhibit 29.
3                (Plaintiff's Exhibit 29, text
4       messages, marked for identification, as of
5       this date.)
6      Q.    Let me know when that comes up.
7      A.    They're up.
8      Q.    This is in your paper materials behind
9  tab 41.
10            Did you receive a subpoena in this
11  matter requesting copies of text messages that you
12  sent or received relating to this matter?
13     A.    Yes.
14     Q.    And responsive to the subpoena, did you
15  provide your cell phone to a vendor?
16     A.    I provided my cell phone number -- my
17  credentials to a vendor who accurately pulled my
18  text messages off of it.
19     Q.    Was it your understanding that the
20  vendor then extracted the text messages from your
21  phone?
22     A.    Yes.
23     Q.    Did you review your text messages after
24  they were extracted and before -- before they got
25  produced in this matter?

Page 238



Page 239



Page 246



Page 247



Page 248



Page 250



Page 251



Page 255

1    STATE OF NORTH CAROLINA

2    WAKE COUNTY

3                 REPORTER'S CERTIFICATE

4             I, Andrea L. Kingsley, a Notary Public

5    in and for the State of North Carolina, do hereby

6    certify that there came before me on Tuesday, the

7    August 4, 2020, the person hereinbefore named, who

8    was by me duly sworn via Virtual Zoom to testify to

9    the truth and nothing but the truth of his

10   knowledge concerning the matters in controversy in

11   this cause; that the witness was thereupon examined

12   under oath, the examination reduced to typewriting

13   under my direction, and the deposition is a true

14   record of the testimony given by the witness.

15            I further certify that I am neither

16   attorney or counsel for, nor related to or employed

17   by, any attorney or counsel employed by the parties

18   hereto or financially interested in the action.

19            IN WITNESS WHEREOF, I have hereto set

20   my hand this the 6th day of August, 2020.

21

22

23

24   _____

          Andrea L. Kingsley, Notary Public

25        Notary Public #201903800023

Page 1

1    UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
2    ----------------------------x
     NOVAFUND ADVISORS, LLC,
3
     Plaintiff,
4
               v.                    No. 3:18-cv-1023 (MPS)
5
     CAPITALA GROUP, LLC,
6
     Defendant.
7    ----------------------------x
     NOVAFUND ADVISORS, LLC,
8
     Plaintiff,
9
               v.                    Docket No.
10                                   FST-CV-20-6045528-S
                                     SUPERIOR COURT JUDICIAL
11                                   DISTRICT STAMFORD/NORWALK
12                                   AT STAMFORD
13   SANDLER, O'NEILL &
     PARTNERS, LP,
14
     Defendant.
15   ----------------------------x
16
17        Zoom Deposition of RICHARD WHEELAHAN, III
18         (Taken by the Plaintiff and Defendants)
19              Charlotte, North Carolina
20              Friday, February 12, 2021
21
22
23   Reported by:    Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
24
25

```
                                            Page 89
 1     Fund V, if any?

 2          A.     None.

 3          Q.     What was your understanding of why CGLLC

 4     was used to sign the term sheet?

 5                 MR. SHAPIRO:  Objection.

 6          A.     Minimize risk and, you know, avoid, avoid

 7     privy of contract with a capitalized entity.

 8          Q.     Do you believe that -- did you -- you had

 9     discussions with NovaFund before the term sheet was

10     signed, correct?

11          A.     Yes.

12          Q.     Do you recall ever telling them about any

13     distinctions among any of the Capitala entities during

14     those discussions?

15                 MR. SHAPIRO:  Objection.

16          A.     I do not.

17          Q.     Do you know how Capitala was introduced to

18     NovaFund?

19          A.     I don't actually.  I don't recall.

20          Q.     Had Capitala considered other placement

21     agents before considering NovaFund?

22          A.     Yes.

23          Q.     About how many?  Do you know?

24          A.     Pick a number.  Well over 20.

25          Q.     Is it fair to say they all declined?
```

Page 328

C E R T I F I C A T E

1

2          I, Marisa Munoz-Vourakis, Stenographic Reporter, RMR,

3     CRR and Notary Public, certify that on February 12, 2021,

4     in Charlotte, North Carolina, having produced satisfactory

5     evidence of identification, and having been first duly

6     sworn by me according to the emergency video notarization

7     requirements contained in G.S. 10B-25, to tell the truth,

8     thereupon testified as set forth in the preceding pages,

9     exclusive of errata sheet and signature page, if required,

10    the examination being reported by me verbatim and reduced

11    to typewritten form by me personally.

