## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NOVAFUND ADVISORS, LLC,

    *Plaintiff*,

    v.

CAPITALA GROUP, LLC, CAPITALA PRIVATE
ADVISORS, LLC, CAPITALA INVESTMENT
ADVISORS, LLC, AND CAPITALA SPECIALTY
LENDING CORPORATION

    *Defendants*.

No. 3:18-cv-1023 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

This action arises out of an agreement between NovaFund Advisors, LLC ("NovaFund")

and Capitala Group, LLC ("CGLLC") in which NovaFund agreed to assist CGLLC with capital-

raising efforts.  Initially, NovaFund sued CGLLC for claims of breach of contract, breach of the

implied covenant of good faith and fair dealing, unjust enrichment, tortious interference with

business expectancies, and unfair and deceptive trade practices.  However, two years into the

litigation, CGLLC dissolved.  ECF No. 152.  NovaFund added Capitala Private Advisors, LLC

("CPA"), Capitala Investment Advisors, LLC ("CIA"), and Capitala Specialty Lending

Corporation ("CSLC") as Defendants and has asserted veil piercing claims that would hold the

Defendants liable for the claims against the now dissolved CGLLC.  ECF No. 193.  Defendants

now move for summary judgment.  ECF No. 327.  For the reasons set forth below, I GRANT in

part and DENY in part the motion for summary judgment.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and from

other documents in the record and are undisputed unless otherwise indicated.  I will refer to

Capitala Investment Advisors, LLC ("CIA"), Capitala Private Advisors, LLC ("CPA"), and

1

Capitala Specialty Lending Corporation ("CSLC") as "Defendants" and generally refer to all Capitala entities together as "Capitala."

## A. Parties

NovaFund Advisors, LLC ("NovaFund") is a limited liability company incorporated in Delaware with a principal place of business in Darien, Connecticut. ECF 355 ¶ 1.

CIA is a Delaware limited liability company that was wholly owned by Atlas Capitala Investments, LLC.[1] ECF 352 ¶¶ 3–4; *see* ECF No. 353-8 at 9 (organization chart showing that Atlas owned 100% of CIA); ECF No. 355-27 at 3, 6 ("The principal owner of [CIA] is Atlas Capitala Investments, LLC, which is wholly owned by Capitala Trust."). CIA was the investment advisor to Capitala Finance Corporation ("CFC"), which is a publicly traded business development company. ECF No. 355 ¶ 11; *see* ECF No. 355-27 at 6.

CPA is a Delaware limited liability company with CIA as the sole member. ECF No. 355 ¶ 5; ECF No. 328 at 260. CPA served as an advisor to CapitalSouth Partners SBIC Fund IV, L.P. ("Fund IV") and Capitala Private Credit Fund V., L.P. ("Fund V"). ECF No. 355 ¶ 12; ECF No. 355-27 at 31. Both CIA and CPA are registered with the U.S. Securities Exchange Commission ("SEC") as investment advisors. ECF No. 355 ¶ 9; ECF No. 352-6 at 2, 4. In SEC filings, "Capitala Group" is listed as the alternative name for CIA and CPA. *Id.* (SEC website listing "Capitala Group" as an alternative name for CIA and CPA); ECF No. 355-27 at 3, 6 (CIA's Form ADV for the SEC defines "Capitala Group" as CPA together with CIA).

---

[1] NovaFund objects to Defendants' use of Joseph Alala's declaration to support the statement that CIA was wholly owned by Atlas Capitala Investments, LLC from 2016 to October 15, 2019. ECF No. 352 ¶ 4. Specifically, NovaFund argues that the declaration does not show that Alala is competent to testify on the matters stated. *Id.* I agree with NovaFund that Alala does not state the basis for his personal knowledge of CIA, CPA, and CSLC. However, Alala does provide a basis for his personal knowledge of CGLLC by stating that he was the sole member of CGLLC. ECF No. 328 at 17. Therefore, I will consider Alala's declaration only for statements concerning CGLLC. Although the Defendants used Alala's declaration to support a statement about CIA, there is other evidence in the record that CIA was wholly owned by Atlas. *See* ECF No. 353-8 at 9.

CSLC is a Delaware corporation wholly owned by CPA and incorporated on March 22, 2018.  ECF No. 355 ¶ 6.  CSLC and Fund V have "similar investment strategies."  ECF No. 353-15 at 6.

CGLLC was a North Carolina limited liability company with Joseph Alala as the sole member.  ECF No. 355 ¶ 2; ECF No. 328 at 17.  CGLLC does not share a common owner with CIA, CPA, and CSLC,[2] ECF No. 355 ¶ 7, and was not the parent company of any other Capitala entities, ECF No. 356-3 at 71; ECF No. 356-1 at 16–17.  According to Alala, CGLLC provided advisory services to small businesses, ECF No. 328 at 23, which NovaFund disputes, pointing to testimony from employees from various Capitala entities suggesting that CGLLC "had no legitimate business purpose and it did not have a role in any specific projects," ECF No. 355 ¶ 10; *see* ECF No. 356-3 at 70 (CGLLC's business purpose was "[t]o be the signatory for certain nuisance agreements."); ECF No. 356-1 at 13 (CGLLC never "had any specific projects within the Capitala enterprise"); ECF No. 356-3 at 86 (CGLLC had "no income, no job, no assets").

Depositions of Capitala employees suggest that CGLLC did not have its own income, employees, office space, or compliance manual.  Employees from various Capitala entities testified that CGLLC did not have—or they were unaware of whether CGLLC had—an income, expenses, or an independent source of revenues.  ECF No. 359 ¶ 102; *see* ECF No. 356-3 at 77 (CGLLC did not have "an independent source of revenue"); ECF No. 356-1 at 12–13 (employee was not aware of whether CGLLC had a bank account, income, or expenses).  In response to a Court order to produce CGLLC's bank records since 2015, ECF No. 331, Defendants only submitted bank records from December 2018 to April 2019, ECF No. 355 ¶ 102; *see* ECF No.

---

[2] NovaFund argues that Alala's declaration does not show that he is competent to testify on this matter but I disagree.  ECF No. 352 ¶ 7.  In his declaration, Alala states that he was the sole member of CGLLC and thus, he would have personal knowledge regarding the ownership of CGLLC.  ECF No. 328 ¶ 2.  NovaFund does not appear to dispute that "CGLLC did not have common ownership with CIA, CPA and CSLC."  ECF No 352 ¶ 7.

355-45.  Richard Wheelahan, the former general counsel of CIA and chief compliance officer of CIA and CFC, ECF No. 356-3 at 3, 8, stated that CGLLC did not have employees of its own, *id.* at 72, and "was run by CPA's agents who were all employed by Capitala Advisors Corp.," *id.* at 76.  *See also* ECF No. 356-1 at 17 (another employee stating that he was not aware that CGLLC had any employees).  Wheelahan also stated that CGLLC "was a shell company" run by CPA, CIA, Capitala Advisors Corp, and Capitala Finance Corp.  *Id.* at 76–77.  Further, Wheelahan testified that at least CIA and CGLLC shared the same office space, *id.* at 72, and that he did not think CGLLC had a compliance manual but CIA and CPA did, *id.* at 74.

Alala is the chief executive officer ("CEO"), chairman, president, chief investment officer, and/or managing partner of CIA, CPA, and CSLC.  *See* ECF No. 353-8 at 7 (Alala is the "President, Chief Investment Officer and Manager Partner" of Capitala Group, which is defined as CPA and its affiliates); ECF No. 328 at 260 (Alala is "[t]he president, chief executive officer, chairman and/or manager of various Capitala entities); ECF No. 355-27 at 6 (Alala "is the President, CEO[,] and Manager of [CIA]"); ECF No. 328 at 77 (Alala is the "found and CEO" of the "Capitala Group").  In addition, Alala was the Chairman and CEO of CGLLC.  ECF No. 328 at 343 (signature block identifying Alala as such).

Alala states that "CIA, CPA and CSLC are separately and validly formed entities under Delaware law" that "serve distinct, legitimate business purposes."  ECF No. 355 ¶ 8; ECF No. 328 at 19.  NovaFund disputes this and states that CIA, CPA, CSLC, and CGLLC "operated as part of a single corporate enterprise with many other Capitala entities."  ECF No. 355 ¶ 8; *see* ECF 356-3 at 3, 8, 78 (Wheelahan testified that CGLLC "operated as part of an enterprise with other Capitala entities," including CIA, CPA, and CSLC).  According to Wheelahan, "various

Capitala entities" are often referred to "as just Capitala or Capitala Group."  ECF No. 356-3 at 42.

### B.  Negotiations and the Term Sheet

In December 2015, "CGLLC sought to raise capital for a credit fund" that was initially named Capitala Private Credit Fund I, L.P. ("PCF") but was later referred to as Capitala Private Credit Fund V, L.P. ("Fund V").  ECF No. 355 ¶¶ 13–14; ECF No. 328 at 18.  As part of the fundraising efforts, Alala states that "CGLLC sought to engage a placement agent" for Fund V.  ECF No. 352 ¶ 15; ECF No. 328 at 18.  NovaFund disagrees that only CGLLC was involved in seeking a placement agent.  ECF No. 352 ¶ 15.  In email correspondence, employees who discussed or solicited a placement agent identified themselves as employees at various Capitala entities in the signature blocks, including Capitala SouthPartners, CFC, and Capitala Group.  *See* ECF No. 352-2 at 2 (Casey Swercheck identified as the "Vice President" of "CapitalSouth Partners & Capitala Finance Group," emailing with Wheelahan and Alala about placement agents); ECF No. 355-2 at 2 (Alala identified as the "Chairman and CEO" and "Chief Investment Officer" of "Capitala Group," "Capitala Finance Corp," and "CapitalSouth Growth Fund," soliciting a placement agent); ECF No. 355-2 at 2–3 (Steve Arnall identified as part of the "Capitala Group," discussing placement agents).

### i.    *The Search for a Placement Agent*

On December 1, 2015, Casey Swercheck emailed Bryan Kelley, who is "a member and Managing Director of NovaFund," to introduce "Capitala Group" and request a conversation about identifying a placement agent for the "Capitala Group fundraise."  ECF No. 355 ¶ 16; ECF No. 352-1 at 1; ECF No. 350-1 at 1.  On December 17, 2015, Alala emailed Thomas Sullivan of Sandler O'Neill + Partners, L.P. about the search for a placement agent.  ECF No. 355-5 at 2; *see*

*also* ECF No. 352-4 at 2 (Wheelahan recounting a conversation with Sullivan regarding the PCF I fundraise).  Over the next few months, Capitala and NovaFund exchanged emails with information about PCF I and Capitala and drafts of the term sheet.  On December 8, 2015, Swercheck emailed Kelley a PDF of a presentation for PCF I.  ECF No. 355 ¶¶ 17–18; ECF No. 328 at 53–54.  Then on January 6, 2016, Swercheck emailed Kelley with responses to NovaFund's questions about "Capitala," including information about CFC and the fund's formation counsel, Robinson Bradshaw & Hinson, P.A.  ECF No. 355 ¶¶ 19–20; ECF No. 328 at 76–77, 80.  On January 31, 2016, Swercheck emailed the NovaFund team—Kelley, Kallie Hapgood, and James Howe—a draft term sheet for the PCF I, which stated that CIA, "together with its affiliates and related entities, 'Capitala Group,'" organized the fund, that the investments would be co-investments with CFC or CapitalSouth SBIC Fund IV, L.P., and that Capitala PCF I, LLC was the General Partner.  ECF No. 355 ¶¶ 23–25; ECF No. 328 at 84, 86, 88.  The draft term sheet further explained that the General Partner would make the investment decisions and was controlled by CIA.  *Id.* at 88.

On February 1, 2016, NovaFund, Alala, Wheelahan, and Swercheck held a due diligence meeting in Charlotte, North Carolina.  ECF No. 355 ¶¶ 22, 27; ECF No. 328 at 43, 82.  Afterwards, the parties continued to exchange information about PCF I or Fund V and draft term sheets.  On February 2, 2016, Alala emailed Kelley, Wheelahan, and the fund's formation counsel with the main points from their meeting.  ECF No. 328 at 98–99.  In response to Alala's email, Kelley asked for the updated term sheet, *id.* at 98 and on February 4, 2016, the fund's formation counsel[3] provided an updated term sheet to Kelley, which identified the fund as Fund

---

[3] The fund's formation counsel, Robinson, Bradshaw & Hinson, P.A., was also identified as "general legal counsel to Fund [V], the General Partner [Capitala PCF V, LLC], and Capitala Group."  ECF No. 328 at 101.  Counsel from that law firm appeared to assist Capitala in its negotiations over the term sheet.  NovaFund did not retain counsel for the negotiation of the term sheet.  ECF No. 328 at 30.