12         I further certify that I am neither counsel for,

13    related to, nor employed by any of the parties to this

14    action in which this proceeding was conducted, and

15    further, that I am not a relative or employee of any

16    attorney or counsel employed by the parties thereof, nor

17    financially or otherwise interested in the outcome of the

18    action.

19    This the 16th day of February, 2021.

20    

21    MARISA MUNOZ-VOURAKIS

      Notary #20032900127

22

23

24

25

Page 1

1          IN THE UNITED STATES DISTRICT COURT

              DISTRICT OF CONNECTICUT

2                  3:18-cv-1023(MPS)

3       --------------------------------

4       NOVAFUND ADVISORS, LLC,

5            Plaintiff,

6       v.

7       CAPITALA GROUP, LLC

8            Defendant.

        --------------------------------

9

10         VIDEO CONFERENCE DEPOSITION VIA ZOOM OF

11            RICHARD G. WHEELAHAN, III, ESQ.

12                  March 30, 2021

13                    9:18 a.m.

14              Charlotte, North Carolina

15

16

17

18

19

20

21

22

23

24     Reported by:  Audra M. Smith, RPR, FCRR

25     Video by:    Brad Thompson

1        Q    And it says:  Let me know if any snafus in

2     viewing the ones I produced.

3             Do you see that?

4        A    Yes.

5        Q    Again, do you know how you produced those

6     emails to Attorney O'Toole?

7        A    Through a third-party provider in Austin

8     that we've discussed in prior questions.

9        Q    Okay.  So you provided them to the

10    third-party provider, and in turn, you believe that

11    they provided them to Attorney O'Toole?

12       A    Correct.

13       Q    And I think you said that you think it was

14    an upload that you provided to the third-party

15    provider; is that correct?

16       A    That's what I remember, yes.

17       Q    Let's go to the next exhibit.  Should be

18    626.  This is a larger document, so it may take a

19    couple minutes to load.

20            (Exhibit Number 626 was identified.)

21       Q    It should be up now.

22       A    It's up.

23       Q    Okay.  This is an email from you to

24    Attorney O'Toole, dated July 20, 2020 at 1:00 p.m.;

25    do you see that?

Page 104

1          A    I do.

2          Q    It looks like you forward a copy of the

3     lawsuit that was filed in Mecklenburg County?

4          A    Yes.

5          Q    All right.  And is this the lawsuit you

6     were referring to earlier?

7          A    Yes.

8          Q    So this is the lawsuit from -- well,

9     withdrawn.

10              Does this help refresh your recollection

11    as to when the lawsuit was filed?

12         A    It does.

13         Q    Why did you provide this lawsuit to

14    Attorney O'Toole or the copies of these papers to

15    Attorney O'Toole on July 20, 2020?

16         A    It speaks further to the chilling

17    intention of Capitala, and at that point, I was

18    desperate for any help I could get referral-wise or

19    otherwise.  I was hooked up to an IV infusion

20    machine at Levine Cancer Center and was not going to

21    be able to be unhooked until after the close of

22    business, and RBH was not cooperative with respect

23    to moving the hearing date.

24         Q    Were you sick at that point in time?

25         A    Yes.

Page 174

1    the success fee that is.  I recall discussions

2    regarding the carve-out list, and that's all I can

3    remember off the top of my head.

4         Q    Prior to this term sheet being provided --

5    withdrawn.

6              That was an in-person meeting?

7         A    Yes.

8         Q    Do you recall having any telephone

9    conversations with Mr. Kelley prior to this email on

10   February 5, 2016?

11        A    I don't recall any of them right now, but

12   I know that I had them.

13        Q    Do you know that you had them before the

14   time period of this February 5, 2016 email?

15        A    I don't remember.

16        Q    Do you recall any conversations with

17   Mr. Kelley that you had prior to the date of this

18   email in which he asked you who the counterparty to

19   the term sheet should be?

20        A    I don't.

21        Q    Do you know whether any discussion took

22   place?