V, *id.* at 98, 100, rather than PCF I.  The updated term sheet stated CPA "together with its affiliated and related entities, 'Capitala Group'" organized Fund V and that Capitala PCF V, LLC, the General Partner of Fund V, was "responsible for making investment and other decisions for the Fund and is managed by Capitala Group."  *Id.* at 100–01; ECF No. 355 ¶¶ 28–32.

Then on February 5, 2016, Kelley emailed Alala, Swerchek, Wheelahan, and the fund's formation counsel a proposed term sheet and wrote that "[NovaFund] would like to execute this short form contract before proceeding to a full engagement letter."  ECF No. 328 at 108; ECF No. 355 ¶ 33.  The proposed term sheet was drafted by Kelley, ECF No. 328 at 47, contained a blank carve-out list, *id.* at 112, and identified CGLLC as the other party to the agreement, *id.* at 110–11.  According to Kelley, he "called Richard Wheelahan and asked him who the counterparty should be for [the term sheet], and [Wheelahan] told [him] Capitala Group, LLC." *Id.* at 48.  Kelley further testified that "[he] would have never put down the entity without calling first."  *Id.*  However, Wheelahan testified that he did not recall any conversation with Kelley regarding which Capitala entity to use for the proposed term sheet.  ECF No. 356-3 at 94–95. Kelley also testified that "[n]o one, associated with any of the Capitala entities hid from [him] that they had multiple entities" and that he "chose to enter into a contract with [CGLLC] even though [he] knew who the fund manager was at CPA."  ECF No. 328 at 218.

On February 8, 2016, Swerchek emailed Alala and Wheelahan stating that the proposed term sheet "look[ed] pretty straightforward" and that "the toughest conversations will be around exclusivity (i.e. How we define Sandler engagement if we go forward there) and the carve out list."  ECF No. 355-4 at 2.  On April 21, 2016, Alala sent an internal draft of the carve-out list to Sullivan and wrote that "[w]e would add your names to this list and have a separate

compensation arrangement with you for the names you add."  ECF No. 355-6 at 2.  Sullivan

replied that he needed "a little time … to vet some things out" and inquired about Alala's timing

to which Alala responded that he had "delayed signing the placement agent engagement for 2

months."  ECF No. 355-7 at 2.  A few days later, Swercheck emailed Alala the following

questions: "Remind me again what Nova said about working with Sandler on Fund V? Were

they OK with it?"  ECF No. 355-8 at 2–3.  Alala responded, "We did not tell them. We are using

the names sandler provides us on our carve out list."  *Id.* at 2.  Swercheck replied, "Is that a good

idea? Don't you think we need to be upfront about it? Seems risky to hide that."[4]  *Id.*  Wheelahan

later testified "that if an investor who is listed on Sandler's carve-out list invested in Fund V,

Sandler would get the fees, not NovaFund."  ECF No. 356-3 at 58; *see also* ECF No. 352-21 at 2

(Swercheck wrote to Alala that "if we're paying Sandler to go to the names on their list (and

that's in the $125mm cap) [NovaFund will] probably … freak out.").

On April 26, 2016, Alala emailed Kelley, among others, stating that the goal was to

execute the term sheet that week and that "[w]e should have our carveout list done soon."  ECF

No. 328 at 186.  Kelley responded that he had sent the revised term sheet with the "agreed to

changes" to Swercheck.  *Id.*  Then, upon Swercheck's request, Kelley provided a revised term

sheet, which still listed CGLLC as the counterparty and included two investors on the carve-out

List—"Hamilton Lane and clients" and "Kemper Insurance."  *Id.* at 185, 187, 190; ECF No. 355

¶ 40.  On the same day, Wheelahan wrote to the fund's outside counsel, Alala, and Swercheck

that he was "awaiting Sandler's additions to the carveout list."  ECF No. 355-10 at 2.  On April

27, 2016, Sullivan emailed Alala and Wheelahan with Sandler's "target list" of investors.  ECF

No. 355-12 at 2–3.  Referring to Sandler's "target list," Alala asked Swercheck whether he

---

[4] The exhibit shows that Alala responded to Swercheck's email but even the version filed under seal has redacted Alala's response.  ECF No. 355-8 at 2.

thought "Nova will fight hard with some of these names."  ECF No. 352-8 at 3.  Swercheck responded that he thought they "need[ed] to avoid giving some sort of global exclusivity to nova, which is what they are asking for."  *Id*

On April 28, 2016, Wheelahan emailed Kelley a revised term sheet with "Capitala's comments, including the carve-out list" with 105 names of potential investors.  ECF No. 355 ¶ 41; ECF No. 328 at 192, 198–201.  Kelley averred that Swercheck previously told him to expect sixty investors on the Carve Out list.  ECF No. 350-1 at 3–4.  After Wheelahan's email, Kelley averred that he had a "conversation with Mr. Swercheck … and express[ed] surprise at the number of the investors on the list."  ECF No. 350-1 at 4; ECF No. 355 ¶ 42; *see also* ECF No. 328 at 205.  Kelley stated that during that conversation, Swercheck "assured [him] that all investors of the Carve Out list were ones with whom Capitala had a strong relationship."  ECF No. 350-1 at 4; *see also* ECF No. 328 at 207–08 (Kelley stating that Swercheck said, "We know these investors … -- we've worked with them before" and that Swercheck expressed confidence specifically about Hamilton Lane and Kemper).  Further, Kelley stated that he did not remember whether he expressed to Swercheck that NovaFund had a good relationship with any of the investors on the Carve Out list during that conversation.  *Id.* at 206.  However, in an email on April 29, 2016, Kelley wrote that NovaFund did not know, or that Capitala had a "superior relationship" with, certain investors on the carve-out list, such as Hamilton Lane, Kemper, and the State of Florida but that there were certain investors on the list that NovaFund "[knew] well." *Id.* at 237.  Kelley then proposed two compromises for the Carve Out list: (1) NovaFund would receive a reduced fee for investors on the Carve Out list that it is familiar with, and (2) NovaFund would receive full fees only on investments over the $125,000,000 cap on

investments from Carve Out list investors.  ECF No. 328 at 230–31; ECF No. 355 ¶ 48.
Wheelahan agreed to the $125,000,000 cap.  ECF No. 328 at 229.

On May 5, 2016, Kelley sent Wheelahan, Alala, and Swercheck a term sheet executed by
himself and Howe.  *Id.* at 247, 254.  In response, Alala asked whether it was clear in the partially
executed draft of the term sheet that NovaFund's fee attached to limited partner commitments on
equity but did not apply to third party debts.  *Id.* at 235; ECF No. 355 ¶ 52.  Kelly confirmed that
it was clear.  ECF No. 328 at 235; ECF No. 355 ¶ 52.  Wheelahan then proposed to change the
"Fee Proposal" language from "Capitala will agree to compensate NovaFund in an amount equal
to 1.5% of the Fund's invested capital for any Target investor that subscribes to the Fund or a
separately managed account ('Success Fee')," ECF No. 328 at 253, to "Capitala will agree to
compensate Nova for an amount equal to 1.5% of the amount of equity capital that any Target
Investor commits to the Fund or a separately managed account ('Success Fee')," *id.* at 234.
Kelley revised the term sheet according to Wheelehan's proposed change.  *Id.*

Finally, on May 9, 2016, Kelley sent Alala and Swercheck the final executed term sheet
("Term Sheet"), which Alala then circulated to various Capitala employees.  ECF No. 355-13 at
2, 6–11.  In the Term Sheet, Alala signed on the signature block for CGLLC, and Kelley and
Howe signed on the signature block for NovaFund.  *Id.* at 8.  After the Carve Out List at the end
of the Term Sheet, NovaFund mistakenly attached a list of responses to due diligence questions
for a credit fund managed by Deerpath.  ECF No. 355-13 at 12–13; ECF No. 350-1 at 12.
Michael Graham, the Vice President of Capitala Group, noticed and informed Swercheck about
the attachment for Deerpath.  ECF No. 352-14 at 2.  In response, Swercheck noted that
NovaFund "will represent three other funds this year."  *Id.*; *see also* ECF No. 350-1 at 12 (Kelley

stating that during the negotiations of the Term Sheet, he informed "Alala that NovaFund typically represented 3-4 funds at any given time.").

At the time of signing, "NovaFund understood that CPA was the manager for Fund V." ECF No. 328 at 261–62 (noting that "it is common for placement agent to work with a fund as well as its fund manager regardless of what entity signs the agreement"); ECF No. 352 ¶ 56. However, NovaFund did not know that Capitala was working with another placement agent, Sandler, to solicit investors for Fund V.  ECF No. 350-1 at 6; *see also* ECF No. 356-3 at 52 (Wheelahan stating that Capitala worked with Sandler).  NovaFund only discovered Sandler's role after the filing of this lawsuit.  ECF No. 350-1 at 6.  Sandler was aware that NovaFund was a placement agent for Fund V.  ECF No. 359 ¶ 137; *see* ECF No. 356-3 at 62 (Wheelahan testifying that it was his "understanding that Sandler knew that NovaFund was the placement agent for Fund V"); ECF No. 352-16 at 2–3 (Alala directing Wheelahan to send Sandler the Term Sheet on May 17, 2016); ECF No. 352-25 (Sullivan, in an email on September 13, 2016, writing that Capitala hired NovaFund as a placement agent for Fund V but that "Capitala would like Sandler to help them raise money as well"); ECF No. 355-25 at 2 (Swercheck writing that Capitala had "two agents, one of which is in the dark about the other one").

### ii.     *The Term Sheet*

Under the Term Sheet, Novafund was required to "make best efforts to place partnership interest in [Fund V] with North American, European, Australian and Asian investors ('Target Investors')."  ECF No. 355-13 at 6.  NovaFund was to start the "advisory work immediately with Capitala Group LLC ("Capitala") to assist with the preparation of marketing materials and, in coordination with Capitala, contacting potential Fund investors."  *Id.*  The Term Sheet included the following provision entitled "Fee Proposal":

As compensation for the advisory and exclusive placement services to be provided by NovaFund hereunder, Capitala agrees to pay NovaFund a monthly fee of $20,000 ("Retainer Fee"). The Retainer Fee will be paid until the sooner of: 1) the first close of Capitala Fund V (if such close constitutes commitments for which NovaFund is paid a success fee in excess of $200,000), or 2) $200,000 of retainer fees have been paid. The first monthly installment of the Retainer Fee will be due May 11, 2006.

Capitala will agree to compensate NovaFund for an amount equal to 1.5% of the amount of equity capital that any Target Investor commits to the Fund or a separately managed account. Should Capitala agree to a lower management fee than 1.5% for any Target Investor, NovaFund will earn a fee equal to one year of the Company's management fee from the Target Investor, but in no case less than 1.0% of committed capital for the Target Investor(s); provided, however, that no Success Fee shall be earned by NovaFund in respect of capital raised for traded credit vehicles with distinct investment strategies from the Fund. Retainer Fees will offset Success Fees at the rate of 50% until all Retainer Fees have been rebated. The Success Fee will be paid quarterly based on invested capital with NovaFund's total Success Fee being paid in full in 30 months. NovaFund will be due a fee for capital commitments from Target Investors that close into the Fund to the next Capitala-sponsored successor vehicle with a substantially similar strategy at the rate of 50 basis points of such capital commitments ("Nova Tail Fee").

It is understood that no Fee shall be payable with respect to commitments by the Manager or General Partner of the Fund or executives of Capitala or any of their respective officers, directors and employees and any such officer's, director's or employee's immediate family members … for its own or their own accounts, or for investors previously known to Capitala ("Schedule 1 – Carve Out Investors"), up to $125 million in commitments.

*Id.* at 7. Wheelahan testified that he understood the Term Sheet to mean that NovaFund was CGLLC's "exclusive placement agent [with] respect [to] the target investors." ECF No. 356-3 at 53.

If an investor breached an agreement by failing to fulfill its commitment, NovaFund would still receive a Success Fee based on the commitment. ECF No. 355 ¶ 83–84; ECF No. 356-3 at 17 (Wheelahan testifying that "NovaFund had the right to fees once an investor committed to investing as opposed to when the investor may actually have invested"); ECF No. 328 at 290 (Mark McAndrews, who is NovaFund's Chief Financial Officer, ECF No. 328 at 263,

12

testifying that even if the investor "committed to investing" but the capital is never invested, then NovaFund is still due a Success Fee). NovaFund admits that for funds, if it "failed to close any capital commitments in Fund [V], the retainer fee and those reimbursements would be the only compensation under" the Term Sheet. ECF No. 328 at 286. However, NovaFund further states that it would receive Success Fees for any capital commitments to the SMAs. *See* ECF No. 353-20 at 3; ECF No. 356-3 at 19. Kelley stated that "NovaFund reasonably expected it could help raise $300 million in capital commitments for Fund V and [SMAs], when taking into account investments from anchor investors and the strength of Capitala's relationships with Carve Out investors." ECF No. 350-1 at 9.