23        A    I don't know.

24        Q    Do you recall any conversation that took

25   place between you and Mr. Kelley or Mr. McAndrews

Page 175

1      about who the signatory to the term sheet should be?

2           A    I do not.

3           Q    All right.  You were deposed in August of

4      2014.  You testified that Capitala Group, LLC was an

5      entity that was the signatory to term sheets,

6      nondisclosure agreements, things that were thought

7      of as not substantive or preliminary in a sense.

8                Do you see that -- do you remember that

9      testimony?  Sorry.

10          A    In August --

11               MS. O'TOOLE:  Objection.  Yeah.

12          A    In August 2014, I do not.

13     BY MR. SHAPIRO:

14          Q    No, no.  I'm going to rephrase my

15     question.  It got a little muddled there and I

16     apologize.

17               Do you recall giving testimony in August

18     of 2020 in connection with the deposition with

19     Attorney O'Toole?

20          A    I recall the deposition, not the date.

21          Q    And in that deposition you described

22     Capitala Group, LLC as an entity that was the

23     signatory to term sheets, nondisclosure agreements,

24     things that were thought of as not substantive or

25     preliminary in a sense.  Do you recall that

Page 258

```
 1    commitment or a legally enforceable commitment?
 2              MR. SHAPIRO:  Objection.
 3              MR. SHAPIRO:  Objection.
 4         A    I never thought about it.
 5    BY MS. O'TOOLE:
 6         Q    Sitting here today, is it your testimony
 7    that you believe NovaFund was owed fees for the
 8    investments made by the -- by Swiss Capital and the
 9    Capitala SMAs?
10              MR. SHAPIRO:  Objection.
11         A    Restate the question, please.
12    BY MS. O'TOOLE:
13         Q    Sitting here today, do you believe that
14    NovaFund is owed fees by Capitala for the
15    investments made by the Swiss Capital SMAs?
16              MR. SHAPIRO:  Objection.
17         A    Yes.
18    BY MS. O'TOOLE:
19         Q    Why is that?
20         A    Because of -- because of the absence of
21    that -- of those investors from the carve-out list,
22    the introduction that took place with respect to
23    Swiss Capital by Nova, notwithstanding the lack of
24    Fund V commitment with the entering into of an
25    actual -- of clearly an SMA as contemplated in the
```

Page 259

1    engagement -- in the term sheet, and that there is a

2    management fee base that is calculable and proveable

3    that could serve as the basis for the success fee

4    under the terms of the term sheet.

5         Q    During the fundraising process in the 2016

6    to 2017 time period, were Capitala and NovaFund also

7    discussing a potential SMA with Allianz?

8              MR. SHAPIRO:  Objection.

9         A    I do recall that, yes.

10   BY MS. O'TOOLE:

11        Q    And was it your understanding that if

12   Allianz invested in an SMA with Capitala that

13   Capitala would owe fees to NovaFund?

14             MR. SHAPIRO:  Objection.

15        A    I don't recall that part of the

16   conversation.

17   BY MS. O'TOOLE:

18        Q    Okay.  Well, I'm not asking about a

19   conversation, I'm asking just about your

20   understanding.

21        A    And so restate the question as to my

22   understanding, please.

23        Q    Sure.  So was it your understanding that

24   if Allianz had invested in an SMA with Capitala,

25   then Capitala would owe fees to NovaFund?

Page 303



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 373



Page 419

1        STATE OF NORTH CAROLINA )

2        COUNTY OF FORSYTH        )

3                     REPORTER'S CERTIFICATE

4               I, Audra Smith, Registered Professional Reporter

5        in and for the above county and state, do hereby certify that

6        the deposition of the person hereinbefore named was taken

7        before me at the time and place hereinbefore set forth; that

8        the witness was by me first duly sworn to testify to the

9        truth, the whole truth and nothing but the truth; that

10       thereupon the foregoing questions were asked and the foregoing

11       answers made by the witness which were duly recorded by me by

12       means of stenotype; which is reduced to written form under my

13       direction and supervision, and that this is, to the best of my

14       knowledge and belief, a true and correct transcript.

15               I further certify that I am neither of counsel to

16       either party nor interested in the events of this case.

17               IN WITNESS WHEREOF, I have hereto set my hand

18       this 12th day of April, 2021.

19

20

21

22

23       Audra Smith, RPR, FCRR

24

25       Notary Number:  201329000033