The Term Sheet further provided that "[a]t NovaFund's discretion, a separate engagement letter to be initiated by NovaFund may be entered into between Capitala and NovaFund that addresses market standard legal and compliance terms," ECF No. 355-13 at 7, but the parties never negotiated or executed a separate engagement letter. Wheelahan acknowledged that that the Term Sheet was "intended to precede an engagement letter," ECF No. 355-10 at 2, and stated that the "funds investment advisor or general partner would have been party to [a definitive agreement]." ECF No. 328 at 181. Kelley testified that the reason for the lack of engagement letter with Capitala was that NovaFund was "okay with moving forward, just based on the business terms, rather than adding in legal regulatory and compliance issues." *Id.* at 29–30. Howe averred that "NovaFund intended to sign a more fulsome agreement, known as an engagement letter, with Capitala" and that "[i]n [his] experience, an engagement letter normally comes at the direction of the fund manager." ECF No. 350-2 at 1–2. Further, Howe averred that "NovaFund regularly ask[ed] Mr. Alala about executing an engagement letter, but Mr. Alala push[ed] [it] off." *Id.* at 2.

### iii.   CGLLC and Fund V

Arnall, the Chief Financial Officer for CFC, ECF No. 356-1 at 3, testified that CGLLC had no ownership interest in Fund V, *id.* at 16.  *See also* ECF No. 353-8 at 2, 8 (Swercheck providing an organization chart for Fund V to a potential investor, which did not include CGLLC).  Wheelahan testified that CGLLC had no connection with Fund V and that Capitala "withheld [the] information from NovaFund about the role that CGLLC would have in connection with Fund V."  ECF No. 356-3 at 98.  Instead, Wheelahan testified that CGLLC "was a relatively meaningless entity" with "[n]o assets, no operations, no real structure," *id.* at 11, and that the "business purpose" of CGLLC was "[t]o be a signatory for certain nuisance agreements," *id.* at 70.

### C.  Performance Under the Term Sheet

On May 26, 2016, CPA paid NovaFund's first monthly retainer, ECF No. 352-19 at 2; *see* ECF No. 356-3 at 77, even though the Term Sheet stated that "[CGLLC] agrees to pay NovaFund a monthly fee of $20,000 ('Retainer Fee')," ECF No. 328 at 241.  After the execution of the Term Sheet, Kelley averred that "NovaFund immediately began performing its duties under the Agreement by providing advice to Capitala on the private placement memorandum …, marketing materials, pitchbook for potential investors, and track record presentations."  ECF No. 328 at 266; ECF No. 352 ¶ 64.  While NovaFund was ready to start marketing to investors, "Capitala [] asked NovaFund to delay" marketing to investors "by several months" and "instructed NovaFund not to do any work with Target Investors until after the first two investors, known as 'anchor investors,' finalized their commitment to Fund V."  ECF No. 328 at 266; *see also* ECF No. 356-3 at 51 (Wheelahan testified that "Capitala requested that NovaFund delay its marketing efforts . . . [i]n order to get a first closing with the anchor investors accomplished

setting the terms for the fund with those anchor investors.").  The two anchor investors were Hamilton Lane, Inc. and Kemper Insurance Company, ECF No. 328 at 266, both of which were on the carve-out list, *id.* at 244.  Kelley averred that "Capitala explained to NovaFund that Capitala had been working with two institutional investors interested in investing in Fund V and would not need NovaFund's assistance in finalizing their participation in Fund V."  *Id.* at 266. On June 16, 2016, Alala wrote to Kelley that he anticipates "clos[ing] Fund V in the next couple of weeks" and believes that "August is the first months [sic] we can crank some meetings."  ECF No. 355-15 at 3; *see also* ECF No. 354-6 at 17 (Swercheck testified that he told NovaFund to start marketing Fund V to investors "around the time of the first close on the fund").  In response, Kelley advised Alala that "the longer "[NovaFund] wait[s] to begin marketing in earnest then the lower the likelihood we close additional capital by the end of the year."  ECF No. 355-15 at 3.  In the first and only close of Fund V on August 31, 2016, ECF No. 354 at 15; ECF No. 354-6 at 17–18, four clients of Hamilton Lane and a subsidiary of Kemper committed capital of $40 million to Fund V, ECF No. 356-3 at 48–50; ECF No. 328 at 267.

After the first closing, according to Kelley, NovaFund began promoting Fund V to investors and contacted almost 500 potential investors.  ECF No. 328 at 267, 268.  On November 8, 2016, Hapgood of NovaFund reached out to Swercheck to determine whether NovaFund should set up a meeting with the Knights of Columbus, which was on the carve-out list.  ECF No. 355-25 at 4–5.  After conferring with Alala, Swercheck emailed Hapgood that Knights of Columbus "was inadvertently put on the list" and if she had "the ability to set a meeting [to] please do so."  *Id.* at 3.  However, after Alala and Arnall determined that Knights of Columbus was on Sandler's carve-out list, *id.* at 2–3; ECF No. 355-26 at 2, Swercheck emailed Hapgood that "Knights of Columbus is an existing relationship hence why on carveout list" and that "we

are reaching out to them to set a meeting," ECF No. 355-24 at 2; *see* ECF No. 350-1 at 9.

Hapgood eventually received permission to contact Knights of Columbus in early 2017 but the

investor declined to invest in Fund V because it had no further allocation for credit.  ECF No.

350-1 at 10; *see also* ECF No. 328 at 297.

NovaFund's fundraising efforts were further delayed by Alala's lack of availability for

investor meetings during a four-week period from January to February 2017 due to his divorce

trial.  *Id.* at 269; ECF No. 350-1 at 10; ECF No. 355 ¶ 68.  Then on January 3, 2017, Alala

emailed Swercheck that he was considering switching placement agents, ECF No. 355-30 at 2

(Alala wrote that "if we cannot raise money direct then we need to switch Placement Firms."),

and on February 1, 2017, he stated that he was planning to meet with new placement agents, ECF

No. 352-33 at 2 (Alala wrote that "I am flying to FLA next week to meet with another placement

agent. Nova is not producing the meetings. Very frustrating.").  Afterwards, on February 16,

2017, Kelley averred that "Alala sent an email to NovaFund threatening to fire and sue

NovaFund, because he claimed that Capitala had learned that NovaFund was in the market

helping to raise capital for another credit fund with a different investment strategy from Fund V."

ECF No. 350-1 at 11; ECF No. 355 ¶ 69.  Around February 2017, Capitala stopped paying the

monthly retainer to NovaFund.  ECF No. 350-1 at 13; ECF No. 355 ¶ 71.  Between mid-

February and mid-March 2017, "Capitala requested that NovaFund suspend its efforts for over a

month … while Capitala focused its attention on raising capital overseas in Europe and Middle

East."  ECF No. 328 at 269; ECF No. 355 ¶ 70.  On March 7, 2017, Wheelahan emailed

NovaFund proposing to end their agreement by May 31, 2017 but NovaFund rejected the offer.

ECF No. 350-1 at 13.  Then "[o]n March 10, 2017, Capitala instructed NovaFund not to attend

any future meetings with investors." ECF No. 350-1 at 13.  A few days later, Wheelahan

terminated NovaFund's access to the "Fund V Data Room."  ECF No. 355-34 at 2.  As of April

5, 2017, Capitala had paid $160,000 of the retainer and $4,838.97 of expenses to NovaFund with

the last payment date on February 7, 2017.  ECF No. 355-37 at 2.

### D.  The Addendum

Kelley stated that Capitala approached NovaFund to amend the Term Sheet.  ECF No.

328 at 219.  According to Wheelahan, it was his "understanding that NovaFund wanted to make

sure that … if the parties were going to continue working together," that there would be a "clean

slate."  ECF No. 356-3 at 99; ECF No. 355 ¶ 95; *see also* ECF No. 328 at 220 (Kelley stating

that based on what he "knew at that point," the purpose of the release in the Addendum was for a

"clean slate").  On March 30, 2017, Wheelahan emailed Mark McAndrews of NovaFund asking

whether he would "agree to forego exclusivity over non-North American capital raising for Fund

V."  ECF No. 353-4 at 2 (Wheelahan's email signature block identifying him as the "CCO" and

"General Counsel" of "Capitala Group"); *see* ECF No. 350-1 at 14.  On April 24, 2017, the

parties executed the Addendum titled "Capital Group and NovaFund Advisors Addendum."

ECF No. 353-7 at 2, 4.  Wheelahan testified that he negotiated the Addendum "at the instruction

and guidance of Alala" and that "Capitala Group," which was used as a party to the Addendum,

was "meant to describe [CIA] and [CPA]."  ECF No. 356-3 at 54.  The Addendum provided as

follows:

Capitala Group and NovaFund Advisors Addendum

I.      Nova agrees that Capitala is free to retain placement agent(s) focused on
non-North American limited partners (e.g., Europe, Asia and Israel), and that
capital commitments obtained from some jurisdictions will generally not entitle
Nova to a "Success Fee".

a. Capitala acknowledges and agrees that notwithstanding the forgoing, Nova Shall
earn a Success Fee in respect of capital commitments obtained from non-North
American investors who were initially solicited by Nova or its agent prior to this

17

date (including, without limitation, capital commitments obtained from Allianz SE, BBC, Golding Capital Partners, BB Alternative Partners or any of their respective affiliates).

II.     Capitala's final two $20,000 Retainer Fee installment payments are due June 1, 2017 and July 1, 2017, respectively.  In addition, Capitala will reimburse Nova for all properly approved travel and entertainment expenses submitted.

III.     Either Capitala or Nova may terminate the entire relationship and transaction terms at any time on or after September 1, 2017, with or without cause, and that in the event of termination, Capitala shall owe Nova a Success Fee on capital commitments from investors introduced to Capitala by Nova either through conference calls or in-person meetings.

IV.     Both Nova and Capital agree to release and discharge each other and all affiliates, officers, and agents, of any and all claims, disputes, demands or causes of action or any nature, which the parties had, now have, or may have, related to Nova's services rendered to Capitala, or Capitala's obligations to Nova to date.

ECF No. 353-7 at 4.  At the bottom of the Addendum, Kelley signed as "Principal" and Alala signed as "Chairman and CEO."  *Id.*

### E.  Investments After the Addendum

After the execution of the Addendum, Kelley stated that "NovaFund continued performing services by contacting investors[,] arranging introductions," and advising and assisting Capitala in its presentations to Target Investors, "including StepStone."  ECF No. 328 at 275.  Before the execution of the Addendum, on October 11, 2016, Kelley emailed his contacts at StepStone Global LP ("StepStone") to introduce them to Fund V, which was the "first time StepStone had been solicited in connection with Fund V and related [SMAs]."  *Id.* at 269.  Kelley also stated that NovaFund had "worked for over a year to keep StepStone interested in forming an investment relationship with Capitala."  *Id.*

On October 6, 2017, Swercheck emailed Capitala's responses to StepStone's data requests to the Stepstone team.  ECF No. 353-8 at 2.  Capitala's response described the ownership structure of the General Partner and Fund V but did not mention CGLLC or include

CGLLC in Fund V's organization chart.  *Id.* at 7–8; ECF No. 359 ¶ 97.  On November 17, 2017, Alala wrote that "Capitala … receive[d] two verbal commitments from a large insurance company and the Swiss Capital Group for "$750MM to $1Billion commitment to private funds in the form of a SMA offshore vehicle."  ECF No. 353-10 at 3.  Then on January 22, 2018, Alala stated that StepStone "want[ed] to close the SMA this quarter and allocate no less than 100mm per annum to the SMA for the next 3 years."  ECF No. 355-41 at 2.  In another email, Alala described StepStone as a "1 billion [dollar] commitment."  ECF No. 355-43 at 2.

On April 13, 2018, CPA entered into an Investment Advisory Agreement ("IAA") with Swiss Capital Invest Holding Limited, ECF No. 330 at 115, which is an affiliate of StepStone, *id.* at 97, 210 (stating the affiliates of the parties to the IAA include StepStone Group Europe LLP); ECF No. 355 ¶ 76.  Subsequently, on July 2, 2018, CPA entered the "Amended and Restated Investment Advisory Agreement" ("Amended IAA") with Swiss Capital Invest Holding (Dublin) Limited.  ECF No. 330 at 4.  The Amended IAA identified Swiss Capital as the "Manager" and CPA as the "Investment Advisor."  ECF No. 330 at 8.  The corporate representative for StepStone testified that these agreements established two separately managed accounts ("SMAs") with Capitala, one onshore and one offshore.  ECF No. 354-5 at 6.  Wheelahan stated that "the investment strategy for Fund V is the same investment strategy" as the Swiss Capital SMAs.[5]  ECF No. 354-7 at 34.  Kelley "learned, through one of [his] connections at StepStone and through discovery in this action, that StepStone and Capitala had set up two [SMAs]."  ECF No. 328 at 269.

Under the Term Sheet and the Addendum, NovaFund receives a "Success Fee" based on the committed equity capital from investors.  ECF No. 355 ¶¶ 78–79; *see* ECF No. 328 at 241

---

[5] I will refer to the SMAs as "Swiss Capital SMAs."  The parties use "Swiss Capital SMAs" and "StepStone SMAs" interchangeably.

(Term Sheet stating that CGLLC "will agree to compensate NovaFund for an amount equal to 1.5% of the amount of equity capital that any Target Investor commits to the Fund or a separately managed account"); *id.* at 306 ("[I]n the event of termination, Capitala shall owe Nova a Success Fee on capital commitments from investors introduced to Capitala by Nova either through conference calls or in-person meetings."). The Defendants and NovaFund disagree as to whether the IAAs between CPA and Swiss Capital included a commitment of capital. ECF No. 355 ¶ 77. According to the Defendants, the IAAs do not include any commitment of capital. *Id.* Wheelahan testified that that the IAAs did not contain "any specific dollar commitment." ECF No. 358-1 at 4. Defendants also point to testimony from Kelley in which he defined "commitments" as "an agreement between an investor and a manager binding them to an agreed upon investment program." ECF No. 328 at 226; *see also id.* at 284 (Kelley testifying that a "closing is when an investor commits, through executing legal documentation that binds them, to provide capital to the manager for their investment strategy"); *id.* at 285 (Kelley testifying that "the fund manager can use those commitments [by investors] to call capital to then make investments in other companies"); *id.* at 317 (McAndrews defining "commits to Fund V or a separately managed account" as "when any investor commits to invest funds … in these vehicles").

However, NovaFund disputes the Defendants' definition of commitment arguing that commitments for SMAs operate differently. ECF No. 355 ¶¶ 80–82; *see* ECF No. 359 ¶ 132. James Howe, the Managing Director of NovaFund, averred that "a private capital fund is typically set up as a limited partnership and investors become limited partners in the fund." ECF No. 350-2 at 2. According to Howe, the fund manager of the private capital fund identifies investments for the fund and calls capital from each investor. *Id.* Once that call for capital is

made, "each limited partner is obligated to transfer that amount to the fund." *Id.* However, Howe stated that SMAs are "different from private funds" and that "[u]nlike a fund, investors to an SMA are bound to provide capital when they commit to the investment that is the subject of the SMA." *Id.* A commitment to a SMA "occurs later in the process, once a loan has been made and the SMAs[]are obligated to fund them." *Id.*; *see also* ECF No. 354-5 at 19 (Stepstone corporate representative testifying that "[i]f a loan is funded [by the SMA], capital would be deployed to fund the loan" and "the loan could be committed but not have cash move").

### F.  Alala's Remarks About NovaFund

Alala made a series of remarks about NovaFund to other investors.  On April 27, 2018, Alala emailed Ares Management stating that the "Fund stalled after first close due to [] horrible and fraudulent placement agent behavior."  ECF No. 355-44 at 2.  In addition, on April 7, 2020, Alala emailed Hamilton Lane and Kemper the following: NovaFund's "principals … are bad people and we suggest nobody do business with them and their respective placement agent firms. We are aware that these bad actors continue to show opportunities to Hamilton Lane."  ECF No. 355-46 at 2.

### G.  The Lawsuit and NovaFund's Stoppage of Business

NovaFund filed this lawsuit against CGLLC on June 15, 2018.  ECF No. 1.  Kelley testified that "the last time NovaFund engaged in any active business" was in July 2018.  ECF No. 328 at 32; ECF No. 355 ¶ 90.  Kelley stated that NovaFund stopped operating because it had completed its capital raising for Deerpath Capital Management, StepStone entered into an agreement with Capitala to create SMAs, and Capitala sued NovaFund.  ECF No. 328 at 33. Kelley also stated while he had no evidence that Alala's "disparaging remarks … contributed to NovaFund not obtaining new engagements," NovaFund "never had a hard time winning business

in the past." *Id.* at 224 –25.  McAndrews stated that "Capitala was badmouthing [NovaFund] everywhere" and that the NovaFund principals left the company in 2018 because "Nova at that point had a damaged name, and it was difficult to … garner new mandates for fundraising." ECF No. 354-4 at 3–4.

CGLLC was dissolved on June 9, 2020.  ECF No. 339 at 13.[6]  Alala testified that CGLLC "had to be dissolved, it couldn't support itself anymore" because "[i]t burned through all its resources … to pay legal bills."  ECF No. 354 at 16.  On June 23, 2020, Alala wrote: "We dissolved Capitala Group LLC. … We are allowing a default judgment against that LLC as that LLC has no assets. Court denied adding other parties to the lawsuit. So Nova receives what they deserve."  ECF No. 353-20 at 4.  On October 27, 2020, the Court allowed NovaFund to add CIA, CPA, and CSLC as defendants.  ECF No. 191.

## II.     LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as

---

[6] The Statements of Material Fact did not indicate when CGLLC was dissolved.  *See* ECF No. 352, 359. The date of dissolution is taken from the ruling on the Defendants' motion to dismiss.  *See* ECF No. 339.

'to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.   DISCUSSION

### A.  Veil Piercing

NovaFund claims that CGLLC "operated under the dominion and control of … CIA, CPA, and CSLC," ECF No. 350 at 11, and therefore, CIA, CPA, and CSLC should also be held liable for NovaFund's claims against CGLLC. Defendants argue that NovaFund's veil piercing theory "fails as matter of law" because (1) there was no fraud associated with the use of CGLLC's corporate form, and (2) NovaFund cannot reach the Defendants by merely piercing the veil of CGLLC. ECF No. 327 at 12–13.

In a diversity case, such as this one, I apply the "choice of law rules of the forum state," which is Connecticut. *Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). In Connecticut, "when a limited liability company is incorporated in another state," courts will apply "the laws of that foreign state." *Weber v. U.S. Sterling Sec., Inc.*, 292 Conn. 722, 730 (2007). Thus, to determine whether to pierce the veil of CGLLC, which is organized under North Carolina law, I will apply North Carolina law. *See Universitas Educ., LLC v. Benistar*, No. 20cv738, 2021 WL 965794, at *7 (D. Conn Mar. 15, 2021) (using Connecticut choice of law rules and applying Delaware law to a company incorporated in Delaware for a veil piercing claim). The parties agree that North Carolina law governs the issue of whether to pierce CGLLC's veil. *See* ECF No. 327-1 at 16; ECF No. 350 at 11–12.

Under North Carolina law, "courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity."  *Glenn v. Wagner*, 313 N.C. 450, 454 (1985).  "[A] corporation which exercises actual control over another, operating the latter as a mere instrumentality or tool, is liable for the torts of the corporation thus controlled. In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded." *Id.* (citations and internal quotation marks omitted). However, veil piercing is a "drastic remedy … invoked only in an extreme case where necessary to serve the ends of justice," *Dorton v. Dorton*, 77 N.C. App. 667, 672 (1985), and "a corporation's separate and independent existence is not to be disregarded lightly," *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438 (2008) (brackets omitted).

In determining whether to pierce the corporate veil, North Carolina courts have adopted the "instrumentality rule," which consists of the three following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn*, 313 N.C. at 455.  For the first prong, courts may examine the following factors: "[i]nadequate capitalization ('thin corporation')," "[n]on-compliance with corporate formalities," "[c]omplete domination and control of the corporation so that it has no independent identity," "[e]xcessive fragmentation of a single enterprise into separate corporations," "non-payment of

dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-functioning of other officers or directors, [and] absence of corporate records." *Id.* at 455, 458.

Here, Novafund seeks to pierce CGLLC's veil to reach CIA, CPA, and CSLC. There is no dispute as to the following facts about the companies:

- CGLLC was a limited liability company of which Alala was the sole member;
- CIA is a limited liability company that was wholly owned by Atlas Capitala Investments, LLC;
- CPA is a limited liability company of which CIA was the sole member;
- CSLC is a limited liability company wholly owned by CPA; and
- CGLLC was not the parent company of CIA, CPA, or CSLC.

ECF No. 352 ¶¶ 2, 4, 5, 6; ECF No. 356-3 at 71. Therefore, it is undisputed that the Defendants have no ownership interest in CGLLC and that they do not have an owner or shareholder in common with CGLLC.

The issue is whether, under North Carolina law, NovaFund may pierce the veil of CGLLC to reach the Defendants despite the lack of common ownership. Defendants argue that NovaFund cannot pierce CGLLC's veil to reach them because the lack of common ownership between CGLLC and the rest of the companies is "fatal to [Novafund's] veil-piercing claims." ECF No. 358 at 4. Instead, Defendants contend that NovaFund, by piercing CGLLC's veil, would reach only Alala, the sole shareholder of CGLLC, *id.*, and that NovaFund could only reach the Defendants by first "pierc[ing] CGLLC to reach Mr. Alala and then reverse pierc[ing] through Mr. Alala under Delaware law," *id.* at 8. NovaFund counters that North Carolina law permits it to pierce CGLLC's veil to reach the Defendants. ECF No. 350 at 16. I agree with the Defendants.

Under North Carolina law, "[g]enerally, the domination and control needed to disregard a corporate entity can be exercised in three different forms: (1) parent-subsidiary corporations,

where the disregarded entity is the wholly or partially owned subsidiary of the parent; (2) individual dominant shareholder, where the disregarded corporate entity is owned by one or more individual persons; and (3) affiliated corporations, where the disregarded corporate entity and one or more other corporations are under the common control of another person or persons." *United States v. CBRE Heery, Inc.*, No. 5:20-CV-257-BR, 2021 WL 3201357, at *2–3 (E.D.N.C. June 9, 2021) (quoting Russell M. Robinson II, *Robinson on North Carolina Corporation Law* § 2.10 (2021)), *report and recommendation adopted*, No. 5:20-CV-00257-BR, 2021 WL 5750493 (E.D.N.C. Dec. 2, 2021); *see Glenn*, 313 N.C. at 457–49 (stating that the instrumentality rule has been applied to parent-subsidiary corporations and corporations with a dominant shareholder but that the rule is broad enough to apply to affiliated corporations). The Supreme Court of North Carolina has defined "affiliated corporations" as "corporations in which the controlling interest in both is owned by the same person or persons." *Glenn*, 313 N.C. at 455–56. NovaFund does not argue a theory of veil piercing of parent-subsidiary corporations or of a corporation to reach a dominant shareholder.[7] Instead, NovaFund argues that the instrumentality test applies to the "Defendants [who] are horizontally affiliated with [CGLLC]." ECF No. 350 at 12. While it is true that the instrumentality test does apply to affiliated corporations, NovaFund cannot avail itself of this test because CGLLC and the Defendants are not affiliated companies. Here, it is undisputed that the controlling interests in CGLLC and the Defendants are not owned by the same person or persons and, therefore, these companies are not affiliated in the way that the North Carolina Supreme Court has defined that term. NovaFund does not point to any North Carolina authority permitting a veil piercing claim against a nonaffiliated company; nor does it point to any other definition of "affiliated companies" under North Carolina law.

---

[7] In fact, NovaFund denies seeking to pierce CGLLC's veil to reach its sole member, Alala. ECF No. 350 at 16.

26

Relying on *Glenn*, NovaFund nonetheless argues that the instrumentality rule applies because "[w]hile shared ownership is certainly a common way in which companies may be affiliated, it is not a requirement to pierce the corporate veil." ECF No. 350 at 17. But *Glenn* does not support this argument, because the *Glenn* court made clear that the instrumentality test applies "when there is evidence of *common ownership and actual working control*, as in the case of affiliated corporations, *taken together with other factors* suggesting domination of finances, policy or business practice (including, but not limited to undercapitalization, disregard of corporate formalities, and insolvency)." 313 N.C. at 459 (emphases added). Therefore, under *Glenn*, to satisfy the element of control for the instrumentality test, the plaintiff must provide both evidence of "direct stock ownership of a subsidiary corporation," *id.*, or, in the case of affiliates, i.e., "corporations in which the controlling interest in both is owned by the same person or persons," *id.* at 455–56, and evidence of other factors showing domination and control such as undercapitalization, disregard of corporate formalities, complete domination and control, and excessive fragmentation, *id.* at 459. NovaFund submits evidence of only the latter, arguing that CGLLC was intentionally undercapitalized, Capitala ignored corporate formalities, Capitala completely dominated and controlled CGLLC, Capitala is excessively fragmented, and Capitala abused the corporate form. ECF No. 350 at 20–26. NovaFund's failure to provide evidence of "common ownership and actual working control" is "fatal" to its veil piercing claims despite the evidence of the other factors of domination and control. *See CBRE Heery, Inc.*, 2021 WL 5750493, at *2, *4, *5 (where the Plaintiffs alleged that Defendant CBRE was the alter ego of another company, BBG, but failed to allege that BBG had an ownership interest in CBRE or that the two companies shared common owners, the court held that the plaintiffs failed to establish the first element of the instrumentality rule even if inferences about control could be drawn from

the plaintiffs' evidence that "BBG controlled funding of the project; BBG's employees supervised work at the construction site and controlled access to it; BBG dictated certain policies regarding the project; BBG controlled the negotiation of subcontractors' claims arising out of the project; and CBRE's President ceded control to BBG"); *id.* at *2, *4 (denying Plaintiffs' motion to add BBG as a defendant, finding that the proposed amendment was "futile because it fail[ed] to allege BBG has any ownership interest in or a legal right to control CBRE"); *see also Krausz Industries Ltd. v. Smith-Blair, Inc.*, 188 F. Supp. 3d 545, 557 (E.D.N.C. 2016) (declining to exercise personal jurisdiction over Defendant Sensus Shanghai based on the theory that it was the alter ego of Defendant Smith-Blair because Smith-Blair had no ownership interest in Sensus Shanghai and therefore, the "[l]ack of showing" of ownership interest was "fatal to jurisdiction on an alter ego basis").

NovaFund cites multiple North Carolina cases in support of its theory of veil piercing, ECF No. 350 at 14, but in all of those cases the plaintiffs sought to pierce the veil of either companies under common ownership or a subsidiary to reach stockholders.  ECF No. 350 at 14; *see Glenn*, 313 N.C. at 456, 459 (applying the instrumentality test to two companies with a common shareholder); *Pfizer v. Synthon Holding, B.V.*, 386 F. Supp. 2d 666, 678 (applying the instrumentality test to companies owned by the same person); *Gen Fid. Ins. Co. v. WFT, Inc.*, 269 N.C. App. 181, 190 (N.C. Ct. App. 2020) (applying the instrumentality test to two companies with the same sole shareholder); *State ex rel. Cooper*, 362 N.C. at 442–43 (applying the instrumentality test to pierce the veil of a company to reach its shareholders).  NovaFund cites no cases applying North Carolina law in which the court permitted a plaintiff to pierce the veil of Company A to reach Company B when the two companies lacked "common ownership."

Because it is undisputed that CGLLC and the Defendants do not have common ownership, I conclude that NovaFund's veil piercing theory fails as a matter of law.

### B. Breach of Contract

Although NovaFund's breach of contract claim against CGLLC, CPA, and CIA relies in part on its failed veil piercing theory, NovaFund separately argues that CIA and CPA themselves are parties to the contract. ECF No. 350 at 26. I find that there are genuine disputes of material fact as to whether NovaFund and CGLLC modified the contract to add CIA and CPA as parties.

#### i.     *Choice of Law*

A threshold issue is whether North Carolina or Connecticut law applies to NovaFund's breach of contract claim. Defendants take no position on which state's law applies. ECF N. 327-1 at 22. NovaFund argues that its breach of contract claim is governed by Connecticut law. ECF No. 350 at 26 n.8. I decline to decide which state's law applies to the breach of contract claim because under either Connecticut or North Carolina law, there remains a genuine dispute of material fact.

#### ii.     *Parties to the Contract*

In Connecticut and North Carolina, courts generally decline to impose liability for breach of contract on persons who are not parties to the contract. *See FCM Grp., Inc. v. Miller*, 300 Conn. 774, 797 (2011) ("Parties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary. … In other words, a person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms." (internal quotation marks, brackets, and citation omitted)); *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*, 143 N.C. App. 1, 8 (2001), *aff'd*, 354 N.C. 565 (2001) ("[I]n a

breach of contract action, a plaintiff's allegations must either show it was in privity of contract, or it is a direct beneficiary of the contract.").

Defendants argue that the Term Sheet unambiguously identifies CGLLC as the counterparty, not CIA or CPA. ECF No. 327-1 at 24. NovaFund counters that even without the veil piercing theory, Defendants are still liable under the contract because there are disputed issues of material fact regarding the parties' intent about the counterparties to the contract, ECF No at 26, whether the parties' course of conduct "evidences an intent to modify the Term Sheet," *id.* at 29, and whether the Addendum added "other Capitala entities" to the contract, *id.* at 30.

Parties may modify their contracts through subsequent conduct. Under North Carolina law, "[a] modification [of] a contract occurs if there is mutual assent to the terms of the modification and consideration for the contract." *Lewis v. Edwards*, 147 N.C.App. 39, 49 (2001). Further, "[t]he provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding." *Son-Shine Grading, Inc. v. ADC Const. Co.*, 68 N.C. App. 417, 422 (1984). Under Connecticut law, "[f]or a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense*." Herbert S. Newman & Partners, P.C. v. CFC Const. Ltd. P'ship*, 236 Conn. 750, 761–62 (1996) (internal quotation marks and citation omitted). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act," *Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981), and the "[m]odification of a contract may be inferred from the attendant

circumstances and conduct of the parties." *Herbert S. Newman & Partners, P.C.*, 236 Conn. at
762.

“When a party asserts a claim that challenges the … construction of a contract, [a court]
must first ascertain whether the relevant language in the agreement is ambiguous.” *Greene v.
City of Waterbury*, 126 Conn. App. 746 (2011).  “If the language of the contract is susceptible to
more than one reasonable interpretation, the contract is ambiguous.” *C & H Shoreline, LLC v.
Rubino*, 203 Conn.App. 351, 357 (2021); *see also Barrett Kays & Assoc., P.A. v. Colonial Bldg.
Co., Inc. of Raleigh*, 129 N.C.App. 525, 528 (1998) (“An ambiguity exists in the contract if the
language of a contract is fairly and reasonably susceptible to either of the constructions asserted
by the parties.” (internal quotation marks and citation omitted)).  Further, “[a] contract
is ambiguous if the intent of the parties is not clear and certain from the language of the contract
itself.... Accordingly, any ambiguity in a contract must emanate from the language used in the
contract rather than from one party's subjective perception of the terms.... When the language of
a contract is ambiguous, the determination of the parties' intent is a question of fact.... If a
contract is unambiguous within its four corners, intent of the parties is a question of law
requiring plenary review.... Where the language of the contract is clear and unambiguous, the
contract is to be given effect according to its terms. A court will not torture words to import
ambiguity where the ordinary meaning leaves no room for ambiguity.” *Greene*, 126 Conn. App.
at 751–52 (citation omitted); *see also Meehan v. Am. Media Inter., LLC*, 214 N.C.App. 245, 262
(2011) (“When determining the intent of contracting parties, we look first to the language of the
agreement.  If the contract's plain language is clear, the intention of the parties can be inferred
from the contract's words.  In that case, interpreting the intention of the parties is a question of

law.  If the contract is ambiguous, however, interpretation is a question of fact, and resort to extrinsic evidence is necessary." (citations and internal quotation marks omitted)).

I find that the Term Sheet unambiguously identifies CGLLC as the counterparty to the contract.  The first page states that "NovaFund will begin advisory work immediately with Capitala Group LLC ('Capitala')."  ECF No. 328 at 240.  The Term Sheet then sets out CGLLC's obligations, including reimbursing NovaFund for out-of-pocket expenses and paying NovaFund the Retainer Fee, Success Fee, and Nova Tail Fee.  *Id.* at 240–41.  On the third page, there are four signature blocks—two for NovaFund, one for Columbus Advisory Group, Ltd., and one for CGLLC.  ECF No. 328 at 242.[8]  Alala signed on CGLLC's signature block as the Chairman and CEO of CGLLC.  *Id.*  Nowhere does the Term Sheet suggest that another Capitala entity is a party to the agreement.

Without addressing the language in the Term Sheet, NovaFund argues that I should consider extrinsic evidence about the parties' intent.  ECF No. at 27–28.  Specifically, NovaFund argues that Capitala selected CGLLC as the counterparty and that NovaFund believed it was retained as a placement agent by "'Capitala,' 'Capitala Group,' or other Capitala entities."  *Id.*  I cannot consider extrinsic evidence, however, because I have found that the Term Sheet unambiguously identifies the CGLLC as the counterparty.  *See North Carolina State Bar v. Merrell*, 243 N.C. App. 356, 370–71 (2015) ("When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties."); *Hartford Acc.*

---

[8] The parties submitted two different versions of the signed Term Sheet.  One version, as described above, has four signature blocks.  ECF No. 328 at 242.  The other version has three signature blocks—two for NovaFund and one for CGLLC—and does not have a signature block for Columbus Advisory Group, Ltd.  ECF No. 355-13 at 6–8.  The parties do not address whether the existence of these two different versions has any significance, and so I assume that it does not.

*and Indem. Co. v. Ace Am. Reinsurance Co.*, 284 Conn. 744, 762–63 (2007) ("[E]xtrinsic evidence may be considered in determining contractual intent if a contract is ambiguous.").

NovaFund also argues that the parties modified the Term Sheet to include other Capitala entities as counterparties through subsequent conduct or through the Addendum. First, NovaFund argues that the "parties' course of conduct evidences an intent to modify the Term Sheet to clarify that other Capitala entities, not just [CGLLC], would be contractual parties." ECF No. 350 at 29. In support of its argument that CGLLC agreed to modify the contract to include the Defendants, NovaFund points to evidence that CPA paid NovaFund's first monthly retainer, ECF No. 352-19 at 2, and NovaFund's request for expense reimbursement, ECF No. 353-29; ECF No. 352-30, that NovaFund worked with employees from other Capitala entities on Fund V, *see e.g.,* ECF No. 355-25 at 4–5 (Hapgood of NovaFund emailing Swercheck, who identified himself as the "Vice President" of "CapitalSouth Partners & Capitala Finance Group," in his email signature, ECF No. 352-2 at 2, about whether she could reach out to a potential investor), and that CGLLC did not receive any fees that Capitala earned in connection with Fund V or SMAs. But this evidence does not show that there was mutual assent to add the Defendants to the Term Sheet. Nothing in the Term Sheet prevents CGLLC from performing its obligations by arranging for another entity to pay on its behalf or work on Fund V on its behalf. Further, nothing in the Term Sheet suggests that CGLLC would receive all of the fees related to Fund V or any SMAs. Merely because other entities assisted in CGLLC's performance or received fees related to Fund V does not make those entities parties to the contract.

Second, NovaFund argues that the Addendum served to modify the Term Sheet and add "other Capitala entities" as parties to the contract. ECF No. 350 at 30. Defendants contend that the "Addendum does not change the parties to the Term Sheet" because, when considering the

contract as a whole with the Term Sheet, "[t]he Addendum modified the Term Sheet and was part of a single overall agreement between [NovaFund] and CGLLC." ECF No. 358 at 11. Applying the contract interpretation principles described above, I find that there is a genuine dispute of material fact as to whether CIA and CPA were added as parties to the contract.

When the Addendum and Term Sheet are read together, I find that the language in the Addendum is ambiguous as to which Capitala entities are parties to that document. The Term Sheet explicitly identifies "Capitala Group LLC" and defines that entity as "Capitala." ECF No. 328 at 240. The signature block in the Term Sheet identifies "Capitala Group LLC." *Id.* at 242. By contrast, the Addendum is titled "Capitala Group and NovaFund Advisors Addendum" and describes "Capitala's" obligations. *Id.* at 306. The signature block does not identify a particular Capitala entity but instead states "[a]greed and [a]ccepted by" Alala, who is identified as "Chairman and CEO." *Id.* I find this language ambiguous. Unlike the Term Sheet, the title of the Addendum refers to "Capitala Group," not "Capitala Group LLC" or "Capitala," the short-hand definition of CGLLC used in the Term Sheet. While "Capitala Group" could refer to CGLLC, it is not clear from the language that it does. And the fact that it is signed by Alala as "Chairman and CEO" does not clarify matters, because he held the same titles with respect to other Capitala entities. The Addendum uses "Capitala" throughout its provisions, which could refer to the abbreviation of CGLLC given in the Term Sheet but could also refer to other Capitala entities. One plausible reading of the Addendum is that "Capitala Group" refers to CGLLC and the parties have not changed; another is that there is a different party to the Addendum because it does not explicitly refer to CGLLC and it is not clear whether "Capitala Group" is meant to be an abbreviation of CGLLC.

Because the language is ambiguous, I may consider extrinsic evidence.  There is evidence in the record that SEC filings for CIA and CPA list "Capitala Group" as an alternative name.  In addition, Wheelahan testified that he negotiated the Addendum "at the instruction and guidance of Alala" and that "Capitala Group," was "meant to describe [CIA] and [CPA]."  ECF No. 356-3 at 54.  Wheelahan was the General Counsel of CIA and the Chief Compliance Officer of CIA and CFC.  ECF No. 356-3 at 3, 8; *see also* ECF No. 353-4 at 2 (showing an email in which Wheelahan is discussing the drafting of the Addendum with McAndrews and the email signature block identifies Wheelahan as the "CCO" and "General Counsel" of "Capitala Group").  Because the Addendum was negotiated by Wheelahan, who was employed by CIA and CFC, and because it used "Capitala Group" instead of "Capitala Group LLC," it is plausible that the Addendum intended to added CIA and CPA as parties to the contract, in part to broaden the release provision to protect other, better capitalized Capitala entities.  However, there is also evidence that the Addendum was meant as a "clean slate" for the existing parties, suggesting that the Addendum was only meant to modify certain provisions of the agreement between NovaFund and CGLLC.  *See* ECF No. 356-3; ECF No. 328 at 220.

I conclude that there is a genuine dispute about whether the Addendum added CIA and CPA as parties to the contract.

### iii. *Commitment of Capital*

The parties do not dispute that a valid contract exists.[9]  Instead, the issue is whether the Defendants breached the agreement by failing to pay NovaFund Success Fees in connection with

---

[9] The elements for a breach of contract claim under Connecticut and North Carolina law are substantially the same.  In Connecticut, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.  *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014).  In North Carolina, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of [the] contract."  *Wells Fargo Servs. USA, Inc. v. Link*, 372 N.C. 260, 276 (2019) (citation omitted).

the Swiss Capital SMAs.  I find that there is a genuine dispute of material fact as to whether the Defendants breached the contract. [10]

Under the Term Sheet, "Capitala … agree[d] to compensate NovaFund for an amount equal to 1.5% of the amount of equity capital that any Target Investor *commits* to the Fund for a separately managed account."  ECF No. 328 at 241 (emphasis added).  The Addendum reiterates that "Capitala shall owe Nova a Success Fee on capital commitments from investors introduced to Capitala by Nova either through conference calls or in-person meetings."  *Id.* at 306.  Defendants argue that NovaFund is not due any Success Fees because "[a] Target Investor must have made a capital commitment to Fund V or a SMA attached to Fund V," ECF No. 358 at 12, and nothing in the IAAs "commits Swiss Capital to provide any capital to … a separately managed account attached to Fund V," ECF No. 327-1 at 32.  Defendants also argue that "commitment" unambiguously means "an agreement to do something in the future, [especially] to assume a financial obligation."  *Id.* at 30.  NovaFund counters that Success Fees are due because Swiss Capital committed to a SMA and Swiss Capital "was obligated to invest funds when Capitala identified appropriate investments."  ECF No. 350 at 31–32.  NovaFund argues that even though commitments to SMAs are different than those to private funds and happen later when the loans close, Swiss Capital's obligations to the SMA still qualify for Success Fees. *Id.* at 31.  NovaFund argues that "commit" is defined as "to carry into action deliberately: perpetrate," *id.*, and that even under the Defendants' definition of "commitment," Swiss Capital has assumed a financial obligation, *id.* at 32 n.13.

---

[10] NovaFund's second amended complaint advances three breaches of contract claims: (1) Defendants breached the exclusivity provision by working with Sandler, (2) Defendants failed to pay Success Fees in connection with the Swiss Capital SMA, and (3) Defendants failed to pay any Tail Fees.  ECF No. at 193 at 33.  I dismiss the first claim—exclusivity—below.  *See* footnote 14, *infra*.  The parties did not address the claim regarding Tail Fees in their briefs and so that claim will remain for trial.

I find that the term "commit" in the Term Sheet is ambiguous.  The Term Sheet and the

Addendum do not define "commit" or "capital commitments."  It is unclear what is required for

an investor to "commit" within the meaning of the contract—whether legal documentation is

required or an oral commitment is sufficient, whether the investor needs to identify a specific

amount of capital, or whether committing would be different for a SMA than for a fund.  Neither

the Defendants' nor NovaFund's definitions of "commit" or "commitment" resolve the dispute

over whether the Swiss Capital IAAs qualify as "capital commitments."  "Commit" appears

broad enough to embrace NovaFund's definition that an obligation to provide capital in the

future is sufficient.[11]  But "commit" could also be construed narrowly to align with the

Defendants' definition.  The extrinsic evidence is not unequivocal on the issue either.

Wheelehan stated that "NovaFund had the right to fees once an investor committed to investing

as opposed to when the investor may actually have invested."  ECF No. 356-3 at 17.  Kelley

stated that a "closing is when an investor commits, through executing legal documentation that

binds them, to provide capital to the manager for their investment strategy," ECF No. 328 at 284,

but NovaFund argues that this statement applies only to funds and that a SMA operates

differently.  Based on the text of the contract and the extrinsic evidence, there is a genuine

dispute of material fact as to whether Swiss Capital has made any "commitments."

Defendants also argue that for NovaFund to receive Success Fees for SMAs, the SMA

must be related or attached to Fund V.  ECF No. 358 at 12.  NovaFund counters it is due Success

Fees for "non-fund vehicles" and that "Capitala knew it was hiring NovaFund to raise capital for

---

[11] Further, there is evidence in the record that Alala wrote to Capitala employees that Swiss Capital had orally committed specific amounts of capital to the SMAs.  *See* ECF No. 353-10 at 3.  Although the Defendants argue that a "commitment" requires "legal documentation *that binds them, to provide capital to a manager for their investment strategy*" and occurs when the investor is subject to a capital call, *id.* at 31 (emphasis in original), the Term Sheet does not state such a requirement and it is not clear that the word "commit" requires such measures.

these other types of investment vehicles." ECF No. 350 at 33. I conclude that the Term Sheet and the Addendum are ambiguous as to whether the SMA must be related or attached to Fund V. The Term Sheet does not state that the SMA must be related or attached to Fund V but, generally, the Term Sheet concerns fund raising efforts for Fund V. The Term Sheet also does not define a SMA. Further, extrinsic evidence does not resolve the issue. Kelley previously testified that a SMA is part of Fund V. ECF No. 358-3 at 3. However, Wheelahan testified that a SMA is "[e]ither what's known as a fund of one, in other words, a limited partnership that has one limited partner in which Capitala -- a Capitala affiliate is the general partner, or an account held on the balance sheet of an institutional investor in which a Capitala entity serves as the investment advisor, not the general partner of the fund." ECF No. 354-7 at 18. CPA serves as the "Investment Advisor" to the Swiss Capital SMA. ECF No. 330 at 8. Therefore, there is a genuine dispute of material fact as to whether the Term Sheet and the Addendum require the SMA to be related to or attached to Fund V to generate Success Fees.

Because I find that the Addendum is ambiguous as to whether the Defendants were added as parties to the contract and that the Term Sheet and Addendum are ambiguous as to whether CIA or CPA breached the contract, I deny summary judgment as to the portion of the breach of contract claim alleging non-payment of Success Fees.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

NovaFund claims that the Defendants breached the covenant of good faith and fair dealing included in the Term Sheet and the Addendum by failing to pay Success Fees and by failing to work exclusively with NovaFund. ECF No. 193 at 33–34.[12] Defendants argue that

---

[12] As noted, *see* footnote 10, *supra*, the Second Amended Complaint alleges another ground for the breach of contract and breach of the implied covenant of good faith and fair dealing claims: the Defendants' alleged failure to pay NovaFund any Tail Fees. ECF No. 193 at 33. Neither parties addressed this claim in their briefs, and so this claim will remain for trial.

because "NovaFund is not entitled to any Success Fees," NovaFund's claim for breach of the

implied covenant of good faith and fair dealing fails.  ECF No. 327-1 at 30.  Further, Defendants

argue that any claims related to "CGLLC's alleged failure to comply with its contractual

obligation to work exclusively with NovaFund" are barred by the Release.  *Id.* at 31.  I find that

the bad faith claim fails because (1) it is barred by the Release, and (2) lacks evidentiary support

in the record.

### i. *The Addendum's Release Provision*

#### a. <u>Whether the Release is Voidable</u>

Defendants argue that all claims related to the "alleged duties or obligations that arose

prior to the Addendum," including "CGLLC's alleged failure to comply with its contractual

obligation to work exclusively with NovaFund," were released under the Addendum's release

provision ("Release").  ECF No. 327-1 at 31.  Further, Defendants argue that even if, as

NovaFund contends, the release was obtained by fraud and therefore voidable, NovaFund

"ratified" the release by "seek[ing] to enforce and affirm the terms of the Addendum."  *Id.* at 33.

NovaFund argues that it did not ratify the release.  ECF No. 350 at 35–36.  Because NovaFund

has elected to pursue damages for the alleged fraud rather than rescind the Term Sheet and the

Addendum, I find that the Release is operative.

Under both Connecticut and North Carolina law, fraud renders a contract voidable.  *See*

*Sakon v. Manager*, 113 Conn. App. 802, 804 (2009) ("[A] release, being a contract whereby a

party abandons a claim to a person against whom that claim exists, is subject to rules governing

the construction of contracts."); *A. Sangivanni & Sons v. F. M. Floryan & Co.*, 158 Conn. 467,

472 (1969) ("Fraud in the inducement of a contract ordinarily renders the contract merely

voidable …."); *Cowart v. Honeycutt*, 257 N.C. 136, 142 (1962) ("[E]very portion and clause of a

release voidable for fraud in its inception is unenforceable and not binding.").  Further, a party

asserting fraud related to a contract may either (1) rescind the contract or (2) affirm the contract

and seek damages as a result of that fraud.  *See A. Sangivanni & Sons*, 158 Conn. at 472 (stating

that the defrauded party has a choice to void the contract or affirm the contract and sue for

damages); *Parker v. White*, 235 N.C. 680, 688 (1952) ("[A] party who has been fraudulently

induced to enter into a contract or sale has a choice of remedies. He may repudiate the contract,

and, tendering back what he has received under it, may recover what he has parted with or its

value; or he may affirm the contract, keeping whatever property or advantage he has derived

under it, and may recover in an action for deceit the damages caused by the fraud. … [A]s a

general rule, the defrauded party cannot both rescind and maintain an action for deceit. If he

elects to rescind the contract, he may recover back what he has parted with under it, but cannot

recover damages for the fraud. On the other hand, if he elects to maintain an action for deceit, he

cannot sue for rescission or reformation.").

NovaFund does not seek to rescind either the Term Sheet or the Addendum.  Instead, it

has elected to affirm both by suing the Defendants for damages stemming from the alleged fraud.

NovaFund argues, however, that because the "Defendants continued to hide the shell nature of

CG[LLC] at the time NovaFund entered into the Addendum," the release is "voidable."  ECF

No. 350 at 35.  But rescission is an all or nothing remedy; NovaFund may not rescind or void

only a part of a contract.  *See Parker*, 235 N.C. at 688 (stating that a "defrauded party is not

allowed to rescind in part and affirm in part, he must do one or the other"); *A. Sangivanni &*

*Sons*, 156 Conn. at 472 (finding that where a defrauded party affirms the contract and sue for

damages, "the contract remains in force" and the provisions within that contract are binding on

the parties).  I conclude that by electing to pursue damages for the alleged fraud, NovaFund affirmed the Addendum, and therefore, the Release is binding on the parties.

b.  <u>Scope of the Release</u>

Defendants argue that NovaFund's claims related to the "alleged duties or obligations that arose prior to the Addendum" are barred by the Release.  ECF No. 327-1 at 31.  The Addendum includes the following Release provision: "Both Nova and Capitala agree to release and discharge each other and all affiliates, officers and agents, of any and all claims, disputes, demands or causes of action of any nature, which the parties had, now have, or may have, related to Nova's services rendered to Capitala, or Capitala's obligations to Nova, to date."  ECF No. 328 at 306.  In a previous ruling, I found that based on the language of the Release, any claims "'related to Nova's services rendered to Capitala, or Capitala's obligations to Nova, to date [*i.e.*, prior to April 24, 2017, the date the Release was signed,]' would be unambiguously within the scope of the release."  ECF No. 101 at 11.  Further, I found that "[b]y enumerating only 'services rendered' and 'obligations,' the language could reasonably suggest that issues regarding the execution and validity of the agreement are not released."  *Id.* at 20.  Thus, I concluded that "[i]t is ambiguous whether [the Release] encompasses … issues which go to the validity of the contract."  *Id.*  The extrinsic evidence submitted regarding the Release does not resolve this issue.  Wheelahan and Kelley testified that the Addendum was meant to provide a "clean slate."  ECF No. 356-3 at 99 (Wheelahan's "understanding that NovaFund wanted to make sure that … if the parties were going to continue working together," there would be a "clean slate"); ECF No. 328 at 220 (Kelley stating that based on what he "knew at that point," the purpose of the release in the Addendum was for a "clean slate").  A "clean state" is too vague a phrase to indicate whether claims based on unknown fraud—especially fraud not relating directly to NovaFund's

41

"services" and Capitala's "obligations"—are encompassed.  Therefore, I conclude that there is a genuine dispute of material fact as to whether the Release covers claims premised on unknown fraud and, more generally, claims related to the execution and validity of the contract.

The Release does bar, however, the bad faith claim related to the alleged breach of the exclusivity provision.  That claim arose prior to April 24, 2017 and is "related to … Capitala's obligations to Nova";[13]  the claim is, therefore, barred by the Release.[14]  But the Release does not bar the other claim of bad faith concerning the Success Fees because those fees are related to the Swiss Capital SMA, which was established after the signing of the Addendum.

### ii.    *Evidence of Bad Faith*

Under Connecticut law, "[t]o constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *Welch v. Stonybrook Gardens Co-op., Inc.*, 158 Conn. App. 185, 200 (2015).  The claim for a breach of the implied covenant "must be tied to an alleged breach of a specific contract term, often one that allows for discretion on the part of the party alleged to have violated the duty."  *Landry v. Spitz*, 102 Conn. App. 34, 47 (2007).  "Bad faith means more than mere negligence; it involves a dishonest purpose.... Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill

---

[13] The Term Sheet provides the "compensation for the advisory and exclusive placement services to be provided by NovaFund."  ECF No. 328 at 241.  The Addendum appears to modify the "exclusivity provision" by stating that "Nova agrees that Capitala is free to retain placement agent(s) focused on non-North American limited partners."  ECF No. 328 at 306.  Together, these provisions suggest that after the execution of the Addendum, NovaFund remained the exclusive placement agent for North American limited partners.  If there were breaches of the exclusivity provision *after* the execution of the Addendum, then those alleged breaches would not be barred by the Release.  Although NovaFund states that it did not know of "Capitala's work with Sandler on Fund V until damning documents were produced in discovery," ECF No. 350 at 36, it does not provide any evidence that Capitala committed additional breaches of the exclusivity provision after the signing of the Addendum.

[14] For the same reasons, NovaFund's breach of contract claim based on the exclusivity provision is also dismissed.

some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576–77 (2004).  Similarly, under North Carolina law, "[t]here is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract." *Musselwhite v. Cheshire*, 266 N.C. App. 166, 179 (2019).

No reasonable juror could find from the evidence in the record that the Defendants deprived NovaFund of the Success Fees in bad faith because NovaFund provides no evidence to warrant such an inference.  Rather, as described above, the parties dispute the applicability of Success Fees to the Swiss Capital SMA and the dispute is centered around an ambiguity in the contract.  Therefore, I grant summary judgment on the breach of implied covenant claim based on the alleged breach of the exclusivity provision and the alleged failure to pay Success Fees.

### D.  Unjust Enrichment

Under Connecticut law, "[u]njust enrichment … provides restitution, or the payment of money, when justice so requires. … Recovery is proper if the defendant was benefitted, the defendant did not pay for the benefit and the failure of payment operated to the detriment of the plaintiff." *Piccolo v. Am. Auto Sales, LLC*, 195 Conn. App. 486, 494 (2020) (internal quotation marks and citation omitted).  However, a "valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." *Kelley v. Five S. Grp., LLC*, 136 Conn. App. 57, 66–67 (2012).  Under North Carolina law, the elements for a "prima facie claim" for unjust enrichment are the following: (1) "one party must confer a benefit upon the other party," (2) "the benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other part in a manner that is not

justified in the circumstances," (3) "the benefit must not be gratuitous," (4) "the benefit must be measurable," and (5) "the defendant must have consciously accepted the benefit." *JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 541–42 (2013) (internal quotation marks and citations omitted). However, "[i]t is well established that if there is a contract between the parties, the contract governs the claim and the law will not imply a contract .... [in such cases] an action for breach of contract, rather than unjust enrichment, is the proper cause of action." *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 165 (1999).

Defendants argue that NovaFund cannot assert a claim for unjust enrichment because a contract exists covering the same subject matter. ECF No. 327 at 37. It is not clear, however, that the contract covers the Swiss Capital SMA. As I found earlier, the contract is ambiguous as to the definition of "commit." If the contract does not cover the Swiss Capital SMA, NovaFund has a claim for unjust enrichment, because it has submitted evidence that Kelley introduced StepStone to Capitala and that Swiss Capital's investment in the SMA was a result of that introduction. *See* Fed. R. Civ. P. 8(d)(2) (permitting parties to plead claims in the alternative). Therefore, I deny summary judgment on the unjust enrichment claim.

### E. Fraud

In its fraud claim, NovaFund identifies three allegedly false representations: (1) Wheelahan represented to NovaFund that CGLLC, which was a "dummy entity," was the appropriate signatory to the Term Sheet; (2) Defendants promised that NovaFund would be the exclusive placement agent for Fund V; and (3) Defendants told NovaFund that Defendants had relationships with all investors on the carve-out list. ECF No. 350 at 38–39. Defendants argue that "NovaFund's fraud claims against CPA and CIA are dependent on its veil piercing theory," and, therefore, must be dismissed. ECF No. 327-1 at 35. It is not clear, however, which Capitala

44

entities certain employees were working for when the alleged fraud occurred, and so I decline to dismiss the claim on that basis. Defendants also argue that the fraud claims are barred by the Addendum. ECF No. 327-1 at 28–32. But, as discussed above, it is not clear whether the Release covers claims premised on unknown fraud. After reviewing the fraud claim, I grant summary judgment as to the first and second allegedly false representations but deny summary judgment as to the third allegedly false representation.

In Connecticut, "the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Capp Indus., Inc. v. Schoenberg*, 104 Conn. App. 101, 116 (2007). Similarly, in North Carolina, fraud requires a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27 (2007) (citation omitted). In addition, "any reliance on the allegedly false representations must be reasonable." *Id.* at 527.

To prove a claim for fraud by nondisclosure under Connecticut law, "there must be a failure to disclose known facts and … a duty to speak." *Duksa v. City of Middletown*, 173 Conn. 124, 127 (1977). A duty to disclose may be imposed (1) by statute or regulation, (2) when a party makes a voluntary disclosure and thus, under common law, is required to "make a full and fair disclosure as to the matters about which he assumes to speak," and (3) when "the parties share a special relationship." *DiMichele v. Perrella,* 158 Conn.App. 726, 731–32 (2015) (internal quotation marks omitted). Under North Carolina law, "where there is a duty to speak[,] the concealment of a material fact is equivalent to fraudulent misrepresentation." *Griffin v.*

*Wheeler-Leonard & Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976).  "A duty to disclose arises in three situations": (1) "a fiduciary relationship exists between the parties to the transaction," (2) "when a party has taken affirmative steps to conceal material facts from the other," and (3) "where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."  *Harton v. Harton*, 81 N.C. App. 295, 297–98 (1986).

First, NovaFund argues that Wheelahan fraudulently represented to NovaFund that CGLLC was the appropriate signatory to the Term Sheet while withholding "information about [CGLLC] being a shell entity purposefully undercapitalized to ensure no liability."  ECF No. 350 at 38.  In support, NovaFund submits Kelley's testimony that Wheelahan told him to use CGLLC as the counterparty to the Term Sheet.  ECF No. 328 at 48.  NovaFund also submits Wheelahan's testimony that he "withheld" information from NovaFund about CGLLC's role in Fund V and that the "business purpose" of CGLLC was "[t]o be a signatory for certain nuisance agreements," ECF No. 356-3 at 70, 98.  While NovaFund provides evidence that Wheelahan told Kelley to use CGLLC as the counterparty for the Term Sheet, there is no evidence that Wheelahan represented to NovaFund that CGLLC was adequately capitalized or that it was being used for a particular purpose.  This portion of the fraud claim thus fails for lack of evidence of a false representation made as a statement of fact.[15]

---

[15] NovaFund also argues that Wheelahan fraudulently failed to disclose to NovaFund that "CG[LLC] would have no role in connection with Fund V."  ECF No. 350 at 40.  Specifically, NovaFund submits testimony from Wheelahan that he "had withheld information from NovaFund about who the entities would be involved in Fund V."  ECF No. 356-3 at 98.  Defendants disagree providing evidence that no Capitala employees "hid that there were multiple entities under the Capitala umbrella" and that NovaFund "voluntarily chose not to contract with CPA."  ECF No. 327-1 at 36.

To prove a claim of fraud by nondisclosure, a party must have a duty to disclose.  I find no such duty here.  These were sophisticated commercial parties dealing at arm's length.  There is no evidence that the parties had a fiduciary relationship or any kind of "special relationship."  Even if Wheelahan offered CGLLC as the counterparty for the Term Sheet, there is no evidence that he made any disclosure concerning CGLLC's business purpose—a

Second, NovaFund argues that Defendants falsely promised that NovaFund would be the exclusive placement agent for Fund V while at the same time Defendants were working with Sandler, ECF No. 350 at 38, and that the Defendants failed to disclose Sandler's involvement, *id.* at 40. Defendants argue that this claim must fail because it duplicates the breach of contract claim. ECF No. 327-1 at 38. I agree that this claim merely replicates the breach of contract claim based on the exclusivity provision. To succeed on a fraud claim brought alongside a breach of contract claim, the fraud claim must be independent of the contract claim. *See Ulbrich v. Growth*, 310 Conn. 375, 390 n.14, 404–05 (Conn. 2013) (stating that the economic loss doctrine bars negligence claims for "commercial losses arising out of the defective performance of contracts" and distinguishing between tort claims that are dependent on contract claims, *e.g.*, a case with "commercial losses *arising out of* the defective performance of contracts," and tort claims that are based on a legal duty outside of a contract, *e.g.*, a case where the "tort claims are 'independent' of the plaintiff's contract claim, and can survive even if the contract claim fails");[16] *id.* 391, 405 (finding that the plaintiffs' tort claims were barred because the negligence and negligent misrepresentation claims were not "independent" from the breach of the implied warranty of title claim since both claims were "premised on the same alleged conduct with respect to the same personal property and rely on the same evidence"); *Tucci v. Jones*, No. FSTCV206048351S, 2021 WL 2182826, at *1 (Conn. Super. Ct. May 5, 2021) (dismissing the plaintiff's fraud claim that was "based solely upon representations made within the [] contractual relationship between the parties" because the defendant did not make any misrepresentations

---

voluntary disclosure that would have required him to "make a full and fair disclosure"—or that he took "affirmative steps to conceal" CGLLC's business purpose from NovaFund.

[16] The *Ulbrich* court suggested that the economic loss doctrine does not bar a fraudulent inducement claim because such a fraud occurs prior to the formation of the contract. *Ulbrich*, 310 Conn. at 406 (quoting *Budgetel Inns, Inc. v. Micros Systems, Inc.,* 8 F.Supp.2d 1137, 1147 (E.D.Wis.1998)). Fraudulent inducement does not apply to this claim because NovaFund points to no evidence that the Defendants made representations about exclusivity outside of the Term Sheet to induce NovaFund to enter into the agreement.

outside of the contract); *Asheville Contracting Co. v. City of Wilson*, 62 N.C. App. 329, 342, 303 S.E.2d 365, 373 (1983) ("Under general principles of the law of torts, a breach of contract does not in and of itself provide the basis for liability in tort. Ordinarily, an action in tort must be grounded on a violation of a duty imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties, rather than one based on an agreement between the parties."). Here, the fraud claim concerning the exclusivity provision is not independent from the breach of contract claim. As the Defendants correctly assert, other than the exclusivity provision in the contract, NovaFund does not point to any evidence in the record of a representation made by the Defendants concerning exclusivity. Even if the Defendants had a duty to disclose Sandler's work on Fund V, the failure to disclose claim would still be "premised on the same alleged conduct" and "rely on the same evidence" as the breach of contract claim. NovaFund also cites evidence of Capitala employees' expressing concern that not informing NovaFund of Sandler's work on Fund V was a "bad idea." ECF No. 350 at 38. Again, this evidence does not indicate that a false representation, outside of the contract, was made to NovaFund. Therefore, this portion of the fraud claim fails because it is not independent from the breach of contract claim.

Third, NovaFund claims that the Defendants falsely represented that they had personal relationships with all the investors on the carve-out list. Defendants argue that Kelley did not remember expressing to Swercheck that NovaFund had a good relationship with any of the names on the carve-out list, that Swercheck expressed confidence about Capitala's relationships with only Hamilton Lane, Kemper, and the State of Florida, and that Swercheck did not represent that any of the names on the carve-out list had previously invested with Capitala. ECF No. 327-1 at 36. I find that NovaFund has raised a genuine dispute of material fact as to this portion of its

fraud claim.  NovaFund points to Kelley's testimony that after the April 28, 2016 email, which

attached a revised term sheet with a carve-out list of 105 names, ECF No. 328 at 204–05,

Swercheck informed Kelley that Capitala knew those investors and had worked with them

before, *id.* at 207.  However, Kelley also testified that he did not remember if Swercheck told

him that the carve-out investors had invested with Swercheck in the past and that Swercheck had

expressed confidence about only three investors.  *Id.* at 207–08.  Therefore, there is a genuine

dispute of material fact as to whether Swercheck represented to Kelley that Capitala knew all of

the investors on the carve-out list and had worked previously with the investors.  There is also

evidence that Swercheck knew this statement to be false.  A few days before that conversation

with Kelley, Alala told Swercheck that "[w]e are using the names [S]andler provides us on our

carve out list."  ECF No. 355-8 at 2.  Thus, a reasonable juror could find that, during the

conversation with Kelley, Swercheck knew that Capitala did not have relationships with all the

investors and that, in fact, the list originated with Sandler.  Finally, there is evidence that

NovaFund relied on Swercheck's representation.  Kelley states that "[t]he strength of

[Capitala's] relationships led NovaFund to believe that Fund V could be raised successfully."

ECF No. 350-1 at 4–5.  I conclude that there are genuine disputes of material fact as to the

portion of the fraud claim alleging that Swercheck misrepresented Capitala's relationship with

investors on the carve-out list.

I grant summary judgment as to the portions to the fraud claim alleging that the

Defendants fraudulently represented CGLLC as the proper counterparty and that the Defendants

promised that NovaFund would be the exclusive placement agent but deny summary judgment as

to the portion alleging that Swercheck misrepresented Capitala's relationship with investors on

the carve-out list.

### F. Tortious Interference with Business Expectancies

NovaFund claims that the Defendants tortiously interfered with its business relationships with prospective investors by (1) barring NovaFund from communicating with carve-out investors, including investors placed on the list by Sandler, (2) making disparaging comments about NovaFund to investors, and (3) prohibiting NovaFund from participating in investor meetings. ECF No. 193 at 38–41.[17]

Under Connecticut law, to prove a claim of tortious interference with business expectancies, a plaintiff must establish: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Brown v. Otake*, 164 Conn. App. 686, 709–10, 138 A.3d 951, 964 (2016). "It is not essential to such a cause of action that the tort have resulted in an actual breach of contract, since even unenforceable promises, which the parties might voluntarily have performed, are entitled to be sheltered from wrongful interference.... It does not follow from this, however, that a plaintiff may recover for an interference with a mere possibility of his making a profit." *Kelly v. Kurtz*, 193 Conn. App. 507, 531, 219 A.3d 948, 967 (2019). "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss ... it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffers actual loss." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 213 (2000). "To put the same thing another way, it is essential to a cause of action for unlawful interference with business that

---

[17] Although the tortious interference claim also mentions that "Alala falsely told" NovaFund that "the Stepstone-Capitala SMAs were beyond the scope of services discussed with NovaFund" and that the investment strategy for the StepStone SMA was "substantially different from the investment strategy for Fund V," these allegations do not appear to form part of the alleged tortious interference. Rather, they appear to be made in an attempt to state a claim of fraudulent concealment that would forestall any statute of limitations defense that the Defendants might assert. *See* ECF No. 193 ¶¶ 199–202.

it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." *Kelly*, 193 Conn. App. at 531.  Under North Carolina law, "tortious interference with prospective economic advantage … arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, ... if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights. … However, a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim. … Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701 (2016) (internal quotation marks and citations omitted).

Defendants argue that NovaFund cannot demonstrate any losses associated with the conduct of the Defendants.  ECF No. 327-1 at 40.  Specifically, Defendants argue that (1) NovaFund ceased engaging in any active business in July 2018 and there is no evidence that the disparaging remarks prevented NovaFund from obtaining business, (2) no loss resulted from NovaFund allegedly being barred from communicating with investors on the carve-out list or being excluded from investor meetings, and (3) NovaFund did not have any prospective contract with any carve-out investors or Target Investors.  *Id.* at 41.  I find that NovaFund cannot demonstrate loss associated with the disparaging remarks but find that NovaFund submits evidence of loss as a result of the Defendants' allegedly barring NovaFund from communicating with investors on the carve-out list.[18]

---

[18] Because the Release covers any claims "related to Nova's services rendered to Capitala" or to "Capitala's obligations to Nova," it bars any claims about the Defendants' precluding NovaFund from communicating with investors, including the Knights of Columbus, before the execution of the Addendum.  It is not clear, however, whether the Defendants still prohibited NovaFund from contacting investors on the carve-out list after the signing of

No reasonable juror could find that the Defendants' disparaging remarks prevented NovaFund from obtaining new business.  During his correspondence with Ares Management, Hamilton Lane, and Kemper, Alala called Capitala's "placement agent" (without identifying NovaFund by name) "horrible and fraudulent," ECF No. 355-44 at 2, and suggested "nobody do business with them," ECF No. 355-46 at 2.  Kelley stated that while he had no evidence that Alala's "disparaging remarks … contributed to NovaFund not obtaining new engagements," NovaFund "never had a hard time winning business in the past."  ECF No. 328 at 224 –25.  In addition, McAndrews stated that "Capitala was badmouthing [NovaFund] everywhere" to the point that NovaFund "had a damaged name, and it was difficult to … garner new mandates for fundraising."  ECF No. 354-4 at 3–4.  When drawing all reasonable inferences in favor of NovaFund, I find that this evidence, at most, indicates that Alala's and/or the Defendants' disparaging remarks about NovaFund made it more difficult for NovaFund to garner new business.  NovaFund submits no evidence suggesting that it had a "reasonable probability" that it was going to enter into contracts with Ares Management, Hamilton Lane, or Kemper, let alone any other investors, but for the disparaging remarks of Alala or the Defendants.

A reasonable juror could find, however, that "there was a reasonable probability" that NovaFund "would have … made a profit," *Kelley*, 195 Conn. App. at 53, had it not been excluded from meetings or barred from contacting investors on the carve-out list.  NovaFund submits evidence that it knew some investors on the carve-out list "well."  ECF No. 328 at 237.  When drawing all reasonable inferences in favor of NovaFund, this evidence suggests that there was a "reasonable probability" that NovaFund could have enticed more investors that it knew

the Addendum.  Since the Addendum does not appear to remove the carve-out list, I assume that the alleged ban on communicating with carve-out investors still existed after the Addendum's signing.  Thus, to the extent that this claim relates to Defendants' actions after the Addendum, it is not barred by the Release.

"well" on the carve-out list to invest in Fund V. NovaFund also provides evidence that it expected to help raise $300 million in capital commitments for Fund V and the SMAs from which NovaFund would have received fees under the Term Sheet. Therefore, NovaFund raises a genuine dispute of material fact as to whether it suffered an "actual loss" from the Defendants' allegedly barring NovaFund from contacting investors on the carve-out list.

In conclusion, I grant summary judgment on the tortious interference claim except for the portion of the claim based on the Defendants' prohibiting NovaFund from contacting carve-out list investors.

### G.  Connecticut Unfair Trade Practices Act ("CUTPA")

NovaFund claims that the Defendants violated CUTPA by (1) using a shell entity to sign the Term Sheet, (2) allowing Sandler to add investors to the carve-out list unbeknownst to NovaFund, (3) excluding NovaFund from participating in communications with StepStone, (4) making representations that CSLC and Fund V did not have a similar investment strategy in order to deprive NovaFund of fees under the Term Sheet, (5) instructing StepStone to keep documents related to CSLC and the Swiss Capital SMA to shield them from discovery, and (6) making disparaging comments about NovaFund to investors. ECF No. 193 at 41–44.

CUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). To establish a claim under CUTPA, a plaintiff must prove: "(1) the defendant committed an unfair or deceptive act or practice; (2) the act complained of was performed in the conduct of trade or commerce; and (3) the prohibited act was the proximate cause of harm to the plaintiff." *Pellet v. Keller Williams Realty Corp.*, 177 Conn. App. 42, 62 (2017). The courts use three factors to determine whether an act or practice is unfair: 1) whether it is in violation of public policy as established by common law or statute, 2)

whether it is otherwise immoral, and 3) whether it causes substantial harm to consumers. *Tillquist v. Ford Motor Credit Co.*, 714 F. Supp. 607, 616 (D. Conn. 1989) (citations omitted).

"[T]o be entitled to any relief under CUTPA, a plaintiff must [also] prove that he has suffered an ascertainable loss due to a CUTPA violation." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 218 (2008).  "An 'ascertainable loss' is a loss that is 'capable of being discovered, observed or established' and that "was caused by, or 'a result of,' the prohibited act." *Id.* (citation omitted).  "[A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Id.* But "a plaintiff is not required to prove actual damages of a specific dollar amount." *Id.* (citation omitted).

Defendants argue that NovaFund failed to demonstrate any deception by the Defendants, that NovaFund failed to demonstrate ascertainable loss, and that NovaFund's claim is a "simple breach of contract" claim and, therefore, cannot support a CUTPA claim. [19]  ECF No. 327-1 at 42.  Because I agree in part with the Defendants that NovaFund failed to demonstrate deception and ascertainable loss, I grant summary judgment as to portions of NovaFund's CUTPA claim.

First, I find that NovaFund has failed to demonstrate that the Defendants acted deceptively by allegedly using a shell entity to sign the Term Sheet.  As discussed above, NovaFund provides no evidence that the Defendants made affirmative representations about CGLLC's role or CGLLC's capitalization.  NovaFund also points to no evidence that the

---

[19] Defendants incorporate their arguments from previous sections but those arguments do not address the portions of NovaFund's CUTPA claim that the Defendants made representations that CSLC and Fund V did not have a similar investment strategy in order to deprive NovaFund of fees under the Term Sheet and instructed StepStone to keep documents related to CSLC and the Swiss Capital SMA to shield them from discovery.  And while the Defendants addressed NovaFund's allegations that they barred NovaFund from contacting investors on the carve-out list, the Defendants did not address the portion of NovaFund's CUTPA claim that the Defendants allegedly excluded NovaFund from participating in communications with StepStone.  Thus, those portions of NovaFund's CUTPA claims will proceed to trial.  In the remainder of this ruling, I will address only NovaFund's claim that the Defendants used a shell entity to sign the Term Sheet, allowed Sandler to add investors to the carve-out list, and made disparaging comments about NovaFund to investors.

Defendants had a duty to disclose such information.  *See Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 43–44 (1998) ("Although a failure to disclose can constitute a CUTPA violation, it will do so only if, in light of all the circumstances, there is a duty to disclose." (internal quotation marks and citation omitted)).  Because NovaFund provides no evidence of affirmative misrepresentations or of a duty to disclose, I grant summary judgment on the portions of the CUTPA claim based on the Defendants' allegedly using a shell entity to sign the Term Sheet.  *See Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 612 (1981) (rejecting the plaintiffs' CUTPA claim "because nothing in the record … suggests that the defendants either affirmatively misrepresented or had a duty").

I deny summary judgment, however, as to NovaFund's CUTPA claim based on the Defendants' allowing Sandler to add investors to the carve-out list.   As discussed above, NovaFund provides evidence that Sandler added investors to the carve-out list and that Swercheck told Kelley that Capitala had personal relationships with all the carve-out investors.  Thus, there is a genuine dispute of material fact as to whether the Defendants acted deceptively and thus, "immorally."  There is also evidence that NovaFund expected to raise $300 million in capital commitments for Fund V and the SMAs, when considering investments from anchor investors and the strength of Capitala's relationships with the carve-out investors.  When drawing all reasonable inferences in favor of NovaFund, Capitala's alleged deception hindered NovaFund's ability to help generate $300 million in capital commitments and receive the fees from those commitments.  And contrary to the Defendants' argument, CUTPA provides a remedy for a breach of contract claim when it is "accompanied by aggravating circumstances." *Ulbrich*, 310 Conn. at 412; *see also See Waterbury Generation LLC v. Waterbury Land Partners, LLC*, No. 3:20CV01409 (JBA), 2021 WL 4224413, at *2 (D. Conn. Sept. 16, 2021) ("A CUTPA

claim cannot be based simply on a breach of contract, or even an intentional breach of contract, absent aggravating circumstances. … Conduct including '[f]raudulent representations, fraudulent concealment, false claims[,] and multiple breaches of contract,' may amount to substantial aggravating circumstances" (quoting *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015))).  Here, I find that the evidence described above would permit a reasonable juror to find such "aggravating circumstances," for the portion of the CUTPA claim based on the Defendants' allegedly allowing Sandler to add investors to the carve-out list.

Second, I find that NovaFund has failed to demonstrate "ascertainable loss" of money or property as to the portion of NovaFund's CUTPA claim based on the Alala's disparaging remarks.  ECF No. 327-1 at 42.  As discussed above, NovaFund has not shown any losses stemming from the disparaging remarks.  Therefore, I grant summary judgment on the portion of the CUPTA claim based on those remarks.

In conclusion, I grant summary judgment as to the portions of NovaFund's CUTPA claim based on the Defendants' allegedly using a shell entity to sign the Term Sheet and Alala's disparaging remarks to investors about NovaFund but deny summary judgment as to the rest of NovaFund's CUTPA claim.[20]

## IV.    CONCLUSION

For the reasons above, I grant in part and deny in part the motion for summary judgment (ECF No. 327).  The claims remaining for trial are the following: (1) the breach of contract claim related to the Success Fees and the Tail Fees, (2) the breach of the implied covenant of good

---

[20] Because NovaFund's CUTPA claim is premised on the Defendants' allegedly fraudulent conduct, I find that it is not clear whether the Release bars the CUTPA claim.

faith and fair dealing claim related to the Tail Fees, (3) the unjust enrichment (as an alternative to the breach of contract claim), (4) the fraud claim based on the representations made about the carve-out list, (5) the tortious interference claim based on the Defendants' allegedly excluding NovaFund from communicating with investors on the carve-out list, and (6) the CUTPA claim other than the portions based on the Defendant's allegedly using a shell entity to sign the Term Sheet and Alala's disparaging remarks to investors.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            March 3, 2022